UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

KING COUNTY, WASHINGTON,
Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiff,

       vs.

IKB DEUTSCHE INDUSTRIEBANK AG, et
al.,

                  Defendants.

Civil Action No. 1:09-cv-08387-SAS

<u>CLASS ACTION</u>

—————————————————————— 

IOWA STUDENT LOAN LIQUIDITY
CORPORATION, Individually and on Behalf
of All Others Similarly Situated,

                    Plaintiff,

       vs.

IKB DEUTSCHE INDUSTRIEBANK AG, et
al.,

                  Defendants.

Civil Action No. 1:09-cv-08822-SAS

<u>CLASS ACTION</u>

—————————————————————— x

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT FITCH, INC.'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND FACTUAL ALLEGATIONS ....................................................1

II.    LEGAL STANDARDS .................................................................................................5

III.    ARGUMENT ................................................................................................................6

    A.    Fitch's False Credit Ratings Are Actionable Misstatements ...................................6

    B.    Fitch's Top Ratings on Rhinebridge Were False and Misleading .........................9

    C.    The Complaint Adequately Alleges Scienter ........................................................10

        1.    Fitch Knew Its Top Ratings on the SIV Were Not Accurate and Had No Basis in Fact ....................................................................................11

            a.    Fitch Knew the SIV's Constituent Assets Were Crashing Before the Senior Notes Were Sold to Investors ..........................11

            b.    Fitch Knew Its Models and Assumptions Were Outdated, Rendering Its Top Ratings False and Misleading and Without a Basis in Fact .................................................................12

            c.    Fitch Knew the Low Quality of the SIV's Constituent Assets Rendered the Top Ratings on the SIV False and Misleading ....................................................................................16

            d.    Fitch's Deep Conflicts of Interest Are Probative of Fitch's Scienter ...........................................................................16

        2.    Fitch Had the Motive and Opportunity to Issue the False Ratings ............18

    D.    Plaintiffs' Claims Are Not Time-Barred................................................................19

    E.    Fitch's Purported "Warnings" and "Disclaimers" are Insufficient to Shield Fitch from Liability for Its False Ratings ..............................................................21

IV.    CONCLUSION.............................................................................................................23

# TABLE OF AUTHORITIES

Page

## CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009)......................................................................... *passim*

*Amusement Indus., Inc. v. Stern*,
   No. 07 Civ. 11586 LAK GWG, 2010 WL 445906
   (S.D.N.Y. Feb. 9, 2010)...................................................................................................6

*Ashcroft v. Iqbal*,
   __ U.S. __, 129 S. Ct. 1937 (2009).................................................................................5

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................................................5

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002)..........................................................................................21

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)............................................................................................6

*Fogarazzo v. Lehman Bros., Inc.*,
   341 F. Supp. 2d 274 (S.D.N.Y. 2004)...........................................................................21

*Halperin v. eBanker USA.COM, Inc.*,
   295 F.3d 352 (2d Cir. 2002)..........................................................................................22

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
   159 F.3d 723 (2d Cir. 1998)..........................................................................................21

*In re Ambac Fin. Group, Inc.*,
   No. 08 Civ. 411 (NRB), 2010 U.S. Dist. LEXIS 16701
   (S.D.N.Y. Feb. 22, 2010)..............................................................................................12

*In re Cardiac Devices Qui Tam Litig.*,
   221 F.R.D. 318 (D. Conn. 2004), *rev'd in part on other grounds*,
   469 F.3d 263 (2d Cir. 2006).......................................................................................6, 7

*In re Columbia Sec. Litig.*,
   747 F. Supp. 237 (S.D.N.Y. 1990) .................................................................................8

*In re IBM Corporate Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)............................................................................................9

507482_1

**Page**

*In re Indep. Energy Holdings PLC Sec. Litig.*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001)........................................................21

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003)......................................................20

*In re Parmalat Sec. Litig.*,
    477 F. Supp. 2d 602 (S.D.N.Y. 2007)........................................................7

*In re Prudential Sec. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ...........................................................22

*In re Regeneron Pharms., Inc. Sec. Litig.*,
    No. 03 Civ. 3111 (RWS), 2005 WL 225288
    (S.D.N.Y. Feb. 1, 2005) ........................................................................22

*In re Salomon Analyst Level 3 Litig.*,
    350 F. Supp. 2d 477 (S.D.N.Y. 2004)......................................................23

*Int'l Motor Sports Group, Inc. v. Gordon*,
    No. 98 Civ. 5611(MBM), 1999 WL 619633
    (S.D.N.Y. Aug. 16, 1999) ........................................................................7

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)...................................................................10

*LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003)...................................................................20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .................................................................13

*Matsumura v. Benihana Nat'l Corp.*,
    542 F. Supp. 2d 245 (S.D.N.Y. 2008)........................................................5

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    382 F. Supp. 2d 411 (S.D.N.Y. 2003)......................................................21

*Min Jin v. Metro. Life Ins. Co.*,
    310 F.3d 84 (2d Cir. 2002).....................................................................24

*Ofori-Tenkorang v. Am. Int'l Group, Inc.*,
    460 F.3d 296 (2d Cir. 2006).....................................................................5

- iii -

**Page**

*Olkey v. Hyperion 1999 Term Trust,*
    98 F.3d 2 (2d Cir. 1996)..................................................................22

*Ouaknine v. MacFarlane,*
    897 F.2d 75 (2d Cir. 1990)..............................................................6

*P. Stolz Family P'ship L.P. v. Daum,*
    355 F.3d 92 (2d Cir. 2004)........................................................21, 22

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)............................................................23

*Shields v. Citytrust Bancorp,*
    25 F.3d 1124 (2d Cir. 1994)........................................................18, 19

*Skylon Corp. v. Guilford Mills,*
    No. 93 Civ. 5581 (LAP), 1997 WL 88894
    (S.D.N.Y. Mar. 3, 1997) ................................................................19

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,*
    531 F.3d 190 (2d Cir. 2008)............................................................13

*United States ex rel. Johnson v. Shell Oil Co.,*
    183 F.R.D. 204 (E.D. Tex. 1998) ......................................................7

*Wight v. BankAmerica Corp.,*
    219 F.3d 79 (2d Cir. 2000)..............................................................6

*Wynn v. AC Rochester,*
    273 F.3d 153 (2d Cir. 2001)............................................................5

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
    Rule 9(b) ................................................................. *passim*
    Rule 12(b)(6)................................................................5, 20
    Rule 15(a)..................................................................23

507482_1

King County, Washington and Iowa Student Loan Liquidity Corporation (collectively, "plaintiffs"), respectfully submit this Memorandum of Points and Authorities in Opposition to Defendant Fitch, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss the Complaints. Fitch, Inc.'s ("Fitch") motion should be denied in full.

## I.    INTRODUCTION AND FACTUAL ALLEGATIONS

This case involves the creation and collapse of the shortest-lived "Triple A" investment fund in the history of corporate finance.  ¶6.[1]  Fitch, defendant The McGraw Hill Companies, Inc. ("S&P"), and defendants Moody's Investors Service, Inc. and Moody's Investors Service Ltd. ("Moody's") (collectively, the "Rating Agencies") worked closely with defendants IKB Deutsche Industriebank AG ("IKB CAM") and IKB Credit Asset Management GmbH (together with IKB CAM, "IKB") to structure and rate a structured investment vehicle ("Rhinebridge" or the "SIV") filled with over $1 billion in toxic assets and tout it as a nearly "risk free" investment.  ¶2.  The Rating Agencies bestowed the SIV and its senior debt securities (the "Senior Notes") with "Top Ratings" – the highest credit ratings possible for debt securities, which signaled to investors the SIV was as safe as debt securities backed by the full faith and credit of the U.S. Government, such as U.S. Treasury Bills – despite the SIV's vast exposure to such toxic assets.  *Id.*; *see also* ¶68.  Less than four months after its launch, when the Rating Agencies' and IKB's fraud was revealed, Rhinebridge was abruptly downgraded to its accurate "junk" ratings and the SIV collapsed.  ¶4.

---

[1]    Unless otherwise noted, all "¶" and "¶¶" references are to the Complaint for Violations of New York State Law filed by plaintiff King County, Washington on October 2, 2009, in case number 09-CV-8387-SAS (Dkt. No. 1).  On October 27, 2009, the Court related this case to the case commenced by Iowa Student Loan Liquidity Corporation on October 16, 2009, which was assigned case number 09-CV-8822.  Because the complaints filed in both cases are substantially identical, and because the Rating Agencies' (as defined herein) motions to dismiss make identical arguments with respect to both complaints, references herein shall refer to both complaints as the "Complaint."

Rhinebridge was comprised of risky, low-quality assets. ¶2. In particular, "Rhinebridge held over a billion dollars of toxic, low-quality mortgage-backed securities," which belied the Rating Agencies' assurance that the SIV was a nearly "risk free" investment. ¶9. The Rating Agencies knew or recklessly disregarded that the SIV's constituent assets were of poor quality because the Rating Agencies were deeply involved in the capital structuring of Rhinebridge and reviewed and approved the assets placed into Rhinebridge, among many other responsibilities. ¶¶27, 50, 109-123. Although the overall rating of the SIV and the Senior Notes "depend[ed] directly on the credit quality of the assets it acquire[d]," the Rating Agencies falsely assigned Rhinebridge Top Ratings. ¶74.

Instead of disclosing to Senior Notes investors the true risk and poor quality of Rhinebridge's assets by providing "junk bond" ratings to the SIV, the Rating Agencies misrepresented throughout the period of June 1, 2007 to October 18, 2007 (the "Class Period") that the Senior Notes warranted A-1+/A3 "investment grade" ratings by S&P and Moody's, F1[+]/AAA "highest credit quality" ratings by Fitch and that the entire structure warranted risk-free or "Top Ratings." ¶¶67, 70. These Top Ratings communicated factual information to investors that the Senior Notes and the SIV in general:

- were nearly "risk free";

- were as safe, secure and reliable as high quality corporate or government bonds;

- had an extremely low probability of transitioning to "junk" status;

- had a high likelihood of recovery in the rare event of default;

- had been rated by objective, independent third parties whose impartiality was not impaired by any significant conflicts of interest;

- had been rated on the basis of current, accurate and complete data and analysis using reasonable and true models and assumptions; and

- 2 -

- the low rates of return offered by the Senior Notes were appropriate and reflected the true level of risk associated with the Senior Notes.

¶75.

The opposite was true.  The Rating Agencies knew or recklessly disregarded the Top Ratings were false because Rhinebridge's constituent assets were crashing before the Senior Notes were sold to investors.  ¶¶11, 109-123.  The Rating Agencies had such knowledge because they worked together with IKB to determine and apply the capital structure of the SIV, instructing how much and what type of capital was needed beneath the Senior Notes in order to support the Top Ratings.  ¶44.  Indeed, the Rating Agencies structured and rated Rhinebridge's underlying assets.  ¶145.  Due to the Rating Agencies' deep involvement in the capital structure and modeling of the SIV's risky, subprime residential mortgage-backed assets, the Rating Agencies knew at the time the Senior Notes were sold that the Top Ratings were false and misleading.  ¶51.

The Rating Agencies further knew the Top Ratings were false because the models, data and assumptions used to rate Rhinebridge were unreasonable, false and based on pure speculation.  ¶¶142-143.  In or around 2004, in order to compete with rival credit rating agencies, the Rating Agencies eased their credit-rating methods, used inaccurate and stale information to rate the SIV's constituent assets and failed to monitor those assets once the Senior Notes were sold to investors.  ¶¶138-149.[2]  The Rating Agencies also knew that Rhinebridge's portfolio of assets was composed of at least $250 million in Countrywide Financial Corporation ("Countrywide") securities – *nearly three times the 4% allowable single obligor limit*.  ¶142.  The Rating Agencies further knew the

---

[2]    Indeed, after 2000 the U.S. mortgage market was inundated with exotic mortgage products, which performed poorly relative to the performance required by their models, and defendants knew it.  ¶¶147-148.  Each month the Rating Agencies received product information and performance data on billions of dollars of U.S. loans, including the post-2000 subprime assets.  *Id.*

SIV's underlying assets had declined in value more than the 8% even before the Senior Notes were issued – a percentage decline that, according to Rhinebridge's operating instructions, was supposed to prohibit the issuance of Senior Notes.  ¶¶52, 109-123.

The Rating Agencies also operated under extreme conflicts of interest that completely undermined the objectivity of their ratings.  Specifically, the Rating Agencies were told what ratings were desired for the SIV and knew they would only be hired if they promised to deliver those ratings.  ¶¶13, 57, 74, 167, 184.  Thus, the Rating Agencies had a direct financial stake in the success of Rhinebridge.  ¶98.  This "pay for performance" scheme undermined the credibility of the Top Ratings and caused the Rating Agencies, in a quest to capture more of the ratings market share, to ease their rating standards to the point of rendering the ratings false and misleading.  ¶¶98-99.

The Rating Agencies were motivated to commit fraud because they would not have been hired and would not have received the substantial remuneration for rating Rhinebridge unless they guaranteed Top Ratings on the SIV.  ¶82.  The Rating Agencies' engagement was indeed *conditioned* on their issuance of Top Ratings.  *Id.*  In fact, the SIV never would have existed without the Rating Agencies' false credit ratings.  ¶¶13, 57, 74, 167, 184.  For their part, the Rating Agencies were paid nearly *three times* their normal fees for fraudulently creating, operating and rating the SIV.  ¶98.  The Rating Agencies also "received substantial success fees for helping launch Rhinebridge, as well as fees that increased *in tandem* with its growth and fees from the assets acquired by Rhinebridge."  ¶29.  Finally, the Rating Agencies were responsible for formally announcing the false credit ratings to the Rated Notes investors.

In sum, the Rating Agencies, knowing Rhinebridge was filled with low-quality, subprime mortgage-backed assets, held the ticking-time-bomb SIV out to investors as a nearly "risk free" investment.

- 4 -

## II.   LEGAL STANDARDS

A motion to dismiss pursuant to Fed. R. Civ. P 12(b)(6) must be denied where, as here, the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009).[3] "Plausibility 'is not akin to a probability requirement'" and is satisfied "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 170 (S.D.N.Y. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949).  Importantly, in making this determination, "the court must 'accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in the plaintiff's favor.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007)); *see also Ofori-Tenkorang v. Am. Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).  Here, the Complaint easily passes the plausibility test.

To state a claim for fraud under New York law, plaintiffs must allege (1) a material misrepresentation or omission of fact (2) made with knowledge of its falsity (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff (5) that causes damage to the plaintiff. *See Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).  While fraudulent misrepresentations and omissions must be pled with particularity in accordance with the requirements set forth in Fed. R. Civ. P. 9(b) (*Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008)), where, as here, "defendants are insiders or affiliates participating in the offer of securities, the Second Circuit has held 'that reference to an offering memorandum satisfies 9(b)'s requirement of

---

[3]      Unless otherwise noted, all emphasis is added and citations are omitted.

identifying time, place, speaker, and content of representation.'" *Abu Dhabi*, 651 F. Supp. 2d at 171

(quoting *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990)).

Rule 9(b) requires a party "alleging fraud or mistake [to] state with particularity the

circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule 9(b) also states, however,

that "***[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged***

***generally***."  *Id.*  Thus, in common law fraud actions, which are not subject to the Private Securities

Litigation Reform Act of 1995 ("PSLRA"), plaintiffs may aver scienter generally.  *See Wight v.*

*BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000); *see also Amusement Indus., Inc. v. Stern*, No.

07 Civ. 11586 LAK GWG, 2010 WL 445906, at *5 (S.D.N.Y. Feb. 9, 2010) (noting that "[w]hile

'the fraud alleged must be stated with particularity . . . the requisite intent of the alleged [perpetrator]

. . . of the fraud need not be alleged with great specificity'") (quoting *Chill v. Gen. Elec. Co.*, 101

F.3d 263, 267 (2d Cir. 1996)).  As the Second Circuit explained, "[w]e apply the more general

standard to scienter for the simple reason that 'a plaintiff realistically cannot be expected to plead a

defendant's actual state of mind.'"  *Wight*, 219 F.3d at 91.  Nonetheless, plaintiffs do not merely

allege Fitch's scienter generally – which is permissible under Rule 9(b) – but plead Fitch's

knowledge with particularity.

## III.    ARGUMENT

### A.    Fitch's False Credit Ratings Are Actionable Misstatements

Courts in the Second Circuit hold that to allege a fraudulent misrepresentation in accordance

with Rule 9(b), "plaintiff's complaint must (1) specify the statements that the plaintiff contends were

fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4)

explain why the statements were fraudulent."  *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D.

318, 332 (D. Conn. 2004), *rev'd in part on other grounds*, 469 F.3d 263 (2d Cir. 2006).  Courts also

recognize that "[s]pecific pieces of information . . . are required under Rule 9(b) only as necessary to serve its underlying purposes." *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 611-12 (S.D.N.Y. 2007). As such, "***plaintiff need not plead dates, times and places with absolute precision***, so long as the complaint 'gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.'" *Int'l Motor Sports Group, Inc. v. Gordon*, No. 98 Civ. 5611(MBM), 1999 WL 619633, at *3 (S.D.N.Y. Aug. 16, 1999). Moreover, where "defendants are insiders or affiliates participating in the offer of securities . . . 'reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place speaker, and content of representation.'" *Abu Dhabi*, 651 F. Supp. 2d at 171.[4]

Here, Fitch bestowed Rhinebridge and the Senior Notes with "Triple A" or "Top Ratings." These ratings communicated to investors that any investment in the SIV was "investment grade" and nearly "risk free." The "Top Ratings" given to the Senior Notes were defined in the Private Placement Memorandum as follows:

> "**Top Rated**" or "**Top Ratings**" means, in the case of S&P, AAA for notes with original term maturities exceeding 364 days and A-1+ for commercial paper, in the case of Fitch, AAA for notes with original maturities exceeding 364 days and F1+ for commercial paper, and, in the case of Moody's, Aaa for notes with original maturities exceeding 364 days and P-1 for commercial paper.

---

[4]      In a case "involving complex or extensive schemes of fraud," such as this case, the pleading requirements of Rule 9(b) must be "relaxed." *Cardiac Devices*, 221 F.R.D. at 333-34 (collecting cases and finding "courts have tempered the heightened pleading requirements of Rule 9(b) when the underlying purposes of Rule 9(b) have been met or when pleading each instance of the allegedly fraudulent conduct would be impractical"). Courts recognize that "[t]o approach the issue otherwise would allow the more ***sophisticated*** to escape liability under [Rule 9(b)] due to the ***complexity of their scheme*** and their deviousness in escaping detection." *United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 207 (E.D. Tex. 1998).

¶67.  Indeed, Fitch's ratings unequivocally communicated that investment in the SIV was nearly risk free:

> **F1[+]:** Highest credit quality.  Indicates the strongest capacity for timely payment of financial commitments; may have an added "+" to denote any exceptionally strong credit feature.
>
> *       *       *
>
> **AAA:** Highest credit quality.  'AAA' ratings denote the lowest expectation of credit risk.  They are assigned only in case of exceptionally strong capacity for payment of financial commitments.  This capacity is highly unlikely to be adversely affected by foreseeable events.

¶70.

These "Triple A" or "Top Ratings" were (1) fraudulent misrepresentations communicated to investors (2) by Fitch when the Senior Notes were sold to investors (3) through private information services, including a "commonly used investment platform provided by *Bloomberg*," and confirmed through Private Placement Memoranda.  ¶¶76, 79, 180.  These "Top Ratings" communicated specific factual information to investors about the purported high quality of the assets contained in the SIV.  ¶67.  The false and misleading ratings were repeated each time a Senior Note was offered or sold to an investor.  ¶4.  Given the nature and complexity of Fitch's fraudulent scheme, the Complaint's allegations more than adequately satisfy Rule 9(b) and provide notice to defendants. *See In re Columbia Sec. Litig.*, 747 F. Supp. 237, 241 (S.D.N.Y. 1990) ("Rule 9(b) 'imposes no requirement of prolixity,' . . . rather, it simply seeks to insure that the defendant has a fair opportunity to respond to the plaintiff's charges . . . .").

Inexplicably, Fitch argues that the Complaint "nowhere allege[s] Fitch made a false or misleading statement of fact" and that credit ratings cannot constitute actionable misrepresentations. *See* Defendant Fitch, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss the Complaints ("Fitch Mem.") at 6.  The Complaint plainly alleges that Fitch's F1[+] and AAA ratings

- 8 -

constitute a series of factual representations.   ¶75; *see also supra* at 2-3 (listing factual representations communicated by Fitch's Top Ratings).  This Court has already expressly held that credit ratings can constitute actionable misstatements.  *See Abu Dhabi*, 651 F. Supp. 2d at 175. Where, as here, rating agencies with debilitating conflicts of interest assign high ratings on an SIV filled with toxic assets that were crashing at the same time the SIV's notes were being issued, they are liable for the falsity of those ratings.  *Id.*  The Court in *Abu Dhabi* noted that "'an opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact,'" and held that plaintiffs had "sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned to the [notes issued by defendants in that case] were accurate and had a basis in fact."  *Id.* at 176 (quoting *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998)).  "As a result," the Court concluded, "***the Rating Agencies' ratings were not mere opinions but rather actionable misrepresentations***."  *Id.*

Here, too, Fitch's ratings were not mere opinions but were actionable misrepresentations.  As explained below, the Complaint adequately alleges the falsity of Fitch's ratings and Fitch's knowledge that the Top Ratings assigned to the Senior Notes were not accurate and had no basis in fact.  Indeed, plaintiffs have shown that Fitch knew ***at the same time*** it issued the Top Ratings that Rhinebridge was filled with toxic assets that nullified its "nearly risk free" ratings.  As such, Fitch's false ratings are plainly actionable misrepresentations.

**B.**   **Fitch's Top Ratings on Rhinebridge Were False and Misleading**

The Top Ratings were false and misleading because they communicated to investors that the Senior Notes were "nearly risk free" when, in reality, "Rhinebridge held over a billion dollars of toxic, low-quality mortgage-backed securities." ¶¶75, 9.  "Because the basic premise of an SIV, as reinforced through the issuance of the Top Ratings, was to acquire only high-quality assets, the

- 9 -

inclusion of low-quality toxic mortgage-backed assets rendered the ratings false and misleading." ¶119.  Moreover, Fitch knew the Top Ratings were false from the outset because Rhinebridge breached its Major Capital Loss Test (which was intended to prevent the SIV from issuing any Senior Notes when the value of the assets included in its portfolio declined below a certain level) "*before* defendants launched Rhinebridge as a new investment in June 27, 2007." ¶¶111-118.

Further, the Top Ratings were false and misleading because they "were based on inaccurate data." ¶147.  Specifically, "defendants used models based on historical information preceding 2000 that had no relevance to rating Rhinebridge." ¶148.  Although Fitch knew its "pre-2000 loan performance data [was] obsolete and irrelevant to rating the Senior Notes," Fitch did not update its models to reflect these changes even though "more current and accurate information was available during the relevant time." ¶150.  The Complaint's allegations regarding the falsity of the Top Ratings, when viewed collectively, more than satisfy Rule 9(b). *See generally Abu Dhabi*, 651 F. Supp. 2d at 171 (holding under nearly identical facts that plaintiffs sufficiently pled the falsity of defendants' credit ratings).

### C.    The Complaint Adequately Alleges Scienter

To plead scienter, plaintiffs "may either plead 'motive and opportunity to commit fraud' *or* 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001)).  In this case, plaintiffs have pled *both* that Fitch knew or recklessly disregarded that the Top Ratings on Rhinebridge were false and misleading *and* had the motive and opportunity to commit fraud.

1.    **Fitch Knew Its Top Ratings on the SIV Were Not Accurate and Had No Basis in Fact**

    a.    **Fitch Knew the SIV's Constituent Assets Were Crashing Before the Senior Notes Were Sold to Investors**

Fitch further knew the SIV's constituent assets were crashing *before* the Senior Notes were sold.  ¶¶11, 109-123.  Fitch's knowledge is evidenced by the fact that Fitch (along with S&P and Moody's) determined how much and what type of capital was needed beneath the Senior Notes in order to support the Top Ratings.  ¶44.  In making that determination, Fitch used data (or provided that data to IKB to use) regarding the probability of default, the amount of money returned to investors in the event of default for each asset in the SIV and data concerning the correlation between assets included in the SIV.  ¶45.  Fitch then entered this proprietary data into models to determine the losses that would accrue to the Senior Notes investors in the event the SIV defaulted. ¶46.  Due to Fitch's deep involvement in structuring and modeling the SIV, Fitch knew at the time the SIV was issued that its Top Ratings were false and misleading.  ¶51.

Fitch also received regular reports on market activity and knew the SIV was filled with risky, subprime assets.  ¶120.  In fact, ***Fitch structured and rated approximately 30% of all the securities that went into Rhinebridge***.  ¶144.  This information alerted Fitch to the fact that the SIV's assets were crashing even before the Senior Notes were sold.  ¶115.[5]  Ignoring these allegations, Fitch argues that it cannot be liable for its knowingly false ratings because "no one in the investment community anticipated the subprime meltdown that occurred in 2007" (Fitch Mem. at 18) –

––––––––––––––––

[5]    Fitch worked with IKB, Moody's and S&P to determine how changes in the values of assets held by Rhinebridge would affect the manner in which Rhinebridge operated.  If the value of Rhinebridge's assets declined by approximately 8% then Rhinebridge was not supposed to issue any Senior Notes.  That 8% limit was breached *before* the Senior Notes were issued. ¶¶52, 109-123.

507482_1

apparently advancing the argument that Senior Notes investors' losses was caused by the general

economic downturn and not Fitch's fraud.  This argument *du jour* of financial wrongdoers was

squarely rejected in the recent case *In re Ambac Fin. Group, Inc.*, No. 08 Civ. 411 (NRB), 2010 U.S.

Dist. LEXIS 16701 (S.D.N.Y. Feb. 22, 2010),

> defendants' arguments on this issue are premised on a ***convenient confusion of***
> ***cause and effect***.  The conduct that plaintiffs allege, if true, would make [defendants]
> an active participant in the collapse of their own business, and of the financial
> markets in general, rather than merely a passive victim.

*Id.* at \*70; *see also* Plaintiffs' Memorandum of Points and Authorities in Opposition to McGraw-Hill

and Moody's Motion to Dismiss the Complaints, at §II.B.1.b, filed concurrently herewith.  More

importantly, such an argument misses the mark where Fitch knew its ratings were false ***before*** the

Senior Notes were sold to investors.  ¶¶11, 109-123.

> **b.      Fitch Knew Its Models and Assumptions Were**
> **Outdated, Rendering Its Top Ratings False and**
> **Misleading and Without a Basis in Fact**

In *Abu Dhabi*, the Court found plaintiffs sufficiently alleged that the rating agency

defendants knew their ratings were false where they "eased [their] standards for evaluating the

creditworthiness of nonprime securities like the" SIV in that case and where they knew "the process

used to derive ratings generally was deeply flawed and unreliable."  651 F. Supp. 2d at 178-79.

Here, too, the Complaint alleges that beginning in or around 2004, in order to compete with rival

credit rating agencies, Fitch and the other rating agencies eased their credit-rating methods, used

inaccurate and stale information to rate the SIV's constituent assets and failed to monitor those assets

once the SIV was sold to investors.  ¶¶138-149.  This easing of the ratings standards "opened the

floodgates for creating SIV's backed by nonprime securities like Rhinebridge."  ¶138.  In the

process, Fitch used false and unreasonable data and assumptions to assign the Top Ratings to the

SIV, all of which ignored that Rhinebridge contained large amounts of risky subprime mortgage-

backed securities.  ¶10.  These allegations adequately plead Fitch's knowledge for the same reason

the rating agencies' knowledge was adequately pled in *Abu Dhabi*.  651 F. Supp. 2d at 178-79.

Instead of responding to the Complaint's detailed allegations demonstrating the falsity of the

ratings and the unreasonableness of Fitch's models, Fitch touts its purported "swift response to

changes in the fund's portfolio."  Fitch Mem. at 13.  This argument fails for the initial reason that

Fitch knew **before** the Senior Notes were sold to investors that the assets contained in the SIV were

crashing.  *See* §III.C.1.a., *supra*.  Fitch's models were admittedly dependent on the continued

**appreciation** in housing prices, which Fitch knew were rapidly **depreciating**.  ¶156.  For example,

on a March 22, 2007 private investor call, a Fitch representative admitted that if home price

appreciation became flat for an extended period of time, Fitch's models "**would start to break

down**."  ¶157.  Fitch further stated that if home price appreciation declined a paltry **1% to 2%**,

Fitch's models "**would break down completely**," affecting even highly-rated AA- and AAA-rated

assets.  *Id.*  As the chart at ¶159 of the Complaint shows, home price appreciation was on the decline

**before** the Senior Notes were ever sold to investors.  The Complaint, therefore, more than

sufficiently pleads that Fitch knew its models and assumptions were flawed and were producing

false ratings.[6]  *See also* ¶158.

---

[6]     Fitch's contention that the Complaint fails to identify a specific Fitch employee responsible
for these statements is of no moment.  As the Second Circuit in *Teamsters Local 445 Freight Div.
Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008), made clear, "'**it is possible to
draw a strong inference of corporate scienter without being able to name the individuals who
concocted and disseminated the fraud**.'"  *Id.* at 196 (quoting *Makor Issues & Rights, Ltd. v. Tellabs
Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).  Indeed, in *Dynex*, the Second Circuit explicitly held: "**we
reject [defendants] contention that [plaintiffs] failed as a matter of law to plead scienter against
[the corporate defendant] when it failed to plead scienter against [the individual defendants]**."
531 F.3d at 196 ("[W]e do not believe [Congress would] have imposed the rule urged by defendants,
that in no case can corporate scienter be pleaded in the absence of successfully pleading scienter as
to an expressly named officer.").

Moreover, this Court has held that the plaintiffs sufficiently pled knowledge where the plaintiffs alleged that "defendants knew that although the actual portfolio [of assets contained in a SIV] consisted of 'much more' than [the] fifty-five percent" threshold of allowable subprime assets outlined in the SIV's operating instructions. *Abu Dhabi*, 651 F. Supp. 2d at 178. Here, too, Rhinebridge violated its operating instructions. Rhinebridge's operating instructions provided that the SIV could not contain more than 4% of one issuer's securities. ¶142. Despite this concrete threshold, Fitch knew the SIV acquired $250 million in Countrywide securities – ***nearly three times the 4% allowable single obligor limit***. *Id.* And Fitch knew the SIV's constituent assets had declined in value more than the 8% threshold – which decline was supposed to prohibit the issuance of the Senior Notes – even ***before*** the Senior Notes were issued. ¶¶52, 109-123. As in *Abu Dhabi*, these allegations satisfy the pleading standard for scienter.

In addition, Fitch received material non-public information from subprime loan originators showing that Rhinebridge had exposure to at least $280 million in low-quality assets. ¶145.[7] Thus, Fitch was in possession of detailed, non-public information about the low-quality assets contained in the SIV that belied the SIV's Top Ratings. ¶145; *see also Abu Dhabi*, 651 F. Supp. 2d at 178 (finding defendants knew their ratings were false where they received non-public information from a

---

[7]     Fitch points to a Private Placement Memorandum stating that Senior Notes investors would receive monthly investment reports about the investments contained in the SIV and argues that plaintiffs received the same non-public information. However, defendants ignore the Complaint, which states: "It is not possible to know the exact true values of Rhinebridge's constituent assets and Senior Notes in the absence of discovery because these assets are not publicly traded. They are traded and priced by banks like IKB on ***proprietary*** trading networks." ¶116.

subprime originator "that would have directly contradicted the high ratings assigned to the [SIV's notes in that case] as a result of the [ ] SIV's large investment in" that subprime originator).[8]

Finally, Fitch knew – just as defendants in *Abu Dhabi* knew – that the Senior Notes differed significantly from high-quality corporate bonds with similar ratings because the models used to rate the Senior Notes were unreasonable and not based on reliable data.  ¶141; *see also Abu Dhabi*, 651 F. Supp. 2d at 178 (finding that the rating agencies "assigned ratings that, on the surface, appeared to investors to equate the Rated Notes to other investments, such as corporate bonds, but, in reality, and unbeknownst to investors, differed materially").  The models used to rate Rhinebridge did not take into account "the actual correlation risks associated with the securities included in Rhinebridge" and were, instead, based on "mere speculation."  ¶¶141-142.  The models were outdated and unreasonable because they were based on historical information preceding 2000 – before structured finance and subprime mortgage-backed assets like the ones contained in the SIV existed.  ¶147.[9]

---

[8]     Fitch contends that "Plaintiffs simply fail to identify any non-public information in Fitch's possession which caused Fitch to believe that Rhinebridge's credit ratings should be lowered before Fitch actually lowered those ratings."  Fitch Mem. at 13.  But this argument ignores the Complaint's detailed allegations concerning Fitch's access to non-public information showing the low quality of Rhinebridge's constituent assets – including the fact that ***Fitch itself rated at least 30% of the assets contained in Rhinebridge***.  ¶144; *see also* ¶¶162-167 (explaining that Fitch, as a nationally recognized statistical rating organization, is exempt from Securities and Exchange Commission ("SEC") Regulation FD (Fair Disclosure) and had access to non-public information about the collateral assets underlying the SIV).

[9]     Indeed, after 2000 the U.S. mortgage market was inundated with exotic mortgage products, which performed poorly relative to the performance required by their models, and defendants knew it.  ¶¶147-148.  Each month Fitch and the other rating agencies received product information and performance data on billions of dollars of U.S. loans, including the post-2000 subprime assets.  *Id.*

- 15 -

> **c.** **Fitch Knew the Low Quality of the SIV's Constituent Assets Rendered the Top Ratings on the SIV False and Misleading**

The Complaint alleges Fitch's Top Ratings were false and misleading because the assets contained in the SIV consisted primarily of low-quality subprime assets. In particular, "Rhinebridge held over a billion dollars of toxic, low-quality mortgage-backed securities," which belied Fitch's assurance that the SIV was a nearly "risk free" investment. ¶9. Further, the overall rating of the SIV and the Senior Notes "depend[ed] directly on the credit quality of the assets it acquire[d]." ¶74. Fitch knew the SIV's constituent assets were of low-quality because Fitch rated and helped structure up to 30% of those assets. ¶50. Additionally, Fitch collaborated to structure Rhinebridge and reviewed and approved the assets placed into Rhinebridge. ¶¶109-123. Because the constituent assets were largely low-quality, mortgage-backed securities undeserving of high ratings, the Top Ratings issued by Fitch on Rhinebridge were false.

> **d.** **Fitch's Deep Conflicts of Interest Are Probative of Fitch's Scienter**

In *Abu Dhabi*, this Court held: "where . . . the Rating Agencies . . . knew that the ratings process was flawed, knew that the portfolio was not a safe, stable investment, and knew that the Rating Agencies could not issue an objective rating because of the effect it would have on their compensation, it may be plausibly inferred that . . . the Rating Agencies knew they were disseminating false and misleading ratings." *Abu Dhabi*, 651 F. Supp. 2d at 179. Here, the Complaint specifically alleges Fitch's direct financial stake in the success of Rhinebridge. ¶98. Indeed, Fitch received "nearly three times the amount to rate Rhinebridge as they would have received to rate a traditional corporate debt obligation" in part because Fitch was actively involved in creating Rhinebridge. *Id.* This "pay for performance" compensation scheme undermined the credibility of Fitch's ratings and caused Fitch to ease its rating standards in order to capture more

- 16 -

market share of the ratings business.  ¶¶98-99; *see also Abu Dhabi*, 651 F. Supp. 2d at 178 (finding "conflicts of interest that arise when rating agencies rate entities in which they have a financial stake" probative of scienter).

Because Fitch's compensation was derived from Rhinebridge – not investors – and was directly tied to the success of Rhinebridge, Fitch operated under debilitating conflicts of interest "that compromised the objectivity of [Fitch's] ratings."  *Id.* at 178-79.  This dramatic lack of objectivity rendered Fitch's ratings false and misleading.  *Id.*  Because plaintiffs allege that Fitch knew (1) its ratings processes were flawed, (2) the portfolio of assets contained in the SIV were of poor quality and (3) it could not issue objective ratings because of the adverse effect it would have on its compensation, Fitch's knowledge of the falsity of their Top Ratings has been adequately alleged.  *Id.* at 179.

Fitch devotes page-after-page of its memorandum arguing that plaintiffs' detailed conflict of interest allegations, standing alone, are insufficient to state a claim.  *See* Fitch Mem. at 11-17.  As an initial matter, to the extent that Fitch contends that plaintiffs have asserted a conflict of interest "claim," Fitch is mistaken.  The Complaint contains one count of common law fraud as to all defendants.  There is ***no*** "conflict of interest" claim.  Rather, Fitch's deep conflicts of interest are just ***one factor*** supporting Fitch's scienter in issuing the false ratings.  ¶¶82-108.  Further, plaintiffs do not rely solely on allegations of conflicts of interest to state a claim.  The Complaint pleads much more.  Specifically, Fitch knew: (1) it could not issue objective ratings due to conflicts of interest; (2) its ratings processes were flawed; and (3) the SIV's constituent assets were of poor quality.  ¶¶82-108.  Accordingly, plaintiffs have adequately alleged Fitch's scienter.  *Abu Dhabi*, 651 F. Supp. 2d at 179.

- 17 -

2.    **Fitch Had the Motive and Opportunity to Issue the False Ratings**

Under New York law, "[a]dequately pleading '[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged,' while adequately pleading 'opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.'"  *Abu Dhabi*, 651 F. Supp. 2d at 171 (quoting *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1130 (2d Cir. 1994)).  Here, the Complaint meets ***both*** pleading standards.

The Complaint painstakingly details the "concrete benefits" realized by Fitch as a result of the false ratings.  *Abu Dhabi*, 651 F. Supp. 2d at 171.  Specifically, the Complaint alleges that Fitch would not have been hired and would not have received the substantial remuneration for rating Rhinebridge unless they guaranteed Top Ratings on the SIV.  ¶82.  Fitch's engagement was indeed ***conditioned*** on their issuance of Top Ratings.  *Id.*  In fact, the SIV never would have existed without the false credit ratings.  ¶¶13, 57, 74, 167, 184.  Fitch, therefore, was clearly motivated to issue the false and misleading Top Ratings.  *Abu Dhabi*, 651 F. Supp. 2d at 179 (finding the rating agency defendants in that case "had the motive and opportunity to communicate the[] allegedly false and misleading ratings to potential investors" where they "knew that if they refused to assign the [SIV's notes] the high rating that Morgan Stanley desired, 'Morgan Stanley would have taken its business elsewhere'").

Moreover, Fitch was paid nearly ***three times*** their normal fees for creating, operating and rating the SIV.  ¶98.[10]  Fitch "received substantial success fees for helping launch Rhinebridge, as

---

[10]    Fitch argues that "the desire for compensation, alone, cannot give rise to a fraud claim." Fitch Mem. at 12.  Defendants' contention completely ignores the Court's holding in *Abu Dhabi*. Plaintiffs' allegations are more than sufficient to plead scienter for the same reasons plaintiffs' allegations in the *Abu Dhabi* case were sufficient. *See, e.g.*, *Abu Dhabi*, 651 F. Supp. 2d at 178-80.

well as fees that increased *in tandem* with its growth and fees from the assets acquired by Rhinebridge." ¶29. As the SIV grew, so would Fitch's fees. *Id.* And the SIV could not grow without the Top Ratings. Fitch's "substantial remuneration was drawn from the proceeds of the Senior Notes' issuance, and [Fitch's] ongoing fees were paid out of income owed to Senior Notes investors." *Id.* Under nearly identical circumstances, the Court in *Abu Dhabi* found the rating agency defendants had the motive to issue false ratings where they "received fees in excess of three times their normal fees for rating the SIV as well as fees that increased in tandem with the Cheyne SIV's growth." *Abu Dhabi*, 651 F. Supp. 2d at 179.

Because the rating agency defendants in the *Abu Dhabi* case "were responsible for determining and issuing their ratings and devised the models that produced the allegedly unreasonably high ratings, the Rating Agencies had the opportunity to assign misleading ratings." *Id.* at 180. Likewise, Fitch (along with Moody's and S&P) obviously had the opportunity to issue false and misleading credit ratings. Accordingly, the Complaint sufficiently alleges Fitch had the opportunity to disseminate the false credit ratings.[11]

### D.    Plaintiffs' Claims Are Not Time-Barred

In an attempt to muddy the waters, Fitch argues that plaintiffs' purported conflict of interest "theory" – whatever that is – is time-barred because a report was issued in January 2003 noting concerns apparently dating back to the 1970s about the conflicts of interest that arise when rating

---

Indeed, plaintiffs allege that Fitch's extraordinary compensation and desire for increased market share, coupled with Fitch's debilitating conflicts of interest and knowledge of faulty models and poor constituent asset quality, demonstrates Fitch's scienter. This is plainly enough.

[11]    *See Shields*, 25 F.3d at 1130 ("Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged."); *see also Skylon Corp. v. Guilford Mills*, No. 93 Civ. 5581 (LAP), 1997 WL 88894, at *3 (S.D.N.Y. Mar. 3, 1997) ("'clear opportunity' to commit fraud implies that defendants are 'well positioned to carry out the fraudulent transaction'").

agencies rely on issuers for their revenue.  Fitch Mem. at 16 (quoting Declaration of Andrew J. Ehrlich ("Ehrlich Decl."), Ex. D at 41).[12]  Fitch then argues that because the statute of limitations *for fraud claims* is six years, plaintiffs cannot rely on ***conflicts of interest allegations*** to support the alleged fraud.  *Id.*  But plaintiffs allege a single claim for common law fraud – not conflict of interest – against all defendants.  Fitch's conflicts of interest are not alleged false statements or omissions. Rather, these debilitating conflicts are probative of Fitch's scienter – just as the rating agency defendants' similar conflicts of interest were probative of scienter in the *Abu Dhabi* case.  651 F. Supp. 2d at 179.[13]

It is simply nonsensical that the statute of limitations on plaintiffs' fraud claim arising from false ratings issued in 2007 would begin to run in January 2003 – ***over four years before Fitch's alleged false ratings were ever issued to investors***.  *LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003); *Merrill Lynch*, 273 F. Supp. 2d at 380 (finding that "the statute begins to run as long as plaintiffs were aware of the existence of alleged false statements").  As Fitch would have it, so long as a rating agency discloses a potential conflict, they are free to commit fraud with impunity in perpetuity once the statute of limitations has run.  Such is

---

[12]    As set forth in more detail in the Memorandum of Law in Support of Plaintiffs' Motion to Exclude Extraneous Materials Improperly Relied on by Defendants in Their Rule 12(b)(6) Motions to Dismiss, filed concurrently herewith, the January 2003 report (Ehrlich Decl., Ex. D), is extraneous material not appropriately considered on a motion to dismiss.  Fitch inappropriately submits this extraneous report for its truth.  Fitch cannot do so at this early stage of the litigation and, thus, the Court should not consider it here.

[13]    For this reason, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 370 (S.D.N.Y. 2003), where one of the specifically-alleged misrepresentations was the fact that defendants failed to disclose certain conflicts of interest, is obviously inapplicable.  Plaintiffs here do not rely on omissions of conflicts as actionable misrepresentations but, instead, highlight Fitch's conflicts as a factor probative of scienter.

not the case.  Instead, the statute of limitations on plaintiffs' fraud claim could not begin to run until, at the earliest, the Fall of 2007.[14]

### E.    Fitch's Purported "Warnings" and "Disclaimers" are Insufficient to Shield Fitch from Liability for Its False Ratings

Fitch contends purported "disclaimers" contained in one Private Placement Memorandum and one research report make it "less likely" that Fitch intended to defraud the Senior Notes investors.  Fitch Mem. at 10.  Fitch's argument is nothing more than a thinly-veiled stab at the "bespeaks caution" defense.  However, this defense is not available because the ratings are current statements of fact, not forward-looking statements.  *See In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001) (Scheindlin, J.) (the bespeaks caution doctrine "only applies to forward-looking statements"); *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) (same).  Defendants' assiduous avoidance of the phrase "bespeaks caution" does not correct this fatal flaw.

Furthermore, these disclaimers do not protect defendants from liability because they consist of nothing more than boilerplate language that fails to alert plaintiffs to any of the actual risks or misrepresentations associated with the Senior Notes.  *See Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 382 F. Supp. 2d 411, 417 (S.D.N.Y. 2003) (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 330 (2d Cir. 2002)); *see also Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language . . . must relate directly to that by which plaintiffs claim to

---

[14]    *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004), another case relied upon by Fitch, actually undermines Fitch's statute of limitations argument.  There, the Court found plaintiffs' claims were ***not*** time-barred because the reports disclosing conflicts ***did*** "***not disclose the systematic misrepresentations charged in this suit***."  *Id.* at 299-300.  Of course, the January ***2003*** report does not disclose the ***2007*** false ratings in Rhinebridge.

- 21 -

have been misled."); *P. Stolz*, 355 F.3d at 97 ("the cautionary language must . . . warn[] of the specific contingency that lies at the heart of the alleged misrepresentation").  Vague disclosures of general risks will not protect defendants from liability. Instead, the relevant cautionary language must be "prominent and specific," and must directly address "the risk the plaintiffs claim was not disclosed." *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 5 (2d Cir. 1996). Since most, if not all, securities offerings contain cautionary words, a district court must pay close attention to the question of whether the language provided matches the risk addressed. *See Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).

Fitch's "disclaimers" are notable for what they fail to disclose.  For example, the Private Placement Memorandum noted only the unremarkable verity that "U.S. Residential Structured Finance Securities are subject to *various risks*," citing the axiomatic risks associated with "losses due to defaults by borrowers in the underlying mortgage loans." Ehrlich Decl., Ex. A at 14.  Fitch's purported warning went on to mention the obvious fact that "[r]ecent developments in the U.S. residential mortgage market, including the nonprime sector, *could* adversely affect the performance and market value of various Investments in the Structured Finance Sector, which *could* adversely affect the holders of the Medium Term Notes." *Id.* at 15.  These vague "disclosures" did nothing to warn investors that the Top Ratings Fitch assigned to Rhinebridge and the Senior Notes were false and misleading.

Indeed, Fitch knew at the time they issued the credit ratings on Rhinebridge that such ratings were false.  *See* §§III.B., III.C., *supra*; *see also In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *19 (S.D.N.Y. Feb. 1, 2005) ("discussing hypothetical risks that might occur in the future does not adequately disclose actual problems that *already have materialized*"); *In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("'To

warn that the untoward may occur when the event is contingent is prudent; ***to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit***.'"); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").  Here, Fitch's purported disclosure regarding the fact that "housing prices and appraisal values in many U.S. states have declined or stopped appreciating, after extended periods of significant appreciation" (Ehrlich Decl., Ex. A at 15) actually ***confirms*** that Fitch knew the risks warned about had already occurred, as Fitch admitted that if housing price appreciation was ***flat*** or declined ***1% to 2%***, Fitch's models would "***break down completely***."  ¶¶157-158.  Where Fitch knew the value of the SIV's constituent assets were crashing ***before*** the Senior Notes were issued (*see* §III.C.1.a.), any disclaimers fail.[15]

## IV.  CONCLUSION

For the reasons set forth above, Fitch's motion to dismiss should be denied in full.  In the alternative, plaintiffs request leave to amend the Complaint consistent with the Court's ruling.  *See* Fed. R. Civ. P. 15(a) ("The court should freely give leave [to amend] when justice so requires.");

---

[15]    For the same reason, Fitch's reliance on *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477 (S.D.N.Y. 2004), is unavailing.  In that case, there was no showing that the reports plaintiffs relied upon did not represent defendant's actual opinions.  *Id.* at 490.  Instead, plaintiffs alleged nothing more than that defendants had been "unduly, even egregiously, optimistic about the future prospects" of the company.  *Id.* at 492.  But where, as here, defendants knew ***at the time*** they issue statements that those statements are false, disclaimers are ineffective.

*Min Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) ("[l]eave to amend should be freely granted").

DATED:  March 3, 2010                     Respectfully submitted,

                                          COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          PATRICK J. COUGHLIN
                                          DANIEL S. DROSMAN
                                          MICHAEL F. GHOZLAND
                                          JESSICA T. SHINNEFIELD
                                          NATHAN R. LINDELL
                                          CHRISTINA A. ROYCE
                                          DARRYL J. ALVARADO

                                                              s/ DANIEL S. DROSMAN
                                                                DANIEL S. DROSMAN

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101-3301
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

                                          COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          SAMUEL H. RUDMAN
                                          JARRETT S. CHARO
                                          58 South Service Road, Suite 200
                                          Melville, NY  1177
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)

                                          COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                          LUKE O. BROOKS
                                          JASON C. DAVIS
                                          100 Pine Street, Suite 2600
                                          San Francisco, CA 94111
                                          Telephone:  415-288-4545
                                          415/288-4534 (fax)

                                          Attorneys for Plaintiff

- 24 -

507482_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 3, 2010.

s/ DANIEL S. DROSMAN

DANIEL S. DROSMAN

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  dalvarado@csgrr.com

# Mailing Information for a Case 1:09-cv-08387-SAS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Anne L. Box**
  anneb@csgrr.com,jillk@csgrr.com,E_File_SD@csgrr.com

- **Luke Orion Brooks**
  lukeb@csgrr.com

- **Andrea Rose Butler**
  abutler@cahill.com

- **James J. Coster**
  jcoster@ssbb.com,managingclerk@ssbb.com,jrubins@ssbb.com

- **Patrick Joseph Coughlin**
  patc@csgrr.com

- **Jason Cassidy Davis**
  jdavis@csgrr.com,ptiffith@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Daniel S. Drosman**
  ddrosman@csgrr.com,E_File_SD@csgrr.com,tholindrake@csgrr.com

- **Andrew James Ehrlich**
  aehrlich@paulweiss.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com,mao_sdny@paulweiss.com

- **Jason Michael Hall**
  jhall@cahill.com

- **Roberta Ann Kaplan**
  rkaplan@paulweiss.com,mao_sdny@paulweiss.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Brian T Markley**
  bmarkley@cahill.com

Case 1:09-cv-08387-SAS    Document 64    Filed 03/03/10    Page 32 of 32

- **John D. McFerrin-Clancy**
  jmcferrin-clancy@lowenstein.com

- **Thomas E. Redburn , Jr**
  tredburn@lowenstein.com

- **James J. Regan**
  jregan@ssbb.com

- **Dean I. Ringel**
  DRingel@Cahill.com,JHall@cahill.com

- **Joshua M. Rubins**
  jrubins@ssbb.com,managingclerk@ssbb.com

- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com

- **Jessica T. Shinnefield**
  jshinnefield@csgrr.com

- **Tobias James Stern**
  tstern@paulweiss.com

- **Thomas S. Wiswall**
  twiswall@phillipslytle.com,jgroat@phillipslytle.com,ecfphillips@phillipslytle.com

- **Aaron Mark Zeisler**
  azeisler@ssbb.com,managingclerk@ssbb.com

- **Adam N. Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
David C. Walton
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P.
655 W. Broadway
Suite 1900
San Diego, CA 92101-3301
```