UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| KING COUNTY, WASHINGTON, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     vs.<br><br>IKB DEUTSCHE INDUSTRIEBANK AG, et al.,<br><br>          Defendants. | Civil Action No. 1:09-cv-08387-SAS<br><br>CLASS ACTION |
| IOWA STUDENT LOAN LIQUIDITY CORPORATION, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     vs.<br><br>IKB DEUTSCHE INDUSTRIEBANK AG, et al.,<br><br>          Defendants. | Civil Action No. 1:09-cv-08822-SAS<br><br>CLASS ACTION |

MEMORANDUM OF LAW OF PLAINTIFF KING COUNTY, WASHINGTON
IN OPPOSITION TO DEFENDANT STEFAN ORTSEIFEN'S
MOTION TO DISMISS THE COMPLAINT

507503_1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND FACTUAL BACKGROUND ......................................................1

    A.  Summary of the Complaint's Allegations Concerning The IKB Defendants..........1

    B.  Additional Documents Supporting Jurisdictional Allegations ...............................5

        1.  IKB Created, Operated and "Arranged" Rhinebridge's Note Program .........................................................................................5

        2.  The IKB Defendants Established Rhinebridge's Note Program in New York ...............................................................................7

        3.  IKB Caused Rhinebridge to Issue $2.2 Billion in Senior Notes in New York ...............................................................................8

        4.  IKB Prepared Preliminary and Final Private Placement Memoranda, and Delivered the False "Top Ratings" to New York Broker Dealers to Distribute ........................................9

        5.  The IKB Defendants Authorized the New York Broker Dealers to Close the Deal .........................................................9

        6.  Ortseifen Admits that He Communicated with People from IKB Concerning Rhinebridge .................................................10

II.  SUMMARY OF ARGUMENT ................................................................10

III.  ARGUMENT ...................................................................................11

    A.  This Court Has Personal Jurisdiction Over Ortseifen ...........................................11

        1.  Applicable Standard..................................................................11

        2.  Ortseifen Transacted Business in New York under N.Y.C.P.L.R. §302(a)(1) ......................................................................13

            a.  Ortseifen "Purposefully" Transacted Business in New York by Personally Participating in Launching a Fraudulent $2.216 Billion Bond Offering in New York to Bail Out IKB..................................................................13

            b.  Ortseifen's Participation in Rhinebridge's $2.216 Billion New York Launch to Bail Out IKB Is "Substantially Related" to the Fraud .............................................18

**Page**

3. Due Process Is Satisfied ...................................................................... 18

B. The Complaint Adequately Alleges Fraud Against Ortseifen ............................ 19

1. Ortseifen's Perfunctory Contentions Regarding Falsity, Scienter, Reliance and Damages Are Waived .......................................... 19

2. The Complaint Alleges Ortseifen's False Statements With Sufficient Particularity ................................................................ 21

IV. CONCLUSION ........................................................................................ 23

507503_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*380544 Canada, Inc. v. Aspen Tech.*,
  544 F. Supp. 2d 199 (S.D.N.Y. 2008)........................................................................22, 23

*Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*,
  651 F. Supp. 2d 155 (S.D.N.Y. 2009)........................................................................22, 23

*Am. Tissue v. DLJ Merch. Banking Partners*,
  No. 03 Civ. 6913 (GEL), 2006 WL 1084392
  (S.D.N.Y. Apr. 20, 2006)...........................................................................................19

*Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd.*,
  62 N.Y. 2d 65, 476 N.Y.S.2d 64 (1984) .....................................................................19

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007)........................................................................................17

*Cenveo v. Diversapack LLC*,
  No. 09 Civ. 7544, 2009 WL 3169484
  (S.D.N.Y. Oct. 1, 2009) ..............................................................................................20

*CutCo Indus. v. Naughton*,
  806 F.2d 361 (2d Cir. 1986)...............................................................................11, 12, 13

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*,
  7 N.Y.3d 65, 818 N.Y.S.2d 164 (2006) ..................................................................12, 18

*Druck Corp. v. Macro Fund*,
  102 Fed. Appx. 192 (2d Cir. 2004).............................................................................13

*Fischbarg v. Doucet*,
  2007 NY Slip Op. 9962, 9 N.Y.3d 375,
  849 N.Y.S.2d 501 (2007)............................................................................................12

*Hill v. Sisters of St. Francis Health Servs.*,
  No. 06 C 1488, 2006 WL 3783415
  (N.D. Ill. Dec. 20, 2006) ............................................................................................20

*In re Cardiac Devices Qui Tam Litig.*,
  221 F.R.D. 318 (D. Conn. 2004),
  *rev'd in part on other grounds*,
  469 F.3d 263 (2d Cir. 2006).......................................................................................21

- iii -

**Page**

*Kreutter v. McFadden Oil Corp.*,
   71 N.Y.2d 460, 527 N.Y.S.2d 195 (1988) ...............................................12, 18

*NewMarkets Partners LLC v. Sal. Oppenheim Jr. & CIE*,
   638 F. Supp. 2d 394 (S.D.N.Y. 2009) ...............................................................17

*Norton v. Sam's Club*,
   145 F.3d 114 (2d Cir. 1998).............................................................................19

*OR.EN Orobia Eng'g S.R.L. v. Nacht*,
   No. 97 Civ. 4912(SAS), 1998 WL 730562
   (S.D.N.Y. Oct. 19, 1998) ...........................................................................13, 18

*Palace Exploration Co. v. Petroleum Dev. Co.*,
   41 F. Supp. 2d 427 (S.D.N.Y. 1998).................................................................17

*PDK Labs v. Friedlander*,
   103 F.3d 1105 (2d Cir. 1997)......................................................................13, 16

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006)..............................................................20

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*,
   No. 05-Civ.-9016 (SAS), 2006 WL 708470
   (S.D.N.Y. Mar. 20, 2006) ...............................................................6, 12, 13, 19

*SEC v. Espuelas*,
   579 F. Supp. 2d 461 (S.D.N.Y. 2008)..............................................................22

*Semi Conductor Materials v. Citibank Int'l PLC*,
   969 F. Supp. 243 (S.D.N.Y. 1997) ..................................................................17

*Taberna Capital Mgmt., LLC v. Dunmore*,
   No. 08 Civ. 1817(JSR), 2008 WL 2139135
   (S.D.N.Y. May 20, 2008)....................................................................... *passim*

*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*,
   612 F. Supp. 2d 267 (S.D.N.Y. 2009).........................................................20, 21

*Turner v. Enders*,
   552 P.2d 694 (Wash. Ct. App. 1976).................................................................20

*United States v. Shell Oil Co.*,
   183 F.R.D. 204 (E.D. Tex. 1998)......................................................................21

Page

*Vieira v. Wal-Mart Stores, Inc.*,
        No. 00-272, 2001 WL 394898
        (D. Conn. Apr. 18, 2001) ..............................................................................11, 20

*White Plains Coat & Apron Co. v. Cintas Corp.*,
        460 F.3d 281 (2d Cir. 2006) ...................................................................20

*Wiwa v. Royal Dutch Petroleum Co.*,
        226 F.3d 88 (2d Cir. 2000) ....................................................................16

*World-Wide Volkswagen Corp. v. Woodson*,
        444 U.S. 286 (1980) ................................................................................18


## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
        Rule 9(b) .....................................................................................11, 20, 21
        Rule 12(b)(2).....................................................................................1, 6
        Rule 12(b)(6)...........................................................................1, 6, 19, 20
        Rule 23 .............................................................................................1, 2

New York Civil Practice Law and Rules
        §302............................................................................................12, 18
        §302(a)(1) ................................................................................. *passim*

## I.      INTRODUCTION AND FACTUAL BACKGROUND

Plaintiff King County, Washington[1] submits this memorandum of law in opposition to defendant Stefan Ortseifen's ("Ortseifen") Motion to Dismiss under Rules 12(b)(2) and 12(b)(6). Plaintiff respectfully requests the Court deny Ortseifen's motions in full.  Ortseifen is subject to personal jurisdiction in New York pursuant to N.Y.C.P.L.R. §302(a)(1), and plaintiff's Complaint states an actionable claim against Ortseifen for fraud.

### A.      Summary of the Complaint's Allegations Concerning The IKB Defendants

This case involves the creation and collapse of the shortest-lived "Triple A" investment fund in the history of corporate finance.  ¶6.[2]  On or about June 27, 2007, defendant IKB (defined below) launched this fund, known as "Rhinebridge," and knowingly filled it with over $1 billion in toxic assets from its own balance sheet.  ¶2.  In late October 2007, Rhinebridge was downgraded to "junk" status by the major credit rating agencies, and forced into receivership.  ¶6.

Named plaintiff King County, Washington ("King County") is a domestic public entity organized under the laws of the State of Washington.  ¶16.  King County manages cash for approximately 100 governmental agencies.  *Id*.  Pursuant to Fed. R. Civ. P. 23, plaintiff brings this case as a class action on behalf of a class consisting of all persons or entities who acquired Rhinebridge's senior debt securities ("Senior Notes") between June 1, 2007 and October 18, 2007 (the "Class Period").  ¶¶170-175.

---

[1]      The related, and substantially identical Iowa Student Loan Liquidity Complaint (09-cv-08822-SAS) was not processed by the German authorities.  Thus, to date, Ortseifen has not been served in the *Iowa* action, which is substantially identical to this action, except for the identity of the plaintiff.  Plaintiff is continuing its attempts to serve Ortseifen through the Hague Convention.

[2]      Unless otherwise noted, all "¶" are to the Complaint for Violations of New York State Law (the "Complaint") filed by King County on October 2, 2009, No. 09-CV-8387-SAS, Dkt. No. 1.

The IKB defendants are two corporate IKB entities and two former IKB executives who were involved in the fraud.  ¶¶17-19.  Defendant IKB Deutsche Industriebank AG ("IKB Bank") arranged Rhinebridge along with its wholly owned and controlled subsidiary, defendant IKB Credit Asset Management GmbH ("IKB CAM") (together "IKB").  ¶17.  During the Class Period, Ortseifen was the Chief Executive Officer of IKB Bank and simultaneously served as Chairman of IKB CAM. ¶19.  Just over a month after Rhinebridge was created, Ortseifen "retired" amidst IKB's near-collapse from its exposure to U.S. subprime mortgage securities.  *Id.*  The other individual defendant in this case, Winfried Reinke ("Reinke")[3] was fired on August 1, 2007.  ¶18.  Shortly after these senior executives left IKB, PricewaterhouseCooper ("PWC") conducted an audit on IKB and "accused the former management board of IKB of hiding problems" relating to IKB's exposure to the U.S. subprime mortgage market.  ¶131.  Defendants IKB Bank, IKB Cam, Reinke and Ortseifen are referred to herein as the "IKB defendants."  ¶20.

IKB "sponsored" or "arranged" Rhinebridge (¶¶2, 17, 136), meaning IKB created it. ¶2. Rhinebridge was an investment fund known as a structured investment vehicle or "SIV."  ¶7.  This SIV raised money from investors by issuing short-term securities (the SIV's liabilities) and using that money to buy a portfolio of securities (the SIV's assets).  ¶¶35-39.  The SIV's liabilities consisted of money Rhinebridge borrowed from investors by issuing the Senior Notes and other securities.  Plaintiff purchased these Senior Notes shortly after IKB commenced Rhinebridge's initial private offering on June 27, 2007.  ¶2.

---

[3]    Plaintiff has attempted to determine Reinke's location but have not yet found him.  Thus, Reinke has not been served in this case.

Rhinebridge would not have existed and could not have operated without very high credit ratings or "Top Ratings" from the major U.S. credit rating agencies. ¶¶57, 82. Thus, IKB collaborated with the major credit rating agencies – defendants Moody's, S&P and Fitch (the "Rating Agencies") – to structure and produce Top Ratings for the Senior Notes. ¶2. The Rating Agencies assign similar credit ratings to debt securities backed by the full faith and credit of the U.S. Government, such as U.S. Treasury Bills. *Id.* The Rating Agencies do not "structure" the U.S. Government's balance sheet or tell it what investments to buy or what types of bonds to issue. Yet they undertook these activities in this case, together with IKB. ¶¶43-55.

IKB created Rhinebridge's "Top Ratings" with the Rating Agencies to take advantage of their special "NRSRO" status. ¶¶2, 25-27. The U.S. Securities and Exchange Commission ("SEC") gave the defendant Rating Agencies this special "nationally recognized statistical rating organization" or NRSRO status in 1975. ¶42. The SEC's endorsement indicates Moody's, S&P and Fitch are "nationally recognized" as independent issuers of "credible and reliable ratings." *Id.* Because of this "national recognition," the Rating Agencies are commonly known as "Gatekeepers" to the financial markets. *See* ¶86 (former SEC Chairman describing Rating Agencies as "Gatekeepers").

All three defendant Rating Agencies are headquartered in New York. ¶¶25-27.

During the Class Period, IKB needed these "Gatekeepers" in order to launch and grow Rhinebridge. ¶170. Their credit ratings are terms of art used in the fixed income industry to communicate specific information to investors. ¶69. The Complaint describes the ratings' quantitative and qualitative significance in detail. *See, e.g.*, ¶¶67-75. SIV investors are willing to invest in large part because of the high credit ratings assigned to SIVs. ¶74. Because of the way

Rhinebridge was designed and its underlying economics, this SIV could not have existed without its false Top Ratings. ¶57; *see, e.g.*, ¶¶109-123.

The IKB defendants raced to launch Rhinebridge with false credit ratings for three reasons: "(a) IKB was highly compensated to do so; (b) IKB's objective was to sell assets from its balance sheet at prices it could never obtain on the open market; and (c) IKB faced its own insolvency if it revealed the true quality of the assets included in Rhinebridge." ¶124; *see also* ¶¶125-137 (describing these motives in detail). A month after the IKB defendants launched Rhinebridge, IKB nearly collapsed from its additional exposure to subprime mortgage-backed investments. ¶¶12, 18. Five of its senior executives (including Ortseifen) retired or were fired as a result. ¶12. As noted, PWC audited IKB and "accused the former management board of IKB of hiding problems" relating to IKB's U.S. subprime exposure. ¶131.

Although IKB is a German entity (¶17), it used none of Germany's financial centers to launch Rhinebridge. ¶¶33-34. The IKB defendants used U.S. capital markets, headquartered in New York, and the big three credit rating "Gatekeepers" to the U.S. capital markets, also headquartered in New York, to raise money and issue false statements in New York. ¶¶21, 23-27, 29, 33-34.

IKB is a sophisticated institution and used its sophistication to commit fraud. Rhinebridge – a "special purpose entity" – was the foundation of the fraud. ¶35. Rhinebridge did not materialize out of thin air. IKB sponsored, arranged, and organized it, including its Senior Note program. ¶¶12, 17. Rhinebridge had no employees; therefore, it could operate only through its agents, such as the IKB defendants and the Rating Agencies. ¶¶7, 136. Rhinebridge did not rate its own securities. The IKB defendants collaborated with the Rating Agencies to produce those ratings. ¶2.

The IKB defendants "knew at all times that [the false ratings] would be communicated directly to plaintiff and other members of the Class through, *inter alia*, a commonly used investment

- 4 -

platform provided by *Bloomberg*." ¶79; *see also* ¶180.  IKB "made (or caused to be made) [these] false statements" in New York.  ¶33.  The IKB defendants bought Rhinebridge's constituent securities in New York.  ¶21.  A "substantial part of the events and omissions that gave rise to the claims asserted herein occurred" in New York.  ¶33.

The Complaint establishes *prime facie* personal jurisdiction over all IKB defendants, including Ortseifen.

**B.      Additional Documents Supporting Jurisdictional Allegations**

**1.      IKB Created, Operated and "Arranged" Rhinebridge's Note Program**

Rhinebridge's private placement memorandum ("PPM")  was filed by IKB in this case, and shows that IKB operated Rhinebridge's business exactly as alleged in the Complaint.  ¶¶2, 17, 136.  The Complaint describes this business in terms of buying "assets" and selling "liabilities," including the Senior Notes.  ¶35.  The PPM confirms Rhinebridge "invests in a portfolio of [i]nvestments" and "funds" these investments by issuing the Senior Notes and other securities.  Declaration of Luke O. Brooks in Support of Memorandum of Law of Plaintiff King County, Washington in Opposition to Defendant Stefan Ortseifen's Motion to Dismiss the Complaint ("Brooks Decl."), Ex. A at 41 (describing "Manager" roles), and last page, following 160 (IKB is "Manager").  The Complaint explains in clear terms that Rhinebridge was not a "real" bank or operating company, however, and could only operate through IKB.  ¶¶2, 17, 136.

The PPM likewise describes IKB's responsibilities in terms of managing Rhinebridge's investments and funding – the only business Rhinebridge had.  As to Rhinebridge's investments, IKB was supposed to manage them "to preserve the Top Ratings of the Senior Notes."  Brooks Decl., Ex. A at 41. With respect to Rhinebridge's funding, IKB had "undertaken . . . ***to arrange*** [for both of Rhinebridge's issuing entities] . . . ***to issue*** or ***enter into***, as the case may be, Senior Funding

- 5 -

[including Senior Notes][4] and/or Capital Notes so as to enable the Issuer to achieve the funding objectives." *Id.*[5]  IKB was directly responsible for "the issuance by [Rhinebridge] . . . of Capital Notes and Senior Notes." *Id.*  Ultimately, the IKB defendants arranged the issuance of the Senior Notes out of New York.

Other documents confirm IKB ran every aspect of Rhinebridge's business.  A Fitch New Issue Report on Rhinebridge filed by defendant Fitch in this case refers to IKB as the "Rhinebridge team" and states "Fitch's analysis of Rhinebridge's notes recognises the fundamental importance of the manager [IKB]," which is "responsible for ***actively managing*** a broad range of business areas, including portfolio management, credit analysis, cash flow and funding," among other things.[6]  Dkt. 45 ("Ehrlich Decl."), Ex. B at 2.  A Standard & Poor's report on Rhinebridge filed by defendant S&P in this case states the "SIV [*i.e.*, Rhinebridge PLC and Rhinebridge LLC] [is] managed by [IKB], which ***is responsible*** for purchasing assets, managing the portfolio, and overseeing the issuance" of Rhinebridge's securities.  Dkt. 40 ("Markley Decl."), Ex. B.  The IKB defendants created and ran Rhinebridge's entire business.

---

[4]     The PPM uses the term "Senior Funding," whose definitions cover the Senior Notes that plaintiff in this case acquired.

[5]     Emphasis is added and citations are omitted throughout unless otherwise indicated.

[6]     While extraneous documents should not be considered in support of a motion under Rule 12(b)(6), which is limited to the four corners of the complaint, these documents are properly considered in opposing a motion under Rule 12(b)(2).  *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*, No. 05-Civ.-9016 (SAS), 2006 WL 708470, at *4 (S.D.N.Y. Mar. 20, 2006).  Here, plaintiffs are forced to point to the self-selected documents submitted by defendants in the absence of jurisdictional discovery.

2.    **The IKB Defendants Established Rhinebridge's Note Program in New York**

The IKB defendants used New York's sophisticated capital markets infrastructure to create and distribute the Senor Notes that plaintiff purchased.  The issuance, payment and ownership transfer machinery – enabling the creation and distribution of the Senior Notes – was located in New York.

For example, the IKB defendants ***arranged*** for Rhinebridge to enter into an agreement with a New York entity to issue the Senior Notes from New York, pursuant to a master note physically located in New York and governed by New York law.  The PPM states that the Senior Notes "will be issued under a depositary agreement" between Rhinebridge and The Bank of New York's branch located at 101 Barclay Street, New York, New York 10286 ("BNY New York").[7]  BNY New York holds the "Master Note" that represents the Senior Notes in New York.[8]  Rhinebridge agreed that the "Master Note is a valid and binding obligation of the Issuers [both Rhinebridge PLC and Rhinebridge LLC]."  *Id.* at 94 (Form of Master Note).  Rhinebridge further agreed to make all payments to investors through "Cede & Co., as nominee of The Depositary Trust Company," a New York corporation.  *Id.*[9]  The Master Note is "governed by, and shall be construed in accordance with,

---

[7]    Brooks Decl., Ex. A at 88 ("The USCP Notes will be issued under a depositary agreement . . . ."); s*ee also id.* at 96 (securities "issued pursuant to, and [are] subject to the terms of" the Depositary Agreement).  It should be noted the "Issuers" are both Rhinebridge PLC and Rhinebridge LLC.  *See id.* at 2.  Further, the "Bank of New York, as USCP Depositary" (*id.* at 88) refers to "The Bank of New York, a New York banking corporation at 101 Barclay Street, New York, New York 10286."  *Id.* at 104.  The PPM repeats this information on its final page (following page 160).

[8]    *See id.* at 5 ("The USCP Notes will be available in book-entry form represented by a Master Note (the 'Master Note') held by the USCP Depositary [the USCP Depositary being BNY New York, *see id.* at 94] as custodian and agent for The Depository Trust Company ('DTC') and recorded in DTC's book entry system.").

[9]    *See id.* at 5; *see also id.* at iii (identifying DTC as a New York Corporation).

- 7 -

the laws of the State of New York." *Id.* at 96.  Both Rhinebridge entities signed the Master Note, with the "The Bank of New York, New York Branch," as custodian of the Master Note signing as counterparty.  *Id.* at 94.  In short, the IKB defendants created a note program located in New York.

### 3. IKB Caused Rhinebridge to Issue $2.2 Billion in Senior Notes in New York

The IKB defendants further ***arranged*** for Rhinebridge to enter into agreements with New York-based broker dealers in order to issue and sell the Senior Notes.  *See id.* at 41.  Rhinebridge entered into a placement agreement with "Morgan Stanley & Co. Incorporated, Citigroup Global Markets, Inc. and Goldman, Sachs & Co" (referenced herein as "Morgan Stanley," "Citigroup" and "Goldman Sachs," respectively, and collectively as the "New York Broker Dealers").  *Id.* at 1.  Each of these entities is located in New York.  *Id.* at last page, following 160.

The IKB defendants used Rhinebridge to file documents with the SEC confirming the New York Broker Dealers in fact offered and sold Senior Notes.  On or about the day Rhinebridge closed, it notified the SEC that it would pay the New York Broker Dealers to make a joint offering in New York.[10]  The document shows IKB used Rhinebridge to solicit investors in every state of the United States, including New York.  *Id.*  The New York Broker Dealers offered to sell up to $20 billion in Senior Notes, and actually sold $2.216 billion in Senior Notes on or about June 27, 2007.  *Id.*  That was the very day the IKB defendants "launched" Rhinebridge, according to a Fitch New Issue Report filed by defendant Fitch in this case.  *See* Ehrlich Decl., Ex B.  Comparing this $2.216 billion amount of notes sold from New York to the "[l]aunch size [of] USD2.4bn" set forth in the Fitch New

---

[10]    The offering was made by both "Rhinebridge PLC and Rhinebridge LLC."  Brooks Decl., Ex. B at 1; *id.* at last page, Note 1 ("The offering was made together with Rhinebridge PLC . . . .") & Note 6 (same).

Issue Report, over **92%** of the money IKB took from investors came directly from an offering and issuance conducted entirely in New York.

> **4.      IKB Prepared Preliminary and Final Private Placement Memoranda, and Delivered the False "Top Ratings" to New York Broker Dealers to Distribute**

The IKB defendants further ***arranged*** for Rhinebridge to deliver both draft and final PPM – containing the false Top Ratings – to the New York Broker Dealers to execute the Senior Notes' offering and issuance.  According to excerpts of the placement agreement ("Placement Agreement") filed by IKB, Rhinebridge "prepared and submitted to the [New York Broker Dealers]" a preliminary" and "will prepare and submit to the [New York Broker Dealers] a final" PPM.  *See* Dkt. 60 ("Rosenbaum Decl."), Ex. E at 1 (second and third recitals).  These documents include the false "Top Ratings" the IKB defendants obtained and disseminated in collusion with the New York based Rating Agencies – the IKB defendants needed to sell the Senior Notes and shift toxic assets off their own books.  ¶62.

The IKB defendants communicated directly with the New York Broker Dealers on an ongoing basis.  The Placement Agreement states each New York Broker Dealer "***will communicate*** to [Rhinebridge], orally or in writing, each offer received" to purchase any notes.  *See* Rosenbaum Decl., Ex. E at 3 (clause (c)).  Rhinebridge, in turn, "may instruct a [New York Broker Dealer] to suspend solicitation of purchases" at any time.  *Id.* at 4 (clause (d)).

"Rhinebridge" could communicate nothing and make no decisions on its own.  IKB "ha[d] undertaken" to manage all of its operations.  Brooks Decl., Ex. A at 41.

> **5.      The IKB Defendants Authorized the New York Broker Dealers to Close the Deal**

Critically, Rhinebridge permitted the New York Broker Dealers to "solicit purchases of such principal amounts" only "***[u]pon receipt of instructions***" from Rhinebridge.  Rosenbaum Decl., Ex.

- 9 -

E at 3 (clause (c)); *see also id.* at 4 (clause (e)).  Again, "Rhinebridge" was a shell: IKB *was* the "Rhinebridge team" that actually created and ran the SIV.  Ehrlich Decl., Ex. B at 2.  The "instructions" that authorized the New York Broker Dealers to close the Rhinebridge deal came from IKB.

**6.    Ortseifen Admits that He Communicated with People from IKB Concerning Rhinebridge**

Ortseifen submitted a sworn affirmation in support of his motion to dismiss.  *See* Dkt. 52 (the "Ortseifen Affirmation").  There, he makes several important admissions.  First, he admits that he was "chairman" of IKB CAM's advisory board and was CEO of IKB Bank, exactly as alleged in the Complaint.  *See* Ortseifen Affirmation, ¶¶12-13; Complaint, ¶19.  Second, and most importantly, he admits:

> In my position on behalf of IKB, ***there were occasions in 2006 and in 2007 when I received information from IKB personnel and other persons and communicated with them concerning Rhinebridge***.  However, those communications generally occurred in Düsseldorf, Germany; none of those communications occurred in New York State.

Ortseifen Affirmation, ¶19.  Third, Ortseifen states that "one often has no way of knowing the location of the person with whom one is communicating."  *Id.*, ¶24.  He makes several statements concerning Rhinebridge "[o]n information and belief," but obviously has direct personal (undisclosed) knowledge about the SIV's launch and operations given the "communications" he had with IKB personnel and others and others in 2006 and 2007.  *Id.*, ¶¶11, 14, 15, 17-19.

## II.    SUMMARY OF ARGUMENT

Ortseifen's motion should be denied in its entirety.  First, Ortseifen's argument that he has no connection to New York confuses the legal standards applied to questions concerning personal jurisdiction, and ignores the fact that he transacted business in this state.  Plaintiff's claims arise directly from these New York business transactions.  Thus, Ortseifen is subject to personal

- 10 -

jurisdiction pursuant to N.Y.C.P.L.R. §302(a)(1).  Even if the Court concludes that Ortseifen somehow has raised a colorable defense to personal jurisdiction, the appropriate remedy is to provide plaintiff discovery to test the factual bases for defendants' jurisdictional arguments, not dismissal.

Second, Ortseifen's contention that the Complaint fails to adequately allege he made a false statement is meritless.  The Complaint alleges (1) the "Top Ratings" for the Senior Notes were communicated to investors, (2) by the IKB defendants, including Ortseifen, (3) through a "commonly used investment platform provided by Bloomberg" and the Private Placement Memoranda on each day throughout the Class Period, and (4) that such ratings conveyed false and misleading information about the SIV and the Senior Notes.  ¶¶2-4, 67, 72, 75-77, 79.  These allegations satisfy Rule 9(b)'s pleading requirement.

Third, Ortseifen's cursory contentions regarding falsity, scienter, reliance and damages (Defs' Mem. at 20) made in a single sentence on a single page and without citation to any legal authority are deemed waived.  *Vieira v. Wal-Mart Stores, Inc.*, No. 00-272, 2001 WL 394898, at *7 (D. Conn. Apr. 18, 2001) ("[i]ssues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").  Even if considered, Ortseifen's throw-away arguments regarding falsity, scienter, reliance and damages fail entirely.  The Complaint properly alleges each element of fraud against Ortseifen and his motion to dismiss should be denied.

## III.   ARGUMENT

### A.    This Court Has Personal Jurisdiction Over Ortseifen

#### 1.     Applicable Standard

To determine personal jurisdiction, federal courts sitting in diversity apply the law of the forum state.  *CutCo Indus. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986).  In New York, federal courts apply a two-part inquiry to determine whether a defendant is subject to personal jurisdiction:

507503_1

"(1) the plaintiff must demonstrate that the defendant is subject to jurisdiction under New York law; and (2) this exercise of jurisdiction must comport with constitutional due process requirements." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, *LLC*, No. 05-Civ.-9016 (SAS), 2006 WL 559811, at *3 (S.D.N.Y. Mar. 7, 2006). Plaintiff easily satisfies both elements.

Section 302(a)(1) of the N.Y.C.P.L.R. "gives New York personal jurisdiction over a nondomiciliary if two conditions are met: first, the nondomiciliary must 'transact business' within the state; second, the claim against the nondomiciliary must arise out of that business activity." *CutCo*, 806 F.2d at 365.

This provision is a "'single act statute,'" which means "proof of **one transaction** in New York is sufficient to invoke jurisdiction, **even though the defendant never enters New York**, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 198-99 (1988). The Court of Appeals continues to apply this standard: "It is **well settled** that 'one need not be physically present [here] . . . to be subject to the jurisdiction of our courts under C.P.L.R. 302.'" *Fischbarg v. Doucet*, 2007 NY Slip Op. 9962, at *6, 9 N.Y.3d 375, 382, 849 N.Y.S.2d 501 (2007). The Court of Appeals recently "reaffirmed this principle." *Id.* (citing *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 69, 71, 818 N.Y.S.2d 164 (2006)). The long-arm statute applies to "tort and contract claims." *Kreutter*, 71 N.Y.2d at 467.

This Court has personal jurisdiction over Ortseifen as a matter of New York law because he (1) "purposefully" transacted business in New York and (2) there is a "substantial relationship" between that transaction and plaintiffs' fraud claim.

Moreover, the "burden" on plaintiffs at this pre-discovery stage of litigation is minimal. Plaintiffs need only make a *prima facie* showing of personal jurisdiction because no jurisdictional

- 12 -

discovery has occurred.  *CutCo*, 806 F.2d at 365; *Druck Corp. v. Macro Fund*, 102 Fed. Appx. 192, 194 (2d Cir. 2004); *OR.EN Orobia Eng'g S.R.L. v. Nacht*, No. 97 Civ. 4912(SAS), 1998 WL 730562, at *2 (S.D.N.Y. Oct. 19, 1998) ("in attempting to defeat a jurisdictional challenge, plaintiff's initial burden is dependent upon the procedural posture of the litigation").  All pleadings and affidavits "are construed in the light most favorable to plaintiff and all doubts are resolved in its favor."  *CutCo*, 806 F.2d at 365; *see also PDK Labs v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (courts "construe the pleadings and affidavits in plaintiff's favor at this early stage").  The Second Circuit recognizes "that personal jurisdiction inquiries are 'necessarily fact sensitive because each case is dependent upon its own particular circumstances.'"  *Id.*  Defendants must provide "'highly specific'" evidence refuting personal jurisdiction.  *Pension Committee*, 2006 WL 559811, at *2.

This Court has personal jurisdiction over Ortseifen as a matter of New York law and constitutional due process.  Plaintiffs satisfy the *prima facie* standards articulated by the Second Circuit.

      **2.**        **Ortseifen Transacted Business in New York under N.Y.C.P.L.R. §302(a)(1)**

            **a.**      **Ortseifen "Purposefully" Transacted Business in New York by Personally Participating in Launching a Fraudulent $2.216 Billion Bond Offering in New York to Bail Out IKB**

Ortseifen purposefully transacted business in New York in connection with Rhinebridge.  The Complaint alleges that Ortseifen participated in the fraud to launch Rhinebridge and caused false statements to be made in New York.  ¶33.  The Complaint further alleges that Ortseifen controlled hundreds of millions of dollars worth of securities offered and sold from New York. ¶21.  Plaintiff alleges with overwhelming factual support that Rhinebridge never should have come to

- 13 -

market and was a fraud from the first day it was launched.  These well-plead allegations are all that is required for personal jurisdiction purposes.  *See Taberna Capital Mgmt., LLC v. Dunmore*, No. 08 Civ. 1817(JSR), 2008 WL 2139135, at *2 (S.D.N.Y. May 20, 2008) (because "no discovery on the merits of the case has taken place, the plaintiff here need only make a prima facie showing as to the alleged fraud").  But plaintiff provides much more.

Additional documents demonstrate Ortseifen is subject to personal jurisdiction in this Court. As discussed above, these documents establish that the IKB defendants (1) created, operated and "arranged" the Rhinebridge note program; (2) established the note program in New York; (3) caused Rhinebridge to issue $2.2 billion of notes from New York; (4) prepared private placement memoranda and delivered the false "top ratings" to New York broker dealers to distribute; and (5) instructed New York Broker Dealers to close the deal.  In his declaration, moreover, Ortseifen concedes that as Chairman of IKB CAM and CEO of IKB Bank he participated in and had communications about Rhinebridge.  In short, the creation and operation of Rhinebridge – a deal put together to move toxic assets from  IKB's balance sheet to investors who sought to purchase "Top Rated" bonds – involved substantial contacts with New York, and, by his own admission, Ortseifen was involved.

Ortseifen is similarly situated to the individual defendant in *Taberna Capital*.  There, as here, it was alleged that the individual defendant had collaborated with others to create a New York corporation for the purpose of defrauding others.  2008 WL 2139135, at *2 ("the two individual defendants, working together, concocted a fraud, and that the primary means of carrying out that fraud was the creation of a New York corporation that would act as a type of front for the fraud"). There, the individual defendant communicated outside New York with others to concoct a plan to place good assets outside the reach of creditors in advance of filing for bankruptcy.  *Id.* at *1.  Here,

- 14 -

Ortseifen and others at IKB "communicated" with each other to transfer over a billion dollars in bad assets to investors through a $2.216 billion New York bond offering in order to avoid bankruptcy.

In *Taberna Capital*, plaintiff obtained a ***single e-mail*** between two California residents after conducting jurisdictional discovery – discovery that has not occurred in this case. *Id.* at *2. The e-mail contained bland language that the individual defendants' California legal advisors "seem[ed] to like that [New York] venue better." *Id.* It was this ***decision*** to use New York as a situs for fraud that counted: "defendants and their agents purposely chose New York as the forum in which to incorporate the corporation that would serve as the foundation for their alleged fraud, and did so in order to receive the benefit of New York's laws as they carried out the scheme." *Id.* That same decision here dooms Ortseifen's motion to failure.

Even without jurisdictional discovery, it is clear that Ortseifen participated in the launch of Rhinebridge. Ortseifen admits that he communicated with "IKB personnel" and "other [unidentified] persons" concerning Rhinebridge "in 2006 and in 2007," and he "retired" approximately one month after launching Rhinebridge. Ortseifen Affirmation, ¶¶19, 29. There is no question, then, that Ortseifen participated in communications about Rhinebridge for months ***before*** the SIV closed in June 2007. Plaintiff alleges that Rhinebridge was a fraud from the day it was launched. That fraud emanated from New York. Ortseifen and the other IKB defendants collaborated with the New York-headquartered credit rating agencies to structure and produce fraudulent Top Ratings for the Senior Notes. ¶2. Additionally, the IKB defendants caused Rhinebridge to enter into an agreement with a New York citizen, The Bank of New York, to issue the Senior Notes from New York. They designed the note program around the Master Note held in New York and governed by New York law. Importantly, the IKB defendants caused Rhinebridge – their shell company – to agree that the Master Note was a valid and binding obligation on

Rhinebridge.   The IKB defendants further caused Rhinebridge to enter into the Placement Agreement with New York citizens Morgan Stanley, Citigroup and Goldman Sachs to sell the Senior Notes, which they did.   The IKB defendants and these New York Broker Dealers communicated directly with each other regarding solicitations and sales of the Senior Notes.   Given these facts, it is legally irrelevant – even if true – that Ortseifen's "communications" involving Rhinebridge took place while he was in Düsseldorf.[11]   *See Taberna Capital*, 2008 WL 2139135, at *2; *PDK Labs*, 103 F.3d at 1109 (one transaction is sufficient to trigger long-arm statute "even through the defendant never enter[ed] New York").

Ortseifen clearly had the authority as CEO of IKB Bank and Chairman of IKB CAM to prevent the launch of Rhinebridge altogether or dictate its location somewhere other than New York, but he did not.   He chose New York.   As the CEO of major German bank (IKB Bank) and as Chairman of a major asset manger (IKB CAM), Ortseifen knows exactly why IKB launched Rhinebridge in New York, as opposed to Düsseldorf or another other location in the world.   New York's capital markets infrastructure enabled IKB to raise over $2 billion in a ***single day***.   The purpose for launching Rhinebridge in New York is clear: "New York is widely regarded as the capital of U.S. capital markets."   *See Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 96 (2d Cir. 2000).   Having determined to use New York as the situs of his fraud and transacted business in New York in furtherance of the fraud, Ortseifen is subject to jurisdiction here.   *Taberna Capital*, 2008 WL 2139135, at *3.

---

[11]      Of course, if discovery reveals that Ortseifen had communications with New York persons or entities in furtherance of the fraud, that information would be relevant to establishing jurisdiction. Plaintiff is at the very least entitled to such discovery.

Against the overwhelming weight of legal authority and the facts of this case, Ortseifen nonetheless argues that he is not subject to personal jurisdiction under §302(a)(1), citing a number of inapposite decisions.  Memorandum of Law in Support of Defendant Stefan Ortseifen's Motion to Dismiss, Dkt. 53 ("Def's Mem") at 10-11.  Not one of those cases involved a sophisticated fraud, such as the one at bar.  And none involved the commencement of a major fraud using New York's capital markets infrastructure as a foundation.  For example, *NewMarkets Partners LLC v. Sal. Oppenheim Jr. & CIE*, 638 F. Supp. 2d 394 (S.D.N.Y. 2009) involved a dispute over materials used by a German company to market "two separate German funds" (*id.* at 399), "primarily in Germany" (*id. at* 400), to German investors located in Germany.  *Id.*  Rhinebridge was launched in New York and 92% of its entire fundraising at launch was garnered in this state and used to transfer bad assets created and purchased by IKB in this state as noted above.

In *Best Van Lines, Inc. v. Walker,* 490 F.3d 239 (2d Cir. 2007), the dispute involved an internet posting by an Iowa resident regarding a New York trucking company (*id.* at 240), bearing no comparison to this case.  And unlike the contract "at the core of [the] litigation" in *Palace Exploration Co. v. Petroleum Dev. Co.*, 41 F. Supp. 2d 427, 430 (S.D.N.Y. 1998) that concerned oil development in Oklahoma, the "'center of gravity'" (*id.* at 433), of the transactions at issue in this case – measured in dollars and cents – is New York.  Finally, *Semi Conductor Materials v. Citibank Int'l PLC*, 969 F. Supp. 243, 245 (S.D.N.Y. 1997) concerned the performance of a letter of credit at a London entity's "Kathmandu branch office" and is a far cry from the circumstances here.  The fact patterns of these cases are not analytically useful.

*Taberna Capital*, on the other hand, is applicable legal precedent given its similarity to the facts of this case, its reliance on the two leading New York Court of Appeals cases construing §302(a)(1), and its principled application of these cases to require defendants to answer in New York

- 17 -

to strong allegations of a fraud they concocted with New York as the launch site.  *Taberna Capital*, 2008 WL 2139135 (applying *Deutsche Bank*, 7 N.Y.3d at 70, and *Kreutter*, 71 N.Y.2d at 466).

Ortseifen's contacts with New York were "not random or fortuitous" but "deliberate and purposeful."  *Id.* at *2.  His participation in a scheme to bailout his company's balance sheet by launching a precarious legal contraption in New York constitutes "transacting business" under §302(a)(1).

### b. Ortseifen's Participation in Rhinebridge's $2.216 Billion New York Launch to Bail Out IKB Is "Substantially Related" to the Fraud

Ortseifen nonetheless claims his participation in launching Rhinebridge is not substantially related to plaintiff's claims.  Def's Mem. at 11-12.  Because Rhinebridge would not have existed but for its launch in New York with the false Top Ratings provided by the New York NRSRO "Gatekeepers," this contention is meritless.  *See, e.g.*, *Taberna Capital*, 2008 WL 2139135, at *2 (New York corporation "foundational" to fraud); *accord OR.EN. Orobia Eng'g S.R.L.*, 1998 WL 730562, at *5 ("financing of Baristamatic purchases of ACEM machines through a New York company," among other facts, sufficiently related to plaintiff's tort claims for §302(a)(1) purposes). The business Ortseifen transacted purposefully used New York to remove bad assets from his company's balance sheet.  The link between that conduct and plaintiff's claim is self-evident.

### 3. Due Process Is Satisfied

Exercising jurisdiction over Ortseifen is fully consistent with constitutional due process.  The question is whether Ortseifen has such "minimum contacts" with New York such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice," such that he "should reasonably anticipate being haled into court" in New York.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 297 (1980).  Because N.Y.C.P.L.R. §302 "does not go as far as is

constitutionally permissible," by demonstrating Ortseifen is subject to personal jurisdiction as a matter of New York law, it follows that that due process is satisfied. *Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd.*, 62 N.Y. 2d 65, 71, 476 N.Y.S.2d 64 (1984). In any event, Ortseifen admits he participated in communications concerning Rhinebridge. Plaintiff adequately alleges Ortseifen was involved in the fraud and that this fraud was launched in New York. Traditional notions of fair play, combined with the contacts discussed herein, are satisfied in this case.[12]

### B.    The Complaint Adequately Alleges Fraud Against Ortseifen

#### 1.    Ortseifen's Perfunctory Contentions Regarding Falsity, Scienter, Reliance and Damages Are Waived

In a single sentence on a single page Ortseifen seeks dismissal on Rule 12(b)(6) grounds for failure to properly allege fraud against Ortseifen. Def's Mem. at 20. With the exception of attribution (discussed in §III.B.2., below), however, Ortseifen does not cite a single Complaint allegation or any legal authority supporting his request for dismissal. Accordingly, Ortseifen's perfunctory contentions respecting falsity, scienter, reliance and damages (Def's Mem. at 20) are waived. *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived . . . ."); *see also Am. Tissue v. DLJ Merch. Banking Partners*, No. 03 Civ. 6913 (GEL), 2006 WL 1084392, at *6 (S.D.N.Y. Apr. 20, 2006) (when a party's motion

---

[12]    If the Court entertains Ortseifen's personal jurisdiction motion to dismiss, plaintiff should be granted the opportunity to conduct discovery regarding the personal jurisdiction challenge. *Pension Committee*, 2006 WL 708470, at *6 ("Jurisdictional discovery 'should be granted where pertinent facts bearing on the question of jurisdiction are controverted . . . .'"). The court in *Pension Committee* granted personal jurisdiction discovery under similar circumstances. There, a foreign defendant corporation argued that it was not subject to personal jurisdiction in New York because it had *no* presence here, while the plaintiffs highlighted several of the defendant's business activities in and contacts with New York, creating a factual dispute as to personal jurisdiction. *See Pension Committee*, 2006 WL 708470, at *4-*6. Jurisdictional discovery should be granted here to test Ortseifen's contention that he had *no* contact with this District.

"fails to address with any seriousness the legal sufficiency of [a] claim[]" that party's challenge is waived); *Hill v. Sisters of St. Francis Health Servs.*, No. 06 C 1488, 2006 WL 3783415, at *5 n.1 (N.D. Ill. Dec. 20, 2006) (where defendant challenges plaintiff's complaint under F.R.C.P. 9(b) and provides a single conclusory sentence in support, defendant "fail[s] to develop it[s argument] in the opening brief [and] has waived this argument"); *Vieira*, 2001 WL 394898, at *7 ("[i]ssues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

In any event, as set forth in plaintiffs' Memorandum of Law in Opposition to the IKB Defendants' Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("IKB 12(b)(6) Opp."), the Complaint adequately alleges all elements of common law fraud under New York law,[13] including falsity, scienter,[14] reliance and damages against all of the IKB defendants, including

---

[13]     Ortseifen incorrectly contends Washington law applies. Def's Mem. at 19 n.4. New York law applies in this case. "In a diversity action, New York choice of law rules govern." *Cenveo v. Diversapack LLC*, No. 09 Civ. 7544, 2009 WL 3169484, at *6 (S.D.N.Y. Oct. 1, 2009) (Scheindlin, J.). "Under New York choice-of-law rules, the first step of the analysis is to determine whether there is a substantive conflict between the laws of the relevant choices. 'In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.'" *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006) (Scheindlin, J.). Because there are no substantive differences between the elements and requirements of common law fraud in New York and Washington, New York law applies. *See, e.g.*, *Turner v. Enders*, 552 P.2d 694, 696 (Wash. Ct. App. 1976) (listing element of common law fraud in Washington State). Even if substantive differences exist, New York law applies because New York has the strongest interest in this action. *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006); *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 284 (S.D.N.Y. 2009).

[14]     Although the allegations detailed in the IKB 12(b)(6) Opp. are enough, numerous additional facts support a compelling inference that Ortseifen acted with scienter: (i) the German authorities prosecuted Ortseifen for "market manipulation" (¶19); (ii) Ortseifen abruptly "retired" from the IKB entities shortly after the launch of Rhinebridge (*id.*); (iii) PWC's investigation concluded that IKB's

---

- 20 -

Ortseifen.  Plaintiff hereby incorporates the IKB 12(b)(6) Opp. by reference.  The only argument

Ortseifen bothers to develop in any manner is his contention that the Complaint fails to properly

attribute the false Top Ratings to Ortseifen.  As discussed below, this argument fails.

### 2. The Complaint Alleges Ortseifen's False Statements With Sufficient Particularity

To adequately plead the first element of common law fraud, "a misrepresentation or omission

of material fact," in compliance with Rule 9(b), a complaint must:

> (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent.

*In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 332 (D. Conn. 2004), *rev'd in part on other*

*grounds*, 469 F.3d 263 (2d Cir. 2006).  The Complaint exceeds Rule 9(b)'s requirements by alleging:

(1) "Top Ratings" for the Senior Notes were communicated to investors; (2) by Ortseifen and his co-

defendants; (3) through a "commonly used investment platform provided by *Bloomberg*" and the

Private Placement Memoranda on each day throughout the Class Period; and (4) that such ratings

conveyed false information about the SIV and the Senior Notes.  ¶¶2-4, 67, 72, 75-77, 79.  Given the

nature and complexity of defendants' fraudulent scheme, these allegations satisfy Rule 9(b) – they

provide notice to Ortseifen of the time, place and content of his misrepresentations and the reasons

those statements were false.  *United States v. Shell Oil Co.*, 183 F.R.D. 204, 207 (E.D. Tex. 1998).

Notwithstanding the Complaint's detailed allegations, Ortseifen urges dismissal, contending

the Complaint fails to state a claim because it "adopts the expedient of including him, along with

[IKB Bank, IKB CAM, and Reinke], within the collective term 'IKB,' thereby attempting to

---

former management board was hiding problems from other members of the company relating to
IKB's U.S. subprime exposure (¶¶122-124); and (iv) the short proximity between the first
dissemination of the false "Top Ratings" and their downgrade (¶¶4-6).

- 21 -

attribute to all four of those defendants anything that was allegedly done or said by any one of them."  Def's Mem. at 2.  However, as the Court explained in *Abu Dhabi*, where, as here, "defendants are insiders or affiliates participating in the offer of securities . . . 'reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of representation.'"[15]  *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009).  The Complaint puts Ortseifen on notice of this claim, and plainly alleges that Ortseifen was an insider who participated in the Senior Notes offering, and Ortseifen concedes as much in his affirmation.  Due to his position as CEO of IKB Bank and Chairman of IKB CAM, Ortseifen "easily qualif[ies]" as a corporate insider for purposes of the group pleading doctrine.  *SEC v. Espuelas*, 579 F. Supp. 2d 461, 473 (S.D.N.Y. 2008) (applying group pleading doctrine to company's CEO, Chairman, and Executive Vice President); *see also 380544 Canada, Inc. v. Aspen Tech.*, 544 F. Supp. 2d 199, 218-19 (S.D.N.Y. 2008) (applying group pleading doctrine to company's CEO, CFO, and Executive Vice President/Co-COO even though they did not personally participate in the drafting of the fraudulent statement and noting that the doctrine has been applied to corporate executives who have occupied similar or even less-high ranking positions).  Accordingly, "'by virtue of [his] high ranking position[] at [IKB Bank and IKB CAM] throughout the Class

---

[15]    As this Court recently held in a case strikingly similar to this one:

> [T]he group pleading doctrine provides an exception "'to the requirement that the fraudulent acts of each defendant be identified separately in the complaint.'"  "[N]o specific connection between fraudulent representations in [an] [o]ffering [m]emorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question."  The group pleading doctrine applies where group-published information, such as an offering memorandum, "are the collective work of those individuals with direct involvement in the everyday business of the company."

*Abu Dhabi*, 651 F. Supp. 2d at 177.

- 22 -

Period, the Court is bound to infer at this stage that [Ortseifen] had direct involvement in [these entities'] daily affairs.'"  *Id.* at 219.

Given Ortseifen's insider status, and the allegations detailing defendants' collaboration to create the false "Top Ratings," plaintiff adequately alleges Ortseifen's false statement.  *See Abu Dhabi*, 651 F. Supp. 2d at 177 (complaint's allegations adequate under group pleading doctrine where complaint alleged that defendants, *inter alia*, designed, structured, marketed and maintained SIV, obtained the ratings assigned to the SIV's notes, and communicated such ratings to investors). Plaintiff is entitled to the inference that the false "Top Ratings" may be attributed to each insider defendant, including Ortseifen.  *Id.*

## IV.    CONCLUSION

For the reasons set forth above, Ortseifen's motion should be denied in full.  In the alternative, plaintiff requests leave to conduct jurisdictional discovery.  Further, if the Court is inclined to grant the defendant's motion in any respect, plaintiff requests leave to file an amended complaint.

DATED:  March 3, 2010                       Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
LUKE O. BROOKS
JASON C. DAVIS


                                     s/ LUKE O. BROOKS
                                 LUKE O. BROOKS

100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:  415-288-4545
415/288-4534 (fax)

- 23 -

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
DANIEL S. DROSMAN
MICHAEL F. GHOZLAND
JESSICA T. SHINNEFIELD
NATHAN R. LINDELL
CHRISTINA A. ROYCE
DARRYL J. ALVARADO
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
JARRETT S. CHARO
58 South Service Road, Suite 200
Melville, NY  1177
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

- 24 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 3, 2010.

s/ LUKE O. BROOKS
LUKE O. BROOKS

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:  415-288-4545
415/288-4534 (fax)
E-mail: JDavis@csgrr.com

507503_1

# Mailing Information for a Case 1:09-cv-08387-SAS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Anne L. Box**
  anneb@csgrr.com,jillk@csgrr.com,E_File_SD@csgrr.com

- **Luke Orion Brooks**
  lukeb@csgrr.com

- **Andrea Rose Butler**
  abutler@cahill.com

- **James J. Coster**
  jcoster@ssbb.com,managingclerk@ssbb.com,jrubins@ssbb.com

- **Patrick Joseph Coughlin**
  patc@csgrr.com

- **Jason Cassidy Davis**
  jdavis@csgrr.com,ptiffith@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Daniel S. Drosman**
  ddrosman@csgrr.com,E_File_SD@csgrr.com,tholindrake@csgrr.com

- **Andrew James Ehrlich**
  aehrlich@paulweiss.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com,mao_sdny@paulweiss.com

- **Jason Michael Hall**
  jhall@cahill.com

- **Roberta Ann Kaplan**
  rkaplan@paulweiss.com,mao_sdny@paulweiss.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Brian T Markley**
  bmarkley@cahill.com

- **John D. McFerrin-Clancy**
  jmcferrin-clancy@lowenstein.com

- **Thomas E. Redburn , Jr**
  tredburn@lowenstein.com

- **James J. Regan**
  jregan@ssbb.com

- **Dean I. Ringel**
  DRingel@Cahill.com,JHall@cahill.com

- **Joshua M. Rubins**
  jrubins@ssbb.com,managingclerk@ssbb.com

- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com

- **Jessica T. Shinnefield**
  jshinnefield@csgrr.com

- **Tobias James Stern**
  tstern@paulweiss.com

- **Thomas S. Wiswall**
  twiswall@phillipslytle.com,jgroat@phillipslytle.com,ecfphillips@phillipslytle.com

- **Aaron Mark Zeisler**
  azeisler@ssbb.com,managingclerk@ssbb.com

- **Adam N. Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
David C. Walton
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P.
655 W. Broadway
Suite 1900
San Diego, CA 92101-3301
```