UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KING COUNTY, WASHINGTON, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 1:09-cv-08387-SAS <br><br> CLASS ACTION |
| Plaintiff, | |
| vs. | |
| IKB DEUTSCHE INDUSTRIEBANK AG, et al., | |
| Defendants. | |
| IOWA STUDENT LOAN LIQUIDITY CORPORATION, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 1:09-cv-08822-SAS <br><br> CLASS ACTION |
| Plaintiff, | |
| vs. | |
| IKB DEUTSCHE INDUSTRIEBANK AG, et al., | |
| Defendants. | |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS IKB
DEUTSCHE INDUSTRIEBANK AG AND IKB CREDIT ASSET MANAGEMENT GMBH'S
MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................1

II.  APPLICABLE LEGAL STANDARDS ................................................................3

III.  ARGUMENT ..........................................................................................................4

    A.  Plaintiffs Have Standing to Assert Claims on Behalf of All Commercial
    Paper Holders ................................................................................................4

    B.  The Complaint Sufficiently Alleges that IKB Made a Material
    Misrepresentation ..........................................................................................5

        1.  The Complaint Pleads a Material Misrepresentation in Compliance
        with Rule 9(b) ....................................................................................5

        2.  The Complaint Sufficiently Alleges the Falsity of the Top Ratings ...........6

        3.  The False Credit Ratings Were Actionable Misrepresentations by
        IKB .....................................................................................................9

    C.  The Complaint Sufficiently Alleges IKB's Knowledge of the Falsity of the
    Top Ratings ..................................................................................................10

        1.  The Complaint Pleads Strong Circumstantial Evidence of IKB's
        Conscious Misbehavior or Recklessness ........................................10

            a.  IKB Knew that the Rhinebridge Portfolio Was Not a Safe,
            Stable Investment ................................................................11

            b.  IKB Knew the Ratings Process Was Flawed ................................13

            c.  IKB Knew the Top Ratings Were Not Objective Due to
            Conflicts of Interest ............................................................15

        2.  IKB Also Had Motive and Opportunity to Issue the False Ratings ...........15

            a.  IKB Was Motivated to Issue the False and Misleading Top
            Ratings ................................................................................16

            b.  IKB Also Had the Opportunity to Disseminate the False
            and Misleading Ratings .......................................................19

507419_1

**Page**

3. IKB's Senior-Level Personnel Changes and the Prosecution of IKB CEO Ortseifen by German Authorities Further Support the Complaint's Scienter Allegations ...............................................................19

D. The Complaint Sufficiently Alleges Reliance ........................................................20

1. The Complaint Sufficiently Pleads Plaintiffs' Reasonable Reliance.........20

2. The Bespeaks Caution Doctrine Is Inapplicable .......................................21

IV. CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009)......................................................................... *passim*

*Ashcroft v. Iqbal*,
    __ U.S. __, 129 S. Ct. 1937 (2009)......................................................................... 3

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................... 3, 12

*Chill v. GE*,
    101 F.3d 263 (2d Cir. 1996)......................................................................... 4

*Conn. Nat'l Bank v. Fluor Corp.*,
    808 F.2d 957 (2d Cir. 1987)......................................................................... 4, 16

*DeLuca v. AccessIT Group, Inc.*,
    No. 08 CIV. 1699 (PKL), 2010 WL 447114
    (S.D.N.Y. Feb. 9, 2010)......................................................................... 12

*DiBlasio v. Novello*,
    344 F.3d 292 (2d Cir. 2003)......................................................................... 12

*Eckstein v. Balcor Film Investors*,
    8 F.3d 1121 (7th Cir. 1993)......................................................................... 25

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)......................................................................... 15

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)......................................................................... 20, 24

*Halperin v. eBanker USA.COM, Inc.*,
    295 F.3d 352 (2d Cir. 2002)......................................................................... 22

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998)......................................................................... 23

*In re Adaptive Broadband Sec. Litig.*,
    No. C 01-1092 SC, 2002 WL 989478
    (N.D. Cal. Apr. 2, 2002)......................................................................... 20

**Page**

*In re Cardiac Devices Qui Tam Litig.*,
    221 F.R.D. 318 (D. Conn. 2004)
    *rev'd in part on other grounds*, 469 F.3d 263 (2d Cir. 2006)..........................................5, 6

*In re Indep. Energy Holdings PLC Sec. Litig.*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001)........................................................22, 23, 24, 25

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006).........................................................................13

*In re Nash Finch Co. Sec. Litig.*,
    502 F. Supp. 2d 861 (D. Minn. 2007).........................................................................20

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009).........................................................................13

*In re Prudential Sec. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ...............................................................................24

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009).........................................................................24

*In re Top Tankers, Inc. Sec. Litig.*,
    528 F. Supp. 2d 408 (S.D.N.Y. 2007).........................................................................17

*J&R Mktg. v. GMC*,
    549 F.3d 384 (6th Cir. 2008) .................................................................................9, 10

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)........................................................................................10

*Kaltman v. Key Energy Servs.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006).......................................................................20

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986)............................................................................................8

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ......................................................................................13

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007)........................................................................................21

- iv -

**Page**

*Milman v. Box Hill Sys. Corp.,*
    72 F. Supp. 2d 220 (S.D.N.Y. 1999)....................................................22, 23, 24, 25

*Min Jin v. Metro. Life Ins. Co.,*
    310 F.3d 84 (2d Cir. 2002)...............................................................................25

*Ofori-Tenkorang v. Am. Int'l Group, Inc.,*
    460 F.3d 296 (2d Cir. 2006)...............................................................................3

*P. Stolz Family P'ship L.P. v. Daum,*
    355 F.3d 92 (2d Cir. 2004)...............................................................................22

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000)...............................................................................16

*Steinberg v. PRT Group, Inc.,*
    88 F. Supp. 2d 294 (S.D.N.Y. 2000)............................................................22, 23

*Strassberg v. N.Y. Hotel & Motel Trades Council, Local 6,*
    31 Fed. Appx. 15 (2d Cir. 2002).........................................................................3

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,*
    531 F.3d 190 (2d Cir. 2008)...............................................................................13

*Wight v. BankAmerica Corp.,*
    219 F.3d 79 (2d Cir. 2000)............................................................................4, 12

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 9(b) ......................................................................................... *passim*
    Rule 12(b)(6)....................................................................................1, 3, 12, 17
    Rule 15(a)(2) ...........................................................................................25

507419_1

## I.      INTRODUCTION

Plaintiffs King County, Washington and Iowa Student Loan Liquidity Corporation (collectively, "plaintiffs") submit this memorandum of law in opposition to Defendants IKB Deutsche Industriebank AG and IKB Credit Asset Management GmbH's Motion to Dismiss the Complaints Under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

This case is about the fraudulent creation and subsequent demise of the shortest-lived "Triple A" investment fund in the history of corporate finance, the Rhinebridge structured investment vehicle (the "SIV"), which defendant IKB[1] arranged and managed.[2]  ¶6.[3]  Prior to the start of the Class Period, IKB was on the brink of insolvency as it had billions of dollars in toxic, mortgage-backed assets weighing down its balance sheet.[4]  ¶126.  With its financial survival on the line, IKB devised a scheme to create and market a financial vehicle, the Rhinebridge SIV, to which IKB could sell its own toxic assets, in secret, at prices it could never achieve by selling them on the open market.  *Id.*

However, IKB knew that without the SIV and its senior debt securities ("Senior Notes")

---

[1]      "IKB" refers to defendants IKB Deutsche Industriebank AG and IKB Credit Asset Management GmbH.

[2]      A detailed summary of plaintiffs' allegations regarding the IKB defendants is set forth in Plaintiffs' Memorandum of Law in Opposition to Defendant Stefan Ortseifen's Motion to Dismiss the Complaint.

[3]      Unless otherwise noted, all "¶__" and "¶¶__" are to the Complaint for Violations of New York State Law filed by King County, Washington on October 2, 2009, Case No. 09-CV-8387-SAS, Dkt. No. 1.  On October 27, 2009, the Court related this case to the case commenced by Iowa Student Loan Liquidity Corporation on October 16, 2009, which was assigned Case No. 09-CV-8822.  Because the complaints filed in both cases are substantially identical, references herein to the "Complaint" shall refer to both complaints.

[4]      The "Class Period" is from June 1, 2007 through October 18, 2007.  ¶170.

receiving the highest possible credit ratings ("Top Ratings"), the SIV would never come into existence. ¶57. To incentivize the Rating Agency defendants[5] to provide the Top Ratings necessary for the SIV's successful launch, IKB made the Rating Agencies' compensation contingent upon their providing the Top Ratings IKB desired, and then collaborated with the Rating Agencies to produce those ratings. ¶60. The Rating Agencies ultimately assigned the SIV and its Senior Notes "the highest ratings that could be given to an investment," which were "similar to ratings assigned to bonds backed by the full faith and credit of the U.S. government such as U.S. Treasury Bills." ¶68. Despite IKB and the Rating Agencies' knowledge that these Top Ratings were false and misleading, as they had no basis in economic reality, IKB disseminated the Top Ratings to investors. ¶¶82-122.

Although the SIV collapsed in late October 2007 – fewer than four months after its launch – by then, IKB had already achieved its goal, narrowly staving off insolvency by shifting more than $1 billion in toxic assets off its own balance sheet into the SIV, and earning substantial fees through its creation and management of the SIV to boot. ¶¶125-126. Investors, who reasonably and justifiably relied on the Top Ratings, ultimately ended up subsidizing IKB's losses through their purchases of the Senior Notes, suffering significant damages as a result. ¶128.

In *Abu Dhabi*, under strikingly similar circumstances, the Court denied defendant Morgan Stanley's, the arranger of the Cheyne SIV, motion to dismiss plaintiffs' common law fraud claims. *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 181 (S.D.N.Y. 2009). Because here, IKB, as both the ***arranger and manager*** of the Rhinebridge SIV, participated even more directly in the alleged fraud than Morgan Stanley did in *Abu Dhabi*, IKB's motion to dismiss

---

[5]     "Rating Agency defendants" or "Rating Agencies" refer to The McGraw Hill Companies, Inc., Moody's Investors Service, Inc., Moody's Investors Service Limited and Fitch, Inc.

must be denied. *Id*.

## II.   APPLICABLE LEGAL STANDARDS

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) must be denied where, as here, the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009).[6]  Importantly, "[p]lausibility 'is not akin to a probability requirement.'" *Abu Dhabi*, 651 F. Supp. 2d at 170 (quoting *Ashcroft*, 129 S. Ct. at 1949).  Rather, the plausibility standard is satisfied "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id*.  Moreover, in making this determination, "the court must 'accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in the plaintiff's favor.'"  *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007)); *see also Ofori-Tenkorang v. Am. Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).  Here, the Complaint easily passes the plausibility test.

To state a claim for common law fraud under New York state law, a complaint must allege:

"(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."[7]

---

[6]    Citations are omitted and emphasis is added, unless otherwise noted.

[7]    IKB moves to dismiss the Complaint on grounds that it does not adequately plead the first, second and fourth elements of plaintiffs' common law fraud claim.  *See* Memorandum of Law of Defendants IKB Deutsche Industriebank AG and IKB Credit Asset Management GmbH in Support of Their Motion to Dismiss the Complaints Under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure ("IKB MTD") at 6.  Having failed to challenge the remaining elements of plaintiffs' claims in their moving papers, IKB has effectively conceded the adequacy of plaintiffs' allegations with regard to those elements.  *See Strassberg v. N.Y. Hotel & Motel Trades Council, Local 6*, 31 Fed. Appx. 15, 17 (2d Cir. 2002) ("failure to raise [an] issue in [the] opening brief waives it").

507419_1

*Abu Dhabi*, 651 F. Supp. 2d at 171.

When asserting a fraud claim, "Rule 9(b) requires that 'the circumstances constituting fraud . . . be stated with particularity. ***Malice, intent, knowledge, and other condition of mind of a person may be averred generally***.'" *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000) (quoting Fed. R. Civ. P. 9(b)). Thus, in common law fraud actions, which are not subject to the Private Securities Litigation Reform Act's ("PSLRA") more stringent pleading requirements, the "'requisite intent of the alleged [perpetrator] ***need not be alleged with great specificity***.'" *Id.* (quoting *Chill v. GE*, 101 F.3d 263, 267 (2d Cir. 1996)). As the Second Circuit explained, "[w]e apply the more general standard to scienter for the simple reason that 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" *Id.* (quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)). That said, the Complaint satisfies both standards.

## III.   ARGUMENT

### A.   Plaintiffs Have Standing to Assert Claims on Behalf of All Commercial Paper Holders

IKB's assertion that plaintiffs lack standing to pursue the fraud claims of class members who purchased Rhinebridge Commercial Paper outside of the U.S. is meritless. *See* IKB MTD at 5-6. IKB's challenge of plaintiffs' standing relies entirely upon the Court's holding in *Abu Dhabi*, 651 F. Supp. 2d at 169-70. *See* IKB MTD at 5-6. However, IKB's reliance on *Abu Dhab*i is misplaced, as nowhere in that opinion does the Court hold that plaintiffs who purchase notes in a particular geographic location lack standing to represent plaintiffs who purchased those same notes in a different geographic location. 651 F. Supp. 2d at 169-70. Rather, in *Abu Dhabi*, the Court held that commercial paper and mezzanine capital note holders lacked standing to assert claims of medium term note holders, because, as ***purchasers of an entirely different class of note***, there was a concern that medium term notes holders' injuries differed from those of commercial paper and mezzanine

- 4 -

capital note holders.[8]  651 F. Supp. 2d at 169 ("A putative class representative lacks standing to bring a claim if it did not suffer the injury that gives rise to that claim.").

Here, because: (1) the credit ratings for the U.S. and European Commercial Paper were identical, (2) the seniority of the U.S. and European Commercial Paper was identical, (3) the assets underlying the SIV were identical, and (4) the Rating Agencies downgraded the U.S. and European Commercial Paper at the same time and in the same manner, there is no concern, as there was in *Abu Dhabi*, that European Commercial Paper holders "did not suffer the [same] injury" as U.S. Commercial Paper holders. *Id.*  Accordingly, plaintiffs have standing to assert a fraud claim on behalf of all Commercial Paper purchasers, regardless of the geographical location where the purchase was made.

      **B.**    **The Complaint Sufficiently Alleges that IKB Made a Material Misrepresentation**

            **1.**    **The Complaint Pleads a Material Misrepresentation in Compliance with Rule 9(b)**

To adequately plead the first element of common law fraud, "a misrepresentation or omission of material fact," in compliance with Fed. R. Civ. P. 9(b), a complaint must:

> (1) specify the statements the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent.

*In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 332 (D. Conn. 2004), *rev'd in part on other grounds*, 469 F.3d 263 (2d Cir. 2006).

However, as the Court explained in *Abu Dhabi*, where, as here, "defendants are insiders or

---

[8]     Plaintiffs do not purport to assert claims based on Rhinebridge Medium Term Notes, as Rhinebridge never actually issued any Medium Term Notes.  *See* IKB MTD at 6 ("no Medium Term Notes were issued").

- 5 -

affiliates participating in the offer of securities . . . 'reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of representation.'" 651 F. Supp. 2d at 171.  The Complaint alleges that IKB was an insider participating in the offering of the Senior Notes (*see, e.g.*, ¶¶17, 23), and also repeatedly references the Private Placement Memoranda IKB provided to investors.  *See* ¶¶58, 67, 74, 77.  Thus, the Complaint's allegations satisfy Rule 9(b)'s pleading requirement.  *Abu Dhabi*, 651 F. Supp. 2d at 177.

In short, the Complaint's allegations: (1) that the false "Top Ratings" for the Senior Notes were communicated to investors; (2) by IKB; (3) through a "commonly used investment platform provided by *Bloomberg*" and the Private Placement Memoranda on each day throughout the Class Period; and (4) that such ratings conveyed false information about the SIV and the Senior Notes (¶¶2-4, 67, 72, 75-77, 79) satisfy Rule 9(b)'s pleading requirements, especially given the complexity of defendants' fraudulent scheme.[9]

### 2.    The Complaint Sufficiently Alleges the Falsity of the Top Ratings

The Complaint adequately pleads the falsity of the Top Ratings assigned to the Senior Notes. Defendants collaborated to assign "Top Ratings" to the Senior Notes, which they defined in the Private Placement Memorandum as follows:

> "***Top Rated***" or "***Top Ratings***" means, in the case of S&P, AAA for notes with original term maturities exceeding 364 days and A-1+ for commercial paper, in the case of Fitch, AAA for notes with original maturities exceeding 364 days and F1+ for commercial paper, and, in the case of Moody's, Aaa for notes with original maturities exceeding 364 days and P-1 for commercial paper.

---

[9]    *See Cardiac Devices*, 221 F.R.D. at 333-34 (collecting cases and finding "courts have tempered the heightened pleading requirements of Rule 9(b) when the underlying purposes of Rule 9(b) have been met or when pleading each instance of the allegedly fraudulent conduct would be impractical").

- 6 -

¶67.  These "Top Ratings" mean: (a) the Senior Notes were nearly risk free; (b) the Senior Notes were as safe, secure and reliable as high quality corporate or government bonds; (c) the Senior Notes had an extremely low probability of transitioning to "junk" status; (d) the Senior Notes had a very low probability of default; (e) the Senior Notes had a reasonably high likelihood of a high recovery in the event of default; (f) the Senior Notes had been rated by an objective, independent third-party whose impartiality was not impaired by any significant conflicts of interest, such as the payment of triple-sized fees for structuring and closing Rhinebridge; (g) the Senior Notes had been rated on the basis of current, accurate and complete data and analysis, as well as reasonable and true models and assumptions, not mere "guess work" and speculation; and (h) the low rates of return offered by the Senior Notes were appropriate and reflected the true level of risk associated with the Senior Notes. ¶75.

The information the Top Ratings conveyed to investors about the strength and quality of the Senior Notes was false and misleading.  For example, the Top Ratings communicated to investors that the Senior Notes were "nearly risk free" and "were as safe, secure and reliable as high quality corporate or government bonds." ¶75.  In reality, however, the Senior Notes were anything but, as "Rhinebridge held over a billion dollars of toxic, low-quality mortgage-backed securities." *See* ¶9. "[B]ecause the basic premise of an SIV, as reinforced through the issuance of the Top Ratings, was to acquire only high-quality assets, the inclusion of low-quality toxic mortgage-backed assets rendered the ratings false and misleading." ¶119.  Indeed, the Top Ratings were false from the outset because Rhinebridge breached its Major Capital Loss Test ("Capital Test"), which was intended to prevent the SIV from issuing any Senior Notes when the value of the assets included in its portfolio declined below a certain level, "***before*** defendants launched Rhinebridge as a new

investment on June 27, 2007."[10]  ¶¶111-118.

Additionally, the Top Ratings were false and misleading because they "were based on inaccurate data."  ¶147; *see also* ¶¶148-161.  Specifically, "defendants used models based on historical information preceding 2000 that had no relevance to rating Rhinebridge."  ¶148.  Even though defendants knew that "the Rating Agencies' pre-2000 loan performance data [was] obsolete and irrelevant to rating the Senior Notes," and even though they knew that there was "more current and accurate information . . . available during the relevant time, the Rating Agencies did not update their models to reflect these changes."  ¶150.  Defendants' use of stale, inaccurate data to rate the Senior Notes resulted in the issuance of false ratings.  *Id*.  These allegations, when viewed collectively, satisfy Rule 9(b)'s requirement for pleading falsity.  *See Abu Dhabi*, 651 F. Supp. 2d at 171 (holding that plaintiffs had sufficiently pled the falsity of defendants' credit ratings in a nearly identical circumstance).

---

[10]     Contrary to IKB's assertions (IKB MTD at 10), the Complaint's allegation regarding Rhinebridge's breach of the Capital Test prior to its launch is properly pled on information and belief.  ¶115.  As IKB concedes, allegations of falsity are properly pled on information and belief when the allegation concerns "'matters peculiarly within the opposing party's knowledge.'"  IKB MTD at 10 (quoting *Luce v. Edelstein*, 802 F.2d 49, 54 n.1 (2d Cir. 1986)).  Here, whether the Rhinebridge SIV's assets degraded by approximately 8% or more, thereby causing a breach of the SIV's Capital Test, prior to its launch is "'a matter[] peculiarly within [IKB and the Rating Agencies'] knowledge,'" as only defendants were privy to which collateral assets were actually included in the Rhinebridge SIV at the time it was initially offered.  *Id.*; *see* ¶¶111, 119.  Moreover, the Complaint details the various bases for plaintiffs' belief that the Capital Test was breached prior to the SIV's launch.  *See, e.g.*, ¶118 (plaintiffs' information and belief is based on statements by indicted fund managers for Bear Stearns, ***which invested "in the same kinds of risky mortgage-backed securities held by Rhinebridge*,**" that by April 2007, "the subprime market look[ed] pretty damn ugly" and that the "entire subprime market [was] toast."  Thus, the Complaint's Capital Test allegations are appropriately pled on information and belief.

### 3.      The False Credit Ratings Were Actionable Misrepresentations by IKB

The false Top Ratings constitute actionable misrepresentations by IKB.  In *Abu Dhabi*, the Court held that false credit ratings assigned to a SIV's notes are actionable statements attributable to a defendant "through the group pleading doctrine" where: (1) the defendant and the rating agencies had "'together designed, structured, marketed and maintained'" the SIV; (2) the defendant had "obtained the ratings assigned to the Rated Notes by the Rating Agencies"; and (3) the defendant "provided . . . potential investors with . . . the alleged misleading ratings, accompanying definitions of the ratings, and statements regarding the Rated Notes' safety and stability through preliminary and final Information Memoranda."  651 F. Supp. 2d at 177.

IKB engaged in precisely the same conduct here.  For example, the Complaint alleges that IKB and the Rating Agencies "'together designed, structured, marketed and maintained'" the SIV. *Id*.; *see, e.g.*, ¶23 (IKB "collaborated with the Rating Agencies to structure Rhinebridge and create the Top Ratings").  The Complaint also alleges that IKB "obtained the ratings assigned to the [Senior Notes]." *Abu Dhabi*, 651 F. Supp. 2d at 177; *see, e.g.*, ¶¶58-60.  The Complaint further alleges that IKB "provided . . . potential investors with . . . the alleged misleading ratings, accompanying definitions of the ratings, and statements regarding the Rated Notes' safety and stability." *Abu Dhabi*, 651 F. Supp. 2d at 177; *see, e.g.*, ¶¶79, 67.  Accordingly, as in *Abu Dhabi*, the credit ratings are actionable misrepresentations attributable to IKB through the group pleading doctrine.[11]  651 F.

---

[11]      IKB's citation to the Sixth Circuit's opinion in *J&R Mktg. v. GMC*, 549 F.3d 384, 392-93 (6th Cir. 2008), for the proposition that false credit ratings assigned to a security are not attributable to the issuer of the security is unpersuasive.  IKB MTD at 7-8.  The key distinction is that, unlike this case, in *J&R Mktg.* the issuer and rating agency did not collaborate to structure and rate the bond offering.  549 F.3d at 392-93.  As this Court held in *Abu Dhabi*, where, as here, a defendant works closely with the rating agencies to "'design[], structure[], market[] and maintain[]'" a SIV, false

Supp. 2d at 177.

### C.  The Complaint Sufficiently Alleges IKB's Knowledge of the Falsity of the Top Ratings

Under New York law, in order to successfully plead the knowledge, or scienter, element of a common law fraud claim, a complaint may plead *either*: (1) "'strong circumstantial evidence of conscious misbehavior or recklessness'" *or* (2) "'motive and opportunity to commit fraud.'" *Id.* at 171; *see also Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001). Here, the Complaint sufficiently pleads IKB's conscious misbehavior or recklessness, as well as that it had motive and opportunity to commit the fraud alleged.

### 1.  The Complaint Pleads Strong Circumstantial Evidence of IKB's Conscious Misbehavior or Recklessness

The Complaint pleads "'strong circumstantial evidence of [IKB's] conscious misbehavior or recklessness.'" *Abu Dhabi*, 651 F. Supp. 2d at 171. In *Abu Dhabi*, the Court held that plaintiffs sufficiently pled strong circumstantial evidence of conscious misbehavior where they alleged that defendants, in connection with the issuance of SIV notes: (1) "knew that the portfolio was not a safe, stable investment"; (2) "knew that the ratings process was flawed"; and (3) "knew that the Rating Agencies could not issue an objective rating because of the effect it would have on their compensation." *Id.* at 179. Although any one of these facts standing alone would be sufficient to establish scienter, the Complaint here, as in *Abu Dhabi*, alleges all three. Accordingly, the Complaint pleads IKB's scienter in compliance with Fed. R. Civ. P. 9(b). *Id.* at 178.

---

credit ratings issued in connection with the SIV are attributable to the defendant. 651 F. Supp. 2d at 177. Moreover, in *Abu Dhabi*, the Court explicitly distinguished cases that were factually similar to *J&R Mktg.* because in those cases, "plaintiffs had failed to establish any inside link between the defendant and the issuer or a direct connection between the defendant and the document alleged to contain misstatements." *Id.* Thus, IKB's reliance on *J&R Mktg.* is misplaced.

- 10 -

**a.    IKB Knew that the Rhinebridge Portfolio Was Not a Safe, Stable Investment**

As in *Abu Dhabi*, IKB "knew that the portfolio was not a safe, stable investment."  251 F. Supp. 2d at 179; *see, e.g.*, ¶13 ("At no time was Rhinebridge a conservative, safe and secure investment and defendants knew it.").  IKB knew which securities the SIV held as assets, but did not provide that information to investors.  ¶11.  Moreover, IKB also knew, even prior to the SIV's initial private offering on June 27, 2007, that "the true market values of . . . Rhinebridge's constituent assets were crashing."  *Id*.

One reason that IKB knew the Rhinebridge SIV was not the safe, stable investment IKB represented it to be was because ***IKB sold over $1 billion in "toxic subprime assets from its own balance sheet" to the SIV "at prices IKB never could have achieved in an open market*."  ¶126. Even more specifically, the Complaint alleges that IKB "sold over $600 million in 'home equity' or low quality subprime bonds to investors through Rhinebridge and another $350 million in CDOs, which consisted mostly of toxic residential mortgage bonds."  *Id*.  Because IKB dumped over $1 billion in toxic assets from its own balance sheet into the Rhinebridge SIV, IKB was clearly aware that the SIV was not a safe, stable investment deserving of the Top Ratings assigned.  *See Abu Dhabi*, 651 F. Supp. 2d at 179.

Another reason IKB knew that the SIV was not a safe and stable investment was because, prior to the launch of the SIV, the SIV had already breached its Capital Test.  ¶115.  As the Complaint alleges, "[i]f the value of Rhinebridge's assets declined by approximately 8%," the Capital Test was breached, and Senior Notes were not supposed to be issued.  ¶¶52, 111.  The Complaint alleges that by June 27, 2007, the SIV's assets had declined by at least 8%, thereby

- 11 -

breaching its Capital Test.  ¶¶52, 115.  IKB was aware of this breach, providing IKB with further

knowledge that the SIV's portfolio was not the safe, stable investment IKB purported it to be.[12]  *See*

*Abu Dhabi*, 651 F. Supp. 2d at 179; *see, e.g.*, ¶¶52, 113-117.

Similarly, the Complaint alleges that IKB allowed the Rhinebridge SIV to violate its

operating instruction that "permitted at most 4% exposure to a single obligor."  ¶142.  Specifically,

the Complaint alleges that "Rhinebridge acquired exposure to approximately $250 million in

Countrywide securities, or approximately three times higher than the 4% limit."[13]  *Id.*  Because IKB

knew that Rhinebridge's operating instructions had been breached, it knew that the Rhinebridge SIV

was not the safe, stable investment IKB represented it to be.

A final indicator to IKB that the Rhinebridge portfolio was not, in reality, a safe, stable

investment was that IKB, by virtue of its management of an even larger SIV called Rhineland,

received market reports showing that "the market for Rhinebridge's obligations and its constituent

securities was crashing."   ¶121.   The Complaint alleges that IKB knowingly or recklessly

---

[12]    IKB's contention that the Complaint inadequately pleads IKB's knowledge of Rhinebridge's breach of the Capital Test because "[p]laintiffs never reference any specific reports reviewed by identified individuals at IKB that establish a breach of the test occurred" (*see* IKB MTD at 22) is without merit because, unlike the cases IKB cites (*see* IKB MTD at 22-23 n.16), which are all federal securities law cases governed by the PSLRA's heightened pleading standard, in common law fraud cases, scienter may be alleged "generally," *i.e.*, without "great specificity."  Fed. R. Civ. P. 9(b); *Wight*, 219 F.3d at 91.

[13]    IKB disputes the Complaint's allegation that the Rhinebridge SIV violated its operating instructions by acquiring $250 million in Countrywide securities.  *See* IKB MTD at 24.  However, this is a factual dispute not appropriate for resolution at this stage of the litigation.  *See DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003) (holding that "a disputed issue of fact . . . is inappropriate to consider in the context of a Rule 12(b)(6) motion"); *DeLuca v. AccessIT Group, Inc.*, No. 08 CIV. 1699 (PKL), 2010 WL 447114, at *7 (S.D.N.Y. Feb. 9, 2010) (same).  Moreover, on a motion to dismiss, "the court must 'accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in the plaintiff's favor.'" *Abu Dhabi*, 651 F. Supp. 2d at 170 (quoting *Bell Atl.*, 550 U.S. at 572).

- 12 -

disregarded the information contained in these reports. *Id.*

For all of these reasons, IKB's assertion that the Complaint must be dismissed because it purportedly fails to plead a "strong inference" that "a named individual defendant or some other specific high-ranking corporate official whose state of mind can be imputed to the corporate entity" possessed the requisite scienter (IKB MTD at 19) is clearly absurd. Moreover, the Second Circuit opinion IKB cites for this proposition – *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008) – clearly holds the opposite: "***[I]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud***.'" *Id.* at 196 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). Indeed, in *Dynex*, the Second Circuit explicitly held: "***[W]e reject [defendants'] contention that [plaintiffs] failed as a matter of law to plead scienter against [the corporate defendant] when it failed to plead scienter against [the individual defendants]***." *Id.* ("[W]e do not believe [Congress] has imposed the rule urged by defendants, that in no case can corporate scienter be pleaded in the absence of successfully pleading scienter as to an expressly named officer."); *see also In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (same); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 303 (S.D.N.Y. 2009) (same).

**b.       IKB Knew the Ratings Process Was Flawed**

As in *Abu Dhabi*, the Complaint alleges also that IKB "knew that the ratings process was flawed." 651 F. Supp 2d at 179; *see, e.g.*, ¶¶138-149. As the Court noted in *Abu Dhabi*, during the timeframe when defendants created and issued the Top Ratings, ratings agencies and other "industry insiders," like IKB, generally "knew" that "the process used to derive ratings generally was deeply flawed and unreliable." 651 F. Supp. 2d at 178. Moreover, the Complaint alleges that IKB knew

- 13 -

that the ratings process that generated the particular Top Ratings at issue here was flawed, as "the Rating Agencies used inaccurate and stale information to create Rhinebridge's constituent assets, and compounded this problem by failing to monitor and update the information regarding these constituent assets after they were first created."  ¶48; *see also* ¶¶141-149.

For example, "defendants well knew" that the "Top Ratings assigned to the Senior Notes did not reflect the actual correlation risks associated with the securities included in Rhinebridge's investment portfolio," but instead were based on "mere speculation."  ¶¶141-143.  Additionally, "defendants knew but failed to appropriately rate the Senior Notes given the lending practices that had been used to generate the underlying mortgages," including stated income loans (aka "liar loans"), mortgages based on artificially inflated appraisals, and loans to nonprime borrowers with "silent seconds," all of which "dramatically increased the probability of delinquencies, defaults, foreclosures and, ultimately, losses."  ¶144.  These "exotic mortgage products characterizing the U.S. marketplace after 2000 performed poorly relative to the performance required for their models, *and defendants knew it*."  ¶149.

In short, the models used by the Rating Agencies to attain the Top Ratings were flawed because they were "'totally out of touch with the underlying economic reality.'"[14] ¶48.  These facts demonstrate that IKB "knew that the ratings process was flawed."  *Abu Dhabi*, 651 F. Supp. 2d at 179.

---

[14]    The Complaint further alleges that the Rating Agencies possessed, but elected not to use, updated models that would better structure and rate Rhinebridge and its constituent assets.  *See* ¶¶150-161.

### c.   IKB Knew the Top Ratings Were Not Objective Due to Conflicts of Interest

The Complaint alleges IKB "knew that the Rating Agencies could not issue an objective rating because of the effect it would have on their compensation." *Id.* In *Abu Dhabi*, the Court explained that where ratings agencies are compensated "at a fee substantially larger than normally received," which is "directly connected to the success" of the SIV, "[t]his structure create[s] a conflict of interest that compromise[s] the objectivity of the ratings. *Id.* at 178.

The fees the Rating Agencies received in connection with the rating of the Rhinebridge SIV and its notes were "three time higher than the Ratings Agencies' compensation for rating traditional municipal or corporate bonds." ¶58; *see also* ¶98 ("Recent statements by industry insiders indicate the Rating Agencies were paid nearly three times the amount to rate Rhinebridge as they would have received to rate a traditional corporate debt obligation.").

Further, the Rating Agencies received approximately $1.8 million in "success fees," which were received "only in the event that the transaction closed **with** the desired 'Top Ratings.'" ¶60; *see also* ¶82 ("[I]t was a condition to the sale of the Senior Notes that they receive the highest ratings possible."); ¶98 ("The Rating Agencies' structuring activities and attendant 'pay for performance' compensation undermined the credibility of their ratings . . . ."). Thus, here, as in *Abu Dhabi*, IKB "knew that the Rating Agencies could not issue an objective rating because of the effect it would have on their compensation." 651 F. Supp. 2d at 179.

### 2.   IKB Also Had Motive and Opportunity to Issue the False Ratings

In addition to alleging facts demonstrating that IKB knew or recklessly disregarded the falsity of the Top Ratings, the Complaint also alleges that IKB had motive and opportunity to issue the false ratings, which further bolsters the Complaint's scienter allegations. *See Ganino v. Citizens*

- 15 -

*Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000); *Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000).

"Adequately pleading '[m]otive would entail concrete benefits that could be realized by one or more

of the false statements . . . alleged,' while adequately pleading 'opportunity would entail the means

and likely prospect of achieving concrete benefits by the means alleged.'" *Abu Dhabi*, 651 F. Supp.

2d at 171.  Here, the Complaint sufficiently alleges that IKB had both "motive and opportunity to

communicate [the] allegedly false and misleading ratings to potential investors" in the Rhinebridge

SIV.  *Id.* at 179.

        **a.**        **IKB Was Motivated to Issue the False and Misleading**
                        **Top Ratings**

IKB's motive is pled in compliance with Fed. R. Civ. P. 9(b), as the Complaint specifically

identifies and explains three factors that motivated IKB to issue the false and misleading Top

Ratings: (1) IKB's objective was to sell assets from its balance sheet at prices it could never obtain

on the open market; (2) IKB was highly compensated to do so; and (3) IKB faced its own insolvency

if it revealed the true quality of the assets included in Rhinebridge.  ¶124; *see also* ¶¶125-129.

*First*, the Complaint alleges that IKB was motivated by its desire to "unload toxic subprime

assets from its own balance sheet."[15]  ¶126.  Ultimately, "IKB sold over $1 billion in toxic mortgage-

---

[15]     IKB claims that, "in flat derogation of Rule 9(b)," the Complaint's motive allegation with respect to IKB unloading its own toxic assets off its books and into the SIV "[are] not supported by ***any*** particularized facts."  IKB MTD at 20-21 (emphasis in original).  IKB is wrong.  As a threshold matter, under Rule 9(b), as interpreted by the Second Circuit, the Complaint's scienter allegations, including motive, ***need not "be alleged with 'great specificity*****.**'"  *Conn. Nat'l Bank*, 808 F.2d at 962.  Therefore, IKB's assertion that, in order to comply with Rule 9(b), the Complaint must specifically allege the exact "prices at which IKB AG supposedly purchased the assets at issue (and then sold them to Rhinebridge)," as well as "those assets' 'true' value at the time Rhinebridge bought them from IKB AG," is simply incorrect.  IKB MTD at 21.  Not surprisingly, IKB cites no authority for this proposition.  *Id.*  Moreover, even though Rule 9(b) does not require it, the Complaint's motive allegations with respect to IKB's dumping of its own toxic assets into the SIV are pled with specificity.  *See, e.g.*, ¶¶126-129.

backed assets to Rhinebridge at prices IKB could never have achieved in an open and competitive market." *Id.* "IKB achieved this goal by entering into a forward purchase agreement with Rhinebridge on November 6, 2006 (amended through May 25, 2007) to sell approximately $4 billion in assets for the purchase price paid by IKB." ¶128. The Complaint further alleges that "[t]he prices paid for these assets by IKB in late 2006 or early 2007 were materially higher than their true worth when over $1 billion in assets were sold under this agreement to Rhinebridge's investors starting on or about June 27, 2007." *Id.* Through these sales, investors "essentially provided IKB over a billion dollars in cheap off-balance-sheet finance and covered all of IKB's market losses on the assets IKB sold to Rhinebridge." *Id.* These facts demonstrate IKB's motive to defraud plaintiffs.[16] *See* ¶¶124-129.

---

[16]   IKB asserts that its purchase of "$110 million worth of the Rhinebridge junior Capital Notes" creates an opposite inference – *i.e.*, "that IKB AG did not commit fraud and believed that the Rhinebridge vehicle was financially sound" – that is "far more cogent and persuasive than any inference of scienter that Plaintiffs would seek to draw." IKB MTD at 21-22. As a threshold matter, this argument relies upon documents that dehore the Complaint. *See* Plaintiffs' Motion to Exclude Extraneous Materials Improperly Relied on by Defendants in Their Rule 12(b)(6) Motions at 9.

However, even if this document was somehow properly considered on a motion to dismiss – and it is not – there are several more persuasive inferences to be drawn. First, if IKB was confident of the value of the billions of dollars of assets held in the Rhinebridge SIV, it would not have transferred those assets off its own balance sheet. Second, depending on the timing, it is far more plausible that any IKB investment in junior Capital Notes was made for the purpose of (a) ensuring that the SIV's highly lucrative Senior Notes could be issued in the first place, as they could not be issued until ***after*** the junior Capital Notes had all been purchased; or (b) preventing the SIV from imploding, thereby allowing IKB to continue transferring toxic assets from its own balance sheets into the SIV and avoid its own insolvency. *See* ¶¶124-129. Each of these inferences is far more plausible than the inference suggested by IKB, because it made economic sense for IKB to invest $110 million in junior Capital Notes to enable it, or preserve its ability, to shift billions of dollars of toxic assets off its own balance sheet into the SIV. ¶126. In a battle of inference-weighing, IKB loses. *See In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 413 (S.D.N.Y. 2007) ("[E]ven if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the 'tie . . . goes to the plaintiff.'").

- 17 -

*Second*, the Complaint alleges that IKB was further motivated to issue the false and misleading Top Ratings because IKB knew that the only way it would receive substantial remuneration through its operation of the SIV was if the SIV obtained Top Ratings.  *See* ¶¶57, 82, 125-126.  As the Complaint alleges, 100% of the profits from the Rhinebridge SIV were to go directly to IKB (after paying the Rating Agencies' ongoing fees).[17]  ¶¶125-126.  IKB knew that without the Top Ratings, however, the Rhinebridge SIV would never come into existence, and, consequently, IKB would lose out on millions of dollars in profit.  *See, e.g.*, ¶57 ("Without the 'Top Ratings,' Rhinebridge would not have existed and could not have operated.").  Therefore, IKB had a strong economic motivation to obtain Top Ratings for the Senior Notes – regardless of whether they were warranted – as well as to "create the illusion that Rhinebridge's collateral assets had high market values and to maintain this illusion as long as possible in order to generate the incentive-based compensation."  ¶125.  In *Abu Dhabi*, under extremely similar circumstances, the Court held that these facts provided "motive" and supported plaintiffs' scienter allegations.[18]  651 F. Supp. 2d at 180 ("Morgan Stanley also knew that the Rated Notes of the Cheyne SIV would not sell without the Rating Agencies' highest ratings and was motivated to ensure that the Rated Notes received high

---

[17]    The Complaint alleges that "[u]nder the Rhinebridge Senior Notes program," IKB was to receive: (1) a "management fee of 0.05% of the market value of the collateral assets"; (2) "another 0.04% calculated in the same manner"; and (3) "a third incentive fee based on Rhinebridge's profit or 'spread' derived from the interest payments received from Rhinebridge's collateral assets minus the interest paid to its investors, including investors in the Senior Notes."  ¶125.

[18]    IKB's assertion that "the mere desire to receive contractually-provided fees or otherwise to earn compensation for services rendered is not sufficiently concrete to give rise to a strong inference of scienter" (IKB MTD at 19-20) is unpersuasive because here, unlike in the cases IKB cites in support of its argument (*id.* at 20 n.10), IKB's ability to earn its incentive fees was contingent upon the SIV's acquisition of the Top Ratings.  *See* ¶¶57, 82.  In *Abu Dhabi*, the Court held that this same fact – *i.e.*, defendants' ability to earn fees in connection with a SIV was contingent upon the SIV receiving high ratings – provided motive.  651 F. Supp. 2d at 180.

- 18 -

ratings, whether or not those ratings were justified.").

*Lastly*, the Complaint alleges facts demonstrating that, had IKB "revealed the true quality of the assets included in Rhinebridge," it would have faced insolvency. ¶124. The forgoing facts, especially when viewed collectively, demonstrate IKB's motive to issue the false and misleading Top Ratings.

> **b.      IKB Also Had the Opportunity to Disseminate the False and Misleading Ratings**

IKB had the opportunity – *i.e.*, was "well-positioned" – to disseminate the false and misleading Top Ratings. *Abu Dhabi*, 651 F. Supp. 2d at 180. Here, as in *Abu Dhabi*, IKB worked closely with the Rating Agencies in structuring, rating and disseminating the Top Ratings. *Id.*; *see, e.g.*, ¶179 ("Defendants collaborated in creating and disseminating the false and misleading ratings."); ¶2 (IKB and the Rating agencies "collaborated to produce and rate Rhinebridge's senior debt securities."). As with Morgan Stanley in *Abu Dhabi*, the Complaint in this case alleges that it was through IKB's "distribution of the Selling Document that the false and misleading ratings reached investors." 651 F. Supp. 2d at 180; *see, e.g.*, ¶180 ("defendants made identical false and misleading statements by way of the ratings to members of the plaintiff class on each day throughout the Class Period through various private information services, including *Bloomberg*, and confirmed through private placement memoranda"). Thus, here, as in *Abu Dhabi*, "[b]oth of these allegations establish that [IKB] was well positioned to cause the false and misleading ratings to be disseminated to investors, thereby establishing [IKB's] opportunity to commit the alleged fraud." 651 F. Supp. 2d at 180.

> **3.      IKB's Senior-Level Personnel Changes and the Prosecution of IKB CEO Ortseifen by German Authorities Further Support the Complaint's Scienter Allegations**

The Complaint alleges that five of IKB's "senior executives have either been fired or retired

- 19 -

over IKB's risky subprime bets." ¶12; *see also* ¶130. Specifically, the Complaint alleges that "[i]t is no coincidence that CEO Stefan Ortseifen and CFO Volker Doberanzke of IKB Bank 'retired' on July 29, 2007 and August 7, 2007, respectively," and that "CEO Winfried Reinke of IKB CAM was fired on August 1, 2007." ¶130. These key, senior-level personnel changes at IKB occurring shortly after the Rhinebridge SIV collapsed are "highly suspicious" and, therefore, serve to bolster the Complaint's already strong scienter allegations. *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (changes in personnel coinciding with the fraud "add one more piece to the scienter puzzle"); *see also Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006) (defendant's termination was "a factor which supports a strong inference of scienter").

The Complaint also alleges that "on August 10, 2007, authorities in Germany began investigating IKB 'managers' on suspicion of criminal disloyalty and other charges," and that defendant Ortseifen was charged with "market manipulation." ¶¶130, 132. These government investigations lend further support to the Complaint's scienter allegations. *See, e.g.*, *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (Scheindlin, J.) (holding that an SEC investigation was "probative of scienter"); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 882 (D. Minn. 2007) (same). "[U]nexpected resignations and [governmental] investigation[s]," when coupled with other facts evidencing defendants' knowledge of the fraud, "cumulatively create a strong inference of scienter." *Nash*, 502 F. Supp. 2d at 882.

### D. The Complaint Sufficiently Alleges Reliance

#### 1. The Complaint Sufficiently Pleads Plaintiffs' Reasonable Reliance

The Complaint sufficiently pleads plaintiffs' reasonable reliance on the Top Ratings. At the motion to dismiss stage, the bar for establishing reasonable reliance is low, as a plaintiff need only

- 20 -

"allege 'that its reliance on the alleged misrepresentation[] was not so utterly unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury its suffered was its own responsibility.'" *Abu Dhabi*, 651 F. Supp. 2d at 172 (quoting *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 182 (2d Cir. 2007)).

The Court's holding in *Abu Dhabi* regarding pleading reasonable reliance at the motion to dismiss stage is instructive. *Id*. at 180-81. In *Abu Dhabi*, the Court held plaintiff investors sufficiently pled reasonable reliance on the SIV's credit ratings because: (1) "the market at large, ***including sophisticated investors***, have come to rely on the accuracy of credit ratings"; and (2) defendants had "access to non-public information that even sophisticated investors [could not] obtain." *Id*. at 181.

Here, as in *Abu Dhabi*, the Complaint alleges that plaintiffs reasonably relied on the accuracy of the Top Ratings, and further alleges that IKB had "access to non-public information that even sophisticated [buyers could not] obtain." *Id*. For example, the Complaint alleges that plaintiffs "acquired the highest rated Senior Notes – indeed the highest rated, safest assets that exist in the market – and actually and reasonably relied on such rating in purchasing Senior Notes." ¶16; *see also* ¶¶5, 80. The Complaint also alleges:

> Rhinebridge did not provide the lists of securities it would hold before investors purchased Senior Notes. Even with those lists, it was not possible to ascertain the true market values of the Senior Notes and Rhinebridge's constituent securities because they were not traded publicly. ***Defendant IKB . . . did have this information***, however, and knew these securities were plunging in value.

¶11; *see also* ¶166. Accordingly, here, as in *Abu Dhabi*, the Complaint adequately pleads reasonable reliance on the Top Ratings. 651 F. Supp. 2d at 180-81.

### 2. The Bespeaks Caution Doctrine Is Inapplicable

In an attempt to skirt the Court's clearly applicable holding regarding reliance in *Abu Dhabi*,

- 21 -

IKB invokes the "bespeaks caution" doctrine as a means of indirectly challenging the Complaint's reliance allegations.  *See* IKB MTD at 12 ("Plaintiffs' claims are also barred by the bespeaks caution doctrine.  Under that doctrine, an alleged misrepresentation or omission in a securities offering is immaterial as a matter of law if, in light of adequate cautionary language set forth in the offering materials, ***no reasonable investor would have been misled***.").[19]

However, the bespeaks caution doctrine does not shield IKB from liability here for at least four reasons: (1) the Top Ratings were not "forward-looking" statements; (2) IKB's purported "Risk Disclosures" do not "'"warn[] investors of ***exactly*** the risk that plaintiff's claim was not disclosed"'" (*In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001) (Scheindlin, J.) (quoting *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999)) (emphasis in original)); (3) "no reasonable investor ***could have been misled*** about the nature of the risk when he invested" despite IKB's purported "Risk Disclosures" (*Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)); and (4) IKB knew that the Top Ratings were false and misleading ***at the time they were issued***.  *Indep. Energy*, 154 F. Supp. 2d at 756.

***First***, as a threshold matter, the bespeaks caution doctrine "only applies to forward-looking statements."  *Id.* at 755; *see also Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 301 (S.D.N.Y. 2000).  The "misrepresentation of present or historical facts cannot," however, "be cured by cautionary language."  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004).  Tellingly, IKB cites no authority in support of its assertion that the Top Ratings are forward-looking

---

[19]    IKB inexplicably makes this assertion despite the fact that the Court rejected a nearly identical argument in *Abu Dhabi*.  651 F. Supp. 2d at 180 (defendants argued that "plaintiffs acted unreasonably in relying on the allegedly false and misleading ratings because," *inter alia*, "the Information Memoranda and other Selling Documents contained express disclaimers of liability").

statements.  Moreover, it is clear that the Top Ratings are misrepresentations of present fact, as they communicated to investors "specific, positive information about the strength and quality of the investment" *at the particular point in time that the rating was issued*.  ¶¶69, 74; *see also* §III.B.2, *supra* (enumerating statements of present fact encompassed by the "Top Ratings").  Consequently, the bespeaks caution doctrine is inapplicable.  *Indep. Energy*, 154 F. Supp. 2d at 755.

*Second*, even if the Top Ratings could be considered forward-looking statements – which they are not – the bespeaks caution doctrine does not apply because the purported Risk Disclosures fail to """warn[] investors of *exactly* the risk that plaintiff's claim was not disclosed.""" *Id.* (quoting *Milman*, 72 F. Supp. at 230) (emphasis in original); *see also Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) (bespeaks caution inapplicable where cautionary language does not "relate directly to that by which plaintiffs claim to have been misled"); *Steinberg*, 88 F. Supp. 2d at 301 ("[T]he language cited 'must precisely address the substance of the specific statement or omission that is challenged.'").

Here, the Complaint alleges that plaintiffs were misled by defendants' false credit ratings.  Importantly, *none* of IKB's purported Risk Disclosures warned investors that the Top Ratings were false and misleading.  *See* IKB MTD at 15-16.  Instead, IKB's purported Risk Disclosures are limited to vague assertions about: (1) the types and amounts of certain securities the SIV may hold; and (2) "'difficulties and changed economic conditions'" being experienced in the U.S. residential mortgage market.  IKB MTD at 16.  Because IKB's Risk Disclosures do not "relate directly to that by which plaintiffs claim to have been misled," *i.e.*, the false Top Ratings, the bespeaks caution doctrine is inapplicable.  *Hunt*, 159 F.3d at 729.

*Third*, "under the judicially created bespeaks caution doctrine, 'alleged misrepresentations . . . are deemed immaterial as a matter of law [if] it cannot be said that any

- 23 -

reasonable investor could consider them important in light of adequate cautionary language.'" *Hall*, 580 F. Supp. 2d at 226; *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 526 (S.D.N.Y. 2009) (Scheindlin, J.) (same).  In *Abu Dhabi*, the Court has already held that the credit ratings assigned to SIV notes are "important" to investors.  651 F. Supp. 2d at 165.  IKB's purported Risk Disclosures, which are hypothetical in nature, stating that certain types and amounts of securities ***may*** be included in the Rhinebridge SIV and providing vague, generalized warnings about "'difficulties and changed economic conditions'" in the U.S. residential mortgage market (IKB MTD at 15-16), do not somehow render the Top Ratings unimportant to reasonable investors.

This is especially true given that, at the time defendants assigned the Top Ratings, they were aware of these purported "risks," but nonetheless "judged [the Senior Notes] to be of the highest quality, with minimal credit risk," ultimately assigning them Top Ratings, ***in spite of those*** "***risks***." ¶70.  Because no serious argument can be made that IKB's Risk Disclosures so undermined the Top Ratings as to render them unimportant to investors, the bespeaks caution doctrine is inapplicable. *Hall*, 580 F. Supp. 2d at 226; *Sadia*, 643 F. Supp. 2d at 536.

***Finally***, the bespeaks caution doctrine does not apply because IKB knew that the Top Ratings were false and misleading at the time they were issued.  *See Indep. Energy*, 154 F. Supp. 2d at 756.  As the Court explained in *Indep. Energy*, "'[n]o degree of cautionary language will protect material misrepresentations or omissions ***where defendants knew their statements were false when made***.'" *Id.* (quoting *Milman*, 72 F. Supp. 2d at 231); *see also In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Here, as detailed in §III.C, *supra*, the Complaint alleges that ***at the time*** the Top Ratings

- 24 -

1 of 35

were issued, IKB *knew* that that the SIV held over a billion dollars in toxic assets and that the value of the SIV's underlying assets were crashing. *See also* ¶¶11, 126. Therefore, the Risk Disclosures cited by IKB warning that, hypothetically, the SIV "*may*" contain certain types and amounts of higher-risk securities and that "difficulties" and "changed conditions" in the residential mortgage market "*could*" cause the value of securities held by Rhinebridge to decline were false and misleading. *Indep. Energy*, 154 F. Supp. 2d at 756; *see also Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A prospectus stating a risk that such a thing could happen is a far cry from one stating that this had happened. The former does not put an investor on notice of the latter."); *Milman*, 72 F. Supp. 2d at 231 (same). Because IKB knew the Top Ratings were false and misleading when they were issued, "the bespeaks caution doctrine is inapplicable." *Indep. Energy*, 154 F. Supp. 2d at 756.

## IV.    CONCLUSION

For each of the foregoing reasons, IKB's motion to dismiss should be denied in its entirety. Alternatively, if the Court finds the Complaint's allegations insufficient in any respect, plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."); *Min Jin v. Metro. Life Ins. Co*., 310 F.3d 84, 101 (2d Cir. 2002) ("[l]eave to amend should be freely granted").

DATED: March 3, 2010                        Respectfully submitted,


                                             s/ JESSICA T. SHINNEFIELD
                                             JESSICA T. SHINNEFIELD

- 25 -

507419_1

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
DANIEL S. DROSMAN
MICHAEL F. GHOZLAND
JESSICA T. SHINNEFIELD
NATHAN R. LINDELL
CHRISTINA A. ROYCE
DARRYL J. ALVARADO
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
JARRETT S. CHARO
58 South Service Road, Suite 200
Melville, NY  1177
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
LUKE O. BROOKS
JASON C. DAVIS
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone:  415-288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

- 26 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 3, 2010.

<u>s/ JESSICA T. SHINNEFIELD</u>
JESSICA T. SHINNEFIELD

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:jshinnefield@csgrr.com

507419_1

# Mailing Information for a Case 1:09-cv-08387-SAS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Anne L. Box**
  anneb@csgrr.com,jillk@csgrr.com,E_File_SD@csgrr.com

- **Luke Orion Brooks**
  lukeb@csgrr.com

- **Andrea Rose Butler**
  abutler@cahill.com

- **James J. Coster**
  jcoster@ssbb.com,managingclerk@ssbb.com,jrubins@ssbb.com

- **Patrick Joseph Coughlin**
  patc@csgrr.com

- **Jason Cassidy Davis**
  jdavis@csgrr.com,ptiffith@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Daniel S. Drosman**
  ddrosman@csgrr.com,E_File_SD@csgrr.com,tholindrake@csgrr.com

- **Andrew James Ehrlich**
  aehrlich@paulweiss.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com,mao_sdny@paulweiss.com

- **Jason Michael Hall**
  jhall@cahill.com

- **Roberta Ann Kaplan**
  rkaplan@paulweiss.com,mao_sdny@paulweiss.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Brian T Markley**
  bmarkley@cahill.com

- **John D. McFerrin-Clancy**
  jmcferrin-clancy@lowenstein.com

- **Thomas E. Redburn , Jr**
  tredburn@lowenstein.com

- **James J. Regan**
  jregan@ssbb.com

- **Dean I. Ringel**
  DRingel@Cahill.com,JHall@cahill.com

- **Joshua M. Rubins**
  jrubins@ssbb.com,managingclerk@ssbb.com

- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com

- **Jessica T. Shinnefield**
  jshinnefield@csgrr.com

- **Tobias James Stern**
  tstern@paulweiss.com

- **Thomas S. Wiswall**
  twiswall@phillipslytle.com,jgroat@phillipslytle.com,ecfphillips@phillipslytle.com

- **Aaron Mark Zeisler**
  azeisler@ssbb.com,managingclerk@ssbb.com

- **Adam N. Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
David C. Walton
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P.
655 W. Broadway
Suite 1900
San Diego, CA 92101-3301
```