UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IOWA STUDENT LOAN LIQUIDITY CORPORATION, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>IKB DEUTSCHE INDUSTRIEBANK, AG; IKB CREDIT ASSET MANAGEMENT, GmbH; MOODY'S INVESTORS SERVICE, INC.; MOODY'S INVESTOR SERVICE LIMITED; THE MCGRAW-HILL COMPANIES, INC. (d/b/a STANDARD & POOR'S RATING SERVICES); FITCH, INC.; WINIFRED REINKE and STEFAN ORTSEIFEN,<br><br>Defendants. | CIVIL ACTION NO. 09-CV-8822 (SAS) |
| KING COUNTY, WASHINGTON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>IKB DEUTSCHE INDUSTRIEBANK, AG; IKB CREDIT ASSET MANAGEMENT, GmbH; MOODY'S INVESTORS SERVICE, INC.; MOODY'S INVESTOR SERVICE LIMITED; THE MCGRAW-HILL COMPANIES, INC. (d/b/a STANDARD & POOR'S RATING SERVICES); FITCH, INC.; WINIFRED REINKE and STEFAN ORTSEIFEN ,<br><br>Defendants. | CIVIL ACTION NO. 09-CV-8387 (SAS) |

**DEFENDANT FITCH, INC.'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINTS**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Martin Flumenbaum
Roberta A. Kaplan
Andrew J. Ehrlich
1285 Avenue of the Americas
New York, New York 10019-6064
Tel. (212) 373-3000
*Attorneys for Defendant Fitch, Inc.*

Defendant Fitch, Inc. ("Fitch") respectfully submits this reply memorandum of law in further support of its motion to dismiss the complaints ("Complaints") of plaintiffs King County, Washington and Iowa Student Loan Liquidity Corporation (together, "Plaintiffs") with prejudice pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).[1]

## Preliminary Statement

The preliminary statement of Plaintiffs' opposition brief underscores the central premise of Fitch's motion: Although Fitch challenged Plaintiffs' Complaints because they fail to include any meaningful allegations pertaining specifically to *Fitch*, not once in Plaintiffs' five-page introduction do Plaintiffs mention Fitch at all.  The *only* mention of Fitch is to define the collective term "Rating Agencies," about whom pages of argument then flow—which, ironically, is cut and pasted verbatim from Plaintiffs' opposition to Standard & Poor's and Moody's motion to dismiss. This tactic highlights the fundamental flaw in Plaintiffs' Complaints: rather than identify specific, particularized allegations purporting to show that *Fitch* did not honestly believe in the accuracy of its ratings of Rhinebridge securities—because they cannot—Plaintiffs lump Fitch together with the other rating agencies and rely on allegations against those entities rather than Fitch, all in the hope that the absence of detail about Fitch will somehow get ignored.  But when the very thin allegations against Fitch receive the sober scrutiny that this motion demands, it is clear that they do not meet the rigorous pleading standards for fraud, and should be dismissed.

---

[1] As with its moving brief, Fitch submits this reply brief in further support of its motion to dismiss both of the above-captioned, substantially similar Complaints.  Citations to the Complaints in this memorandum are to both complaints unless otherwise specified.  Additionally, Fitch joins in and adopts by reference the reply being filed today on behalf of Moody's Investors Service, Moody's Investor Service Limited (collectively, "Moody's"), and the McGraw Hill Companies, Inc. (d/b/a Standard & Poor's Rating Services) ("Standard & Poor's") by counsel for the McGraw-Hill Companies, but makes this additional submission to address issues unique to Fitch.

**Argument**

**I.**
**Plaintiffs Fail To Adequately Plead That Fitch Did Not**
**Truly Believe Its Opinions About Rhinebridge Securities**

Plaintiffs' opposition papers proceed from the entirely faulty premise that Fitch's ratings of Rhinebridge securities constitute statements of fact. (Opp'n Br. at 8-9) (stating that the ratings "constitute a series of factual representations").  In fact, the very laundry list of purported "factual representations communicated by Fitch's Top Ratings"[2] (*Id*. at 9) that Plaintiffs cite in support of this erroneous characterization make clear that the ratings speak to "probability," "likelihood of recovery," and are based on "models and assumptions."  (*Id.* at 2.)  Of course, an "expectation," "likelihood," and "probability" cannot, as a practical matter, ever be provably false.

The purported support for the assertion that the ratings are statements of fact is the Court's opinion in *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.* (hereinafter "*Abu Dhabi*"), 651 F. Supp. 2d 155 (S.D.N.Y. 2009).  Plaintiffs, however, distort *Abu Dhabi*'s holding.  In *Abu Dhabi*, the Court plainly held that credit ratings are statements of opinion, but further held, quoting the Second Circuit, that "an opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without basis in fact." *Abu Dhabi*, 651 F. Supp. 2d at 176 (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998).)[3]  The reason for Plaintiffs'

---

[2]   Plaintiffs insist on referring to Fitch's purported "Top Ratings."  This is obfuscation.  That phrase was never uttered by Fitch; it was a defined term in the Rhinebridge Private Placement Memorandum (hereinafter "PPM") (not, of course, authored by Fitch) referring to the three rating agencies' highest ratings, applicable to certain Rhinebridge securities.  Plaintiffs' Complaints acknowledge, as they must, that Fitch's own rating definition speaks to "<u>expectation</u> of credit risk," which is plainly a subjective opinion.  (Compls. ¶ 70 (emphasis added).)

[3]   This is consistent with the conclusion of every court that, to Fitch's knowledge, has addressed the question, and Plaintiffs cite no law to the contrary.  *See, e.g., Compuware Corp.* v. *Moody's Investors Services, Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (holding that a "credit rating is a predictive opinion, dependent on a subjective and discretionary weighing of complex factors").

distortion of the law is not hard to understand. If the ratings were mere facts, Plaintiff would be required to plead that they were untrue. But because the ratings are opinions, Plaintiffs are required to plead specific facts demonstrating that Fitch did not believe the accuracy of the rating when it was issued. Plaintiffs do not even come close to doing so.

On this score, just as telling as Plaintiffs' preliminary statement that speaks only to the "Rating Agencies," and never mentions Fitch, is the fact that Plaintiffs devote just two paragraphs in their 24-page Opposition Brief to argue that Fitch's ratings were false and misleading. (Opp'n Br. at 9-10.) They make just three arguments as to the falsity of the ratings, none of which suggests—much less with the requisite specificity—that Fitch did not honestly believe its opinions when they were published:

*First*, Plaintiffs contend that the "Top Ratings were false and misleading because they communicated to investors that the Senior Notes were 'nearly risk free' when, in reality, 'Rhinebridge held over a billion dollars of toxic, low-quality mortgage-backed securities.'" (Opp'n Br. at 9.) Of course, the market now knows that the mortgage-backed securities included in Rhinebridge did not perform as Fitch (and many others) had expected. But Plaintiffs do not allege that Fitch *knew* in June 2007 that this collateral was "toxic," much less explain how Fitch could have known that.[4] All this amounts to is a contention that Fitch's expectations of performance turned out to be wrong.

*Second*, Plaintiffs repeatedly claim that Fitch knew its ratings were false because Rhinebridge supposedly breached a so-called "Major Capital Loss Test" before the fund's June 27, 2007 offering. (Opp'n Br. at 10.) Plaintiffs' allegations, however, are very carefully worded, and

---

[4] Plaintiffs themselves were fully aware that the Rhinebridge SIV contained the so-called "toxic" assets. The PPM clearly disclosed that up to 75% of the SIV's asset portfolio would be comprised of residential mortgage-backed securities ("RMBS"). *See* Declaration of Andrew J. Ehrlich dated March 17, 2010 ("Ehrlich Decl."), Ex. A. at 107.

they actually never contend that Fitch *knew* that Rhinebridge supposedly breached this test. (Compls. ¶¶ 111-18.) Rather, Plaintiffs contend that Rhinebridge supposedly breached this test before its securities were sold, and that this breach in turn somehow supports the allegation that Fitch did not actually believe its rating opinions. (*Id.* ¶¶ 117-18.)

The Major Capital Loss Tests were specific valuation metrics that Rhinebridge had to meet daily in order to be able to offer (or continue to offer) Senior Notes, the securities that Plaintiffs purport to have purchased. (Ehrlich Decl. Ex. A at 111.) The allegations supporting Plaintiffs' contention that Rhinebridge breached such a test before the Senior Notes were issued are contained in paragraph 118 of the Complaints, and deserve careful scrutiny: Plaintiffs' tortured logic is that Rhinebridge had failed one of these Major Capital Loss Tests (Plaintiffs do not specify which one) prior to June 2007 because (1) a pair of *Bear Stearns* investment funds that had nothing to do with Rhinebridge or IKB were publicly reported to have declined in value during that time (¶¶ 118(a)-(c)), and (2) other *public* media outlets—all prior to Plaintiffs' alleged purchase of Rhinebridge securities—reported that the subprime "mortgage market [is] in turmoil" (*Id.* ¶¶ 118(d)-(f)).[5] The only thing these allegations do is underscore that Plaintiffs—who were on notice through the PPM that Rhinebridge primarily contained RMBS securities, and were deemed on notice of the *Wall Street Journal* and *Financial Times* articles they cite in the Complaints about troubles in the RMBS markets—should be barred from suing by the statute of limitations. (See Part III, *infra*.)

---

[5] Moreover, as Judge Stein made clear, "media reports about a downturn in the subprime mortgage industry do not, by themselves, permit the inference that the directors knew or should have known that any of the statements cited in the complaint were misleading." *In re Citigroup S'holder Derivative Litig.*, No. 07 Civ. 9841 (SHS), 2009 WL 2610746, at *10 (S.D.N.Y. Aug. 25, 2009) (hereinafter "*Citigroup*").

*Third*, and finally, Plaintiffs state that the ratings were false and misleading because they supposedly relied on inaccurate data and outdated models. (Opp'n Br. at 10.)  Although Fitch denies this allegation, whether the data and models were accurate or not is completely beside the point.  To adequately plead their fraud claim, Plaintiffs must allege that Fitch's analysts *knew* that their models were outdated at the time that they were being used.  The Complaints actually plead precisely the opposite of this: citing a supposed "private investor," the Complaints concede that Fitch's analysts were "highly confident regarding their models and their ratings."  (Compls. ¶ 157.)

At most, the Complaints allege in the most general terms that the "Rating Agencies" "did not update their models" to reflect supposed changes to the mortgage market that took place after 2000. (Compls. ¶ 150.)  But setting aside whether these allegations are sufficient as to *other* rating agencies,[6] there is no support for this contention as to *Fitch*.  Plaintiffs cite, for example, statements by a former senior S&P official concerning S&P's alleged considered decision not to implement new models that it had developed.  (Compls. ¶¶ 151-52.)  Similarly, Plaintiffs state that an internal Moody's document purports to say that Moody's failed to invest in its rating models, and did so knowing that their accuracy would suffer.  (Compls. ¶ 154.)  Plaintiffs make no similar allegations against Fitch.

Indeed, challenged by Fitch's motion to identify specific factual allegations in their Complaints supporting their claim that Fitch did not honestly believe its ratings when they were issued, Plaintiffs come up with nothing other than a series of citations to allegations that refer to "Rating Agencies" in general, or to specific defendants *other* than Fitch.  It is not permissible pleading to lump Fitch together with other defendants, and offer no individualized allegations

---

[6] As noted in Fitch's moving brief, Fitch cites these statements not to suggest that they are sufficient to plead a claim against Standard & Poor's and Moody's, but rather to demonstrate the absence of analogous pleading against Fitch.

5

about Fitch. Plaintiffs cannot "mask[ ] the lack of factual allegations against each defendant through broad allegations which combine the acts of several defendants to create the impression that all engaged in every aspect of the alleged fraud." *O'Brien* v. *Nat'l Property Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) (dismissing fraud claim against one defendant due to "failure to differentiate the role of [defendant] in the purported fraud"). Indeed, this Court has previously disapproved of such lazy and insufficient pleading tactics, noting that "plaintiffs may not use collective references to a group of defendants as a pleading technique to blur important distinctions among defendants and evade the requirement that fraud be pled with particularity." *Pension Committee of the Univ. of Montreal Pension Plan* v. *Banc of America Sec., LLC* (hereinafter "*Pension Committee*"), 446 F. Supp. 2d 163, 187 n.167 (S.D.N.Y. 2006). While this Court's holding in *Pension Committee* was made in the context of scienter and the group pleading doctrine, its logic applies just as forcefully, if not more so, where plaintiffs attempt to conflate allegations against separate and distinct corporate defendants, despite an obligation to plead specifically that each did not honestly believe its unique opinion.[7] *See Castillo* v. *Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP), 1998 WL 342050 at *12 (S.D.N.Y. June 25, 1998) (dismissing securities fraud claim in a case involving "separate corporate defendants" where plaintiffs failed to "allege with particularity the role each defendant played in any fraudulent scheme").

---

[7] Plaintiffs deploy this tactic egregiously when they attempt to link Fitch to the SIV at issue in *Abu Dhabi* by quoting the Court's decision there as if Fitch were a party to that case, although of course counsel to Plaintiffs well know it is not. Specifically, Plaintiffs argue that "[b]ecause Fitch's compensation was derived from Rhinebridge – not investors – and was directly tied to the success of Rhinebridge, Fitch operated under debilitating conflicts of interest 'that compromised the objectivity of [Fitch's] ratings.' [*Abu Dhabi*] at 178-79.'" (Opp'n Br. at 17.) Such misleading use of the Court's words underscores the lengths to which Plaintiffs have gone to make it appear as if there are specific allegations against Fitch, when there in fact are none.

## II.
## Plaintiffs Fail To Adequately Plead That Fitch Possessed the Requisite Scienter

Courts, including this one, have made clear that the element of scienter must be separately pleaded from allegations as to why a statement is allegedly misleading. *See Fogarazzo* v. *Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 293 (S.D.N.Y. 2004) (holding as a matter of law that a court should not "conflate[] the requirement that plaintiffs plead that misstatements are made with fraudulent intent-i.e., the scienter element-with the requirement that they explain why the statement is misleading."). Here, Plaintiffs fail to meet their burden of doing so, under either theory of scienter endorsed by the Second Circuit. Under the first theory, "conscious misbehavior or recklessness," Plaintiffs identify four reasons why Fitch purportedly knew its ratings to be inaccurate. (Opp'n Br. at 10-17.) None can withstand scrutiny.

*First,* Plaintiffs again contend that Fitch "knew" that Rhinebridge's constituent assets were declining in value before Rhinebridge was launched. (Opp'n Br. at 11-12.) Here, Plaintiffs again cite to the same series of allegations about Bear Stearns and the other public events unrelated to Rhinebridge, (*Id.* (citing Compls. ¶¶ 109-23), none of which have probative value for the reasons discussed above. Plaintiffs also point out that Fitch rated 30% of Rhinebridge's constituent assets. (Compls. ¶ 145.) But aside from citing the general and widely-publicized decline in value of mortgage-backed securities affecting Rhinebridge's constituent assets, the Complaints do not tie Fitch's ratings of some portion of Rhinebridge's constituent assets with Fitch's supposed knowledge that its Rhinebridge ratings were false and misleading (much less that the ratings of the underlying assets were false and misleading).

*Second*, Plaintiffs reiterate and expand upon their contention that Fitch supposedly knew its models to be outdated. Here, Plaintiffs do rely on one of just two places in the Complaints where they in fact offer allegations against Fitch in particular—namely, the purported call

7

between Fitch analysts and an anonymous "private investor." (Compls. ¶ 157.)[8] However, they distort their own allegation; Plaintiffs' opposition suggests that Fitch conceded that its ratings models would fail "if home price appreciation declined by a paltry 1% to 2%," and that Fitch knew of such depreciation. (Opp'n Br. at 13.) But Plaintiffs fail to acknowledge the *entire* statement quoted in their own pleading, which goes on to say that Fitch's models would have failed if home-price appreciation "declined by 1% to 2% *for an extended period of time*," and that Fitch's models were based on historical appreciation rates of the last 50 years. (Compls. ¶ 157) (emphasis added). This is particularly significant because elsewhere in Complaints, Plaintiffs concede that subprime securities declined in value "*before stabilizing somewhat in April and May*." (Compls. ¶ 118(b)) (emphasis added). The fact that these bonds, which were pegged to home prices, had stabilized within a month or two of the alleged phone call suggests that home price appreciation had not declined for "an extended period of time." The alleged "private investor" call—as contained in the Complaints—thus cannot sustain the contention that Fitch knew its models were inaccurate.

*Third*, Plaintiffs briefly rehash their contentions, addressed in Part I, *supra*, that Fitch supposedly knew about the "low credit quality" of Rhinebridge's constituent assets. As explained above, such allegations are based on information from news articles about the decline in value of unrelated Bear Stearns funds. And in any event, even if these newspaper accounts were relevant, which they are not, Plaintiffs had access to the same media outlets as did Fitch.

---

[8]  Plaintiffs do not even bother to cite the other such statement in their opposition brief, presumably because it is so inconsequential. The only other place in the roughly 50-page Complaints where Fitch is singled out in any kind of purportedly substantive allegation is a statement allegedly made by the CEO of Moody's while defending his own company's ratings practices, in which he claims that Moody's competitors, S&P and Fitch, went "nuts" in 2004 and 2005. (Compls. ¶¶ 9, 106.) While still failing to explain how *Moody's* CEO would be in a position to know anything about *Fitch's* ratings process, Plaintiffs also fail to explain how "going nuts," whatever that means, specifically applies to Rhinebridge, much less to the conclusion that Fitch's ratings of Rhinebridge were misleading.

This leaves the fourth and final theory in support of scienter: that conflicts of interest supposedly affected Fitch's ratings. Stripped of hyperbole and conjecture, the crux of Plaintiffs' lawsuits thus rest on a single allegation, girded by no facts: that Fitch had a conflict of interest. As this Court held in *Abu Dhabi*, generalized allegations of conflicts of interest affecting an opinion, without any more specific allegations about why the opinion is supposedly compromised, are insufficient. *See Abu Dhabi*, 651 F. Supp. 2d at 179 ("The existence of conflicts of interest alone typically is not sufficient to establish that defendants 'knowingly' made a false and misleading statement.").

Alternatively, Plaintiffs have not pleaded "motive and opportunity." None of the contortions in their brief can mask that Plaintiffs' scienter theory, at bottom, is that Fitch was paid for its rating—which under clear precedent cannot suffice to establish fraudulent intent. (Fitch Mem. at 19 (citing cases).) Plaintiffs attempt to dress up their theory by arguing that Fitch's fees "increased in tandem with [Rhinebridge's] growth." (Opp'n Br. at 19 (quoting Compls. ¶ 29).) But this is totally incoherent as a theory of wrongful conduct; Fitch could not simultaneously have known that the value of Rhinebridge's assets was "collapsing," as Plaintiffs contend, yet also have assigned it falsely optimistic ratings to secure future fees. Such a scienter theory violates the Supreme Court's teaching that a plaintiff must plead "plausible" inferences, not just some possible inference—and all the more so when pleading a fraud claim. *See Ashcroft* v. *Iqbal*, 556 U.S. __, 129 S. Ct. 1937, 1949 (2009) (to survive a motion to dismiss, plaintiff must plead "more than a sheer possibility that a defendant has acted unlawfully").

### III.
### Plaintiffs' Conflict of Interest Allegations Are Time-Barred

To the extent that Plaintiffs base their common law fraud claim on alleged conflicts of interest—and it is central to their theory of scienter—Fitch's clear disclosure of these potential conflicts defeats Plaintiffs' claims. Plaintiffs' conflict of interest allegations (Compls. ¶¶ 84-107)

9

essentially boil down to one potential conflict: that the issuer of securities paid Fitch to provide rating opinions of its securities.  In its opposition papers, Plaintiffs do not dispute that the possibility of conflicts of interest arising under the "issuer pays" model was widely disseminated years before Plaintiffs brought their claims.[9]  Instead, they simply mock this theory by contending that widespread disclosure—including through an SEC report—cannot constitute inquiry notice because it means that the statute of limitations would have began to run four years before Fitch's ratings of Rhinebridge securities were issued.  (Opp'n Br. at 20.)  This misses the point of inquiry notice altogether; as cases in this District hold, a Plaintiff on notice of facts potentially giving rise to a claim is under a duty to inquire as to such facts.  *See, e.g., In re Openware Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 245 (S.D.N.Y. 2007).  Put differently, if Plaintiffs had truly cared about the potential negative of effects of alleged conflicts of interest—rather than citing them years later, as a means to shift the blame for their investment decisions—they could have taken steps to investigate such potential conflicts.  They did not, and their claims therefore should be considered time-barred.

## **Conclusion**

For the reasons set forth above, and those in its moving papers, Fitch respectfully affirms its request that the Court dismiss Plaintiffs' Complaints with prejudice.

---

[9] Indeed, they cannot.  Remarkably, even the "private investor" call cited in the Complaints demonstrates that Plaintiffs were on notice of their claims before purchasing Rhinebridge securities.  The account of this call, involving Richard L. Rodriguez of First Pacific Investors, is publicly available and reveals that it was given in a speech given by Mr. Rodriguez on June 28, 2007, the day after the Rhinebridge securities were first offered.  *See* Richard L. Rodriguez, "Absence of Fear," available at http://www.fpafunds.com/news_070703_absense_of_fear.asp (last visited Mar. 17, 2010). The speech critiques the practices of credit rating agencies and highlights what the speaker viewed as the "flawed nature" of the market for mortgage-backed securities.  (*Id.*)

Dated: March 17, 2010
New York, New York

                                       Respectfully submitted,

                                       /s/ Martin Flumenbaum
                                       Martin Flumenbaum
                                         Roberta A. Kaplan
                                         Andrew J. Ehrlich
                                         PAUL, WEISS, RIFKIND, WHARTON &
                                         GARRISON LLP
                                         1285 Avenue of the Americas
                                         New York, NY 10019-6064
                                         Telephone: 212-373-3000
                                         Facsimile: 212-757-3990
                                         *Attorneys for Defendant Fitch, Inc.*