UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

KING COUNTY, WASHINGTON,
Individually and on Behalf of All Others
Similarly Situated,

                Plaintiff,

      - against -

IKB DEUTSCHE INDUSTRIEBANK
AG, *et al.*,

                Defendants.

―――――――――――――――――

IOWA STUDENT LOAN LIQUIDITY
CORPORATION, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,

     -against-

IKB DEUTSCHE INDUSTRIEBANK
AG, *et al.*,

                Defendants.

------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 8387 (SAS)**

**09 Civ. 8822 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/26/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      Two institutional investors, King County, Washington and Iowa

1

Student Loan Liquidity Corporation ("ISL"), bring these putative class actions for common law fraud in connection with the collapse of Rhinebridge, a structured investment vehicle ("SIV"). Plaintiffs sue six corporate entities and two individuals: IKB Deutsche Industriebank AG and IKB Credit Asset Management, GmbH (together, "IKB"); The McGraw Hill Companies, Inc. d/b/a Standard & Poor's Rating Services ("S&P"); Moody's Investors Service, Inc. and Moody's Investors Service Ltd. (together, "Moody's"); Fitch, Inc. ("Fitch," and, with S&P and Moody's, the "Rating Agencies"); Winfried Reinke and Stefan Ortseifen (collectively, "defendants").

Characterizing Rhinebridge as "the shortest-lived 'Triple A' investment fund in the history of corporate finance," plaintiffs claim that between June 1, 2007 and October 18, 2007, defendants fraudulently misrepresented the value of Rhinebridge and its senior debt securities (the "Senior Notes" or "Notes").[1] These misrepresentations took the form of the high credit ratings assigned to the Notes by the Rating Agencies (the "Ratings").[2] In addition to

---

[1]    Complaints ("Compl.") ¶ 6. As acknowledged by plaintiffs, S&P and Moody's, the Complaints filed in both cases are substantially identical and S&P and Moody's raise identical arguments with respect to both Complaints. References and citations are intended to refer to both Complaints.

[2]    *See id.* ¶ 51.

jurisdictional issues raised by IKB and Ortseifen, defendants[3] move to dismiss the

Complaints under Rule 12(b)(6) of the Federal Rules of Civil Procedure. This

opinion and order addresses only the issues raised jointly by S&P and Moody's.[4]

The issues raised by Fitch, IKB, and Ortseifen will be addressed in separate

rulings. For the reasons discussed below, S&P and Moody's motion is denied.

---

[3]     Reinke has not yet been served in either action.

[4]     Plaintiffs, S&P, and Moody's agree that the issues presented by this
case are similar to those considered in another action pending before this Court,
*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,* No. 08 Civ. 7508. On
September 2, 2009, I granted S&P and Moody's motions to dismiss on ten out of
eleven causes of action, but permitted the plaintiffs' common law fraud claim to
proceed against them. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
651 F. Supp. 2d 155 (S.D.N.Y. 2009). S&P and Moody's now raise arguments
with regard to loss causation and scienter which they assert were neither addressed
in the September 2, 2009 Opinion nor raised by the parties in their briefs. *See* Joint
Memorandum of S&P and Moody's in Support of Their Motion to Dismiss the
Complaints ("S&P/Moody's Mem.") at 1 n.2 (noting that their brief "address[ed]
flaws in the fraud allegations not raised by them or addressed by the Court in *Abu
Dhabi*"). Although S&P and Moody's are correct that loss causation was not
considered or addressed in *Abu Dhabi*, scienter was addressed at length in that
decision. *See* 651 F. Supp. 2d at 178-80. Because I do not find that S&P and
Moody's "new" scienter arguments are substantially different from those raised in
*Abu Dhabi*, I discuss them in only limited fashion below.

## II.   BACKGROUND[5]

On or about June 27, 2007,[6] the Rating Agencies, along with the

transaction sponsor, IKB, and its officers, Reinke and Ortseifen, collaborated to

produce and rate Rhinebridge's Senior Notes.[7]  The Rating Agencies gave the

Senior Notes their "Top Ratings" and rated them "Triple A."[8]  Top Ratings like

those issued on Rhinebridge's Senior Notes conveyed to investors that the Notes

were highly credit worthy, that Rhinebridge's ability to meet its financial

commitments was exceptionally strong, and that the Senior Notes were nearly as

safe and secure as United States Treasury Bills backed by the full faith and credit

of the United States Government.[9]

In fact, these Ratings concealed that Rhinebridge's portfolio actually

---

[5]      All facts are drawn from the Complaints and are presumed to be true
for the purpose of this motion.

[6]      Although plaintiffs propose a class period that begins on June 1, 2007,
*see* Compl. ¶ 170, plaintiffs assert throughout the Complaints that Rhinebridge's
Senior Notes and allegedly false and misleading ratings were issued on June 27,
2007. *See, e.g., id.* ¶¶ 4, 11, 76, 115, 117, 169. It is unclear whether plaintiffs
actually propose June 1, 2007 as the beginning of the class period or whether the
use of June 1, 2007 in this single paragraph is a typographical error. I need not
rule at this time which date properly identifies the start of the class period.

[7]      *See id.* ¶ 2.

[8]      *See id.* ¶¶ 67-71.

[9]      *See id.* ¶¶ 67-68, 70, 75, 139.

4

consisted of toxic assets that were heavily concentrated in the structured finance and subprime mortgage industries and thus likely to default.[10]  Only four months after the Senior Notes were issued with Triple A Ratings, on October 18 and 19, 2007, the Rating Agencies abruptly downgraded the Notes to "junk" status.[11]  The downgrades revealed the problems with Rhinebridge's constituent assets and its lack of sufficient capital.[12]  The SIV was stripped of its short-term funding ability and the Senior Notes went from having a probability of default of approximately zero to approximately one hundred percent in less than four months.[13]  Rhinebridge unraveled in a matter of days and entered receivership on October 22, 2007.[14]  The Senior Notes correspondingly collapsed in value and investors suffered millions of dollars in damages as a result.[15]

## III.    APPLICABLE LAW

### A.    Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court

---

[10]    *See id.* ¶¶ 144, 163, 185.

[11]    *See id.* ¶¶ 4, 168.

[12]    *See id.* ¶¶ 4, 6, 57, 76, 144, 163, 168.

[13]    *See id.* ¶ 6.

[14]    *See id.* ¶¶ 6, 14, 57, 144, 163, 169, 185.

[15]    *See id.* ¶¶ 14-15, 170, 190.

must "accept as true all of the factual allegations contained in the complaint"[16] and "draw all reasonable inferences in [the] plaintiff[s'] favor."[17]  However, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[18]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[19] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[20]  Plausibility "is not akin to a probability requirement," rather plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[21]

When determining the sufficiency of a claim under Rule 12(b)(6), the court is normally required to consider only the allegations in the complaint.

---

[16]     *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[17]     *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[18]     *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

[19]     *Twombly*, 550 U.S. at 564.

[20]     *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted).

[21]     *Id.* (quotation marks omitted).

6

However, the court is allowed to consider documents outside the pleading if the documents are integral to the pleading or subject to judicial notice.[22]

## B.    Common Law Fraud

### 1.    The Elements

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."[23]   Because the elements of common law fraud under New York law are "substantially identical to those governing Section 10(b) [of the Securities and Exchange Act of 1934], the identical analysis applies."[24]

With regard to the causation element of a common law fraud claim, a complaint must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."[25]   "[A] misstatement or omission

---

[22]    *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[23]    *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

[24]    *Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991). *Accord San Diego County Employees Retirement Ass'n v. Maounis*, No. 07 Civ. 2618, 2010 WL 1010012, at *17 (S.D.N.Y. Mar. 15, 2010).

[25]    *Dura Pharm., Inc. v. Broudo* , 544 U.S. 336, 347 (2005). *Accord In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010); *Operating*

7

is the 'proximate cause' of an investment loss if the risk that caused the loss was

within the zone of risk *concealed* by the misrepresentations and omissions alleged

by a disappointed investor."[26] "The zone of risk is determined by the purposes of

the securities laws, *i.e.*, 'to make sure that buyers of securities get what they think

they are getting.'"[27] "Central to the notion of proximate cause is the idea that a

person is not liable to all those who may have been injured by his conduct, but only

to those with respect to whom his acts were 'a substantial factor in the sequence of

responsible causation,' and whose injury was 'reasonably foreseeable or

anticipated as a natural consequence.'"[28]

---

*Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 95
(2d Cir. 2010) (explaining that loss causation is "a causal connection between the
material misrepresentation and the loss") (quotation marks omitted). Although
these cases consider loss causation under the federal securities laws, they are
applicable here because the requirement of proximate causation under common law
fraud is analogous to loss causation under the federal securities laws. *See
Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d
Cir. 2003).

[26]     *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).
*Accord In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 513 (noting that the
Second Circuit in *Lentell* adopted the "zone of risk" test).

[27]     *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 513 (quoting
*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984)).

[28]     *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d
Cir. 1994) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24
(2d Cir. 1990)) (citations omitted). *Accord ATSI Commc's, Inc. v. Shaar Fund,
Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007) ("[T]he plaintiff's complaint must plead that
the loss was foreseeable and caused by the materialization of the risk concealed by

Plaintiffs need not demonstrate that defendants' misstatements or

omissions caused *all* of plaintiffs' losses.  Rather, plaintiffs need only allege "facts

that would allow a factfinder to ascribe *some rough proportion* of the whole loss to

[the defendant's alleged] misstatements."[29]

### 2.    Pleading Loss Causation

Complaints alleging fraud must plead the misstatement or omission

with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.[30]

However, plaintiffs need only meet the lesser Rule 8(a) standard when pleading

loss causation.[31]  Under Rule 8(a)(2), a pleading must contain only "a short and

plain statement of the claim showing that the pleader is entitled to relief."[32]

---

the fraudulent statement.") (citing *Lentell*, 396 F.3d at 173).

[29]    *Lattanzio*, 476 F.3d at 158 (emphasis added).  *Accord In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).

[30]    *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 187 (2d Cir. 2004) (quotation marks omitted).

[31]    *See Dura*, 544 U.S. 336 at 346 (applying Rule 8(a)(2) standard in assessing loss causation); *see also In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) ("[N]early all courts addressing the [loss causation] issue since [*Dura*] have also applied Rule 8, rather than the heightened pleading standard of Rule 9.").

[32]    Fed. R. Civ. P. 8(a)(2).  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008) ("[C]ourts in this district have made it clear that if the complaint connects the Defendants' fraud with Plaintiffs' purported loss within the 'short and plain statement' standard of Rule 8(a), then '[t]hat is all that is necessary at this stage of the litigation.'") (quoting *CompuDyne Corp. v.*

As applied to loss causation, the Supreme Court has made clear that even when applying Rule 8(a), "something beyond the mere possibility of loss causation must be alleged . . . ."[33]  While Rule 8(a) "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, [ ] it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."[34]  Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[35]

## IV.   DISCUSSION

Plaintiffs have adequately pleaded that the misleading ratings, and the eventual corrective disclosure, proximately caused plaintiffs' losses.  The Top Ratings conveyed to investors that the Rhinebridge Senior Notes were as safe and

---

*Shane*, 453 F. Supp. 2d 807, 828 (S.D.N.Y. 2006)).  I note that *In re Bristol Myers Squibb* was decided after *Twombly*, but before *Iqbal*.  Therefore, it is unclear whether *In re Bristol Myers Squibb* still states the controlling standard.

[33]     *Twombly*, 550 U.S. at 557-58.  *Accord Dura*, 544 U.S. 336 at 346 ("We concede that the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'  And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.  But, even so, the 'short and plain statement' must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests.") (quoting Fed. R. Civ. P. 8(a)(2)) (quotation marks omitted).

[34]     *Iqbal*, 129 S. Ct. at 1950.

[35]     *Id.* at 1949.

secure as United States Treasury Bills.[36]  These Ratings concealed the risk that

Rhinebridge was comprised of billions of dollars of toxic assets and thus likely to

default.[37]  The risk materialized when the Rating Agencies abruptly downgraded

the Senior Notes to "junk" status on October 18 and 19, 2007.[38]  When investors

learned that Rhinebridge was invested in these toxic assets and was likely to

default, Rhinebridge lost its ability to obtain funding.[39]  Three days later,

Rhinebridge entered receivership and the Senior Notes collapsed in value, causing

investors hundreds of millions of dollars in damages.[40]

Drawing all reasonable inferences in the plaintiffs' favor, the risk that

caused plaintiffs' losses – that Rhinebridge consisted of toxic assets that would

become worthless – was precisely within the zone of risk concealed by the Top

Ratings.  That plaintiffs would suffer losses when these toxic assets collapsed and

---

[36]    *See* Compl. ¶¶ 67-68, 70, 75, 139.

[37]    *See id.* ¶¶ 144, 163, 185.

[38]    *See id.* ¶¶ 4, 168.

[39]    *See id.* ¶¶ 4, 6, 57, 76, 144, 163, 168.

[40]    *See id.* ¶ 14 ("When the true quality and value of Rhinebridge and its
constituent assets became known, Rhinebridge was forced into receivership and the
Senior Notes immediately collapsed in value."); *id.* ¶ 163 ("[T]he ratings on the
Senior Notes were . . . misleading.  When the real risks were exposed, Rhinebridge
lost its funding ability – obviously, there will be a 'liquidity crisis' when investors
learn Rhinebridge invested in toxic assets – and collapsed."); *see also id.* ¶¶ 15, 57,
144, 169, 170, 185, 190.

11

Rhinebridge entered receivership was reasonably foreseeable. Therefore, plaintiffs have plausibly alleged that the materialization of the risk concealed by the Top Ratings caused plaintiffs' losses.[41]

S&P and Moody's dispute that such allegations are enough to demonstrate loss causation because they fail to account for the global liquidity crisis that began in the summer of 2007.[42]  To fully appreciate S&P and Moody's

---

[41]     *See Emergent Capital*, 343 F.3d at 198 (holding loss causation to be sufficient where the plaintiffs "specifically asserted a causal connection between the concealed information . . . and the ultimate failure of the venture"); *First Nationwide Bank*, 27 F.3d at 769 (holding loss causation sufficiently pleaded where the alleged misstatements were "the reason the transaction turned out to be a losing one"); *Owens v. Gaffken & Barriger Fund, LLC*, No. 08 Civ. 8414, 2009 WL 3073338, at *8 (S.D.N.Y. Sept. 21, 2009) (holding loss causation adequately pleaded where defendant's misstatements concealed from a plaintiff seeking a low-risk investments that he was investing in a fund comprised largely of unstable commercial real estate loans and plaintiff suffered losses when the investment declined in value as a result); *see also Louros v. Kreicas*, 367 F. Supp. 2d 572, 579 (S.D.N.Y. 2005) (denying a motion for summary judgment on loss causation where the broker told plaintiff the broker had placed his investment in "conservative," "safe" investments, when, in fact, the broker had placed his investment in highly risky securities, and plaintiff's loss was caused when the value of the highly risky securities plummeted).

[42]     *See* S&P/Moody's Mem. at 15-16.  A number of courts have taken judicial notice of the credit crisis. *See Langley v. Prudential Mortgage Capital*, 546 F.3d 365, 367 (6th Cir. 2008) (recognizing the subprime mortgage crisis began in the summer of 2007), *reh'g denied*, 554 F.3d 647 (6th Cir. 2009); *Bloomberg L.P. v. Board of Governors of FRB*, 649 F. Supp. 2d 262, 266 (S.D.N.Y. 2009) ("In 2007, the U.S. economy encountered a serious financial crisis."); *Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.*, No. 08 Civ. 5516, 2009 WL 3787197, at *2 (S.D.N.Y. Nov. 10, 2009) ("July 2007 marked the beginning of what was then called the 'credit crunch,' the first phase of the financial crisis that

argument, some context is required.  SIVs like Rhinebridge typically borrow

money from investors by issuing debt securities of varying maturities and payment

priority.[43]  These debt securities typically fall into three categories:  commercial

paper,[44] medium-term notes, and other medium-term debt, often called "capital

notes."[45]  The commercial paper and medium-term notes are senior in priority to

the capital notes, which bear the first loss if an SIV's assets decline in value.[46]

---

culminated in the fall of 2008."); *see also Lautenberg Found. v. Madoff*, No. 09 Civ. 816, 2009 WL 2928913, at *1 (D.N.J. Sept. 9, 2009) (taking judicial notice on a motion to dismiss of the plea and conviction of Bernard Madoff "because as matters of public record extensively and globally covered in news, legal, financial and other media, it seems to the Court that not to take notice of them would be to isolate this Complaint from reality").  It is also a fact that is "not subject to reasonable dispute in that it is . . . generally known within the territorial jurisdiction of the trial court."  Fed. R. Evid. 201(b)(1).  *See also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 419 (S.D.N.Y. 2003) (taking judicial notice of the "burst of the notorious internet bubble which directly intervened during plaintiffs' ownership of the securities and caused the virtual destruction of their stock holdings, before the accrual of their claims"); *Virtual Countries, Inc. v. Republic of S. Af.*, 148 F. Supp. 2d 256, 267 (S.D.N.Y. 2001) (taking judicial notice of the Internet market decline in 2000).

[43]  *See* Compl. ¶ 35.

[44]  "'Commercial paper' refers generally to unsecured, short-term promissory notes issued by commercial entities.  Such a note is payable to the bearer on a stated maturity date.  Maturities vary considerably, but typically are less than nine months."  *Securities Indus. Ass'n v. Board of Governors of Fed. Reserve Sys.*, 468 U.S. 137, 140 n.1 (1984).

[45]  *See* Compl. ¶ 36.

[46]  *See id.*

SIVs then use the proceeds from the sale of its debt securities to acquire various income-producing assets, such as residential mortgage-backed securities ("RMBS"), commercial mortgage-backed securities ("CMBS"), and collateralized debt obligations ("CDOs").[47]

Generally, investors in commercial paper purchase the paper upon its issuance and hold it until maturity. Rather than liquidating the paper upon its maturity date, many investors continuously "roll over" maturing commercial paper.[48] This means that they purchase newly issued commercial paper from the same issuer.[49] As a result, issuers usually "repay" holders of matured commercial paper with newly issued commercial paper.[50] An SIV's business model resembles that of a bank because it seeks to earn a spread between the interest rate at which it borrows and the interest rate at which it lends.[51] While such structures were considered an effective way to raise capital, they ran the risk that investors would

---

[47]     *See id.* ¶ 35.

[48]     *See* Marcin Kacperczyk & Philipp Schnabl, *When Safe Proved Risky: Commercial Paper During the Financial Crisis of 2007-2009*, 24 J. Econ. Perspectives 29, 30 (2010) ("Kacperczyk & Schnabl"); *see also* Compl. ¶¶ 35-36, 46.

[49]     *See* Kacperczyk & Schnabl at 30-31.

[50]     *See id.*

[51]     *See* Compl. ¶ 35.

not be willing to reinvest the proceeds of the maturing commercial paper in newly issued commercial paper.[52]  If such a circumstance were to occur, the issuer would need to find financing elsewhere to repay the holders of the maturing commercial paper.[53]  If unable to find other financing, the SIV could default on its debt.[54]

In the summer and fall of 2007, the United States housing market suffered an unprecedented number of mortgage delinquencies and foreclosures. These defaults, in turn, forced the value of the securities backed by subprime mortgages[55] downward and led investors to flee financial products based upon them.  As for SIVs and similar entities, investors were no longer willing to roll over their maturing commercial paper and no new investors could be found. Without capital to repay their debts, some entities defaulted on their debt and wiped out investors.

S&P and Moody's claim that it was this credit crisis and not the

---

[52]    *See* Kacperczyk & Schnabl at 31.

[53]    *See id.*

[54]    *See id.*

[55]    The term "subprime mortgages" typically refers to the "segment of the mortgage market which generally consists of borrowers who, for a variety of reasons, might otherwise be denied credit.  A typical borrower in the subprime mortgage market is 'house-rich' but 'cash-poor,' having built up equity in his home but in little else, and has a lower net income than the average borrower."  *In re First Alliance Mortgage Co.*, 471 F.3d 977, 984 (9th Cir. 2006).  Subprime mortgages are considered among the riskiest category of consumer loans. *See id.*

materialization of the risk allegedly concealed by the Top Ratings that caused plaintiffs' losses.  Relying on the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo* and the Second Circuit's decision in *Lentell v. Merrill Lynch & Co.*, S&P and Moody's contend that to establish loss causation at the pleadings stage, plaintiffs "must allege facts sufficient to exclude other non-fraud explanations for plaintiff's loss."[56]  They assert that the credit crisis is such a non-fraud explanation for plaintiffs' losses that plaintiffs are unable to exclude.

Neither *Dura* nor *Lentell*, however, imposes on plaintiffs the heavy burden of pleading "facts sufficient to *exclude* other non-fraud explanations."  In *Dura*, the Supreme Court held that a plaintiff could not plead loss causation by alleging only that he or she purchased shares at an inflated purchase price.[57]  The Court noted that a plaintiff must show that it was the fraud, as opposed to "the tangle of [other] factors affecting [the] price" of the security, that caused the alleged damage because "the longer the time between purchase and sale, . . . the

---

[56]     *See* S&P/Moody's Mem. at 15.

[57]     544 U.S. at 342.  Although the facts in *Dura* involved a fraud claim under the federal securities laws, its holding is also applicable to common law fraud claims because the element of causation is treated the same in both. *See Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954, 2006 WL 27470, at *10 (S.D.N.Y. Jan. 3, 2006).

more likely that other factors caused the loss."[58]  The Court observed that the

"lower price may reflect, not the earlier misrepresentation, but changed economic

circumstances, changed investor expectations, new industry-specific or

firm-specific facts, conditions or other events."[59]

In *Lentell*, the Second Circuit delved deeper into the impact a non-

fraud explanation may have on pleading loss causation.  The Second Circuit

explained:

> "[i]f [a plaintiff's] loss *was caused by an intervening event*,
> like a general fall in the price of Internet stocks, the chain
> of causation . . . is a matter of proof at trial and not to be
> decided on a Rule 12(b)(6) motion to dismiss."[60]  However,
> "when the plaintiff's loss *coincides with a marketwide
> phenomenon causing comparable losses to other investors*,
> the prospect that the plaintiff's loss was caused by the fraud
> decreases," and a plaintiff's claim fails when "it has not
> adequately ple[ ]d facts which, if proven, would show that
> its loss was caused by the alleged misstatements as opposed
> to intervening events."[61]

As an initial matter, I note that this passage lacks clarity.  It provides no

explanation for how "a general fall in the price of Internet stocks" is

---

[58]     *Dura*, 549 U.S. at 343.

[59]     *Id.* at 342-43.

[60]     *Lentell*, 396 F.3d at 174 (quoting *Emergent Capital*, 343 F.3d at 197)
(emphasis added).

[61]     *Id.* (quoting *First Nationwide Bank*, 27 F.3d at 772) (emphasis added).

17

distinguishable from "a marketwide phenomenon causing comparable losses to other investors" – the former of which is a matter of proof at trial, while the latter can be a sufficient basis on which to dismiss a complaint.

Regardless of this discrepancy, *Lentell* can be read to lend credence to S&P and Moody's argument. However, neither *Lentell* nor *Dura* burden plaintiffs with pleading that *no other possible* event could have caused plaintiffs' losses as S&P and Moody's suggest. *Lentell* states unequivocally that the existence of a "market-wide phenomena caus[ing] comparable losses to other investors" only "*decreases*" the prospect that the plaintiff's loss was caused by the fraud. In other words, *Lentell* does not say that the existence of a market-wide phenomenon necessarily *eliminates* a plausible causal connection between plaintiffs' losses and defendants' alleged fraud. Examination of *First Nationwide Bank v. Gelt Funding Corp.* – the Second Circuit opinion from which *Lentell* draws this language – justifies this conclusion:

> We do not mean to suggest that in all cases a fraud plaintiff will be unable to plead proximate cause when the claim follows a market collapse. In this case, it is the cumulative effect of the considerations discussed above, *rather than any single factor*, that compels our decision.[62]

Consider the following illustration:

---

[62]  *First Nationwide Bank*, 27 F.3d at 772 (affirming the district court's decision that proximate cause was not adequately alleged) (emphasis added).

18

> [I]f a mutual fund holds itself out as investing no more than
> 25 percent in a single industry but then, as actually planned,
> invests fifty percent in a single industry, there is no escape
> by blaming the industry [upon its decline] rather than the
> promoter. The materialization of the concealed risk causes
> the loss.[63]

The same is true here. To hold that plaintiffs failed to plead loss

causation solely because the credit crisis occurred contemporaneously with

Rhinebridge's collapse would place too much weight on one single factor and

would permit S&P and Moody's to blame the asset-backed securities industry

when their alleged conduct plausibly caused at least some proportion of plaintiffs'

losses.[64]

---

[63]  *In re Charles Schwab Corp. Sec. Litig.*, No. 08 Civ. 1510, 2010 WL 1463490, at *6 (N.D. Cal. Apr. 8, 2010) (citing *Lentell*, 396 F.3d at 172) (denying a mutual fund's motion for summary judgment in a securities fraud suit charging that the fund failed to disclose the extent to which it had invested in asset-backed securities).

[64]  This is not to say that the financial crisis cannot break the chain of causation when considered in a different factual context. *See, e.g., In re Security Capital Assurance Limited Sec. Litig.*, No. 07 Civ. 11086, 2010 WL 1372688, at *32 (S.D.N.Y. Mar. 31, 2010) (dismissing – albeit with leave to amend – plaintiffs' complaint for failure to plead loss causation where plaintiffs had not "effectively shown that it was the incremental revelation of Defendants' fraudulent misrepresentations, and not the actions of third parties or other circumstances of the market, that caused the decline in SCA's share price over the Class Period," noting that plaintiffs had "le[ft] wide periods unaccounted for, and select[ed] inconsistent date spreads and wide event windows that permit market noise, [ ] suggest[ing that] Plaintiffs may [have been] cherrypicking dates that suit[ed] their argument"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (holding that plaintiff could not untangle his losses

Even if the existence of the credit crisis – standing alone – could be enough to defeat a plaintiff's pleading of loss causation, it is not apparent here that the credit crisis was the sole cause of Rhinebridge's collapse. Central to S&P and Moody's position is their ability to point to the effect of the credit crisis on yields on three-month Treasury Bills.[65] Assuming the credit crisis occurred in the manner suggested by S&P and Moody's,[66] as the credit crisis grew in strength in the summer of 2007, investors fled asset-backed commercial paper and sought refuge

---

from the contemporaneous collapse of the Internet sector because he failed to explain the issuer's stock price decline in the months *prior* to the alleged materialization of the risk concealed by the fraud). *But see Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (accepting, on similar facts, defendants' argument that an intervening event defeated loss causation and dismissing plaintiffs' complaint for its failure to "show[] that it was the claimed concealment which caused plaintiffs' losses, rather than the [ ] market-wide Internet stock collapse" where "[t]he only allegation in the [complaint] of a causal link between the alleged misrepresentations and the liquidity crisis [was]: If the true subscriber growth and prospects had been as represented, At Home would have had more financial strength and would not have had to file for bankruptcy as it did") (quotation marks omitted).

[65]     According to the Securities Industry and Financial Markets Association ("SIFMA"), U.S. Treasury Bills were the second-largest debt instrument in the United States short-term debt financing market in early 2007. Commercial paper was the first. *See* Kacperczyk & Schnabl at 30-31.

[66]     Although I take judicial notice that the credit crisis occurred in the summer of 2007, it is beyond the scope of judicial notice or this opinion to take judicial notice of the various – and heavily debated – ebbs, flows, causes, and indicators of the crisis. *See* April 1, 2010 Order (denying defendants' requests for this Court to take judicial notice of a number of items outside the scope of the Complaints).

in "safer" government-backed securities, such as Treasury Bills. According to

S&P and Moody's, this mass exodus from asset-backed commercial paper drove

up interest rates on commercial paper because higher interest rates were necessary

to entice investors.[67] By contrast, interest rates on Treasury Bills were pushed

downward because they were a more attractive investment and, therefore, in higher

demand.[68] The following chart, provided by S&P and Moody's, demonstrates that

the secondary market rate for three-month Treasury Bills was relatively stable

when the Rhinebridge Senior Notes were issued in June 2007.[69] By August 8,

2007, a severe drop in the interest rates paid on three-month Treasury Bills

occurred and a period of extraordinary volatility followed. This volatility

continued through the collapse of Rhinebridge in October 2007.[70]

---

[67]     *See* S&P/Moody's Mem. at 7-10.

[68]     *See id.*

[69]     *See id.* at 10.

[70]     The Court may take judicial notice on a motion to dismiss of items
"capable of accurate and ready determination by resort[ing] to sources whose
accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). *Accord
Ganino v. Citizens Utils. Co.* 228 F.3d 154, 167 n.8 (2d Cir. 2000) ("[T]he district
court may take judicial notice of well-publicized stock prices without converting
the motion to dismiss into a motion for summary judgment."); *Metropolitan
Transp. Auth. v. F.E.R.C.*, 796 F.2d 584, 593 (2d Cir. 1986) ("tak[ing] judicial
notice of the recent sharp decline in the price of oil"). Plaintiffs contested a
number of items submitted with defendants' motion to dismiss – most of which
were excluded from consideration by this Court. *See* April 1, 2010 Order.
Plaintiffs did not dispute that this Court could take judicial notice of yields on

21



At first glance, such data suggest that the credit crisis may have caused other investors comparable losses to those suffered by investors in Rhinebridge within the meaning of *Lentell*.  That the yields for the entire secondary market for three-month Treasury Bills dropped so substantially suggests that rates on asset-backed commercial paper may have dramatically risen during the same period.  However, upon closer inspection, the data is less compelling.  While the secondary market rate for three-month Treasury Bills is lower in October 2007 than it was in June 2007 and although it was certainly more volatile, the

---

three-month Treasury Bills.

precipitous decline occurred in *August 2007*, not *October 2007* when Rhinebridge collapsed. Further, it is not clear that *any* substantial decline in three-month Treasury Bill interest rates occurred between or around October 18 and October 22, 2007. Thus, there is insufficient evidence at this stage of the proceedings to conclude that interest rates on commercial paper substantially rose during this period. Accordingly, S&P and Moody's argument based on the secondary market rate for three-month Treasury Bills does not defeat plaintiffs' pleading of loss causation.[71]

        S&P and Moody's argument may yet prevail at a later stage in this case. But, a court's task when ruling on a motion to dismiss is to "constru[e] the complaint liberally, accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiffs' favor."[72] As the Supreme Court stated in *Twombly*, "a well-pleaded complaint may proceed even if it strikes a

---

[71]    I also note that the applicability of this data is limited. Neither plaintiffs nor defendants have submitted the par value for the Senior Notes on their date of issue, their promised or actual rate of return, or prices paid for the Notes in any secondary market. Therefore, it is impossible at this stage to determine whether Rhinebridge's decline followed a pattern suggested by that depicted above, moved along a path that was entirely unrelated, or even whether the secondary market rate for three-month Treasury Bills is an appropriate comparison. This is precisely the type of evidence that will likely be revealed if plaintiffs are permitted to proceed to discovery.

[72]    *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). *Accord E&L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 28 (2d Cir. 2006).

savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[73] Thus, even though I am uncertain whether plaintiffs will be able to ultimately prove that any portion of their losses were caused by the defendants' conduct as opposed to the credit crisis, that is not their burden at this stage.[74] If defendants ultimately prove that plaintiffs' losses were, in fact, caused entirely by an intervening event, then defendants will prevail either at summary judgment or at trial.[75]

---

[73]   *Twombly*, 550 U.S. at 556 (footnote and quotation marks omitted).

[74]   *See In re Moody's Corp. Sec. Litig.,* 599 F. Supp. 2d 493, 512-13 (S.D.N.Y. 2009) (holding that plaintiffs had established loss causation where they had identified corrective disclosures relating to Moody's independence, integrity and ratings methodologies that corresponded to stock price drops); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 467 (S.D.N.Y. 2008) ("where *some* or all of the risk is concealed by the defendant's misrepresentation or omission, courts have found loss causation sufficiently pled") (emphasis added); *In re Tycom Ltd. Sec. Litig.*, No. 03 Civ. 1352, 2005 WL 2127674, at *12 n.15 (D.N.H. Sept. 2, 2005) ("Here, the collapse of the market . . . was arguably not an intervening event, but rather the proximate result of defendants' misrepresentation of the demand [for the company's product].").

[75]   *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d at 166 ("Plaintiffs need only plead that Defendants' fraudulent behavior concealed facts or circumstances which, when revealed, *contributed to* the loss. The Court need not make a final determination as to what losses occurred and what actually caused them.") (emphasis added); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007) ("For the purposes of a motion to dismiss, plaintiff has adequately alleged that there was a marked decline in Openwave stock price on the date of a curative disclosure about the company's alleged backdating scheme. Likewise, whether the decline was attributable to some other cause [an informal SEC inquiry and two United States Attorneys' subpoenas], as defendants allege, is

Although S&P and Moody's motion to dismiss based on plaintiffs' failure to adequately plead loss causation is denied, it is not necessary for me to accept plaintiffs' position that "the Rating Agencies were in fact one of the major *causes* of any so-called global crisis that may have occurred in late 2007."[76] Blame for the financial crisis can be, and has been, spread globally – from the financial sector's increasingly complex financial products, to mortgage originators, to the government's loosened regulatory practices and its failure to respond to the collapse and substantial weakening of multiple financial powerhouses. While the Rating Agencies' actions may have been a "substantial factor" in causing the loss,[77] that is not tantamount to labeling their conduct a "major cause" of the global financial crisis.

S&P and Moody's raise two additional arguments in their motion. *First*, S&P and Moody's contend that plaintiffs have failed to adequately plead scienter.[78] To satisfy the pleading requirements with respect to scienter, a plaintiff may plead that a defendant possessed a "motive and opportunity to commit

---

a matter for proof at trial.").

[76]    Plaintiffs' Memorandum of Points and Authorities in Opposition to S&P and Moody's Motion to Dismiss the Complaint at 12 (emphasis in original).

[77]    *See Hecht*, 897 F.2d at 23-24.

[78]    *See* S&P/Moody's Mem. at 18-23.

fraud . . . ."[79]  Although couched in different terms, the arguments S&P and

Moody's raise with regard to scienter are substantially similar to those addressed in

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.* and do not undermine the

conclusions drawn in that decision.[80]  Thus, for the same reasons that I held that

plaintiffs plausibly pleaded that S&P and Moody's possessed the motive and

opportunity to commit fraud in *Abu Dhabi*,[81] plaintiffs have plausibly pleaded

scienter here.[82]  As a result, S&P and Moody's motion to dismiss for failure to

plead scienter is denied.

　　　　*Second*, S&P and Moody's point out that, although ISL implies

throughout its Complaint that it purchased the Rhinebridge Senior Notes, ISL

never expressly makes such an allegation as required for standing.[83]  ISL argues

that it does, in fact, have standing.  In support, ISL submits a trade ticket

evidencing its purchase of the Rhinebridge Senior Notes during the proposed class

---

[79]　　*Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) (quotations and citations omitted).

[80]　　*See* 651 F. Supp. 2d at 178-80.

[81]　　*See id.*

[82]　　*See, e.g.*, Compl. ¶¶ 29, 50, 58-80, 82, 85, 89, 90, 94, 98-108, 120, 138-146, 150-156, 158-167.

[83]　　*See* S&P/Moody's Mem. at 24 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

period.[84]  Because ISL is clearly able to remedy this deficiency in its Complaint,

ISL is granted leave to amend its Complaint to plead that it purchased the Senior

Notes.[85]

## V.  CONCLUSION

For the foregoing reasons, S&P and Moody's joint motion to dismiss

is denied.  ISL may file an amended Complaint within forty-five (45) days of the

date of this Order.  The Clerk of the Court is directed to close this motion (09 Civ.

8387, docket no. 39; 09 Civ. 8822, docket no. 37).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             April 26, 2010

---

[84]      *See* Trade Ticket, Ex. A to Declaration of Daniel S. Drosman in
Support of Plaintiffs' Memorandum of Points and Authorities in Opposition to
McGraw-Hill and Moody's Motion to Dismiss the Complaint.

[85]      *See* Fed. R. Civ. P. 15(a) ("[O]ther than amendments as a matter of
course, a party may amend the party's pleading only by leave of court or by written
consent of the adverse party; and leave shall be freely given when justice so
requires.").

## - Appearances -

**For Plaintiffs King County, Washington and Iowa Student Loan Liquidity Corporation:**

Anne L. Box, Esq.
Daniel S. Drosman, Esq.
David C. Walton, Esq.
Jessica T. Shinnefield, Esq.
Luke O. Brooks, Esq.
Nathan R. Lindell, Esq.
Patrick J. Coughlin, Esq.
Christina A. Royce, Esq.
Darryl J. Alvarado, Esq.
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, California 92101-3301
(619) 231-1058

Samuel H. Rudman, Esq.
Jarrett S. Charo, Esq.
David A. Rosenfeld, Esq.
Robert M. Rothman, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100

Jason C. Davis, Esq.
Robbins Geller Rudman & Dowd LLP
100 Pine Street, Suite 2600
San Francisco, California 94111
(415) 288-4545

**For Defendants IKB Deutsche Industriebank AG and IKB Credit Asset Management, GmbH:**

John D. McFerrin-Clancy, Esq.
Lowenstein Sandler PC
1251 Avenue of The Americas
New York, New York 11020
(212) 262-6700

Thomas E. Redburn, Jr., Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2456

**For Defendants Moody's Investors Service Limited and Moody's Investors Service, Inc.**

James J. Coster, Esq.
Aaron M. Zeisler, Esq.
James J. Regan, Esq.
Joshua M. Rubins, Esq.
Justin E. Klein, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York, New York 10169
(212) 818-9200

**For Defendant The McGraw Hill Companies, Inc. d/b/a Standard & Poor's Rating Services**

Adam N. Zurofsky, Esq.
Andrea R. Butler, Esq.
Brian T Markley, Esq.
Dean I. Ringel, Esq.
Floyd Abrams, Esq.
Jason M. Hall, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

**For Defendant Fitch, Inc.**

Andrew J. Ehrlich, Esq.
Martin Flumenbaum, Esq.
Roberta A. Kaplan, Esq.
Tobias J. Stern, Esq.
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3166

**For Defendant Stefan Ortseifen:**

Thomas S. Wiswall, Esq.
Phillips Lytle LLP
1400 First Federal Plaza
Rochester, New York 14203
(716) 847-7031

**For Defendant Winfried Reinke:**

None

29