UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KING COUNTY, WASHINGTON,
IOWA STUDENT LOAN LIQUIDITY
CORPORATION, etc.,

                Plaintiffs,

v.

IKB DEUTSCHE INDUSTRIEBANK, AG,
IKB CREDIT ASSET MANAGEMENT,
GmbH, MOODY'S INVESTORS SERVICE,
INC., MOODY'S INVESTORS SERVICE
LIMITED, THE McGRAW HILL
COMPANIES, INC. (d/b/a STANDARD &
POOR'S RATINGS SERVICES), FITCH,
INC., MORGAN STANLEY & CO.
INCORPORATED, MORGAN STANLEY &
CO. INTERNATIONAL LIMITED,
WINFRIED REINKE and STEFAN
ORTSEIFEN,

                Defendants.

**AFFIRMATION OF
STEFAN ORTSEIFEN IN
SUPPORT OF RENEWED
MOTION TO DISMISS**

Civil Action No. 1:09-cv-08387-SAS

---

STEFAN ORTSEIFEN hereby affirms pursuant to 28 U.S.C. § 1746:

1. I make this affirmation in support of my renewed motion to dismiss this action on the grounds that there is no sufficient basis for the assertion of jurisdiction over me in this matter and that plaintiffs' amended complaint fails to state a claim against me.

2. I respectfully submit that none of the evidence that has been disclosed in discovery contradicts the facts stated in my earlier affirmations dated February 2, 2010,

March 15, 2010, and March 23, 2010. I incorporate by reference those earlier affirmations and supplement them with the additional information set forth below.

3. As described in my earlier affirmations, the last time I was present in New York State for any reason was in April 2006. The purpose of that visit was to attend a board of directors meeting at IKB Capital Corporation. I was a non-executive member of that board. In addition to some other meetings with other persons and entities who are not involved in this action, I had dinner on April 5, 2006 with Stefano Corsi, an employee of Morgan Stanley (which I understand was added to this action as a defendant in June 2010). Although I cannot specifically remember that particular conversation, I did not use such dinner meetings to discuss, let alone consummate, specific business transactions. Instead, I used them for the purpose of developing and maintaining lines of general communication with persons who had existing or potential relationships with IKB AG or its affiliates. Moreover, I am not aware that Mr. Corsi had any involvement in designing the Rhinebridge SIV or marketing its notes. Morgan Stanley has had relations with IKB AG and its affiliates in numerous matters that did not involve Rhinebridge. I have no recollection that there was any reference to Rhinebridge, or to the SIV concept in general, made either by me or to me, during that dinner meeting or during any other part of my April 2006 trip.

4. It is simply not plausible that any discussion in April 2006 had any relation to the claims asserted by plaintiffs in this action. As I understand the allegations in the amended complaint, plaintiffs' claim is that defendants made representations to them concerning the credit ratings assigned by the rating agency defendants to certain notes issued by Rhinebridge, knowing that those ratings were false and misleading. Documents produced in discovery show that the ratings were assigned to the Rhinebridge notes in June 2007; the Private

Placement Memorandum ("PPM") containing the representations now challenged by the plaintiffs was also dated June 2007; and to the extent that anyone could have had knowledge that those ratings and representations were false and misleading on the premise that the "true" value was "plunging" at that time, such alleged knowledge would also have arisen in or about June 2007 (or later). My dinner with Mr. Corsi on April 5, 2006, well over a year earlier, did not have any relation to the events that are alleged as the basis of plaintiffs' claims.

5. To the extent that I participated in other activities that did involve Rhinebridge in some respect, those activities did not take place in New York and did not constitute the purposeful transaction of business by me in New York. Any participation I had was as a member of either the Executive Board of IKB AG or the Advisory Board of IKB CAM. It is respectfully submitted that plaintiffs' claims did not arise from my participation in actions by either of those Boards.

6. IKB AG had two separate boards, the Supervisory Board and the Executive Board. The Supervisory Board consisted of 21 members. It appointed the members of the Executive Board and had the authority to replace Executive Board members. In that sense, the Executive Board was accountable to the Supervisory Board. I was not a member of the Supervisory Board.

7. From September 9, 2004 until July 29, 2007, I held the position of Spokesman of IKB AG's Executive Board. That position is sometimes translated into English as "Chief Executive Officer" or "CEO" because "Spokesman of the Executive Board" is not a term with which English speaking persons are likely to be as familiar. However, according to my experience and understanding, the authority of an Executive Board Spokesman is not the same as the authority possessed by a CEO in an American corporation. For example, unlike an American

CEO, I did not have general authority to hire and fire the employees of IKB AG. Instead, the Executive Board as a whole appointed the managers who ran the particular departments within the IKB AG organization, and the Executive Board was the organ that entered into (or terminated) their contracts. It was the responsibility of the department managers to make personnel decisions concerning the employees in their departments. That was not my function as Spokesman of the Executive Board.

8. Similarly, I did not have the unilateral authority to bind IKB AG to contracts with other parties. If a contract was of the type that required Executive Board approval, I had one vote, as did each of the other Executive Board members, but the decision was that of the Board as a body, not me alone. In fact, according to my experience and understanding, even when the Board authorized members to sign a contract after it was approved, it had to be signed by at least *two* Board members. The signature of a single member would not be sufficient.

9. When IKB AG entered into the Forward Sale Agreement with Rhinebridge, that transaction was approved by the Executive Board. And when IKB AG decided to purchase capital notes issued by Rhinebridge, that decision too was approved by the Board as a whole. Although I may have joined in those decisions, they were acts of the Board as a body, taken on behalf of IKB AG. They were not transactions by me individually, done either on my own behalf or even as a representative authorized to act for IKB AG. The entity that was authorized to act for IKB AG was the entire Executive Board. I, as a single member, lacked such authorization.

10. In addition to being a member and Spokesman of the Executive Board of IKB AG, from September or October 2006 until July 29, 2007, I was also a non-executive member and chairman of the Advisory Board of IKB CAM, which was a subsidiary of IKB AG. I did not have any employment position with IKB CAM and was not one of its managing directors. The Advisory Board consisted of six members. The function of the Advisory Board of IKB CAM was different than that of the Executive Board of IKB AG. The general purpose of the Advisory Board, as its name indicates, was to give advice from time to time to the managing directors. The managing directors were the persons in charge of running the business of IKB CAM. For example, personnel decisions within IKB CAM were made by its managing directors. Also, the Advisory Board could not and did not enter into contracts with third parties on behalf of IKB CAM. Again, that authority rested with the managing directors.

11. Just as my Executive Board position at IKB AG did not have the same authority as that normally associated with a "Chief Executive Officer" in an American corporation, according to my experience and understanding, my Advisory Board position at IKB CAM did not have the same authority that is normally associated with the position of "Chairman of the Board" in an American corporation. Thus, the English language labels for my positions that are used in the amended complaint (¶20) could potentially lead to invalid inferences about my actual authority and responsibility.

12. Due to the corporate structure described above, I respectfully submit that any decisions by the IKB AG Executive Board and the IKB CAM Advisory Board were not my own transactions, and they constitute my acts to no greater extent than they constitute the acts of the other board members who voted the same way. Nothing that I did as a member of those

Boards would support any argument that I purposefully selected New York State as the place where credit ratings known to be false and misleading would be used to defraud the plaintiffs.

13. With regard to the PPM, I had no participation whatever in the preparation or use of that document. I did not see any drafts of the PPM; I did not contribute any of the language in it; I was not asked to review it or to give my approval to its contents; I am not named in the PPM, and none of the statements in it are attributed to me. According to disclosures made during discovery, the PPM constitutes the work product of numerous individuals. However, I was not one of them.

14. I do not know whether either of the plaintiffs purchased Medium Term Notes or read the Information Memorandum relating to those notes, but my lack of involvement with that Information Memorandum was the same as I have stated above concerning the PPM.

15. I did not participate in making any communications to the plaintiffs concerning the ratings or any other subject.

16. I did not engage in any "collaboration" with the defendant rating agencies at any time or anywhere concerning the credit ratings they assigned to any notes issued by Rhinebridge PLC or Rhinebridge LLC. To the best of my recollection, I did not communicate with the rating agencies on that subject at all. I did not know of any problems with the validity or accuracy of the credit ratings assigned to the Rhinebridge notes or assets, and I did not believe that those ratings were false or misleading.

17. It is respectfully submitted that, to the extent that I participated in any decisions relating in some fashion to Rhinebridge as a member of either the Executive Board of IKB AG or the Advisory Board of IKB CAM, none of those activities constituted a transaction

of business by me in New York State, none of them gave rise to any of plaintiffs' claims, and none of them constitutes any basis for the assertion of jurisdiction over me in this action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Stefan Ortseifen

Executed on September 08, 2010
in Meerbusch, Germany