UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KING COUNTY, WASHINGTON, IOWA   : 1:09-CV-08387 (SAS)
STUDENT LOAN LIQUIDITY CORPORATION, :
Together and on Behalf of All Others :
Similarly Situated, et ano., :
 :
               Plaintiffs, : DECLARATION OF WINFRIED
 : REINKE IN SUPPORT OF
  -against-. : MOTION TO DISMISS
 :
IKB DEUTSCHE INDUSTRIEBANK AG, et al., :
 :
               Defendants. :
------------------------------------------------------------x

      Pursuant to 28 U.S.C. § 1746, WINFRIED REINKE declares that the following facts are true and correct, subject to the laws against perjury of the United States of America:

      1.    I have been named as a defendant in the above-entitled action relating to what plaintiffs describe as the Rhinebridge investment fund. I submit this declaration in support of my motion to dismiss the complaint (the "Complaint") against me on the ground that no basis exists for this Court to exercise personal jurisdiction over me.

A.    <u>Background</u>

      2.    I am now, and have always been, a citizen of the Federal Republic of Germany. For the past 26 years, I have lived in Düsseldorf, Northrhine-Westphalia, except for a five-year period from 1991 to 1996 when I lived and worked in Luxembourg. I have never resided in New York or anywhere else in the United States. The last time I even visited New York was in June 2007, and I spent less than a day there at that time. If, as the Complaints alleges, the relevant period is June 1, 2007 to October 18, 2007, I was in New York, at most, once during that period and my visit had nothing to do with Rhinebridge.

DM1\2322677.1



3. I was a managing director of defendant IKB Credit Asset Management GmbH ("IKB CAM") for about a year beginning in September 2006. In early 2007, a second managing director of IKB CAM was appointed and, from then until I retired in August 2007, he and I shared the managing director responsibilities. We, in turn, reported to IKB CAM's advisory board.

4. Prior to becoming a managing director of IKB CAM, I spent 22 years as an employee of either IKB Deutsche Industriebank AG ("IKB") or an IKB subsidiary. At no point during my employment by IKB or related companies did I live or work in New York. I have not worked for IKB CAM, IKB, or any IKB affiliate since the second half of 2007, and am now fully retired.

5. I do not own or rent any real property in New York and have no bank or brokerage accounts there. To the limited extent that I traveled to New York, it was on behalf of my employer and was never for the purpose of conducting my own business. I do not receive any revenue from New York.

B. I Had Limited Contact with New York

6. I made four trips to New York in 2006 and three in 2007. Each of these trips was for less than a week, including some side trips to Boston and North Carolina, and, as already noted, my most recent trip to New York was for less than a day. The only trip I made to New York between 2006 and 2007 that was not on behalf of IKB or IKB CAM was in March 2006 to attend a weekend charity event.

7. The purpose of most of my visits to New York was to meet with asset managers who were handling portfolios or investments which IKB either owned or for which IKB acted as investment adviser. Although there was no fixed schedule for doing so, my responsibilities at



IKB included meeting with these asset managers two or three times a year to discuss the status of the portfolios and investments, review the managers' systems and procedures, and confer about the market in general.

C.   April 2006 Trip

8.   One of my periodic meetings with managers occurred in April 2006. According to the expense reports I submitted to IKB and other contemporaneous records (Ex. 5, p. 1; Ex. 6, pp. 1-2[1]), I attended half a dozen business meetings in New York and Boston between April 4 and 8, 2006. Four of these meetings were with Standish Mellon Asset Management ("Standish Mellon"), Black Rock Financial Management, Inc. ("Black Rock"), Brightwater Capital Management ("Brightwater"), and C-Bass LLC ("C-Bass"). Standish Mellon, which I met with in Boston, and Black Rock, which I met with in New York, were each responsible for managing a portion of IKB's Luxembourg portfolio. Brightwater and C-Bass had made offerings in which IKB had a substantial interest either as an investor in its own right or as an investment adviser.

9.   The other meetings I attended on my April 2006 trip to New York were with Morgan Stanley & Co., Inc. ("Morgan Stanley") and Bear Stearns & Co., Inc. ("Bear Stearns"), investment banks which also served as asset managers and with which IKB had discussions from time to time about the possibility of working together. The electronic calendar I used while I worked for IKB has an entry for a meeting with Morgan Stanley on April 4, 2006 between 4:30 and 6:00 P.M. (Ex. 4, p. 1.) Although the calendar entry refers to "asset ramp up," as of April 2006, Rhinebridge was just an idea IKB was exploring; the actual ramp up for Rhinebridge did not begin until October or November 2006. Any discussion about an asset ramp up in April

---

[1]   Copies of the exhibits referred to in this declaration are annexed to my attorney's declaration.

DM1\2322677.1



2006 would necessarily have been conceptual in nature and would have been part of a more general discussion about ways Morgan Stanley and IKB could work together.

10. The following evening – April 5, 2006 – I had dinner with Stefan Ortseifen ("Ortseifen"), IKB's Vorstandsprecher or "Speaker," and Stefano Corsi ("Corsi"), a managing director of Morgan Stanley. The dinner took place at a restaurant at 8:30 P.M. We did not discuss any specific transactions. Instead, our conversation remained at a general level: we talked about what was happening in the market and other areas of common interest.

11. Following the dinner meeting on April 5, 2006, more than a year went by before I spoke to or met with Corsi again in New York. To the extent that I had any other contacts with Morgan Stanley in the interim, they were with Morgan Stanley personnel in London.

D. <u>August 2006 Trip</u>.

12. The next time I was in the United States was in August 2006, when I attended a series of business meetings in New York, Boston, and Charlotte, North Carolina. Contemporaneous written reports show that the August meetings were held with some of IKB's asset managers – Black Rock, Standish Mellon, and Fisher Francis Trees & Watts, Inc. – to discuss the same kinds of routine matters that had been discussed at the April manager meetings: how the portfolios and investments were performing; what was happening in the relevant markets; whether the managers' systems and procedures were working; and what their plans were for the portfolios and investments. (Ex. 7.) The meetings were also used to introduce Dr. Markus Guthoff, a member of IKB's Board of Managing Directors, to the asset managers. (Ibid.)

13. The subject of Rhinebridge did not come up at any of the meetings I attended in August 2006.

DM1\2322677.1



E. <u>December 2006 Trip</u>.

14. The last time I was in New York in 2006 was to attend Wachovia's annual Real Estate, Gaming & Lodging Securities Conference, an industry event. (Ex. 5, p. 6.) The trip had nothing to do with Rhinebridge.

F. <u>March 2007 Trip</u>.

15. I returned to the United States for about five days in March 2007, when I traveled from New York to Boston to Charlotte and back to New York. (Exs. 2; 5, p. 8; 8.) I was accompanied on this trip by Frank Braunsfeld, a newly-appointed member of IKB's Board of Managing Directors, and Claus-Dieter Wagner, the head of risk management at IKB. Over a two-day period, we met with five different entities in New York – C-Bass, Credit Suisse, UBS, Moody's, and Fitch.

16. Contemporaneous notes show that the purpose of the meetings was to hear what the banks and rating agencies had to say about the sub-prime housing market. (Ex. 8.) While Moody's and Fitch were involved in rating Rhinebridge, our meetings were completely unrelated to Rhinebridge. As the notes of the meetings show, we met with Moody's and Fitch to obtain information about the market in general, and did not discuss Rhinebridge or any ratings-related issues, which were, in any event, being handled by the rating agencies' London offices. Indeed, on March 23, 2007, Neil Ryan ("Ryan") – the person I hired to run IKB CAM's London branch and manage Rhinebridge – made a due diligence presentation to Moody's <u>in London</u>. On my way back to Dusseldorf from New York, I stopped in London and attended Ryan's presentation. (Ex. 5, p. 8.) I played no part in the presentation and did not even know any of the Moody's representatives who were also there.

17. I had no meetings in New York in March 2007 to discuss Rhinebridge or the ratings assigned to Rhinebridge.

G. April 2007 Trip.

18. I was in New York again between April 10 and 12, 2007. Michael Braun ("Braun"), then head of IKB's treasury department and a member of IKB CAM's advisory board, was on the same trip. He and I attended a meeting between C-Bass and Morgan Stanley, which was trying to place Rhinebridge junior capital notes and mezzanine notes at C-Bass. As far as I know, C-Bass never purchased any Rhinebridge notes. The junior capital notes and mezzanine notes that Morgan Stanley discussed at the April 11, 2007 meeting were entirely different from the senior notes that Plaintiffs purchased. They were offered pursuant to an information memorandum – and not the private placement memorandum applicable to the senior notes. (Exs. 1, 10.) More importantly, the junior capital notes were <u>unrated</u> and the mezzanine notes, unlike Plaintiffs' senior notes, did not receive the highest possible ratings.

19. In addition to the April 11, 2007 meeting with C-Bass and Morgan Stanley, Braun and I had a separate meeting with Morgan Stanley alone to discuss general aspects of cooperation between IKB and Morgan Stanley.

H. June 2007 Trip.

20. My final trip to New York occurred on June 27, 2007. The sole purpose of the trip, which lasted less than a day, was to meet with Brightwater and its parent, West LB, to discuss agreements relating to Blue Heron, the issuer of certain collateralized debt obligations in which IKB had invested. (Ex. 4, p. 2.) I had no discussions about Rhinebridge on this trip – the only one that occurred during the period when Plaintiffs claim fraudulent representations about Rhinebridge were made.

DM1\2322677.1



21. Although it appears that Rhinebridge was marketed in New York, I was not asked to – and did not – participate in any roadshows or other attempt to sell senior notes in Rhinebridge in New York. (Ex. 11.) I also have never met Plaintiffs or communicated with them about Rhinebridge.

I. <u>The Management of Rhinebridge</u>

22. As a managing director of IKB CAM, I was responsible for staffing IKB CAM's London branch. Once I did so, I had no day-to-day responsibility for the activities of the London branch which managed all aspects of Rhinebridge and was empowered to – and did – acquire the assets used to create Rhinebridge without my involvement.

23. I was not an officer or employee of Rhinebridge PLC or Rhinebridge LLC and had no management role in either entity. I also had no role in selecting the assets that Rhinebridge held.

24. Although I had planned to retire in April 2007, IKB's Board asked me to continue working past April 2007 on a part-time basis until a replacement could be found, and I agreed to do so. From April 2007 until I finally retired in August 2007, I worked only three days a week.

25. I am not a party to any legal proceedings in Germany relating to Rhinebridge or, more generally, to IKB CAM and, with the exception of the claims asserted by Plaintiffs, have never been charged with any wrongdoing in connection with Rhinebridge.

## CONCLUSION

26. The complaint does not set forth any basis for subjecting me to personal jurisdiction in New York: I do not conduct business in New York; Plaintiffs' claims do not arise from anything I did in New York; and, even if I had done something outside New York which



caused injury in New York – which the Complaint does not allege and I deny – I do not personally derive substantial revenue from New York or regularly solicit business in New York.

27. For purposes of determining whether I can properly be required to defend myself against Plaintiffs' claims in New York, it is my contacts, and not those of my former employer, IKB CAM, that the Court should consider. Based on the extremely limited nature of my contacts with New York, and the fact that they are entirely unrelated to Plaintiffs' claims, I respectfully submit that I am not subject to jurisdiction in New York and the Complaint against me should therefore be dismissed.

Dated: Dusseldorf, Germany
       September 13, 2010

_____
WINFRIED REINKE