UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KING COUNTY, WASHINGTON,
IOWA STUDENT LOAN LIQUIDITY
CORPORATION, etc.,

       Plaintiffs,

v.

IKB DEUTSCHE INDUSTRIEBANK, AG,
IKB CREDIT ASSET MANAGEMENT,
GmbH, MOODY'S INVESTORS SERVICE,
INC., MOODY'S INVESTORS SERVICE
LIMITED, THE McGRAW HILL
COMPANIES, INC. (d/b/a STANDARD &
POOR'S RATINGS SERVICES), FITCH,
INC., MORGAN STANLEY & CO.
INCORPORATED, MORGAN STANLEY &
CO. INTERNATIONAL LIMITED,
WINFRIED REINKE and STEFAN
ORTSEIFEN,

       Defendants.

**REPLY AFFIRMATION OF STEFAN ORTSEIFEN IN SUPPORT OF HIS RENEWED MOTION TO DISMISS**

Civil Action No. 1:09-cv-08387-SAS

**REDACTED**

---

  STEFAN ORTSEIFEN hereby affirms pursuant to 28 U.S.C. § 1746:

  1. I am named in the title of this action as one of the defendants. I make this reply affirmation in further support of my renewed motion to dismiss and in response to various new and unsupported assertions in plaintiffs' opposition papers.

### The Financial Condition of IKB AG in Early 2006

  2. Without any supporting evidence or allegations, plaintiffs' opposition memorandum starts from the false premise that "[i]n early 2006, defendant IKB Deutsche

Industriebank ("IKB Bank") was on the brink of insolvency" (Plaintiffs' Opposition Memorandum, p. 1). To the contrary, throughout 2006, IKB AG was financially sound and certainly was not "on the brink of insolvency."

REDACTED

In early 2006, I had no reason to believe, and did not believe, that any significant portion of the assets held by IKB AG would precipitously drop in value, or that its lenders would decide to withhold their financing support from it, as ultimately happened in the following year.

REDACTED

3.  With regard to

    REDACTED                                              (Shinnefield Exhibit 6), I did

not attend or participate in any such meeting and have no knowledge of it.

**The Meeting with**   REDACTED

4.  Plaintiffs' opposition papers make reference to

REDACTED

, I do not recall that there was any reference to Rhinebridge, or to the SIV concept in general, during the meeting with REDACTED . Rhinebridge was not

- 2 -

formed until September 2006, and, to the best of my recollection, the first time I ever saw any documents bearing the name "Rhinebridge," or ever heard anyone mention that name, was months after April 2006.

5. I have no personal knowledge concerning whether REDACTED had any involvement in Rhinebridge. In particular, I have no knowledge that any assets were purchased REDACTED, or that any purchases of Rhinebridge notes were made by C-BASS.

### The Executive Board Approval of the Ramp Up Extension

6. One of the documents on which plaintiffs rely (Shinnefield declaration, Exhibit 3) consists of excerpts from an English translation of some German language documents produced in discovery by IKB AG. Although my signature and those of other members of the executive board were photocopied onto the first page of the exhibit, neither I nor, upon information and belief, any of the other board members signed that English language document. The German document from which our signatures were photocopied was not included in Shinnefield Exhibit 3. Also, neither the exhibit itself, nor the Shinnefield declaration, nor plaintiffs' opposition memorandum, identifies who created the exhibit or who, if anyone, has certified the English translation as accurate. What was shown to me during my deposition included the German language original documents, and those were the documents that I reviewed when I testified concerning them.

7. The only decision that Shinnefield Exhibit 3 attributes to me is REDACTED. Nothing in the exhibit refers to any transaction of business by me or anyone else in New York State. With the exception of my signature, copied and pasted into the first page of the

- 3 -

exhibit, there is no other reference to me in the exhibit. Although later pages in the exhibit refer to "decisions of the board" of which I was a member, the exhibit does not describe what participation I may have had in any prior decisions, and I cannot presently recall whether I was present at each of the meetings that are referenced.

8. In addition, according to my understanding, there is nothing unusual or wrongful about the concept of using ramp up or warehousing procedures for the purpose of assembling a portfolio of assets for a newly-formed investment vehicle. At the moment of its incorporation, a structured investment vehicle may lack sufficient capital of its own to purchase the assets that it needs to secure the notes that it intends to issue. In such a case, the investment vehicle commonly enters into a warehousing agreement with one or more established financial institutions, such as a bank, by which the bank agrees to purchase in the market the particular assets that the directors of the investment vehicle choose to approve for inclusion in its portfolio. The bank then temporarily holds the warehoused assets until the investment vehicle, through the sale of its own notes or otherwise, is able to purchase the warehoused portfolio from the bank. The prices paid by the investment vehicle are generally based on the prices that the bank had to pay to acquire the assets, with adjustments as provided in the agreement.

9. Upon information and belief,

REDACTED

. An amended version of         REDACTED         is attached to the Wiswall Affirmation of September 13, 2010 as Ex. H.

10. Whether or not there was anything improper about the actual implementation of the ramp up procedures (which I have no knowledge of), it is respectfully submitted that there was nothing improper about                REDACTED

REDACTED                                  . It is further submitted that such decision did not constitute a transaction of business in New York.

### Shinnefield Exhibits 9 and 10

11.   With regard to the emails attached to the Shinnefield declaration as Exs. 9 and 10, although they name me as one of the intended recipients, I did not request either of those communications. They did not call for any action on my part, and I do not recall taking any action in response to them.

### IKB AG's Financial Problems Arose Independently of Rhinebridge

12.   Plaintiffs' opposition memorandum also states that "without the creation of Rhinebridge, IKB faced bankruptcy" (Plaintiffs' Opposition Memorandum, p. 21). Once again, that assertion is not supported by the referenced complaint paragraphs and is incorrect. The solvency of IKB AG did not depend on the success or failure of Rhinebridge. Rhinebridge PLC and Rhinebridge LLC were entities separate from IKB AG, and any income anticipated by IKB AG from the success of Rhinebridge was largely prospective at the time of IKB AG's financial crisis in July 2007. That crisis arose from commitments between IKB AG and other financial institutions, which commitments were unrelated to Rhinebridge.

13.   Similarly, my resignation on July 29, 2007 was unrelated to Rhinebridge. Upon information and belief, the ratings of Rhinebridge's Senior Notes were downgraded by the rating agencies sometime after I had already left IKB.

### The Court Proceedings in Germany

14.   With regard to the references in plaintiffs' opposition papers to the German court proceedings in Düsseldorf, for the reasons stated in the reply affirmation of my German counsel, Dr. Wolfgang Nockelmann, it is respectfully submitted that those proceedings

do not relate in any way to plaintiffs' claims in this action or to any transaction of business in New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Stefan Ortseifen

Executed on November 3, 2010
in Meerbusch, Germany