UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
:
KING COUNTY, WASHINGTON, IOWA　　:　Master File No. 1:09-cv-08387-SAS
STUDENT LOAN LIQUIDITY　　　　　　:　**(Consolidated)**
CORPORATION, Together and on Behalf of　:
All Others Similarly Situated,　　　　　　:　<u>CLASS ACTION</u>
:
　　　　　　　　　　Plaintiffs,　　　:
:　SECOND AMENDED CONSOLIDATED
:　COMPLAINT FOR VIOLATIONS OF NEW
　　　vs.　　　　　　　　　　　　:　YORK STATE LAW
:
IKB DEUTSCHE INDUSTRIEBANK AG,　　:
IKB CREDIT ASSET MANAGEMENT,　　　:　[**REDACTED**]
GmbH, MOODY'S INVESTORS SERVICE,　:
INC., MOODY'S INVESTORS SERVICE　　:　<u>DEMAND FOR JURY TRIAL</u>
LIMITED, THE McGRAW HILL　　　　　:
COMPANIES, INC. (d/b/a STANDARD &　　:
POOR'S RATINGS SERVICES), FITCH,　　:
INC., MORGAN STANLEY & CO.　　　　:
INCORPORATED, MORGAN STANLEY &　:
CO. INTERNATIONAL LIMITED,　　　　:
WINFRIED REINKE and STEFAN　　　　:
ORTSEIFEN,　　　　　　　　　　　:
:
　　　　　　　　　　Defendants.　　:
:
———————————————————————— x

## INTRODUCTION

1.     This case involves the sale and subsequent collapse of an investment fund known as "Rhinebridge."

2.     Defendants created and marketed Rhinebridge on or about June 27, 2007, to a select group of qualified investors as a safe, highly secure investment.  Specifically, the defendant credit rating agencies (the "big three" credit rating agencies Moody's, S&P and Fitch (as defined below)), the transaction sponsor (the German bank IKB and Co-Arranger Morgan Stanley) (as defined below)) collaborated to produce and rate Rhinebridge's senior debt securities (the "Senior Notes"). The Senior Notes received the highest credit ratings possible for debt securities.  These "Top Ratings" are similar to those assigned to debt securities backed by the full faith and credit of the U.S. Government, such as U.S. Treasury Bills.

3.     Defendants used these "Top Ratings" to sell the Senior Notes and defendants knew they were false and misleading.

4.     Defendants communicated these false and misleading ratings on or about June 27, 2007, when the Senior Notes were first sold to investors.  The false and misleading ratings were repeated each time a Senior Note was offered or sold to an investor until the Senior Notes were downgraded to their accurate "junk" ratings by the defendant credit rating agencies on October 18 and 19, 2007.

5.     A credit rating is a term of art used in the investment industry to communicate specific information about the strength and quality of an investment.  It was at all times widely known that investors would and did actually and reasonably rely on this information in making investment decisions. Plaintiffs actually and reasonably relied on the "Top Ratings" assigned to the Senior Notes.

- 1 -

676180_1

6.      Indeed, in what is perhaps the shortest-lived "Triple A" fund in the history of corporate finance, the Senior Notes were downgraded to "junk" status on October 18 and 19, 2007. The Senior Notes went from having a probability of default of approximately zero to approximately 100% in less than four months.   Rhinebridge was then forced into receivership on or about October 22, 2007.

7.      Before it was forced to shut down, Rhinebridge belonged to a class of investments called "structured" products.   In particular, it was a "structured investment vehicle" or an "SIV." Rhinebridge was not a real operating company and could only operate, raise funds and invest those funds through its agents, such as the defendants in this case.   The defendants in this case controlled Rhinebridge's capital structure and credit ratings.

8.      Rhinebridge raised money from investors like plaintiffs and used those funds to buy other securities.

9.      Unbeknownst to plaintiffs, Rhinebridge held over a billion dollars worth of toxic, low-quality mortgage-backed securities.   According to a "confidential and proprietary" document obtained by Congress (and released to the public in 2008), on September 10, 2007, the Chief Executive Officer ("CEO") of defendant Moody's met with the managing directors of Moody's and summarized the processes used to create these types of securities:

> "*What happened in '04 and '05* with respect to subordinated tranches is that our competition, Fitch and S&P, went nuts.   Everything was investment grade.   It didn't really matter."

10.      Because the defendant rating agencies unreasonably structured the assets that comprised Rhinebridge, the Top Ratings assigned to the Senior Notes were necessarily false and misleading.   An SIV is by definition only as strong as the assets it holds.   The defendant rating agencies lowered their standards and used false and unreasonable data to stamp out "Triple A"

- 2 -

ratings on mortgage-backed securities in a constant pursuit of greater market share and higher profits. They received triple their usual fees for rating products like Rhinebridge, and "double-dipped" on fees because Rhinebridge and other SIVs acquired billions of dollars worth of the rating agencies' other rated products.

11.     The Top Ratings were also false and misleading because the true market values of the Senior Notes and Rhinebridge's constituent assets were crashing before Rhinebridge's initial private offering on June 27, 2007. Investors were not aware of this fact, though, because Rhinebridge did not provide the lists of securities it would hold before investors purchased Senior Notes. Even with those lists, it was not possible to ascertain the true market values of the Senior Notes and Rhinebridge's constituent securities because they were not traded publicly. Defendant IKB (as defined below) did have this information, however, and knew these securities were plunging in value. In retrospect, that was the reason why Rhinebridge existed.

12.     Defendant IKB sponsored this investment for the purpose of moving investment losses off of its *own balance sheet* and dumping those losses on investors in order to avoid its own demise. Shortly after creating Rhinebridge, IKB nearly collapsed due to its own subprime exposure but was bailed out by other banks. Five of its senior executives have either been fired or retired over IKB's risky subprime bets and one of these executives is being prosecuted by German authorities for "market manipulation."

13.     Under these circumstances, Rhinebridge never should have even existed let alone receive Top Ratings. At no time was Rhinebridge a conservative, safe and secure investment and defendants knew it.

14.     When the true quality and value of Rhinebridge and its constituent assets became known, Rhinebridge was forced into receivership and the Senior Notes immediately collapsed in value.

15.     For these and other reasons set forth herein, defendants recklessly or deceptively created and sold the Senior Notes. As a consequence, plaintiffs and others similarly situated have suffered millions of dollars in damages.

## PARTIES

16.     Plaintiff King County, Washington ("King County") is a domestic public entity organized under the laws of the State of Washington, United States of America. King County manages cash for approximately 100 governmental agencies. King County acquired Senior Notes and has been damaged thereby. King County acquired the highest rated Senior Notes – indeed the highest rated, safest assets that exist in the market – and actually and reasonably relied on such rating in purchasing Senior Notes.

17.     Plaintiff Iowa Student Loan Liquidity Corporation ("Iowa Student Loan") is a nonprofit corporation that helps Iowa students and families obtain the resources necessary to succeed in post-secondary education. Iowa Student Loan is self-funded and self-capitalized and is governed by a Board of Directors that, since its inception in 1979, has been appointed by the Governor of Iowa. Iowa Student Loan does not have shareholders nor does it receive state appropriations. Iowa Student Loan is based in West Des Moines, Iowa. Iowa Student Loan acquired Senior Notes and has been damaged thereby. Iowa Student Loan acquired the highest rated Senior Notes – indeed the highest rated, safest assets that exist in the market – and actually and reasonably relied on such rating in purchasing the Senior Notes.

18.     Defendant IKB Deutsche Industriebank AG ("IKB Bank") arranged Rhinebridge along with its wholly owned and controlled subsidiary, defendant IKB Credit Asset Management GmbH ("IKB CAM"). IKB Bank is a German banking institution with its principal place of business in Düsseldorf, Germany. IKB CAM is a German financial institution with its principal place of business in London, England, and with a registered German office located in Düsseldorf, Germany.

19.     Defendant Winfried Reinke was the CEO of IKB CAM during the relevant time, and was fired on August 1, 2007 following IKB's near collapse due to exposure to mortgage-backed investments. On information and belief, Reinke is a citizen of and resides in Germany.

20.     Defendant Stefan Ortseifen was the CEO of IKB Bank and Chairman of IKB CAM during the relevant time. He "retired" on July 29, 2007, and now faces charges of "market manipulation," among others, brought by German authorities. On information and belief, Ortseifen is a citizen of and resides in Germany.

21.     The defendants named in ¶¶18-20 are referred to herein as "IKB."

22.     In connection with Rhinebridge, IKB controlled the acquisition and sale of hundreds of millions of dollars worth of securities, which securities were offered and sold from this District and elsewhere.

23.     IKB Bank and IKB CAM entered into a profit extraction agreement regarding Rhinebridge. Under that agreement, IKB CAM was required to pass all of the profits it derived from Rhinebridge to IKB Bank.

24.     IKB collaborated with the Rating Agencies and Morgan Stanley to structure Rhinebridge and create the Top Ratings.

25.     IKB defrauded investors by including extremely low quality assets in Rhinebridge –
assets obtained from its *own balance sheet*. The market for these assets was crashing before IKB
sold them to investors via Rhinebridge. Indeed, IKB dumped these assets on investors precisely
because the market was crashing.

26.     Defendant Moody's Investors Service, Inc. and its affiliates, including its affiliate
Moody's Investors Service Limited (collectively, "Moody's"), provides credit market services and
products. Moody's structured, rated and was supposed to monitor Rhinebridge and approximately
100% of its constituent assets. Moody's Investors Services, Inc. is a Delaware corporation with its
principal place of business in New York; in particular, in this District. Moody's Investors Service
Limited is a United Kingdom entity, with its principal place of business in London, England.

27.     Defendant The McGraw-Hill Companies, Inc. and its affiliates, including its wholly-
owned and controlled business division Standard & Poor's Ratings Services (collectively, "S&P"),
provides credit market services and products. S&P structured, rated and was supposed to monitor
Rhinebridge and approximately 100% of its constituent assets. S&P is a New York corporation,
with its principal place of business in New York; in particular, in this District.

28.     Defendant Fitch, Inc. ("Fitch") provides credit market services and products. Fitch
structured, rated and was supposed to monitor Rhinebridge and approximately 30% of its constituent
assets. Fitch is a Delaware corporation, with its principal place of business in New York; in
particular, in this District.

29.     Moody's, S&P and Fitch are referred to herein as the "Rating Agencies."

30.     Among other things, the Rating Agencies were involved in the structuring, rating and
monitoring of the Senior Notes and the assets backing those notes. The Rating Agencies received
substantial success fees for helping launch Rhinebridge, as well as fees that increased in tandem with

- 6 -

its growth and fees from the assets acquired by Rhinebridge. The Rating Agencies' substantial remuneration was drawn from the proceeds of the Senior Notes' issuance, and their ongoing fees were paid out of income owed to Senior Notes investors.

31.     Defendant Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited and their affiliates (together, "Morgan Stanley") is an investment banking and global financial services corporation headquartered in New York City. Morgan Stanley serves diversified groups of corporations, governments, financial institutions, and individuals, and acted as a Co-Arranger and a placement agent for the Senior Notes. In that capacity, Morgan Stanley helped create Rhinebridge and worked directly with IKB and the Rating Agencies to design, structure, market and maintain Rhinebridge. Morgan Stanley had in its possession at the time it helped design, structure, market and maintain Rhinebridge, quantitative and qualitative information demonstrating that the Rhinebridge SIV Senior Notes were far riskier than represented. This action charges Morgan Stanley with violations of New York law.

## IMPORTANT NON-PARTIES

32.     Among others, subprime loan originators whose loans were sold to plaintiffs through Rhinebridge include the following:

(a)     Countrywide Financial Corporation ("Countrywide") was during the relevant time the largest subprime lender in the country, with its principal executive offices located at 4500 Park Granada, Calabasas, CA 91302;

(b)     Ameriquest Mortgage Co. was during the relevant time the second largest subprime lender in the country, with its principal executive offices at 1100 Town & Country Road, Suite 1100, Orange, CA 92868;

- 7 -

(c)     First Franklin Financial Corporation was during the relevant time the fourth largest subprime lender in the country, with its principal executive offices at 2150 N. 1st Street, No. 600, San Jose, CA 95131;

(d)     Option One Mortgage Corp. was during the relevant time the sixth largest subprime lender in the country, with its principal executive offices at 3 ADA, Irvine, CA 92618; and

(e)     WMC Mortgage Corp. was during the relevant time the tenth largest subprime lender in the country, with its principal executive offices at 3100 Thorton Avenue, Burbank, CA 91505.

33.     The lenders set forth above are referred to herein as the "California Lenders." Rhinebridge had exposure to approximately $280 million in loans originated by these lenders, with approximately $250 million in exposure to Countrywide alone.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(3) because plaintiffs and defendants are citizens of different states, there are foreign citizens as additional parties, and the matter in controversy exceeds $75,000, exclusive of interest and costs.  Plaintiff King County is a citizen of the State of Washington.  Plaintiff Iowa Student Loan is a citizen of the State of Iowa.  Each defendant is a citizen of the State of Delaware or New York or is a citizen of a foreign state.  No defendant is a citizen of the State of Washington or Iowa.

35.     Venue is proper in this District because the Rating Agencies' and Morgan Stanley's global headquarters are located in this District and all defendants made (or caused to be made) false statements that gave rise to the violations of law alleged herein and a substantial part of the events and omissions that gave rise to the claims asserted herein occurred in this District.

- 8 -

36.    In addition, venue is proper in this District because the terms of the Senior Notes are governed by New York law and hundreds of millions of dollars in mortgage-backed securities backing the Senior Notes were underwritten in this District. Approximately 82% of the securities included in Rhinebridge were originated in the United States by the California Lenders and others. While certain activity with respect to rating and structuring the Senior Notes may have occurred in London, on information and belief, the overwhelming majority of the information concerning the low-quality assets included in Rhinebridge and the sources of the unreasonable and false data inputs used to create the credit ratings complained of herein will be found in this District and elsewhere in the United States.

## BACKGROUND

37.    A structured investment vehicle is a special purpose entity that borrows money by issuing short- and medium-term debt and then uses that money to buy longer-term securities, including mortgage bonds and other asset-backed securities. An SIV is sometimes called a "conduit," because it raises short-term funds and channels those funds into longer-term assets. An SIV's business model resembles that of a bank because it seeks to earn a spread between the interest rate at which it borrows and the interest rate at which it lends. And like a bank, an SIV has both assets and liabilities.

38.    An SIV typically has three categories of liabilities: commercial paper, medium-term notes, and other medium-term debt, often called "capital notes." The commercial paper and medium term notes are senior in priority to the capital notes, which bear the first loss if an SIV's assets decline in value.

39.    An SIV's assets typically include "investment grade" rated or high quality asset-backed securities ("ABS"), residential mortgage-backed securities ("RMBS"), and collateralized

- 9 -

debt obligations ("CDOs"). ABS investments typically entitle investors to principal and interest drawn from pools of student loans, credit cards, or auto loans. The term is sometimes used more broadly to include RMBS. RMBS are backed by a variety of residential mortgages. CDOs invest in ABS and RMBS and are similar to SIVs. SIVs typically are designed to invest in high-grade and highly rated assets in these investment categories.

40.     The "liabilities" or bonds (notes) issued by SIVs typically receive very high or "investment grade" ratings from credit rating agencies.

41.     These ratings are derived in large measure from the quality of the assets backing the structure. The credit quality of an SIV's assets is extremely important to the credit quality and resulting market value of the securities issued by the SIV. Structural features such as "credit enhancement" are used to create an SIV's "investment grade" securities as well. Credit enhancement can take a number of forms, but is often accomplished through structural subordination. For example, investors in Rhinebridge were supposedly protected by subordinated series or "tranches" of junior liabilities. The sole "equity" of SIVs in general, and Rhinebridge in particular, consists of a thin slice of unrated notes and nominal equity.

42.     Rhinebridge's securities were not offered or sold to the public but only to a select group of buyers in private placements.

## THE RATING AGENCIES' ROLES

### A.     The Rating Agencies' Historical Roles

43.     Historically, the Rating Agencies were conservative institutions more like governmental entities or publishers than market actors. The Rating Agencies often liken themselves to reporters. That is because in the past they provided unsolicited "opinions" on the creditworthiness

of corporations and had a subscription-based business model. Their evaluations were often derived from publicly available information such as filings with the SEC.

44.    Over time, the Rating Agencies earned the trust of the marketplace for their integrity and unbiased approach to evaluating bonds. Similarly, in 1975 the SEC provided the Rating Agencies a special status of "nationally recognized statistical rating organization" or NRSRO to help ensure the integrity of the ratings process. According to the SEC, the "single most important factor" to granting NRSRO status is that the rating organization is recognized "in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings" and that part of awarding the NRSRO label to a company hinges on the rating organization's "independence from the companies it rates."

**B.    The Rating Agencies Helped Create and Operate Rhinebridge**

45.    While the Rating Agencies may continue to perform their historical functions in some cases, they did not do so in this particular case. Instead, the Rating Agencies were actively involved in the creation and ongoing operation of Rhinebridge.

46.    For example, the Rating Agencies helped determine how much capital was needed beneath the Senior Notes in order to support the Top Ratings. The Rating Agencies agreed that support of approximately 16% (of the entire capital structure) from junior notes and nominal "equity" was sufficient to support the Top Ratings.

47.    The process of determining the amount of capital needed to support the Senior Notes in order to achieve Top Ratings is called "sizing." Sizing is directly related to the quality and value of assets held by Rhinebridge. All three Rating Agencies used data (or provided that data to IKB to use) regarding the probability of default, the amount of money returned to investors in the event of default (or recovery) for each asset in Rhinebridge, and data concerning the relationships among

- 11 -

assets included in Rhinebridge (called "correlation"). These inputs are based upon the performance of other ratings and data provided by the Rating Agencies.

48.    The inputs are entered into models used by the Rating Agencies (or provided to IKB and approved by the Rating Agencies) to determine the losses that would accrue to the Senior Notes in the event that Rhinebridge was required to sell its assets to pay back investors.

49.    The model then determines the amount of capital needed to support the Top Ratings of the Senior Notes. This activity of determining the quantum of capital necessary to support the assigned investment grade ratings was done at the inception of Rhinebridge and on an ongoing basis with the Rating Agencies' instructions and approval.

50.    These models generated the false and misleading "Top Ratings" in part because the Rating Agencies used inaccurate and stale information to create Rhinebridge's constituent assets, and compounded this problem by failing to monitor and update the information regarding these constituent assets after they were first created. One professor of finance explained to *Bloomberg* that "[t]his type of model is totally out of touch with the underlying economic reality."

51.    Nobel Prize winning economist, Joseph Stiglitz, was even more blunt in an interview with *Bloomberg*: "The greed of Wall Street knows no bounds . . . [t]hey cheated on their models. But even without the cheating, their models were bad."

52.    While the Rating Agencies' processes for creating Rhinebridge and its constituent assets were out of touch with economic reality, the personal financial benefits that accrued to the Rating Agencies by unreasonably failing to consider that reality are unmistakable. In Rhinebridge alone, Moody's and S&P rated and helped structure approximately 100% of the assets comprising Rhinebridge, while Fitch rated and helped structure approximately 30% of those assets. The Rating

Agencies thus double-dipped on large fees for rating and structuring the securities acquired by Rhinebridge and the securities issued by Rhinebridge.

53.     The Rating Agencies actually provided or approved instructions governing types and volumes of assets Rhinebridge could acquire.  These instructions were also based upon credit ratings.  The quality of assets included in Rhinebridge was crucial to investors in the Senior Notes because their investment depended directly upon those assets for the service of interest and return of principal.  Given the importance of credit quality to the success of any SIV, SIVs like Rhinebridge are only supposed to invest in assets of the highest credit quality.  In this case, however, Rhinebridge held mostly low-quality mortgage-backed securities.

54.     Structuring and rating Rhinebridge's securities and collateral assets were not the only roles the Rating Agencies played.  For example, the Rating Agencies worked with IKB to determine how changes in the values of assets held by Rhinebridge would affect the manner in which Rhinebridge operated.  If the value of Rhinebridge's assets declined by approximately 8%, for instance, then Rhinebridge was not supposed to issue any Senior Notes.  That limit was breached *before* the Senior Notes issued, as discussed herein at ¶¶111-125.

55.     The Rating Agencies had ongoing involvement in operating Rhinebridge:

(a)     Rhinebridge had to monitor and hedge against risks associated with the level of funding provided by its constituent assets consistent with the Rating Agencies' instructions;

(b)     Rhinebridge was required to get the Rating Agencies' approval before making changes to its operating instructions;

(c)     The Rating Agencies had the right to veto any changes in the management of Rhinebridge;

- 13 -

(d)     The Rating Agencies provided instructions on how to maintain the Top Ratings and maintained veto rights over any changes thereto;

(e)     The Rating Agencies had veto rights over changes in the parties who provided administrative services to Rhinebridge;

(f)     The Rating Agencies provided the criteria and had veto rights over any changes to nearly every aspect of the manner in which Rhinebridge obtained funding;

(g)     The Rating Agencies had a right to immediate notice of any changes in Rhinebridge's operating conditions;

(h)     The Rating Agencies had veto rights over any investment while Rhinebridge was supposed to operate in more conservative modes;

(i)     The Rating Agencies' approval was required before Rhinebridge could loan out any constituent assets or enter into related agreements;

(j)     Their approval was required before Rhinebridge could make any changes to its investment guidelines; and

(k)     The Rating Agencies had the right to review and approve certain insurance or derivative contracts Rhinebridge could execute.

56.     Importantly, because the primary source of funding was commercial paper and medium-term notes, which are short-term liabilities, the Rating Agencies had to monitor Rhinebridge's capital frequently. IKB was supposed to run tests every day to determine whether the amount of capital held by Rhinebridge was consistent with the Top Ratings requirements, and to calculate various capital tests for the Rating Agencies every week.

57.     In short, whatever their historical roles, the Rating Agencies were deeply entrenched in the creation and operation of Rhinebridge. They did not merely provide an "opinion." A Group

- 14 -

Managing Director of Moody's recently confirmed that Moody's did in fact provide structuring services for structured finance entities, such as Rhinebridge. *The Wall Street Journal* reported the following acknowledgement in an article dated June 7, 2008:

> [A Group Managing Director] acknowledges that accepting the subprime mortgage ratings at face value didn't work out as planned. *"We have to create additional robustness in the structures to account for the volatility"* in the underlying mortgage securities, she says. *"We didn't necessarily do enough of that."*

58.     Similarly, a former S&P employee who was "responsible for directing ratings criteria development, ratings production, marketing and business development for single-family mortgage and home equity loan bond ratings and related products" explained to Congress on October 22, 2008:

> The ratings process consisted of two distinct operations – the credit analysis of the individual mortgages, and a review of the documents governing the servicing of the loans and the payments to investors in the securities.
>
> The credit analysis is focused on determining the expected default probabilities on each loan and the loss that would occur in the event of a default. And these, in turn, establish the expected loss to support the Triple A bonds.
>
> *In short, what the ratings process attempts to do is to find out what that equity piece is that needs to support the Triple A bond so that investor won't take any losses.* It's very similar to the home equity you have in a home loan. That equity's intended to protect the lender from taking a loss in the event of a change in circumstance.

59.     Without the "Top Ratings," Rhinebridge would not have existed and could not have operated. Indeed, once the Rating Agencies' conflicts of interest and models based on flawed data and unreasonable model assumptions started to become apparent in late 2007, the Rating Agencies were forced to drop their ratings and Rhinebridge's structure began to unravel. The ratings declines cut off Rhinebridge's access to funding and it collapsed. As a result, investors suffered hundreds of millions of dollars in damages.

- 15 -

**C.    The Rating Agencies Received Three Times Their Usual Compensation to Provide Consulting Services and Ratings to Rhinebridge**

60.     According to Rhinebridge's Private Placement Memorandum, there were $16 million in upfront costs (paid out of the proceeds of investors' capital) to be shared among a number of parties. On information and belief, the Rating Agencies were paid fees of approximately ten or more basis points of Rhinebridge's stated market value when the transaction "closed" or was funded on or about June 27, 2007. These fees are three times higher than the Rating Agencies' compensation for rating traditional municipal or corporate bonds. With an approximate (and false) initial portfolio value of $1.8 billion, the Rating Agencies would have been paid $1.8 million in success fees.

61.     The Rating Agencies were also paid ongoing fees following the June 27, 2007 closing. They shared annual remuneration with several other parties of approximately $1 million and 0.05% of the market value of the collateral assets.

62.     The Rating Agencies had powerful economic incentives to provide false ratings. A substantial portion of the Rating Agencies' fees were linked to the size and market values of the assets held by Rhinebridge. In addition, the Rating Agencies received their success fees only in the event that the transaction closed *with* the desired "Top Ratings."

63.     The millions of dollars in fees paid to the Rating Agencies were taken out of plaintiffs' and the Class members' investment capital.

64.     In addition, the Rating Agencies enjoyed "double-dipping" fees because Rhinebridge's operating instructions (which the Rating Agencies helped design) required Rhinebridge to acquire *other* securities that had been rated and structured by the Rating Agencies.

65.     In fact, Moody's and S&P rated approximately 100% of Rhinebridge's constituent assets, while Fitch rated approximately 30% of these assets.

- 16 -

676180_1

66.    The Rating Agencies' revenue growth during the relevant period was driven by the creation of SIVs like Rhinebridge and other structured finance securities.  This growth is illustrated by the following chart, generated by the U.S. Congress' Committee on Oversight and Government Reform, published on October 22, 2008:



## Revenue of Big 3 Credit Rating Agencies: 2002-2007



67.    The effect of these economic incentives on ratings was explained by a managing director of another credit rating agency (not Fitch, Moody's or S&P) to Congress on October 22, 2008:

> EGAN: Of course, there have been other contributing parties to this debacle, including some of the mortgage brokers, depository institutions and investment banks, *but there should be no doubt that none of this would have been possible were it not for the grossly inflated, unsound and possibly fraudulent ratings* provided to both the asset-backed securities directly issued, as well as companies which dealt in these securities, whether it be originating, aggregating, financing, securitizing, insuring, credit enhancing, or ultimately purchasing them.

- 17 -

Issuers paid huge amounts to these rating companies for not just significant rating fees but, in many cases, *very significant consulting fees for advising the issuers on how to structure the bonds to achieve maximum Triple A ratings*.

*This egregious conflict of interest may be the single greatest cause of the present global economic crisis*. This is an important point which is often overlooked in the effort to delimit the scope of the across-the-board failures of the major credit rating firms.

This is not just a *securitization* problem. The credit rating industry is a five to $6 billion market with these three companies, *S&P, Moody's and Fitch, controlling more than 90 percent of the market*.

68.     The Rating Agencies were highly compensated for undertaking this new business venture of consulting, structuring and monitoring special purpose investment funds like Rhinebridge.

## THE FALSE AND MISLEADING CREDIT RATINGS

69.     The ratings assigned to any bond communicate specific information to investors about the assets backing their bonds (notes).  In this case, the Senior Notes received "Top Ratings," defined in the Private Placement Memorandum as follows:

"**Top Rated**" or "**Top Ratings**" means, in the case of S&P, AAA for notes with original term maturities exceeding 364 days and A-1+ for commercial paper, in the case of Fitch, AAA for notes with original maturities exceeding 364 days and F1+ for commercial paper, and, in the case of Moody's, Aaa for notes with original maturities exceeding 364 days and P-1 for commercial paper.

70.     As to each Rating Agency, the Top Ratings constituted the highest ratings that could be given to an investment.  They are similar to ratings assigned to bonds backed by the full faith and credit of the U.S. Government such as U.S. Treasury Bills.

71.     The Top Ratings at issue in this case are standard terms of art in the investment industry and communicate specific, positive information about the strength and quality of an investment.

- 18 -

72.    At all relevant times, defendants knew how these terms of art were used in the investment industry.  The Rating Agencies describe the short-term and long-term "Top Ratings" assigned to Rhinebridge's Senior Notes in the following way:

Moody's:    **P-1:** Issuers (or supporting institutions) rated Prime-1 have a superior ability to repay short-term debt obligations.

*          *          *

**Aaa:** Obligations rated Aaa are judged to be of the highest quality, with minimal credit risk.

S&P:    **A-1[+]:** An obligor rated 'A-1' has STRONG capacity to meet its financial commitments.  It is rated in the highest category by Standard & Poor's.  Within this category, certain obligors are designated with a plus sign (+).  This indicates that the obligor's capacity to meet its financial commitments is EXTREMELY STRONG.

*          *          *

**AAA:** An obligation rated 'AAA' has the highest rating assigned by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is extremely strong.

Fitch    **F1[+]:** Highest credit quality.  Indicates the strongest capacity for timely payment of financial commitments; may have an added "+" to denote any exceptionally strong credit feature.

*          *          *

**AAA:** Highest credit quality.  'AAA' ratings denote the lowest expectation of credit risk. They are assigned only in case of exceptionally strong capacity for payment of financial commitments. This capacity is highly unlikely to be adversely affected by foreseeable events.

73.    While the Senior Notes enjoyed the highest possible ratings, even a portion of obligations that were *junior* to the Senior Notes were rated "Triple A" by the Rating Agencies.

74.    In addition to the foregoing qualitative information, credit ratings communicate quantitative information, and defendants knew it. In June of 2007, for example, Moody's explained in a Special Comment on "Short-Term Corporate and Structured Finance Transition Rates" that:

•    Structured finance short-term rating transition rates are reported here for the first time, using the same definition of default and methodology for measuring rating transition rates as used for our corporate ratings. The data set consists primarily of asset-backed commercial paper ratings; however, all other short term structured finance ratings are included in the sample, including those of structured investment vehicles (SIVs), collateralized debt obligations (CDOs), and money market tranches of term asset-backed (ABS), residential mortgage-backed (RMBS), and commercial-mortgage-backed transactions (CMBS).

– Since 1983, 1,689 distinct ABCP programs or tranches of ABS, CDO, CMBS, and RMBS transactions have been assigned short-term ratings.

*– No obligation carrying a short-term rating has ever defaulted in structured finance market.*

•    About 3.8% of all P-1 rated short-term corporate ratings were downgraded within one year, *compared to about 0.6% of P-1-rated short-term structured finance ratings.*

(Footnote omitted.)

75.    In brief, as Moody's and all other defendants knew, the "Top Ratings" for SIVs like Rhinebridge and similar CDO and ABS securities were apparently *even stronger* than comparable corporate bond ratings. Nothing could have been further from the truth.

76.    The information communicated by the Top Ratings is important because an SIV's success depends directly on the credit quality of the assets it acquires. SIV investors are willing to invest in large part because of the high credit ratings assigned to SIVs. These ratings are largely a reflection of the high ratings assigned to the assets acquired by SIVs. Indeed, without such high credit ratings, Rhinebridge would not have existed. Rhinebridge's Private Placement Memorandum acknowledges this fact by noting that any downgrade in assets held by Rhinebridge "is likely to have an adverse effect on the market value" of the Senior Notes.

- 20 -

77.    Defendants communicated to investors that the Senior Notes had Top Ratings.  As noted, these ratings are terms of art in the investment industry and mean:

(a)    the Senior Notes were nearly risk free;

(b)    the Senior Notes were as safe, secure and reliable as high quality corporate or government bonds;

(c)    the Senior Notes had an extremely low probability of transitioning to "junk" status;

(d)    the Senior Notes had a very low probability of default;

(e)    the Senior Notes had a reasonably high likelihood of a high recovery in the event of default;

(f)    the Senior Notes had been rated by an objective, independent third-party whose impartiality was not impaired by any significant conflicts of interest, such as the payment of triple-sized fees for structuring and closing Rhinebridge;

(g)    the Senior Notes had been rated on the basis of current, accurate and complete data and analysis, as well as reasonable and true models and assumptions, not mere "guess work" and speculation; and

(h)    the low rates of return offered by the Senior Notes were appropriate and reflected the true level of risk associated with the Senior Notes.

78.    The false ratings were communicated starting on or about June 27, 2007, when the Senior Notes were first sold to investors and were repeated each time a Senior Note was offered or sold to an investor until October 18 and 19, 2007, when the Senior Notes were downgraded to their accurate "junk" ratings by the Rating Agencies.

- 21 -

79.     The false ratings were communicated to a narrow group of private investors in transactions exempt from registration under the United States securities laws.  Indeed, the Senior Notes could be offered and sold only to this limited group of qualified investors, and according to the Private Placement Memorandum, any offer or sale of Senior Notes to anyone other than a qualified purchaser would "BE DEEMED NULL AND VOID *AB INITIO* AND OF NO EFFECT."

80.     On information and belief, all defendants knew at all times that Class members, including plaintiffs, would and did reasonably rely on the false ratings before making a decision to invest in Rhinebridge.

81.     On information and belief, all defendants knew at all times that such information would be communicated directly to plaintiffs and other members of the Class through, *inter alia*, a commonly used investment platform provided by *Bloomberg* and confirmed via Private Placement Memoranda and other written materials concerning Rhinebridge.

82.     The foregoing beliefs are based upon, *inter alia,* the fact that the Top Ratings were a critical investment characteristic of the Senior Notes and it was common industry practice both to communicate and to rely upon this information as set forth above.

83.     The Top Ratings were false, as defendants knew, for the reasons set forth below.

### THE REASONS WHY DEFENDANTS KNEW THE RATINGS WERE MATERIALLY MISLEADING

**A.     Due to Conflicts of Interest in the Structuring, Rating and Monitoring of Rhinebridge and Its Constituent Assets, the Ratings Were Misleading, as Defendants Knew**

84.     As noted, it was a condition to the sale of the Senior Notes that they receive the highest ratings possible.  A rating must be independent to have any value.  The ratings in this case were not independent.

85.     Investors placed their trust in the credit ratings largely because they were supposed to be independent and unbiased agencies.

86.     Serious conflicts of interest at the Rating Agencies have been revealed recently.  Such conflicts undermined the credibility of the ratings structures and surveillance of Rhinebridge *and* its constituent structured finance assets.  As reported on April 11, 2008, in *The Wall Street Journal*, a former Moody's analyst stated that while there was no explicit directive to abandon ratings objectivity to earn business from investment banks, such as defendant IKB, there was "'a palpable erosion of institutional support for rating analysis that threatened market share.'"

87.     It was reported in the same article that "Moody's agreed to switch analysts on deals after bankers complained."  The Chief Executive Officer of Moody's recently confirmed that they were in fact pressured to provide strong ratings: "Everybody always seeks to pressure us.  Anyone with a position in the credit markets will hope that the credit-rating agencies agree with its opinion. It's a conflict of interest question."

88.     The former Chairman of the SEC, Arthur Levitt, Jr., made the remarks quoted below on November 27, 2007, in Ontario, at a forum for securities regulators and market participants to discuss important capital markets issues.  Mr. Levitt's remarks were entitled "Strengthening the Gatekeepers: The importance of independence and accountability to capital markets."

> In terms of market meltdowns and the degree of pain inflicted on the financial system, the subprime mortgage crisis has the potential to rival just about anything in recent financial history including the post-Enron turndown of a few years ago.
>
> The scope of this crisis is not the only similarity to the Enron-era scandals. They also share root causes that include conflicts of interest, a lack of accountability, and limited transparency leavened with a healthy dose of naive greed.
>
> *Indeed, the subprime meltdown – which is still roiling the markets and the economic health of the world – is yet another example of what happens when independence and accountability is compromised among key market actors . . . of what happens when trust breaks down.*

- 23 -

*Just like we did in the months after the implosion of Enron and WorldCom, we are now learning that a number of critical gatekeepers and market actors did not perform as we had hoped.*

First, consider the credit rating agencies.

Until the 1970s, the business model of credit rating agencies was fairly straightforward: Investors bought a subscription to receive ratings which were then used to make investment decisions.

But then the business model changed, and the issuers of securities themselves became the ones who paid to be rated . . . and as structured finance increased in popularity, it deepened this relationship between issuer and rater.

Now, *investors are relying on credit ratings to make informed investment decisions, but the credit rating firms are paid not by investors but by the companies they rate. And as complex, structured debt products have increased in popularity, the relationship between rater and issue became even closer – and the line between independent rater and paid advisor became blurred.*

*This very circumstance suggests that a potential conflict of interest – between providing objective ratings and satisfying their corporate clients may be distorting the rating agencies' judgment. That they are both coach and referee.*

89.    The former Chairman of the SEC, Christopher Cox, provided a statement to Congress

on April 22, 2008, that said:

The rating agencies' performance in rating these structured credit products has called into question their credit ratings generally as well as the integrity of the ratings process as a whole.

90.    On June 11, 2008, Chairman Cox made the following remarks concerning the Rating

Agencies:

When the Congress passed the Credit Rating Agency Reform Act a year and a half ago, it was well understood that certain conflicts of interest were hardwired into the rating agency business model. *But we have learned since then that the ratings of structured products in the subprime area made those conflicts of interest even more acute. That's because structured products were specifically designed for each tranche to achieve a particular credit rating – and the ratings agencies then made a lucrative business of consulting with issuers on exactly how to go about getting those ratings. Selling consulting service to entities that purchased ratings became a triple-A conflict of interest.*

- 24 -

91.     On July 8, 2008, following a ten-month investigation, the SEC released a report concerning the three defendant Rating Agencies (the "July 8 SEC Report"). No findings were made about any other rating agency in this report. In summarizing its "factual findings, observations and recommendations from the examinations," the SEC stated: "*Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal.*"

92.     The SEC stated that "[i]n some instances, analysts discussed fees for a rating." The SEC gave the following examples of this problem:

- At one firm, an analyst wrote to his manager asking about whether the firm would be charging a fee for a particular service and what the fee schedule will be.

- At another firm, a business manager in the RMBS group wrote to several analysts: ". . . if you have not done so please send me any updates to fees on your transactions for this month. It is your responsibility to look at the deal list and see what your deals are currently listed at."

- At two rating agencies, there were indications that analysts were involved in fee discussions with employees of the rating agency's billing department.

93.     The July 8, 2008 SEC Report also stated that: "Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria." The SEC provided the following examples of this problem:

- For instance, a senior *analytical manager* in the Structured Finance group wrote "I am trying to ascertain whether we can determine at this point if we will suffer any loss of business because of our decision [on assigning separate ratings to principal and interest] and if so, how much?" "Essentially, [names of staff] ended up agreeing with your recommendations but *the CDO team didn't agree with you because they believed it would negatively impact business.*"

- In another example, after noting a change in a competitor's ratings methodology, an employee stated: "[w]e are meeting with your group this week to discuss *adjusting criteria for rating CDOs of real estate assets this week because of the ongoing threat of losing deals.*" In another email,

- 25 -

following a discussion of a competitor's market share, an employee of the same firm states that *aspects of the firm's ratings methodology would have to be revisited to recapture market share from the competing rating agency.* An additional email by an employee stated, following a discussion of losing a rating to a competitor, "*I had a discussion with the team leaders here and we think that the only way to compete is to have a paradigm shift in thinking, especially with the interest rate risk.*"

- Another rating agency reported to the Staff that one of its foreign ratings surveillance committees had knowledge that the rating agency had issued ratings on almost a dozen securities using a model that contained an error. The rating agency reported to the Staff that, as a result, the committee was aware that the *ratings were higher than they should have been.*

(Footnotes omitted.)

94.    This information concerning CDO rating and structuring processes is directly relevant because CDOs are similar to SIVs.  Moreover, Rhinebridge acquired millions of dollars worth of CDOs that were structured, rated and monitored by the Rating Agencies.

95.    The SEC's investigation further revealed that the Rating Agencies did not have enough staff to rate CDOs properly and that the Rating Agencies knew this fact.

96.    Recent admissions by former employees of the Rating Agencies confirm the Rating Agencies knew their ratings on investment pools such as Rhinebridge were false, as reported in a September 25, 2008 *Bloomberg* article:

- "'I knew it was wrong at the time'" said a former S&P Managing Director;

- "'It was either that or skip the business. That wasn't my mandate. My mandate was to find a way. Find the way.'"

97.    Similarly, *Bloomberg* reported the following on September 24, 2008:

- Another former S&P Managing Director commented "'[S&P] thought they had discovered a machine for making money that would spread the risks so far that nobody would ever get hurt.'"

98.    The July 8, 2008 SEC Report made the following observations with respect to all three agencies:

- 26 -

At one firm, internal communications appear to expose analytical staff to this conflict of interest by indicating concern or interest in market share when firm employees were discussing whether to make certain changes in ratings methodology.   In particular, employees discussed concerns about the firm's market share relative to other rating agencies, or losing deals to other rating agencies.

99.     Defendants failed to disclose all of the compensation arrangements with the Rating Agencies – including "repeat player" compensation paid by banks such as IKB.

100.     Recent statements by industry insiders indicate the Rating Agencies were paid nearly three times the amount to rate Rhinebridge as they would have received to rate a traditional corporate debt obligation.   Among other reasons they were paid substantially more to rate Rhinebridge is because they helped structure – that is, create – the product. The Rating Agencies' structuring activities and attendant "pay for performance" compensation undermined the credibility of their ratings to such a significant degree as to make those ratings false and misleading.

101.     It is not surprising that the Rating Agencies repeatedly eased their ratings standards in order to capture more market share of the ratings business given the conflicts of interest between the Rating Agencies and the entities for whom they performed rating work.  As reported in the September 25, 2008 *Bloomberg* article, a former S&P Managing Director stated that when the subject of tightening S&P's rating criteria came up, the co-director of CDO ratings, David Tesher, said: "'Don't kill the golden goose.'"

102.     The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") – two S&P analysts describing S&P's rating of an investment similar to Rhinebridge and its constituent securities:

| | |
|---|---|
| Shah: | btw – that deal is ridiculous |
| Mooney: | i know right . . . model def[initely] does not capture half of the rish [sic] |
| Mooney: | *risk* |

| Shah: | we should not be rating it |
|---|---|
| Mooney: | we rate every deal |
| Mooney: | it could be structured by cows and we would rate it |
| Shah: | but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member. |

103.    In a December 15, 2006 e-mail, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the rating agencies continue to create an "'even bigger monster – the CDO market. Let's hope we are all wealthy and retired by the time this house of cards falters.'"

104.    The loosening of ratings criteria due to market share considerations was evident at Moody's also. Jerome Fons ("Fons"), a former Managing Director for Credit Quality at Moody's, indicated during his October 22, 2008 testimony before the U.S. Congress that due to profit concerns, a loosening of ratings standards took place at his company: "'*[T]he focus of Moody's shifted from protecting investors to being a market-driven organization*'" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

105.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "*typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality.*" Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another." Fons said it was this business model that "*prevented analysts from putting investor interests first.*"

106.    Recently, Fons further explained the deep conflicts at Moody's. Fons was a frequent in-house critic of Moody's overly optimistic credit ratings, but was not able to persuade Moody's to

- 28 -

change its policies. In a March 16, 2009 opinion editorial for *The New York Times*, Fons stated that "[o]ne of us worked at Moody's, and was a frequent in-house critic of how the agencies put troubled companies on artificial 'watch lists' while they maintained overly optimistic letter ratings."

107.    Raymond McDaniel ("McDaniel"), the CEO of Moody's, also acknowledged the degradation of ratings standards. In a presentation to Moody's Board of Directors in October 2007, McDaniel told the Board: "The real problem is not that the market . . . underweights ratings quality but rather that, in some sectors, it actually penalizes quality . . . . It turns out that *ratings quality has surprisingly few friends* . . . ." He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'" In fact, *The Wall Street Journal* found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage bond after its client complained and said it might go with a different rating firm.

108.    As McDaniel noted, this degradation of ratings quality was not limited to Moody's: "What happened in '04 and '05 with respect to subordinated tranches is that our competition, *Fitch and S&P, went nuts. Everything was investment grade. It didn't really matter.*"

109.    Suffice it to say, Moody's did not "asterisk" their ratings of the Senior Notes and did not explain that S&P and Fitch "went nuts" in rating Rhinebridge and its constituent assets.

110.    Due to the Rating Agencies' easing of credit rating criteria, the Rating Agencies made the Senior Notes appear to be far less risky than they really were. This easing of credit rating criteria and the true risk of Rhinebridge contradicts the Top Ratings.

**B.    The Ratings Were False Because Rhinebridge's Constituent Assets Crashed in Value Before the Senior Notes Were Sold**

111.    The Senior Notes never should have been issued nor should they have received Top Ratings.

- 29 -

112.    Rhinebridge had operating instructions that governed the types of assets it could buy and the ways in which it could fund, or borrow money to buy, those assets. These instructions included various tests. The "Major Capital Loss Test" (herein, the "Capital Test") was one such test.

113.    The basic function of the Capital Test was to prevent Rhinebridge from issuing any Senior Notes when the value of the assets included in the portfolio declined below a certain level. Specifically, if the market value of Rhinebridge's assets fell by approximately 8% or more, then the Capital Test would be breached and no Senior Notes could be sold.

114.    Because Rhinebridge was highly "levered," or had a high proportion of debt relative to its junior liabilities, changes in the value and quality of its constituent assets have a magnified effect on the value of its junior liabilities. And when a material percentage junior debt is eroded, the Top Ratings ascribed to the Senior Notes become meaningless.

115.    Thus, a decline in the value of Rhinebridge's assets has three effects. First, it erodes the value of the capital notes and shuts down Rhinebridge's ability to sell any Senior Notes. An approximate 8% decline in asset values erodes 50% of the value of the capital notes. Second, because the value of the capital notes is eroded, there is effectively less "protection" supporting the Top Ratings and the Top Ratings are destroyed. Third, because Rhinebridge cannot issue new debt to replace maturing debt, existing investors are stuck and Rhinebridge must conduct fire sales of its constituent securities to repay investors.

116.    These relationships can be illustrated as follows:



117.    Upon information and belief, the Capital Test was breached and the Top Ratings were clearly false *before* defendants launched Rhinebridge as a new investment on June 27, 2007.

118.    It is not possible to know the exact true values of Rhinebridge's constituent assets and Senior Notes in the absence of discovery because these assets are not publicly traded.  They are traded and priced by banks like IKB on proprietary trading networks.

119.    Whatever the exact true values of Rhinebridge's constituent assets were on or about June 27, 2007, they were well below the value necessary to generate Top Ratings or satisfy the "Capital Test" discussed above.

120.    The following information strongly supports the conclusion that Rhinebridge's mortgage-backed assets had crashed in value before June 27, 2007:

(a)    A criminal indictment of Bear Stearns fund managers.  The indictment relates to funds that were invested in the *same kinds* of risky mortgage-backed securities held by Rhinebridge.  The indictment states, "[t]oward the end of March [2007], the performance of the Funds had deteriorated to a point where [a defendant] expressed . . . 'I'm sick to my stomach over

- 31 -

the performance in *[M]arch [2007]*.'" An "*April 22, [2007]*" e-mail between the indicted defendants

states that

> the subprime market looks pretty damn ugly . . . . If the [CDOs report is]
> ANYWHERE CLOSE to accurate I think we should close the funds now. The
> reason for this is that if [the CDOs report] is correct *then the entire subprime market
> is toast*. . . . If AAA bonds are systematically downgraded then there is simply no
> way for us to make money -- ever.

(Capitalized emphasis in original; bold and italicized emphasis added.)

        (b)     An *Associated Press* report dated June 21, 2007:

Q:     What went wrong with the [Bear Stearns] Enhanced Leverage fund?

A:     The fund reportedly lost *23 percent of its value* in the first four months of the
year. The specific reasons are not clear, but starting earlier this year, there
was a sharp increase in the number of delinquencies and defaults on loans
made to borrowers with spotty credit histories. Bonds backed by these
subprime mortgages lost much of their value, before stabilizing somewhat in
April and May.

        (c)     Reports of traders with knowledge of sales from the Bear Stearns funds *before*

June 27, 2007 that the assets – again the same kinds of assets held by Rhinebridge – had "high credit

ratings" but were in fact "junk in investment-grade clothing." The assets were "variously described

as 'sludge' [and] 'immovable objects'" that obtained "'atrocious prices.'"

        (d)     A report by the *Financial Times* that the "giant market for securities backed

by US subprime mortgages was thrown into turmoil on [June 20, 2007] as lenders struggled to sell

more than $1bn of assets seized from two Bear Stearns hedge funds that suffered heavy losses on

subprime bets." The *Financial Times* explained these sales pushed indices that track the value of the

types of assets included in Rhinebridge to "record lows." One "key index" dropped to a "*record low

of 59.25*" on June 20, 2007. As a result, the mortgage-backed debt tracked by that index traded at a

41% discount to par.

(e)    A report by *The Wall Street Journal*, dated June 18, 2007, that "[i]n recent months, market prices of subprime bonds have seen wide swings as investors fear many securities could default as mortgage losses rise" and that analysts said such securities "aren't easily traded by investors" and thus "may draw bids that are significantly below what their sellers are hoping for."

(f)    A report by the *American Banker*, a banking industry trade publication, dated June 22, 2007, that "[t]he recent collapse of the subprime mortgage sector and the pullback in the alt-A arena has the mortgage market in turmoil."

121.    Neither IKB nor the Rating Agencies distributed or identified the actual collateral assets that would be included in Rhinebridge before offering and selling the Senior Notes. Because the basic premise of an SIV, as reinforced through the issuance of the Top Ratings, was to acquire only high-quality assets, the inclusion of low-quality toxic mortgage-backed assets rendered the ratings false and misleading.

122.    The Rating Agencies knew or recklessly disregarded these market movements in rating the Senior Notes because they received regular reports on market activity and knew what assets were included in Rhinebridge.

123.    In addition to Rhinebridge, IKB managed a separate even larger fund called "Rhineland," which was very similar in composition and size to the Bear Stearns funds discussed above. Thus, IKB received the same types of market reports as Bear Stearns and knew or recklessly disregarded the fact that the market for Rhinebridge's obligations and its constituent securities was crashing.

124.    Further, as discussed below, an October 2007 audit report by an outside accounting firm concluded that the management board of IKB was in fact hiding problems from other members of the company regarding IKB's exposure to the subprime market. Neither plaintiffs nor any other

- 33 -

member of the Class could have uncovered the risks relating to Rhinebridge's toxic assets when members of IKB's own senior management team were attempting to hide that risk from others within IKB.

125.    It is now clear, however, that senior management of IKB was highly motivated to sell the toxic assets held in Rhinebridge to investors for the reasons described below.

**C.    IKB Was Highly Motivated to Defraud Investors and Knew that Rhinebridge's Toxic Constituent Assets Contradicted the "Top Ratings"**

126.    IKB was highly motivated to make the Senior Notes appear less risky than they were because (a) IKB was highly compensated to do so; (b) IKB's objective was to sell assets from its balance sheet at prices it could never obtain on the open market; and (c) IKB faced its own insolvency if it revealed the true quality of the assets included in Rhinebridge.

127.    Under the Rhinebridge Senior Notes program, IKB was set to receive a management fee of 0.05% of the market value of the collateral assets. IKB was entitled to another 0.04% calculated in the same manner. And IKB was entitled to a third incentive fee based on Rhinebridge's profit or "spread" derived from the interest payments received from Rhinebridge's collateral assets minus the interest paid to its investors, including investors in the Senior Notes. In other words, 100% of the profits from Rhinebridge went directly to IKB (after paying the Rating Agencies' ongoing fees). These economic incentives motivated IKB both to create the illusion that Rhinebridge's collateral assets had high market values and to maintain this illusion as long as possible in order to generate the incentive-based compensation.

128.    More important than this substantial remuneration, however, was IKB's objective to unload toxic subprime assets from its *own balance sheet*. Specifically, IKB sold over $1 billion in toxic mortgage-backed assets to Rhinebridge at prices IKB never could have achieved in an open and competitive market. IKB sold over $600 million in "home equity" or low quality subprime

- 34 -