UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------- X

KING COUNTY, WASHINGTON,
and IOWA STUDENT LOAN
LIQUIDITY CORPORATION,

           Plaintiffs,

    - against -

IKB DEUTSCHE INDUSTRIEBANK
AG, IKB CREDIT ASSET
MANAGEMENT, GmbH, MOODY'S
INVESTORS SERVICE, INC.,
MOODY'S INVESTORS SERVICE
LIMITED, THE McGRAW HILL
COMPANIES, INC. (d/b/a STANDARD
& POOR'S RATINGS SERVICES),
FITCH, INC., MORGAN STANLEY &
CO. INCORPORATED, and MORGAN
STANLEY & CO. INTERNATIONAL
LIMITED,

           Defendants.

---------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 8387 (SAS)**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___5/4/12___

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.  INTRODUCTION

Institutional investors King County, Washington ("King County") and Iowa Student Loan Liquidity Corporation ("ISL") bring this action to recover losses stemming from the October, 2007 collapse of Rhinebridge, a structured

1

investment vehicle ("SIV").  Plaintiffs' First Amended Complaint included claims of common law fraud and aiding and abetting fraud against two individuals — who have since been dismissed from the action — and eight corporate entities: Deutsche Industriebank AG and IKB Credit Asset Management, GmbH (together, "IKB"); The McGraw Hill Companies, Inc. d/b/a Standard & Poor's Rating Services ("S&P"); Moody's Investors Service, Inc. and Moody's Investors Service Ltd. (together, "Moody's"); Fitch, Inc. ("Fitch," and, with S&P and Moody's, the "Rating Agencies"); Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited (together, "Morgan Stanley," or "MS").[1]

At the time the plaintiffs filed their First Amended Complaint, it was settled in the Second Circuit that New York's Martin Act preempted common law tort claims in the securities context.  On December 20, 2011, the New York Court of Appeals ruled that the Martin Act does *not* preempt common law claims in the securities context,[2] and on December 27, 2011, I granted plaintiffs leave to amend their complaint to state causes of action for negligence, negligent misrepresentation, and breach of fiduciary duty, as well as aiding and abetting with

---

[1]     *See* First Amended Consolidated Complaint for Violations of New York State Law ("FAC").

[2]     *See Assured Guaranty (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.* (*Assured Guaranty II*), 18 N.Y.3d 341, 353 (2011).

respect to those claims.[3]  King County and ISL filed the Second Amended

Complaint ("SAC") on January 10, 2012, and defendants now move to dismiss

plaintiffs' claims of negligence, negligent misrepresentation, breach of fiduciary

duty and aiding and abetting.  For the reasons stated below, defendants' motions

are granted in part and denied in part.

## II.    BACKGROUND[4]

### A.    Credit Ratings and Rhinebridge

Structured investment vehicles are special purpose entities that borrow

money by issuing short- and medium-term debt, and then use that money to buy

longer-term securities including mortgage bonds and other asset-backed securities.[5]

SIVs are often likened to "conduits" because they raise short-term funds and

channel those funds into longer-term assets, and the SIV business model resembles

that of a bank in that its goal is to earn a spread between its borrowing interest rate

and its lending interest rate.[6]  Like banks, SIVs have both assets and liabilities.[7]

_____

[3]    *See* 12/27/11 Scheduling Order, No. 09 Civ. 8387 (Docket No. 209).

[4]    All facts are drawn from the SAC and are presumed to be true for the
purpose of this motion.

[5]    *See* SAC ¶ 37.

[6]    *See id.*

[7]    *See id.*

As an SIV, Rhinebridge could only operate, raise funds, and invest those funds through its agents, such as the defendants.[8]  At the direction of the defendants — who controlled Rhinebridge's capital structure and credit ratings — the SIV borrowed money from investors by issuing debt securities of varying maturities and payment priority, including: (1) short term commercial paper (the "Senior Notes") with maturities of up to 364 days; and (2) several tranches of Capital Notes that were junior to the Senior Notes and would mature in several years.[9]  Rhinebridge used the proceeds from the sale of these debt securities to acquire various income-producing assets.[10]  Rhinebridge's securities were not offered or sold to the public but only to a select group of buyers in private placements.[11]

The notes that SIV investors purchase typically receive very high or "investment grade" ratings from Rating Agencies.[12]  Rating Agencies — such as defendants Moody's, S&P, and Fitch — use public, and sometimes non-public, information regarding the assets of issuers to evaluate and rate debt offerings; the

---

[8]       *See id.* ¶ 7.

[9]       *See id.* ¶¶ 7, 38.

[10]      *See id.* ¶ 39.

[11]      *See id.* ¶ 42.

[12]      *See id.* ¶ 40.

4

ratings are intended to convey information about the creditworthiness of the issuer's debt to potential creditors and investors.[13]

The role allegedly played by Moody's, S&P, and Fitch in creating, operating and rating Rhinebridge represents a deviation from the historical role of Rating Agencies. Prior to 1975, rating agencies used publicly available information about corporations — such as Securities and Exchange Commission ("SEC") filings — to generate unsolicited "opinions" on the creditworthiness of corporations, which they then charged investors to view.[14] Over time, the market came to trust rating agencies for their integrity and unbiased approach to evaluating bonds.[15] In 1975, the SEC created a special status to distinguish the most credible and reliable rating agencies, identifying them as "nationally recognized statistical rating organizations" or "NRSROs" to help ensure the integrity of the ratings process.[16]

According to the SEC, the "single most important criterion" to granting NRSRO status is that "the rating organization is recognized in the United

---

[13]     *See id.* ¶¶ 43, 168.

[14]     *See id.* ¶ 43.

[15]     *See id.* ¶ 44.

[16]     *See id.*

States as an issuer of credible and reliable ratings by the predominant users of securities ratings" and that part of awarding the NRSRO label to the company hinges on "the rating organization's independence from the companies it rates."[17]

A credit rating is important to both issuers and investors. The Second Circuit has recognized that:

> [Issuers] have their securities rated for two reasons. First, once the security or debt has received a favorable rating, that rating makes it easier to sell the security to investors, who rely upon [the rating agency's] analysis and evaluation. The second reason is that a favorable rating carries with it a regulatory benefit as well. Fitch, along with its direct competitors Amici Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S&P"), has been designated by the Securities and Exchange Commission ("SEC") as a "nationally recognized statistical rating organization" ("NRSRO") whose endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO rating.[18]

A credit rating provides essential information to potential investors in an SIV because an SIV's success depends on the credit quality of the assets acquired by

---

[17]    *Id.*

[18]    *In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003) (citing Securities and Exchange Commission, Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets, 5-8 (Jan. 2003) *available at* http://www.sec.gov/news/studies/creditratingreport0103.pdf).

the SIV.[19]  Indeed, credit quality is of such paramount importance that SIVs such

as Rhinebridge are only supposed to invest in assets of the highest credit quality.[20]

   An SIV's assets typically include some combination of "investment

grade" rated asset-backed securities ("ABS"), residential mortgage backed

securities ("RMBS"), and collateralized debt obligations ("CDOs") — this was

true of Rhinebridge and its Rated Notes which were invested, in part, in RMBS

securities.[21]  Even though Rhinebridge held over a billion dollars worth of low-

quality, mortgage-backed securities, the Senior Notes it issued were "top rated[22] —

Moody's rated the Senior Notes "Prime-1" and "AAA," Fitch rated the Senior

Notes "F1[+]" and "AAA," and S&P rated the Senior Notes "A-1+" and "AAA"

(collectively, "Top Ratings").[23]  These ratings are the same as those usually

assigned by the Rating Agencies to bonds backed by the full faith and credit of the

United States Government, such as Treasury Bills.[24]  Top Ratings are terms of art

---

[19]  *See* SAC ¶ 76.

[20]  *See id.* ¶ 53.

[21]  *See id.* ¶¶ 2, 9.

[22]  *See id.* ¶¶ 70, 73.

[23]  *See id.* ¶ 72.

[24]  *See id.* ¶ 70.  On August 5, 2011, S&P downgraded the credit rating of
the U.S. Federal Government from "AAA" to "AA+."  Thus the ratings that S&P
assigned to the Senior Notes were higher than those S&P currently assigns to

in the investment industry, and when assigned to a financial product such as the Senior Notes, they convey to investors that the product has been evaluated by an objective and independent third-party and is found to be "nearly risk free," "safe, secure and reliable," and possessing both a "very low probability of default" and "a high likelihood of recovery in the event of default."[25]  Starting on or about June 27, 2007, the Top Ratings assigned to the Senior Notes were communicated to investors; all defendants knew that investors such as the plaintiffs would view and rely upon the ratings when deciding whether or not to invest in Rhinebridge.[26]

       According to the U.S. Commercial Paper Private Placement Memorandum, the Senior Notes could not be offered to the public at large; they could only be offered and sold to Qualified Institutional Buyers, as defined in Rule 144A under the Securities Act of 1933, that are also Qualified Purchasers, as defined in Section 2(a)(51)(A) of the Investment Company Act of 1940 ("QIBs").[27] King County and ISL are QIBs, and — as qualified investors often do — have

---

bonds backed by the full faith and credit of the United States Government.  *See* Binyamin Appelbaum & Eric Dash, *S.&P. Downgrades Debt Rating of U.S. for the First Time*, N.Y. Times, Aug. 5, 2011, at A1.

[25]    SAC ¶ 77.

[26]    *See id.* ¶¶ 78, 80, 81.

[27]    *See id.* ¶ 216.

minimum ratings requirements for their investments.[28]  The defendants knew this, and accordingly, the Rhinebridge U.S. Commercial Paper Placement Agency Agreement ("PAA") specified that the Senior Notes would not be issued unless they received Top Ratings.[29]  The Senior Notes did receive Top Ratings when they were first sold to investors on or about June 27, 2007.[30]

### B.    The Role of IKB and Morgan Stanley

IKB and MS were responsible for: (1) overseeing Rhinebridge's portfolio; (2) facilitating the purchase of portfolio assets; (3) conducting capital, market sensitivity and liquidity tests to monitor Rhinebridge's assets; and (4) monitoring the Senior Notes to determine whether they were supported by sufficient equity and junior notes.[31]  Throughout the negotiation, ramp-up and launch periods, MS and IKB circulated and received drafts of virtually all of the documents concerning Rhinebridge, and set deadlines by which deal documents were to be completed and distributed to investors.[32]  Morgan Stanley operated as a Co-Arranger and placement agent for Rhinebridge, and — through marketing

---

[28]    *See id.* ¶ 217.

[29]    *See id.* ¶ 224.

[30]    *See id.* ¶¶ 2, 4, 9.

[31]    *See id.* ¶ 171.

[32]    *See id.* ¶ 174.

materials — provided potential investors with the allegedly misleading ratings, accompanying definitions of the ratings, and statements regarding the Senior Notes' safety and stability.[33]

In structuring Rhinebridge, MS and IKB caused the SIV to acquire high-risk toxic assets — unbeknownst to investors, Rhinebridge held over a billion dollars worth of low-quality mortgage-backed securities, more than half of which IKB had transferred from its own balance sheet into the SIV's portfolio.[34]  Morgan Stanley "caused"[35] Rhinebridge to acquire "hundreds of millions of dollars of poor quality, toxic assets" that it knew IKB was trying to "unload[]."[36]  It "coerced"[37] the Rating Agencies to allow risky Home Equity Loans ("HELs") to constitute up to seventy-five percent of Liquid Eligible Assets ("LEAs")[38] in the SIV, where most SIVs limit HELs to fifteen to twenty percent of such assets.[39]  It caused Rhinebridge to acquire approximately two-hundred and fifty million dollars in

---

[33]    *See id.* ¶ 170.

[34]    *See id.* ¶¶ 181-190.

[35]    *Id.* at 49 (Heading B).

[36]    *Id.* ¶ 181.

[37]    *Id.* ¶ 182.

[38]    *See id.* ¶ 184.

[39]    *See id.*

Countrywide securities – a single obligor exposure approximately three times higher than the four percent limit stipulated in the SIV's operating instructions.[40]  It knew Rhinebridge had breached its "Major Capital Loss Test"[41] ("Capital Test") before Rhinebridge was launched on June 27, 2007, and that its Top Ratings were false.[42]

By virtue of their roles in creating, structuring, managing and monitoring the SIV, MS and IKB had access to confidential information regarding Rhinebridge.[43]  Because Morgan Stanley structured and underwrote several of the SIV's underlying assets, it had intimate knowledge regarding the quality of its securitizations.[44]  And because it had unsuccessfully attempted to sell its low-quality mortgage-backed securities on the open market, IKB had unique information regarding the demand and liquidity of those assets — assets IKB was

---

[40]     *See id.* ¶¶ 144, 186.

[41]     *Id.* ¶ 112.  According to the SAC, "Rhinebridge had operating instructions that governed the types of assets it could buy and ways in which it could fund, or borrow money to buy, those assets.  These instructions included various tests" such as the Capital Test.  *Id.*

[42]     *See id.* ¶ 187.

[43]     *See id.* ¶ 197.

[44]     *See id.* ¶¶ 198, 199.

"thrilled" that it could sell to Rhinebridge.[45]

## C.     The Rating Agencies' Collaboration with MS and IKB

The Rating Agencies collaborated with IKB and MS to draft key selling documents, determine which assets the SIV could hold and what structural protections to put in place, and investigate and recommend securities for the SIV's portfolio.[46]  The Rating Agencies had a significant ongoing role in the operation of Rhinebridge, which included (among other rights and responsibilities) the right to veto changes in management and the right to review and potentially veto any changes in how Rhinebridge obtained funding, modified its operating instructions, or changed its investment guidelines.[47]  Regardless of their historical roles, the Rating Agencies did not merely provide ratings; rather, they were deeply entrenched in the creation and operation of Rhinebridge.[48]

The Rating Agencies were compensated for their involvement with Rhinebridge, and had significant economic incentives to provide falsely high

---

[45]     *See id.* ¶ 204.

[46]     *See id.* ¶¶ 24, 25, 45, 55, 100, 170-80, 196, 271(j).

[47]     *See id.* ¶ 55.

[48]     *See id.* ¶ 57.

ratings.[49]  Each of the three Rating Agencies gave the Senior Notes the "Top Ratings" without which Rhinebridge could not have existed.[50]  Yet these ratings were false or misleading, in part because all three Rating Agencies used information that was stale and inaccurate, and models that were outdated.[51]  Moreover, the Rating Agencies knew that their ratings were false or misleading[52] because they:  (1) had access to confidential information about the assets held by Rhinebridge; (2) had knowledge unavailable to the public regarding the assumptions and methodologies used in rating the SIV; and (3) knew that, although the goal of an SIV is to acquire high-quality assets making it worthy of a "Top Rating," the Rhinebridge SIV included low-quality toxic mortgage-backed assets.[53]

### D.    Defendants' Targeting of QIBs

The defendants knew that the Senior Notes could only be offered to

---

[49]    *See id.* ¶¶ 60-68, 100.  In summary, "[a] substantial portion of the Rating Agencies' fees were linked to the size and market values of the assets held by Rhinebridge.  In addition, the Rating Agencies received their success fees only in the event that the transaction closed with the desired 'Top Ratings.'" *Id.* ¶ 62.

[50]    *See id.* ¶¶ 76, 221.

[51]    *See id.* ¶¶ 47-51, 59, 150.

[52]    *See id.* ¶¶ 3, 121, 122.

[53]    *See id.* ¶¶ 121, 197, 214.

QIBs and QPs,[54] and indeed, according to the PPM, any offer or sale of Rhinebridge-issued Senior Notes to a party other than a QP or a QIB would "BE DEEMED NULL AND VOID *AB INITIO* AND OF NO EFFECT."[55]  Not only were defendants aware that many qualified investors could only invest in SIVs that received "Top Ratings," but prior to their Senior Note purchases, the plaintiffs directly informed the Rating Agencies they relied on credit ratings to make investment decisions.[56]  Knowing that qualified investors, including the plaintiffs, were relying on the Senior Notes' ratings to decide whether or not to invest in Rhinebridge, the defendants worked closely to ensure that the Senior Notes received "Top Ratings"[57] — according to the PAA, receipt of the "Top Ratings" was a "condition precedent" to issuing the Senior Notes.[58]

The Rating Agencies knew or should have known the identity of the potential Senior Notes investors,[59] and Morgan Stanley and IKB did know the identities of the Senior Notes investors prior to those investors' purchases of the

---

[54]     *See id.* ¶¶ 215, 216.

[55]     *Id.* ¶ 79.

[56]     *See id.* ¶¶ 215-223.

[57]     *See id.* ¶¶ 215-223, 225-229.

[58]     *Id.* ¶ 224.

[59]     *See id.* ¶ 264(f).

Senior Notes.[60]

### E.    The Collapse of the Rhinebridge SIV

The Senior Notes had Top Ratings from their first sale to investors on or about June 27, 2007 to their downgrade to "junk" ratings on October 18 and 19, 2007.[61]  Thus, in less than four months, the ratings went from indicating an extremely low probability of default to indicating a near-certain likelihood of default.[62]  The Rhinebridge SIV was forced into receivership on or about October 22, 2007, becoming perhaps the shortest-lived "Triple A" investment fund in the history of corporate finance.[63]

## III.    LEGAL STANDARD

### A.    Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor."[64]  The court evaluates the sufficiency of the complaint under the "two-pronged approach"

---

[60]    *See id.* ¶ 264(h)

[61]    *See id.* ¶¶ 2, 4, 9.

[62]    *See id.* ¶ 6

[63]    *See id.*

[64]    *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011).

suggested by the Supreme Court in *Ashcroft v. Iqbal.*[65]  First, a court "'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"[66]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[67]  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[68]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[69]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[70]  Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a

---

[65]      556 U.S. —, 129 S.Ct. 1937, 1950 (2009).

[66]      *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 129 S.Ct. at 1950).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

[67]      *Iqbal*, 129 S.Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[68]      *Id.* at 1950.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[69]      *Twombly*, 550 U.S. at 564.

[70]      *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

defendant has acted unlawfully."[71]

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[72]  However, the court may also consider a document that is not incorporated by reference, "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[73]

### B.    Rule 8 Pleading Requirement

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[74]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of plausibility, as discussed above.[75]

---

[71]    *Id.* (quotation marks omitted).

[72]    *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[73]    *Id*. (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[74]    *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R Civ. P. 8(a)(2)).

[75]    *See Iqbal*, 129 S. Ct at 1949; *Twombly*, 550 U.S. at 564.

### C.    Rule 9(b) Pleading Requirement

Common law fraud claims must be pled with particularity in accordance with the requirements set forth in Rule 9(b).[76]  Where defendants are insiders or affiliates participating in the securities offering, the Second Circuit has held "that reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of representation . . . ."[77]

## IV.   APPLICABLE LAW

### A.    Negligence

Under New York law, a plaintiff asserting a claim of negligence must show that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach was the proximate cause of the harm suffered by the plaintiff.[78]  While foreseeability and causation are generally questions of fact to be determined by juries, "the duty owed one member of society to another is a legal issue" to be decided by the courts.[79]

---

[76]    *See Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008).

[77]    *Ouaknine v. MacFarlane*, 897 F.2d 75 (2d Cir. 1990) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) *and Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986)).

[78]    *See McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997).

[79]    *Eiseman v. State*, 70 N.Y.2d 175, 187 (1987).

**B.      Negligent Misrepresentation**

Under New York law, a plaintiff asserting a claim of negligent

misrepresentation must show:

> that (1) the defendant had a duty, as a result of a special
> relationship, to give correct information; (2) the defendant made
> a false representation that he or she should have known was
> incorrect; (3) the information supplied in the representation was
> known by the defendant to be desired by the plaintiff for a serious
> purpose; (4) the plaintiff intended to rely and act upon it; and (5)
> the plaintiff reasonably relied on it to his or her detriment.[80]

**C.      Breach of Fiduciary Duty**

Under New York law, to prove a breach of fiduciary duty, "a plaintiff

must demonstrate:  'breach by a fiduciary of a duty owed to plaintiff; defendant's

knowing participation in the breach; and damages.'"[81]  A fiduciary relationship

exists when one party "'is under a duty to act for or to give advice for the benefit of

another upon matters within the scope of the relation.'"[82]  Further, "a fiduciary

---

[80]      *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

[81]      *Eugenia VI Venture Holdings, Ltd. v. Glaser*, 370 Fed. App'x 197, 199 (2d Cir. 2010) (quoting *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004)).

[82]       *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (quoting Restatement (Second) of Torts § 874 cmt. a (1977)).

relationship must exhibit the characteristics of 'de facto control and dominance.'"[83]

A fiduciary relationship may exist where "'one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party,'"[84] or in situations "'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'"[85]  Yet reposing trust or confidence in a party that has superior access to confidential information is not sufficient to establish a fiduciary relationship — under New York law, there is no fiduciary duty unless the trust or confidence has been *accepted* as well.[86]  Further, there can be no claim for breach of fiduciary duty unless a fiduciary relationship existed *prior* to the

---

[83]  *Doe v. Roman Catholic Diocese of Rochester*, 12 N.Y.3d 764, 765 (2009) (quoting *Marmelstein v. Kehillat New Hempstead*, 11 N.Y.3d 15, 21 (2008)).

[84]  *Pension Committee v. Banc of America Sec., LLC* (*Pension Committee II*), 592 F. Supp. 2d 608, 624 (S.D.N.Y. 2009) (quoting *Ross v. FSG PrivatAir, Inc.*, No. 03 Civ. 7292, 2004 WL 1837366, at *5 (S.D.N.Y. Aug. 17, 2004)).

[85]  *Id.* (quoting *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002)).

[86]  *See Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) ("Mere reposal of one's trust or confidence in a party, however, does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well.").

transaction giving rise to the alleged wrong.[87]

### D.    Aiding and Abetting

When proceeding under an aiding and abetting theory of liability under New York law, a plaintiff must show "(1) the existence of a . . . violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation."[88]  For claims of aiding and abetting to survive a motion to dismiss, they must be pled with some level of specificity and may not consist solely of a broad, conclusory repetition of the elements of aiding and abetting.[89]

## V.    DISCUSSION

### A.    Timeliness

---

[87]    *See Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Intl.*, 674 N.Y.S.2d 648, 648 (1st Dep't 1998).

[88]    *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006) (quotation marks omitted) (omission in original).  *Accord Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006).

[89]    *See, e.g.*, *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 119 (2d Cir. 1982) (dismissing allegations of aiding and abetting liability that are "so broad and conclusory as to be meaningless"); *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (holding that allegations that the defendants "provided substantial assistance and encouragement to the other defendants . . . in connection with the breaches by such other defendants of duties owed by them to the plaintiffs" were "too broad to be sustained").

### 1.     Relation-back

Morgan Stanley argues that plaintiffs' negligence claims are time-barred because they were initiated more than three years after the alleged negligence and because the allegations in the original complaint did not put Morgan Stanley on notice of potential liability for its alleged negligent structuring of the SIV.[90]  However, the First Amended Complaint did allege that Morgan Stanley structured and monitored the SIV.[91]  Because the negligence claim "arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading,"[92] and because the allegations in the First Amended Complaint alerted Morgan Stanley to the possibility of a claim based on its structuring of the SIV, the negligence claim relates back to the First Amended Complaint, and is therefore timely.

### 2.     Leave to File the SAC Under Rule 15

Notwithstanding that I already granted plaintiffs leave to amend,[93]

---

[90]     *See* Memorandum of Law in Support of Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited's Motion to Dismiss the Second Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6) ("MS Mem."), at 16.

[91]     *See* FAC ¶¶ 172-190.

[92]     Fed. R. Civ. P. 15(c)(1)(B).

[93]     *See* 12/27/11 Scheduling Order, No. 09 Civ. 8387 (Docket No. 209).

IKB argues that "Plaintiffs should not be granted leave to file the SAC under Rule 15."[94]  The decision to allow plaintiffs leave to amend is committed to the court's "sound discretion."[95]  I granted plaintiffs leave to file the SAC because — contrary to IKB's argument that there was a "clear legal trend against Martin Act preemption" by early 2011[96] — Martin Act preemption was settled law in the Second Circuit[97] until the New York Court of Appeals' decision in *Assured Guaranty II* on December 20, 2011.[98]  Leave to amend was warranted because

---

[94]    Memorandum of Law of Defendants IKB Deutsche Industriebank AG and IKB Credit Asset Management GmbH in Support of their Motion to Dismiss Counts II, III, IV and Portions of Count VI of the Second Amended Complaint under Rules 12(b)(6) and 15 of the Federal Rules of Civil Procedure ("IKB Mem."), at 24.  Rule 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).

[95]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[96]    IKB Mem. at 25 (citing *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 456 (S.D.N.Y. 2010); *Assured Guaranty (UK) Ltd. V. J.P. Morgan Inv. Mgt. Inc.* (*Assured Guaranty I*), 915 N.Y.S.2d 7 (1st Dep't 2010)).

[97]    *See In re Herald, Primeo & Thema Sec. Litig.*, No. 09 Civ. 0289, 2011 WL 5928952, at *9 (S.D.N.Y. Nov. 29, 2011) ("[n]otwithstanding the thoughtful decision[s]" in *Anwar* and *Assured Guaranty I*, "'the weight of opposing authority, including Second Circuit Court of Appeals precedent, compels this Court to reaffirm its recognition of Martin Act preemption[.]'") (quoting *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 433 (S.D.N.Y. 2010)); *In re Merkin*, No. 08 Civ. 10922, 2011 WL 4435873, at *13 n.15 (S.D.N.Y. Sept 23, 2011) ("Martin Act preemption remains a viable defense until the New York Court of Appeals (or the Second Circuit in interpreting existing New York law) revisits this area.").

[98]    18 N.Y.3d 341.

plaintiffs did not "sit on their rights" as IKB contends;[99] they requested leave to amend *two days* after the decision in *Assured Guaranty II*.[100]

### B. Negligence Claims Against All Defendants

Collectively, defendants raise a host of arguments as to why plaintiffs' negligence claims should be dismissed:  (1) the negligence claims are duplicative of the negligent misrepresentation claims;[101] (2) negligence claims to recover purely economic losses are barred by New York's economic loss doctrine;[102] (3) defendants did not owe a duty to plaintiffs;[103] and (4) plaintiffs have not adequately pled breach or causation.[104]  For the reasons discussed below, plaintiffs' negligence claims are not duplicative of their negligent misrepresentation claims. However, because I find that plaintiffs' negligence claims are barred by New

---

[99]    IKB Mem. at 25.

[100]    *See* 12/22/11 E-mail from Darryl Alvarado to the Court, Exhibit 7 to the Declaration of Daniel S. Drosman in Support of Plaintiffs' Opposition to the Rating Agencies', Morgan Stanley's and IKB's Motions to Dismiss Claims for Negligence, Negligent Misrepresentation, Breach of Fiduciary Duty and Aiding and Abetting in Plaintiffs' Second Amended Complaint.

[101]    *See* The Rating Agencies' Memorandum of Law in Support of their Joint Motion to Dismiss the Second Amended Consolidated Complaint ("RA Mem."), at 15-16.

[102]    *See* MS Mem. at 17; RA Mem. at 17; IKB Mem., at 12-14.

[103]    *See* MS Mem. at 16; RA Mem. at 16.

[104]    *See* MS Mem. at 17-18.

York's economic loss doctrine, I decline to address defendants' other arguments.

### 1.   Duplicativeness

The Rating Agencies argue that plaintiffs' negligence claim against them challenges the same conduct at issue in plaintiffs' negligent misrepresentation claim.[105]  This is not so.  Whereas plaintiffs' negligent misrepresentation claim challenges alleged misrepresentations made by the Rating Agencies, the negligence claim arises from the Rating Agencies' role in "designing, arranging, structuring, modeling, marketing, selling and monitoring" Rhinebridge.[106]  There are several allegations in the SAC that the Ratings Agencies — in addition to and apart from their alleged misstatements — played a role in creating and operating the Rhinebridge SIV.[107]  Thus, the negligence claim challenges different conduct than the negligent misrepresentation claim, and it is therefore not duplicative.

### 2.   New York's Economic Loss Doctrine

Under New York's "economic loss" rule, a plaintiff cannot recover in tort for purely economic losses caused by a defendant's negligence.[108]  In *532*

---

[105]   *See* RA Mem. at 15.

[106]   SAC ¶ 270.

[107]   *See id.* ¶¶ 52-55, 57, 270, 272.

[108]   *See Schiavone Constr. Co. v. Mayo Corp.*, 56 N.Y.2d 667 (1982); *Gusmao v. GMT Grp., Inc.*, No. 06 Civ. 5113, 2008 WL 2980039, at *6 (S.D.N.Y.

*Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*, the New York

Court of Appeals cautioned that the "economic loss rule" has no application

outside of the product-liability context.[109]  And yet, in practice the principle has

been applied broadly, and has been referred to interchangeably as the "economic

loss rule" and the "economic loss doctrine."[110]  The approach taken in *Finlandia* is

instructive — rather than apply a "rule" barring plaintiffs from recovering for

purely economic losses, the Court of Appeals conducted a duty analysis and

determined that "plaintiffs' negligence claims based on economic loss alone fall

beyond the scope of the duty owed them by defendants."[111]  It is this focused duty

---

Aug. 1, 2008) ("'New York law holds that a negligence action seeking recovery for economic loss will not lie.'") (quoting *Suffolk County v. Long Island Lighting Co.*, 728 F.2d 52, 62 (2d Cir. 1984)).

[109]    96 N.Y.2d 280, 289 (2001) ("The 'economic loss' rule espoused in [*Schiavone*] and relied on by defendants has no application here.  That case stands for the proposition that an end-purchaser of a product is limited to contract remedies and may not seek damages in tort for economic loss against a manufacturer.").

[110]    *Cruz v. TD Bank, N.A.*, No. 10 Civ. 8026, 2012 WL 694267, at *15 (S.D.N.Y. Mar. 2, 2012) (applying the "economic loss doctrine" to bar a claim that a bank had negligently frozen its customers' accounts and charged them improper fees); *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007) (applying the "economic loss rule" to bar a negligent misrepresentation claim arising from an automobile manufacturer's refusal of a dealership's franchise application).

[111]    96 N.Y.2d at 292.

26

analysis — this policy-driven scrutiny of whether a defendant had a duty to protect a plaintiff against purely economic losses — that can best be termed "the economic loss doctrine."  In *Hydro Investors, Inc. v. Trafalgar Power Inc.*, the Second Circuit explained the rationale behind the doctrine:

> [The economic loss rule's] continuing role is based on the recognition that "[r]elying solely on foreseeability to define the extent of liability [in cases involving economic loss], while generally effective, could result in some instances in liability so great that, as a matter of policy, courts would be reluctant to impose it."  To prevent such open-ended liability, courts have applied the economic loss rule to prevent the recovery of damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort.[112]

Thus the economic loss doctrine serves two purposes: (1) it "protect[s] defendants from disproportionate, and potentially limitless, liability";[113] and (2) it disentangles contract and tort law by restricting plaintiffs who suffer economic losses to the benefits of their bargains.[114]

---

[112]   227 F.3d at 16 (quoting *5th Ave. Chocolatiere, Ltd. v. 540 Acquisition Co., LLC.*, 712 N.Y.S.2d 8, 12 (1st Dep't 2000)).

[113]   *Travelers Cas. & Sur. Co. v. Dormitory Auth.*, 734 F. Supp. 2d 368, 379 (S.D.N.Y. 2010).

[114]   *See Manhattan Motorcars*, 244 F.R.D. at 220 ("New York courts have attempted to keep 'contract law from drown[ing] in a sea of tort' by erecting various 'dikes,' which serve to bar actions in tort when an action in contract is available.  One such dike is the economic loss rule.  Viewing the purpose of the law of contract to be 'the [facilitation] of voluntary economic exchange,' New York courts restrict plaintiffs who have 'suffered economic loss, but not personal

Plaintiffs argue that the economic loss doctrine does not apply where an action in contract is unavailable, and that because I dismissed contract claims under facts very similar to those here,[115] the doctrine does not bar plaintiffs' negligence claims.  This argument misunderstands the economic loss doctrine — the unavailability of a contract remedy does not automatically trigger an exception to the rule.[116]  Indeed, the doctrine may apply even when there is no contract at all between the parties.[117]  Rather, the presence of a contract or a financial transaction that is "in the nature of contract"[118] can be a strong indicator that a plaintiff was not

---

or property injury, to an action for the benefits of their bargains.'") (quoting *Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 938 (S.D.N.Y. 1989)).

[115]   *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 183 (S.D.N.Y. 2009).

[116]   *See Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605, 609 (S.D.N.Y. 2009) (dismissing plaintiff's negligent misrepresentation claim as barred by the economic loss doctrine even as it dismissed plaintiff's breach of contract claims for other reasons).

[117]   *See Suffolk County*, 728 F.2d at 62-63 (affirming the dismissal of appellant's negligence claim as barred by the economic loss rule as it affirmed the dismissal of appellant's breach of contract claim due to a lack of contractual privity); *American Fin. Int'l Group-Asia, LLC v. Bennett*, No. 05 Civ. 8988, 2007 WL 1732427, at *3 (S.D.N.Y. June 14, 2007) (dismissing plaintiff's negligence claim as barred by the economic loss rule as it dismissed breach of contract claims due to plaintiff's "[failure] to allege that they were parties to any relevant contract").

[118]   227 F.3d at 16.

28

owed a legal duty separate and apart from obligations bargained for and subsumed within the transaction.[119]

   While plaintiffs have not alleged the existence of any contract between them and either Rhinebridge or the defendants, an analysis of the conduct that plaintiffs' negligence claim challenges — defendants' creation, structuring and operation of the Rhinebridge SIV — demonstrates why it would be inappropriate to allow plaintiffs to recover in negligence for their economic losses.  Notes issued by an SIV are financial products — they carry an expected return, a level of risk, and a price which is supposed to reflect those factors.  If a seller of a financial product misleads buyers about the level of risk or expected return, then actions may lie in breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty, etc.  Such products, however, cannot be negligently structured — even a low-quality financial product with a high level of risk and low expected return would have an appropriate price, albeit a low one.  As a matter of law, creators and structurers of investment vehicles — even risky or "low quality" ones — do not have a duty of care to protect investors against economic losses.  The

---

[119] *See 5th Ave. Chocolatiere, Ltd.*, 712 N.Y.S.2d at 11 ("[T]he majority of cases enunciating the economic loss rule arise in the context of product liability, where the economic losses are essentially contractual in nature, and therefore the risk may be allocated by the parties, as reflected in the purchase price, UCC warranties or insurance.").

economic loss doctrine serves to disentangle inappropriate negligence liability such as that alleged by the plaintiffs from sustainable causes of action stemming from flaws in the transaction or defects in the information disclosed.

Plaintiffs argue that even if the economic loss rule were to apply, the rule allows recovery for economic loss where the defendant had a professional responsibility to the plaintiffs.[120]  This exception stems from the fact that malpractice is a subcategory of negligence,[121] and it exists to prevent the economic loss doctrine from barring recovery in many types of malpractice actions.[122]  The exception has been read narrowly to apply to professionals that might be liable for malpractice — such as attorneys, engineers, accountants, or architects.[123]  Even were plaintiffs correct that defendants are "professionals," the exception to the

---

[120]     *See Hydro Investors*, 227 F.3d at 18 ("[T]he rule allows such recovery in the limited class of cases involving liability for the violation of a professional duty.").

[121]     *See id.* at 15 ("Under New York law, 'professional malpractice . . . is a species of negligence.'") (quoting *Marks Polarized Corp. v. Solinger & Gordon*, 476 N.Y.S.2d 743, 744 (Sup. Ct. Queens Co. 1984)).

[122]     *See 17 Vista Fee Assocs. v. Teachers Ins. and Annuity Ass'n of America*, 693 N.Y.S.2d 554, 560 (1st Dep't 1999) ("[T]he fact that 17 Vista suffered pecuniary losses only is of no significance in this malpractice claim against a professional.  Many types of malpractice actions, such as those against an accountant or attorney, will frequently result in economic loss only.").

[123]     *See Hydro Investors*, 227 F.3d at 18.

economic loss doctrine is only triggered when the defendant either had a contract with or provided professional services directly to the plaintiff.[124]  Because plaintiffs have failed to allege that defendants owed them a professional responsibility to structure the Rhinebridge SIV in a certain fashion, their negligence claim is barred by the economic loss doctrine.

### C.      Negligent Misrepresentation

#### 1.      The Economic Loss Doctrine

Although "[n]egligent misrepresentation is a type of fraud,"[125] the economic loss doctrine may nonetheless bar negligent misrepresentation claims. Where the parties have a contract governing their relationship, the analytical approach is the same: the economic loss rule may apply unless the defendant had a legal duty — separate and apart from any contractual obligations — to protect the plaintiff from purely economic losses.[126]  Where, as here, the parties are not in

---

[124]      *See, e.g.*, *id.* at 12 (defendant engineering firm provided professional services to the plaintiff in the form of an assessment of energy generation); *Valentini v. Citigroup, Inc.*, — F. Supp. 2d —, No. 11 Civ. 1355, 2011 WL 6780915, at *1 (S.D.N.Y. Dec. 27, 2011) (defendants provided investment recommendations to plaintiff).

[125]      *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770, 2003 WL 1858153, at *4 (S.D.N.Y. Apr. 10, 2003).

[126]      *See Nebraskaland, Inc. v. Sunoco, Inc.*, No. 10 Civ. 1091, 2011 WL 6131313, at *4 (E.D.N.Y. July 13, 2011) (dismissing a negligent misrepresentation claim as barred by the economic loss doctrine, but recognizing that "New York

31

contractual privity, the duty analysis at the heart of the economic loss doctrine is

subsumed by the determination of whether the parties had a relationship that barred

the defendant from making any negligent misrepresentations to the plaintiff.[127]

### 2.    Actionability of Credit Ratings

In *Abu Dhabi*, I rejected the argument that credit ratings are not

actionable as misrepresentations in New York.[128]  Morgan Stanley and the Rating

---

courts also 'recognize[ ] exceptions to the economic loss rule where the defendant has a duty independent of contractual obligations or where defendant's conduct causes damage to property not subject to the contract.'") (quoting *Rochester-Genesee Regional Trans. Auth. v. Cummins*, No. 09 CV 6370, 2010 WL 2998768, at *8 (W.D.N.Y. July 28, 2010)).  I acknowledge that I rejected a similar argument in  *Manhattan Motorcars*, 244 F.R.D. at 220 ("The fact that the duty breached here is independent of any contract between the parties merely prevents this claim from being dismissed as duplicative of Manhattan's breach of contract claims.  It does not allow evasion of the economic loss rule, which presents a second, distinct barrier.").  However, a district court decision is never controlling authority – even one's own — and were I deciding that case today, I might rule differently.

[127]     *See Travelers*, 734 F. Supp. 2d at 379-80 ("A limited exception to New York's barrier against recovery of economic loss exists, however, for claims of negligent misrepresentation.  Nevertheless, 'before a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity.'") (quoting *Parrott v. Coopers & Lybrand, L.L.P.*, 95 N.Y.2d 479, 483 (2000)).

[128]     *See Abu Dhabi*, 651 F. Supp. 2d at 176 ("[P]laintiffs have sufficiently pled that the Rating Agencies did not genuinely or reasonably believe that the ratings they assigned to the Rated Notes were accurate and had a basis in fact.  As a result, the Rating Agencies' ratings were not mere opinions but rather actionable misrepresentations.").

Agencies now argue that, as predictive opinions about future events, credit ratings are only actionable "when they misrepresent the speaker's genuine opinion (i.e., when fraudulent), they cannot be actionable in a negligence context."[129]  Yet under New York negligent misrepresentation law, "even statements of opinion are actionable if they are made in bad faith or are not supported by the available evidence."[130]  Many of the cases which defendants cite for the proposition that credit ratings are not actionable deal with Sections 11 and 12 of the Securities Act of 1933.[131]  Although cases interpreting Section 10(b) of the Securities Act are helpful to federal courts applying New York law,[132] the same is not true for

---

[129]    RA Mem. at 14.  *See also* MS Mem. at 13-15.

[130]    *ADL, LLC v. Tirakian*, No. 06 Civ. 5076, 2010 WL 3925131, at *12 (E.D.N.Y. Aug. 26, 2010).  *Accord Eaves v. Designs for Finance, Inc.*, 785 F. Supp. 2d 229, 256 (S.D.N.Y. 2011) ("[S]tatements of opinion may support a fraud claim when a plaintiff alleges that the defendant did not genuinely or reasonably believe the opinions at the time the defendant made them. This principle applies to negligent misrepresentation claims as well."); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1092-95 (S.D.N.Y. 1996) (upholding a negligent misrepresentation claim based on a false credit rating).

[131]    *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 107 (2d Cir. 2011); *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 183 (2d Cir. 2011).

[132]    *See In re Optimal U.S. Litigation*, — F. Supp. 2d —, No. 10 Civ. 4095, 2011 WL 6424988, at *4 (S.D.N.Y. Dec. 21, 2011) ("Because the elements of common-law fraud in New York are substantially identical to those governing § 10(b), the identical analysis applies.'") (quoting *AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC*, No. 01 Civ. 11448, 2005 WL 2385854, at *16 (S.D.N.Y.

Sections 11 and 12.[133]  Similarly, defendants cite several cases applying the

common law of other states,[134] but they are inapposite because they do not apply

New York law.  *Maverick Fund, L.D.C. v. Comverse Technology, Inc.* — one of

the few cases cited by defendants that deals with New York negligent

misrepresentation law — distinguishes between statements predicting future

events, which are not actionable in negligent misrepresentation in New York, and

statements of opinion, which may be.[135]  The other cases that defendants cite only

---

Sept. 26, 2005)).

    [133]    *See Lehman Bros.*, 650 F.3d at 182-85 (holding that ratings issued by Rating Agencies are not actionable under Section 11, but acknowledging that plaintiffs "may bring securities fraud claims against the Rating Agencies pursuant to § 10(b) of the Securities Exchange Act of 1934 ('1934 Act'), although liability under that section is, of course, subject to scienter, reliance, and loss causation requirements not applicable to § 11 claims. . . .  It is precisely because § 11 'give[s] rise to liability more readily,' however, that it is [applied] 'more narrowly' than § 10(b).") (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359-60 (2d Cir. 2010).

    [134]    *See, e.g.*, *Ohio Police & Fire Pension Fund et al. v. Standard & Poor's Fin. Servs., LLC*, No. 09 Civ. 1054, 2011 WL 4448847, at *11-13 (S.D. Ohio Sept. 26, 2011) (applying Ohio negligent misrepresentation law); *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030, 2011 WL 536437, at *12-13 (S.D.N.Y. Feb. 9, 2011) (applying California negligent misrepresentation law).

    [135]    801 F. Supp. 2d 41, 64 (E.D.N.Y. 2011) ("Plaintiffs argue that non-factual statements are still actionable if they are made in bad faith or are not reasonably supported by the available evidence.  However, the case plaintiffs cite in support of this argument deals with opinion statements, not statements predicting future events.").

hold that certain types of opinions — as opposed to opinions in general — are not actionable in New York.[136]  As such, I again hold that plaintiffs "have sufficiently alleged that the ratings issued by the Rating Agencies on the Rated Notes are actionable misstatements."[137]

### 3.  Special Relationship with the Rating Agencies

Under New York law, "[w]hether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact."[138]  The New York Court of Appeals further directs the fact-finder to consider:

> [W]hether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be

---

[136]    *See Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, 159 Fed. App'x 317, 317-318 (2d Cir. 2005) (holding that statements were not actionable in negligent misrepresentation because they were "puffery" which were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance") (quoting *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540-41 (2d Cir. 1996)); *Sotheby's Fin. Servs., Inc. v. Baran*, 107 Fed. App'x 235, 238 (2d Cir. 2004) ("It is well established that conclusory representations or those that constitute 'puffery,' opinions as to value, or future expectations cannot form the basis of a claim for negligent misrepresentation.").

[137]    *Abu Dhabi*, 651 F. Supp. 2d at 176.

[138]    *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996).

put and supplied it for that purpose.[139]

Thus, there can be no negligent misrepresentation without some form of "special relationship" between the parties.[140] At the motion to dismiss stage, "a 'sparsely pled' special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in *Kimmell* [*v. Schaefer*].'"[141] Plaintiffs have sufficiently alleged that the Rating Agencies possessed unique or specialized expertise,[142] and that the

---

[139]    *Id.*

[140]    *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788-89 (2d Cir. 2003) (describing the "basic requirement of a 'special relationship'" for negligent misrepresentation claims as existing when the defendant "'possess[es] unique or specialized expertise, or [is] in a special position of confidence and trust with the injured party.'") (quoting *Kimmell*, 89 N.Y.2d at 263).

[141]    *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 188 (2d Cir. 2004) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001)). *Accord AFA Protective Systems, Inc. v. American Tel. and Tel. Co., Inc.*, 57 N.Y.2d 912, 914 (1982) ("The issue of whether a 'special relationship' exists sufficient to make out a cause of action for negligent misrepresentation should also be left to the finder of fact.") (citing *White v. Guarente*, 43 N.Y.2d 356, 363 (1977)).

[142]    *See* SAC ¶¶ 197-198, 205-206, 210-211, 213-214, 230.  In *Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*, — F. Supp. 2d —, No. 10 Civ. 7549, 2011 WL 4495034, at *7 (S.D.N.Y. Sept. 28, 2011), Judge Pauley dismissed fraud and negligent misrepresentation claims against structurers of a Credit Default Obligation ("CDO"), holding that because plaintiffs were sophisticated investors with access to "information about the mortgage-backed securities in [the CDO]'s portfolio — and even the individual loans backing those securities," defendants did not have "unique or specialized expertise.  *Cf* SAC ¶

36

Rating Agencies knew and intended that their ratings would be used by investors in deciding whether or not to invest in Rhinebridge.[143]

In the absence of actual contractual privity, plaintiffs alleging a special relationship sufficient to give rise to a duty face a "heavy burden,"[144] and must establish that the relationship was so close as to be "privity-like."[145]  Still, "a determination of whether a special relationship exists is highly fact-specific and 'generally not susceptible to resolution at the pleadings stage.'"[146]

In *Credit Alliance Corp. v. Arthur Andersen & Co.*, the New York

---

230 (the former Managing Director of Credit Policy at Moody's testimony to the Senate that "subprime RMBS and their offshoots [such as the Rhinebridge SIV] offer little transparency around the composition and characteristics of the underlying loan collateral.  Potential investors are not privy to the information that would allow them to understand clearly the quality of the loan pool.  Loan-by-loan data, the highest level of detail, is generally not available to investors.").

[143]     *See* SAC ¶¶ 215-231.

[144]     *Securities Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63 (2d Cir. 2000) ("In New York, a plaintiff claiming negligent misrepresentation against an accountant with whom he has no contractual relationship faces a heavy burden.").

[145]     *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007) ("A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.").

[146]     *Century Pacific, Inc. v. Hilton Hotels Corp.*, No. 03 Civ. 8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) (quoting *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 536 (S.D.N.Y. 2001)).

Court of Appeals elaborated on the "special relationship" standard:

> (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.[147]

Although *Credit Alliance* discussed accountants, the *Credit Alliance* test has been applied broadly.[148]  Plaintiffs have sufficiently alleged that the Rating Agencies knew their statements would be used for a particular purpose — to evaluate the quality of the assets in the SIV.  The Rating Agencies argue that: (1) the second prong of the *Credit Alliance* test has not been met because plaintiffs were not "known parties" but rather unknown amidst a large pool of potential investors; and (2) the third prong of the *Credit Alliance* test has not been met because there was no "linking conduct" between the Rating Agencies and the plaintiffs.  The Rating Agencies are wrong on both counts.

Because they were members of a select group of qualified investors, plaintiffs were known parties towards whom the Rating Agencies targeted their

---

[147]     65 N.Y.2d 536, 551 (1985).

[148]     *See Sykes v. RFD Third Ave. 1 Assocs., LLC*, 15 N.Y.3d 370, 373 (2010) (applying the *Credit Alliance* test to engineers, and stating "[w]e have made clear since *Credit Alliance* that these requirements do not apply to accountants only").

alleged misrepresentations, and thus the "known party" prong of the *Credit Alliance* test has been met.[149]   The Rating Agencies rely on *Sykes v. RFD Third Ave 1 Associates, LLC*, in which the New York Court of Appeals used broad language in holding that potential purchasers of apartments in a condominium building were not "known parties" to the engineering firm that designed the building's heating, ventilation and air conditioning system.[150]   Yet *Sykes* should not be read to require that the defendant know the identity of each particular plaintiff; rather, plaintiffs are a "known party" if they are members of a "settled and particularized class,"[151] as opposed to an "indeterminate class."[152]   Whereas the pool of potential purchasers of apartments in a condominium building is an "indeterminate class," the select group of qualified investors towards which the Rating Agencies targeted

---

[149]   *See LaSalle*, 951 F. Supp. at 1093 ("Knowledge of the identity of each particular plaintiff is not necessary, however, if the defendant's representation is designed to target a 'select group of qualified investors' rather than 'the public at large.'") (quoting *Schwartz v. Michaels*, No. 91 Civ. 3538, 1992 WL 184527, at *32 (S.D.N.Y. July 23, 1992)).

[150]   15 N.Y.3d 370, 373 (2010) ("The words 'known party or parties' in the *Credit Alliance* test mean what they say.").

[151]   *White*, 43 N.Y.2d at 363 (holding that an accountant owed a duty to partners of a client "not as a mere member of the public, but as one of a settled and particularized class").

[152]   *Ultramares Corp. v. Touche*, 255 N.Y. 170, 179 (1931), cited by both *Sykes* and *Credit Alliance*.

their alleged misrepresentation is a "settled and particularized class."[153]  Further,

plaintiffs were known parties to the Rating Agencies because — prior to their

purchase of the Senior Notes — plaintiffs directly informed the Ratings Agencies

that they rely on credit ratings in making investment decisions.[154]

Similarly, "linking conduct" is present such that the third prong of the

*Credit Alliance* test is satisfied.  In *LaSalle National Bank v. Duff & Phelps Credit

Rating Co.*, under facts mirroring those present here, Judge Whitman Knapp found

---

[153]    *Anwar*, 728 F. Supp. 2d at 456 (holding that investors were known parties to an auditor, given the auditors' "intention that a known class of future investors would rely on their financial reports").  Although *Anwar* was decided before *Sykes*, the defendant auditors subsequently moved for reconsideration based on *Sykes*.  *See* Memorandum of Law of Defendants PricewaterhouseCoopers N.V. and PricewaterhouseCoopers LLP in Support of Motion for Reargument, No. 09 Civ. 0118, at 5-7 (S.D.N.Y. June 23, 2011) (Docket No. 664).  Judge Marrero denied the auditors' motion, holding that the defendants "failed to identify any controlling law or factual matters" that would alter his decision.  *Anwar v. Fairfield Greenwich Ltd.*, 800 F. Supp. 2d 571, 574 (S.D.N.Y. 2011).  Plaintiffs cite *Merrill Lynch*, 2011 WL 536437, as a case holding that QIBs are an insufficiently "narrow and circumscribed" class.  *Id.* at *12 n.6.  However, *Merrill Lynch* applies California law, and a subsequent California case determined that QIBs *are* a sufficiently "circumscribed" class.  *See Anschutz Corp. v. Merrill Lynch and Co. Inc.*, 785 F. Supp. 2d 799, 826 (N.D. Cal. 2011) ("[A]lthough the class of QIBs might number in the thousands, it is still a circumscribed and identifiable group that the Ratings Defendants not only knew would have access to the ratings but who necessarily rely on the ratings in order to purchase investment grade securities.").  *Accord Duke v. Touche Ross & Co.*, 765 F. Supp. 69, 77 (S.D.N.Y. 1991) (upholding a negligent misrepresentation claim and distinguishing a "select group of qualified investors" from the "indeterminate class" in *Ultramares*) (citing *Ultramares*, 255 N.Y. at 183).

[154]    *See* SAC ¶ 222.

"linking conduct" between Duff & Phelps Credit Rating Co. ("Duff & Phelps") —

a ratings agency — and a select group of qualified investors.[155]  To meet the

"linking conduct" prong of the *Credit Alliance* test, the *LaSalle National Bank*

plaintiffs alleged — as the plaintiffs do here — that the "primary if not exclusive

end and aim" of the rating was to market an investment product to plaintiffs, and

that the rating was shaped to meet plaintiffs' needs.[156]  The Rating Agencies argue

that the facts in *LaSalle National Bank* are distinguishable — whereas in *LaSalle*

*National Bank*, six out of the twenty-six plaintiffs had direct phone contact with

Duff & Phelps, here the Rating Agencies had no direct contact with any of the

plaintiffs prior to their investment in the SIV.[157]  This distinction is of no moment,

however, as Judge Knapp declined to dismiss the negligence claims of the

plaintiffs who had no direct contact with Duff & Phelps.[158]  Rather, Judge Knapp

viewed the contact with the six plaintiffs as indicative of Duff & Phelps' awareness

that its ratings would be given to a select group of qualified investors.[159]  Here, not

---

[155]    *See LaSalle*, 951 F. Supp. at 1093-95.

[156]    *Id.*

[157]    *See* RA Mem. at 10 n.10.

[158]    *LaSalle*, 951 F. Supp. at 1094-95.

[159]    *See id.* ("When viewed in the larger context of Duff & Phelps'
primary goal of enabling [a third party] to sell the Bond offerings to the plaintiffs,
the allegations about Duff & Phelps' knowledge and conduct are sufficient to

only have plaintiffs alleged that the Rating Agencies were aware their ratings would be given to a select group of qualified investors, but plaintiffs also alleged that the Rating Agencies issued their ratings with the end and aim of inducing that limited group of investors to invest in Rhinebridge.[160]  The Rating Agencies cite *Securities Investment Protection Corp. v. BDO Seidman, LLP* for the proposition that "end and aim" allegations are insufficient to allege "linking conduct."[161]  But unlike in *BDO Seidman*, there are additional indicia of "linking conduct" here: plaintiffs have alleged that the Rating Agencies' ratings were prepared for the benefit of the plaintiffs, were sent to the plaintiffs, were read by the plaintiffs and, as a result, placed the plaintiffs in a relationship significantly different from anyone else in the investing public at large.[162]

　　　　All three prongs of the *Credit Alliance* test have been met:  the Rating

---

approach privity — at least at the pleading stage.").

[160]    *See* SAC ¶¶ 76, 215-216, 225-232.

[161]    245 F.3d at 175.

[162]    *See* SAC ¶¶ 215-231.  *Cf. Securities Inv. Prot. Corp. v. BDO Seidman, LLP*, 95 N.Y.2d 702, 712 (2001) ("[T]here was no "linking conduct" that put SIPC and BDO in a relationship approaching privity. BDO's audits were not prepared for the specific benefit of SIPC, were not sent to SIPC, were not read by SIPC and, as a result, did not place SIPC in a relationship significantly different from anyone else in the regulatory community or the investing public at large. Hence, the third prong of the *Credit Alliance* test is not met.").

Agencies (1) intended that their ratings would be used to evaluate the SIV; (2) intended that the plaintiffs — members of a select group of qualified investors — would rely on their ratings to evaluate the SIV; and (3) prepared their ratings with the end and aim of inducing investors such as the plaintiffs to invest in the SIV. Because there was a privity-like "special relationship"[163] between the plaintiffs and the Rating Agencies, the Rating Agencies' motion to dismiss the negligent misrepresentation claims is denied.[164]

### 4.    Special Relationship with Morgan Stanley and IKB

Similarly, plaintiffs have satisfied the three prongs of the *Credit Alliance* test and sufficiently alleged a "special relationship" with both IKB and

---

[163]    *Cf. Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180-81 (2011) (finding no "special relationship" where the complaint failed to allege "whether [defendant] had any contact with [plaintiff], whether [plaintiff] solicited the appraisal directly from [defendant], whether [defendant] knew the purpose of the appraisal letter, or whether [defendant] was even aware of [plaintiff]'s existence." Here, plaintiffs explicitly allege that the Rating Agencies knew of their existence and needs, knew for what purpose they would use the ratings, and specifically targeted the ratings to induce them to purchase the Senior Notes.).

[164]    Judge Sherwood's slip opinion in *Abu Dhabi Commercial Bank v. Credit Suisse Sec. (USA) LLC*, No. 115417/2010 at 2-3 (Sup. Ct. N.Y. Co. June 28, 2011) — which under very similar facts dismissed a negligent misrepresentation claim for lack of a special relationship — is not binding on this Court. Judge Sherwood also dismissed fraud claims almost identical to those I declined to dismiss in *Abu Dhabi*, 651 F. Supp. 155, a decision he neglected to acknowledge or cite.

MS.[165]  Under the first prong, plaintiffs have sufficiently alleged that MS and IKB knew the credit ratings would be used by investors to decide whether or not to purchase the Senior Notes.[166]  Further, MS and IKB made Top Ratings a condition precedent to issuance of the Senior Notes because they knew that QIBs such as the plaintiffs — legally, the only potential purchasers of the Senior Notes — require Top Ratings.[167]

The second prong of the *Credit Alliance* test is met, as IKB and MS created the Senior Notes for QIBs, a limited and known group of potential

---

[165]   65 N.Y.2d at 551.  IKB argues that *Credit Alliance* only governs the assertion of negligent misrepresentation claims against professionals, and that courts that applied *Credit Alliance* in other contexts have done so mistakenly.  *See* IKB Mem. at 19.  IKB does not, however, provide any support for this assertion. Instead, IKB cites *Stewart v. Jackson & Nash* for the proposition that a "special relationship" must be at least fiduciary-like in nature.  976 F.2d 86, 90 (2d Cir. 1992).  Yet *Stewart* is inapposite, as it is part of a line of cases that address future-looking promises.  *See Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald L.P.*, 40 F. Supp. 2d 183, 190 n.3 (S.D.N.Y. 1999) (applying the *Credit Alliance* test to determine whether defendant brokers had a "near privity" relationship with plaintiff investors, and noting that "[d]efendants point to a separate line of authorities [including *Stewart*] which hold that, in order to state a negligent misrepresentation claim under New York law, a plaintiff must show that the defendant is in a fiduciary or 'special relationship' with the plaintiff . . . . However, this line of cases is inapplicable here as they concern situations where there has been a promise of future conduct.").

[166]   *See* SAC ¶¶ 215, 216, 224.

[167]   *See id.* ¶¶ 221-225, 230.

investors.[168]   MS and IKB knew about QIBs' investment requirements, and

structured Rhinebridge accordingly.[169]   Although MS and IKB may not have

remembered or known the specific identities of all of the QIBs, "[k]nowledge of

the identity of each particular plaintiff is not necessary."[170]   Moreover, the SAC

specifically alleges that "Morgan Stanley and IKB knew the identities of the Senior

Notes investors prior to those investors' purchases of the Senior Notes."[171]

Although the SAC does provide some factual support for this allegation, IKB

contends that the allegation is false and contradicted by underlying documents.[172]

Whether or not IKB actually knew the identity of the Senior Notes investors prior

to their purchases of the Senior Notes is a factual question; for the purpose of

deciding this motion to dismiss, I must accept plaintiffs' allegation as true.

The third prong of the *Credit Alliance* test is met in that IKB and MS

created and structured Rhinebridge, worked with the Rating Agencies to ensure

that the Rated Notes received falsely-high ratings, and communicated those

inaccurate ratings to a select group of qualified investors including the plaintiffs.

---

[168]   *See LaSalle*, 951 F. Supp. at 1092-93.   *See also* Part V.C.3, *supra*.

[169]   *See* SAC ¶ 216.

[170]   *LaSalle*, 951 F. Supp. at 1093.

[171]   SAC ¶ 264(h).

[172]   *See* IKB Mem. at 21.

Morgan Stanley argues that it cannot be liable for negligent misrepresentation because it has not made any statement.  Based on the group pleading doctrine, I rejected this argument when I denied Morgan Stanley's motion to dismiss plaintiffs' fraud claim.[173]  MS argues that the group pleading doctrine has no applicability to negligent misrepresentation and breach of fiduciary duty claims,[174] but cites no controlling authority for this proposition.[175]  While it is settled that "[t]he group pleading doctrine is an exception to the requirement that

---

[173]    *See King County, Washington v. IKB Deutsche Industriebank, AG*, 751 F. Supp. 2d 652, 659 (S.D.N.Y. 2010) ("Having sufficiently alleged that Morgan Stanley was an 'insider[ ] or affiliate[ ] participating in the offer of [the SIV],' plaintiffs' reference to (1) the ratings and (2) the core deal documents 'satisfies [Rule] 9(b)'s requirement of identifying time, place, speaker, and content of representation.'  In such instances, 'no specific connection between fraudulent representations in [an] Offering Memorandum and particular defendants is necessary . . . .'  Therefore, plaintiffs' failure to allege 'that [they] had any oral or written communications of any kind with Morgan Stanley concerning the [Private Placement Memorandum], or that [they] received the allegedly false credit ratings from Morgan Stanley' is not fatal to their claim.") (quoting *Ouaknine* at 80; *Luce* at 55).

[174]    *See* Reply Memorandum of Law in Further Support of Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited's Motion to Dismiss the Second Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6), at 1.

[175]    The one case that plaintiffs do cite for this assertion — *Steinberg v. Sherman* — is not controlling and does not address the applicability of the group pleading doctrine to negligent misrepresentation claims.  No. 07 Civ. 1001, 2008 WL 2156726, at *5 (S.D.N.Y. May 8, 2008) ("[A] plaintiff may not rely on group pleading to assert a breach of fiduciary duty claim.").

46

the fraudulent acts of each defendant be identified separately in the complaint,"[176] this does not imply that the group pleading doctrine applies only to fraud claims; rather, it applies whenever Rule 9(b) applies, which is whenever the alleged conduct of defendants is fraudulent in nature.  Because negligent misrepresentation is a type of fraud,[177] the group pleading doctrine does apply to negligent misrepresentation claims.  Further, the group pleading doctrine applies to breach of fiduciary duty claims that are rooted in fraud, as is the case here.[178]  Thus, because plaintiffs' negligent misrepresentation and breach of fiduciary duty claims allege fraudulent conduct, the group pleading doctrine applies, and plaintiffs' failure to allege a statement made by Morgan Stanley is not fatal to their negligent

---

[176]    *Elliott Associates, L.P. v. Hayes*, 141 F. Supp. 2d 344, 354 (S.D.N.Y. 2000).

[177]    While the Second Circuit has left open the question of whether Rule 9(b) applies to negligent misrepresentation claims, *see Eternity Global*, 375 F.3d at 188, district courts in this Circuit have repeatedly held that Rule 9(b) does apply to negligent misrepresentation claims. *See Maalouf*, 2003 WL 1858153, at *4 ("Negligent misrepresentation is a type of fraud and, as such, is subject to Rule 9(b)'s heightened pleading standard."). *Accord Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, — F. Supp. 2d —, No. 08 Civ. 2437, 2011 WL 6034310, at *25 (S.D.N.Y. Dec. 5, 2011); *Naughright v. Weiss*, No. 10 Civ. 8451, 2011 WL 5835047, at *7 (S.D.N.Y. Nov. 18, 2011); *Bettinger v. Doueck*, No. 10 Civ. 7653, 2011 WL 2419799, at *5 (S.D.N.Y. June 3, 2011)).

[178]    *See Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292, 319-20 (S.D.N.Y. 2009) ("The breach of the fiduciary duty in this case is firmly rooted in fraud . . . . [T]his Court finds group pleading is appropriate.").

misrepresentation claim.[179]

### 5.   Plaintiffs' Reliance on the Ratings

IKB argues that there can be no special relationship between plaintiffs and IKB due to: (1) plaintiffs' sophistication as QIBs;[180] and (2) the PPM's disclaimers that plaintiffs should conduct their own investment analysis and that IKB only accepted responsibility for a narrow category of representations in the document.[181]   A defendant's awareness of or intention to induce plaintiff's reliance may be relevant to the "special relationship" analysis.[182]   However, the sophistication of plaintiffs, the existence of disclaimers, and a defendant's possession of unique or special expertise are generally only relevant to whether or

---

[179]   The Supreme Court's recent decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), does not alter this result. *See In re Optimal*, 2011 WL 6424988, at *11 ("[W]hile *Janus* calls into question the viability of the group pleading doctrine for federal securities law claims, its application to common law fraud claims is unaffected by *Janus*.").

[180]   *See SEC v. Rorech*, 720 F. Supp. 2d 367, 376 (S.D.N.Y. 2010) (referring to QIBs as "sophisticated institutional customers").

[181]   *See* IKB Mem. at 17.

[182]   *See Housing Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 219 (S.D.N.Y. 2001) ("[Plaintiff] must allege, at a minimum, conduct on the part of [defendant] evincing its awareness of [plaintiff's] contemplated use of the report and reliance.  Because [plaintiff] has failed to do so, it cannot sustain its burden of pleading pursuant to the third criterion of the *Credit Alliance* test.").

not a plaintiff reasonably relied on statements made by the defendant.[183]  Justifiable

reliance has little to do with the *Credit Alliance* test, and is a separate element of a

negligent misrepresentation claim.[184]

> In *Abu Dhabi*, under very similar facts, I held that plaintiffs

sufficiently alleged justifiable reliance on credit ratings.[185]  Although there, as here,

the offering documents contained disclaimers of liability and warnings that

investors should conduct their own investigation, I found that plaintiffs could

prove that their reliance was justified given their lack of access to the information

upon which the ratings were based.[186]  I see no reason to deviate from that ruling

here.

---

[183]    *See Kimmell*, 89 N.Y.2d at 264 ("In order to impose tort liability here, there must be some identifiable source of a special duty of care. The existence of such a special relationship may give rise to an exceptional duty regarding commercial speech and justifiable reliance on such speech.").

[184]    *See Hydro Investors*, 227 F.3d at 20.

[185]    651 F. Supp. 2d at 181 ("[T]he market at large, including sophisticated investors, have come to rely on the accuracy of credit ratings and the independence of rating agencies because of their NRSRO status and, at least in this case, the Rating Agencies' access to non-public information that even sophisticated investors cannot obtain. Plaintiffs accordingly have adequately pled their reasonable reliance on the ratings.").

[186]    *See id.  Cf. Landesbank*, 2011 WL 4495034, at *7 ("Additionally, information about the mortgage-backed securities in Davis Square's portfolio — and even the individual loans backing those securities — were available to Landesbank if it examined SEC filings.").

### D.   Breach of Fiduciary Duty

#### 1.   Concession of Fiduciary Duty

Plaintiffs argue that, while testifying before Congress, the Rating Agencies conceded that they owe a fiduciary responsibility to investors.[187]  In the SAC, plaintiffs selectively quote from the October 22, 2008 Hearing on Credit Rating Agencies and the Financial Crisis as follows:

> Senator Speier:  "Who do you owe a fiduciary duty to, the issuer or the investor?
> Fitch:  "I feel quite responsible to provide our best opinion to investors . . . ."
> Moody's:  "[W]e must be responsible to the investor."
> S&P:  "Responsibility to the investor is the most critical thing for us."[188]

These out-of-context and vague statements by the Rating Agencies that they feel a responsibility to investors do not constitute a concession that they have a fiduciary duty to all investors, let alone the plaintiffs.[189]

#### 2.   Disclaimers of Fiduciary Duty

---

[187]   *See* Plaintiffs' Memorandum in Opposition to the Rating Agencies', Morgan Stanley's and IKB's Motions to Dismiss Claims for Negligence, Negligent Misrepresentation, Breach of Fiduciary Duty and Aiding and Abetting in Plaintiffs' Second Amended Complaint ("Pl. Mem."), at 50.

[188]   SAC ¶ 232.

[189]   *Cf. John Blair Commc'ns, Inc. Profit Sharing Plan v. Telemundo*, 26 F.3d 360, 367 (2d Cir. 1994) (finding a fiduciary relationship where the defendant "conceded its fiduciary status" to plaintiffs earlier in the litigation).

MS and IKB argue that they had no fiduciary duty to plaintiffs given their lack of contact with the plaintiffs and the existence of disclaimers in the PPM.[190]  Contractual disclaimers of fiduciary duty are enforceable in New York,[191] but only when explicit.[192]  Here, the "disclaimers" on which IKB and MS rely are not sufficiently explicit, as they make no reference to a fiduciary duty.[193]

### 3.    Existence of a Fiduciary Relationship

It is settled in New York that a fiduciary relationship exists "'when confidence is reposed on one side and there is resulting superiority and influence

---

[190]    *See*  MS Mem. at 6-10; IKB Mem. at 9-12.

[191]    *See Cooper v. Parsky*, 140 F.3d 433, 439 (2d Cir. 1998).

[192]    *See Valentini*, 2011 WL 6780915, at *16 ("Under New York law, contractual disclaimers of fiduciary duty are enforceable when sufficiently explicit.").

[193]    *See* MS Mem. at 9 ("'Morgan Stanley . . . expressly do[es] not undertake . . . to advise any investor in the [Senior] Notes of any information coming to [its] attention.'") (quoting Declaration of James P. Rouhandeh in Support of Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. International Limited's Motion to Dismiss the Second Amended Complaint Pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6), Exhibit 1, at x).  *Cf. Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 381-82 (S.D.N.Y. 2004) (finding that a disclaimer of fiduciary relationship was sufficiently explicit under New York law, where the disclaimer read "[e]ach party represents to the other party [that] the other party is not acting as a fiduciary or adviser to it in respect of this Transaction").

on the other.'"[194]  Plaintiffs argue that such a relationship was created through the

Rating Agencies' superior access to confidential information about Rhinebridge

and the fact that, as NRSROs, the Rating Agencies held themselves out to investors

as independent and reliable issuers of credit ratings.[195]  While "[a]scertaining the

existence of a fiduciary relationship 'inevitably requires a fact-specific inquiry,'"[196]

a breach of fiduciary duty claim requires a closer relationship than the "special

relationship" necessary for a negligent misrepresentation claim.[197]  Because

fiduciary relationships are "personal and context-specific,"[198] before a court can

"infer and superimpose" a fiduciary duty, "the contract and relationship of the

---

[194]     *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848 (2011) (quoting *AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 11 N.Y.3d 146, 148 (2008)).

[195]     *See* Pl. Mem. at 49-50; *Pension Committee v. Banc of America Sec., LLC* (*Pension Committee I*), 446 F. Supp. 2d 163, 196-97 (S.D.N.Y. 2006) ("Although '[f]iduciary duties do not arise solely because one party has expertise that is superior to another,' here, plaintiffs also allege that Citco NV held itself out to investors as having policies and procedures to ensure that the Funds' valuations would be accurate and fair, and that they relied on these representations.") (quoting *Suthers v. Amgen Inc.*, 441 F. Supp. 2d 478, 486-87 (S.D.N.Y. 2006)).

[196]     *Roni LLC*, 18 N.Y.3d at 848 (quoting *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 561 (2009)).

[197]     *See Musalli Factory For Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 28 (S.D.N.Y. 2009) ("[T]he standard of a special relationship in the context of a negligent misrepresentation claim is less rigorous than that of a fiduciary duty.").

[198]     *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ .318, 2009 WL 2242605, at *30 (S.D.N.Y. July 27, 2009).

parties must be plumbed."[199]

Although plaintiffs sufficiently alleged the existence of a relationship with defendants sufficient to state a cause of action for negligent misrepresentation, the relationship between the parties is too attenuated to give rise to a fiduciary duty.[200]  Classic examples of fiduciary relationships include trustee-beneficiary, guardian-ward, principal-agent, and attorney-client relationships.[201]  These relationships all include "an unusually high degree of care,"[202] to the point where one party "'is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'"[203]  This is generally not the case for commercial relationships in which the parties have had no direct dealings with one another.[204]  To hold that the Rating Agencies had a fiduciary duty to plaintiffs

---

[199]    *Northeast Gen. Corp. v Wellington Adv.*, 82 N.Y.2d 158, 162 (1993).

[200]    *See Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001) ("Here, the relationship between plaintiffs and defendants was far too attenuated to give rise to a fiduciary duty.  To Sandgrain, Thermal was, at most, a client of a client; the two businesses engaged in no other direct transaction.").

[201]    *See* Black's Law Dictionary 1315 (8th ed. 2004).

[202]    *Id.*

[203]     *Flickinger*, 947 F.2d at 599 (quoting Restatement (Second) of Torts § 874 cmt. a (1977)).

[204]    *See Wilmington Trust Co. v. Metro Life Ins. Co.*, No. 0600242/2008 at 20 (Sup. Ct. N.Y. Co. Aug. 4, 2008) (dismissing a breach of fiduciary duty claim

would be to hold that, whenever rating agencies issue ratings based on confidential

information, they have a fiduciary duty to all potential investors who are likely to

rely on that rating.  Likewise, to hold that MS and IKB had a fiduciary relationship

with plaintiffs prior to plaintiffs' purchase of the Senior Notes would be to hold

that the creators and arrangers of structured finance vehicles have a fiduciary duty

to all potential investors.  New York does not recognize so broad a fiduciary duty

— a fiduciary relationship does not arise from a party's superior knowledge about

an investment product,[205] nor does it arise in a business transaction between an

investor and a company soliciting investors.[206]  Thus, defendants' motions to

dismiss plaintiffs' breach of fiduciary duty claims are granted.

### E.    Aiding and Abetting

There is no cause of action for aiding and abetting negligence or

negligent misrepresentation in New York.  In *In re Bayou Hedge Funds Investment*

---

where plaintiff failed to "identify a single instance of direct contact").

[205]    *See RNK Capital LLC v. Natsource LLC*, 907 N.Y.S.2d 476, 478 (1st Dep't 2010) ("[T]hat defendants may have had superior knowledge of the particular type of investment products involved does not, without more, create a fiduciary relationship.").

[206]    *See Elliott v. Qwest Commc'ns Corp.*, 808 N.Y.S.2d 443, 445 (3rd Dep't 2006) ("No such fiduciary relationship existed here between plaintiff and Phoenix because his acceptance of the stock purchase offer was a simple business transaction between a potential investor and a company soliciting such investors.").

*Litigation*, Judge Colleen McMahon pointed out that few states recognize aiding and abetting liability for a third party's negligence, and — after noting that there were no examples of New York courts allowing such claims to proceed — dismissed a claim for aiding and abetting negligence.[207]  For this reason, plaintiffs' claims of aiding and abetting negligence and negligent misrepresentation are dismissed.

New York does recognize a cause of action for aiding and abetting breach of fiduciary duty where: (1) one breached a fiduciary duty owed to another; (2) the defendant knowingly induced or participated in the breach; and (3) the plaintiff suffered damage as a result of the breach.[208]  However, there can be no aiding and abetting claim without the existence of a violation by a primary (as opposed to aiding and abetting) party.[209]  Thus, because I dismissed plaintiffs' breach of fiduciary duty claims, plaintiffs' aiding and abetting breach of fiduciary duty claims are likewise dismissed.

---

[207]     *See* 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007).

[208]     *See Lerner*, 459 F.3d at 294 ("'A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach.'") (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (1st Dept. 2003)).

[209]     *See Eugenia VI Venture Holdings, Ltd.*, 370 Fed. App'x at 199 (quoting *SCS Commc'ns, Inc.*, 360 F.3d at 342).

### F.    Sufficiency of Allegations Pertaining to Fitch

In a separate brief, defendant rating agency Fitch argues that the SAC fails to "plead facts particular to Fitch sufficient to sustain these new claims."[210] Fitch made — and I rejected — this argument when I denied Fitch's motion to dismiss plaintiffs' fraud claims.  Nonetheless, Fitch offers two reasons it believes a different result is warranted here: (1) because discovery has begun on plaintiffs' fraud claims, plaintiffs cannot bring new common law claims against Fitch without more allegations particular to Fitch;[211] and (2) my prior holding is inconsistent with the decision of Judge James O. Browning of the district court in New Mexico in *Genesee County Employees' Retirement System v. Thornburg Mortgage Securities Trust 2006-3*.[212]  Fitch is wrong on both counts.

Fitch offers no support for the proposition that once discovery has begun on some claims, newly added claims face a heightened pleading standard.

---

[210]    Defendant Fitch, Inc.'s Memorandum of Law in Further Support of the Rating Agencies' Joint Motion to Dismiss the Second Amended Consolidated Complaint, at 1.

[211]    *See*  Defendant Fitch, Inc.'s Supplemental Reply Memorandum of Law in Further Support of the Rating Agencies' Joint Motion to Dismiss the Second Amended Consolidated Complaint, at 2 ("[W]hatever level of group pleading may have been permissible at the outset of the case is certainly not proper now, after the completion of the massive fact discovery in this matter.").

[212]    — F. Supp. 2d —, No. 09 Civ. 0300, 2011 WL 5840482 (D.N.M. Nov. 12, 2011).

And indeed, no such support exists.  Rule 12(b)(6) demands that I  "accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor."  At no point in the discovery process does Rule 12(b)(6) permit me to make a negative inference from facts that are absent from the complaint.  That plaintiffs refer to Fitch, S&P and Moody's collectively as the "Rating Agencies" does not make the allegations in the SAC any less particular.  Although plaintiffs do have "an obligation to 'make clear exactly who is alleged to have done what to whom,'"[213] plaintiffs are not required to copy and paste their allegations for each rating agency.  It is sufficient to define the three rating agency defendants collectively as the "Rating Agencies" — as plaintiffs did[214] — and then use that collective term in all allegations that apply equally to those three defendants.

Fitch's reliance on *Genesee County* is similarly unavailing.  Whereas Judge Browning held that the allegations against Fitch in *Genesee County* were insufficient because they "lead only to the conclusion that [Fitch's credit] ratings 'were honestly held when formed but simply turn[ed] out later to be inaccurate,' or

---

[213]    *Id.* at *96 (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008)).

[214]    *See* SAC ¶ 29.

that Fitch 'could have formed "better" opinions,'"[215] I have already held that "plaintiffs have adequately pled that (1) Fitch did not 'genuinely and reasonably believe' the ratings it issued or that (2) those ratings were 'without basis in fact' — i.e., that they did not 'hold the opinions expressed by the ratings.'"[216] I see no reason to reconsider that ruling.

## VI.   CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted in part and denied in part: plaintiffs' claims for negligence, breach of fiduciary duty, and aiding and abetting are dismissed; defendants' motions to dismiss plaintiffs' claims of negligent misrepresentation are denied.  The Clerk of the Court is directed to close this motion (Docket Nos. 212, 216, and 219).  A status conference is scheduled for May 29, 2012 at 4:30pm

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 4, 2012

---

[215]   2011 WL 5840482, at *98 (citing *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st Cir. 2011)).

[216]   *King County*, 751 F. Supp. 2d at 664-65 (quoting *Abu Dhabi*, 651 F. Supp. 2d at 176).

**- Appearances -**

**For Plaintiffs King County, Washington and Iowa Student Loan Liquidity Corporation:**

Daniel S. Drosman, Esq.
Jessica T. Shinnefield, Esq.
Darryl J. Alvarado, Esq.
Anne L. Box, Esq.
James A. Caputo, Esq.
Patrick J. Coughlin, Esq.
Nathan R. Lindell, Esq.
David C. Walton, Esq.
X Jay Alvarez, Esq.
Christina A. Royce, Esq.
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, California 92101
(619) 231-1058

Luke O. Brooks, Esq.
Jason C. Davis, Esq.
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
1 Montgomery Street, Suite 1800
San Francisco, California 94104
(415) 288-4545

Samuel H. Rudman, Esq.
Jarrett S. Charo, Esq.
David A. Rosenfeld, Esq.
Robert M. Rothman, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100

**For Defendants Morgan Stanley & Co., Inc. and Morgan Stanley & Co. International Limited:**

James P. Rouhandeh, Esq.
Antonio Jorge Perez-Marques, Esq.
William Ross Miller, Jr. Esq.
Christopher Joseph Roche, Esq.
Andrew Dickens Schlichter, Esq.
Davis Polk & Wardwell L.L.P.
450 Lexington Avenue
New York, NY 10017
(212) 450-4559

**For Defendants IKB Deutsche Industriebank AG and IKB Credit Asset Management, GmbH:**

John D. McFerrin-Clancy, Esq.
Zachary D. Rosenbaum
Lowenstein Sandler PC
1251 Avenue of The Americas
New York, New York 11020
(212) 262-6700

Thomas E. Redburn, Jr., Esq.
Jennifer Jane McGruther, Esq.
Michael James Hampson, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2456

**For Defendants Moody's Investors Service Limited and Moody's Investors Service, Inc.**

Mario Aieta, Esq.
James J. Coster, Esq.
Joshua M. Rubins, Esq.
Justin E. Klein, Esq.
James J. Regan, Esq.
Joshua M. Rubins, Esq.
Aaron M. Zeisler, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York, New York 10169
(212) 818-9200

**For Defendant The McGraw Hill Companies, Inc. d/b/a Standard & Poor's Rating Services**

Dean I. Ringel, Esq.
Andrea R. Butler, Esq.
Floyd Abrams, Esq.
Jason M. Hall, Esq.
Brian T Markley, Esq.
Tammy L. Roy, Esq.
Adam N. Zurofsky, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

**For Defendant Fitch, Inc.**

Andrew J. Ehrlich, Esq.
Martin Flumenbaum, Esq.
Donna M. Ioffredo, Esq.
Roberta A. Kaplan, Esq.
Mark S. Silver, Esq.
Tobias J. Stern, Esq.
Julia Tarver-Mason Wood, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3166