UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
KING COUNTY, WASHINGTON,                              :
and IOWA STUDENT LOAN                                 :
LIQUIDITY CORPORATION,                                :
                                                      :
                            Plaintiffs,               :        09 Civ. 8387 (SAS)
                                                      :
               - against -                            :        **ECF Case**
                                                      :
IKB DEUTSCHE INDUSTRIEBANK AG,                        :
et al.,                                               :
                            Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF DEFENDANTS MOODY'S AND S&P
## IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

Floyd Abrams
Dean Ringel
Tammy L. Roy
Jason M. Hall
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Telephone: 212-701-3000

*Attorneys for Defendants The McGraw-Hill
Companies, Inc. and Standard & Poor's
Ratings Services*

Joshua M. Rubins
James J. Coster
Mario Aieta
James Doty
SATTERLEE STEPHENS BURKE &
BURKE LLP
230 Park Avenue
New York, New York 10169
Telephone: 212-818-9200

*Attorneys for Defendants Moody's Investors
Service, Inc. and Moody's Investors Service
Limited*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................... 1

STANDARD OF REVIEW ............................................................................. 5

ARGUMENT ................................................................................................... 5

I.      PLAINTIFFS HAVE NOT SHOWN THAT THERE IS A DISPUTED ISSUE OF MATERIAL FACT AS TO KEY ELEMENTS OF THEIR FRAUD CLAIM ........................................................................................................ 5

      A.      There is No Evidence of Reasonable Reliance by Either Plaintiff ......... 5

      B.      There is No Evidence of Loss Causation ............................................. 15

              1.      Plaintiffs' Losses Were Caused by an Unprecedented Market Disruption ............................................................................... 16

              2.      The Credit Ratings Did Not Conceal The Risks That Caused Plaintiffs' Losses .................................................................... 18

      C.      There is No Evidence of an Actionable Misstatement .......................... 19

      D.      There is No Evidence of Scienter ....................................................... 23

CONCLUSION ............................................................................................. 24

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbey* v. *3F Therapeutics, Inc.*,
  2011 WL 651416 (S.D.N.Y. Feb. 22, 2011) ................................................ 6, 10n

*Abrahami* v. *UPC Construction Co.*,
  224 A.D.2d 231 (1st Dep't 1996) .................................................................. 5

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
  08 Civ. 7508 (SAS) (Aug. 17, 2012) ....................................................... *passim*

*Amida Capital Management II, LLC* v. *Cerberus Capital Management, L.P.*,
  669 F. Supp. 2d 430 (S.D.N.Y. 2009) .......................................................... 16

*In re AOL Time Warner, Inc. Securities Litigation*,
  503 F. Supp. 2d 666 (S.D.N.Y. 2007) .......................................................... 19

*Ashland Inc.* v. *Morgan Stanley & Co.*, 700 F. Supp. 2d 453 (S.D.N.Y. 2010),
  *aff'd*, 652 F.3d 333 (2d Cir. 2011) ............................................................. 12n

*Banque Franco-Hellenique de Commerce International et Maritime, S.A.* v.
  *Christophides*,
  106 F.3d 22 (2d Cir. 1997) .......................................................................... 10

*Barneli & Cie SA* v. *Dutch Book Fund SPC, Ltd.*, 95 A.D.3d 736 (1st Dep't 2012) ................. 10n

*Century Pacific, Inc.* v. *Hilton Hotels Corp.*, 354 F. App'x 496 (2d Cir. 2009) .................... 5, 12n

*Crigger* v. *Fahnestock & Co.*, 443 F.3d 230 (2d Cir. 2006) ............................................. 5, 6

*In re CRM Holdings, Ltd. Securities Litigation*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) ................................................ 19n

*Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005) ........................................ 15, 16, 19

*Erica P. John Fund., Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179 (2011) ............................... 18

*Fait* v. *Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011) ...................................... 20

*In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29 (2d Cir. 2009) .......... 16, 18

*Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*,
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) .............................................. 23

*Gaidon* v. *Guardian Life Insurance Co. of America*, 94 N.Y.2d 330 (1999) .................... 5

*HSH Nordbank AG* v. *UBS AG*, 95 A.D.3d 185 (1st Dep't 2010) ............................. 10n, 11, 12n

*Jaramillo* v. *Weyerhaeuser Co.*, 536 F.3d 140 (2d Cir. 2008) ...................................... 5

*King County* v. *IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334 (S.D.N.Y. 2010) .......... 18

*Lazard Feres & Co.* v. *Protective Life Insurance Co.*, 108 F.3d 1531 (2d Cir. 1997) ............ 12n

*Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) .................................. 16, 18, 19

*In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010) ............ 15, 16, 19n

*PPI Enterprises (U.S.), Inc.* v. *Del Monte Foods Co.*,
   2003 WL 22118977 (S.D.N.Y. Sept. 11, 2003).................................................. 12n

*In re Salomon Analyst AT&T Litigation*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004) ........................ 24

*Steed Finance LDC* v. *Nomura Securities International, Inc.*,
   2004 WL 2072536 (S.D.N.Y. Sept. 14, 2004),
   *aff'd*, 148 F. App'x 66 (2d Cir. 2005) .................................................................. 10

*Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) ................................................................................. 23

*In re Vivendi Universal, S.A. Securities Litigation*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011)......... 23

*In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011).................. 23

*Whirlpool Finance Corp.* v. *GN Holdings, Inc.*, 67 F.3d 605 (7th Cir. 1995).............................. 11

**Additional Authority**

Paul J. Davies, *Sigma Collapse Ends Shadow Bank Project*,
   FINANCIAL TIMES, Oct. 1, 2008, *available at* http://www.ft.com/cms/s/0/19db6e24-
   8fff-11dd-9890-0000779fd18c.html ...................................................................... 17n

HENRY TABE, THE UNRAVELLING OF STRUCTURED INVESTMENT VEHICLES: HOW
   LIQUIDITY LEAKED THROUGH SIVS
    (Thoth Capital LLP 2010).................................................................................... 17n

Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Ratings Services (together, "S&P"), Moody's Investors Service, Inc. and Moody's Investors Service Limited (together, "Moody's") respectfully submit this Memorandum of Law in support of their Motions for Summary Judgment.[1]

## PRELIMINARY STATEMENT

Three weeks ago, this Court stated that "[s]ummary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict." *See* Opinion and Order, Dkt. No. 474, *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 08 Civ. 7508 (SAS) (Aug. 17, 2012) ("*Abu Dhabi Op.*"), at 8 (citation omitted). The factual record in this action reveals just such a case.

The two Plaintiffs, Iowa Student Loan Liquidity Corporation ("ISL") and King County, Washington, assert that they were injured as a result of their reliance on credit ratings which allegedly concealed the presence of "toxic" assets in the Rhinebridge SIV at the time Plaintiffs invested in Rhinebridge commercial paper in late July 2007. Specifically, Plaintiffs allege that the Moody's and S&P's credit ratings on the Rhinebridge commercial paper were fraudulent because "Defendants were in possession of material non-public information" about the assets

---

[1]     Moody's and S&P move separately for summary judgment but submit this joint brief for the Court's convenience; Moody's and S&P reserve the right to file individual reply briefs as needed in response to Plaintiffs' opposition. As directed by the Court's email of August 20, 2012, Moody's and S&P have not now moved but reserve the right to move for summary judgment on Plaintiffs' negligent misrepresentation claim.

The Court's May 4, 2012 Order dismissed Count V for Aiding and Abetting Against the Rating Agencies. *See* Dkt. No. 244 at 58 ("plaintiffs' claims for . . . aiding and abetting are dismissed"); *see also* Dkt. 251 (McGraw-Hill's Answer) ¶¶ 281-84 and Dkt. 253 (Moody's Answer) ¶ 245. Defendants note, however, that summary judgment as to the aiding and abetting claim would be required in any event for the same reasons identified in this Court's *Abu Dhabi* ruling: Here, as in *Abu Dhabi*, "the ratings are attributable only to the Rating Agencies that issued them," so neither Morgan Stanley nor IKB is alleged to have made an actionable misstatement concerning Rhinebridge that Moody's or S&P could be said to have aided or abetted, *see* Mem. in Support of Morgan Stanley's Motion for Summary Judgment, and there is no evidence that either S&P or Moody's "knew what was going on at [any] other Rating Agency." *Abu Dhabi Op.* at 29, 85.

held by the Rhinebridge SIV and that Plaintiffs "reasonably and justifiably relied" on those ratings in deciding to invest in Rhinebridge. Second Amended Complaint ("SAC") ¶¶ 249, 252. But the record reveals that the investment strategy of the Rhinebridge SIV to invest in subprime assets was explicitly disclosed in the offering materials, that Plaintiffs had access to the same information including asset composition information available to Moody's and S&P, and that these two Plaintiffs engaged in no due diligence whatsoever prior to their decision to invest.

To survive summary judgment, King County and ISL must demonstrate a triable issue of fact with respect to each element of their claim. They cannot do so.

First, Plaintiffs' alleged *sole* reliance on credit ratings and yield information to select the investments at issue—without any further diligence—was unreasonable as a matter of law. Whatever may be said of plaintiffs in other cases involving other investments, the conduct of the two Plaintiffs in this case in making the decisions to purchase Rhinebridge securities cannot satisfy any concept of "reasonable" reliance. The record reveals the following undisputed facts:

- Both King County and ISL stated that they reviewed ratings and yield information but *made no other investigation* prior to completing the $50 million Rhinebridge commercial paper purchases on which they base their claims in late July 2007;

- Each plaintiff alleges that it was a Qualified Institutional Buyer ("QIB"), *i.e.*, a sophisticated investor, and each has testified that it was aware of market concerns about subprime investments *prior* to purchasing the Rhinebridge securities at issue;

- Yet neither obtained, let alone read, the Rhinebridge marketing materials, the Private Placement Memorandum ("PPM"), or any other information about Rhinebridge prior to purchasing Rhinebridge commercial paper;

- Had they done so, they would have read explicit disclosures about the risks associated with the subprime collateral being purchased by Rhinebridge, including the risk of the "serious financial difficulties" affecting originators of "subprime loans" and the risk of sales at "distressed" prices that "could result in losses to investors";

- King County and ISL had access to the same information about Rhinebridge's structure and assets that Moody's and S&P had; other potential investors used that information to assess the investment and some chose not to buy; neither King County nor ISL availed itself of this opportunity before purchase.

Because "[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts," *Abu Dhabi Op.* at 14, Plaintiffs' willful disregard of the widely disclosed risks associated with Rhinebridge and its underlying collateral bars them from demonstrating an essential element of their claim and the claim must be dismissed as a matter of law.

Second, King County and ISL have also failed to demonstrate, as they must, that their losses were caused by the Rhinebridge commercial paper ratings or that the ratings concealed information that, when revealed to the marketplace, negatively affected the value of their investment. Contemporaneous documents from Plaintiffs' own files confirm that Plaintiffs ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Such evidence contradicts any claim that Plaintiffs' losses were caused by the Defendants' conduct as opposed to intervening, market-wide events. Moreover, in light of the extensive disclosures and information available about the Rhinebridge SIV and its assets, including the widespread (and widely publicized) risks inherent in securities backed by subprime loans, Plaintiffs cannot connect their alleged losses with any of the information allegedly concealed from them.

Nor do Plaintiffs have any evidence of an actionable misstatement. Plaintiffs base their claims exclusively on the credit ratings assigned to the Rhinebridge commercial paper they purchased. The Court has described those ratings as "fact-based opinions" and has held that they may only be considered actionable misstatements if they were both subjectively disbelieved and objectively "false" at the time they were issued. Here, the record is entirely devoid of any evidence suggesting that *any* member of *any* rating committee from Moody's or S&P disbelieved the Rhinebridge ratings or believed the Rhinebridge ratings (or indeed, SIV ratings generally) were wrong when issued. With respect to the additional element of scienter, for the same reason that Plaintiffs cannot demonstrate that Moody's or S&P disbelieved their Rhinebridge ratings,

there is no evidence of any kind in the record that the rating committees who worked on the Rhinebridge SIV acted with scienter.

The record in this case makes clear that King County and ISL, both sophisticated entities with billions of dollars under management, invested in the Rhinebridge SIV in the midst of extensive public discussion regarding the state of the subprime market without making any effort to request, much less evaluate, readily available information about whether the SIV was exposed to such risks.  They purchased, after themselves expressing concerns about taking subprime exposure (and in ISL's case after deciding to avoid it altogether), without so much as looking at the PPM to see the extensive and explicit risk factor disclosures about Rhinebridge's subprime exposure.  And they purchased without seeking out any information about the Rhinebridge notes that they could have obtained from the SIV's asset manager—this despite the fact that that manager testified without contradiction that it would have provided King County and ISL with *any* information that was available to Moody's and S&P.  The case thus stands in contrast to *Abu Dhabi*, where the Court found it "highly relevant" that the rating agencies allegedly had access to information that prospective investors did not.  *See Abu Dhabi Op.* at 73 n.264.

Plaintiffs now seek to recover their investment losses by portraying the Rhinebridge ratings as fraudulent without any basis to assert or evidence to show that (i) their purported reliance on credit ratings and yield information alone to make multi-million dollar investment decisions was reasonable, (ii) the ratings assigned to the Rhinebridge SIV caused Plaintiffs' loss, (iii) Moody's and S&P did not believe the Rhinebridge ratings at the time they were issued, (iv) the Rhinebridge ratings were false or misleading as to the subject matter they addressed, or (v) Moody's and S&P acted with scienter in issuing their Rhinebridge ratings.  Plaintiffs cannot overcome these significant—and legally dispositive—evidentiary gaps in the record by repeating the allegations from their complaint that describe public criticism of unrelated ratings for different assets not purchased by Plaintiffs.

## STANDARD OF REVIEW

Summary judgment must be granted unless Plaintiffs can show that there is a disputed issue of material fact as to each element of their claim.  *See Abu Dhabi Op.* at 8-10 (citing *Jaramillo* v. *Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).  Plaintiffs must make this showing by "clear and convincing" evidence.  *Id.* at 11; *see also Gaidon* v. *Guardian Life Insurance Co. of America*, 94 N.Y.2d 330, 349-50 (1999).  The "clear and convincing" standard "forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory." *Abrahami* v. *UPC Construction Co.*, 224 A.D.2d 231, 233 (1st Dep't 1996) (internal quotation marks omitted).

## ARGUMENT

## I.   PLAINTIFFS HAVE NOT SHOWN THAT THERE IS A DISPUTED ISSUE OF MATERIAL FACT AS TO KEY ELEMENTS OF THEIR FRAUD CLAIM

In New York, a successful fraud claim requires clear and convincing evidence: (i) that the defendant made a misrepresentation of existing material fact, with (ii) knowledge of its falsity and (iii) an intent to defraud the plaintiff, and that (iv) plaintiff reasonably relied on the misrepresentation (v) to his detriment.  *See Abu Dhabi Op.* at 12; *Crigger* v. *Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).  No such evidence exists in this case.

### A.   There is No Evidence of Reasonable Reliance by Either Plaintiff

Plaintiffs' fraud claims must be dismissed because their own admitted conduct with respect to their investments prevents them from demonstrating reasonable reliance on the credit ratings issued by Moody's and S&P.  *See Century Pacific, Inc.* v. *Hilton Hotels Corp.*, 354 F. App'x 496, 498 (2d Cir. 2009) (affirming summary judgment where plaintiff could not show that its reliance on purported misrepresentations was reasonable and approving the district court's review of "the entire context of the transaction, including factors such as its complexity and magnitude [and] the sophistication of the parties"); *Abbey* v. *3F Therapeutics, Inc.*, 2011 WL 651416, at *8 (S.D.N.Y. Feb. 22, 2011) (summary judgment warranted "where the court finds that no rational juror could conclude that a plaintiff's reliance on a defendant's alleged

misrepresentations was reasonable"). "Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts." *Abu Dhabi Op.* at 14 (quoting *Crigger*, 443 F.3d at 234).

As demonstrated below, neither King County nor ISL can point to evidence that either of them conducted the required investigation here. Plaintiffs purchased the Rhinebridge notes at issue on July 19, 2007 (King County) and July 25, 2007 (ISL), approximately two years after the Cheyne SIV was rated, amid wide public discussion regarding the state of the subprime market. Both Plaintiffs bought Rhinebridge notes as sophisticated investors with billions of dollars under management.[2] Rhinebridge's asset manager, IKB Credit Asset Management GmbH ("IKB CAM"), prepared extensive written disclosures regarding the assets that the Rhinebridge SIV owned or intended to purchase. Indeed, contrary to the allegations of the Complaint, the record makes clear that, at the time Plaintiffs made their purchases, prospective Rhinebridge commercial paper investors had access to the same non-public information about the SIV and its assets that Moody's and S&P received. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 30, 2011) at 150:18-25

■■■■■■■■■■■■■■■■■■■■■■■■■■. IKB CAM's representative also testified ■■■■■■■■■■■■■■■■■■■■■■■■■■. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 29, 2011) at 37:12-16, 63:6-25); *see also id.* at 65:6-16. Importantly, the same representative testified ■■■■■■■■■■■■■■■■■■■■■■■■■■

---

[2]    In 2008, the King County Investment Pool totaled approximately $4.5 billion. *See* King County Investment Pool Advisory Panel Report (May 2008) at 1, *available at* http://www.kingcounty.gov/council/issues/public_trust/Investment_Pool.aspx. In 2010, ISL had total assets of $3.75 billion. *See* http://emma.msrb.org/ER526948-ER407143-.pdf.

███████████████████████████████████████. As demonstrated below, the text of the various disclosures available to Plaintiffs, including the Rhinebridge PPM itself, addressed precisely those risks identified in Plaintiffs' complaint but Plaintiffs' own testimony now confirms that neither King County nor ISL bothered to obtain such material or to investigate their Rhinebridge investments in any way. Under such circumstances, summary judgment in favor of Defendants is required.

In contrast to *Abu Dhabi*, where plaintiffs made purchases as early as mid-2005, the record here makes clear that both Plaintiffs invested in Rhinebridge at the onset of that crisis, in late July 2007, after extensive public warnings regarding issues in the subprime market that they themselves had identified, without reading any of the available disclosures about their investment. *See*:

- Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. at 72:11-16 ███████████████████ ████████████████████████████████████████████████;

- Ringel Decl. Ex. 3 at 182:16-24 ██████████████████████████████████████████ ████████████████████████████████████████████████ ██████████;

- Ringel Decl. Ex. 8 (ISL-e0015284 (email from R. Foresman to S. Nichols dated July 25, 2007) ("We decided to avoid CDO asset backed issuances due to sub-prime taint."));

- Ringel Decl. Ex. 1 (ISL 30(b)(6) Tr. at 139:16-140:17 ████████████████████ ████████████████████████████████████████████████ ███████.

*See also* SAC ¶ 120 (quoting extensive media coverage of subprime market in June 2007).

Notwithstanding these known and highly publicized events, both King County and ISL have admitted under oath that they failed to review even the most basic features of their

Rhinebridge investments before purchase.  Neither recalls reviewing the published Moody's and S&P research reports that accompanied the assignment of the Rhinebridge ratings.  *See* Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 33:15-21); Rubins Decl. Ex. 4 at 289:15-292:10; Ringel Decl. Ex. 2 (ISL 30(b)(6) Tr. at 361:2-9).  Neither recalls reviewing the PPM prepared for prospective Rhinebridge investors.  Rubins Decl. Ex. 3 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 84:18-86:24); Ringel Decl. Ex. 1 (ISL 30(b)(6) Tr. at 55:12-14, 223:16-19). Neither even knew or endeavored to learn what a SIV was, and neither undertook to consider the collateral supporting their proposed investment in any way.  Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 49:13-52:13); Rubins Decl. Ex. 3 at 80:7-81:7, 183:11-15; Ringel Decl. Ex. 1 (ISL 30(b)(6) Tr. at 44:15-45:2, 46:11-18, 47:3-8, 52:6-11).  And both Plaintiffs have conceded that they realized credit ratings were not recommendations to buy, *see* Rubins Decl. Ex. 3 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 146:8-15); Ringel Decl. Ex. 2 (ISL 30(b)(6) Tr. at 235:19-20), but rather subjective, forward-looking opinions.[3]  Plaintiffs' investments of tens of millions of dollars without doing *any work at all* to analyze the nature and risks of those investments cannot be viewed as anything short of reckless.

Both Plaintiffs have also acknowledged the limits of their pre-investment review.  King County's corporate representative conceded that, ███████████████████████████ ███████████████████████████████████████ *e.g.*, Rubins Decl. Ex. 3 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 135:20-136:5), ██████████████████████████████████████████████████, *see id.* at 86:20-89:6 and Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 20:10-21:23).  *See also*

---

[3]     *See* Ringel Decl. Ex. 7 ((KC0001601-06) ███████████████████████ ██████████████████████████████; Ringel Decl. Ex. 8 at ISL-e00004965 ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.

Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 31:18-24

████████████████████████████████████████

[4]

████████████████████████████████████████

ISL admits that its own analysis was no more substantial.  *See, e.g.*, Ringel Decl. Ex. 1
(ISL 30(b)(6) Tr. at 49:11-19 ██████████████████████████████

██████████████████████████████████████████

(emphasis added)));  *id.* at 47:9-18 ████████████████████████

██████████████████████████ ; *id.* at 53:7-15 ██████████████████

██████████ (emphasis added)).  ISL acknowledged

████████████ . *See* Ringel Decl. Ex. 3 (Sommers Tr. at 54:5-55:22).   As Rhinebridge's asset
manager later testified, ██████████████████████████████████████

██████████████████ . *See* Rubins Decl. Ex. 1 (Bains Tr. (June 29, 2011) at 89:12-
89:21 (██████████████████████████████████████████████

████████████████████████████████ ; *see also id.* at 91:16-92:15.[5]

_____

[4] ████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

[5] ████████████████████████████████████████████

Plaintiffs' failure to undertake any due diligence with respect to their investments in Rhinebridge commercial paper prevents them from raising a genuine issue of material fact with respect to the reasonableness of their alleged reliance. A plaintiff that declines to conduct even "the minimal diligence" necessary to "negat[e] its own recklessness" cannot claim that its alleged reliance was reasonable. *Banque Franco-Hellenique de Commerce International et Maritime, S.A.* v. *Christophides*, 106 F.3d 22, 26-27 (2d Cir. 1997) (internal quotation marks omitted) (noting that "justifiable reliance" under New York law requires a baseline "showing of care" on the plaintiff's part and vacating judgment for further consideration where party alleging reliance had information that directly contradicted the alleged misrepresentation two months prior to his alleged reliance thereon).[6]

"The principle that sophisticated parties have 'a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they [are] assuming' has particular application where, as here, the true nature of the risk being assumed could have been ascertained from

(emphasis added).

[6]    *See also Abbey*, 2011 WL 651416, at *8, *10 (finding reliance was not reasonable as a matter of law, in part due to plaintiff's "failure to read the materials made available to him" and noting that "[w]hen asked at deposition whether he 'had carefully read' the [Limited Partnership] agreement, he responded 'no,' and said he failed to do so because he understood that his investment was 'relatively riskless'"); *Steed Finance LDC* v. *Nomura Securities International, Inc.*, 2004 WL 2072536, at *6-8 (S.D.N.Y. Sept. 14, 2004) (granting summary judgment where plaintiff failed to demonstrate reasonable reliance and holding that "[e]ven in the absence of . . . cautionary language in the PPM," "[plaintiff] would not be able to maintain its misrepresentation claims if it chose not to investigate the information available to it prior to its purchase of the Private Certificates"), *aff'd*, 148 F. App'x 66 (2d Cir. 2005); *Barneli & Cie SA* v. *Dutch Book Fund SPC, Ltd.*, 95 A.D.3d 736, 736-37 (1st Dep't 2012) (holding that fraud claim was "not viable" where plaintiff "failed to investigate before investing $50 million in defendant"); *HSH Nordbank AG* v. *UBS AG*, 95 A.D.3d 185, 197 (1st Dep't 2012) (An investor's "failure to undertake (either directly or through an advisor) an independent appraisal of the risks of the transaction necessarily leads to the conclusion that [the investor] was 'so lax in protecting [itself] that [it] cannot fairly ask for the law's protection.'" (citation omitted)).

reviewing market data or other publicly available information." *HSH Nordbank AG*, 95 A.D.3d at 188, 195 (citations omitted) (finding that HSH, "a sophisticated commercial entity," could not satisfy the element of reasonable reliance where it "was explicitly warned of the risks it was undertaking in this highly leveraged and complex transaction").   "[A]s a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it." *Id.* at 194-95 (internal citation and quotation marks omitted); *see also Abu Dhabi Op.* at 14; *Whirlpool Financial Corp.* v. *GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995) ("A reasonable investor is presumed to have information available in the public domain . . . .").

Plaintiffs allege that, "[u]nbeknownst to [them], Rhinebridge held over a billion dollars worth of toxic, low-quality mortgage-backed securities" and that "the inclusion of [those] assets [in the SIV] rendered the ratings false and misleading." SAC ¶¶ 9, 121; *see also id.* at ¶ 165. Plaintiffs further allege that "[n]o amount of investigative prowess would have enabled plaintiffs to discover the true quality" of Rhinebridge's assets. SAC ¶ 137. Contrary to these assertions, extensive information about the Rhinebridge SIV—including explicit discussion of the risks flowing from its exposure to the subprime mortgage market—was available to Plaintiffs and, as explicitly confirmed by the SIV's manager, ███████████████████████████████████ ████████████████████████████████████████████████████. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 30, 2011) at 150:18-25); Ringel Decl. Ex. 5. Thus, it was not the case, as alleged in the Complaint, that "the Rating Agencies had access to information about the SIV's assets that investors did not." *Compare Abu Dhabi Op.* at 73 n.264.   Here, as the Rhinebridge asset manager testified, ██████████████████████████████████████████████ ████████████████████████████████████████. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 30, 2011) at 150:18-25); *id.* at 40:20-41:13 (Bains Tr. (June 29, 2011) ██████ ████████████████████████████████████████████████████████████



. Plaintiffs may not, therefore, overcome their own failure to investigate by suggesting that the specific information to which they attribute their loss was a matter "peculiarly within [D]efendant[s'] knowledge." *Abu Dhabi Op.* at 14.[7]

The particular risks associated with subprime securities were focused on and explicitly and specifically disclosed to potential investors (and would have been known to Plaintiffs if they had bothered to read the disclosures) prior to their investments. For example, the PPM made available to all investors prior to their investments in the Rhinebridge SIV expressly disclosed:



---

[7]    Even if the record supported Plaintiffs' claim that information about the Rhinebridge SIV was unavailable to them, and it does not, "the Second Circuit has noted that the fact that information may be peculiarly known to one entity does not end the analysis in the case of sophisticated players." *PPI Enterprises (U.S.), Inc.* v. *Del Monte Foods Co.*, 2003 WL 22118977, at *24 (S.D.N.Y. Sept. 11, 2003) (referencing *Lazard Freres & Co.* v. *Protective Life Insurance Co.*, 108 F.3d 1531 (2d Cir. 1997)); *see also Century Pacific*, 354 F. App'x at 498 (stating that in *Lazard* "a sophisticated party could not show reasonable reliance notwithstanding the fact that . . . the alleged misrepresentation concerned a matter 'peculiarly within' the other party's knowledge"). The peculiar knowledge exception grants that reliance may be reasonable where plaintiffs are unable to verify certain facts despite having "made a significant effort to protect themselves against the possibility of [misstatements]...." *HSH Nordbank AG*, 95 A.D.3d at 198 n.9 (citation omitted). It does not grant sophisticated investors carte blanche to make $50 million investments without conducting *any* diligence and then claim afterwards that they acted reasonably because their own conduct left certain information unknown to them. *See Ashland Inc.* v. *Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 470-71 (S.D.N.Y. 2010) (holding that though some information was non-public, there was public information that allowed plaintiffs to evaluate the relationship between a structured investment, the subprime crisis and the credit ratings), *aff'd*, 652 F.3d 333 (2d Cir. 2011). Such a standard would put willfully blind plaintiffs like King County and ISL in a better position than the investors in *Lazard* and *Century Pacific* who, despite efforts to obtain assurances regarding the truth of statements which they could not verify, could not, as a matter of law, establish reasonable reliance.



Ringel Decl. Ex. 6 at KC0023256-59 (emphasis added).

Rhinebridge's asset manager has also testified

. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 29, 2011) at 37:12-16); *id.* at 63:6-19:



*See also id.* at 65:6-16, 67:10-19:

*See also* Ringel Decl. Ex. 5 (MS_RHI_000315636-37 (

).

The Rhinebridge asset manager further testified that

. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 29, 2011) at 124:8- 125:12).

Plaintiffs' own testimony confirms that

. *See, e.g.*, Ringel Decl. Ex. 1 (ISL 30(b)(6) Tr. at 55:7-57:11



); *id.* at 44:6-14 ; Rubins Decl. Ex. 3 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 84:25-85:11 .

The total failure of the two Plaintiffs in this case to investigate their investments and their acknowledged disregard for the contents of the PPM and related marketing materials that explicitly discussed Rhinebridge's exposure to subprime market risks render Plaintiffs' purported reliance on the Defendants' credit ratings in making their investment decisions unreasonable as a matter of law and the fraud claim must be dismissed as a result.

**B.      There is No Evidence of Loss Causation**

Private litigation is not meant to be "a partial downside insurance policy" for investors who are dissatisfied with the performance of their investments. *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336, 347-48 (2005). Summary judgment must be granted where Plaintiffs have "failed to raise a material issue of fact that would support a finding of loss causation." *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501, 514 (2d Cir. 2010). Where, as here, "'the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,'" and a plaintiff must produce evidence that its losses were "'caused by the alleged misstatements as opposed to intervening events.'" *See Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (citation omitted); *see also Dura*, 544 U.S. at 342-43 ("To 'touch upon' a loss is not to

*cause* a loss, and it is the latter that the law requires." (citation omitted)).

As the Second Circuit has made clear, the burden of proving loss causation, and disaggregating losses caused by other factors from losses caused by alleged fraud, falls squarely on Plaintiffs. *See In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29, 36 (2d Cir. 2009) ("[T]o establish loss causation, *Dura* requires *plaintiffs* to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements." (emphasis added) (citation omitted)); *Lentell*, 396 F.3d at 172 ("It is long settled that a securities-fraud plaintiff 'must prove both transaction and loss causation.'" (citation omitted)); *In re Omnicom*, 597 F.3d at 509, 514 (affirming summary judgment dismissal where plaintiff "failed to raise a material issue of fact that would support a finding of loss causation," explaining: "[S]ummary judgment is appropriate where . . . undisputed facts reveal that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof'" (citation omitted)).

1.   <u>Plaintiffs' Losses Were Caused by an Unprecedented Market Disruption</u>

The year 2007 witnessed the onset of an unforeseeable and unprecedented market-wide liquidity crisis. *See Amida Capital Management II, LLC* v. *Cerberus Capital Management, L.P.*, 669 F. Supp. 2d 430, 433 (S.D.N.Y. 2009) ("July 2007 [*i.e.*, the month *after* Rhinebridge was rated] marked the beginning of what was then called the 'credit crunch,' the first phase of the financial crisis that culminated in the fall of 2008."); *see also* Ringel Decl. Ex. 3 (Scott (ISL advisor) Tr. at 117:15-19 ███████████████████████████████████████████████████ ███████████████████████████████████████████. King County itself has described the crisis as ███████████████████████████████████ Ringel Decl. Ex. 6 at KCe0046219. King County has also admitted that ████████████████████████████ ████████████████████. *See, e.g.*, Ringel Decl. Ex. 6 ((KCe0023244-

54) (███████████████████████████████████████████████████████

████████████████████████████████████████████); Rubins Decl. Ex. 3 (King County

30(b)(6) Tr. (Nov. 7, 2011) at 206:21-25 ███████████████████████████████████████

████████).[8]

Following Plaintiffs' purchases, an intervening event severed any connection between Defendants' alleged misconduct and Plaintiffs' alleged losses — namely, a total disintegration of historical market paradigms, as one IKB analyst testified, *see* Ringel Decl. Ex. 3 (Bauknecht Tr. at 332:23-333:16):



Not surprisingly, Plaintiffs have not come forward with any evidence to disaggregate losses caused by this liquidity crisis from losses allegedly caused by fraud.  Although, at the motion to dismiss stage, Plaintiffs were not required to prove that a specific portion of their

---

[8]     Indeed, nearly all SIVs collapsed in the wake of this crisis.  Paul J. Davies et al., *Sigma Collapse Ends Shadow Bank Project*, FINANCIAL TIMES, Oct. 1, 2008, *available at* http://www.ft.com/cms/s/0/19db6e24-8fff-11dd-9890-0000779fd18c.html; HENRY TABE, THE UNRAVELLING OF STRUCTURED INVESTMENT VEHICLES: HOW LIQUIDITY LEAKED THROUGH SIVs 6, 202, 209 (Thoth Capital LLP 2010).

[9]     Kenneth Guy, Director of the Finance and Business Operations Division for King County, described the market events of late Summer and early Fall 2007 to King County pool participants as ███████████████████████████████████████████████████████████████
*See* Ringel Decl. Ex. 6 (KC0013657-58 (███████████████████████████████████████
████████████████████).

losses were attributable to Defendants' conduct, Plaintiffs must now come forward with clear and convincing evidence tying some identifiable portion of their losses to Defendants' alleged fraud. *See King County* v. *IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 346 (S.D.N.Y. 2010) (Scheindlin, J.) (allowing case to proceed at the pleading stage, explaining: "[E]ven though I am uncertain whether *plaintiffs* will be able to ultimately prove that any portion of their losses were caused by the defendants' conduct as opposed to the credit crisis, that is not their burden *at this stage*." (emphasis added)). Their claims must be dismissed because the burden is on Plaintiffs to come forward with evidence to disaggregate fraud from non-fraud explanations for the loss. *See In re Flag Telecom*, 574 F.3d at 36; *see also Erica P. John Fund., Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) (if "intervening causes" are "responsible for the loss or part of it, a plaintiff would not be able to prove loss causation to that extent").

    2.    <u>The Credit Ratings Did Not Conceal The Risks That Caused Plaintiffs' Losses</u>

Nor is there any evidence in this case "'that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the [alleged] misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (emphasis in original) (citation omitted). Here, as noted above, *supra*, 12-15, the risks that Plaintiffs claim materialized and caused their alleged losses—the failure of liquidity and decline in market value of subprime assets—were disclosed risks. The Rhinebridge PPM explained that the SIV had exposure to subprime mortgages, that delinquencies were increasing in the U.S. housing market, and that this could affect the value of assets held by Rhinebridge and could result in sales on a "distressed basis," and consequential losses to investors. In light of such disclosures, Plaintiffs cannot demonstrate that the information available to them failed to "accurately report the risky nature of [their] investment." *Compare Abu Dhabi Op.* at 79; *Lentell*, 396 F.3d at 173 (risks that caused loss must be "within the zone of risk *concealed* by the [alleged] misrepresentations" (emphasis in original)).[10]

---

[10]    Plaintiffs' sensational characterization of subprime assets as "toxic" cannot vitiate the

Plaintiffs cannot immunize themselves from these disclosures by pleading blind reliance on the ratings. The "zone of risk" allegedly concealed by the Rhinebridge ratings cannot as a matter of law include, as Plaintiffs have suggested, any risk that could cause them a loss. *See In re AOL Time Warner, Inc. Securities Litigation*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) (alleged concealed risk must be specific). Such an expansive theory would improperly convert any AAA rating into a form of insurance, and any loss on an AAA security into *prima facie* proof of loss causation. *See Dura*, 544 U.S. at 345 (Private securities fraud actions are available "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause"). Plaintiffs had available to them information "directly address[ing] the risk that plaintiffs' claim was not disclosed," *Abu Dhabi Op.* at 79 & n.286, which precludes any showing of loss causation.

## C. There is No Evidence of an Actionable Misstatement

Here, both Plaintiffs base their misrepresentation claim against Moody's and S&P exclusively on the ratings assigned to the Rhinebridge SIV. *See, e.g.*, SAC ¶¶ 83, 243, 259. As a matter of law, those ratings represent subjective, forward-looking opinions as to the creditworthiness of the rated notes, as Plaintiffs have acknowledged. *See Abu Dhabi Op.* at 34 & n.123 (citations omitted); *see also supra*, n.3. While an opinion generally cannot provide the basis for a claim of fraud in New York, the Second Circuit has recognized a narrow exception to this rule where a speaker subjectively, but privately, disbelieves his or her stated opinion *and* such statements are also objectively "false or misleading with respect to the underlying subject

---

fact that both Rhinebridge's exposure to these assets and the risks associated therewith were disclosed in writing to all potential Rhinebridge investors. *See, e.g.*, *In re Omnicom*, 597 F.3d at 512; *In re CRM Holdings, Ltd. Securities Litigation*, 2012 WL 1646888, at *31 (S.D.N.Y. May 10, 2012) ("Investors cannot establish loss causation merely by relying on an after-the-fact 'negative characterization of already-public information.' Here, CRMH disclosed the inherent risks associated with the GSIT business . . . . Plaintiffs' allegations that 'CRM built a business unit upon a house-of-cards' and that 'numerous trusts were *already* underfunded by year-end 2005' are nothing more than negative characterizations of information . . . disclosed by Defendants.'" (quoting *In re Omnicom*, 547 F.3d at 512)).

matter they address." *See Fait* v. *Regions Financial Corp.*, 655 F.3d 105, 111-12 (2d Cir. 2011). Under that standard, Moody's and S&P may only be liable for fraud if their ratings *both* misstated the opinions or beliefs they held *and* were false or misleading with respect to the underlying subject matter they addressed. *Abu Dhabi Op.* at 38. Plaintiffs cannot identify any evidence, let alone "clear and convincing evidence," of either prong of this standard in this case.

With respect to S&P, Plaintiffs can produce no evidence that the Rhinebridge ratings were subjectively disbelieved by the S&P rating committee that issued them or that those ratings were based on anything other than a "reasoned analysis." First, there is absolutely no deposition testimony or documentary evidence that S&P's rating on the Rhinebridge SIV reflected anything but the rating committee's genuine, honest view of the Rhinebridge SIV following a thorough analysis. The only deposition testimony is to the contrary. *See, e.g.*, Guadagnuolo Tr. at 188:6-17 (); *id.* at 189:7-15 ). Second, the record evidence reflects that S&P's Rhinebridge rating committee spent many months and countless hours conducting detailed analysis of the creditworthiness of Rhinebridge notes. *See, e.g.*, Ringel Decl. Ex. 4 (S&P-IKB 0012940 ( ); Ringel Decl. Ex. 10 (S&P-IKB 0021271 ( ); Ringel Decl. Ex. 10 (S&P-IKB 0011842 ( ). Moreover, the S&P rating committee's conclusions as to the Rhinebridge SIV,[11] were fully explained in contemporaneous publications—publications that

---

[11]     *See* Ringel Decl. Ex. 9 (KC0000348-60 ( ).

were available to the public but that ████████████████████████████. *See, e.g.,* Rubins Decl. Ex. 4 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 289:15- 292:10); Ringel Decl. Ex. 2 (ISL 30(b)(6) Tr. at 361:2-9). There is simply no evidence whatsoever in the record of this case that S&P's ratings on the Rhinebridge notes deviated in any way from S&P's published SIV rating criteria or from S&P's published explanation of its Rhinebridge rating process contained in its Pre-Sale Report.

With respect to Moody's, the record unequivocally demonstrates that the Rhinebridge ratings were well supported by "reasoned analysis" and had an ample "factual foundation." *See Abu Dhabi Op.* at 36. The rating process, which was led by Moody's analysts Fanny Lau, Angela Jung and Paul Kerlogue (*see* Rubins Decl. Ex. 5 at 22-23), involved eight months of research, analysis, and deliberation by the committee members, at the end of which the committee voted to assign ratings to the Rhinebridge notes. (*See id.* at 36-37.)[12] During those eight months, the committee met formally on many occasions to discuss all aspects of the Rhinebridge proposal, and the committee members sent countless emails, both internally and to Morgan Stanley, that, *inter alia*, (1) analyzed all relevant qualitative and quantitative aspects of the transaction; (2) requested additional proposals, data, or other work from Morgan Stanley; and (3) closely questioned Morgan Stanley regarding details of the transaction, rejecting aspects of the proposal where the committee felt appropriate. *See, e.g.,* Rubins Decl. Ex. 6 at 003447 (████████████████████); MDYS RHNB 0011930 (██████████████████████); MDYS RHNB 012028 (████████████████); Rubins Decl. Ex. 7 at 011940 (████████████████████████); Rubins Decl. Ex. 8 at MS-RHI_000181982 (███████████████████ ████████████████████); at MS_RHI_000055179 (█████████████████ ████████████████); at MS_RHI_000255461 (████████████████ ████████████████████████████████████████████); Rubins Decl.

---

[12]      Tellingly, Plaintiffs did not pursue depositions of Ms. Lau, Ms. Jung or Mr. Kerlogue.

Ex. 9 at MDYS RHNB 003452 (█████████████████████████████████████); at
MS_RHI_000043161 (█████████████████████████████████████████████
███████████████); at IKB003258849 (██████████████████████████████
█████████████████████████); at MDYS RHNB 050453
(███████████████████████████████████████████████████); Rubins Decl.
Ex. 10 at MS_RHI_000070461 (███████████████████████████████████████
█████████); at IKB000143871 (████████████████████████████████████
█████████████████████████████████████████████████████████████); at
IKB003997170-71 (████████████████████████████████████████████████
███████████████████); at MDYS RHNB 018284 (██████████████████████
█████████████████████████████████████████████); at MDYS RHNB
009903 (███████████████████████████████████████).

     Moody's and S&P separately produced approximately *60,000 pages each* of documents related specifically to their respective ratings of the Rhinebridge notes, only a small sample of which are cited above. Those documents, including the above-referenced committee memoranda and emails, contain all the hallmarks of the serious, thorough, independent, and diligent rating processes undertaken by both Moody's and S&P. No evidence exists that Moody's or S&P knowingly issued Rhinebridge commercial paper ratings that were either unsupported by "reasoned analysis" or lacked a "factual foundation." *Abu Dhabi Op.* at 36. And there is no evidence, let alone clear and convincing evidence, for Plaintiffs' fantastical assertion that the ratings committee at Moody's *and* the ratings committee at S&P (*and* the ratings committee at Fitch) worked for months, independently of one another, analyzing the Rhinebridge SIV simply to issue ratings that they did not believe. The absence of such evidence compels the conclusion that Plaintiffs have failed to plead an actionable misstatement by Moody's or by S&P.

### D.      There is No Evidence of Scienter

"To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter" and that both ultimate responsibility for the alleged culpable act and the requisite mental state existed in the same corporate employee. *Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Thus, to survive summary judgment, Plaintiffs must present evidence that the "speaker" responsible for the Rhinebridge rating made the alleged misstatement with the requisite state of mind. *See id.* at 194-96; *In re Vivendi Universal, S.A. Securities Litigation*, 765 F. Supp. 2d 512, 544-46 (S.D.N.Y. 2011).  No such evidence exists.

The Rhinebridge ratings were issued by rating committees at Moody's and S&P, and it is the knowledge and belief of those committees that forms the locus of the scienter inquiry here. Plaintiffs cannot identify any evidence, let alone clear and convincing evidence, demonstrating that the committee members who issued the Rhinebridge ratings considered those ratings, or the ratings of SIVs generally, to be "false." *See supra*, 20-23.

In addition to affirmative testimony from the committee members on this point, the record also contains indisputable evidence that the very information Plaintiffs claim to have been denied was expressly disclosed in writing prior to Plaintiffs' purchase. *See supra*, 12-15.  "The mere fact of that disclosure undermines any credible theory of scienter," *In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326, 356 (S.D.N.Y. 2011), because such disclosures are "inconsistent with a state of mind going toward 'deliberate illegal behavior.'" *Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *20 (S.D.N.Y. Sept. 28, 2010) (citation omitted).

Even under this Circuit's more lenient standard of review for scienter issues on summary judgment, *Abu Dhabi Op.* at 13, "evidence" on non-Rhinebridge, non-SIV subjects cannot reasonably be considered "evidence of conscious misbehavior or recklessness" with respect to the Rhinebridge ratings on which King County and ISL base their claim.  *See, e.g., In re Salomon Analyst AT&T Litigation*, 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) (holding that

"generalized allegations about conflicts of interest, incentives to increase compensation, or internal pressure on analysts that is not tied to the particular stock at issue are not sufficient" to establish scienter).   Plaintiffs have not identified any factual connection between comments addressing other subjects cited in their complaint and the actual state of mind of the Rhinebridge rating committees.   Indeed, none of the statements cited in Plaintiffs' complaint refers to the Rhinebridge SIV, and many refer to entirely different and independently-rated categories of structured finance assets that are wholly unrelated to the investments at issue here.   No jury could reasonably infer scienter in this case from such material and Plaintiffs cannot rely on it to raise a material question of fact as to the Rhinebridge committees' respective states of mind.

## CONCLUSION

For the foregoing reasons, summary judgment for Moody's and S&P should be granted.

September 7, 2012                                        Respectfully submitted,

  /s/ Dean Ringel                                            /s/ Joshua M. Rubins
Floyd Abrams (fabrams@cahill.com)          Joshua M. Rubins (jrubins@ssbb.com)
Dean Ringel (dringel@cahill.com)              James J. Coster (jcoster@ssbb.com)
Tammy L. Roy (troy@cahill.com)               Mario Aieta (maieta@ssbb.com)
Jason Hall (jhall@cahill.com)                     James Doty (jdoty@ssbb.com)
CAHILL GORDON & REINDEL LLP           SATTERLEE STEPHENS BURKE &
80 Pine Street                                            BURKE LLP
New York, NY 10005                                230 Park Avenue
Telephone:  212-701-3000                         New York, New York 10169
                                                               Telephone: 212-818-9200

*Attorneys for Defendants The McGraw-Hill*     
*Companies, Inc. and Standard & Poor's*        *Attorneys for Defendants Moody's Investors*
*Ratings Services*                                     *Service, Inc. and Moody's Investors Service Ltd.*