UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| KING COUNTY, WASHINGTON, et al., Individually and on Behalf of All Others Similarly Situated, | : | Master File No. 1:09-cv-08387-SAS **(Consolidated)** |
|  | : |  |
|  | : | CLASS ACTION |
| Plaintiffs, | : |  |
|  | : | PLAINTIFFS' OMNIBUS MEMORANDUM |
| vs. | : | OF LAW IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' |
|  | : | MOTIONS FOR SUMMARY JUDGMENT |
| IKB DEUTSCHE INDUSTRIEBANK AG, et al., | : | PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(c) |
|  | : |  |
| Defendants. | : |  |

---

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT .........................................................................................................2

    A.    The Rhinebridge SIV Was a "Copycat" of the Cheyne SIV ....................2

    B.    MS Pressured the Rating Agencies to Assign Top Ratings .......................4

    C.    The Rating Agencies Defrauded Plaintiffs ..............................................7

        1.    The Rating Agencies Knew the Subprime Market Was Crashing
            but Assigned Top Ratings Anyway ...........................................10

        2.    The Rating Agencies Knew that Rhinebridge CP Was Inflated
            Because the Ratings on the Underlying Assets Were Inflated .................20

    D.    MS Aided and Abetted the Rating Agencies' Fraud .............................23

    E.    MS Is Liable for Fraud and Negligent Misrepresentation ......................32

    F.    The Evidence of Justifiable Reliance Presents Disputed Issues of Fact .............34

        1.    King County ............................................................................35

        2.    ISL ..........................................................................................36

        3.    No Amount of Investigation Could Have Uncovered Defendants'
            Fraud .......................................................................................38

        4.    Defendants' "Disclosures" Do Not Negate Plaintiffs' Reliance ..............40

    G.    The Evidence of Loss Causation Presents Disputed Issues of Fact .....................43

III.  CONCLUSION ....................................................................................................50

773090_1

# TABLE OF AUTHORITIES

Page

## CASES

*Abbey v. 3F Therapeutics, Inc.*,
No. 06 CV 409 KMW, 2011 WL 651416
(S.D.N.Y. Feb. 22, 2011) ............................................................................42

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009).........................................................30

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*,
No. 08 Civ. 7508 SAS, 2012 WL 3584278
(S.D.N.Y. Aug. 17, 2012) .................................................................. *passim*

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*,
646 F. Supp. 2d 385 (S.D.N.Y. 2009)
*aff'd*, 386 F. App'x 5 (2d Cir. 2010)...........................................................48

*Alexander v. Evans*,
No. 88 Civ. 5309 (MJL), 1993 WL 427409
(S.D.N.Y. Oct. 15, 1993) ............................................................................38

*Ashland Inc. v. Morgan Stanley & Co.*,
700 F. Supp. 2d 453 (S.D.N.Y. 2010)
*aff'd*, 652 F.3d 333 (2d Cir. 2011)..............................................................43

*Banque Franco-Hellenique de Commerce Int'l Maritime, S.A. v. Christophides*,
106 F.3d 22 (2d Cir. 1997).........................................................................42

*Central Bank, N.A. v. First Interstate Bank, N.A.*,
511 U.S. 164 (1994).....................................................................................24

*Century Pac., Inc. v. Hilton Hotels Corp.*,
354 F. App'x 496 (2d Cir. 2009) .................................................................43

*Chubb & Son, Inc. v. Kelleher*,
No. 92 CV 4484 (TLM) (RML), 2010 WL 5978913
(S.D.N.Y. Oct. 22, 2010) ............................................................................32

*CPC Int'l Inc. v. McKesson Corp.*,
70 N.Y.2d 268 (1987)..................................................................................32

*Danna v. Malco Realty, Inc.*,
857 N.Y.S.2d 688 (2d Dep't 2008)..............................................................32

Page

*Defer LP v. Raymond James Fin., Inc.*,
    654 F. Supp. 2d 204 (S.D.N.Y. 2009)..................................................................8, 9

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008).................................................................41, 42

*HSH Nordbank AG v. UBS*,
    941 N.Y.S. 2d 59 (1st Dep't 2012) ........................................................................42

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012) .....................................................................33

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) .......................................................................9

*In re E. & S. Dist. Asbestos Litig.*,
    772 F. Supp. 1380 (E.D.N.Y. 1991)
    *aff'd in part and rev'd in part on other grounds*,
    *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992)................34

*In re JPMorgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005).......................................................................9

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006).......................................................................8

*In re MBIA, Inc. Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010).......................................................................9

*In re Metlife Demutualization Litig.*,
    262 F.R.D. 217 (E.D.N.Y. 2009) ..............................................................................8

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009).......................................................................9

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011).......................................................................8

*In re Wash. Mut. Mortg. Backed Sec. Litig.*,
    No. C09-37 (MJP), 2012 WL 2995046
    (W.D. Wash. July 23, 2012) ....................................................................................10

*In re WorldCom, Inc. Sec. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005).......................................................................9

**Page**

*JP Morgan Chase Bank v. Winnick,*
    350 F. Supp. 2d 393 (S.D.N.Y. 2004)....................................................................38

*King Cnty. v. IKB Deutsche Industriebank AG,*
    708 F. Supp. 2d 334 (S.D.N.Y. 2010) ..................................................................44

*King Cnty. v. IKB Deutsche Industriebank AG,*
    751 F. Supp. 2d 652 (S.D.N.Y. 2010) ........................................................ *passim*

*King Cnty. v. IKB Deutsche Industriebank AG,*
    No. 09 Civ. 8387 (SAS), 2012 WL 2160285
    (S.D.N.Y. June 7, 2012).........................................................................................34

*King Cnty. v. IKB Deutsche Industriebank AG,*
    No. 09 CIV 8387 SAS, 2012 WL 1592193
    (S.D.N.Y. May 4, 2012).........................................................................................34

*Lerner v. Fleet Bank, N.A.,*
    459 F.3d 273 (2d Cir. 2006)...................................................................................33

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
    513 F.3d 702 (2008)................................................................................................24

*Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,*
    801 F.2d 13 (2d Cir. 1986).....................................................................................49

*NML Capital v. Republic of Arg.,*
    435 F. App'x 41 (2d Cir. 2011) ..............................................................................49

*Pa. Pub. Sch. Emples. Ret. Sys. v. Bank of Am. Corp.*
    No. 11 Civ. 733 (WHP), 2012 WL 2847732
    (S.D.N.Y. July 11, 2012) .........................................................................................9

*PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co.,*
    No. 99 Civ 3794 (RSJ), 2003 WL 22118977
    (S.D.N.Y. Sept. 11, 2003)......................................................................................43

*Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.,*
    No. 10 Civ. 2835(NRB), 2011 WL 4357368
    (S.D.N.Y. Sept. 19, 2011) ........................................................................................9

*Richman v. Goldman Sachs Grp., Inc.,*
    No. 10 Civ. 3461(PAC), 2012 WL 2362539
    (S.D.N.Y. June 21, 2012)........................................................................................9

Page

*Rule v. Brine,*
 85 F.3d 1002 (2d Cir. 1996)..................................................................48

*Silver Oak Capital L.L.C. v. UBS AG,*
 920 N.Y.S. 2d 325 (1st Dep't 2011) ....................................................41

*Steed Finance LDC v. Nomura Sec. Int'l, Inc.,*
 No. 00 Civ. 8058 (NRB), 2004 WL 2072536
 (S.D.N.Y. Sept. 14, 2004)
 *aff'd*, 148 F. App'x 66 (2d Cir. 2005)..................................................42

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,*
 531 F.3d 190 (2d Cir. 2008)...............................................................8, 9

*Valentini v. Citigroup, Inc.,*
 837 F. Supp. 2d 304 (S.D.N.Y. 2011) ...................................................9

*White v. Guarente,*
 43 N.Y.2d 356 (1977) ....................................................................33, 34

*Williams v. Sidley Austin Brown & Wood, L.L.P.,*
 832 N.Y.S.2d 9 (1st Dep't 2007) .........................................................33

**STATUTES, RULES AND REGULATIONS**

17 C.F.R.
 §240.10b-5 ...........................................................................................24

Federal Rules of Civil Procedure
 Rule 30(b)(6)................................................................................*passim*
 Rule 56(c)...............................................................................................1

Federal Rules of Evidence
 Rule 803(8)(A)(iii)................................................................................10

Local Rule 56.1 ...........................................................................................1

773090_1

## I.     INTRODUCTION

Plaintiffs King County, Washington ("King County") and Iowa Student Loan Liquidity Corporation ("ISL") (collectively, "plaintiffs") together purchased approximately $100 million of the Rhinebridge SIV's top rated U.S. Commercial Paper ("CP") and suffered devastating losses.  The overwhelming evidence establishes that those losses were caused by defendants' fraud.  Plaintiffs have established a triable issue of fact as to the claims alleged.

All of the defendants knew that the subprime market was on the brink of disaster in the months leading up to the launch of the Rhinebridge SIV.  Nevertheless, the defendants created a structured investment vehicle to hold more toxic, subprime assets than any other in the market. Defendants deliberately ignored the increased risk.  Not surprisingly, the Rhinebridge SIV went from AAA to junk in a matter of weeks – perhaps the shortest-lived AAA fund in history.

The Rhinebridge SIV was a "copy cat" of the fraudulent Cheyne SIV, "both in terms of structure and modeling, since the arranger [was] the same, Morgan Stanley." Tab 1 at S&P-IKB 0011842.[1]  Despite voluminous, new information further undermining the ratings, defendants made no material changes to the structure, methodologies, or assumptions.  Fitch, which previously refused to rate the Cheyne SIV, simply copied the same flawed methodologies of the other defendants in rating the Rhinebridge SIV.  Because Rhinebridge was a carbon-copy of Cheyne, the Court's holding in *Abu Dhabi* denying summary judgment applies with equal force in this case.

The evidence establishes that the ratings had materially false components and that defendants had no reasonable basis to believe the assigned ratings were justified.  The top ratings assigned to the

---

[1]     All "Tab _" references are to the Declaration of Daniel S. Drosman in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(c) and in Response to Fitch's Rule 56.1 Statement ("Drosman Decl.").  All emphasis is added, and citations, internal quotations and footnotes are omitted, unless otherwise stated.

CP connoted a level of safety and stability that should survive the Great Depression.  Tab 2.  Yet, defendants knew that the data and assumptions used to rate the Rhinebridge SIV were unreliable and insufficient to support the ratings.  *See* Declaration of Sanjiv R. Das, Ph.D. ("Das Decl.").  Defendants also knew that the assets Rhinebridge held were not accurately rated and that the ratings were not commensurate with the risk.  Finally, defendants knew that the true market values of the Rhinebridge SIV's underlying assets were crashing before the SIV's launch on June 27, 2007.  Defendants ignored these facts and issued top ratings without a basis in fact for doing so.

Both plaintiffs testified that they substantially relied on the ratings assigned by all three rating agencies.  No amount of investigation conducted by the plaintiffs could have uncovered defendants' fraud.  The information necessary to do so was "peculiarly within [defendants'] knowledge [such] that plaintiff[s] may rely without prosecuting an investigation, as [they] ha[d] no independent means of ascertaining the truth."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, No. 08 Civ. 7508 SAS, 2012 WL 3584278, at *4 (S.D.N.Y. Aug. 17, 2012).

There is no question that plaintiffs' losses were proximately caused by defendants' fraud.  When the market realized the true quality of the Rhinebridge SIV and its assets, the SIV collapsed.  As Moody's conceded: "[T]he undoing of the SIVs . . . is primarily explained by the overly aggressive ratings of underlying assets, from the market's perspective."  Tab 3.

## II.      ARGUMENT

### A.      The Rhinebridge SIV Was a "Copycat" of the Cheyne SIV

From the beginning, the rating agencies, Moody's, S&P and Fitch (the "Rating Agencies"), and Morgan Stanley ("MS") (collectively, "defendants") designed, structured and marketed the Rhinebridge SIV as a carbon-copy of the Cheyne SIV: "The structure of Rhinebridge is basically modeled on Cheyne (*as required by MS*) . . . ."  Tab 4 at MS_001372333.  In August 2006, S&P

- 2 -

analyst Lapo Guadagnuolo noted that "the same MS team" that structured Cheyne was also structuring Rhinebridge and that MS provided S&P with the Rhinebridge operating manual "and termsheet blacklined against Cheyne SIV."  Tab 5; *see* Tab 6.

In February 2007, Moody's acknowledged in an internal memorandum that MS simply copied the Cheyne SIV: "Rhinebridge is a SIV proposed to be set up and managed by IKB, and arranged by Morgan Stanley. . . .  IKB's capital model is ***identical*** to that of Cheyne's."  Tab 7 at MDYS RHNB 012022.  Similarly, S&P observed that Rhinebridge would be "very close in terms of assets and strategy to the Cheyne SIV" and that, "[l]ike [the] Cheyne SIV, the senior notes will be rated with a capital charge matrix, whereas the model for capital notes is based on a simulation model."  Tab 8.  In March 2007, S&P compared Rhinebridge to Cheyne, noting that Rhinebridge "is ***a copy cat both in terms of structure and modeling***, since the arranger is the same, Morgan Stanley."  Tab 1 at S&P-IKB 0011842.

S&P analyst Lapo Guadagnuolo testified that the haircut matrices, used to determine how much capital would protect the CP from losses, were the same for the Rhinebridge and Cheyne SIVs. *See* Tab 9 at 95:8-97:22; *see also* Tab 10 at S&P-IKB 0061760 (S&P's Guadagnuolo tells MS: "We will use the same assumptions . . . as on Cheyne.").  Moody's analyst David Rosa agreed that the Rhinebridge haircuts were, "if not identical, very similar."  *See* Tab 11 at 104:22-107:18.  In fact, the haircuts were identical.  Tab 12.  Fitch simply "cut and paste[d]" S&P's haircut matrices, which were established two years prior in connection with Cheyne – an SIV that Fitch refused to rate.  Tab 13 at FITCH-RHINE 00047588; Tab 14 at 116:17-117:14; *see also* Tab 15 at S&P-ADCB 0001317.

Because Rhinebridge was a copycat of Cheyne, the Rating Agencies simply accepted the same flawed structure and assumptions in rating Rhinebridge.  *See Abu Dhabi*, 2012 WL 3584278, at *11-*12.  This was MS's strategy from the very beginning.  In 2004, Drennan wrote that MS had

773090_1

"shaped rating agency technology" for the SIVs, "develop[ed] . . . a new model for the [SIV] transaction" and "adapt[ed] and creat[ed] a new form of SIV methodology that was presented to the rating agencies and the client for their approval." Tab 16 at MS_000558825. Drennan explained that the SIV technology that he developed was "critical" for MS's "Development of Future Business." Tab 17 at 000432583. MS and the Rating Agencies knew that the "new model" and the "new form of SIV methodology" developed by MS would benefit MS at the investors' expense; in fact, Drennan boasted about MS's "ability to push the envelope" on SIVs. Tab 16 at MS_000558828; Tab 18 at 472:17-474:22.

Because Rhinebridge was a carbon-copy of Cheyne, the Court's holding in *Abu Dhabi* that the evidence is sufficient to create disputed issues of fact as to fraud against Moody's and S&P, and aiding and abetting fraud against MS, applies with equal force here. *Abu Dhabi*, 2012 WL 3584278, at *11-*12. Further, defendants knew the risks that they ignored when they created the Cheyne SIV were on the verge of materializing *before* Rhinebridge was launched in late June 2007. But all of the defendants simply ignored those risks and knowingly launched an SIV that was destined to collapse.

### B.     MS Pressured the Rating Agencies to Assign Top Ratings

MS exerted pressure on the Rating Agencies to inflate the ratings on the Rhinebridge CP. From the outset of the Rhinebridge ratings process, MS ratcheted up the pressure: "They [MS] are pushing the rating agencies very hard (especially Moodys) . . . ." Tab 19. In February 2007 (four months before Rhinebridge launched), MS's Drennan asked IKB to "*lobby*" *S&P because S&P* "*suggested that [it] might not rate the deal!!!*" Tab 20 at IKB000143551. After "pushing the rating agencies very hard," however, MS succeeded in attaining the top ratings on the CP required to launch the Rhinebridge SIV. Tab 19. Indeed, after MS's Drennan blasted S&P analysts, telling them that S&P's Rhinebridge rating committee was "mistakenly tieing [sic] together two distinct

- 4 -

concepts," S&P's McCabe lamented to Lapo Guadagnuolo: "Did at any point you expect him [Drennan] to go away quietly???"  *See* Tab 21 at S&P-IKB 0009486.  As MS's Drennan boasted, MS "push[ed] the envelope" on SIVs and manipulated the Rhinebridge SIV modeling process to fabricate the ratings it desired.  Tab 16 at MS_000558828.

In addition, MS coerced the Rating Agencies into dramatically increasing the limits on the amount of risky Home Equity Loans ("HELs") the SIV could hold.  MS knew that HELs were poor quality, subprime assets.  As S&P's Director of Structured Finance Ratings explained in a March 27, 2007 e-mail: "[W]e have assumed that all HEL exposure is subprime RMBS."  Tab 22 at S&P-IKB 0009468.  The inclusion of HELs was a vital component of MS's plan; MS deliberately designed the SIV as a vehicle to sell its high risk HEL assets.  MS's Drennan crowed: "MS developed a proprietary hedging strategy to allow SIVs to purchase HELs which has since been copied by several other SIVs, ***adding billions of additional demand to the HEL market, with consequential benefits for [Morgan Stanley's] HEL franchise***."  Tab 19 at MS_000432583.

MS pressured the Rating Agencies to raise the SIV's overall limits for exposure to RMBS generally and risky HELs in particular.  In September 2006, MS directed S&P to raise Rhinebridge's maximum eligible limit of exposure to RMBS from 55% to 75% and increase its maximum operational limit of exposure to RMBS from 50% to 70%.  Tab 23 at S&P-IKB 0012942.  MS also pressured S&P to raise the limit on risky HELs.  S&P believed that the Rhinebridge SIV should be limited to a maximum of 35% to 40% HELs, whereas MS demanded that S&P raise the HEL limit to 65%-70%.  Tab 24 at S&P-IKB 0012783.  S&P ultimately acquiesced to MS's edict, agreeing to a dramatic increase in subprime exposure for Rhinebridge, including the 65%-70% HEL limit MS had pushed for.  *See* Tab 25 at BNYM10185444; Tab 26 at S&P-IKB 0086513-14.

Once it succeeded in packing the Rhinebridge SIV with HELs, MS then pressured the Rating

- 5 -

Agencies to lower the haircuts on those same HELs.  The primary Moody's analyst on the Rhinebridge deal explained: "Fanny and I had a look into this for Rhinebridge and we originally requested [MS] to increase their HEL haircut to 5% across the board, but I don't recall what the final end result was, if they complied with it, or if *we let it slip*."  Tab 27 at MDYS RHNB 018289.  Moody's acquiesced to MS's pressure and did not increase their HEL haircut to 5% "across the board."  *Id*.  Rather, Moody's applied the 3% and 4% haircuts that MS demanded to many of the HELs.  Tab 28 at MDYS RHNB 011610; *see also* Tab 12 at MDYS RHNB 050532.[2]

In late March 2007, Fitch told MS that it would like to see a 10% haircut for HELs treated as LEAs.  Tab 33.  Gracie Chen, a quantitative analyst at MS assigned to Rhinebridge, responded that MS wanted "less stringent haircuts on HELs as LEAs."  Tab 34 at FITCH-RHINE 00052968.  Fitch ultimately succumbed to the pressure MS applied, allowing for haircuts as low as 3% on certain HELs.  Tab 35; Das Decl., ¶14.  And when Fitch conveyed that its existing SIV guidelines limited HEL as LEAs to 10% of the total portfolio, IKB responded: "This is probably not good news for bringing you all on board the SIV.  Please let me know if your guid[e]lines will be able to *stretch as far* as we are looking for."  Tab 37 at FITCH-RHINE 00052664.  Ultimately, Rhinebridge contained more than 60% HELs.  Tab 91 at MDYS RHNB 009379.

Finally, MS pushed the Rating Agencies to classify HELs as liquidity eligible assets ("LEAs") when HELs were in fact illiquid.  Moody's recognized that if it agreed to treat HELs as LEAs, "it is clear that our message to the market is that Moody's still view[s] HELs as liquid assets while the *reality is the opposite*."  Tab 38 at MDYS RHNB 009774.  Although treating HELs as

---

[2]     In March 2007, MS's Drennan "convinced" Moody's analyst Fanny Lau to "kill the rating language" and "to ignore" comments that she proposed for inclusion in the Rhinebridge Offering Memorandum over Lau's protest: "I feel very strongly that I would like to keep to the language in the current draft of the OM which is based on . . . Cheyne."  *See* Tab 29 at IKB000143917; Tabs 30-32.

LEAs when they were actually "illiquid" made Moody's "a bit uncomfortable," it nevertheless did so because, without those assets, the Rhinebridge SIV would not have been economically viable. Tab 425; Das Decl., ¶12. Dr. Das found that the SIV's high "concentration in HELs . . . made it crucial that these assets were treated as liquidity eligible (i.e., LEAs)." *Id.*, ¶14. As Dr. Das concluded, "if the HELs were excluded from LEAs," Rhinebridge would have failed its liquidity tests "at inception." *Id*. With those assets, however, the SIV was a ticking time bomb: "[i]f the portfolio had not held concentrated risk in HELs and CDOs, the SIV would have survived through the entire period." *Id.*, ¶9. Moody's primary analyst, David Rosa, now concedes that treating HELs as LEAs was "a mistake."

MS also pressured the Rating Agencies to use older, obsolete models that would produce higher ratings, instead of newer, more accurate models – a practice known as "grandfathering." Because of the widespread use of grandfathering, MS knew before Rhinebridge's launch that many of its underlying assets had been rated with outdated and inaccurate models that produced inflated ratings. Tab 39 at PSI-MOODYS-000056 ("***We appreciate your willingness to grandfather these transactions [under] Moody's old methodology***."); *see also* Tab 40 at MDYS ADCB 1030418 (When new guidelines are issued, affected ratings are usually grandfathered, "rather than downgraded").[3]

C.    **The Rating Agencies Defrauded Plaintiffs**

The Court held in *Abu Dhabi* that "[r]atings should best be understood as ***fact-based***

---

[3]    MS also pressured S&P to grandfather MS's deals, causing S&P executive, Elwyn Wong, to exclaim: "***Lord help our fucking scam*** . . . this has to be the stupidest place I have worked at." Tab 41 at PSI-SP-000192; *see also* Tab 42 at S&P-ADCB 0703695 (S&P: "If we want to pursue a client-friendly strategy (I have no problem with this) then I think we should simply grandfather the existing deals."); Tab 43 at S&P-IKB 0775676 (Despite releasing an improved CDO model, E3.0, S&P monitored CDOs under its outdated model: "All transactions that are rated on E2.4.3 will continue to be surveilled on E2.4.3.").

*opinions.*"  *Abu Dhabi*, 2012 WL 3584278, at \*10 (emphasis in original).  Under that standard, "[i]f

a rating agency **knowingly** issues a rating that is either unsupported by reasoned analysis or without

a factual foundation, it is stating a fact-based opinion that it does not believe to be true."  *Id.*

(emphasis in original).  As to scienter, "plaintiffs may demonstrate scienter with evidence that the

Rating Agencies issued the ratings recklessly."  *Id.* at \*12.

Defendants contend that plaintiffs must establish that the Rhinebridge rating committees

made the alleged misstatement with the requisite state of mind.  However, the false ratings were

statements made by the Rating Agencies, and not their employees.  These statements carried the full

weight and authority of the Rating Agencies, each of which repeatedly assured investors that its

ratings were objective and impartial.  Plaintiffs therefore need only establish a disputed issue of fact

that Rating Agency employees whose knowledge can be imputed to the Rating Agencies had the

requisite state of mind – "there is no requirement 'that the same individual who made the alleged

misstatement on behalf of a corporation personally possessed the required scienter.'"  *In re Marsh &

McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006); *Defer LP v. Raymond James

Fin., Inc.*, 654 F. Supp. 2d 204, 212 (S.D.N.Y. 2009) (same).

Defendants' reliance on *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital,

Inc.*, 531 F.3d 190, 195 (2d Cir. 2008), is misplaced.  *Dynex* stands merely for the legal principle

that, "[w]hen the defendant is a company, scienter refers to the state of mind of one or more of the

company's agents."  *In re Metlife Demutualization Litig.*, 262 F.R.D. 217, 234 (E.D.N.Y. 2009).[4]

As Judge Kaplan explained:

---

[4]       Defendants also cite *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y.
2011).  But in that case, the court concluded that the "significant evidence" of scienter admitted
against Vivendi, but not the individual defendants, could have led the jury to conclude that there was
sufficient evidence of scienter as to Vivendi, even if the jury was unable to conclude that the
plaintiffs met their burden of proof as to the individual defendants.  *Id*. at 549-53.

> There are good reasons for imputing the collective knowledge of employees or agents to their corporate principal. Doing so creates incentives for the entity to create and maintain effective internal communications and, more importantly, serves to protect third parties with which it does business.

*Defer*, 654 F. Supp. 2d at 218-19.

Recently, in *Pa. Pub. Sch. Emples. Ret. Sys. v. Bank of Am. Corp.* ("*BoA*"), No. 11 Civ. 733 (WHP), 2012 WL 2847732 (S.D.N.Y. July 11, 2012), the court rejected the same argument defendants advance here. In *BofA*, Judge Pauley analyzed *Dynex* and upheld the plaintiff's fraud claim, finding that the plaintiff's complaint raised a strong inference of scienter against Bank of America even though the allegations were not sufficient to allege scienter against the individual defendants that made the alleged false statements. *Id.* at *18-*19; *see Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) ("The fact that, on multiple occasions, employees of both companies are alleged to have performed their professional duties in a consciously wrongful or reckless manner establishes a 'strong inference' of corporate scienter.").[5]

Here, the evidence establishes that senior management at each Rating Agency directed and coerced its employees to sacrifice analytical integrity in order to maintain market share, knowing full well that inflated ratings on RMBS, CDOs and other structured products would be used to rate other securities, like Rhinebridge, that contained those assets. *See* §II.C.2. Under these circumstances, the

---

[5]      *See also*, *Richman v. Goldman Sachs Grp., Inc.*, No. 10 Civ. 3461(PAC), 2012 WL 2362539, at *12 n.10 (S.D.N.Y. June 21, 2012) (attributing scienter of head of mortgage department to corporate defendant); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009) ("the individual making an alleged misstatement and the one with scienter do not have to be one and the same"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236-37 (S.D.N.Y. 2010) (same); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, No. 10 Civ. 2835(NRB), 2011 WL 4357368, at *13 (S.D.N.Y. Sept. 19, 2011) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority."); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590-91 (S.D.N.Y. 2010).

Rating Agencies cannot escape liability for their fraud simply because senior management used their employees to carry out the scheme.  In any event, as discussed in §§II.A.-C., the members of the Rhinebridge rating committees knew the ratings were false when they were assigned.

1.    **The Rating Agencies Knew the Subprime Market Was Crashing but Assigned Top Ratings Anyway**

As set forth in §II.A. and §II.B, the evidence establishes that Rhinebridge was a carbon-copy of the fraudulent Cheyne SIV and all of the Rating Agencies succumbed to pressure from MS to assign top ratings.  In addition, by the time Rhinebridge launched, all of the Rating Agencies knew that assets Rhinebridge held were on the precipice of disaster:

> The evidence shows that analysts within Moody's and S&P were aware of the increasing risks in the mortgage market in the years leading up to the financial crisis, including higher risk mortgage products, increasingly lax lending standards, poor quality loans, unsustainable housing prices, and increasing mortgage fraud.  Yet for years, neither credit rating agency heeded warnings – even their own – about the need to adjust their processes to accurately reflect the increasing credit risk.

Tab 44 at 268 (April 13, 2011 report of the U.S. Senate Permanent Subcommittee on Investigations, entitled *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* ("Senate Report")).[6] Had the Rating Agencies properly incorporated the information they knew into their analyses, the Rhinebridge SIV never would have launched.  Das Decl., ¶¶9-10.

S&P:    Because the Rhinebridge SIV was based on the Cheyne SIV, S&P knew "there [was] no science behind" the Rhinebridge ratings.  Tab 45 at S&P-ADCB 0176951; *see also Abu Dhabi*,

---

[6]    The Senate Report reflects "factual findings from a legally authorized investigation" and is therefore admissible pursuant to Fed. R. Evid. 803(8)(A)(iii).  Tab 44 at 1-2.  In *In re Wash. Mut. Mortg. Backed Sec. Litig.*, No. C09-37 (MJP), 2012 WL 2995046, at *8 (W.D. Wash. July 23, 2012), the court denied defendants' motion to strike the Senate Report in connection with a motion for summary judgment, finding the Senate Report admissible under Fed. R. Evid. 803(8)(A)(iii) because it "contain[s] factual findings from a legally authorized investigation."  In so holding, the court rejected defendants' argument "that because the report is politicized, it is inherently untrustworthy" and noted defendants' failure to "point[] to anything specific to this report that suggests it is untrustworthy."  *Id.*

2012 WL 3584278, at *12.  Rhinebridge adopted a model which itself was derived from a "paucity of historical data, especially for single ABS sectors."  Tab 46 at S&P-ADCB 2661015; *see also* Tab 47 at S&P-ADCB 3096898 ("[F]rom looking at the numbers it is obvious that we have just stuck our preverbal [sic] finger in the air!"); *Abu Dhabi*, 2012 WL 3584278, at *12.[7]

As early as 2005, long before Rhinebridge launched, S&P was tracking the developing residential real estate "'bubble.'"  Tab 52 at S&P-ADCB 2595538.  S&P knew that if "the 'bubble' bursts then a large number of rating downgrades may occur."  *Id*.  This, in turn, would "lead to high negative rating volatility and potential skepticism of the rating."  *Id*.  Incredibly, however, as the subprime bubble got larger and larger, S&P did not update its SIV methodology to account for the increased risk.  Das Decl., ¶¶22-29; Tab 9 at 45:25-48:14.  Instead, S&P used the same flawed methodologies and assumptions it had developed years earlier for the Cheyne SIV.  *Id*.; *see also Abu Dhabi*, 2012 WL 3584278, at *11.

S&P knew that "there ha[d] been ***rampant appraisal and underwriting fraud*** in the industry for quite some time as pressure . . . mounted to feed the origination machine."  Tab 39 at PSI-SP-000091.  Numerous documents evidence S&P's awareness of "[r]ising [d]elinquencies" and "[n]ightmare [m]ortgages" underlying RMBS assets such as those held by the Rhinebridge SIV.  *Id*. at PSI-SP-000110, PSI-SP-000116, PSI-SP-000131, PSI-SP-000395.  By February 2007, S&P was feeling "serious pressure to respond to the burgeoning poor performance of sub-prime deals" and

---

[7]     *See also* Tab 48 at S&P-ADCB 0378263 ("Given the relative paucity of historical data, and the very low number of defaults observed in most ABS asset classes," Kai Gilkes did not believe it was possible to calculate default rates "with a level of accuracy even close to that of corporate issuers"); Tab 49 at S&P-ADCB 0534880 (In February 2005, S&P noted that "we did not have sufficient historical data to accurately determine the true transition and default behaviour of the underlying corporates"); Tab 50 at S&P-ADCB 0069460 (S&P discusses the RMBS curve in the Cheyne SIV model: "a lot of blood, sweat and tears went into those numbers and ***we really compromised a lot***"); Tab 51 at 243:12-244:22; Tab 44 at 288.

- 11 -

recognized internally that subprime RMBS ratings were "not going to hold through 2007." *Id.* at PSI-SP-000280-81; *see also* Tab 53; *id.* at PSI-SP-000163; Tab 54 at S&P SEN-PSI 0001467.

S&P's concern about the subprime market went all the way to the top.  In S&P's June 2007 Board of Directors Report, the Chairman of S&P's board observed that "[t]he meltdown in the subprime mortgage market will increase both foreclosures and the overhang of homes for sale."  Tab 55 at 19666913.  S&P's Chief Credit Officer, Cliff Griep, was directed to conduct an analysis of S&P's "Vulnerabilities In A Downturn."  Tab 56 at S&P-ADCB 0412873.  Griep's June 15, 2007 assessment, prepared only two weeks before Rhinebridge launched with an A-1+ rating from S&P, included the following observations: (1) structured finance had "come to dominate" S&P's entire business; (2) S&P was vulnerable to "management pressures to maintain or grow market share while also growing margins"; (3) limited historical data created "a risk that the default experience of the ratings could be understated"; and (4) subprime securitizations created "sector risk that dominates our structure finance ratings universe."  *Id.* at S&P-ADCB 0412873-76; Tab 57 at 420-428.

Members of the S&P team that rated the Rhinebridge SIV admitted that they knew of but ignored problems in the subprime market completely: "No, I am not aware of those things having an impact on our thinking on the [Rhinebridge rating] process."  Tab 9 at 152:9-154:15, 169:9-24. They also knew S&P was going to downgrade hundreds of subprime RMBS.  *Id.* at 160:23-161:19. The impending downgrades were discussed "within the structured finance rating group," but still, S&P did not deviate from its Rhinebridge model or assumptions.  *Id.*[8]

In May 2007, the month before Rhinebridge launched with A-1+ CP, Perry Inglis, who was

---

[8]      Although S&P's "***CDO*** team recognized potential weakness in RMBS ratings in 2006. . . .[,] notching down ratings of US RMBS going into CDOs . . . was not considered given that it would imply a lack of agreement with our own internal view."  Tab 58 at S&P-ADCB 2749226.  Lapo Guadagnuolo, S&P's lead analyst on Rhinebridge, was "part of the ***CDO*** and SIV team."  Tab 9 at 151:4-16.

the Rhinebridge SIV Committee Chairperson, Practice Leader and Team Leader (*see* Tab 59), presented "a market and performance forecast" that focused on the "[c]hallenging landscape for the residential mortgage market," including "(i) [u]nderwriting guidelines stretched too far"; (ii) "[s]lowing home price appreciation ('HPA') rates"; (iii) "[e]arly payment defaults"; (iv) "[f]inancial distress"; (v) "*[s]tress on 2006 loans*"; and (vi) "*[i]ncreased ratings transitions* – [c]redit watch, *downgrade actions* as a result of defaults." [9]  *See* Tab 62 at 1886351; Tab 63 at 0745396.

Inglis, Guadagnuolo, and the rest of the Rhinebridge rating committee simply ignored this information.  Despite its knowledge that "data becomes worrying beyond 3yrs" due to "lack of issuance and trading volumes for 3-5yr and 5-yr+ HELs" (Tab 36 at S&P-IKB 0030071), S&P used the same (incorrect) ratings transition, correlation, and price volatility data that it used to rate Cheyne.  Tab 9 at 76:11-78:4, 83:20-84:9.  It also used the same faulty matrix for the critical determination of how much capital would be required to protect the CP.  *Id.* at 86:18-25.  Knowing that its (already woefully insufficient) data and methodologies had been rendered even more obsolete by 2007, S&P could not reasonably rely on that data in rating the Rhinebridge SIV.  *Abu Dhabi*, 2012 WL 3584278, at *11-*13.  Tab 64 at PSI-SP-000144; Das Decl., ¶¶22-29.  As Dr. Das found, had S&P incorporated the appropriate (and available) data, the Rhinebridge SIV would not have been around for plaintiffs to purchase.  Das Decl., ¶6.

Moody's:  Moody's simply copied the Cheyne model, which had "no actual data backing the current model assumptions."  Tab 65 at MS_000695505-06; *Abu Dhabi*, 2012 WL 3584278, at *11.

---

[9]  Inglis had known for years that S&P's structured finance ratings were unsupported.  In an April 2005 presentation Gilkes warned S&P executives, including Inglis, that the "Current Reality" was that (i) "[m]odel development [was] somewhat 'ad-hoc'" (ii) there was "[t]oo much reliance on bankers' models" (iii) "Little or No Strategic Research" (iv) "[w]e create new model risks every day" and (v) "[w]e can produce a rating, but have very little idea how sensitive those ratings are to market developments or model assumptions."  Tab 60 at S&P-ADCB 0956742; Tab 61 at 474:14-481:7.

Furthermore, Moody's had "no company-wide guidelines or standards for methodologies," and "[t]here wasn't enough historical data on new variants of adjustable rate loans to allow for reasonable predictions of performance." Tab 66 at MDYS ADCB 289185. Moreover, the "[l]ayering [of] risks" embodied in Moody's models gave "rise to '**perfect storm**' situations." *Id.* The model's creation was ad hoc – as MS's lead structurer Gregg Drennan acknowledged: "Moody's will fix the inputs to get the outputs they want!" Tab 67 at Z0404422. For Rhinebridge, MS informed Moody's that "we do not have enough data to parameterise the majority of the input points required." Tab 68 at MDYS RHNB 050501. Moody's executives, including Henry Tabe, the managing director responsible for the Rhinebridge SIV rating process, were warned that SIV risks were not properly accounted for in the SIV rating model. Tab 69; Tab 70 at 240:20-248:9. But Tabe routinely, "disregarded the [SIV model] output and made up haircuts that were palatable to SIV issuers." Tab 71 at 56 ("nothing about SIVs added up").

Moody's had "a significant concern" about subprime RMBS, which were suffering from "significant foreclosures and REOs." Tab 72 at MDYS ADCB 294189.[10] In March 2007, members of Moody's Rhinebridge rating committee had internal communications about the "recent high default trend of the US Subprime mortgages" and observed "spread widening in the US RMBS sector, the price of A and Aa HEL have shown [a] decrease in price to a certain degree." Tab 75 at MDYS ADCB 080002. Moody's also met with IKB in March 2007 "to discuss the sub-prime housing market from the perspective of the rating agencies." Tab 76 at IKB 00016326. Moody's told IKB that it was "not surprised by the deterioration of the subprime market" and that "subprime

---

[10]     *See also* Tab 73 at MDYS ADCB 1273324 ("Challenges for 2007" include "[c]ompetitive issues" such as "[r]ating inflation, successful rating shopping . . . [h]igher than expected rating transition in Home Equity and RMBS"); *id.* at MDYS ADCB 1273335 ("SIV team moved to Derivatives headed by Henry Tabe."); Tab 74.

borrowers [we]re at a 'tipping point.'"[11] *Id*. Thus, even before Rhinebridge launched, Moody's was monitoring certain SIVs "closely," "given their exposures to US su[bp]rime." Tab 81.

By June 6, 2007, Moody's was discussing internally "increased amount of lying on income, increased amounts of occupancy misstatements." Tab 82. The week before Rhinebridge launched, Moody's President Brian Clarkson was advised that "most players in the market" believed that subprime would "perform extremely poorly," and "even some Aaa original rating may end up taking a loss." Tab 83. These problems were "quite serious." *Id*. Still, "the structured group refused to change their ratings in the face of overwhelming evidence that they were wrong." Tab 84 at MDYS ADCB 935121.

By June 27, 2007, the day Rhinebridge launched, Moody's was already planning to downgrade hundreds of subprime, and even "Alt A," RMBS. Tab 85. That day, Moody's called Countrywide to warn the subprime originator that deals were going to be downgraded – "[Countrywide's] only reaction was: ***it is systemic***," a fact Moody's already knew. *Id*.

Moody's acknowledged, when first approached by IKB to rate the Rhinebridge SIV, that "[a]s part of the market trend robust risk analytics will be necessary to meet the range of instruments being managed." Tab 86 at MDYS RHNB 010215. Instead, as Moody's analyst and Rule 30(b)(6) designee, David Rosa, testified, "what we had done [in rating Rhinebridge] was ***exactly*** as we had rated other SIVs before." *See, e.g.*, Tab 11 at 16:22-17:3.

As discussed in §II.B., *supra*, Moody's acquiesced to MS's demand that the haircuts "should

---

[11]    IKB executive Bauknecht authored numerous research reports expressing serious concerns regarding subprime RMBS and housing market developments. Tab 77 at MS_RHI_000094757 ("liquidity tightening in the broader US mortgage market and not just sub prime is ***inevitable*** and has been ***predictable for some time***"); *see also* Tab 78 at IKB002242099; Tab 79. While these reports "were not intended for external publications," Bauknecht discussed the reports and concerns raised in them with Fitch, Moody's, S&P and MS. Tab 80 at 182:13-187:11.

stay the same" as those used in Cheyne, even though Moody's had two additional years worth of data.  *See* Tab 27; Tab 28 at MDYS RHNB 011610; Tab 12 at MDYS RHNB 050532.  Rosa admitted that the haircuts used to rate the Rhinebridge CP were "if not identical, very similar" to those used in Cheyne despite that Rhinebridge was rated two years later.  Tab 11 at 105:21-106:16.  In fact, they were identical.  Tab 12.  As plaintiffs' expert, Dr. Sanjiv R. Das explained in *Abu Dhabi*, the haircuts used to rate the Cheyne SIV CP "used aggressive parameters that resulted in lower levels of capita than required," were formulated with "minimal" data, and resulted in reserved capital being understated by 17%.  *Abu Dhabi*, Dkt. No. 455, ¶¶6, 25.  Dr. Das found Moody's use of the identical haircuts for Rhinebridge was even more inappropriate given "defendants' recognition of changes in market conditions."  Das Decl., ¶25.

Further, despite Moody's knowledge that HELs were not LEAs, as the market for HELs was completely "illiquid," Moody's succumbed to the pressure MS exerted on it, ultimately agreeing to treat HELs as LEAs.  *See* §II.B., *supra*.  Rosa conceded in an internal August 2007 e-mail that treating HELs as LEAs was "a mistake."  Tab 38 at MDYS RHNB 009774.  As the Court found in *Abu Dhabi*, "although the Cheyne SIV contained a high percentage of RMBSs, ***[Rosa] had little knowledge of the U.S. RMBS market when he rated Cheyne*.**"  2012 WL 3584278, at *11.  Rosa's lack of understanding of the U.S. RMBS market is equally problematic here because the Rhinebridge SIV held even more RMBS than the Cheyne SIV.  Tab 22.[12]

---

[12]     *See also* Tab 87 at Z0406293 (Rosa complained to MS about "the lack of relevant data" that would require "a lot of reliance in interpolation"); Tab 88 at 283:2-288:5 (Rosa testified he did not have data to analyze HELs and HELOCs); Tab 89 at 76:6-78:25 (AAA RMBS assets "did not have a track record [in a liquidity crisis], . . . but . . . neither did any asset class within structured finance"); Tab 66 at MDYS ADCB 289185 (senior Moody's executive admitted that "[t]here wasn't enough historical data on new variants of adjustable rate loans to allow for reasonable predictions of performance"); Tab 90 at MDYS ADCB 368823 (Moody's stated, "We feel, as usual, that currently we are near the edge with our models and continue to have concerns . . . .").

During the week of July 23, 2007, Henry Tabe and other Moody's analysts involved in rating Rhinebridge met with IKB CAM.   During the meeting, IKB "acknowledged that their SIV, Rhinebridge, is an **outlier** in relation to sub-prime exposure (60% broad RMBS vs. 23% average SIV)." Tab 91 at MDYS RHNB 009379.[13]   IKB told Moody's that it "fear[ed] that there may be minor test breaches to put them into Restricted Investments (leading to seizure of asset purchases, non-payment of incentive fees to IKB, or profits to equity holders) should the situation continue to worsen." *Id.* at MDYS RHNB 009379-80.   Although Moody's knew the Rhinebridge SIV was on the brink of failing tests, Moody's merely "warned" IKB that action **might** be taken. *Id.* at MDYS RHNB 009380.   However, Moody's did not put the ratings on watch or warn potential investors of the SIV's imminent collapse. *Id.*

    Fitch: Fitch observed that the "poor early deal performance" and "struggles and failures of subprime lenders" were "resulting in rapidly falling ABX-HE index prices" – an index that tracked the price of HEL assets.   Tab 93 at FITCH-RHINE 00128249.   By March 2007, Fitch also "**expect[ed] delinquencies and losses of the 2006 subprime vintage to reach and perhaps surpass** those of earlier vintages during previous market downturns." *Id.*

    On April 2, 2007, Fitch issued a report stating that "[a] slowdown in home price appreciation in the second half of 2006 led to an increase in delinquencies." Tab 94 at FITCH-RHINE 00104008. Fitch assured investors that these developments "spark[ed] **intense scrutiny** [by Fitch] of subprime RMBS in CDOs." *Id.*   Stefan Bund, the head of European Structured Credit at Fitch, testified that this "intense scrutiny" applied to transactions, such as the Rhinebridge SIV, that included subprime

---

[13]      By August 2007, as Moody's began heightened monitoring of the Rhinebridge SIV, it recognized that "almost **95%** of the portfolio comprised of assets with direct/indirect RMBS exposure" with "[n]early **50%** of the portfolio . . . comprised of HELs." Tab 92 at MDYS RHNB 008364.  With respect to these figures, Rosa testified that "[t]here is nothing here that is surprising." Tab 11 at 166:33-168:8.

RMBS.  Tab 95 at 128:10-129:13.  The Fitch report described the 2005-2006 vintages of RMBS as "very poor" and expected downgrades of those assets in the second-half of 2007.  Tab 94 at FITCH-RHINE 00104009.  Yet, fewer than two months later, Fitch assigned top ratings to the Rhinebridge SIV, which had a high concentration of subprime RMBS and CDOs, including many with 2005-2006 vintages.

When Paddy Clerkin and Glenn Moore, the two primary Fitch analysts assigned to Rhinebridge, first learned that the SIV was "going to be 60% HEL," and that IKB was asking that HELs be treated as LEAs, Moore remarked that the vehicle "does not appear to be a SIV."  Tab 37 at FITCH-RHINE 00052662.  Clerkin responded  that "60 percent in one asset category does seem aggressive," that he had "not heard of HELs as LEAs," and that "IKB are **pushing the boundaries** of what the market understands a SIV to be."  *Id.*  In April 2007, Glenn Moore was asked to help identify the "raciest asset pools" because "to make the economics [of the Rhinebridge SIV] work," there needed to be "a larger weighting in 'riskier' basket of ABS assets e.g. CDO's [sic]."  Tab 96. Two months later, however, Fitch's Rhinebridge rating committee, on which both Clerkin and Moore served, assigned F-1+  ratings to the CP.  *See* Das Decl., ¶¶5-6; Tab 14 at 75:1-20. According to plaintiffs' quantitative modeling expert, Dr. Sanjiv Das, without this high concentration of risky mortgage-related instruments, particularly HELs and CDOs, the SIV would not have failed in the second-half of 2007.  Das Decl., ¶6.

Fitch also rated the Rhinebridge SIV knowing that Fitch lacked sufficient data to do so.  For example, Fitch simply "cut and paste[d]" S&P's haircut matrices, which were established two years prior in connection with Cheyne – an SIV that Fitch **refused** to rate.  Tab 13 at FITCH-RHINE 00047588; Tab 14 at 116:17-117:14; *see also* Tab 15 at S&P-ADCB 0001317 (showing S&P's haircut matrices in the Cheyne SIV's 2005 Operating Manual were identical to those approved by

the Fitch committee).  Indeed, Moore testified that he did not conduct any analysis of the haircut matrices.  Tab 14 at 116-117.  Further, in Fitch's final Rhinebridge committee memorandum, Moore admitted that Fitch's ***HEL volatility assumptions (a critical metric) were "arbitrary" and "not reflective of the actual HEL market.***"  Tab 97 at FITCH-RHINE 00053854-55.

Fitch contends that it conducted extensive analysis of the Rhinebridge SIV's underlying assets.  But in reality, Fitch's RMBS ratings group simply verified the ratings and originators of the RMBS Rhinebridge contained.  Tab 14 at 100:5-102:2.  Fitch performed no further analysis.  In fact, Glenn Costello, Co-Head of Fitch's RMBS group, informed Moore that he was not familiar with "SIV rating criteria and unfortunately [did] not have the resources to provide the kind of writeup [Moore was] asking for."  Tab 98 at FITCH-RHINE 00052882.  Further, Fitch knew that there was insufficient data underlying RMBS and CDO ratings, which were a key driver of the Rhinebridge SIV's ratings.  *See, e.g.*, Tab 99.

Finally, Fitch claims that it rated the Rhinebridge SIV with "independence and integrity" based on a single e-mail in which Fitch declined to grant a waiver to IKB for a certain test.  Of course, Fitch omits the fact that, in the same e-mail, Fitch granted a waiver to IKB.  *See, e.g.*, Tab 100 at IKB000284915 ("In terms of minimum WAL requirements ***a waiver is an entirely reasonable request***.  Will 3 months be sufficient?"); *see also* Tab 101 at FITCH-RHINE 00058554 ("The proposed changes and waivers to tests [sic] limits have been agreed.").  Fitch also claims that, because it ran "hundreds of thousands of simulations through its model," it could not have acted with scienter.  But the number of simulation model runs conducted by Fitch is completely irrelevant here because the simulation model was used to rate only the Rhinebridge SIV's capital notes, not the CP at issue in this case, which were rated based on capital matrices "cut and paste[d]" from Cheyne.  Tab 102 at FITCH-RHINE 00001470; Tab 14 at 116:17-117:14.

## 2.    The Rating Agencies Knew that Rhinebridge CP Was Inflated Because the Ratings on the Underlying Assets Were Inflated

Because the Rating Agency defendants fraudulently structured and rated the assets that comprised Rhinebridge, the top ratings assigned to the CP were necessarily false and misleading.  A SIV is by definition only as strong as the assets it holds.  The Rating Agencies knew that the mortgage-backed assets supporting Rhinebridge were shoddy, because the Rating Agencies had access to non-public information about the collateral underlying Rhinebridge from their involvement in rating these deals.  The Rating Agencies lowered their standards and used inaccurate and unreliable data to stamp out high ratings on mortgage-backed securities in a constant pursuit of greater market share and higher profits.  This, in turn, resulted in inflated ratings on the Rhinebridge SIV.

The Rating Agencies recognized at the highest levels that the ratings on one type of asset would impact the ratings on many other assets.  As Joanne Rose, S&P's Global Practice Leader for asset backed securities, recognized: "Most of the decisions we make have an impact beyond the immediate transaction, asset type, country, or region."  Tab 103 at S&P-ADCB 0315444.  The Rhinebridge SIV rating analysis was heavily dependent on the false ratings assigned to the SIV's underlying assets.  S&P testified that "[t]he element that we would have look at in order for us to look at the creditworthiness of the [SIV's underlying] assets would have been mainly the rating of those assets."  Tab 9 at 61:20-63:6, 64:24-66:8; *see also* Tab 104 at 467:6-468:21 ("I was just trying to convey the obvious.").  Fitch testified that the "primary inputs to the . . . SIV model were the – the asset and rating information on the underlying assets."  Tab 105 at 97:12-98:4; *see also* Tab 14 at 97:1-98:2.  Moody's testified that the ratings on the underlying securities were one of two factors Moody's took into consideration when rating the CP.  Tab 106 at 285:21-287:8.

The Rating Agencies subjugated their rating criteria to market share.  S&P represented

publicly that "[i]ndependent and objective information is what professionals expect and get from us. Respect for the integrity of information is part of our company's makeup."  Tab 107 at 2, 4. However, S&P's internal documents tell a different story.  S&P consistently sacrificed its analytical integrity in a never ending pursuit of market share.[14]

Moody's also promised that "[t]he determination of a Credit Rating will be influenced only by factors relevant to the credit assessment" and "Moody's will separate its Credit Rating business and Analysts from other businesses that may reasonably present a conflict of interest."  Tab 118 at MDYS ADCB 600692.  However, Brian Clarkson, Moody's President, acknowledged that market pressure influenced Moody's ratings: "Competitive issues (ex. ***Rating inflation, successful rating shopping***, notching below investment grade for mono-line insured deals, etc.)."  Tab 73 at MDYS ADCB 1273324.[15]

As Kai Gilkes (S&P's most senior quantitative analyst in Europe) testified, the false ratings on RMBS and CDOs resulted in false ratings on SIVs:

> [I]t is a factual statement that the ratings of those [structured investment] vehicles were inappropriate because the ratings of the underlying assets were not appropriate. So it leads to the conclusion that they should not have been rated, but that is not necessarily my – is not necessarily my belief. It is just a factual statement.

Tab 141 at 105:7-106:7.

---

[14]     *See* Tab 108 at PSI-SP-000226; Tab 109 at 51:18-23, 80:24-85:9; 87:1-9, 89:7-9, 107:2-109:7, 184:14-186:1, 192:21-193:9; Tab 51 at 241:5-244:22, 266:16-273:11, 282:7-283:3, 323:20-333:16; Tab 110 at S&P-ADCB 0461730; Tab 111 at S&P ADCB 0967342; Tab 112 at S&P-ADCB 0967791; Tab 113 at S&P-ADCB 0956089; Tab 114 at PSI-SP-000192; Tab 39 at PSI-SP-000015; Tab 39 at PSI-SP-000045-46; Tab 44 at 26-27, 243-244, 247, 272-275; Tab 52 at S&P-ADCB 2595538; Tab 115 at S&P-ADCB 0733219, S&P-ADCB 0733223; Tab 116 at 1; Tab 117 at S&P-ADCB 2658265.

[15]     *See also* Tab 119 at MDYS ADCB 305352-53; *see also* Tab 120 at 589:6-598:10; Tab 121 at 62:3-12; Tab 122; *see also* Tab 123 at 360:2-361:9, 367:25-368:25; Tab 44 at 26-27, 243-244, 247, 272-275; Tab 123 at 140:4-148:2; Tab 124 at MDYS ADCB 1179241; Tab 125 at MDYS ADCB 1316459, MDYS ADCB 1316452; Tab 90 at MDYS ADCB 368823-24; Tab 39 at PSI-SP-000235; Tab 39 at PSI-MOODYS-000056; Tab 126 at S&P-ADCB 0571141.

For the Rating Agencies, the ratings on structured products like CDOs and SIVs were "cash cow[s]." Tab 131 at MDYS ADCB 998832;[16] *see Abu Dhabi*, 2012 WL 3584278, at *13 (finding evidence that the Rating Agencies considered structured finance ratings "'cash cows'" to be indicative of motive). They understood that if they refused to assign the top ratings sought by MS, MS would simply take its business elsewhere. In a 2004 internal e-mail, Moody's President Brian Clarkson candidly summed it up: "in the ABS market: the issuer could take its business elsewhere ***unless*** the rating agency provides a higher rating." Tab 142 at MDYS ADCB 1261874 (emphasis in original). S&P and Moody's assigned top ratings to the Rhinebridge SIV because they received three times their normal corporate rating fees for rating the SIV. *See* Tabs 127-129; Tab 130 at S&P-ADCB 0532881 ("Rating agencies charge nearly three times as much for structured finance ratings as they do for corporate bond work . . . ."). As S&P's Raiter testified, "there was a big breakdown between the people that were trying to maximize profits and the people that were trying to maximize the credit ratings methodology and activities. And that the people with the profit motive won." Tab 51 at 271:22-272:3, 272:12-273:3. Motive is established where, as here, the ratings fees would have been "significantly diminished" had the SIV not closed. *Abu Dhabi*, 2012 WL 3584278, at *13; *see also* Tabs 127-129.

Fitch, too, succumbed to market pressures. Although Fitch refused to rate the Cheyne SIV because it believed the top ratings that MS required were not justified,[17] by 2007, Fitch was "desperate" to gain a foothold in the lucrative SIV market. Tab 136 at IKB000285698. In 2006, Fitch began actively "chasing" SIV business (Tab 137 at FITCH-RHINE 00055916), and developed

---

[16]     Tab 132 at MDYS ADCB 992564; Tab 130 at S&P-ADCB 0532881; Tab 44 at 30-31, 244; Tab 133 at CRDT_RTG_EXH_0000019.

[17]     *See* Tab 134 (Fitch "felt that it was going to be difficult to get approved/rated at the desired levels"); Tab 135 at FI-ABUDHABI 00041(describing the "Cheyne[] programme" as "difficult to approve").

- 22 -

a "[s]trategy of gaining market share" in the rating of SIVs, which included "target[ing] new entrants" like IKB.  Tab 138 at FITCH-RHINE 00062622-28.  By November 2006, Fitch was so "desperate" (Tab 136 at IKB000285698) to rate the Rhinebridge SIV that it offered to "heavily discount" its rating fee, describing the fee as "significantly less than the standard fees for these types of complex ratings."  Tab 139 at FITCH-RHINE 00055961.  Of course Fitch did not discount its fee out of the goodness of its heart.  Tab 136 at IKB000285698.  Rather, **Fitch did** "**exactly what we need in order to prove ourselves and secure our place at the SIV table**" (Tab 140 at FITCH-RHINE 00057448), *i.e.*, slap top ratings on a copycat of the SIV it had previously refused to rate.  Tab 95 at 30:1-40:10.

In short, "plaintiffs have presented evidence that the Rating Agencies had incentives to issue top ratings, regardless of whether those ratings were supportable."  *Abu Dhabi*, 2012 WL 3584278, at *13.

### D.    MS Aided and Abetted the Rating Agencies' Fraud

"To avoid summary judgment on the aiding and abetting claims, plaintiffs must provide evidence that Morgan Stanley had actual knowledge of the Rating Agencies' fraud."  *Abu Dhabi*, 2012 WL 3584278, at *22.  In denying MS's motion to dismiss, this Court previously explained why plaintiffs' allegations met that standard:

> In reinstating plaintiffs' aiding and abetting claims in *Abu Dhabi*, I found sufficient allegations of Morgan Stanley's actual knowledge of the underlying fraud where plaintiffs pled that Morgan Stanley: knew the credit ratings were false; possessed actual information that contradicted the high ratings that the SIV had received; knew the ratings process was flawed; knew the portfolio was not a safe, stable investment; and knew the Rating Agencies could not issue an objective rating because of the effect it would have on their compensation.

*King Cnty. v. IKB Deutsche Industriebank AG*, 751 F. Supp. 2d 652, 664 (S.D.N.Y. 2010).

In support of its motion to dismiss, MS argued then, as it does again here, that plaintiffs must

show that MS *knew* that the Rating Agencies *knew* that the ratings were fraudulent when issued. MS's "semantic argument" is no more compelling now than when the Court found it "unpersuasive" nearly two years ago:

> The FAC also alleges that Morgan Stanley worked *in tandem* with IKB and the Rating Agencies to construct an investment vehicle whose junk assets (supported by junk equity) belied its high ratings – ratings that were achieved in part by Morgan Stanley's actively assisting the Rating Agencies by (1) manipulating its models and (2) convincing them to "grandfather" the Rhinebridge SIV.  A defendant's active participation in fraud creates more than a reasonable inference that it had knowledge of it.

*See id.* at 664-65 (emphasis in original).[18]  As described below and in §II.B., *supra*, the evidence shows that MS possessed actual information that the ratings were false and misleading, including evidence that MS convinced the Rating Agencies to manipulate their models and to "grandfather" the assets in the SIV.  Nothing more is required to show that MS had actual knowledge of the Rating Agencies' fraud.

MS also shrugs off this Court's prior ruling regarding substantial assistance:

> In reinstating plaintiffs' aiding and abetting claims in *Abu Dhabi*, I found sufficient allegations of Morgan Stanley's substantial assistance where plaintiffs pled that:  Morgan Stanley and the Rating Agencies together designed, structured, marketed and maintained the Cheyne SIV; Morgan Stanley disseminated the false and misleading ratings with the knowledge, participation, and approval of the Rating Agencies; and the Rating Agencies issued the false and misleading ratings with the assistance of Morgan Stanley.

*King Cnty.*, 751 F. Supp. 2d at 665.  The Court concluded: "***These allegations also sufficiently***

---

[18]     While MS cites *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (2008), that federal securities fraud case had nothing to do with aiding and abetting fraud.  *Id.*  Rather, in *Tellabs*, the Court explained: "The Supreme Court has declined to incorporate common law principles root and branch into section 10(b) of the Securities Exchange Act (and hence into Rule 10b-5), and specifically has rejected aider and abettor liability."  *Id.* at 708 (citing *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994)).  Equally meritless are MS's corporate scienter arguments.  *See* §II.C., *supra*.

*plead proximate causation*." *Id.* at 665-66.[19]  As set forth below and in §II.B., *supra*, the evidence

shows that MS affirmatively assisted the Rating Agencies to assign the false and misleading ratings.

Accordingly, there is a genuine issue of disputed fact as to MS's substantial assistance that precludes

summary judgment.

MS played the same role in Rhinebridge that it did in Cheyne.  MS copied the Cheyne SIV

and pressured the Rating Agencies to assign false and misleading ratings.  *See* §§II.A.-B., *supra*.

MS arranged, structured and acted as the placement agent for Rhinebridge SIV.  Tab 143 at 54:3-

64:6.  In fact, it was the "very senior people at Morgan Stanley" who were involved in arranging the

Rhinebridge SIV.  *Id.* at 28:12-31:5.  MS also was involved in purchasing the assets the SIV would

hold.  *Id.* at 54:23-55:10.  Further, MS negotiated with the Rating Agencies to obtain the rating

desired on the Rhinebridge SIV.  Tab 144 at MS_RHI_000258501; *see also* §§II.B.-C., *supra*.  In the

summer of 2007, MS prepared marketing information and made multiple presentations "to inform

investors about a potential investment that they may wish to consider in Rhinebridge SIV senior

notes."  Tab 143 at 121:18-124:18.

MS knew *before* plaintiffs purchased the CP that the Rhinebridge SIV was on the verge of

collapse and that its CP did not merit a AAA rating.  In January 2007, MS's Gregg Drennan

predicted that Moody's would assign Rhinebridge's risk strategy a score of 2 (the grade was on a

scale of 1 to 5, with 5 being the top score).  Tab 147.  Drennan recognized that the low grade was

warranted because Rhinebridge had a "*riskier portfolio than most sivs*."  *Id.* at

MS_RHI_000256588-0001.  In February 2007, S&P warned MS that there was not enough capital in

the Rhinebridge structure to protect against losses to the CP in the event of defeasance.  Tab 148.  In

---

[19]     For this reason, MS's argument that MS did not proximately cause plaintiffs' losses fails here
for the same reason the Court rejected it on the motion to dismiss.

March 2007, MS observed "a great deal of turbulence in the subprime mortgage sector and CDOs." Tab 149 at IKB000657090. That same month, IKB told MS's Diana Fezer: "The whole project [Rhinebridge] is getting the smell of a d[i]saster." Tab 150 at IKB003025369.

In May 2007 – before launching the Rhinebridge SIV – MS was aware that the underlying assets in the Rhinebridge portfolio were rapidly deteriorating and losses on those assets were being masked by inaccurate pricing information. In May 2007, MS's Jonathan Horowitz wrote to Tim Armstrong: "Guys, I don't want to send the historical pricing to investors. . . . [I]t will cause people to ask more questions. . . . *[W]e need to know how much underwater the purchased portfolio is to date*." Tab 151 at MS_RHI_000089036. MS knew the severity of the impairment to the Rhinebridge portfolio because it provided inflated prices on Rhinebridge's riskiest assets. Tabs 152-153. In order to conceal the fact that Rhinebridge was "underwater" and thereby ensure that the SIV would launch, MS trader, Brett Kalesky, was told to "*work his magic*" when providing prices on 99 of the 101 riskiest HEL assets transferred into the Rhinebridge SIV from IKB. Tab 151 at MS_RHI_000089036; Tab 152 at IKB 000125654.

MS had such grave concerns about the Rhinebridge SIV that – just days before it launched – *MS stripped all information identifying MS as the arranger* from the CP Private Placement Memorandum ("PPM"). *Compare* Tab 154 at MDYS RHNB 041365 (on June 25, 2007, MS is identified as the arranger in the PPM) *with* Tab 155 at S&P-IKB 0050286 (later that day, MS deleted information identifying it as the arranger from the PPM). Before plaintiffs purchased their notes, MS acknowledged internally that "pricing represent[ed] the weak link" because "RMBS/Sub Prime issues are miss [sic] priced." Tab 156 at MS_RHI_000249219. MS knew that "even if [the price is] off by $.05/$ it *means that CP investors are not adequately protected*." *Id*. Morgan Stanley itself "*never approved Rhinebridge for purchase*" *by its own money market funds*. Tab 157 at

MS_RHI_000296478.

By mid-July 2007, MS had grown increasingly concerned about the toxic subprime assets held by Rhinebridge and concluded that these assets were "dicier/more leveraged" than even Cheyne. *See* Tab 158 at MS_000732119. On July 10, 2007 – less than two weeks after launching Rhinebridge – MS's CDO trader, Jeff Dudas, expressed concern that the value of the assets underlying both the Cheyne SIV and the Rhinebridge SIV were inflated: "No matter how you view it, mark[s on the assets underlying SIVs] should be lower." Tab 159 at MS_000622539.[20] As a result, he warned his superior, Erik Siegel, and recommended that MS ***stop selling new bonds***: "it's riskier than it is valuable for MS to continue selling new bonds." Tab 161 at MS_000622767.[21] But, MS continued to sell "new bonds" even though it knew that the ratings on the Rhinebridge SIV were based on non-existent or unreliable data.

A week later – still ***before*** plaintiffs purchased their Rhinebridge CP – MS was "convinced" that the Rhinebridge SIV was on the verge of collapse. Tabs 158, 163-165.[22] On July 18, 2007, MS warned IKB: "As you can see, the Minor Capital Loss Test appears ***close to being breached***, which would put you into Restricted Investments, and the Major Capital Loss Test also appears close . . . ." Tab 163. That same day, MS's Senior Managing Director, Steve D'Agostino, was "***convinced the***

---

[20]     In light of the plummeting asset values, MS put in place a structure to "ensure that mark to market fluctuations that occur between the purchase and the SIV closing date are ***absorbed by the SIV*** rather than by IKB." Tab 160 at MS_RHI_000016357.

[21]     *See* Tab 143 at 193:14-194:6 ("with respect to the Rhinebridge SIV, [MS's managers] were aware that falling asset values, falling market values would impact the [Rhinebridge] SIV, given it is a market value driven vehicle"); Tab 162 at MS_000748973 (In the summer of 2007, MS's Erik Siegel explained: "[I]f we had the [SIV's] assets at the bid side . . . they would fail the entire portfolio trigger for both the Minor and Major Test as well as the HEQ's [home equities] would trigger outright if they came in at the bid side.").

[22]     King County purchased the CP that is the subject of this action on July 20, 2007; ISL purchased its CP on July 25, 2007.

***IKB SIV is close to and likely will hit triggers that would mean forced selling of its assets***." Tab 158 at MS_000732119. The following day (July 19, 2007), MS visited IKB to discuss this alarming information, writing in an internal e-mail: "[MS's] Steve D'[Agostino] expressing ***very strong view that this [Rhinebridge SIV portfolio]*** . . . could hit triggers and unwind quickly. . . . We've been in there with IKB this morning to raise the alarm. They acknowledged that this is a serious issue." Tab 165 at MS_000551707.

Undeterred, MS continued to market and sell CP to investors, including plaintiffs, who, days later, purchased what they thought were top rated notes while MS's senior managing director was "convinced" that the Rhinebridge SIV was on the verge of collapse. MS's corporate designee admitted that MS concealed this explosive information from investors: "As far as I am aware, there was no communication to investors about Steve D['Agostino]'s opinion" that Rhinebridge was on the verge of collapse. Tab 143 at 277:23-278:9.

MS was well aware, but failed to disclose, that the subprime assets held by Rhinebridge had inflated ratings and were riskier than represented.[23] For example, Moody's told MS in March 2006 that it had loosened its guidelines to reclassify AltA/B loans originated by subprime lenders as Alt/A, treating them as less risky and requiring less subordination. Tab 167 at MS_RHI_003065396. Rhinebridge held many such loans and MS knew Moody's "have not and do not plan too [sic]" make the change public. *Id.*[24] In addition, MS employed Clayton, a third-party due diligence provider, to conduct due diligence on loan pools purchased by MS for securitization. *See* Tab 168 at MS_RHI_001258141; Tab 169 at MS_RHI_00592706, MS_RHI_00592714-15. The purpose of due

---

[23]     "77.5% of the Rhinebridge target portfolio is exposed to US Home Equity Loans." Tab 166 at MS_RHI_000133323.

[24]     Before launching the Rhinebridge SIV, MS knew that Moody's had "only a limited appreciation of the change in underwriting guidelines and processes." Tab 399 at MS_001349272.

diligence was to "indentify potentially riskier loans." Tab 170 at 43:2-44:12. According to internal MS documents, based on this due diligence, MS knew that "*[a]cross the board* . . . all of the sellers" of subprime loans had suffered from "deteriorating appraisal quality" (Tab 171), and that "there [was] not a lot of 'common sense' being used when approving these types of loans." Tab 172 at MS_RHI_001756493. As early as October 2005, MS recognized that subprime loans from particular originators were suspect: "I have worked with Mary [at New Century] to clear as many borderline loans as possible, but it seems that [New Century] is *pushing the envelope* a bit." Tab 174 at MS_RHI_000625824; *see also* Tab 173. MS also "observe[d] a decline in credit quality in early '06." Tab 170 at 167:1-176:13.

Although Clayton identified numerous defective, low-quality loans that failed to meet certain quality tests, MS "waived" hundreds of these loans into its RMBS securitizations. *Id*. at 48:25-54:17, 60:24-61:6, 62:25-67:19. For example, MSAC 2005-WMC6 – an RMBS deal that was structured by MS and sold to the Rhinebridge SIV – contained an astonishing 53.6% of loans with a grade of "3" based on Clayton's due diligence, which meant that the loans materially deviated from the originator's guidelines. Tab 175. Notwithstanding these material deficiencies, MS "waived" 79.5% of the grade 3 loans into the loan pools underlying the MSAC 2005-WMC6 deal. *Id*. More than one out of every two loans subject to due diligence in the MSAC 2005-WMC6 securitization was rejected by Clayton, but nevertheless was "waived" into the deal by MS. *Id*.

These materially non-compliant loans had a myriad of disqualifying characteristics that MS knew about, but consciously ignored. MS waived in loans with missing or insufficient borrower employment verification, insufficient borrower credit quality, incomplete appraisals and excessive loan-to-value ratios. MS even waived in a loan of $146,400 on a vacant lot in a flood plain where the property address was spray painted on a tree. While the market value according to an

- 29 -

independent broker was $11,000, MS securitized the loan into an RMBS and ascribed it a value of $183,000 (thus having a loan-to-value ratio of over **1,300%**).  Tabs 176-177; Tab 170 at 149:11-155:18; Tab 178.  MS also waived in loans to bankrupt borrowers and millions of dollars of "bail out" loans made for the purpose of refinancing loans that already were seriously delinquent or in foreclosure at the time of closing.  Tab 178; Tab 170 at 30:2-32:7, 68:7-70:6.  Overwhelming evidence establishes that, from 2005 through 2007, MS heard a constant drumbeat of negative information about its subprime originators.  *See* Tabs 167-168, 171, 179-251, 401-424.  Accordingly, MS's due diligence and securitization practices directly impacted the ratings assigned to the MS RMBS and, in turn, the Rhinebridge SIV.

As in Cheyne, MS's "big fat up front fees" on the Rhinebridge deal – $11.8 million – incentivized MS to aid and abet the Rating Agencies' fraud.  *See* Tab 19 at MS_000432580; Tabs 253-255.  IKB also agreed, among other things, to pay MS a 7% commission for any Junior Capital Notes ("JCNs") that MS sold.[25]  Tab 256.  In addition, MS, as placement agent, ***underwrote*** the JCNs with the intention of reaping roughly $2 million in commissions from what they believed to be $28 million in JCN sales.  In May 2007, Tim Armstrong bragged: "***we have around 28mm done*** in equity [JCN's], 2mm to go for a 2.5bn first close.  ***We can take more equity[JCNs]*** – the vehicle [Rhinebridge] will then just grow more quickly."  *See* Tab 257 at MS_ RHI_000088964.  MS's placement of the JCNs gave MS "a motive to maintain the appearance that the SIV assets were safe and highly rated" – at least until it dumped the JCNs on investors.  *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 180 (S.D.N.Y. 2009).[26]

---

[25]    This was the highest commission paid for the placement of any of the Rhinebridge notes.  *See* Tab 256.

[26]    In the face of this compelling evidence, MS now pretends that the $10 million of JCN's that it failed to place were "the bulk of its fee" and should offset the $11.8 million in cash it received in

Indeed, MS's Gregg Drennan, the primary structurer for the Rhinebridge SIV, was nominated for a lucrative promotion based on the fact Drennan: (1) "was crucial to winning SIV and ABS CDO mandates in Europe for IKB"; (2) "develop[ed] new technologies and use[d] them for revenue generation . . . [t]he strongest example has been the development of SIV, which has resulted in 2 highly profitable mandates (IKB & Blackrock)"; and (3) gave "Morgan Stanley . . . a first mover advantage in both SIVs and European RE CDOs, and it is critical for the development of the business that we continue to take advantage of this in the coming year." Tab 260 at MS_001446256; *see also* Tab 261 at MS_000424381. Shortly after Rhinebridge launched, in August 2007, Drennan leveraged this promotion into an even more lucrative position at another investment bank – "I'll be gone, you'll be gone." Tab 259; Tab 262 at 300:4-6 (Q: "And you were also dissatisfied with your $900,000 a year compensation, right?  Drennan:  Yes."); Tab 259 at 5; Tab 252.

Despite the overwhelming evidence that "Morgan Stanley possessed actual information that contradicted the high ratings that the SIV had received," MS simply repeats (almost verbatim) the very same meritless arguments it already made – and the Court already rejected – in *Abu Dhabi*.  As in *Abu Dhabi*, there is no evidence that MS had any economic interest in the Rhinebridge SIV's underlying assets.  In fact, the purported residual interest that MS identifies – Series R Notes – was described by MS as worthless. *See* Tab 263 at 160.  Tellingly, MS fails to mention the hundreds of millions of dollars that MS made from structuring and selling these deals.   Tab 264 at

---

fees.  To the contrary, MS's placement of JCNs had nothing to do with its fee.  *See* Tab 258 (In May 2007, MS's Laya Khadavi told her colleagues, "***Morgan Stanley [is] willing to underwrite the entire remaining $18MM of JCNs***" for the Rhinebridge SIV, but noted that MS would "get[] paid full fees upfront (ie 12MM on 2.5BN transaction.").  In fact, nowhere in the engagement letter between IKB and MS was there an agreement for MS to be paid in the form of JCNs.  Tab 256. Despite its efforts to spin the facts, MS understood that "[t]he incentives for the 'fee based' structuring investment bank were clear: get the deal closed, and if there's a problem later on, it was just another case of 'IBGYBG' – 'I'll be gone, you'll be gone.'"  *See* Tab 259 at 5.

MS_000137619.  Likewise, MS's assertion that it was caught flat-footed by the collapse of the subprime crisis is simply untrue.[27]  To the contrary, MS's $9 billion loss resulted from a botched strategy to short the subprime market by buying credit default swaps on pools of subprime mortgages.  *See* Tabs 266-267.  Tab 409 at MS_RHI_000914438-40 (showing that MS's Structured Product Group is betting against the market – profiting as cumulative losses to securitizations increased due to the deterioration of the underlying mortgage pools).  At the same time that MS was betting against subprime assets, it was also stuffing subprime assets into the Rhinebridge SIV.  *See* Tab 268 at MS_RHI_000123023 (MS's "SIV Business Plan" explaining that "Additional Benefits to Morgan Stanley Developing SIV Business" included "Trading Opportunities" for MS's "ABS trading team" to sell ABS to the Rhinebridge SIV); Tab 269 (MS discusses its plan to source the assets to the Rhinebridge SIV, including "assign[ing Morgan Stanley's] sales to cover IKB."); Tab 270 (Rhinebridge SIV obtained RMBS "purchased through Morgan Stanley").

### E.       MS Is Liable for Fraud and Negligent Misrepresentation

The evidence supporting MS's liability for aiding and abetting fraud also supports liability for fraud.  In New York, "[l]iability for fraud may be premised on knowing participation in a scheme to defraud, even if that participation does not by itself suffice to constitute the fraud."  *See Danna v. Malco Realty, Inc.*, 857 N.Y.S.2d 688, 689 (2d Dep't 2008); *see also Chubb & Son, Inc. v. Kelleher*, No. 92 CV 4484 (TLM) (RML), 2010 WL 5978913, at *5 (S.D.N.Y. Oct. 22, 2010); *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 285-86 (1987).  In addition, MS's superior knowledge gave rise to a duty to disclose, which it breached: "***Although there are no allegations of any affirmative***

---

[27]      In fact, MS structured the Cheyne SIV in 2004 in order to facilitate the acquisition of poor quality, subprime assets that it could short and profit from when those assets deteriorated.  *See* Tab 265 at MS_000597348 ("[R]emember, ***our goal will be to stay short many of the high risk assets*** by buying term protection from the SIV if and when the deal gets done.  Lastly, we must approve each and every bond that goes on the [warehouse] line.  ***If we don't like the bond we'll short it***.").

***misrepresentations by [defendant] HVB itself, and no fiduciary relationship*** arose between the

individual plaintiff and HVB as the purported lender, fraud is sufficiently stated by allegations" of

superior knowledge.  *Williams v. Sidley Austin Brown & Wood, L.L.P.*, 832 N.Y.S.2d 9, 11 (1st

Dep't 2007) (collecting cases); *see Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291-92 (2d Cir. 2006).

As described in §§II.B. & II.D., *supra*, MS plainly possessed superior knowledge not readily

available to the plaintiffs and knew that plaintiffs acted on the basis of that mistaken knowledge.[28]

As a result, MS is liable for fraud under New York law despite the Court's determination in *Abu

Dhabi* that MS did not issue the ratings.  *See In re Bear Stearns Mortg. Pass-Through Certificates

Litig.*, 851 F. Supp. 2d 746, 771 (S.D.N.Y. 2012) ("Here, there are two 'speakers': the agencies that

rated the Certificates, and Defendants, who presented those ratings to investors in the Offering

Documents.").

     Morgan Stanley is liable for negligent misrepresentation for the same reason that it is liable

for fraud: "a negligent misrepresentation claim may be based on the breach of a duty to provide

accurate information."  *Abu Dhabi*, Dkt. No. 501, Opinion and Order at 7 (S.D.N.Y. Oct. 5, 2012).

Further, Morgan Stanley had a "special relationship" with plaintiffs.  Despite the Court's ruling in

*Abu Dhabi* that direct contact is required (Tab 274 at 10:4-6), the New York Court of Appeals in

*White v. Guarente*, 43 N.Y.2d 356 (1977), held that a defendant did not need not know the identity

of each particular plaintiff to satisfy the *Credit Alliance* test.  Rather, "plaintiffs are a 'known party'

if they are members of a 'settled and particularized class,' as opposed to an 'indeterminate class.'"

---

[28]    MS understood that investors would not purchase the Rhinebridge SIV's notes without the ratings it sought for the notes. *See, e.g.*, Tab 271 at MDYS RHNB 050287 (MS: "Our immediate objective before pricing is to receive . . . the desired ratings . . . ."); Tab 272 (MS's Drennan to Katugampola regarding Rhinebridge: "[Y]ou still need both snp and moodys for cp rating."); Tab 273 ("[MS] intended to offer Moody's only rated [capital] notes," but "not having S&P on the deal basically precludes vehicles (including high grade deals who typically buy junior AAA) from purchasing these notes, unless something has changed.").

- 33 -

*King Cnty. v. IKB Deutsche Industriebank AG*, No. 09 Civ. 8387 (SAS), 2012 WL 2160285, at *3 (S.D.N.Y. June 7, 2012).  Because "[t]he federal Court of Appeals is in the same position as a lower state court vis-a-vis the New York Court of Appeals in construing state substantive law under *Erie*," *In re E. & S. Dist. Asbestos Litig.*, 772 F. Supp. 1380, 1388-91 (E.D.N.Y. 1991), *aff'd in part and rev'd in part on other grounds, In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992), the holding in *White* cannot be abrogated by *Anschutz* and militates in favor of finding MS liable for negligent misrepresentation for the reasons set forth in *King Cnty. v. IKB Deutsche Industriebank AG*, No. 09 CIV. 8387 SAS, 2012 WL 1592193 (S.D.N.Y. May 4, 2012).  Moreover, MS was responsible for communicating the misleading ratings to investors through the Bloomberg Professional service, an electronic trading platform from which both plaintiffs purchased their Rhinebridge CP.  Tab 145-146.

### F.      The Evidence of Justifiable Reliance Presents Disputed Issues of Fact

Plaintiffs need only "provide evidence from which a reasonable jury could infer that the ratings were a substantial factor in [their] decision to invest in" the Rhinebridge SIV.  *Abu Dhabi*, 2012 WL 3584278, at *14.  "'[R]easonable reliance is often a question of fact for the jury rather than a question of law for the court.'"  *Id.* at *4.  "Generally, '[t]he reliance element does not require complex legal analysis and may be satisfied simply by plaintiff's testimony.'"  *Id.* at *14.  In considering the reliance element, the Court must "draw every inference in favor of the non-moving party if it swears under oath to reliance at least in part. . . .  They say they relied, so they relied.  So reliance isn't going to be easy for the defendant."  Tab 275 at 15:11-16.

Defendants admit that investors in structured finance instruments substantially rely on credit

ratings.[29]  Where, as here, "plaintiffs lacked access to information available to the Rating Agencies," and defendants have admitted that investors in structured finance instruments must rely on credit ratings, there is a "likelihood that [Rhinebridge's] investors relied on the ratings." *Abu Dhabi*, 2012 WL 3584278, at *14.

### 1.  King County

King County relied in substantial part on the A-1+/P-1/F-1+ ratings assigned to the CP it purchased.  As King County's Rule 30(b)(6) witness testified, King County relied on the ratings assigned to the CP because it was required by its investment policies and Washington state law to rely on the "highest short-term rating from at least two out of the three rating agencies.  And if there's a third rating, which in this case, in Rhinebridge, there was, it also ha[d] to be the top rating." Tab 287 at 16:6-17:12.[30]  Under almost identical circumstances, the Court found a triable issue of fact as to King County's reliance on credit ratings on the Cheyne SIV notes where "King County provide[d] evidence that its investment policies and Washington state law governing its investments required it to rely on the ratings." *Abu Dhabi*, 2012 WL 3584278, at *18; *see also id.* at *16 (finding reliance where plaintiff's investment "guidelines required that ratings be a relevant factor in [plaintiff's] analysis").  King County also testified repeatedly that the ratings assigned to the

---

[29]    Tab 276 at IKB_H000000945; Tab 256 at IKB000493902-03; Tab 272; Tab 277 at MS_000670480; Tab 278 at MS_000705532-33; Tab 279 at 129:1-15; Tab 280 at 430:18-431:7; Tab 281; Tab 282 at MDYS ADCB 1262282; Tab 283 MDYS ADCB 994645; Tab 84 at MDYS ADCB 935049; Tab 284 at MDYS ADCB 0392497; Tab 285 at S&P-ADCB 0945549-50; Tab 115 at S&P-ADCB 0733231; Tab 115 at S&P-ADCB 0733218; Tab 286 at 2-3; Tab 286 at 30.

[30]    King County's Rule 30(b)(6) designee testified similarly in *Abu Dhabi* that governing investment criteria and Washington state law required "that at least two national credit rating agencies have to rate it the highest and if there is a third rating, it also has to be the highest rating." Tab 288 at 63:2-65:12.

- 35 -

Rhinebridge CP were of "***critical importance***" to King County.  Tab 287 at 25:19-26:11.[31]

S&P and Moody's do not dispute that King County relied on their ratings.  Fitch argues that because certain King County documents do not contain the Fitch rating, King County did not rely.  However, the testimony from King County's Rule 30(b)(6) designee and Mike Smith, the King County employee responsible for considering and purchasing the Rhinebridge CP, proves otherwise.  Both witnesses testified that King County was ***required*** to and in fact ***did*** rely in substantial part on the ratings from ***all three Rating Agencies*** before purchase.  Tab 287 at 16:6-17:12; Tab 289 at 52:6-14 (testifying that the basis for Mr. Smith's pre-purchase conclusion that the Rhinebridge CP was a safe investment was, in part, "the high ratings that the program carried from ***three separate rating agencies***, both short-term and long-term ratings"); *see also id.* at 152:6-14, 154:23-155:11.[32]

## 2.    ISL

ISL relied in substantial part on the A-1+/P-1/F-1+ ratings assigned to the CP it purchased.  As ISL's Rule 30(b)(6) witness testified, "[t]he investment process that we went through relied on the ratings, and the ratings were based on [ISL's] investment criteria . . . that the rating agencies themselves approved."  Tab 290 at 31:4-12.  Similarly, ISL testified that "[a]t the time of the

---

[31]    *See also* Tab 287 at 23:9-24:10 ("[W]e rely heavily on . . . the rating"); *id.* at 25:19-26:11 ("And it's the evaluation by the rating agencies that, you know, we rely on as part of that decision-making process.  And it's because that rating reflects an evaluation of that security over – over the life of that security."); *id.* at 33:9-14 ("I did outline our [investment] process earlier, and I stress the importance of – of our reliance on the credit rating itself."); *id.* at 51:16-52:13; 155:1-8; 162:4-17 ("King County understood the structure of these asset-backed commercial paper programs.  And based on the nature of the ratings, short-term maturities and our status as a senior creditor, that's how we judged credit risk.  So we perceived this as nearly – very minimal credit risk based on those factors.").

[32]    Fitch quibbles that Mr. Smith's Quotesheet omits the Fitch rating.  This is irrelevant.  Mr. Smith testified under oath that King County relied on Fitch's rating.  *See, e.g.*, Tab 289 at 52:9-11.  Furthermore, the investment guidelines required reliance on Fitch's rating.  Given this evidence, Mr. Guy's second-hand testimony about Mr. Smith's recollection concerning the Fitch rating carries no weight.  In any event, Mr. Smith told Mr. Guy that the omission from the Quotesheet was "just inadvertent."  Tab 287 at 325:9-19.

investment [in Rhinebridge CP], [ISL] relied on the ratings assigned." *Id.* at 46:24-25. ISL's Rule 30(b)(6) designee testified that ISL's investment "process was to . . . follow the indentures [*i.e.*, the investment guidelines governing ISL's purchase of the Rhinebridge CP] and the ratings guidelines, and we used the ratings." *Id.* at 44:11-13.[33] The investment guidelines governing ISL's purchase of Rhinebridge CP required that the CP be "rated at the time of purchase in the single highest classification, 'A-1+' by S&P and 'P-1' by Moody's" – the precise ratings that were in fact assigned by S&P and Moody's to the Rhinebridge CP. Tab 292 at ISL-e0016389. Similarly, ISL's broker responsible for executing the Rhinebridge CP purchase testified that ISL's guidelines required consideration of the assigned ratings and that "safety of principal was paramount" to ISL's investment guidelines. Tab 293 at 236:14-237:9.

S&P and Moody's do not dispute that ISL relied on their ratings. Fitch argues that ISL could not have relied on Fitch's rating because ISL's investment guidelines did not require a Fitch rating and because certain ISL documents regarding the Rhinebridge CP purchase did not reflect the Fitch rating. But as described above, ISL's investment relied on the "***ratings assigned***," which included the Fitch F-1+ rating. Tab 290 at 229:5. Moreover, Steve Nichols, the ISL employee responsible for identifying the Rhinebridge CP investment opportunity and approving its purchase, highlighted the Fitch F-1+ rating on the trade ticket associated with the Rhinebridge CP purchased by ISL. Tab 294. This document contains Mr. Nichols' handwritten notes and shows that Mr. Nichols placed a "+"

---

[33]     *See also* Tab 290 at 46:24-25 ("At the time of the investment, we relied on the ratings assigned . . . ."); *id*. at 49:16-19 ("We used . . . the ratings assigned at the time, from the rating agencies, that's all we used in evaluating the decision to invest."); *id*. at 57:20-21 (testifying that ISL's "process was to rely on the ratings"); *id*. at 101:15-16 ("We relied on the ratings process and the ratings assigned"); *id*. at 133:17, 229:3-9 (ISL "based [its] investment on the ratings assigned, and understood that – that the ratings process vetted all necessary requirements to obtain that rating, and that's what we used as it complied with the investment policy"); *id*. at 346:11-15; Tab 291 at 413:23-414:2, 422:17-22.

over the Fitch F-1+ rating, indicating it was a positive factor.  *Id.* at ISL0000383.  This notation

demonstrates that Mr. Nichols relied on the assigned Fitch rating.[34]

### 3. No Amount of Investigation Could Have Uncovered Defendants' Fraud

The level of due diligence performed by plaintiffs is irrelevant here because the information

necessary to uncover the fraud was "peculiarly within defendant's knowledge [such] that plaintiff[s]

may rely without prosecuting an investigation, as [they] ha[d] no independent means of ascertaining

the truth."  *Abu Dhabi*, 2012 WL 3584278, at *4; *see also JP Morgan Chase Bank v. Winnick*, 350

F. Supp. 2d 393, 410 (S.D.N.Y. 2004) (same); *Alexander v. Evans*, No. 88 Civ. 5309 (MJL), 1993

WL 427409, at *17 (S.D.N.Y. Oct. 15, 1993) ("the reliance requirement was not designed to shield

perpetrators of fraud by forcing investors to conduct exhaustive research every time they invest

money, lest the seller be manipulative or deceptive").  No amount of investigation could have

uncovered that the ratings process had been completely compromised, the ratings "misstated the

likelihood of collapse" (*Abu Dhabi*, 2012 WL 3584278, at *20), and the SIV was on the verge of

imploding only days before plaintiffs invested.

Furthermore, plaintiffs did not have equal access to information.  For example, despite an

investor's request, defendants withheld the Rhinebridge SIV Operating Manual, which is the core

document that contains all of the key details, tests, parameters, and assumptions underlying the

Rhinebridge SIV's operation.  Tab 297 at MS_RHI_000125833 (the operating manual is a

"***confidential document***" that cannot be disclosed to investors).  Similarly, MS withheld pricing

---

[34]    In its prior purchase of Rhinebridge CP – only 13 days prior to the Rhinebridge CP at issue in
this case – ISL also expressly relied on Fitch's rating, further demonstrating ISL's reliance on Fitch.
Tab 295 at ISL-e0000832; *see also* Tab 290 at 181:2-182:2; Tab 296 at ISL0000355.  Similarly, a
document communicating ISL's investments to its trustees reflects this additional purchase of
Rhinebridge CP and highlights the "A-1+ (S&P) P-1 (MOODY'S) and ***F-1+ (FITCH)***" ratings
assigned thereto.  *Id.*

information: "I don't want to send the historical pricing information to investors . . . it will cause people to ask more questions."  Tab 298 at MS_RHI_000089036.

Nor were investors privy to critical information concerning the SIV's underlying assets, including the discount margin and weighted average life of those assets:  "***[T]his was information which we knew and we had on our records, but essentially it was private information as to where – what prices and returns were generating on various assets***."  Tab 299 at 176:13-22; *see also* Tab 300 (noting that IKB would "hide" the discount margin and weighted average life data from investors); Tab 301 at IKB000092603 (warning that "[t]he file sent to MS cannot be sent out to clients").

In response to a potential investor's inquiry regarding whether the Rhinebridge SIV contained underlying assets whose subordinated tranches had been recently downgraded or put on negative watch, IKB suggested several flippant responses, including pretending the respondent was out of the office, but never suggested telling investors the truth.  Tab 302.  Notably, whether the SIV contained any underlying assets whose subordinated tranches had been downgraded or put on negative watch or the market value of Rhinebridge's underlying assets was not disclosed.  *See, e.g.*, Tab 303.[35]  Similarly, investors did not have access to Rhinebridge's net asset values ("NAV"), an important indicator of its stability.  Tab 304.  Defendants, on the other hand, received daily, weekly and monthly updates and reports monitoring the performance and value of Rhinebridge and its

---

[35]      In light of this evidence, defendants' suggestion that plaintiffs had equal access to information is absurd.  In support of their erroneous assertion, defendants cite Bains's deposition testimony where he stated that he could not think of any information that would not have been provided to investors had they asked.  *See* Tab 305 at 150:18-25.  But that testimony is directly contradicted by the evidence that investors did ***not*** have equal access information.  Indeed, the evidence shows that Bains himself was involved in concealing key evidence from investors.  Even ***after*** the Rhinebridge SIV collapsed, Bains was reluctant to provide information concerning the SIV's assets to ISL's broker.  *See* Tab 306 at IKB000613269 (Bains stated that IKB does "not normally give out our full list of assets.").

underlying assets.  As Moody's Tabe testified, SIVs were "obviously the ***most*** opaque structured credit vehicles and transactions in the market."  Tab 280 at 441:14-443:1.

Perhaps most striking, plaintiffs did not know (because MS concealed it from them) that MS believed that the Rhinebridge SIV contained a "riskier portfolio than most SIVs" and was on the verge of collapse just days before their purchase.  *See supra*, §II.D.  By virtue of having rated 100% (S&P and Moody's) and 30% (Fitch) of the Rhinebridge SIV's underlying assets, the Rating Agencies also had access to information concerning the poor quality of the SIV's underlying assets that was not available to plaintiffs.

Despite this compelling evidence of information asymmetry, defendants argue that plaintiffs should have done more.  In *Abu Dhabi*, the Court rejected "defendants' assertion that King County should have conducted a diligent investigation rather than rely on the ratings . . . 'due to the Cheyne SIV's complexity and the limited information available to plaintiffs'" and noted that "it is highly relevant to plaintiffs' claims that the Rating Agencies had access to information about the SIV's assets that investors did not."  2012 WL 3584278, at *18 n.264.  In light of plaintiffs' lack of access to critical information, their due diligence was entirely appropriate.[36]

### 4.    Defendants' "Disclosures" Do Not Negate Plaintiffs' Reliance

Defendants' general disclosures regarding the Rhinebridge SIV's subprime exposure do not negate reliance.  In *Abu Dhabi*, the Court held that similar disclosures failed to "***directly address the risks that plaintiffs claim was not disclosed***." *Abu Dhabi*, 2012 WL 3584278, at *20.  Here,

---

[36]    Despite plaintiffs' lack of access to critical information, defendants argue, as they did in *Abu Dhabi*, that King County and ISL's reliance is unreasonable because they may have spent only minutes considering the Rhinebridge SIV.  The Court has already rejected this identical argument: "While a jury may find such evidence persuasive if it is admissible and presented by defendants at trial, I cannot give it more weight than the testimony offered by King County.  Thus, a genuine issue of fact remains as to whether King County relied on the ratings."  *Abu Dhabi*, 2012 WL 3584278, at *18.

plaintiffs do not allege that defendants concealed the fact that the SIV held subprime assets. Thus, the disclosures relied upon by defendants are beside the point.[37] Indeed, despite the SIV's subprime exposure, defendants assured investors that they had structured the SIV such that the SIV's CP merited top ratings – which would survive the Great Depression. Tab 2 at MDYS ADCB 936594. Defendants failed to disclose that the ratings (i) were "unsupported by facts or reason[able] analysis" (*Abu Dhabi*, 2012 WL 3584278, at *20); (ii) "misstated the likelihood of collapse" (*id.*); (iii) were false and misleading; or (iv) that the SIV was on the verge of collapse days before plaintiffs' purchases.

Thus, "the general disclaimers contained in the private placement memorandum" do not "avail [defendants] since they [are] not specifically applicable to the alleged misrepresentation at issue." *Silver Oak Capital L.L.C. v. UBS AG*, 920 N.Y.S. 2d 325, 327 (1st Dep't 2011). Instead, they "are invalid" because notwithstanding any disclaimer, the true risk was concealed by the false ratings, and "the information required to confirm or disprove the validity of the [ratings] was peculiarly within [defendants'] knowledge." *King Cnty.*, 751 F. Supp. 2d at 661 (brackets in original); *see also Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.").[38]

Rather than disclose that the SIV was on the verge of collapse, defendants reassured investors

---

[37]    In any event, the marketing material cited by defendants to argue that all subprime risk was disclosed actually *misrepresented* the SIV's exposure to subprime. *Compare* Tab 307 at IKB000030844 (marketing material telling investors the SIV held *17.91%* subprime); *with* Tab 308 (internal document demonstrating the SIV held *41.3%* subprime).

[38]    Further, "the disclaimers in the [PPM upon which defendants here rely] are attributable to [Rhinebridge], *not* the Rating Agencies" or MS. *Abu Dhabi*, 2012 WL 3584278, at *13. Having disclaimed responsibility for anything in the PPM, defendants cannot now seek its refuge. *See* Tab 310 at MS_RHI_000038721.

- 41 -

regarding the subprime risk.   In an April 2007 investor presentation, MS explained why the Rhinebridge SIV was "right in the current environment" and why investors "should [] buy a HEL backed portfolio."  Tab 311 at MS_RHI_000015330-31.  Answering the question, "Why should I invest into this complex structure that I don't understand?," MS stated that SIV investors *do* "*not tak[e] credit risk*" and ensured that "SIVs are [] heavily regulated" by Rating Agency monitoring. *Id.*  Having *encouraged* investors who did not understand SIVs to invest in the Rhinebridge SIV, MS cannot be heard to attack plaintiffs for their purported failure to undertake sufficient due diligence or to sufficiently understand SIVs.  Further, all of the Rating Agencies represented that the SIV's structure and capital cushion protected CP investors from any subprime risk.  *See, e.g.*, Tab 312 at IKB000106722; Tab 313 at IKB003623090; Tab 314 at IKB000004567-68.

In fact, plaintiffs testified that they relied on defendants' superior knowledge and understood defendants had accounted for increased risk in the market when defendants assigned top ratings. *See, e.g.*, Tab 290 at 117:15-24, 245:23-246:8, 248:21-25; Tab 289 at 169:4-12; Tab 287 at 70-73.

Finally, the cases defendants cite to suggest that plaintiffs' reliance was not justifiable stand for the unremarkable and inapposite proposition that "[a] heightened degree of diligence is required where the victim of fraud had hints of its falsity" or where plaintiff had access to information sufficient to verify defendants' false statements.  *See Banque Franco-Hellenique de Commerce Int'l Maritime, S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir. 1997) (plaintiff "had heard about the" misconduct "two months before" the transaction at issue).[39]  Here, the information necessary to

---

[39]     Defendants' other cases are similarly inapposite.  *See Abbey v. 3F Therapeutics, Inc.*, No. 06 CV 409 KMW, 2011 WL 651416, at *9 (S.D.N.Y. Feb. 22, 2011) (finding that plaintiffs had equal access to information); *Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2004 WL 2072536, at *6-*8 (S.D.N.Y. Sept. 14, 2004) (finding that plaintiff received an "exact replication" of the information claimed to have been withheld), *aff'd*, 148 F. App'x 66 (2d Cir. 2005); *HSH Nordbank AG v. UBS*, 941 N.Y.S. 2d 59, 68 (1st Dep't 2012) (finding plaintiff did not

uncover the fraud was peculiarly within defendants' possession.

### G.   The Evidence of Loss Causation Presents Disputed Issues of Fact

Based on controlling New York and Second Circuit authority, the Court has "already determined that plaintiffs' position on loss causation is both logical and legally viable." *Abu Dhabi*, 2012 WL 3584278, at *19.   In *Abu Dhabi*, the Court rejected the exact same arguments defendants repeat here, ruling that "'[p]laintiffs need not demonstrate that defendants' misstatements or omissions caused ***all*** of plaintiffs' losses.'"   *Id.* (emphasis in original).   Instead, this Court has consistently, and correctly, held that plaintiffs need only "provide evidence 'that would allow a factfinder to ascribe some ***rough proportion*** of the whole loss to [the defendant's alleged] misstatements.'"   *Id.* (some emphasis in original).   Here, as in *Abu Dhabi*, the evidence establishes a triable issue of fact as to the element of loss causation.

The top ratings signified a safe, secure and reliable investment with an extremely low probability of transitioning to "junk" status, and a high likelihood of full recovery even in the extraordinary event of a default.   *Supra*, §II.C.   As Moody's itself explained, SIVs like Rhinebridge were created "in response to investor demand for steady returns on capital and highly rated portfolios that are ***immunised against substantial downgrade***, interest rate, currency ***and liquidity risks***."   Tab 315 at MDYS ADCB 735239.   Indeed, at the time plaintiffs purchased Rhinebridge's top rated CP,

---

rely on any statements made by the defendant).   The plaintiffs in this case did not know about defendants' fraud before they purchased or have equal access to information. *PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co.*, No. 99 Civ 3794 (RSJ), 2003 WL 22118977, at *24 (S.D.N.Y. Sept. 11, 2003) (plaintiff had been provided "ample financial information to perform updated valuations" of the stock at issue); *Century Pac., Inc. v. Hilton Hotels Corp.*, 354 F. App'x 496, 498 (2d Cir. 2009) (finding plaintiff's failure to protect itself by inserting limiting language into a contract where plaintiff knew there was information not available to plaintiff); *Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 471 (S.D.N.Y. 2010) (finding plaintiffs' reliance unreasonable because the alleged misstatements were "highly general statements"), *aff'd*, 652 F.3d 333 (2d Cir. 2011).   Here, however, plaintiffs lacked access to the information necessary to perform an independent investigation of the Rhinebridge SIV's ratings.

- 43 -

"[n]o triple-A-rated bond ever defaulted." Tab 316 at 2; *see also* Declaration of Bjorn I. Steinholt,

CFA ("Steinholt Decl."), ¶17 ("the probability of AAA and AA securities being downgraded to

below investment grade (BB or below) has traditionally been very remote"). And, while "a handful

of trip-A companies that deteriorated over the years, were substantially downgraded, and then

defaulted," this "journey from Triple-A to default was never shorter than four years." Tab 316; *see*

*also* Steinholt Decl., ¶17 n.6.

Defendants concealed from plaintiffs the poor quality of Rhinebridge's toxic assets, the risks

posed by the SIV's woefully insufficient structural protections, and a deeply flawed ratings process

that put profits before accuracy. *Supra*, §§II.A.-C.; *see also* Das Decl., ¶¶5-6. When these

concealed risks materialized, the value of Rhinebridge's toxic subprime assets plummeted, taking the

Rhinebridge SIV down with them. *See* Steinholt Decl., ¶¶27-28. Plaintiffs suffered substantial

losses on their purchases of the Rhinebridge CP as a direct result of the materialization of these

concealed risks. *Id.*, ¶¶27-32.

As the Court recognized in *King County I*, that the Rhinebridge SIV would collapse was

utterly foreseeable:

> [T]he risk that caused plaintiffs' losses – that Rhinebridge consisted of toxic assets
> that would become worthless – was precisely within the zone of risk concealed by
> the Top Ratings. That plaintiffs would suffer losses when these toxic assets
> collapsed and Rhinebridge entered receivership was reasonably foreseeable.
> Therefore . . . the materialization of the risk concealed by the Top Ratings caused
> plaintiffs' losses.

*King Cnty. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 340 (S.D.N.Y. 2010); *see also*

*Abu Dhabi*, 2012 WL 3584278, at *19. Plaintiffs have presented evidence that the Rhinebridge SIV

collapsed, causing them to suffer losses, because the nature of the SIV's holdings and structural

protections were other than defendants represented.

The Rhinebridge SIV, like the Cheyne SIV upon which it was modeled, was driven into

- 44 -

receivership when investors began to realize that the ratings on the subprime assets Rhinebridge held did not represent the actual risk inherent in those securities. *See* Steinholt Decl., ¶¶27-29. Prices dropped as investors' concern about poor credit quality in subprime securitizations increased, and the SIV was forced into enforcement, receivership and ultimately liquidation. *Id.* As a result, CP purchasers, like plaintiffs here, incurred substantial losses. *Id*., ¶¶28, 31-32.

By early 2007, defendants were aware that the top ratings that MS and IKB required for launch were unwarranted given the high percentage of risky subprime assets the SIV would hold, *supra*, §§II.A.-C. In the months leading up to the SIV's launch, the prices on the underlying assets were dropping because of credit problems. *See, e.g.*, §§II.A.-C., *see also* Tab 39 at PSI-SP-000280; Tab 317 at IKB000351772; Tab 318 at IKB000726046; Tab 319; Tab 320 at IKB003715303; Tab 321 at MDYS ADCB 092639; Tab 298 at MS_RHI_000089036; Tabs 322-323.

On July 10, 2007, just two weeks after Rhinebridge launched, Moody's downgraded 399 RMBS assets, and put an additional 32 on watch for a possible downgrade. Tab 324 at IKB000055257. That same day, S&P also placed 612 RMBS assets on Creditwatch with negative implications and downgraded 498 of those securities two days later. Tab 325 at IKB000157345; Tab 326 at S&P-IKB 0143160. The downgrades adversely impacted Rhinebridge. *See* Steinholt Decl., ¶¶8-11. The following day, in light of the downgrades, Roger Merritt and John Schiavetta, two Fitch Managing Directors, were "asking detailed questions regarding the [Rhinebridge] portfolio" due to its "large exposure to Sub Prime." Tab 327 at FITCH-RHINE SUPP 0000766. Paddy Clerkin, one of the lead analysts for Fitch on the Rhinebridge deal, responded that "Rhinebridge is probably the most exposed" to the "recent wave of downgrades/rating watch from Moody's and S&P." Tab 328 at FITCH-RHINE 00051613.

When plaintiffs purchased top rated Rhinebridge CP in late-July 2007, the SIV was on the

- 45 -

verge of collapse due to plummeting asset prices.  Tab 158 at MS_000732119; Tab 164 at IKB000721245; Tab 329; Tab 165 at MS 000551707.  Defendants internally attributed these problems to toxic subprime assets.  Tab 330 at FITCH-RHINE 00049607; Tab 331.  These problems continued after the plaintiffs' purchases.  For example, Stephen Bund, the Managing Director overseeing Rhinebridge for Fitch, stated that Fitch was "closely following" the "market erosion on the underlying US sub prime RMBS an SF CDO assets" in Rhinebridge.  Tab 332 at IKB000115941.

By August 4, 2007, the Rhinebridge SIV was in such dire straights that unless IKB AG agreed to bail out the SIV by investing $80 million in Rhinebridge's Junior Capital Notes, the SIV was going to breach its Minor Capital Loss Test, with the "ultimate consequence" being the "unwind[ing] of the portfolio."  Tab 333 at IKB000063187; *see also* Tab 334 at IKB000819578 (same).  On August 7, 2007, IKB AG invested $80 million in Junior Capital Notes, to "ensure the solvency of the fund," at least for the time being.  Tab 335 at FITCH-RHINE00059421.

On August 22, 2007, Fitch placed Rhinebridge's CP on "Watch Negative," but did not downgrade the CP's top rating.  Tab 336 at FITCH-RHINE 0005275.  Moody's and S&P took no action.  On August 28, 2007, Rhinebridge released an official statement that it had sold $176 million of assets to raise cash, and said that it did not expect further support from IKB AG.  Tab 337 at IKB003206902.  On September 7, 2007, IKB breached its Net Capital Outflow Test, and entered a Restricted Investment State.  Tab 338.  On September 11, 2007, Fitch downgraded Rhinebridge's CP from F1+ (its highest rating) to F3 (its lowest investment-grade rating).  Tab 337 at IKB003206893.  S&P and Moody's, however, maintained their top ratings on the CP.

On September 13, 2007, Rhinebridge breached the Minor Capital Loss Test.  *See* Tab 339 at IKB000014248.  On October 11, 2007, the SIV breached its Major Capital Loss Test.  *See* Tab 337.  Bloomberg reported the following day that Rhinebridge's NAV had declined to less than 50% of

capital. *See id*. at IKB003206907.  On October 16, 2007, five days after Rhinebridge breached its

Major Capital Loss Test, S&P finally downgraded Rhinebridge's CP from A1+ (its highest rating) to

A3 (its lowest investment-grade rating).  *See* Tab 340 at S&P-IKB 0071211.  Fewer than four

months after its launch, and only two months after plaintiffs purchased CP with top ratings, on

October 18, 2007, Rhinebridge defaulted on its CP, and yet was still being rated investment-grade by

the Rating Agencies.  *See* Tab 337 at IKB003206892, IKB003206909; Tab 341.  That same day,

Moody's finally downgraded Rhinebridge's CP from P-1 (its highest rating) to Not Prime.  *See* Tab

342.

Ultimately, the Rhinebridge SIV portfolio was auctioned off at a steep discount, and

plaintiffs suffered substantial losses.  *See* Steinholt Decl., ¶¶16, 31; Steinholt Decl., Ex. K.  These

losses were a direct and foreseeable result of defendants' gross understatement of the CP's risk.  *Id.*,

¶¶21-28, 32.

As plaintiffs' loss causation expert explains, the market's actions were entirely rational and

directly connected to severe ***credit*** problems in Rhinebridge's constituent portfolio.  *See, e.g.*,

Steinholt Decl., ¶¶24-28, 32.  When Rhinebridge entered Enforcement, all of Rhinebridge's

investments were rated A or above (89% were rated AAA), yet the market value of these securities

was estimated at only 65% of book value.  *Id.*, ¶27.  In other words, the price investors were willing

to pay was significantly less than that implied by the credit ratings.  *Id.*  Rhinebridge's troubled

assets continued to suffer increasing ***credit*** problems driving the SIV into insolvency and liquidation.

*Id.*  For example, more than eight months after Rhinebridge entered Enforcement, on July 3, 2008,

IKB valued the investment portfolio at 32% of notional value.  *Id.*  If the assets had merely been

impaired by an "unprecedented market disruption" in 2007, but not credit issues, they would not

have been downgraded and they would trade at or above par today, more than ***three years*** after

defendants' supposed liquidity crisis.  Steinholt Decl., ¶¶27-29.

That SIVs, like Rhinebridge, that invested in high percentages of risky subprime assets performed significantly worse during the same time period than SIVs that did not also undermines defendants' argument that plaintiffs' losses were caused by a liquidity crisis.  *See, e.g.*, Steinholt Decl., ¶¶25-26.  As S&P reported approximately seven months after its initial downgrade of Rhinebridge's CP: "Those SIVs with the highest concentration of U.S. RMBS . . . have generally experienced the most acute loss in market value of the securities in their asset portfolios."  *Id.*

Defendants cite to selective and misleading so-called "admissions" by plaintiffs that the Rhinebridge SIV's losses were market-driven.  But as the Court has already explained in rejecting these same arguments in *Abu Dhabi*, "those 'admissions' may have been based on information provided by defendants and [Rhinebridge], all of whom had incentives to blame the market for [Rhinebridge's] losses."  *Abu Dhabi*, 2012 WL 3584278, at *19; *see also AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 400 (S.D.N.Y. 2009), *aff'd*, 386 F. App'x 5 (2d Cir. 2010).  Moreover, as the Court correctly observed in *Abu Dhabi*, it "cannot assess the credibility of witnesses or weigh the evidence on a motion for summary judgment."  *Abu Dhabi*, 2012 WL 3584278, at *19; *see also Rule v. Brine*, 85 F.3d 1002, 1011 (2d Cir. 1996).

As in *Abu Dhabi*, plaintiffs here have proffered "factual evidence from which a jury could infer their losses were a direct and foreseeable result of defendants' false or misleading ratings," and "have also submitted an expert declaration demonstrating that some of their losses are attributable to defendants' conduct."  *Abu Dhabi*, 2012 WL 3584278, at *19; *see* Steinholt Decl., ¶¶19-28.  Nothing more is required to proceed to trial.  *Abu Dhabi*, 2012 WL 3584278, at *19.

Defendants contend that the Rhinebridge PPM disclosed the risks that materialized and caused plaintiffs' losses.  As set forth in §II.F.4, this argument is no more availing here than it was in

*Abu Dhabi*, because the Rhinebridge PPM's risk disclosures fail to "'"***directly address the risks that plaintiffs' claim was not disclosed***."'" *Abu Dhabi*, 2012 WL 3584278, at *20.

Both King County and ISL suffered substantial and cognizable damages as a result of defendants' fraud.  Steinholt Decl., ¶31; Steinholt Decl., Ex. K.  On July 16, 2008, Rhinebridge noteholders were informed that a vertical strip of Rhinebridge's investment portfolio would be sold at auction, and that senior creditors (including CP holders) would have the option of receiving: (a) Pass-through Notes (*i.e.*, Raven Notes), representing an ownership in remaining Rhinebridge assets; (b) Goldman Sachs Zero Coupon Notes; or (c) Cash from the sale of Rhinebridge's assets in the auction.  *See* Steinholt Decl., ¶16.  On August 6, 2008, Bloomberg reported that Rhinebridge had auctioned off the vertical strip, and that "[i]nvestors in the commercial paper of Rhinebridge . . . will recover 55 percent of the amount owed to them." *Id.*; Steinholt Decl., Ex. D at 15.

Defendants do not dispute that King County has been damaged.  Plaintiffs' damages expert has calculated King County's losses to be $31,013,230.  *See* Steinholt Decl., ¶31; Steinholt Decl., Ex. K.  With respect to ISL, however, Fitch contends that because "ISL has received $7,750,000 in cash and a Raven note with a starting value of $44,249,216 . . . as well as monies from a settlement with IKB . . . it has not suffered any losses on its $50 million Rhinebridge investment."[40]

Defendants' analysis is incorrect.  To start, while ISL's principle investment in Rhinebridge CP was $50 million, its losses exceed that amount when the interest to which ISL is entitled under New York law is added.[41]  *See* Steinholt Decl., Ex. K (adding $11,749,872 in pre-judgment).

---

[40]     Fitch raises this issue "solely to preserve the arguments for further discussion at an appropriate time."

[41]     *See NML Capital v. Republic of Arg.*, 435 F. App'x 41 (2d Cir. 2011) (applying 9% per annum statutory interest rate); *Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 28 (2d Cir. 1986) (under New York law, awards for prejudgment interest for lost time-value of money are mandatory).

Further, in *Abu Dhabi*, in addressing this same issue with respect to Cheyne Senior Noteholders who elected to receive Gryphon notes (the equivalent of Raven notes here), the Court held that "the damages of the senior noteholders holding Gryphon notes should be reduced by an approximation of the *value* of the Gryphon notes as of the day plaintiffs acquired them in return for the remainder of their interest in Cheyne." *Abu Dhabi*, 2012 WL 3584278, at *22. Fitch's calculation of ISL's damages erroneously reduces ISL's damages by the face value of the Raven Note when it was received ($44,349,216). Steinholt Decl., ¶31; Steinholt Decl., Ex. K. However, the Raven note's true market value at that time was $18,254,120, ISL's portion of the amount received through auction of Rhinebridge's remaining assets. *See* Tab 343; Steinholt Decl., ¶31. Thus, as reflected in a November 17, 2008 e-mail, ISL made a "$18,254,120.17 par value exchange of Rhinebridge for Raven." Tab 343 at ISL-e0008509; *see also* Steinholt Decl., Ex. K. As set forth in the trustee reports, when the true value of the Raven Note is aggregated with other payments, ISL recovered approximately 55% of its purchase price. *See* Tabs 344-347. *See also* Steinholt Decl., Ex. K. Accordingly, ISL's recovery from its settlement with IKB does not come close to fully compensating ISL for its losses.

ISL has "provided evidence that the return on [its Raven] notes will not match the expected revenue steam of the senior notes," and has "suggested a method of valuation for the [Raven] notes." *Abu Dhabi*, 2012 WL 3584278, at *22; *see also* Steinholt Decl., ¶¶ 20, 27, 31. Under the Court's ruling in *Abu Dhabi* in analogous circumstances, this provides "sufficient evidence to raise a disputed issue of fact as to whether [Raven] note-holding senior noteholders have suffered measurable economic losses." *Abu Dhabi*, 2012 WL 3584278, at *22.

## III.  CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment should be denied.

- 50 -

DATED:  October 5, 2012                Respectfully submitted,

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       DANIEL S. DROSMAN
                                       JAMES A. CAPUTO
                                       DARRYL J. ALVARADO
                                       JESSICA T. SHINNEFIELD


                                              s/ DANIEL S. DROSMAN
                                       _____
                                            DANIEL S. DROSMAN

                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101-3301
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)
                                       dand@rgrdlaw.com
                                       jimc@rgrdlaw.com
                                       dalvarado@rgrdlaw.com
                                       jshinnefield@rgrdlaw.com

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)
                                       srudman@rgrdlaw.com

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       LUKE O. BROOKS
                                       JASON C. DAVIS
                                       Post Montgomery Center
                                       One Montgomery Street, Suite 1800
                                       San Francisco, CA  94104
                                       Telephone:  415/288-4545
                                       415/288-4534 (fax)
                                       lukeb@rgrdlaw.com
                                       jdavis@rgrdlaw.com

                                       Attorneys for Plaintiffs

- 51 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 10, 2012.

s/ DANIEL S. DROSMAN
DANIEL S. DROSMAN

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: ddrosman@rgrdlaw.com

# Mailing Information for a Case 1:09-cv-08387-SAS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Floyd Abrams**
  fabrams@cahill.com

- **Mario Aieta**
  maieta@ssbb.com,managingclerk@ssbb.com,marioaieta@gmail.com,dgerard@ssbb.com

- **Darryl J. Alvarado**
  dalvarado@rgrdlaw.com,nhorstman@rgrdlaw.com

- **X Jay Alvarez**
  jaya@rgrdlaw.com

- **Anne L. Box**
  abox@scott-scott.com

- **Luke Orion Brooks**
  lukeb@rgrdlaw.com

- **James A. Caputo**
  jimc@rgrdlaw.com

- **Jarrett Scott Charo**
  jcharo@rgrdlaw.com

- **Dai Wai Chin Feman**
  dchinfeman@ssbb.com

- **James J. Coster**
  jcoster@ssbb.com,managingclerk@ssbb.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com

- **Jason Cassidy Davis**
  jdavis@rgrdlaw.com,khuang@rgrdlaw.com,ptiffith@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Daniel S. Drosman**
  ddrosman@rgrdlaw.com,E_File_SD@rgrdlaw.com,tholindrake@rgrdlaw.com

- **Andrew James Ehrlich**
  aehrlich@paulweiss.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com

- **Jessica Lynn Freese**
  jessica.freese@davispolk.com

- **Jason Michael Hall**
  jhall@cahill.com

- **Roberta Ann Kaplan**

rkaplan@paulweiss.com

- **Justin Evan Klein**
  jklein@ssbb.com,managingclerk@ssbb.com

- **Brian T Markley**
  bmarkley@cahill.com

- **William Ross Miller , Jr**
  william.miller@dpw.com,ecf.ct.papers@dpw.com

- **Antonio Jorge Perez-Marques**
  antonio.perez@dpw.com,ecf.ct.papers@dpw.com

- **James J. Regan**
  jregan@ssbb.com,managingclerk@ssbb.com

- **Dean I. Ringel**
  DRingel@Cahill.com,JHall@cahill.com

- **Christopher Joseph Roche**
  croche@kaplanrice.com,cfaber@kaplanrice.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Robert M. Rothman**
  rrothman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **James P. Rouhandeh**
  james.rouhandeh@dpw.com,ecf.ct.papers@davispolk.com

- **Tammy Lynn Roy**
  troy@cahill.com,ndelutri@cahill.com,mmcloughlin@cahill.com,nmarcantonio@cahill.com

- **Christina A. Royce**
  croyce@rgrdlaw.com

- **Joshua M. Rubins**
  jrubins@ssbb.com,managingclerk@ssbb.com,jdoty@ssbb.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andrew Dickens Schlichter**
  andrew.schlichter@dpw.com

- **Jessica T. Shinnefield**
  jshinnefield@rgrdlaw.com

- **Mark Steven Silver**
  mssilver@paulweiss.com

- **Tobias James Stern**
  tstern@paulweiss.com

- **Thomas S. Wiswall**
  twiswall@phillipslytle.com,jgroat@phillipslytle.com,ecfphillips@phillipslytle.com

- **Julia Tarver-Mason Wood**
  jmason@paulweiss.com

- **Aaron Mark Zeisler**
  azeisler@ssbb.com,managingclerk@ssbb.com

- **Adam N. Zurofsky**
  azurofsky@cahill.com,MMcLoughlin@cahill.com,NMarcantonio@cahill.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Donna M Ioffredo**
Paul, Weiss, Rifkind, Wharton & Garrison, LLP (DC)
2001 K Street, N.W.
5th Floor
Washington, DC 20006

**David C. Walton**
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P.
655 W. Broadway
Suite 1900
San Diego, CA 92101-3301