UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
KING COUNTY, WASHINGTON,                             :
and IOWA STUDENT LOAN                                :
LIQUIDITY CORPORATION,                               :
                                                    :
                        Plaintiffs,                 :        09 Civ. 8387 (SAS)
                                                    :
            - against -                             :        **ECF Case**
                                                    :
IKB DEUTSCHE INDUSTRIEBANK AG,                       :
et al.,                                              :
                        Defendants.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF DEFENDANTS MOODY'S AND S&P IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

Floyd Abrams                          Joshua M. Rubins
Dean Ringel                           James J. Coster
Tammy L. Roy                          Mario Aieta
Jason M. Hall                         James Doty
CAHILL GORDON & REINDEL LLP           SATTERLEE STEPHENS BURKE &
80 Pine Street                        BURKE LLP
New York, NY 10005                    230 Park Avenue
Telephone: 212-701-3000               New York, New York 10169
                                      Telephone: 212-818-9200

*Attorneys for Defendants The McGraw-Hill*        *Attorneys for Defendants Moody's Investors*
*Companies, Inc. and Standard & Poor's*           *Service, Inc. and Moody's Investors Service*
*Ratings Services*                                *Limited*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

STANDARD OF REVIEW ....................................................................................... 5

ARGUMENT .............................................................................................................. 5

I.   PLAINTIFFS HAVE NOT SHOWN THAT THERE IS A DISPUTED ISSUE OF MATERIAL FACT AS TO KEY ELEMENTS OF THEIR FRAUD CLAIM ............................................................................................................. 5

    A.   There is No Evidence of Reasonable Reliance by Either Plaintiff ......... 5

    B.   There is No Evidence of Loss Causation ................................................ 15

        1.   Plaintiffs' Losses Were Caused by an Unprecedented Market Disruption ....................................................................................... 16

        2.   The Credit Ratings Did Not Conceal The Risks That Caused Plaintiffs' Losses ............................................................................ 18

    C.   There is No Evidence of an Actionable Misstatement ........................... 19

    D.   There is No Evidence of Scienter .......................................................... 23

    CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbey* v. *3F Therapeutics, Inc.*,
  2011 WL 651416 (S.D.N.Y. Feb. 22, 2011) ................................................................ 6, 10n

*Abrahami* v. *UPC Construction Co.*,
  224 A.D.2d 231 (1st Dep't 1996) ................................................................ 5

*Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*,
  08 Civ. 7508 (SAS) (Aug. 17, 2012) ................................................................ *passim*

*Amida Capital Management II, LLC* v. *Cerberus Capital Management, L.P.*,
  669 F. Supp. 2d 430 (S.D.N.Y. 2009) ................................................................ 16

*In re AOL Time Warner, Inc. Securities Litigation*,
  503 F. Supp. 2d 666 (S.D.N.Y. 2007) ................................................................ 19

*Ashland Inc.* v. *Morgan Stanley & Co.*, 700 F. Supp. 2d 453 (S.D.N.Y. 2010),
  *aff'd*, 652 F.3d 333 (2d Cir. 2011) ................................................................ 12n

*Banque Franco-Hellenique de Commerce International et Maritime, S.A.* v.
  *Christophides*,
  106 F.3d 22 (2d Cir. 1997) ................................................................ 10

*Barneli & Cie SA* v. *Dutch Book Fund SPC, Ltd.*, 95 A.D.3d 736 (1st Dep't 2012) ................. 10n

*Century Pacific, Inc.* v. *Hilton Hotels Corp.*, 354 F. App'x 496 (2d Cir. 2009) .................... 5, 12n

*Crigger* v. *Fahnestock & Co.*, 443 F.3d 230 (2d Cir. 2006) ................................................ 5, 6

*In re CRM Holdings, Ltd. Securities Litigation*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) ................................................................ 19n

*Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336 (2005) ................................ 15, 16, 19

*Erica P. John Fund., Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179 (2011) ................................ 18

*Fait* v. *Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011) ................................................ 20

*In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29 (2d Cir. 2009) .......... 16, 18

*Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*,
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ................................................................ 23

*Gaidon* v. *Guardian Life Insurance Co. of America*, 94 N.Y.2d 330 (1999) ................................ 5

*HSH Nordbank AG* v. *UBS AG*, 95 A.D.3d 185 (1st Dep't 2010) .............................. 10n, 11, 12n

*Jaramillo* v. *Weyerhaeuser Co.*, 536 F.3d 140 (2d Cir. 2008) ................................................ 5

*King County* v. *IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334 (S.D.N.Y. 2010) .......... 18

*Lazard Feres & Co.* v. *Protective Life Insurance Co.*, 108 F.3d 1531 (2d Cir. 1997) .............. 12n

*Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ................................ 16, 18, 19

*In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010) ........... 15, 16, 19n

*PPI Enterprises (U.S.), Inc.* v. *Del Monte Foods Co.*,
    2003 WL 22118977 (S.D.N.Y. Sept. 11, 2003) .................................................. 12n

*In re Salomon Analyst AT&T Litigation*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004) ........................ 24

*Steed Finance LDC* v. *Nomura Securities International, Inc.*,
    2004 WL 2072536 (S.D.N.Y. Sept. 14, 2004),
        *aff'd*, 148 F. App'x 66 (2d Cir. 2005) .................................................................. 10

*Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ........................................................................... 23

*In re Vivendi Universal, S.A. Securities Litigation*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011) ........ 23

*In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................. 23

*Whirlpool Finance Corp.* v. *GN Holdings, Inc.*, 67 F.3d 605 (7th Cir. 1995) ............................ 11

**Additional Authority**

Paul J. Davies, *Sigma Collapse Ends Shadow Bank Project*,
    FINANCIAL TIMES, Oct. 1, 2008, *available at* http://www.ft.com/cms/s/0/19db6e24-
    8fff-11dd-9890-0000779fd18c.html .................................................................. 17n

HENRY TABE, THE UNRAVELLING OF STRUCTURED INVESTMENT VEHICLES: HOW
    LIQUIDITY LEAKED THROUGH SIVs
      (Thoth Capital LLP 2010) ........................................................................... 17n

Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Ratings Services (together, "S&P"), Moody's Investors Service, Inc. and Moody's Investors Service Limited (together, "Moody's") respectfully submit this Memorandum of Law in support of their Motions for Summary Judgment.[1]

## PRELIMINARY STATEMENT

Three weeks ago, this Court stated that "[s]ummary judgment is designed to pierce the pleadings to flush out those cases that are predestined to result in a directed verdict." *See* Opinion and Order, Dkt. No. 474, *Abu Dhabi Commercial Bank* v. *Morgan Stanley & Co.*, 08 Civ. 7508 (SAS) (Aug. 17, 2012) ("*Abu Dhabi Op.*"), at 8 (citation omitted). The factual record in this action reveals just such a case.

The two Plaintiffs, Iowa Student Loan Liquidity Corporation ("ISL") and King County, Washington, assert that they were injured as a result of their reliance on credit ratings which allegedly concealed the presence of "toxic" assets in the Rhinebridge SIV at the time Plaintiffs invested in Rhinebridge commercial paper in late July 2007. Specifically, Plaintiffs allege that the Moody's and S&P's credit ratings on the Rhinebridge commercial paper were fraudulent because "Defendants were in possession of material non-public information" about the assets

---

[1]     Moody's and S&P move separately for summary judgment but submit this joint brief for the Court's convenience; Moody's and S&P reserve the right to file individual reply briefs as needed in response to Plaintiffs' opposition. As directed by the Court's email of August 20, 2012, Moody's and S&P have not now moved but reserve the right to move for summary judgment on Plaintiffs' negligent misrepresentation claim.

The Court's May 4, 2012 Order dismissed Count V for Aiding and Abetting Against the Rating Agencies. *See* Dkt. No. 244 at 58 ("plaintiffs' claims for . . . aiding and abetting are dismissed"); *see also* Dkt. No. 251 (McGraw-Hill's Answer) ¶¶ 281-84 and Dkt. 253 (Moody's Answer) ¶ 245. Defendants note, however, that summary judgment as to the aiding and abetting claim would be required in any event for the same reasons identified in this Court's *Abu Dhabi* ruling: Here, as in *Abu Dhabi*, "the ratings are attributable only to the Rating Agencies that issued them," so neither Morgan Stanley nor IKB is alleged to have made an actionable misstatement concerning Rhinebridge that Moody's or S&P could be said to have aided or abetted, *see* Mem. in Support of Morgan Stanley's Motion for Summary Judgment, and there is no evidence that either S&P or Moody's "knew what was going on at [any] other Rating Agency." *Abu Dhabi Op.* at 29, 85.

held by the Rhinebridge SIV and that Plaintiffs "reasonably and justifiably relied" on those ratings in deciding to invest in Rhinebridge. Second Amended Complaint ("SAC") ¶¶ 249, 252. But the record reveals that the investment strategy of the Rhinebridge SIV to invest in subprime assets was explicitly disclosed in the offering materials, that Plaintiffs had access to the same information including asset composition information available to Moody's and S&P, and that these two Plaintiffs engaged in no due diligence whatsoever prior to their decision to invest.

To survive summary judgment, King County and ISL must demonstrate a triable issue of fact with respect to each element of their claim. They cannot do so.

First, Plaintiffs' alleged *sole* reliance on credit ratings and yield information to select the investments at issue—without any further diligence—was unreasonable as a matter of law. Whatever may be said of plaintiffs in other cases involving other investments, the conduct of the two Plaintiffs in this case in making the decisions to purchase Rhinebridge securities cannot satisfy any concept of "reasonable" reliance. The record reveals the following undisputed facts:

- Both King County and ISL stated that they reviewed ratings and yield information but *made no other investigation* prior to completing the $50 million Rhinebridge commercial paper purchases on which they base their claims in late July 2007;

- Each plaintiff alleges that it was a Qualified Institutional Buyer ("QIB"), *i.e.*, a sophisticated investor, and each has testified that it was aware of market concerns about subprime investments *prior* to purchasing the Rhinebridge securities at issue;

- Yet neither obtained, let alone read, the Rhinebridge marketing materials, the Private Placement Memorandum ("PPM"), or any other information about Rhinebridge prior to purchasing Rhinebridge commercial paper;

- Had they done so, they would have read explicit disclosures about the risks associated with the subprime collateral being purchased by Rhinebridge, including the risk of the "serious financial difficulties" affecting originators of "subprime loans" and the risk of sales at "distressed" prices that "could result in losses to investors";

- King County and ISL had access to the same information about Rhinebridge's structure and assets that Moody's and S&P had; other potential investors used that information to assess the investment and some chose not to buy; neither King County nor ISL availed itself of this opportunity before purchase.

Because "[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts," *Abu Dhabi Op.* at 14, Plaintiffs' willful disregard of the widely disclosed risks associated with Rhinebridge and its underlying collateral bars them from demonstrating an essential element of their claim and the claim must be dismissed as a matter of law.

Second, King County and ISL have also failed to demonstrate, as they must, that their losses were caused by the Rhinebridge commercial paper ratings or that the ratings concealed information that, when revealed to the marketplace, negatively affected the value of their investment.  Contemporaneous documents from Plaintiffs' own files confirm that Plaintiffs considered the market collapse which precipitated Rhinebridge's default to be a "'100-year flood' type of event" (King County) that caused "systemic" turmoil in the credit markets for asset-backed commercial paper (ISL).  Such evidence contradicts any claim that Plaintiffs' losses were caused by the Defendants' conduct as opposed to intervening, market-wide events. Moreover, in light of the extensive disclosures and information available about the Rhinebridge SIV and its assets, including the widespread (and widely publicized) risks inherent in securities backed by subprime loans, Plaintiffs cannot connect their alleged losses with any of the information allegedly concealed from them.

Nor do Plaintiffs have any evidence of an actionable misstatement.  Plaintiffs base their claims exclusively on the credit ratings assigned to the Rhinebridge commercial paper they purchased.  The Court has described those ratings as "fact-based opinions" and has held that they may only be considered actionable misstatements if they were both subjectively disbelieved and objectively "false" at the time they were issued.  Here, the record is entirely devoid of any evidence suggesting that *any* member of *any* rating committee from Moody's or S&P disbelieved the Rhinebridge ratings or believed the Rhinebridge ratings (or indeed, SIV ratings generally) were wrong when issued.  With respect to the additional element of scienter, for the same reason that Plaintiffs cannot demonstrate that Moody's or S&P disbelieved their Rhinebridge ratings,

there is no evidence of any kind in the record that the rating committees who worked on the Rhinebridge SIV acted with scienter.

The record in this case makes clear that King County and ISL, both sophisticated entities with billions of dollars under management, invested in the Rhinebridge SIV in the midst of extensive public discussion regarding the state of the subprime market without making any effort to request, much less evaluate, readily available information about whether the SIV was exposed to such risks. They purchased, after themselves expressing concerns about taking subprime exposure (and in ISL's case after deciding to avoid it altogether), without so much as looking at the PPM to see the extensive and explicit risk factor disclosures about Rhinebridge's subprime exposure. And they purchased without seeking out any information about the Rhinebridge notes that they could have obtained from the SIV's asset manager—this despite the fact that that manager testified without contradiction that it would have provided King County and ISL with *any* information that was available to Moody's and S&P. The case thus stands in contrast to *Abu Dhabi*, where the Court found it "highly relevant" that the rating agencies allegedly had access to information that prospective investors did not. *See Abu Dhabi Op.* at 73 n.264.

Plaintiffs now seek to recover their investment losses by portraying the Rhinebridge ratings as fraudulent without any basis to assert or evidence to show that (i) their purported reliance on credit ratings and yield information alone to make multi-million dollar investment decisions was reasonable, (ii) the ratings assigned to the Rhinebridge SIV caused Plaintiffs' loss, (iii) Moody's and S&P did not believe the Rhinebridge ratings at the time they were issued, (iv) the Rhinebridge ratings were false or misleading as to the subject matter they addressed, or (v) Moody's and S&P acted with scienter in issuing their Rhinebridge ratings. Plaintiffs cannot overcome these significant—and legally dispositive—evidentiary gaps in the record by repeating the allegations from their complaint that describe public criticism of unrelated ratings for different assets not purchased by Plaintiffs.

**STANDARD OF REVIEW**

Summary judgment must be granted unless Plaintiffs can show that there is a disputed issue of material fact as to each element of their claim. *See Abu Dhabi Op.* at 8-10 (citing *Jaramillo* v. *Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)). Plaintiffs must make this showing by "clear and convincing" evidence. *Id.* at 11; *see also Gaidon* v. *Guardian Life Insurance Co. of America*, 94 N.Y.2d 330, 349-50 (1999). The "clear and convincing" standard "forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory." *Abrahami* v. *UPC Construction Co.*, 224 A.D.2d 231, 233 (1st Dep't 1996) (internal quotation marks omitted).

**ARGUMENT**

**I.    PLAINTIFFS HAVE NOT SHOWN THAT THERE IS A DISPUTED ISSUE OF MATERIAL FACT AS TO KEY ELEMENTS OF THEIR FRAUD CLAIM**

In New York, a successful fraud claim requires clear and convincing evidence: (i) that the defendant made a misrepresentation of existing material fact, with (ii) knowledge of its falsity and (iii) an intent to defraud the plaintiff, and that (iv) plaintiff reasonably relied on the misrepresentation (v) to his detriment. *See Abu Dhabi Op.* at 12; *Crigger* v. *Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). No such evidence exists in this case.

**A.    There is No Evidence of Reasonable Reliance by Either Plaintiff**

Plaintiffs' fraud claims must be dismissed because their own admitted conduct with respect to their investments prevents them from demonstrating reasonable reliance on the credit ratings issued by Moody's and S&P. *See Century Pacific, Inc.* v. *Hilton Hotels Corp.*, 354 F. App'x 496, 498 (2d Cir. 2009) (affirming summary judgment where plaintiff could not show that its reliance on purported misrepresentations was reasonable and approving the district court's review of "the entire context of the transaction, including factors such as its complexity and magnitude [and] the sophistication of the parties"); *Abbey* v. *3F Therapeutics, Inc.*, 2011 WL 651416, at *8 (S.D.N.Y. Feb. 22, 2011) (summary judgment warranted "where the court finds that no rational juror could conclude that a plaintiff's reliance on a defendant's alleged

-5-

misrepresentations was reasonable"). "Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts." *Abu Dhabi Op.* at 14 (quoting *Crigger*, 443 F.3d at 234).

As demonstrated below, neither King County nor ISL can point to evidence that either of them conducted the required investigation here. Plaintiffs purchased the Rhinebridge notes at issue on July 19, 2007 (King County) and July 25, 2007 (ISL), approximately two years after the Cheyne SIV was rated, amid wide public discussion regarding the state of the subprime market. Both Plaintiffs bought Rhinebridge notes as sophisticated investors with billions of dollars under management.[2]  Rhinebridge's asset manager, IKB Credit Asset Management GmbH ("IKB CAM"), prepared extensive written disclosures regarding the assets that the Rhinebridge SIV owned or intended to purchase. Indeed, contrary to the allegations of the Complaint, the record makes clear that, at the time Plaintiffs made their purchases, prospective Rhinebridge commercial paper investors had access to the same non-public information about the SIV and its assets that Moody's and S&P received. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 30, 2011) at 150:18-25 ("Q. So would it be fair to say that the answer to my question is that there is no—there was no information that was provided to the rating agencies that you would refuse to provide to an investor as far as you are aware? A. As far as I'm aware that's an accurate statement, and I'm not aware of any request as such that was turned down to investors.")).  IKB CAM's representative also testified that the marketing materials prepared for Rhinebridge expressly disclosed the SIV's exposure to subprime market risks and were available to any and all prospective investors upon demand. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 29, 2011) at 37:12-16, 63:6-25); *see also id.* at 65:6-16. Importantly, the same representative testified that several investors, wary of subprime market exposure, reviewed the very materials available to Plaintiffs

---

[2]     In 2008, the King County Investment Pool totaled approximately $4.5 billion. *See* King County Investment Pool Advisory Panel Report (May 2008) at 1, *available at* http://www.kingcounty.gov/council/issues/public_trust/Investment_Pool.aspx. In 2010, ISL had total assets of $3.75 billion. *See* http://emma.msrb.org/ER526948-ER407143-.pdf.

and declined to invest on the basis of that exposure following their review.  As demonstrated below, the text of the various disclosures available to Plaintiffs, including the Rhinebridge PPM itself, addressed precisely those risks identified in Plaintiffs' complaint but Plaintiffs' own testimony now confirms that neither King County nor ISL bothered to obtain such material or to investigate their Rhinebridge investments in any way.  Under such circumstances, summary judgment in favor of Defendants is required.

In contrast to *Abu Dhabi*, where plaintiffs made purchases as early as mid-2005, the record here makes clear that both Plaintiffs invested in Rhinebridge at the onset of that crisis, in late July 2007, after extensive public warnings regarding issues in the subprime market that they themselves had identified, without reading any of the available disclosures about their investment.  *See*:

- Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. at 72:11-16 ("You know, we—to my understanding, we were aware of—of—you know, some turmoil in the markets dealing with mortgage-backed securities, especially what we had read, were aware of exposure to subprime mortgages.  So we were aware of that."));

- Ringel Decl. Ex. 3 at 182:16-24 ("Q. What did King County know about that turmoil [in the residential mortgage market] at the time of the Rhinebridge SIV investment?  A.  I think [King County Investment Officer] Mike Smith had a general knowledge from everything that, you know, he had read through either on Bloomberg or access to other documents in the course of his investing.  He understood that there was this type of concern about subprime mortgages.");

- Ringel Decl. Ex. 8 (ISL-e0015284 (email from R. Foresman to S. Nichols dated July 25, 2007) ("We decided to avoid CDO asset backed issuances due to sub-prime taint."));

- Ringel Decl. Ex. 1 (ISL 30(b)(6) Tr. at 139:16-140:17 (reviewing a March 26, 2007 email titled "U.S. Structured Finance Newsletter – Modifications in RMBS Transactions [ISL-E0015644-50]) ("Q.  . . .Was ISL aware of mounting delinquencies in the subprime market at the time it invested in the Rhinebridge SIV?  A. . . . Personally, yes, I think we generally knew that there were such issues.")).

*See also* SAC ¶ 120 (quoting extensive media coverage of subprime market in June 2007).

Notwithstanding these known and highly publicized events, both King County and ISL have admitted under oath that they failed to review even the most basic features of their

Rhinebridge investments before purchase.  Neither recalls reviewing the published Moody's and S&P research reports that accompanied the assignment of the Rhinebridge ratings.  *See* Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 33:15-21); Rubins Decl. Ex. 4 at 289:15-292:10; Ringel Decl. Ex. 2 (ISL 30(b)(6) Tr. at 361:2-9).  Neither recalls reviewing the PPM prepared for prospective Rhinebridge investors.  Rubins Decl. Ex. 3 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 84:18-86:24); Ringel Decl. Ex. 1 (ISL 30(b)(6) Tr. at 55:12-14, 223:16-19).  Neither even knew or endeavored to learn what a SIV was, and neither undertook to consider the collateral supporting their proposed investment in any way.  Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 49:13-52:13); Rubins Decl. Ex. 3 at 80:7-81:7, 183:11-15; Ringel Decl. Ex. 1 (ISL 30(b)(6) Tr. at 44:15-45:2, 46:11-18, 47:3-8, 52:6-11).  And both Plaintiffs have conceded that they realized credit ratings were not recommendations to buy, *see* Rubins Decl. Ex. 3 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 146:8-15); Ringel Decl. Ex. 2 (ISL 30(b)(6) Tr. at 235:19-20), but rather subjective, forward-looking opinions.[3]  Plaintiffs' investments of tens of millions of dollars without doing *any work at all* to analyze the nature and risks of those investments cannot be viewed as anything short of reckless.

Both Plaintiffs have also acknowledged the limits of their pre-investment review.  King County's corporate representative conceded that, even though King County's status as a QIB required it to "look out for [its] own interests," *e.g.*, Rubins Decl. Ex. 3 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 135:20-136:5), King County may have spent *less than five minutes* considering the $50 million investment of public funds into Rhinebridge, *see id.* at 86:20-89:6 and Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 20:10-21:23).  *See also*

---

[3]    *See* Ringel Decl. Ex. 7 ((KC0001601-06) (King County Investment Pool 2006 Annual Report representing to pool members that "Standard & Poor's Fund Ratings represent an opinion only, not a recommendation to buy or sell")); Ringel Decl. Ex. 8 at ISL-e00004965 (acknowledging that ratings assigned to ISL bonds "reflect only the views of such organizations" and that "[t]here is no assurance that such ratings will be continued for any given period of time or that they will not be revised downward or withdrawn entirely by the rating agency furnishing the same, if, in the judgment of such rating agency, circumstances so warrant").

Rubins Decl. Ex. 2 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 31:18-24 ("Q. At the time King County invested in the Rhinebridge SIV, did King County have any information about the Rhinebridge SIV other than what it obtained on Bloomberg? A. I—I don't recall. Q. Nothing you're aware of? A. I—I don't recall.")).[4]

ISL admits that its own analysis was no more substantial. *See, e.g.*, Ringel Decl. Ex. 1 (ISL 30(b)(6) Tr. at 49:11-19 ("Did ISL take any steps to analyze the methodology by which Rhinebridge had been rated? . . . A. We used the ratings, but didn't – I mean, the ratings assigned at the time, from the rating agencies, *that's all we used* in evaluating the decision to invest." (emphasis added))); *id.* at 47:9-18 ("Q. Did ISL ask any questions about Rhinebridge prior to investing? . . . A. Iowa Student Loan asked what the rating was, the term and the yield. Q. Anything else? . . . A. No.")); *id.* at 53:7-15 ("Q. What steps did you take to understand your investments at that point, that you are describing? A. . . . The research that we employed was *post* investment." (emphasis added)). ISL acknowledged that it typically made an investment decision "*within minutes*," and never spent more than thirty minutes investigating an investment opportunity. *See* Ringel Decl. Ex. 3 (Sommers Tr. at 54:5-55:22). As Rhinebridge's asset manager later testified, ISL representatives may not even have understood what a SIV was two months *after* ISL made its purchase. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 29, 2011) at 89:12-89:21 (reviewing September 11, 2007 email exchange with ISL CEO Steve McCullough [Ringel Decl. Ex. 5 (IKB000109565-66)]) ("He's asking here if there are liquidity facilities behind this CP and who are the providers. . . . [I]t would seem to convey to me that he didn't understand what a structured investment vehicle was.")); *see also id.* at 91:16-92:15.[5]

---

[4]     The independent expert panel retained by King County to review its investment practices in 2007 subsequently described those practices as "atrocious," Ringel Decl. Ex. 7 (JOHN_ROSE_0000243 at 0000244), and compared those making King County's investment decisions to the "incompetent" and "comical" Keystone Kops, *see* Ringel Decl. Ex. 3 (Dobrowolski Tr. at 236:8-237:3). *See also* Ringel Decl. Ex. 7 (KCe0004182-84 (reviewing an independent May 2008 report on the King County Investment Pool that urged "rapid and forceful action" to address "significant deficiencies in the governance and operations of the pool")).

[5]     "Q. Did you have any reaction to Mr. McCullough's [September 11, 2007] request for a

Plaintiffs' failure to undertake any due diligence with respect to their investments in Rhinebridge commercial paper prevents them from raising a genuine issue of material fact with respect to the reasonableness of their alleged reliance. A plaintiff that declines to conduct even "the minimal diligence" necessary to "negat[e] its own recklessness" cannot claim that its alleged reliance was reasonable. *Banque Franco-Hellenique de Commerce International et Maritime, S.A.* v. *Christophides*, 106 F.3d 22, 26-27 (2d Cir. 1997) (internal quotation marks omitted) (noting that "justifiable reliance" under New York law requires a baseline "showing of care" on the plaintiff's part and vacating judgment for further consideration where party alleging reliance had information that directly contradicted the alleged misrepresentation two months prior to his alleged reliance thereon).[6]

"The principle that sophisticated parties have 'a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they [are] assuming' has particular application where, as here, the true nature of the risk being assumed could have been ascertained from

---

copy of the private placement memorandum? A. *Well I was surprised he didn't have this already, as this is what I thought any diligent investor would base their decision upon after reading through the documentation for the vehicle, and there'd been a lot of work done to put this documentation together . . . . So I was surprised he didn't have this already and he needed me to provide this to him*." (emphasis added).

[6]   *See also Abbey*, 2011 WL 651416, at *8, *10 (finding reliance was not reasonable as a matter of law, in part due to plaintiff's "failure to read the materials made available to him" and noting that "[w]hen asked at deposition whether he 'had carefully read' the [Limited Partnership] agreement, he responded 'no,' and said he failed to do so because he understood that his investment was 'relatively riskless'"); *Steed Finance LDC* v. *Nomura Securities International, Inc.*, 2004 WL 2072536, at *6-8 (S.D.N.Y. Sept. 14, 2004) (granting summary judgment where plaintiff failed to demonstrate reasonable reliance and holding that "[e]ven in the absence of . . . cautionary language in the PPM," "[plaintiff] would not be able to maintain its misrepresentation claims if it chose not to investigate the information available to it prior to its purchase of the Private Certificates"), *aff'd*, 148 F. App'x 66 (2d Cir. 2005); *Barneli & Cie SA* v. *Dutch Book Fund SPC, Ltd.*, 95 A.D.3d 736, 736-37 (1st Dep't 2012) (holding that fraud claim was "not viable" where plaintiff "failed to investigate before investing $50 million in defendant"); *HSH Nordbank AG* v. *UBS AG*, 95 A.D.3d 185, 197 (1st Dep't 2012) (An investor's "failure to undertake (either directly or through an advisor) an independent appraisal of the risks of the transaction necessarily leads to the conclusion that [the investor] was 'so lax in protecting [itself] that [it] cannot fairly ask for the law's protection.'" (citation omitted)).

-10-

reviewing market data or other publicly available information." *HSH Nordbank AG*, 95 A.D.3d at 188, 195 (citations omitted) (finding that HSH, "a sophisticated commercial entity," could not satisfy the element of reasonable reliance where it "was explicitly warned of the risks it was undertaking in this highly leveraged and complex transaction").   "[A]s a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it." *Id.* at 194-95 (internal citation and quotation marks omitted); *see also Abu Dhabi Op.* at 14; *Whirlpool Financial Corp.* v. *GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995) ("A reasonable investor is presumed to have information available in the public domain . . . .").

Plaintiffs allege that, "[u]nbeknownst to [them], Rhinebridge held over a billion dollars worth of toxic, low-quality mortgage-backed securities" and that "the inclusion of [those] assets [in the SIV] rendered the ratings false and misleading." SAC ¶¶ 9, 121; *see also id.* at ¶ 165. Plaintiffs further allege that "[n]o amount of investigative prowess would have enabled plaintiffs to discover the true quality" of Rhinebridge's assets. SAC ¶ 137. Contrary to these assertions, extensive information about the Rhinebridge SIV—including explicit discussion of the risks flowing from its exposure to the subprime mortgage market—was available to Plaintiffs and, as explicitly confirmed by the SIV's manager, Plaintiffs could have obtained *any* information that Moody's and S&P had access to if they had only bothered to ask. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 30, 2011) at 150:18-25); Ringel Decl. Ex. 5. Thus, it was not the case, as alleged in the Complaint, that "the Rating Agencies had access to information about the SIV's assets that investors did not." *Compare Abu Dhabi Op.* at 73 n.264. Here, as the Rhinebridge asset manager testified, the specific composition of assets in the SIV as well as other information was in fact available upon request to any potential investor. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 30, 2011) at 150:18-25); *id.* at 40:20-41:13 (Bains Tr. (June 29, 2011) ("Q. Did IKB CAM ever receive a request from a dealer for disclosure of the specific assets in the portfolio to a CP

[commercial paper] investor? . . . A. Yes, it did. I know during our initial marketing phase, sort of end of June, early July, we were contacted by people such as State Street, who requested line by line information. . . . Q. . . . Subject to that confidentiality, did IKB ever turn down such a request? A. Not that I'm aware of.")). Plaintiffs may not, therefore, overcome their own failure to investigate by suggesting that the specific information to which they attribute their loss was a matter "peculiarly within [D]efendant[s'] knowledge." *Abu Dhabi Op.* at 14.[7]

The particular risks associated with subprime securities were focused on and explicitly and specifically disclosed to potential investors (and would have been known to Plaintiffs if they had bothered to read the disclosures) prior to their investments. For example, the PPM made available to all investors prior to their investments in the Rhinebridge SIV expressly disclosed:

- That the Rhinebridge SIV was "backed by a substantial exposure to the nonprime, and *in particular subprime*, U.S. residential mortgage market."

- That "[n]umerous residential mortgage loan *originators that originate nonprime, and in particular subprime, mortgage loans have recently experienced serious financial difficulties*, negative ratings actions and, in some cases, bankruptcy. Those

---

[7]   Even if the record supported Plaintiffs' claim that information about the Rhinebridge SIV was unavailable to them, and it does not, "the Second Circuit has noted that the fact that information may be peculiarly known to one entity does not end the analysis in the case of sophisticated players." *PPI Enterprises (U.S.), Inc.* v. *Del Monte Foods Co.*, 2003 WL 22118977, at *24 (S.D.N.Y. Sept. 11, 2003) (referencing *Lazard Freres & Co.* v. *Protective Life Insurance Co.*, 108 F.3d 1531 (2d Cir. 1997)); *see also Century Pacific*, 354 F. App'x at 498 (stating that in *Lazard* "a sophisticated party could not show reasonable reliance notwithstanding the fact that . . . the alleged misrepresentation concerned a matter 'peculiarly within' the other party's knowledge"). The peculiar knowledge exception grants that reliance may be reasonable where plaintiffs are unable to verify certain facts despite having "made a significant effort to protect themselves against the possibility of [misstatements]...." *HSH Nordbank AG*, 95 A.D.3d at 198 n.9 (citation omitted). It does not grant sophisticated investors carte blanche to make $50 million investments without conducting *any* diligence and then claim afterwards that they acted reasonably because their own conduct left certain information unknown to them. *See Ashland Inc.* v. *Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 470-71 (S.D.N.Y. 2010) (holding that though some information was non-public, there was public information that allowed plaintiffs to evaluate the relationship between a structured investment, the subprime crisis and the credit ratings), *aff'd*, 652 F.3d 333 (2d Cir. 2011). Such a standard would put willfully blind plaintiffs like King County and ISL in a better position than the investors in *Lazard* and *Century Pacific* who, despite efforts to obtain assurances regarding the truth of statements which they could not verify, could not, as a matter of law, establish reasonable reliance.

developments could affect other participants in the market as well as holders [such as the Rhinebridge SIV] of securities of such originators."

- That "[d]elinquencies, defaults and losses with respect to residential mortgage loans generally *have increased in recent months and may continue to increase*, particularly in the nonprime sector."

- That "*housing prices and appraisal values in many U.S. states have declined* or stopped appreciating, after extended periods of significant appreciation" and that "[a] continued decline or extended flattening of those values" could cause increased delinquencies and losses.

- That an increase in monthly payments attributable to adjustable rate mortgages could also increase delinquencies, and that borrowers seeking to avoid such increases by refinancing or selling their homes "may no longer be able to find available replacement loans at comparably low interest rates," and "may find that they cannot sell their properties" for more than they owed on their mortgages.

- That forced sales of subprime assets if the Rhinebridge SIV were forced to wind down "could be on a discounted or possibly *distressed basis* and sales on such terms could result in losses to investors."

- That, in addition to causing increased delinquencies and defaults, these trends could affect the market value and liquidity of the Rhinebridge SIV's investments, and that, "in *distressed circumstances in the residential mortgage market*," the market value of the SIV's subprime investments could decrease such that any sale would be on a discounted or distressed basis, again causing losses to investors.

Ringel Decl. Ex. 6 at KC0023256-59 (emphasis added).

Rhinebridge's asset manager has also testified that the Rhinebridge marketing materials prepared for investor review deliberately used the phrase "subprime" in describing the SIV's intended asset mix so that investors wary of the subprime real estate market could understand the nature of the Rhinebridge investment and decline to invest if they so chose. Those materials were available on demand to any potential investor, and several potential investors *did* decline to purchase the notes on the basis of such a review. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 29, 2011) at 37:12-16); *id.* at 63:6-19:

> Q.   Mr. Bains, why did IKB CAM include the information [regarding Rhinebridge's U.S. RMBS portfolio breakdown] in this July 2007 presentation?
>
> A. . . . [W]e wanted to be as honest and open as we could with investors as to

what was in the portfolio. We knew that some investors had certain concerns over the US housing market and mortgage bonds at that point in time. It is something that had come up during pre-marketing. So this was something there to demonstrate what we had in the portfolio. If there were any particular investors who didn't want any subprime exposures, they would have been able to tell straightaway that this wasn't something for them . . . .

*See also id.* at 65:6-16, 67:10-19:

> Q. Well, given that the Rhinebridge commercial paper was rated AAA or AAA equivalent, why did IKB CAM think it was nevertheless appropriate to provide additional information about the portfolio beyond just the rating that had been given to the commercial paper?
>
> A. Okay. Well, as I said earlier, any diligent investor would want to understand what was behind that AAA rating . . . .
>
> Q. Did—were there any investors who declined to purchase Rhinebridge commercial paper in particular because it contained subprime assets?
>
> A. Yes, there were a few investors out there who we were aware of who declined to invest in Rhinebridge commercial paper specifically because they were reluctant to take on additional US subprime exposure at that time.

*See also* Ringel Decl. Ex. 5 (MS_RHI_000315636-37 (March 21, 2007 email attaching spreadsheet that summarized potential investor comments regarding the SIV) (Bank Hapoalim: "[w]obbling due to headline noise around HEL exposure;" KfW: "concerned about HEL exposure[,] [w]obbling")).

The Rhinebridge asset manager further testified that ISL's investment representative did not request the Rhinebridge marketing materials until September or October 2007, months *after* ISL purchased its Rhinebridge notes. He could not recall King County *ever* making such a request during IKB CAM's operation of the structure. *See* Rubins Decl. Ex. 1 (Bains Tr. (June 29, 2011) at 124:8- 125:12).

Plaintiffs' own testimony confirms that they did not consider the extensive information and risk disclosures available to them. *See, e.g.,* Ringel Decl. Ex. 1 (ISL 30(b)(6) Tr. at 55:7-57:11 ("My question is whether ISL knew at the time it invested that an information memorandum was available. . . . A. We didn't specifically ask if the PPM existed, but I think we

knew that there was some—there was information available. Q. Including an information memorandum? . . . A. Yeah, I think you could assume there was one, but we didn't specifically ask if it existed. . . . [W]e did not ask for [the PPM] specifically at that time of investment.")); *id.* at 44:6-14 ("we used the ratings, and we did not review the offering memorandum prior to [investing in Rhinebridge]"); Rubins Decl. Ex. 3 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 84:25-85:11 ("Q. So to be clear, did King County have—did King County even have the [PPM] for the Rhinebridge SIV at the time of its first Rhinebridge investment? A. We could not recall specifically when we received that [PPM]. Q. And so you don't know one way or the other whether King County even had the [PPM] at the time of the second investment either; is that correct?  A. There—I could not say.")).

The total failure of the two Plaintiffs in this case to investigate their investments and their acknowledged disregard for the contents of the PPM and related marketing materials that explicitly discussed Rhinebridge's exposure to subprime market risks render Plaintiffs' purported reliance on the Defendants' credit ratings in making their investment decisions unreasonable as a matter of law and the fraud claim must be dismissed as a result.

**B.      There is No Evidence of Loss Causation**

Private litigation is not meant to be "a partial downside insurance policy" for investors who are dissatisfied with the performance of their investments. *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U.S. 336, 347-48 (2005).  Summary judgment must be granted where Plaintiffs have "failed to raise a material issue of fact that would support a finding of loss causation." *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501, 514 (2d Cir. 2010).  Where, as here, "'the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,'" and a plaintiff must produce evidence that its losses were "'caused by the alleged misstatements as opposed to intervening events.'" *See Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (citation omitted); *see also Dura*, 544 U.S. at 342-43 ("To 'touch upon' a loss is not to

*cause* a loss, and it is the latter that the law requires." (citation omitted)).

As the Second Circuit has made clear, the burden of proving loss causation, and disaggregating losses caused by other factors from losses caused by alleged fraud, falls squarely on Plaintiffs. *See In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29, 36 (2d Cir. 2009) ("[T]o establish loss causation, *Dura* requires *plaintiffs* to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements." (emphasis added) (citation omitted)); *Lentell*, 396 F.3d at 172 ("It is long settled that a securities-fraud plaintiff 'must prove both transaction and loss causation.'" (citation omitted)); *In re Omnicom*, 597 F.3d at 509, 514 (affirming summary judgment dismissal where plaintiff "failed to raise a material issue of fact that would support a finding of loss causation," explaining: "[S]ummary judgment is appropriate where . . . undisputed facts reveal that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof" (citation omitted)).

  1.   Plaintiffs' Losses Were Caused by an Unprecedented Market Disruption

The year 2007 witnessed the onset of an unforeseeable and unprecedented market-wide liquidity crisis. *See Amida Capital Management II, LLC* v. *Cerberus Capital Management, L.P.*, 669 F. Supp. 2d 430, 433 (S.D.N.Y. 2009) ("July 2007 [*i.e.*, the month *after* Rhinebridge was rated] marked the beginning of what was then called the 'credit crunch,' the first phase of the financial crisis that culminated in the fall of 2008."); *see also* Ringel Decl. Ex. 3 (Scott (ISL advisor) Tr. at 117:15-19 ("The markets were—there was—there was a series of events through '07 and '08 where liquidity in the market was thin.  Those people requiring liquidity were in a disadvantaged position.  And liquidity was expensive.")).  King County itself has described the crisis as "the largest financial crisis since the Great Depression."  Ringel Decl. Ex. 6 at KCe0046219.  King County has also admitted that the liquidity crisis that caused Rhinebridge's collapse was not unique to the Rhinebridge SIV.  *See, e.g.*, Ringel Decl. Ex. 6 ((KCe0023244-

54) (February 20, 2008 email from Ken Guy to King County pool members noting that: "all forms of asset backed commercial paper were part of an unprecedented global credit market crisis that hit in late August 2007 without much warning")); Rubins Decl. Ex. 3 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 206:21-25 ("Q. Does it remain your view that what occurred was global in nature? . . . A. Based on my personal understanding, it—it appeared to have widespread impact.")).[8]

Following Plaintiffs' purchases, an intervening event severed any connection between Defendants' alleged misconduct and Plaintiffs' alleged losses — namely, a total disintegration of historical market paradigms, as one IKB analyst testified, *see* Ringel Decl. Ex. 3 (Bauknecht Tr. at 332:23-333:16):

> [T]his was something that could not have been foreseen. . . . [F]rom an economic perspective, it is like analyzing the Stock Market, the Dow, and one should certainly—we can argue that with the economy moderating and going into recession, we can argue whether the Stock Market is going to fall 10 or 15 percent, on what the earnings potential of companies, all these things we can discuss. But surely nobody will argue that the US economy is going to go into recession the US Stock Exchange is going to cease to exist. That would even have been more plausible than the commercial paper market. . . . We are not talking about downturn, we are talking about it ceased to exist.[9]

Not surprisingly, Plaintiffs have not come forward with any evidence to disaggregate losses caused by this liquidity crisis from losses allegedly caused by fraud. Although, at the motion to dismiss stage, Plaintiffs were not required to prove that a specific portion of their

---

[8]     Indeed, nearly all SIVs collapsed in the wake of this crisis. Paul J. Davies et al., *Sigma Collapse Ends Shadow Bank Project*, FINANCIAL TIMES, Oct. 1, 2008, *available at* http://www.ft.com/cms/s/0/19db6e24-8fff-11dd-9890-0000779fd18c.html; HENRY TABE, THE UNRAVELLING OF STRUCTURED INVESTMENT VEHICLES: HOW LIQUIDITY LEAKED THROUGH SIVs 6, 202, 209 (Thoth Capital LLP 2010).

[9]     Kenneth Guy, Director of the Finance and Business Operations Division for King County, described the market events of late Summer and early Fall 2007 to King County pool participants as "systemic in nature" and "not limited to just one or two programs in the market." *See* Ringel Decl. Ex. 6 (KC0013657-58 (Oct. 19, 2007 email titled "Commercial Paper Investment Update")).

losses were attributable to Defendants' conduct, Plaintiffs must now come forward with clear and convincing evidence tying some identifiable portion of their losses to Defendants' alleged fraud. *See King County* v. *IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 346 (S.D.N.Y. 2010) (Scheindlin, J.) (allowing case to proceed at the pleading stage, explaining: "[E]ven though I am uncertain whether *plaintiffs* will be able to ultimately prove that any portion of their losses were caused by the defendants' conduct as opposed to the credit crisis, that is not their burden *at this stage*." (emphasis added)). Their claims must be dismissed because the burden is on Plaintiffs to come forward with evidence to disaggregate fraud from non-fraud explanations for the loss. *See In re Flag Telecom*, 574 F.3d at 36; *see also Erica P. John Fund., Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) (if "intervening causes" are "responsible for the loss or part of it, a plaintiff would not be able to prove loss causation to that extent").

> 2.   The Credit Ratings Did Not Conceal The Risks That Caused Plaintiffs' Losses

Nor is there any evidence in this case "'that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the [alleged] misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (emphasis in original) (citation omitted). Here, as noted above, *supra*, 12-15, the risks that Plaintiffs claim materialized and caused their alleged losses—the failure of liquidity and decline in market value of subprime assets—were disclosed risks. The Rhinebridge PPM explained that the SIV had exposure to subprime mortgages, that delinquencies were increasing in the U.S. housing market, and that this could affect the value of assets held by Rhinebridge and could result in sales on a "distressed basis," and consequential losses to investors. In light of such disclosures, Plaintiffs cannot demonstrate that the information available to them failed to "accurately report the risky nature of [their] investment." *Compare Abu Dhabi Op.* at 79; *Lentell*, 396 F.3d at 173 (risks that caused loss must be "within the zone of risk *concealed* by the [alleged] misrepresentations" (emphasis in original)).[10]

---

[10]   Plaintiffs' sensational characterization of subprime assets as "toxic" cannot vitiate the

Plaintiffs cannot immunize themselves from these disclosures by pleading blind reliance on the ratings. The "zone of risk" allegedly concealed by the Rhinebridge ratings cannot as a matter of law include, as Plaintiffs have suggested, any risk that could cause them a loss. *See In re AOL Time Warner, Inc. Securities Litigation*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) (alleged concealed risk must be specific). Such an expansive theory would improperly convert any AAA rating into a form of insurance, and any loss on an AAA security into *prima facie* proof of loss causation. *See Dura*, 544 U.S. at 345 (Private securities fraud actions are available "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause"). Plaintiffs had available to them information "directly address[ing] the risk that plaintiffs' claim was not disclosed," *Abu Dhabi Op.* at 79 & n.286, which precludes any showing of loss causation.

### C.   There is No Evidence of an Actionable Misstatement

Here, both Plaintiffs base their misrepresentation claim against Moody's and S&P exclusively on the ratings assigned to the Rhinebridge SIV. *See, e.g.*, SAC ¶¶ 83, 243, 259. As a matter of law, those ratings represent subjective, forward-looking opinions as to the creditworthiness of the rated notes, as Plaintiffs have acknowledged. *See Abu Dhabi Op.* at 34 & n.123 (citations omitted); *see also supra*, n.3. While an opinion generally cannot provide the basis for a claim of fraud in New York, the Second Circuit has recognized a narrow exception to this rule where a speaker subjectively, but privately, disbelieves his or her stated opinion *and* such statements are also objectively "false or misleading with respect to the underlying subject

---

fact that both Rhinebridge's exposure to these assets and the risks associated therewith were disclosed in writing to all potential Rhinebridge investors. *See, e.g.*, *In re Omnicom*, 597 F.3d at 512; *In re CRM Holdings, Ltd. Securities Litigation*, 2012 WL 1646888, at *31 (S.D.N.Y. May 10, 2012) ("Investors cannot establish loss causation merely by relying on an after-the-fact 'negative characterization of already-public information.' Here, CRMH disclosed the inherent risks associated with the GSIT business . . . . Plaintiffs' allegations that 'CRM built a business unit upon a house-of-cards' and that 'numerous trusts were *already* underfunded by year-end 2005' are nothing more than negative characterizations of information . . . disclosed by Defendants.'" (quoting *In re Omnicom*, 547 F.3d at 512)).

matter they address." *See Fait* v. *Regions Financial Corp.*, 655 F.3d 105, 111-12 (2d Cir. 2011). Under that standard, Moody's and S&P may only be liable for fraud if their ratings *both* misstated the opinions or beliefs they held *and* were false or misleading with respect to the underlying subject matter they addressed. *Abu Dhabi Op.* at 38. Plaintiffs cannot identify any evidence, let alone "clear and convincing evidence," of either prong of this standard in this case.

With respect to S&P, Plaintiffs can produce no evidence that the Rhinebridge ratings were subjectively disbelieved by the S&P rating committee that issued them or that those ratings were based on anything other than a "reasoned analysis." First, there is absolutely no deposition testimony or documentary evidence that S&P's rating on the Rhinebridge SIV reflected anything but the rating committee's genuine, honest view of the Rhinebridge SIV following a thorough analysis. The only deposition testimony is to the contrary. *See, e.g.*, Guadagnuolo Tr. at 188:6-17 (describing Rhinebridge's ratings as reflecting his "honest independent opinion of the creditworthiness of those issuances."); *id.* at 189:7-15 ("Q. Did anyone who sat on the committee that rated the Rhinebridge notes ever express in any way a view that the rating did not represent their honest opinion? A. No. Q. Did anyone at committee ever express a view to you a rating came to diverge from their honest opinion? A. No."). Second, the record evidence reflects that S&P's Rhinebridge rating committee spent many months and countless hours conducting detailed analysis of the creditworthiness of Rhinebridge notes. *See, e.g.*, Ringel Decl. Ex. 4 (S&P-IKB 0012940 (September 2006 initial Rhinebridge termsheet and presentation provided to S&P)); Ringel Decl. Ex. 10 (S&P-IKB 0021271 (February 2007 internal S&P memorandum regarding committee discussion of a modeling issue)); Ringel Decl. Ex. 10 (S&P-IKB 0011842 (March 2007 internal S&P summary of transaction structure as presented to rating committee and noting committee comments)). Moreover, the S&P rating committee's conclusions as to the Rhinebridge SIV,[11] were fully explained in contemporaneous publications—publications that

---

[11]     *See* Ringel Decl. Ex. 9 (KC0000348-60 (April 13, 2007 Rhinebridge PLC and Rhinebridge LLC Pre-Sale Report)).

were available to the public but that Plaintiffs never bothered to obtain or review. *See, e.g.*, Rubins Decl. Ex. 4 (King County 30(b)(6) Tr. (Nov. 7, 2011) at 289:15- 292:10); Ringel Decl. Ex. 2 (ISL 30(b)(6) Tr. at 361:2-9). There is simply no evidence whatsoever in the record of this case that S&P's ratings on the Rhinebridge notes deviated in any way from S&P's published SIV rating criteria or from S&P's published explanation of its Rhinebridge rating process contained in its Pre-Sale Report.

With respect to Moody's, the record unequivocally demonstrates that the Rhinebridge ratings were well supported by "reasoned analysis" and had an ample "factual foundation." *See Abu Dhabi Op.* at 36. The rating process, which was led by Moody's analysts Fanny Lau, Angela Jung and Paul Kerlogue (*see* Rubins Decl. Ex. 5 at 22-23), involved eight months of research, analysis, and deliberation by the committee members, at the end of which the committee voted to assign ratings to the Rhinebridge notes. (*See id.* at 36-37.)[12] During those eight months, the committee met formally on many occasions to discuss all aspects of the Rhinebridge proposal, and the committee members sent countless emails, both internally and to Morgan Stanley, that, *inter alia*, (1) analyzed all relevant qualitative and quantitative aspects of the transaction; (2) requested additional proposals, data, or other work from Morgan Stanley; and (3) closely questioned Morgan Stanley regarding details of the transaction, rejecting aspects of the proposal where the committee felt appropriate. *See, e.g.*, Rubins Decl. Ex. 6 at 003447 (January 19, 2007 committee); MDYS RHNB 0011930 (January 23, 2007 committee); MDYS RHNB 012028 (April 2, 2007 committee); Rubins Decl. Ex. 7 at 011940 (March 2 and 12, 2007 committees); Rubins Decl. Ex. 8 at MS-RHI_000181982 (email from MS, sending results of stress runs that were requested by Moody's); at MS_RHI_000055179 (referring to runs performed by Moody's using its own model); at MS_RHI_000255461 (email from Ms. Lau, explaining the need to "re-do the calibration process," in light of changed target portfolio; subsequent email from MS enclosing "sensitivity runs as requested" by Moody's); Rubins Decl.

---

[12]    Tellingly, Plaintiffs did not pursue depositions of Ms. Lau, Ms. Jung or Mr. Kerlogue.

Ex. 9 at MDYS RHNB 003452 (rejecting MS proposal to accept 7-year HELs as LEAs); at MS_RHI_000043161 (email relaying committee's deliberations and requesting an additional proposal from MS); at IKB003258849 (seeking clarification on several aspects of the proposal and stating that the term sheet would be "re-checked" by Moody's); at MDYS RHNB 050453 (internal Moody's email providing additional analysis as requested by committee); Rubins Decl. Ex. 10 at MS_RHI_000070461 (providing feedback on network of legal documents supporting the SIV); at IKB000143871 (internal IKB email regarding upcoming operations review, stating, "[Ms. Lau] gave me what as a result of the intensity and her insistence I would describe as a 'fair warning' in the form of a description of how Moody's will [] carry out their due diligence"); at IKB003997170-71 (email from Ms. Lau to MS, outlining six separate areas to be investigated during the operations review); at MDYS RHNB 018284 (3-page list prepared by Ms. Lau of additional tasks to be performed by Moody's and IKB prior to closing); at MDYS RHNB 009903 (noting that Moody's and IKB had gone through Ms. Lau's list "in detail").

Moody's and S&P separately produced approximately *60,000 pages each* of documents related specifically to their respective ratings of the Rhinebridge notes, only a small sample of which are cited above. Those documents, including the above-referenced committee memoranda and emails, contain all the hallmarks of the serious, thorough, independent, and diligent rating processes undertaken by both Moody's and S&P. No evidence exists that Moody's or S&P knowingly issued Rhinebridge commercial paper ratings that were either unsupported by "reasoned analysis" or lacked a "factual foundation." *Abu Dhabi Op.* at 36. And there is no evidence, let alone clear and convincing evidence, for Plaintiffs' fantastical assertion that the ratings committee at Moody's *and* the ratings committee at S&P (*and* the ratings committee at Fitch) worked for months, independently of one another, analyzing the Rhinebridge SIV simply to issue ratings that they did not believe. The absence of such evidence compels the conclusion that Plaintiffs have failed to plead an actionable misstatement by Moody's or by S&P.

**D.    There is No Evidence of Scienter**

"To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter" and that both ultimate responsibility for the alleged culpable act and the requisite mental state existed in the same corporate employee. *Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Thus, to survive summary judgment, Plaintiffs must present evidence that the "speaker" responsible for the Rhinebridge rating made the alleged misstatement with the requisite state of mind. *See id.* at 194-96; *In re Vivendi Universal, S.A. Securities Litigation*, 765 F. Supp. 2d 512, 544-46 (S.D.N.Y. 2011). No such evidence exists.

The Rhinebridge ratings were issued by rating committees at Moody's and S&P, and it is the knowledge and belief of those committees that forms the locus of the scienter inquiry here. Plaintiffs cannot identify any evidence, let alone clear and convincing evidence, demonstrating that the committee members who issued the Rhinebridge ratings considered those ratings, or the ratings of SIVs generally, to be "false." *See supra*, 20-23.

In addition to affirmative testimony from the committee members on this point, the record also contains indisputable evidence that the very information Plaintiffs claim to have been denied was expressly disclosed in writing prior to Plaintiffs' purchase. *See supra*, 12-15. "The mere fact of that disclosure undermines any credible theory of scienter," *In re Wachovia Equity Securities Litigation*, 753 F. Supp. 2d 326, 356 (S.D.N.Y. 2011), because such disclosures are "inconsistent with a state of mind going toward 'deliberate illegal behavior.'" *Footbridge Ltd.* v. *Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *20 (S.D.N.Y. Sept. 28, 2010) (citation omitted).

Even under this Circuit's more lenient standard of review for scienter issues on summary judgment, *Abu Dhabi Op.* at 13, "evidence" on non-Rhinebridge, non-SIV subjects cannot reasonably be considered "evidence of conscious misbehavior or recklessness" with respect to the Rhinebridge ratings on which King County and ISL base their claim. *See, e.g., In re Salomon Analyst AT&T Litigation*, 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) (holding that

"generalized allegations about conflicts of interest, incentives to increase compensation, or internal pressure on analysts that is not tied to the particular stock at issue are not sufficient" to establish scienter).  Plaintiffs have not identified any factual connection between comments addressing other subjects cited in their complaint and the actual state of mind of the Rhinebridge rating committees.   Indeed, none of the statements cited in Plaintiffs' complaint refers to the Rhinebridge SIV, and many refer to entirely different and independently-rated categories of structured finance assets that are wholly unrelated to the investments at issue here.  No jury could reasonably infer scienter in this case from such material and Plaintiffs cannot rely on it to raise a material question of fact as to the Rhinebridge committees' respective states of mind.

## CONCLUSION

For the foregoing reasons, summary judgment for Moody's and S&P should be granted.

September 7, 2012

Respectfully submitted,

   /s/ Dean Ringel
Floyd Abrams (fabrams@cahill.com)
Dean Ringel (dringel@cahill.com)
Tammy L. Roy (troy@cahill.com)
Jason Hall (jhall@cahill.com)
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Telephone:  212-701-3000

*Attorneys for Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Ratings Services*

   /s/ Joshua M. Rubins
Joshua M. Rubins (jrubins@ssbb.com)
James J. Coster (jcoster@ssbb.com)
Mario Aieta (maieta@ssbb.com)
James Doty (jdoty@ssbb.com)
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue
New York, New York 10169
Telephone: 212-818-9200

*Attorneys for Defendants Moody's Investors Service, Inc. and Moody's Investors Service Ltd.*