UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :

KING COUNTY, WASHINGTON,
and IOWA STUDENT LOAN
LIQUIDITY CORPORATION,
                                           :

                    Plaintiffs,     :       09 Civ. 8387 (SAS)

                                   :

          - against -          :       **ECF Case**

                                   :

IKB DEUTSCHE INDUSTRIEBANK AG,
et al.,
                    Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF DEAN RINGEL IN SUPPORT OF THE MOODY'S AND S&P MOTIONS FOR SUMMARY JUDGMENT

I, DEAN RINGEL, declare as follows:

1.    I am a member of the bar of this Court and a member of the firm of Cahill Gordon & Reindel LLP, which represents defendants Defendants The McGraw-Hill Companies, Inc. and Standard & Poor's Ratings Services (collectively, "S&P") in the above-captioned action. I submit this declaration to place before the Court certain documents referenced in the Memorandum of Defendants Moody's and S&P in Support of Their Motions for Summary Judgment. I am fully familiar with the facts set forth herein and make this declaration based on personal knowledge.

2.    Attached hereto as <u>Exhibit 1</u> is a true and correct copy of excerpted deposition testimony given by Ronald Foresman (Iowa Student Loan Liquidity Corporation ("ISL") Fed. R. Civ. P. 30(b)(6) designee).

3.    Attached hereto as <u>Exhibit 2</u> is a true and correct copy of additional excerpted deposition testimony given by Ronald Foresman (ISL Fed. R. Civ. P. 30(b)(6) designee).

4.      Attached hereto as <u>Exhibit 3</u> is a true and correct copy of excerpted deposition testimony given by King County Investment Pool Advisor John T. Dobrowolski, ISL advisor Glenn E. Scott, ISL advisor David Sommers, and IKB analyst Dr. Klaus Bauknecht.

5.      Attached hereto as <u>Exhibit 4</u> is a true and correct excerpted copy of a draft Rhinebridge termsheet and related September 2006 presentation provided to S&P, Bates-stamped S&P-IKB 0012940-13068.

6.      Attached hereto as <u>Exhibit 5</u> is a collection of excerpted Rhinebridge-related documents prepared by former Defendant IKB and current Defendant Morgan Stanley, consisting of: a true and correct excerpted copy of an IKB email dated July 17, 2007 and attaching Rhinebridge marketing materials for investor review, Bates-stamped IKB 000030823-56; an email chain Bates-stamped IKB 000109565-66 reflecting delivery of the Rhinebridge PPM to ISL representatives; and a true and correct copy of MS_RHI_000315636-37, a March 21, 2007 Morgan Stanley email attaching potential investor comments regarding the Rhinebridge SIV.

7.      Attached hereto as <u>Exhibit 6</u> is a collection of excerpted documents produced in discovery by Plaintiff King County, consisting of:  a true and correct excerpted copy of the Rhinebridge private placement memorandum Bates-stamped KC 0023229-403; a true and correct excerpted copy of an email chain Bates-stamped KCe0023244-54; ; a true and correct copy of an email dated October 19, 2007 and Bates-stamped KC 0013657-58; a true and correct excerpted copy of an email chain Bates-stamped KCe0046219-31.

8.      Attached hereto as <u>Exhibit 7</u> is a collection of additional excerpted documents produced in discovery by Plaintiff King County and documents produced in discovery by John Rose, a member of the King County Investment Advisory Panel, consisting of:  a true and correct excerpted copy of a 2006 King County Investment Pool Annual Report, Bates-stamped KC 0001601-06; a true and correct copy of an email dated May 28, 2008 and Bates-stamped KCe0004182-84; and a true and correct copy of an email from John Rose Bates-stamped John_Rose_0000243-44.

2

9.     Attached hereto as <u>Exhibit 8</u> is a collection of excerpted documents produced in discovery by Plaintiff ISL, consisting of:  a true and correct excerpted copy of an email chain (with attachment) Bates-stamped ISL-e0004919-5092; and a true and correct copy of an email chain Bates-stamped ISL-E0015284.

10.    Attached hereto as <u>Exhibit 9</u> is and a true and correct copy of a Rhinebridge pre-sale rating report Bates-stamped KC0000348-60.

11.    Attached hereto as <u>Exhibit 10</u> is a true and correct copy of excerpted deposition testimony given by S&P Rhinebridge rating committee member Lapo Guadagnuolo and true and correct excerpted copy of internal S&P Rhinebridge committee materials Bates-stamped S&P-IKB 0021271-72 and S&P-IKB 0011842-74.

/s/ Dean Ringel
Dean Ringel

Executed this 7th day of September, 2012, in New York, New York.

3

EXHIBIT 1

Page 1

1                Highly Confidential
2            UNITED STATES DISTRICT COURT
3            SOUTHERN DISTRICT OF NEW YORK
4      ---------------------------X
5   KING COUNTY, WASHINGTON;
    STUDENT LOAN LIQUIDITY
6   CORPORATION, together and on
    Behalf of All Others Similarly
7   Situated,
8                    Plaintiffs,
9         -vs-                    09-CV-8387 (SAS)
    IKB DEUTSCHE INDUSTRIEBANK
10  AG; IKB CREDIT ASSET MANAGEMENT,
    GmbH; MOODY'S INVESTORS SERVICE,
11  INC.; MOODY'S INVESTORS SERVICE
    LIMITED; THE MCGRAW-HILL
12  COMPANIES, INC. (d/b/a STANDARD &
    POOR'S RATING SERVICES);  FITCH,
13  INC.; MORGAN STANLEY & CO.
    INCORPORATED, MORGAN STANLEY
14  & CO. INTERNATIONAL LIMITED;
    WINFRIED REINKE AND ORTSEIFEN,
15                   Defendants.
16     ---------------------------X
17            * * HIGHLY CONFIDENTIAL * *
18       VIDEOTAPED 30(b)(6) DEPOSITION OF IOWA STUDENT
    LOAN LIQUIDITY CORPORATION by RONALD FORESMAN
19                  New York, New York
                    November 29, 2011
20
21
22
23
24  Reported by:
    Bonnie Pruszynski, RMR
25  JOB NO. 42720

Page 38

```
1         Highly Confidential - R. Foresman
2    investment process required speaking with the
3    brokers and investments offered, so that was the
4    communication.
5         Q     But you don't know which one of the
6    three, if any, ISL discussed Rhinebridge with; is
7    that right?
8         MS. MATERA: Objection. Asked and
9    answered. Vague and ambiguous.
10        A     Well, we purchased from Linsco
11   Private Ledger and Citigroup.
12        Q     Did ISL discuss Rhinebridge prior to
13   investing with Linsco?
14        MS. MATERA: Objection. Vague and
15   ambiguous. Asked and answered.
16        A     Yes, we purchased from them, so yes,
17   we discussed that.
18        Q     What did ISL discuss with Linsco
19   about Rhinebridge prior to investing?
20        MS. MATERA: Objection. Vague and
21   ambiguous.
22        A     Linsco provided Rhinebridge as an
23   investment and provided ratings, term, yield.
24        Q     Were there any oral conversations
25   with Linsco concerning Rhinebridge prior to ISL's
         TSG Reporting - Worldwide     877-702-9580
```

Page 39

```
1         Highly Confidential - R. Foresman
2    investment?
3         MS. MATERA: Objection. Vague and
4    ambiguous.
5         A     The oral conversation would be
6    relaying the rating, the term and the yield.
7         Q     Anything else?
8         MS. MATERA: Objection. Vague and
9    ambiguous.
10        A     No.
11        Q     Did ISL have conversations with Citi
12   in deciding whether to invest in Rhinebridge?
13        MS. MATERA: Objection. Vague and
14   ambiguous. May call for a legal conclusion.
15        A     Citigroup offered or provided
16   Rhinebridge as an investment, and so yes, we
17   discussed the ratings, yield and term.
18        Q     What did ISL discuss with Citi
19   specifically concerning Rhinebridge prior to
20   investing?
21        MS. MATERA: Objection. Vague and
22   ambiguous.
23        A     The -- just the rating, the term and
24   the yield.
25        Q     What did ISL discuss with Citi about
         TSG Reporting - Worldwide     877-702-9580
```

Page 40

```
1         Highly Confidential - R. Foresman
2    the rating, if anything?
3         A     Just what the rating was.
4         Q     What did ISL discuss with Citi about
5    the yield?
6         A     Citi communicated what that
7    particular offering was yielding.
8         Q     Anything else about the yield?
9         A     No.
10        Q     And what about the term? What did
11   ISL discuss with Citi about the term of the
12   Rhinebridge investment?
13        A     It would just be what the term was on
14   that -- on that offering.
15        Q     Who at ISL had those discussions with
16   Citi?
17        A     Steve Nichols.
18        Q     Who at ISL had the discussions with
19   Linsco?
20        A     Steve Nichols.
21        Q     Did anyone other than Mr. Nichols
22   participate in the discussions with Linsco?
23        MS. MATERA: Objection. Vague and
24   ambiguous.
25        A     No.
         TSG Reporting - Worldwide     877-702-9580
```

Page 41

```
1         Highly Confidential - R. Foresman
2         Q     What about the discussions with Citi?
3         MS. MATERA: Same objection.
4         Q     Anyone other than Mr. Nichols?
5         MS. MATERA: Sorry. Same objection.
6         A     No. Just Steve Nichols.
7         Q     Did ISL have discussions with Wells
8    Fargo in deciding whether to invest in
9    Rhinebridge?
10        MS. MATERA: Objection. Vague and
11   ambiguous.
12        A     It's unclear if Wells Fargo ever
13   offered Rhinebridge as an option. So I am not
14   sure.
15        Q     In preparing for your deposition, did
16   you make an effort to determine the statements
17   that ISL considered in deciding whether to invest?
18        MS. MATERA: Objection. The
19   testimony is subject to our objections.
20   That's the end of my objection.
21        A     Can you repeat that, please?
22        Q     Yes.
23        In preparing for your deposition, did
24   you make an effort to determine the statements
25   that ISL considering in deciding whether to invest
         TSG Reporting - Worldwide     877-702-9580
```

11 (Pages 38 to 41)

Page 42

```
 1        Highly Confidential - R. Foresman
 2   in Rhinebridge?
 3            MS. MATERA:  Subject to our
 4   objections.
 5     A    Yes.
 6     Q    And were you able to determine
 7   whether any statements by Wells Fargo were
 8   considered in the investment decisions?
 9            MS. MATERA:  Objection.  Vague and
10   ambiguous.
11     A    Specifically about Rhinebridge?
12     Q    Um-hum.
13            MS. MATERA:  Same objection.
14     A    We didn't purchase Rhinebridge from
15   Wells Fargo, so it's unclear whether they ever
16   offered that and whether there were any
17   discussions.
18     Q    Who made the decision on behalf of
19   ISL to invest in Rhinebridge?
20            MS. MATERA:  Objection.  Vague and
21   ambiguous.
22            You may answer.
23     A    Steve Nichols.
24     Q    Anyone other than Mr. Nichols?
25            MS. MATERA:  Same objection.
        TSG Reporting - Worldwide    877-702-9580
```

Page 43

```
 1        Highly Confidential - R. Foresman
 2     A    No.
 3     Q    Did Mr. Nichols have any
 4   conversations, other than the conversations or
 5   discussions with brokers that you have already
 6   described, in deciding whether to invest in
 7   Rhinebridge?
 8            MS. MATERA:  Objection.  The
 9   testimony is subject to our objections.  May
10   call for speculation.
11            You may answer.
12     A    In discussing it with Mr. Nichols, he
13   had indicated there were no other conversations.
14     Q    Now, you have identified one specific
15   investment by date, which was the July 12
16   investment.  Did ISL make other investments in
17   Rhinebridge?
18     A    Yes.
19     Q    How many other investments?
20     A    We had a total of four.
21     Q    Do you recall the dates of those
22   other investments?
23     A    The -- we had an investment on
24   July 25th, and I believe July 26th, and the first
25   part of September; I can't remember the specific
        TSG Reporting - Worldwide    877-702-9580
```

Page 44

```
 1        Highly Confidential - R. Foresman
 2   day.
 3     Q    First part of September?
 4     A    I'm sorry, August.  Let me change
 5   that.
 6     Q    Prior to investing in Rhinebridge,
 7   did anyone at ISL review the information
 8   memorandum for Rhinebridge?
 9            MS. MATERA:  Objection.  Vague and
10   ambiguous.  Calls for speculation.
11     A    Our process was to, you know, follow
12   the indentures and the ratings guidelines, and we
13   used the ratings, and we did not review the
14   offering memorandum prior to.
15     Q    Did ISL have any understanding of the
16   collateral backing the Rhinebridge SIV at the time
17   it invested?
18            MS. MATERA:  Objection.  Vague and
19   ambiguous.
20     A    At the time of investing, we did not
21   know the specific collateral within Rhinebridge.
22     Q    Did ISL know the general collateral
23   in Rhinebridge?
24            MS. MATERA:  Objection.  Vague and
25   ambiguous.
        TSG Reporting - Worldwide    877-702-9580
```

Page 45

```
 1        Highly Confidential - R. Foresman
 2     A    No, we did not.
 3     Q    Did ISL know that there was
 4   collateral in Rhinebridge?
 5            MS. MATERA:  Objection.  Vague and
 6   ambiguous.
 7     A    Well, it was an asset-backed
 8   commercial paper investment, so yes.
 9     Q    Did ISL know that it was an
10   asset-backed commercial paper program at the time
11   it invested?
12            MS. MATERA:  Objection.  Vague and
13   ambiguous.
14     A    Yes.
15     Q    What is the basis for that testimony?
16     A    In reviewing, you know, the trade
17   tickets, it indicates asset-backed, and discussing
18   it with Steve Nichols.
19     Q    What did Mr. Nichols tell you about
20   ISL's knowledge as to whether Rhinebridge was
21   asset-backed?
22            MS. MATERA:  Objection.  Vague and
23   ambiguous.
24     A    He indicated that it was commercial
25   paper, asset-backed commercial paper.
        TSG Reporting - Worldwide    877-702-9580
```

Page 46

1     Highly Confidential - R. Foresman
2    Q    Did he indicate whether he knew that
3 at the time he invested?
4    A   Yes. He knew that at the time.
5    Q    Did Mr. Nichols know that it was a
6 structured investment vehicle at the time he
7 invested?
8     MS. MATERA: Objection. Vague and
9 ambiguous.
10    A   No, he did not.
11    Q    Did Mr. Nichols know what a
12 structured investment vehicle was at the time he
13 invested in Rhinebridge?
14     MS. MATERA: Objection. Vague and
15 ambiguous. Calls for speculation. Beyond
16   the scope of the deposition notice.
17    A   I don't believe he knew what the SIV
18 product was.
19    Q    Did -- did ISL have any understanding
20 of the assets backing the Rhinebridge SIV at the
21 time it invested?
22     MS. MATERA: Objection. Vague and
23 ambiguous.
24    A   At the time of the investment, we
25 relied on the ratings assigned, and did not know
     TSG Reporting - Worldwide   877-702-9580

Page 47

1     Highly Confidential - R. Foresman
2 the collateral.
3    Q    Did ISL ask any questions about the
4 collateral prior to investing?
5     MS. MATERA: Objection. Vague and
6 ambiguous.
7    A   We, once again, relied on the ratings
8 assigned, and did not ask that.
9    Q    Did ISL ask any questions about
10 Rhinebridge prior to investing?
11     MS. MATERA: Objection. Vague and
12 ambiguous. Misstates prior testimony.
13    A   Iowa Student Loan asked what the
14 rating was, the term and the yield.
15    Q    Anything else?
16     MS. MATERA: Objection. Vague and
17 ambiguous.
18    A   No.
19    Q    Did ISL have any understanding of the
20 other parties involved with the Rhinebridge SIV at
21 the time it invested?
22     MS. MATERA: Objection. Vague and
23 ambiguous.
24    A   No, we did not.
25    Q    Did ISL understand that Rhinebridge
     TSG Reporting - Worldwide   877-702-9580

Page 48

1     Highly Confidential - R. Foresman
2 was a -- had an investment manager?
3     MS. MATERA: Objection. Vague and
4 ambiguous.
5    A   We wouldn't have known the specific
6 party that managed that at that time.
7    Q    Well, but you are anticipating my
8 next question. Did ISL understand that
9 Rhinebridge had an investment manager?
10     MS. MATERA: Objection. Vague and
11 ambiguous.
12    A   I don't know -- you know, that wasn't
13 part of our inputs for an investment decision. I
14 don't believe we would have known that.
15    Q    Okay. And ISL didn't know who,
16 specifically, the investment manager was for
17 Rhinebridge; isn't that right?
18     MS. MATERA: Objection. Vague and
19 ambiguous. Asked and answered.
20    A   That's correct.
21    Q    Did ISL have any understanding of
22 the -- strike that.
23     Did ISL take any steps to analyze the
24 methodology by which Rhinebridge had been rated?
25     MS. MATERA: Objection. Vague and
     TSG Reporting - Worldwide   877-702-9580

Page 49

1     Highly Confidential - R. Foresman
2 ambiguous. May call for speculation.
3    A   The steps we took were to follow the
4 investment guidelines in the indenture, and then
5 make sure that the guidelines were adhered to in
6 purchasing the investment.
7    Q    That didn't answer my question, so
8 let me ask it again.
9     Did ISL have any understanding -- I'm
10 sorry, I have to strike that again.
11     Did ISL take any steps to analyze the
12 methodology by which Rhinebridge had been rated?
13     MS. MATERA: Objection. Vague and
14 ambiguous. May call for speculation. Asked
15   and answered.
16    A   We used the ratings, but didn't -- I
17 mean, the ratings assigned at the time, from the
18 rating agencies, that's all we used in evaluating
19 the decision to invest.
20    Q    Did ISL have any understanding of the
21 methodology by which the notes had been rated?
22     MS. MATERA: Objection. Vague and
23 ambiguous. May call for speculation. Asked
24   and answered.
25    A   Not specific to Rhinebridge and the
     TSG Reporting - Worldwide   877-702-9580

Page 50

```
 1        Highly Confidential - R. Foreman
 2   process that the rating agencies went through for
 3   that specific investment.
 4        Q     What about SIVs generally?
 5        MS. MATERA:  Same objection.
 6        Q     Did ISL have any understanding of the
 7   rating agency methodologies for ratings SIVs at
 8   the time it invested in Rhinebridge?
 9             MS. MATERA:  Objection.  Vague and
10   ambiguous.
11        A     We wouldn't have known the specific
12   process, all of the inputs that the rating agency
13   used.  We understood that the ratings assigned
14   were what they were, and that the information used
15   to come up with that ratings was vetted through
16   the rating agencies and the process that they had.
17        Q     Was ISL aware, at the time it
18   invested in Rhinebridge, that there were
19   publications available from the rating agencies
20   describing their methodology?
21             MS. MATERA:  Objection.
22        Q     For rating SIVs.
23             MS. MATERA:  Objection.  Vague and
24   ambiguous.
25        A     Specific to Rhinebridge or just to
          TSG Reporting - Worldwide    877-702-9580
```

Page 51

```
 1        Highly Confidential - R. Foreman
 2   SIVs?
 3        Q     Well, again, you are anticipating my
 4   question.  This one is general to SIVs.
 5             Was ISL aware at the time it invested
 6   in Rhinebridge that there were publications
 7   available from the rating agencies describing
 8   their methodologies for rating SIVs?
 9             MS. MATERA:  Objection.  Vague and
10   ambiguous.
11        A     You know, in terms of SIV specific,
12   we wouldn't have known that, you know, there were
13   ratings methodologies published.  We weren't
14   investing in SIVs.  We were investing in
15   investments with a certain rating.
16        Q     Well, you were investing in SIVs,
17   weren't you?
18        A     We did not make a choice to invest in
19   SIVs.  We invested in investments with a certain
20   rating.
21        Q     In fact, you invested in SIVs without
22   knowing that you were investing in SIVs; isn't
23   that right?
24             MS. MATERA:  Objection.
25   Argumentative.  Vague and ambiguous.
          TSG Reporting - Worldwide    877-702-9580
```

Page 52

```
 1        Highly Confidential - R. Foreman
 2   Misstates prior testimony.
 3        A     Once again, our process was to use
 4   the ratings and -- and the specific ratings
 5   criteria in our investment policy.
 6        Q     And ISL did not know it was investing
 7   in SIVs at the time it did so; isn't that right?
 8             MS. MATERA:  Objection.  Asked and
 9   answered.
10        A     We did not -- we wouldn't have known
11   that we were investing in an SIV.  We were
12   investing in commercial paper at a certain rating.
13        Q     How many different SIVs did ISL
14   invest in?
15             MS. MATERA:  Objection.  Vague and
16   ambiguous.  Beyond the scope of the
17   deposition notice.
18        A     We -- we wouldn't know because we --
19   we weren't investing specifically in SIVs, we --
20   didn't track that.  We were investing in
21   investments with a certain rating.
22        Q     Eventually you tracked it; right?
23             MS. MATERA:  Objection.  Vague and
24   ambiguous.  Beyond the scope of the
25   deposition notice.
          TSG Reporting - Worldwide    877-702-9580
```

Page 53

```
 1        Highly Confidential - R. Foreman
 2        A     At the time of the investment, we
 3   wouldn't have known that, but at a point post
 4   investment, we tried to do as much research as we
 5   could to understand the investments we had at that
 6   time.
 7        Q     What steps did you take to understand
 8   your investments at that point, that you are
 9   describing?
10        A     This was all --
11             MS. MATERA:  Objection.  Vague and
12   ambiguous.  Beyond the scope of the
13   deposition notice.
14        A     The research that we employed was
15   post investment.  We looked for any PPMs or any
16   other offering memorandum that we could find that
17   would describe the transactions, and, you know,
18   any source that we could to find, you know,
19   anything about the investments at that time.
20        Q     With respect to Rhinebridge, what
21   sources did ISL turn up as part of that research?
22             MS. MATERA:  Objection.  Vague and
23   ambiguous.
24        A     We -- we were given the PPM.  We --
25   you know, anything that was published, you know,
          TSG Reporting - Worldwide    877-702-9580
```

14 (Pages 50 to 53)

Page 54

1    Highly Confidential - R. Foresman
2  through like Bloomberg, Wall Street Journal, that
3  we could find.  You know, any information directly
4  from Rhinebridge itself.
5    Q    But ISL didn't make any effort to
6  gather those materials before investing; isn't
7  that right?
8         MS. MATERA: Objection. Misstates
9    prior testimony.  Vague and ambiguous.
10   A    We relied on the ratings and
11  didn't -- just completely the ratings at that
12  point.
13   Q    And didn't make any effort to gather
14  those other materials that you described; right?
15         MS. MATERA: Objection. Misstates
16    prior testimony.  Vague and ambiguous.
17    Asked and answered.
18   A    Well, the effort is with the
19  indenture guidelines and what went through that,
20  that provided the investment guidelines that we
21  used.  That was the effort.
22   Q    Was ISL aware at the time it invested
23  in Rhinebridge that an information memorandum was
24  available?
25         MS. MATERA: Objection. Vague and
TSG Reporting - Worldwide    877-702-9580

Page 55

1    Highly Confidential - R. Foresman
2  ambiguous.
3    A    Once again, that wasn't part of our
4  criteria.  We looked at the ratings, so...
5    Q    I understand.  That's not my
6  question, though.
7         My question is whether ISL knew at
8  the time it invested that an information
9  memorandum was available.
10         MS. MATERA: Objection. Vague and
11    ambiguous.  Asked and answered.
12   A    We didn't specifically ask if the PPM
13  existed, but I think we knew that there was
14  some -- there was information available.
15   Q    Including an information memorandum?
16         MS. MATERA: Objection. Vague and
17    ambiguous.
18   A    Yeah, I think you could assume there
19  was one, but we didn't specifically ask if it
20  existed.
21   Q    How many debt offerings have you
22  participated in, would you say, during your time
23  at ISL?
24         MS. MATERA: Objection. Vague and
25    ambiguous.
TSG Reporting - Worldwide    877-702-9580

Page 56

1    Highly Confidential - R. Foresman
2    A    Debt offerings?  That Iowa Student
3  Loan issued?  It's over 4.5 billion, but the
4  amount, it's more than ten.  I don't know the
5  specific amount.
6    Q    Did any of them not have information
7  memorandums of some form?
8         MS. MATERA: Objection. Vague and
9    ambiguous.  Beyond the scope of the
10    deposition notice.
11   A    They all had information available to
12  investors.
13   Q    Right.  Including some form of
14  official information memorandum; right?
15         MS. MATERA: Objection. Vague and
16    ambiguous.  Beyond the scope of the
17    deposition notice.
18   A    Yes.
19   Q    And ISL knew at the time it invested
20  in Rhinebridge that Rhinebridge would likewise
21  also have an information memorandum available;
22  isn't that right?
23         MS. MATERA: Objection. Vague and
24    ambiguous.  Asked and answered.
25   A    We -- we didn't have firsthand
TSG Reporting - Worldwide    877-702-9580

Page 57

1    Highly Confidential - R. Foresman
2  knowledge that one existed, but we knew generally
3  that investments had that information.
4    Q    But you didn't ask for the
5  information memorandum for Rhinebridge
6  specifically; isn't that right?
7         MS. MATERA: Objection. Asked and
8    answered.
9    A    Part of our process was just to rely
10  on the ratings, so we did not ask for that
11  specifically at that time of investment.
12   Q    Did ISL make any effort to gather
13  news articles concerning Rhinebridge prior to
14  investing?
15         MS. MATERA: Objection. Vague and
16    ambiguous.
17   A    Specific to Rhinebridge?
18   Q    Yes.
19         MS. MATERA: Same objection.
20   A    We did not go through the effort
21  because our process was to rely on the ratings.
22         MS. MATERA: At any point -- we have
23    been going for over an hour.  It would be
24    good to take a break when you are ready.
25         MR. PEREZ-MARQUES: Okay.  That's
TSG Reporting - Worldwide    877-702-9580

Page 58

1      Highly Confidential - R. Foreman
2    fine.  We can take a break now if you would
3    like.
4          MS. MATERA:  Is that okay?
5          THE WITNESS:  Yes.
6          THE VIDEOGRAPHER:  The time is
7    10:33 a.m.
8          We are off the record.
9          (Recess taken.)
10         THE VIDEOGRAPHER:  The time is
11   10:51 a.m.
12         We are on the record.
13   BY MR. PEREZ-MARQUES:
14     Q    Mr. Foresman, prior to investing in
15   Rhinebridge, was ISL aware that the rating
16   agencies published reports on the Rhinebridge SIV?
17         MS. MATERA:  Objection.  Vague and
18   ambiguous.
19     A    Not specifically to Rhinebridge, but
20   we knew that there were -- there was information
21   published by the rating agencies.
22     Q    Did ISL make any effort to obtain
23   that information published by the rating agencies?
24         MS. MATERA:  Objection.  Vague and
25   ambiguous.
         TSG Reporting - Worldwide    877-702-9580

Page 59

1      Highly Confidential - R. Foresman
2      A    Our process was to rely on the
3    ratings assigned at the time of investment, so we
4    did not make an effort to review those.  It was --
5    you know, our process was mostly dependent on the
6    ratings.
7      Q    Well, beyond the ratings, the only
8    things it depended on were the yield and the term;
9    isn't that right?
10         MS. MATERA:  Objection.  Vague and
11   ambiguous.  Misstates prior testimony.
12     A    Yes, that is correct.
13     Q    I asked you earlier whether ISL made
14   any effort to gather news specific to the
15   Rhinebridge SIV prior to investing in it.  Did ISL
16   make any effort to gather other news not general
17   to Rhinebridge in deciding whether to invest?
18         MS. MATERA:  Objection.  Vague and
19   ambiguous.
20     A    Like I said, our process was to
21   mostly rely on the ratings provided for that
22   particular investment, and I can't speculate on
23   whether we -- you know, as a general
24   understanding, all parties within Iowa Student
25   Loan had knowledge of different pieces, but we
         TSG Reporting - Worldwide    877-702-9580

Page 60

1      Highly Confidential - R. Foresman
2    relied on the ratings for that.
3      Q    Okay.  Let me repeat my question.
4    Did ISL make any effort to gather news prior to
5    investing in Rhinebridge?
6          MS. MATERA:  Objection.  Vague and
7    ambiguous.  May go beyond the scope of the
8    deposition notice.
9      A    Personally, I don't recall us ever,
10   you know, researching that prior to.
11     Q    Did ISL -- what steps, if any, did
12   ISL take to monitor the market for investments in
13   2007?
14         MS. MATERA:  Objection.  Vague and
15   ambiguous.  Goes beyond the scope of the
16   deposition notice.
17     A    It -- it's just un- -- I would be
18   speculating on what processes were reviewed.
19     Q    Well, you supervised Mr. Nichols with
20   respect to his investment functions; right?
21         MS. MATERA:  Objection.  Vague and
22   ambiguous.
23     A    That is correct.
24     Q    And as his supervisor, did you know
25   what steps, if any, he took to monitor the
         TSG Reporting - Worldwide    877-702-9580

Page 61

1      Highly Confidential - R. Foresman
2    markets?
3          MS. MATERA:  Objection.  Vague and
4    ambiguous.  Goes beyond the scope of the
5    deposition notice.
6      A    I mean, personally I was generally
7    aware of various conditions in the market.
8      Q    Okay.  But my question was about
9    Mr. Nichols.  As his supervisor, were you aware of
10   what steps, if any, he took to monitor the market?
11         MS. MATERA:  Objection.  Vague and
12   ambiguous.  Goes beyond the scope of the
13   deposition notice.
14     A    I wouldn't know what steps he went
15   through.
16     Q    You didn't ask him that question?
17         MS. MATERA:  Objection.  Vague and
18   ambiguous.  Goes beyond the scope of the
19   deposition notice.
20     A    Once again, I -- I wouldn't know what
21   he went through.
22     Q    Okay.  Did he read any newspapers to
23   stay abreast of market developments?
24         MS. MATERA:  Objection.  Vague and
25   ambiguous.  Goes beyond the scope of the
         TSG Reporting - Worldwide    877-702-9580

Page 134

```
1        Highly Confidential - R. Foreman
2   for the investment decision.
3        Q    And when you say used them mostly,
4   you mean you used them and yield term; right?
5        A    Correct.
6            MS. MATERA: Objection. Move to
7   interpose an objection, misstates prior
8   testimony.
9            MR. PEREZ-MARQUES: Sorry, did you
10  get the answer?
11       Q    Could you repeat your answer?
12  Because I don't think the reporter got it.
13       A    Yes, that is correct.
14       Q    Did the guidelines prohibit
15  consideration of other factors outside the
16  criteria?
17           MS. MATERA: Objection. Vague and
18  ambiguous.
19       A    The -- the indenture guidelines did
20  not prohibit other information.
21       Q    The indenture guidelines didn't
22  prohibit reading information memoranda, did it?
23           MS. MATERA: Objection. Vague and
24  ambiguous.
25       A    It did not.
         TSG Reporting - Worldwide    877-702-9580
```

Page 135

```
1        Highly Confidential - R. Foreman
2        Q    The offering documents for ISL's debt
3   offerings, do those include risk factors?
4        A    Yes. Yes, it does.
5        Q    What are risk factors?
6        A    The -- it's going to depend on a
7   particular offering, but those are the factors
8   that the -- the offering will not meet the
9   expectations as structured.
10       Q    Did ISL understand, at the time it
11  invested in Rhinebridge, that the Rhinebridge SIV
12  would likewise have a set of risk factors that it
13  published for its investment?
14           MS. MATERA: Objection. Vague and
15  ambiguous.
16       A    While it wasn't specifically
17  discussed or factored into the decision, you know,
18  our understanding of the process, I would believe
19  that we understood there were risk factors in an
20  investment.
21       Q    But ISL made no effort to review
22  those risk factors prior to investing; isn't that
23  right?
24           MS. MATERA: Objection. Misstates
25  prior testimony. Vague and ambiguous.
         TSG Reporting - Worldwide    877-702-9580
```

Page 136

```
1        Highly Confidential - R. Foreman
2        A    We used the ratings and our
3   understanding of that ratings process, that that
4   information and those factors and other things
5   would have been vetted through before the ratings
6   were assigned.
7        Q    That doesn't answer my question.
8            Did ISL make any effort to review the
9   risk factors available on the Rhinebridge SIV
10  prior to investing?
11           MS. MATERA: Objection. Asked and
12  answered. Misstates prior testimony. Vague
13  and ambiguous.
14       A    We -- because of what I mentioned
15  about our process and mostly using the ratings and
16  understanding that process, we would not have done
17  that.
18       Q    When you say "we would not have,"
19  you -- in fact, ISL did not do so; isn't that
20  right?
21           MS. MATERA: Objection. Misstates
22  prior testimony. Vague and ambiguous.
23       A    That is correct. Because that was
24  our process.
25       Q    ISL's process didn't involve
         TSG Reporting - Worldwide    877-702-9580
```

Page 137

```
1        Highly Confidential - R. Foreman
2   reviewing the risk factors on its investments; is
3   that what you are saying?
4            MS. MATERA: Objection. Asked and
5   answered. Vague and ambiguous. Misstates
6   prior testimony.
7        A    That is correct. Our understanding,
8   that the ratings process would -- would review
9   those factors and incorporate that into the
10  ratings assigned.
11       Q    But that is not in the guidelines
12  either, is it, the understanding that the risk
13  factors will be incorporated into the ratings?
14           MS. MATERA: Objection. Vague and
15  ambiguous. Misstates prior testimony.
16       A    No, that is not in the factors or in
17  the guideline, investment guidelines.
18       Q    And the guidelines don't say anything
19  about any understanding of how ratings are
20  assigned, do they?
21           MS. MATERA: Objection. Vague and
22  ambiguous.
23       A    No, it does not identify that.
24       Q    In preparing for your testimony here
25  today, did you discuss with Mr. Nichols his
         TSG Reporting - Worldwide    877-702-9580
```

Page 138

1      Highly Confidential - R. Foresman
2   understanding at the time of the Rhinebridge SIV
3   investment of how ratings are assigned?
4      A    You know, we had conversation about
5   the process and ratings and just going over that.
6   There wasn't any detailed discussion about the
7   elements of what goes into a ratings analysis, no.
8      Q    Did he identify any factors that at
9   the time of the Rhinebridge SIV investment, he
10  understood or assumed that would have been
11  considered in assigning a rating to the
12  Rhinebridge SIV?
13     MS. MATERA:  Objection.  Vague and
14  ambiguous.  Compound.  Calls for a legal
15  conclusion.
16     A    Can you repeat that, please?
17     Q    Did he identify any factors that at
18  the time of the Rhinebridge SIV investment he
19  understood or assumed would have been considered
20  in assigning a rating to the Rhinebridge SIV?
21     MS. MATERA:  Same objections.
22     A    No, he did not identify any of the
23  factors.  He, once again, would have relied on the
24  ratings assigned.
25     Q    Let's take a look at Defendants'

TSG Reporting - Worldwide    877-702-9580

Page 139

1      Highly Confidential - R. Foresman
2   Exhibit 85, still in front of you.  Let me refer
3   you to the fourth page of this document, on Bates
4   ending 647.
5      I'll note, to be clear, the date of
6   this e-mail is March 26, 2007; isn't that right?
7      A    Yes, that is what it says.
8      Q    So about four months prior to ISL's
9   investment in Rhinebridge on which it's suing
10  here?
11     MS. MATERA:  Objection.  Vague and
12  ambiguous.
13     Q    Isn't that right?
14     MS. MATERA:  Same objection.
15     A    Yes, those are the timeframes.
16     Q    So looking at page 647, you see at
17  the top of the page, there is a paragraph that
18  begins "even though"?
19     Do you see that paragraph?
20     A    Yes, I do.
21     Q    The first paragraph.
22     A    Yes.
23     Q    And the last sentence of that
24  paragraph reads, "However, in light of the
25  mounting delinquencies in the subprime market, the

TSG Reporting - Worldwide    877-702-9580

Page 140

1      Highly Confidential - R. Foresman
2   regulators in the industry are looking for ways to
3   change these limitations."
4      Do you see that?
5      A    Yes, I do.
6      Q    Was ISL aware of mounting
7   delinquencies in the subprime market at the time
8   it invested in the Rhinebridge SIV?
9      MS. MATERA:  Objection.  Lacks
10  foundation.  Vague and ambiguous.  Assumes
11  facts not in evidence.  Beyond the scope of
12  the deposition notice.
13     A    I wouldn't know individuals within
14  Iowa Student Loan that had specific information
15  or -- or the level of information.
16  Personally, yes, I think we generally
17  knew that there were such issues.
18     Q    Including mounting delinquencies in
19  the subprime market?
20     MS. MATERA:  Objection.  Vague and
21  ambiguous.  Beyond the scope of the
22  deposition notice.
23     A    I don't know at the time if I knew it
24  was, personally, categorized as mounting
25  delinquencies, but I knew there were issues.

TSG Reporting - Worldwide    877-702-9580

Page 141

1      Highly Confidential - R. Foresman
2      Q    What issues did you know there were
3   in the subprime market, prior to investing in
4   Rhinebridge?
5      MS. MATERA:  Objection.  Vague and
6   ambiguous.
7      A    Well, generally the housing market
8   values were declining, that there were certain
9   homeowners that were having problems repaying.
10     Q    Anything else?
11     A    Not that comes to mind.
12     Q    Were you aware, prior to investing in
13  Rhinebridge, that the number or levels of
14  homeowners that were having problems paying, as
15  you put it, was increasing?
16     MS. MATERA:  Objection.  Vague and
17  ambiguous.  Beyond the scope of the
18  deposition notice.
19     A    You know, in these timeframes, I
20  don't know specifically what I would have known,
21  at what level, but --
22     Q    Did Mr. -- was Mr. Nichols aware of
23  mounting delinquencies in the subprime market
24  prior to investing in the Rhinebridge SIV?
25     MS. MATERA:  Objection.  Calls for

TSG Reporting - Worldwide    877-702-9580

---

...

Page 166

1    Highly Confidential - R. Foreman
2  lending, I wouldn't know what he knew. But it
3  wasn't factored into any investment decisions.
4    **Q    And how do you know it wasn't**
5  **factored into any investment decisions?**
6    A    Based on the discussions we had on
7  how the investment was placed and what information
8  was used, and my direct knowledge of how it was
9  supposed to work.
10   **Q    How did Mr. Nichols communicate to**
11 **you that he did not consider origination trends in**
12 **subprime lending in making investment decisions on**
13 **July 25th, 2007?**
14       MS. MATERA: Objection. Misstates
15    prior testimony. Vague and ambiguous.
16   A    Well, he wouldn't have told me that
17 he specifically ignored or knew about origination
18 trends in subprime lending. We discussed what
19 information that he used, and he didn't use this
20 information.
21   **Q    Did you ask him whether he used this**
22 **information?**
23       MS. MATERA: Objection. Beyond the
24    scope of the deposition notice, to the
25    extent you are talking about investments
       TSG Reporting - Worldwide    877-702-9580

Page 167

1    Highly Confidential - R. Foreman
2  outside of Rhinebridge. Vague and
3  ambiguous.
4    A    Yes, we specifically talked about
5  were other factors considered, and not
6  specifically origination trends in subprime
7  lending, but other factors were not considered.
8    **Q    The first sentence of this article**
9  **under "Origination Trends in Subprime Lending"**
10 **states, "In order to address the underwriting**
11 **problems that have plagued the 2006 subprime**
12 **vintage, lenders are tightening their underwriting**
13 **guidelines."**
14       **Do you see that?**
15   A    Yes, I do.
16   **Q    What do you understand "underwriting**
17 **problems that have plagued the 2006 subprime**
18 **vintage" to mean?**
19       MS. MATERA: Objection. Vague and
20    ambiguous. Beyond the scope of the
21    deposition notice. Lack of foundation.
22    Calls for speculation.
23   A    Well, I don't know what they are
24 specifically meaning here, but just general
25 information, that there were some loans that
       TSG Reporting - Worldwide    877-702-9580

Page 168

1    Highly Confidential - R. Foreman
2  probably shouldn't have been made, that didn't
3  really fit -- or they fit the underwriting
4  criteria, but maybe they were not the best type of
5  loans to originate.
6    **Q    Was ISL aware of those underwriting**
7  **problems prior to investing in Rhinebridge?**
8        MS. MATERA: Objection. Vague and
9     ambiguous. Calls for speculation. Beyond
10    the scope of the deposition notice.
11    Improper hypothetical.
12   A    I think personally, yes, I was aware
13 of the environment, and different -- different
14 factors in the environment, and mortgages, and the
15 problems that mortgages were facing, yes. I was
16 personally aware of that.
17       But it wasn't anything that was
18 addressed in our investment criteria and used to
19 determine investment selections.
20   **Q    Was Mr. Nichols aware of those**
21 **underwriting problems at the time he invested in**
22 **Rhinebridge?**
23       MS. MATERA: Objection. Beyond the
24    scope of the deposition notice. Calls for
25    speculation. Improper hypothetical. Vague
       TSG Reporting - Worldwide    877-702-9580

Page 169

1    Highly Confidential - R. Foreman
2  and ambiguous.
3    A    Personally, I don't -- I don't recall
4  specific conversations on that topic alone.
5    **Q    So you don't know one way or the**
6  **other?**
7        MS. MATERA: Same objections.
8    A    I don't know.
9    **Q    The fourth paragraph on this page**
10 **begins, "As the industry awaits."**
11       **Do you see that?**
12   A    Yes, I do.
13   **Q    And it states, "As the industry**
14 **awaits the outcome of the proposed guidance for**
15 **subprime lending, some investors are gaining**
16 **comfort by increasing their up-front due diligence**
17 **percentages prior to purchasing securities."**
18       **Do you see that?**
19   A    Yes, I do.
20   **Q    What do you understand that to mean?**
21       MS. MATERA: Objection. Vague and
22    ambiguous. Lack of foundation. Improper
23    hypothetical. Outside the -- beyond the
24    scope of the deposition notice.
25   A    Personally, when I see it, I don't
       TSG Reporting - Worldwide    877-702-9580

Page 170

1    Highly Confidential - R. Foresman
2  really know what a due diligence percentage is,
3  other than I'm assuming that there were some
4  investors that were doing more than relying on
5  ratings.
6      Q    Did ISL understand, at the time it
7  invested in Rhinebridge, that some investors did
8  more than rely on ratings?
9          MS. MATERA: Objection. Vague and
10  ambiguous. Beyond the scope of the
11  deposition notice.
12     A    I don't recall any firsthand
13  knowledge that other investors -- how they
14  operated and what decisions they made.
15     Q    Well, was it your understanding in
16  July 2007 that every investor considered only the
17  rating, the yield and the term when buying
18  commercial paper?
19         MS. MATERA: Objection. Beyond the
20  scope of the deposition notice. Calls for
21  speculation. Vague and ambiguous.
22     A    Yeah, personally, I wouldn't know. I
23  mean, I would assume that there were some that
24  probably did that, but I -- knowing the ratings
25  process, I would assume there were a lot that did,

TSG Reporting - Worldwide   877-702-9580

Page 171

1    Highly Confidential - R. Foresman
2  and they relied on the ratings, because that's
3  what it was for, and if you understood the ratings
4  process, then those ratings should have been, you
5  know, subject to all of the information in order
6  to assign ratings.
7          So, I don't know how others operated,
8  but it wouldn't surprise me if there was a high,
9  high percentage that relied on ratings.
10     Q    Did you know in July 2007 that some
11  investors read offering documents?
12         MS. MATERA: Objection. Beyond the
13  scope of the deposition notice. Calls for
14  speculation. Vague and ambiguous.
15     A    I don't recall having any
16  conversations with other investors on what they
17  did, to be honest.
18     Q    So, you didn't know one way or the
19  other whether investors read offering documents?
20         MS. MATERA: Objection. Beyond the
21  scope of the deposition notice. Calls for
22  speculation. Vague and ambiguous.
23     A    With Iowa Student Loan offering, I --
24  I can't imagine why -- that there wasn't at least
25  one or two investors, but I don't know. I think,

TSG Reporting - Worldwide   877-702-9580

Page 172

1    Highly Confidential - R. Foresman
2  yes. I mean, personally, I believe that there
3  were probably some investors that did read those.
4      Q    Did ISL take any steps to increase
5  its due diligence on its own investments in light
6  of news about problems in the mortgage market in
7  early 2007?
8          MS. MATERA: Objection. Beyond the
9  scope of the deposition notice. Calls for
10  speculation. Vague and ambiguous.
11     A    Personally, I don't recall why we
12  would do that, so -- you know, in using the
13  ratings, and understanding how those ratings were
14  assigned, and -- and we followed the guidelines
15  that were approved. No.
16     Q    I'm sorry. Was the last part of your
17  answer "no"?
18     A    Yes.
19     Q    So no, ISL did not take any steps to
20  increase its due diligence on investments in light
21  of news about problems in the mortgage market in
22  early 2007; is that right?
23         MS. MATERA: Objection. Misstates
24  prior testimony. Beyond the scope of the
25  deposition notice. Calls for speculation.

TSG Reporting - Worldwide   877-702-9580

Page 173

1    Highly Confidential - R. Foresman
2  Vague and ambiguous.
3      A    Well, I will answer it this way, that
4  my personal recollection was that we didn't change
5  our process that we had used for years and years
6  and our reliance on the ratings.
7          MR. PEREZ-MARQUES: Okay. Why don't
8  we break for lunch?
9          THE VIDEOGRAPHER: The time is
10  1:18 p.m.
11         We are off the record.
12
13         (Recess taken.)
14         THE VIDEOGRAPHER: The time is
15  2:14 p.m.
16         We are on the record.
17  BY MR. PEREZ-MARQUES:
18     Q    Mr. Foresman, let me show you what I
19  have marked as Defendants' Exhibit 88, which is a
20  two-page e-mail, double-sided, beginning on
21  ISL-E0015104 through 105.
22         Please take a moment to look it over
23  and let me know when you are ready.
24         (Defendants' Exhibit 88 marked for
25  identification as of this date.)

TSG Reporting - Worldwide   877-702-9580

Page 174

1       **Highly Confidential - R. Foresman**
2       **Q**       Okay?
3       **A**       Okay.
4       **Q**       This is an e-mail from Financial Week
5   Daily News Blast to you; correct?
6       **A**       Yes, that is what it says.
7       **Q**       Dated July 11, 2007; right?
8       **A**       Yes.
9       **Q**       With the subject line "Financial Week
10  Daily News Blast"; correct?
11      **A**       That is correct.
12      **Q**       And then a little bit down the page,
13  there is a header that reads "Headlines for
14  July 11, 2007"; right?
15      **A**       Yes.
16      **Q**       That is about two weeks before the
17  Rhinebridge investment at issue in this
18  litigation; right?
19      **A**       That is correct.
20      **Q**       The third item down in that list
21  states, "Moody's drops ratings on 5.2 billion in
22  subprime-related debt.  S&P to follow."
23              Do you see that?
24      **A**       Yes, I do.
25      **Q**       Was ISL aware, around this time in

TSG Reporting - Worldwide    877-702-9580

Page 175

1       **Highly Confidential - R. Foresman**
2   early July, 2007, of rating agencies downgrading a
3   large number of subprime-related debt?
4           MS. MATERA: Objection.  Outside the
5   scope of the deposition notice.  Vague and
6   ambiguous.
7       **A**       I do not recall at that time if we
8   were aware.
9       **Q**       You received this e-mail, though,
10  didn't you?
11      **A**       This e-mail was to me, yes.
12      **Q**       You don't know whether you read it or
13  not?
14      **A**       I do not recall.
15      **Q**       Do you know whether anyone else at
16  ISL also received e-mails from Financial Week
17  Daily News Blast?
18          MS. MATERA: Objection.  Beyond the
19  scope of the deposition notice.  Calls for
20  speculation.
21      **A**       I wouldn't remember if anybody else
22  did, because I don't remember getting this myself.
23      **Q**       You testified earlier about the
24  process of reviewing the investment policies in
25  connection with the 12th supplemental indenture.

TSG Reporting - Worldwide    877-702-9580

Page 176

1       **Highly Confidential - R. Foresman**
2   Do you recall that?
3       **A**       Yes.
4       **Q**       When did that process begin?
5           MS. MATERA: Objection.  Vague and
6   ambiguous.
7       **A**       The review of the supplemental?
8       **Q**       The review of the investment policy
9   specifically.
10      **A**       Well, it's -- the processes in
11  reviewing that, those items, have been going on
12  for years.
13              In terms of preparation for the
14  deposition?
15      **Q**       No.
16              The review of the investment policies
17  in connection with the 12th supplemental indenture
18  specifically, when did that process start?
19          MS. MATERA: Objection.  Vague and
20  ambiguous.
21      **A**       I don't know when it started, but it
22  was prior to the issuance of that debt.
23      **Q**       Was that process already underway as
24  of July 11, 2007?
25          MS. MATERA: Objection.  Vague and

TSG Reporting - Worldwide    877-702-9580

Page 177

1       Highly Confidential - R. Foresman
2   ambiguous.
3       **A**       Yes, that process would have been.
4       **Q**       Did ISL consider the broad downgrades
5   of subprime-related debt by S&P and Moody's in
6   considering what role ratings should play in their
7   revised investment guidelines?
8           MS. MATERA: Objection.  Vague and
9   ambiguous.
10      **A**       Iowa Student Loan did not -- it
11  was -- during the -- the debt process, the ratings
12  that were -- that remained in the investment
13  guidelines were still believed to be sound, and
14  input from all parties didn't lead us to believe
15  that there were other -- other types of criteria
16  that we needed to include.
17      **Q**       Did ISL consider the July downgrades
18  of mortgage-related debt in considering whether
19  the ratings in the investment policies were sound,
20  as you described it?
21          MS. MATERA: Objection.  Vague and
22  ambiguous.
23      **A**       I don't recall that being a factor in
24  any discussions.
25      **Q**       That's all for that document.

TSG Reporting - Worldwide    877-702-9580

45 (Pages 174 to 177)

Page 218

1    Highly Confidential - R. Foresman
2   that these investments were placed.
3       Q    Anything other than the fact that
4   these investments were placed?
5           MS. MATERA: Objection. Vague and
6   ambiguous.
7       A    I don't believe it represents
8   anything else.
9       Q    And the last page of this document,
10  355, has a row concerning the, or a set of rows
11  concerning the investment at issue in this
12  lawsuit; correct?
13      A    On 355?
14      Q    358.
15          MS. WOOD: The first --
16      A    Oh.
17          MS. MATERA: Could you repeat the
18  question? I'm sorry.
19      Q    The page of this document on 358 has
20  a set of rows concerning the investment at issue
21  in this lawsuit, doesn't it?
22      A    It appears that it's the same, based
23  on maturity date and the amount.
24      Q    Okay. And bond issue is indicated as
25  2007E; correct?
         TSG Reporting - Worldwide    877-702-9580

Page 219

1    Highly Confidential - R. Foresman
2       A    That is correct.
3       Q    And what does that reflect?
4       A    That is the bond series that these
5   funds -- the funds used for this investment relate
6   to that bond series.
7       Q    And then you signed this page as
8   well; correct?
9       A    Yes, I did.
10      Q    On August 7, 2007; is that right?
11      A    That's what it says, yes.
12      Q    And Ms. DeBolt signed it on
13  August 9th, 2007; right?
14      A    Yes.
15          MS. MATERA: Objection.
16      Q    And between the date the Rhinebridge
17  trade was placed, on July 25th, and your review on
18  August 7th, did anyone else review the Rhinebridge
19  investment at issue in this lawsuit?
20          MS. MATERA: Objection. Vague and
21  ambiguous.
22      A    I don't believe so. There could have
23  been another accountant that actually saw the
24  trust statement activity. But there wouldn't have
25  been a review.
         TSG Reporting - Worldwide    877-702-9580

Page 220

1    Highly Confidential - R. Foresman
2       Q    And what steps, if any, did you take
3   to review these investments prior to signing this
4   page 358?
5           MS. MATERA: Objection. Vague and
6   ambiguous.
7       A    The -- the ratings were -- were
8   perused and reviewed. That's the only review that
9   I performed.
10      Q    You see that there are certain
11  checkmarks on this page; right?
12      A    That is correct.
13      Q    Whose checkmarks are those?
14      A    I don't know for sure, but it would
15  make sense that these are Steve Nichols'
16  checkmarks.
17      Q    Who put together this sheet for your
18  signature?
19      A    Steve Nichols.
20      Q    And you see under "Minimum Investment
21  Criteria," in the row concerning Rhinebridge, it
22  says, "A-1 plus (S&P)" and "P-1 (Moody), and then
23  "DSC PRM NT. "
24          Do you see that last part?
25      A    I do.
         TSG Reporting - Worldwide    877-702-9580

Page 221

1    Highly Confidential - R. Foresman
2       Q    What does "DSC PRM NT" mean?
3       A    I don't know what the intent was
4   here, but to me it reads discount promissory note.
5       Q    What does that mean?
6       A    It means it's a discounted
7   investment.
8       Q    And again, there is no reference to
9   the Fitch rating under the minimum investment
10  criteria, is there?
11      A    That is correct.
12      Q    Some of the other investments on this
13  sheet have a Fitch rating indicated in the minimum
14  investment criteria; correct?
15      A    That is correct.
16      Q    But the Rhinebridge one at issue in
17  this lawsuit doesn't; isn't that right?
18          MS. MATERA: Objection. Asked and
19  answered.
20      A    That is correct.
21      Q    Let me show you what I have marked as
22  Defendants' Exhibit 94, which is an e-mail with an
23  attachment beginning on IKB000064408 through
24  64584.
25          Please take a moment to look it over
         TSG Reporting - Worldwide    877-702-9580

Page 222

1   Highly Confidential - R. Foresman
2   and let me know when you are ready. My first
3   question will be whether you recognize this
4   document.
5       (Defendants' Exhibit 94 marked for
6       identification as of this date.)
7   A   Okay.
8   Q   And you see that this exhibit has as
9   its cover page, or the first piece of this exhibit
10  is an e-mail string; correct?
11  A   It appears to be an e-mail, yes.
12  Q   And it starts with an e-mail from
13  Steve McCullough to Christian Rohde; correct?
14  A   Yes, that is what it says.
15  Q   Who is Mr. Rohde?
16  A   I believe he is somebody that is a
17  part of IKB, but I don't know for sure.
18  Q   And Mr. McCullough's e-mail that
19  starts this string is dated September 10, 2007;
20  right?
21  A   Yes.
22  Q   And he asks a series of questions
23  about the Rhinebridge SIV; correct?
24  A   Yes, that is what is included.
25  Q   Then there is a -- a response from

TSG Reporting - Worldwide   877-702-9580

Page 223

1   Highly Confidential - R. Foresman
2   Amrit Bains at the bottom of page 408; correct?
3   A   That is correct.
4   Q   Dated September 11, 2007; right?
5   A   Yes, that is what it says.
6   Q   And then Mr. McCullough writes back
7   with -- on that same day, September 11, 2007;
8   right?
9   A   That is the date on the e-mail.
10  Q   And he writes, "Please send me a copy
11  of the private placement memorandum and/or other
12  documents describing the tests and restriction
13  events in the transaction as soon as possible."
14  Correct?
15  A   Yes, that is what it says.
16  Q   Did ISL have a copy of the
17  information memorandum for the Rhinebridge SIV at
18  any time prior to September 11, 2007?
19  A   I do not believe so.
20  Q   Then Mr. Bains writes back that same
21  day; correct?
22  A   The dates are the same, yes.
23  Q   And he writes, "As requested, please
24  find attached a copy of the USCP PPM as at launch
25  (did you not get a copy of this from the dealers

TSG Reporting - Worldwide   877-702-9580

Page 224

1   Highly Confidential - R. Foresman
2   already?)."
3       Do you see that?
4   A   Yes, I do.
5   Q   Then there is, in fact, an attachment
6   to this e-mail, which begins on page 410; right?
7   A   Yes.
8   Q   Do you recognize this attachment?
9   A   I have seen this document before.
10  Q   What is it?
11  A   It appears to be the Rhinebridge PPM.
12  Q   And you see the very first page, 410,
13  under "Important Notice," it states: "The
14  commercial paper notes described in the attached
15  private placement memorandum (as defined below)
16  (the USCP notes) have not been, and will not be,
17  registered under the United States Securities Act
18  of 1933 as amended (the Securities Act) or the
19  securities laws of any state of the United States
20  or the securities laws of any other jurisdiction."
21      Do you see that?
22  A   Yes, I do.
23  Q   Was ISL aware of that fact at the
24  time it invested?
25      MS. MATERA: Objection. Vague and

TSG Reporting - Worldwide   877-702-9580

Page 225

1   Highly Confidential - R. Foresman
2   ambiguous.
3   A   At the time of our investment, we
4   obtained the rating only.
5   Q   And you were not aware of the fact
6   that the commercial paper was not registered?
7       MS. MATERA: Objection. Vague and
8   ambiguous. Asked and answered.
9   A   That is information we would not have
10  had at the time of investment.
11  Q   You mean it's information you did not
12  have; right?
13  A   We did not have that.
14  Q   You are not saying you didn't have
15  access to that information, are you?
16      MS. MATERA: Objection. Misstates
17  prior testimony. Vague and ambiguous.
18  Calls for speculation.
19  A   I am saying we did not have it.
20  Q   And the second paragraph states The
21  USC -- I will paraphrase. The USCP notes may only
22  be offered to a qualified institutional buyer or a
23  qualified purchaser.
24      Do you see that paragraph?
25  A   Yes, I do.

TSG Reporting - Worldwide   877-702-9580

Page 226

1    Highly Confidential - R. Foresman
2    Q    And was ISL aware that the
3  Rhinebridge notes it purchased were only available
4  to QIBs and QPs at the time it invested?
5         MS. MATERA: Objection. Calls for a
6  legal conclusion. Vague and ambiguous.
7    A    We were only aware of the rating at
8  the time of investment.
9    Q    And not the fact that the investment
10 was only available to QIBs and QPs?
11        MS. MATERA: Objection. Vague and
12 ambiguous. Calls for a legal conclusion.
13 Misstates prior testimony.
14   A    We did not have this statement at the
15 time of investment.
16   Q    When did you sign a certification
17 indicating that ISL was a QIB?
18        MS. MATERA: Objection. Lack of
19 foundation.
20   A    The most recent recollection was
21 during the Rhinebridge -- during restructuring
22 Rhinebridge.
23   Q    At the time of the Rhinebridge
24 investments, at the time the Rhinebridge
25 investments were originally made, had ISL ever
     TSG Reporting - Worldwide    877-702-9580

Page 227

1    Highly Confidential - R. Foresman
2  analyzed whether or not it was a qualified
3  institutional buyer?
4         MS. MATERA: Objection. Vague and
5  ambiguous. Asked and answered. Calls for a
6  legal conclusion.
7         To the extent you can answer that
8  question without revealing privileged
9  attorney-client communications, you may do
10 so.
11   A    Yes, before that we had guidance from
12 our -- our counsel.
13   Q    And did ISL certify to its brokers
14 that it was a qualified institutional buyer prior
15 to investing in Rhinebridge?
16        MS. MATERA: Objection. Vague and
17 ambiguous.
18   A    On at least a couple of occasions, we
19 provided information to Wells Fargo.
20   Q    Any other brokers?
21   A    I don't believe the other brokers
22 asked, at least anything in writing that I recall.
23   Q    Taking a look at Bates stamp page
24 421. It's a couple of pages in.
25        MS. MATERA: And at any point -- we
     TSG Reporting - Worldwide    877-702-9580

Page 228

1    Highly Confidential - R. Foresman
2  have been going over an hour, so, when it
3  makes sense for you to take a break, it
4  would be great.
5    A    You said 421?
6    Q    Yes.
7    A    Okay.
8    Q    You see that the first sentence
9  begins, "Potential purchasers should determine."
10 Do you see that?
11   A    Yes, I do.
12   Q    It says, "Potential purchasers should
13 determine for themselves the relevance of the
14 information contained in this USCP private
15 placement memorandum as supplemented from time to
16 time, and their decision to purchase any of the
17 USCP notes should be based upon such investigation
18 as they themselves deem necessary."
19        Do you see that?
20   A    Yes, I do.
21   Q    Did ISL understand at the time it
22 invested in Rhinebridge, that its decision to
23 invest should be based on such investigation as
24 they deemed necessary?
25        MS. MATERA: Objection. Vague and
     TSG Reporting - Worldwide    877-702-9580

Page 229

1    Highly Confidential - R. Foresman
2  ambiguous. Calls for a legal conclusion.
3    A    At the time of investment, we did not
4  have this statement. We have based our investment
5  on the ratings assigned, and understood that
6  that -- that ratings process vetted all necessary
7  requirements to obtain that rating, and that's
8  what we used as it complied with the investment
9  policy.
10   Q    What do you mean, vetted all
11 necessary requirements to obtain that rating?
12   A    Well, rating agencies go through a
13 process to consider all relevant information to
14 reach their -- their ratings level on an
15 investment.
16   Q    Well, we have already established
17 that ISL had no information about the ratings of
18 SIVs; isn't that right?
19        MS. MATERA: Objection. Misstates
20 prior testimony.
21   Q    We don't need to do that again, do
22 we?
23        MS. MATERA: Objection. Misstates
24 prior testimony. Vague and ambiguous.
25 Argumentative.
     TSG Reporting - Worldwide    877-702-9580

58 (Pages 226 to 229)

EXHIBIT 2

Page 230

```
1            Highly Confidential - R. Foresman
2       A    Can you repeat the question?
3       Q    Yes.
4            We have already established that ISL
5   did not have information about the ratings of
6   SIVs; isn't that right?
7            MS. MATERA:  Object -- same
8       object- --
9       Q    At the time it invested in
10  Rhinebridge.
11           MS. MATERA:  Same objections.
12      A    We did not have specific information
13  on the process that -- that the rating agencies
14  went through on SIVs, that's correct.
15      Q    And leaving aside whether ISL had
16  seen the particular statement that I read, did ISL
17  understand that its decision to invest in
18  Rhinebridge should be based upon the investigation
19  that it considered necessary prior to investing in
20  Rhinebridge?
21           MS. MATERA:  Objection.  Asked and
22      answered.  Vague and ambiguous.
23      A    Iowa Student Loan for many, many
24  years followed a process to rely on the ratings
25  and understood that the rating agencies went
```

Page 231

```
1            Highly Confidential - R. Foresman
2   through a process to determine those ratings,
3   built upon lots of information, much more
4   information than we had, and if information, you
5   know, about all of the pieces within a particular
6   investment didn't warrant that particular rating,
7   then the rating agency wouldn't provide that --
8   that determination.
9            So, that's what we relied upon, that
10  was our practice, and that's what we followed in
11  this case.  We were investing in commercial paper.
12      Q    As a qualified institutional buyer,
13  did ISL understand that it was expected to conduct
14  its own analysis of investments?
15           MS. MATERA:  Objection.  Calls for a
16      legal conclusion.  Vague and ambiguous.
17      Outside the scope of the deposition notice.
18      A    Well, personally, with our experience
19  on ratings, and years of following those, and
20  knowing the investment policy, that's what we
21  followed.  That was the -- criteria necessary.
22      Q    Did anyone ever represent to ISL that
23  it was appropriate for it to make investment
24  decisions based only on ratings?
25           MS. MATERA:  Objection.  Vague and
```

Page 232

```
1            Highly Confidential - R. Foresman
2       ambiguous.  Calls for a legal conclusion.
3       A    I would say yes, because the bond
4   indentures indicated these were the investments
5   that -- and the ratings levels that you were
6   supposed to invest in.
7       Q    Did anyone ever say to ISL or
8   represent to ISL that it was appropriate not to
9   consider anything else other than the eligibility
10  criteria?
11           MS. MATERA:  Objection.  Vague and
12      ambiguous.  Calls for a legal conclusion.
13           To the extent answering that question
14      requires you to reveal attorney-client --
15      privileged attorney-client communications,
16      do not reveal those communications, but you
17      may otherwise answer the question.
18      A    We did not have any specific guidance
19  to do other things.
20      Q    Did anyone ever represent to ISL that
21  it was appropriate to invest in the Rhinebridge
22  SIV based only on the rating?
23           MS. MATERA:  Objection.  Vague and
24      ambiguous.  Calls for a legal conclusion.
25           Again, to the extent, answering that
```

Page 233

```
1            Highly Confidential - R. Foresman
2       question would require you to reveal
3       privileged attorney-client communications, I
4       would instruct you not to reveal those
5       communications.  However, you may otherwise
6       answer the question.
7       A    At the time of investment into
8   Rhinebridge, we followed the investment criteria
9   in the indenture.
10      Q    That doesn't answer my question,
11  though.  Did anyone ever tell ISL that it was
12  appropriate to invest in Rhinebridge based only on
13  the rating?
14           MS. MATERA:  Objection.  Asked and
15      answered.  Vague and ambiguous.  Calls for a
16      legal conclusion.
17           To the extent answering that question
18      would require you to reveal privileged
19      attorney-client communications, I instruct
20      you not to reveal those communications.
21      However, you may otherwise answer the
22      question.
23           MR. OWEN:  Object to the instruction,
24      again.
25      A    I would say personally that the
```

TSG Reporting - Worldwide    877-702-9580

Page 234

1    Highly Confidential - R. Foresman
2  rating agencies gave us approval to invest based
3  on the investment criteria that they approved in
4  the bond indentures.
5    Q    Did ISL tell the rating agencies that
6  it wasn't considering anything other than the
7  eligibility criteria?
8    MS. MATERA: Objection. Vague and
9  ambiguous. Outside the scope of the
10 deposition notice.
11   A    I don't have any recollection of
12 that, that communication.
13   MR. PEREZ-MARQUES: I have got a
14 couple more minutes on this document. I
15 would suggest wrapping up on this, but if
16 people are dying for a break --
17   MS. MATERA: Are you okay?
18   THE WITNESS: I'm okay.
19   MS. MATERA: Okay.
20   Q    Let me direct your attention to
21 page 432. In fact, I'm sorry, before we get
22 there, let me direct your attention to page 422.
23   A    Okay.
24   Q    And you see at the bottom of this
25 page, the second-to-last paragraph begins, "The
TSG Reporting - Worldwide    877-702-9580

Page 235

1    **Highly Confidential - R. Foresman**
2  **USCP program is rated."**
3    **Do you see that?**
4    A    Yes, I do.
5    Q    And then the second sentence of this
6  states, "A rating reflects only the views of S&P,
7  Moody's and Fitch, as the case may be, and is not
8  a recommendation to buy, sell or hold the USCP
9  notes."
10   **Do you see that?**
11   A    Yes, I do.
12   Q    Did ISL understand at the time it
13 invested in Rhinebridge that the ratings were not
14 recommendations to buy?
15   MS. MATERA: Objection. Calls for a
16 legal conclusion. Vague and ambiguous.
17   A    We wouldn't have had this specific
18 statement at the time of investment, but I believe
19 we understood that the ratings was just one input
20 into an investment decision.
21   Q    Did ISL understand that the ratings
22 reflected opinions on the part of the rating
23 agencies?
24   MS. MATERA: Objection. Vague and
25 ambiguous. Calls for a legal conclusion.
TSG Reporting - Worldwide    877-702-9580

Page 236

1    Highly Confidential - R. Foresman
2    A    I don't know if we ever considered
3  them opinions. I think they were endorsements
4  that an investment would have a -- a -- the right
5  information and the right structure to -- to meet
6  the criteria of that assigned rating.
7    Q    Do you see that the sentence I read
8  begins, "A rating reflects only the views of S&P,
9  Moody's and Fitch, as the case may be," and then
10 it continues? Do you see that?
11   A    Yes, I do.
12   Q    At the time ISL invested in
13 Rhinebridge, did it understand the ratings to
14 reflect anyone's views other than the rating
15 agencies' that assigned them?
16   MS. MATERA: Objection. Vague and
17 ambiguous. Calls for a legal conclusion.
18   A    Can you ask that again, please?
19   Q    Yes.
20   At the time ISL invested in
21 Rhinebridge, did ISL understand the ratings to
22 reflect anyone's views other than the rating
23 agencies' that assigned them?
24   MS. MATERA: Same objections.
25   A    No.
TSG Reporting - Worldwide    877-702-9580

Page 237

1    Highly Confidential - R. Foresman
2    Q    The sentence after the one I read
3  states, "An explanation of the significance of
4  each such rating may be obtained from the related
5  rating agency."
6    Do you see that?
7    A    Yes.
8    Q    Was ISL aware of that fact at the
9  time it invested in Rhinebridge?
10   MS. MATERA: Objection. Vague and
11 ambiguous.
12   A    Not specifically for Rhinebridge.
13   Q    But generally, ISL was aware that
14 explanations of the significance of ratings could
15 be obtained?
16   MS. MATERA: Objection. Vague and
17 ambiguous. Beyond the scope of the
18 deposition notice.
19   A    Well, I think personally there is
20 general knowledge that the rating agency provide
21 definitions, make that available.
22   Q    Did ISL make any effort to obtain
23 these definitions prior to investing in
24 Rhinebridge?
25   MS. MATERA: Objection. Vague and
TSG Reporting - Worldwide    877-702-9580

Page 238

1    Highly Confidential - R. Foresman
2    ambiguous.
3        A    Once again, we did not, because we
4    were relying on the ratings process and
5    understanding that ratings process, and that in
6    order to reach that ratings, that certain things
7    had to be met and -- or else that rating shouldn't
8    have been assigned.
9        Q    Let me direct your attention to
10   page 432, which is titled "Risk" -- or it begins
11   the section titled "Risk Factors."
12       A    Okay.
13       Q    And the second paragraph here states,
14   "Each potential investor in the USCP notes must
15   determine the suitability of that investment in
16   light of its own circumstances."
17           Do you see that?
18       A    Yes, I do.
19       Q    Did ISL understand when it invested
20   in Rhinebridge that it was expected to determine
21   the suitability of that investment in light of its
22   own circumstances?
23           MS. MATERA: Objection. Vague and
24   ambiguous.
25       A    I think Iowa Student Loan knew that

TSG Reporting - Worldwide    877-702-9580

Page 239

1    Highly Confidential - R. Foresman
2    if an investment met all applicable criteria, that
3    it was a suitable investment for us.
4        Q    And did ISL understand that it was
5    expected to assess suitability?
6            MS. MATERA: Objection. Vague and
7    ambiguous.
8        A    I believe our process had defined
9    that for us in that the investment guidelines laid
10   out these levels of investments at these ratings,
11   and that the rating agencies approved that, and
12   they subjected our investment to all of those
13   factors that led them to their rating, so the
14   rating agency was doing that, and it allowed us to
15   select investments according to those criteria.
16       Q    Did anyone ever represent to ISL that
17   the rating agency's process for rating SIVs was
18   the same as its process for rating the notes
19   offered by ISL?
20           MS. MATERA: Objection. Calls for a
21   legal conclusion. Beyond the scope of the
22   deposition notice. Vague and ambiguous.
23       A    Personally, I understand the ratings
24   process, but, you know, each investment is going
25   to be different. So I wouldn't know that the

TSG Reporting - Worldwide    877-702-9580

Page 240

1    Highly Confidential - R. Foresman
2    criteria the rating agency went through or the
3    process was exactly the same.
4        Q    Did anyone represent to ISL that it
5    was even partially the same?
6            MS. MATERA: Objection.
7        Q    To rate a SIV as to rate the notes
8    issued by ISL?
9            MS. MATERA: Objection. Calls for a
10   legal conclusion. Beyond the scope of the
11   deposition notice. Vague and ambiguous.
12       A    Personally, no. I mean, the ratings
13   process was vetted based on that -- the criteria
14   to reach that rating.
15       Q    After the sentence I read, it
16   continues: "In particular, each potential
17   investor should," and then there is a list of five
18   items.
19           Do you see those?
20       A    Yes, I do.
21       Q    And the first one is, "Each potential
22   investor should, A, have sufficient knowledge and
23   experience to make a meaningful evaluation of the
24   USCP notes, the merits and risks of investing in
25   the USCP notes, and the information contained in

TSG Reporting - Worldwide    877-702-9580

Page 241

1    Highly Confidential - R. Foresman
2    this USCP private placement memorandum or any
3    supplement thereto."
4            Do you see that?
5        A    Yes, I do.
6        Q    Did ISL understand at the time it
7    invested in Rhinebridge that it was expected to
8    have sufficient knowledge and experience to make a
9    meaningful evaluation of the notes?
10           MS. MATERA: Objection. Vague and
11   ambiguous. Calls for a legal conclusion.
12       A    Yes. Our sufficient knowledge and
13   experience was based on using the ratings against
14   the ratings criteria in the investment policy.
15       Q    The next item on this list,
16   continuing the sentence that precedes it, says,
17   "Each potential investor should, B, have access to
18   and knowledge of appropriate analytical tools to
19   evaluate, in the context of its particular
20   financial situation, an investment in the USCP
21   notes and the impact the USCP notes will have on
22   its overall investment portfolio."
23           Do you see that?
24       A    Yes, I do.
25       Q    Did ISL understand that it was

TSG Reporting - Worldwide    877-702-9580

Page 358

1      Highly Confidential - R. Foresman
2      **Q    Does that refresh your recollection**
3  **that it was in the discretion of the security**
4  **trustee as to whether or not to redeem ISL's**
5  **investment on October 23, 2007?**
6      A    I believe in --
7          MS. MATERA: Objection. Vague and
8  ambiguous. The document speaks for itself.
9      A    The "security trustee" here is
10 referring to BONY.
11     **Q    Um-hum.**
12     A    I thought you were referring to the
13 receiver.
14     **Q    So, let me ask you again, is it your**
15 **understanding that it was up to the security**
16 **trustee as to whether or not to redeem ISL's**
17 **outstanding commercial paper on October 23, 2007?**
18         MS. MATERA: Objection. Calls for a
19 legal conclusion. Vague and ambiguous.
20     A    I don't have a legal opinion on what
21 the documents say, but our belief was that the
22 trustee managed the outflow of funds to the
23 investors, and they would be the ones that would
24 make payment to us.
25     **Q    And it was -- as far as you were**
       TSG Reporting - Worldwide    877-702-9580

Page 359

1      **Highly Confidential - R. Foresman**
2  **concerned, it was the security trustee's decision;**
3  **correct?**
4          MS. MATERA: Objection. Vague and
5  ambiguous. Calls for a legal conclusion.
6      A    I don't know if we are saying that it
7  was the security trustee's decision, but the
8  security trustee should make payment to us.
9          MR. MCFERRIN-CLANCY: I have nothing
10 further, or I should say, we have a dispute
11 as to how long the deposition should go.
12 I'm sorry. In light of that, we are all
13 trying to be accommodating to co-counsel.
14 So, although I do have other questions,
15 subject to ruling on that dispute, I will
16 pass the chair, as it were.
17         MS. WOOD: Let's go off the record.
18         THE VIDEOGRAPHER: The time is
19 7:06 p.m.
20 We are off the record.
21         (Discussion held off the record.)
22         THE VIDEOGRAPHER: The time is
23 7:07 p.m.
24 We are on the record.
25
       TSG Reporting - Worldwide    877-702-9580

Page 360

1      Highly Confidential - R. Foresman
2  EXAMINATION
3  BY MR. ZEISLER:
4      **Q    Mr. Foresman, I'm Aaron Zeisler. I**
5  **represent the Moody's defendants in this case.**
6          **Sir, you testified that ISL did not**
7  **review any reports published by any of the rating**
8  **agencies in connection with its decision to invest**
9  **in Rhinebridge SIV; correct?**
10         MS. MATERA: Objection. Misstates
11 prior testimony. Vague and ambiguous.
12     A    At the time of the investment, we did
13 not.
14     **Q    Correct.**
15         **So, when you testified that you**
16 **relied on -- that ISL relied on ratings, you meant**
17 **that ISL considered the letter ratings assigned to**
18 **Rhinebridge; correct?**
19         MS. MATERA: Objection. Calls for a
20 legal conclusion. Misstates prior
21 testimony. Vague and ambiguous.
22     A    Yes. Our process would use the
23 letter ratings, as it relates to that particular
24 investment.
25     **Q    Right.**
       TSG Reporting - Worldwide    877-702-9580

Page 361

1      **Highly Confidential - R. Foresman**
2          **And to be clear, ISL never bothered**
3  **to review the ratings reports published by the**
4  **agencies themselves about Rhinebridge SIV before**
5  **investing; correct?**
6          MS. MATERA: Objection. Misstates
7  prior testimony. Vague and ambiguous.
8      A    We did not review those reports prior
9  to investing.
10     **Q    And you testified that you yourself**
11 **perused, I think you used the word "perused" the**
12 **ratings, after the Rhinebridge investment was**
13 **made; correct?**
14         MS. MATERA: Objection. Misstates
15 prior testimony. Vague and ambiguous.
16     A    I don't recall that.
17     **Q    Did you ever peruse the ratings?**
18         MS. MATERA: Objection. Vague and
19 ambiguous.
20     A    The rating statements from the rating
21 agencies?
22     **Q    No. The letter ratings.**
23         MS. MATERA: Objection. Vague and
24 ambiguous.
25     A    Oh. Well --
       TSG Reporting - Worldwide    877-702-9580

Page 362

```
1        Highly Confidential - R. Foresman
2          MS. MATERA:  Outside the scope of the
3     deposition notice.
4       A     Yes, I have seen the letter ratings.
5       Q     Did you personally ever look at them
6     before the investment decision was made?
7          MS. MATERA:  Objection.  Beyond the
8     scope of the deposition notice.  Vague and
9     ambiguous.
10      A     I did not personally see them before
11    the investment was made.
12      Q     Did ISL understand that the ratings
13    on Rhinebridge SIV could be revised at any time?
14         MS. MATERA:  Objection.  Vague and
15    ambiguous.  Outside the scope of the
16    deposition notice.
17      A     Well, I think personally, our
18    understanding of the ratings, yes, the ratings can
19    change.
20      Q     Okay.  And ISL wasn't monitoring the
21    ratings on Rhinebridge after it purchased the SIV
22    in July, 2007, was it?
23         MS. MATERA:  Objection.  Misstates
24    prior testimony.  Vague and ambiguous.
25      A     After the investment was made in
```
TSG Reporting - Worldwide     877-702-9580

Page 363

```
1        Highly Confidential - R. Foresman
2     July, we did not monitor that rating.
3       Q     Is it your testimony that someone at
4     ISL was monitoring the ratings on Rhinebridge SIV
5     in August 2007?
6          MS. MATERA:  Objection.  Vague and
7     ambiguous.
8       A     Not as a regular practice, but up
9     until the point we had another investment that had
10    some issues, we started to research and review,
11    and at that point we were aware.
12         So, prior to that, no, we did not
13    monitor.
14      Q     Well, at what point did ISL begin
15    monitoring the ratings of Rhinebridge SIV?
16         MS. MATERA:  Objection.  Asked and
17    answered.  Vague and ambiguous:
18      A     I can't say, I can't say for sure the
19    exact point, but it was sometime after August 23,
20    2007.
21         MR. ZEISLER:  Those are the questions
22    that I have at this point, but I join in the
23    objections of other defense counsel that I
24    have more questions, but in the interest of
25    time, and allowing codefendant's counsel to
```
TSG Reporting - Worldwide     877-702-9580

Page 364

```
1        Highly Confidential - R. Foresman
2     ask questions, I will finish at another
3     point.
4          MR. OWEN:  Likewise on behalf of S&P.
5          MR. ZEISLER:  Let's go off the
6     record.
7          THE VIDEOGRAPHER:  The time is
8     7:12 p.m.
9          We are off the record.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  The time is
12    7:14 p.m.
13         We are on the record.
14    EXAMINATION
15    BY MS. WOOD:
16      Q     Mr. Foresman, my name is Julia
17    Tarver-Mason Wood.  I'm an attorney at Paul Weiss.
18    We represent Fitch.
19         When did you personally become aware
20    that ISL invested in Rhinebridge?
21         MS. MATERA:  Objection.  Beyond the
22    scope of the deposition notice.
23      A     The -- the date that I signed the --
24    I don't know if we have a name for it -- the sheet
25    that goes to the trustees where we have dual
```
TSG Reporting - Worldwide     877-702-9580

Page 365

```
1        Highly Confidential - R. Foresman
2     signatures, that these are the investments and the
3     particulars of that investment.
4       Q     And what, if anything, did you learn
5     about the Rhinebridge investment at the time you
6     signed that sheet?
7       A     I would see the ratings, the term.  I
8     don't recall if there was the -- if the discount
9     amount was on there, but the dollar amount, the
10    name of the investment, the fund that it related
11    to, the bond fund.
12      Q     So, you saw the contents of that
13    sheet, but nothing more than the contents of that
14    sheet of paper; correct?
15      A     That is correct.
16         MS. MATERA:  Objection.  Move to
17    interpose an objection between the question
18    and the answer, beyond the scope of the
19    deposition notice.
20      Q     And did you have any discussions with
21    anyone at that time concerning the Rhinebridge
22    investment?
23      A     Not that I recall.
24      Q     When was the first time you recall
25    having any discussions with anyone concerning
```
TSG Reporting - Worldwide     877-702-9580