EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ABU DHABI COMMERCIAL BANK, KING COUNTY WASHINGTON, SEI Investments Company, Together and on behalf of all others similarly situated,

Plaintiffs,

vs. Civil Action No. 1:08-cv-07508-SAS

MORGAN STANLEY & CO. INCORPORATED, ET AL.,

Defendants.

---

DEPOSITION OF JOHN T. DOBROWOLSKI

Taken on behalf of the Defendants

April 29, 2011

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of MARY ELLEN MULLEN, VOLUME II was taken before Tia B. Reidt, #2798, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 29, 2011, commencing at the hour of 9:06 a.m., the proceedings being reported at 1111 3rd Avenue, Suite 3400, Seattle, Washington.

Job Number: 38397

Page 230

JOHN T. DOBROWOLSKI

thinking of.

A. So that's the one? Yeah. So "no commercial paper monitoring."

Q. Okay. And what does that reflect?

A. That means, if you go to the left where it says "Commercial paper, 25 percent of the portfolio, 5 percent of for issuer," how do you monitor that you are within those guidelines?

Q. And they were not monitoring within the guidelines? Is that what that point means?

MR. MIKOLAJCZYK: Objection. Leading; lack of foundation.

BY MR. PEREZ-MARQUES:

Q. Well, what did you mean by "no commercial paper monitoring"?

A. I don't know. There's two possible things it could mean. One would be they're not monitoring versus their limits, or the other could be that after they purchased commercial paper, they're not monitoring to see how it performs thereafter.

Q. And do you know from all of your work on the panel whether King County was monitoring the performance of its commercial paper after purchase?

MR. MIKOLAJCZYK: Objection. Lack of foundation;

TSG Reporting - Worldwide 877-702-9580

Page 231

JOHN T. DOBROWOLSKI

calls for speculation.

THE WITNESS: I don't know specifically if they monitored their investments thereafter, from a credit point of view.

BY MR. PEREZ-MARQUES:

Q. Under that slide on "Default Risk Limits," there's a note that appears to say "soft hard limits."

Do you see that?

A. Yes.

Q. What does that reflect?

A. So in risk management or policy guideline underwriting, generally you have what are called soft limits and hard limits. Soft limits are viewed more as a trigger. So let's take your US Agency 75 percent of portfolio on this page. My question, or what that is meant to say, is it a hard limit or a soft limit? If you go to 76, have you breached a limit or is that a trigger and your true on that is, you know, 80 percent. So these are viewed as hard limits. Do not exceed them.

And what I was exploring is, well, then you may want to consider putting in a soft limit at 70 percent so then you know you're within, you know, 5 percent of your hard limit.

Q. And then at the bottom of Page 6 on the left-hand

TSG Reporting - Worldwide 877-702-9580

Page 232

JOHN T. DOBROWOLSKI

side, there's a notation.

Can you read what that says?

A. "Credit analyst," "S&P."

Q. Do you know what those mean?

A. I don't know what they referred to.

Q. Okay. That's all for that document.

I'll show you what's been previously marked as Defendant's Exhibit 140. And for the record, Defendant's Exhibit 140 is a two-page e-mail string MARY_MULLEN_0013230 through -13231.

Let me know when you've looked it over and are ready to answer a question.

A. Okay. (Witness peruses documents.)

Okay. I'm ready.

Q. You see on Page -231 there's an e-mail from John Rose to Mary Mullen and yourself? Do you see that?

A. Yes.

Q. March 18th, 2009, with the subject "Olympia News," correct?

A. Correct.

Q. And in the last paragraph of this e-mail, Mr. Rose writes, "At 4:15 I meet with Rep Santos. Her questions of me were not friendly. She wanted to know why our panel didn't do more to cause the County to change its ways."

TSG Reporting - Worldwide 877-702-9580

Page 233

JOHN T. DOBROWOLSKI

Do you see all that?

A. Yes.

Q. And then on Page -230, you respond to Mr. Rose, correct?

A. Correct.

Q. And you write, in the second paragraph, "I would advise Rep Santos the reason that panel was unable to force change was because the executive branch did not accept responsibility for their investment actions."

Do you see that?

A. Yes.

Q. And was that your view at the time?

A. Yes.

Q. And then you continue, "Why change if you do nothing wrong! Classic public sector"?

A. Correct.

Q. And you wrote that?

A. Yes.

Q. And what did you mean by "classic public sector"?

A. The lack of desire to change the current environment; keep the status quo.

MR. PEREZ-MARQUES: Last one from me.

(Whereupon, a 1-page e-mail from John Dobrowolski to multiple recipients dated 3/19/09 re: More Olympia was

TSG Reporting - Worldwide 877-702-9580

Page 234

JOHN T. DOBROWOLSKI

marked Defendant's Exhibit 169 for identification.)

BY MR. PEREZ-MARQUES:

Q. This is Defendant's Exhibit 169. It's a two-page e-mail string MARY_MULLEN_0013233 through -234.

Please let me know when you've looked it over and are ready.

A. I'm ready.

Q. There's another e-mail on the back.

A. Oh, okay. (Witness peruses document.) Okay.

Q. And this is another e-mail that -- the second page of this exhibit (Exhibit 169), -234, is another update from Mr. Rose about activity in Olympia, correct?

A. Correct.

Q. And it's dated the same date as Exhibit 140, correct?

A. Correct.

Q. And he's providing an update on legislative action?

A. Yes.

Q. And then on Page -233, you respond to Mr. Rose, correct?

A. Correct.

Q. Copying Ms. Mullen?

Page 235

JOHN T. DOBROWOLSKI

A. Correct.

Q. And that's on March 19th, 2009?

A. Correct.

Q. And you write, "Thanks for update. I do not think the service could be worse, no matter what limit is placed on the fund. Presently the Keystone Kops are 'managing' 4 billion. Very sad."

A. Right.

Q. Do you see that?

A. Right.

Q. What did you mean by "I do not think the service could be worse, no matter what limit is placed on the fund"?

A. What limit is being placed on the fund, do you know -- oh, the bill limiting fees. So this is opining that they could limit the amount of fees that they're going to charge to the fund. But by limiting, you're actually creating less resources available to develop the infrastructure to manage the fund.

So you can place a limit, but in my opinion, you can't -- you're not going to be able to build that infrastructure that is needed to appropriately manage that fund. So this is a aligned with my view that you should outsource because you can't build it.

Q. You're saying also that you don't think the

Page 236

JOHN T. DOBROWOLSKI

service could be worse, correct?

A. Right. Well, I mean, it could always be worse. You could lose every penny, right? Which they did not do. But I mean, my opinion here was it couldn't be worse.

Q. And that was your view at this time?

A. Yes.

Q. And then you state, "Presently the Keystone Kops are 'managing' $4 billion. Very sad."

Do you see that?

A. Yes.

Q. And who are you referring to as the Keystone Kops?

A. That would be the treasury group.

Q. Okay. And what did you mean by characterizing them as the Keystone Kops?

A. That they did not have the adequate infrastructure to manage a $4 billion pool.

Q. What are the Keystone Kops?

A. Keystone Kops are -- at least my understanding or my definition of "Keystone Kops" are individuals who are in a role that they're not adequately suited to perform.

Q. People who are incompetent, correct?

MR. MIKOLAJCZYK: Objection. Leading; calls for a conclusion; vague and ambiguous.

THE WITNESS: Could be incompetent. That could be

Page 237

JOHN T. DOBROWOLSKI

one of the traits of being a Keystone Kop, but I'm sure there are many. One would be comical, for example.

BY MR. PEREZ-MARQUES:

Q. Comically incompetent?

A. Just comical. Think of Charlie Chaplin.

Q. Okay. What did you mean by putting "managing" in quotes?

A. Managing. If you believe the view that best practices is someone who is exhibiting or utilizing best practices to manage money, is indeed managing the money because they're using best practices, that's one end of the spectrum.

The other end of spectrum is you do not have best practices; in fact, you have horrific practices. I would not define that group as managing the money appropriately.

Q. Okay.

A. And again, that gets back to the fiduciary responsibility.

Q. And it was in that category of not truly managing the money that you put the treasury staff, correct?

MR. MIKOLAJCZYK: Objection. Leading; vague and ambiguous.

THE WITNESS: I viewed the treasury group as not having best practices in place to manage this $4 billion

GLENN E. SCOTT

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 09-cv-8387 (SAS) (ECF Case)

---

CONFIDENTIAL - ATTORNEYS EYES' ONLY
VIDEOTAPE DEPOSITION OF:
GLENN E. SCOTT - November 29, 2011

---

KING COUNTY, WASHINGTON; IOWA STUDENT LOAN LIQUIDITY CORPORATION, Together and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

IKB DEUTSCHE INDUSTRIEBANK AG; IKB CREDIT ASSET MANAGEMENT, GmbH; MOODY'S INVESTORS SERVICE, INC.; MOODY'S INVESTORS SERVICE, LIMITED; THE MCGRAW-HILL COMPANIES, INC. (d/b/a STANDARD & POOR'S RATING SERVICES); FITCH, INC.; MORGAN STANLEY & CO., INCORPORATED; MORGAN STANLEY & CO. INTERNATIONAL LIMITED; WINFRIED REINKE and STEFAN ORTSEIFEN,

Defendants.

---

Job # 43430

GLENN E. SCOTT

just received the Security Trust Deed (attached) and am reading through it now."

Do you see that?

A. I do.

Q. Do you remember from where you received the security trust deed?

A. I do not.

Q. Let's mark this as 35. Thank you. Scott Exhibit 35.

(Deposition Exhibit 35 was marked.)

Q. And this is an email from Amrit Bains to yourself copying Christian Rohde and Harjan Kuiper dated October 15, 2007, Bates-stamped IKB 207073. Do you see that?

A. I do.

Q. Do you recognize this document?

A. I don't recall it, but it appears to be a document -- or an email sent to me by Amrit.

Q. Do you have any reason to believe that you didn't receive this email?

A. No.

Q. And does that refresh your recollection about from where you received the Security Trust Deed?

A. It looks like I got it from IKB.

GLENN E. SCOTT

Q. Okay. You can put that document aside, too. If you can turn your attention to what has been marked as Defendants' Exhibit 82. I'll show you just so you have an idea of what it looks like.

A. Oh, right, right. Oh, here it is. Okay.

Q. Now, I realize you've testified -- well, first of all, let me just note for the record it's an October 19, 2007, letter from Steve McCullough, president and COE of Liquidity Corp, to Kate Russell of Bank of New York and Amrit Bains of IKB-CAM.

I realize you previously testified you don't -- aren't familiar with this document, but if you could just turn to the second page and read to yourself the paragraph the -- the paragraph No. 3.

(The deponent perused the document.)

Q. Let me know when you're done.

A. Okay.

Q. And if you can turn you -- turn your attention to the first sentence of that third paragraph, it says, "Third, it is our opinion that IKB-CAM's mark to market calculations may be overly conservative, leading to a premature declaration of a Mandatory Acceleration Event."

Do you have any recollection of any

GLENN E. SCOTT

discussions you had with Steve McCullough from Iowa Student Loan where he expressed his opinion that IKB CAM mark to market calculations for Rhinebridge were overly conservative?

MR. CHARO: Objection, lacks foundation.

A. Vaguely.

Q. (BY MR. HAMPSON) And what are your vague recollections?

A. My -- my recollection is that ISL was exploring whether the mandatory acceleration event had been properly declared.

Q. Do you remember whether you disagreed with ISL's conclusions at that time?

A. I don't recall that being an area that we really worked on. This was something that, as I recall, ISL had determined or came out of ISL.

Q. Do you remember whether ISL told you what their basis for that determination was?

A. I don't recall them doing so.

Q. Okay. You can put that document aside. If you can turn back to Scott Exhibit 26, please. It's an April 4, 2008, email from Ron Foresman to Scott Prickett to Scott -- I'm sorry.

A. Yeah, two Scotts.

GLENN E. SCOTT

Q. It's an April 4, 2008, email from yourself to Ron Foresman copying Scott Prickett; is that correct?

A. It is.

Q. If I can direct your attention to the last sentence of the first paragraph. You say to Mr. Foresman, "Likewise, the cash out option is somewhat of a fire sale; selling into a market not yet recovered from the subprime crisis in order to generate cash for liquidity starved participants."

What did you mean by that?

A. Let's see, this is -- this is April of '08. All right. So April of '08, we're before Lehman. The markets were -- there was -- there was a series of events through '07 and '08 where liquidity in the market was thin. Those people requiring liquidity were in a disadvantaged position. And liquidity was expensive.

Q. Is it fair to say that it was your opinion in April 2008 that people -- investors taking the cash out option were not realizing full value from the Rhinebridge commercial paper that they held?

MR. CHARO: Objection, calls for speculation.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
(FOLEY SQUARE)

| | |
|---|---|
| KING COUNTY, WASHINGTON, et al., | Case No. 1:09-cv-08387-SAS |
| Plaintiffs, | |
| vs. | |
| IKB DEUTSCHE INDUSTRIEBANK AG, et al., | VIDEOTAPED DEPOSITION OF DAVID V. SOMMERS |
| Defendants. | |

**CONFIDENTIAL**

THE VIDEOTAPED DEPOSITION OF DAVID V. SOMMERS, taken before Chris A. Quinlin, Certified Shorthand Reporter and Notary Public of the State of Iowa, commencing at 9:32 a.m., January 31, 2012, at 801 Grand Avenue, Suite 3100, Des Moines, Iowa.

Reported by: Chris A. Quinlin, C.S.R.

Videographer: Amy Cooper

**Long Lane, the issuer, 5.245 would have been the yield quoted to Iowa Student Loan, and $100 would have been -- off to the far right there would have been the commission on that particular piece.**

Q. In other words, you would earn $100 if ISL made that trade?

A. **No. $100 would have been the gross commission. I would have made 25 bucks.**

Q. I see.

So you're right. LPL would have gotten $100, of which you would have ended up getting 25?

A. **Yeah.**

Q. Okay. And why is there no number on the next entry down?

A. **Because the commission on the trade was the least important part of the -- of doing the business. It was what it was. The trade desk calculated the commission, not myself. And I'm obviously writing down a lot of information in an abbreviated period of time because I have to turn this information around to Steve Nichols.**

Q. Okay. How long did it take you to turn this information around to Steve Nichols?

A. **I would say a day of 13 pieces was a bigger day than normal. There's no way I could put an exact time on it. We tried to operate as efficiently and quickly and timely as possible.**

Q. Would you send it back -- Would you send this information back to Steve Nichols on the 24th or on the 25th?

A. **This information, this actual document would not have been sent back to Steve. He would have been communicated with by telephone on the issuer and the yield for the first piece, the second piece, and so on.**

Q. I see.

Okay. So you would have called up Steve Nichols and said, "Okay. I have your fax. As to the first entry, we've got Long Lane at 5.245"?

A. **Yes, sir.**

Q. Would you also tell him what the commission was?

A. **No.**

Q. Okay. And then you would say to Mr. Nichols "As to the second one, we have" -- what is it, Astra Corp. or --

A. **Yes, sir.**

Q. And this information came back to you from --

A. **It was communicated by phone to me from my fixed income trade desk.**

Q. Okay. When -- All right. I'm just trying to construct a timeline here. You received this fax on or around 5:17 p.m. on the 24th?

A. **Usually the day before, yes.**

Q. You would then transmit this information by fax?

A. **To the trade desk.**

Q. To the trade desk?

A. **Yes, sir.**

Q. And they would then telephone you with this information?

A. **Yes.**

Q. Approximately how long would it take before they telephoned you with the information that you copied down onto this piece of paper?

A. **Offerings were due, I want to say, like by 8:15 or 8:30. So it would be -- this would be faxed to my trade desk, as a rule, the previous business day. They would phone me very early in the morning. I would turn around and**

**contact Iowa Student Loan by the prescribed time.**

Q. I see. Okay.

So approximately what time on the 25th would you have your discussion with Mr. Nichols in which you provided him this information, the handwritten information?

MR. CAPUTO: Objection. Calls for speculation.

A. **There would have been no benefit to me in waiting right up to the last minute. So as soon as my trade desk contacted me, I would have turned around and called Steve.**

Q. Okay. Would that be before 9 a.m.?

A. **It would have been before their cutoff time. And I believe it to be before 9.**

Q. Yes.

A. **It -- Yep.**

Q. Actually, if you look at the last page --

A. **Yep.**

Q. -- there's an indication that --

A. **Between 8:20 and 8:40. Yep.**

Q. So that would be the time that you would have your discussion with Mr. Nichols?

10:54:03 A. **Yep.**
10:54:04 Q. Mr. Nichols would then compare your quotations with other quotations?
10:54:11 A. **That is correct.**
10:54:12 Q. Okay. And he would then get back to you with orders for the things that -- relating to the quotes -- the LPL quotes that had been selected from the various quotes that they received; correct?
10:54:28 A. **Correct.**
10:54:28 Q. What time would that be, approximately?
10:54:42 A. **Once again, nothing to be gained by delaying, so as promptly as he could make the assessment as possible that we were the successful offerer.**
10:54:55 Q. Well, just in order of magnitude, are we talking hours or --
10:55:18 A. **No.**
10:55:18 Q. -- several hours or a half an hour?
10:55:21 MR. CAPUTO: Objection. Lacks foundation, calls for speculation. It's also vague as to time.
10:55:30 A. **These pieces that would have been presented to me to offer Iowa Student Loan are not available all day. There is a finite size.**

10:55:39 **It is available first come first serve. It behooves everyone to operate as quickly and efficiently as possible.**
10:55:48 **I would say in the most part within minutes of my responding to him I would get an answer back.**
10:55:57 Q. So less than a half an hour?
10:56:02 A. **I can't think of the occasion where it was anywhere near that long.**
10:56:09 Q. So would it be fair to say that having received the quotes from you sometime between 8:20 and 8:40, it would only be a matter of minutes for Mr. Nichols to evaluate those quotes and place his orders? Correct?
10:56:26 MR. CAPUTO: Objection. Lacks foundation, calls for speculation, vague as to time frame.
10:56:33 A. **It -- It could have been. I -- My memory isn't clear. That's almost five years ago. Could it have been 20 minutes? 30 minutes? On occasion I assume it could have been.**
10:56:48 Q. But that would be as long as it ever got?
10:56:50 A. **Well, you have a position -- there**

10:56:53 **could have been an issue where the successful bidder was Smith Barney -- or the successful offerer was Smith Barney, and by time -- by the time that Smith Barney went back to confirm and purchase that piece, it was gone, and I was the next most competitive. I'm just creating a scenario here. But that would force a delay in something happening.**
10:57:17 Q. And with respect to the actual investments that are identified here, ISL never requested at any time information that would provide more information about those investments than what's provided here in this document; correct?
10:57:37 MR. CAPUTO: Objection. Lacks foundation, calls for speculation, vague as to time. It's also outside the scope of this deposition, in that they relate to other investments other than Rhinebridge.
10:57:57 A. **To answer your question, prior to placing the order from me, no other information requested.**
10:58:12 Q. If ISL had asked you for more information about the kinds of issuers that were out there in the marketplace, would LPL have

10:58:23 provided them that information if they had access to it?
10:58:25 MS. COMBS: Objection as to form. Answer it if you can.
10:58:30 MR. CAPUTO: It's also objectionable in that it's vague as to time frame.
10:58:38 A. **If it was within their scope and they had the time at that point in time, yes, they would have provided whatever information they could have. It's a trade desk. It's not a research center.**
10:58:56 Q. Are you aware of whether ISL had any avenues for access to information about potential investments in the marketplace other than LPL?
10:59:09 MR. CAPUTO: Objection. Lacks foundation, calls for speculation.
10:59:13 A. **I was not the only broker-dealer they were conducting business with. As we mentioned earlier, they're a sophisticated institutional investor not only buying large dollar amounts of investments but selling bonds on their own. I would have assumed their information -- their access to information would have probably at a**

CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------

KING COUNTY, WASHINGTON ) Civil Action No.
Individually and on Behalf of ) 1:09-cv-08387-SAS
All Others Similarly Situated, )
Plaintiff, )
vs. ) CLASS ACTION
IKB DEUTSCHE INDUSTRIEBANK AG, )
et al., )
Defendants. )

----------------------------------

IOWA STUDENT LOAN LIQUIDITY ) Civil Action No:
CORPORATION, Individually and on ) 1:09-cv-08822-SAS
Behalf of All Others Similarly )
Situated, )
Plaintiff, ) CLASS ACTION
vs. )
IKB DEUTSCHE INDUSTRIEBANK, AG, ) VOLUME II
et al., )
Defendants. )

----------------------------------

CONFIDENTIAL

CONTINUED VIDEOTAPED DEPOSITION OF DR. KLAUS BAUKNECHT
FRIDAY, OCTOBER 14, 2011
PAGES 295 - 393

CONFIDENTIAL

MR. HALL: Object to the form.
MR. STERN: Object to the form.
MR. McFERRIN-CLANCY: Objection. You may answer.
A It sounded like the same question. Can you repeat it?
**Q It is the same except we talked about your work at IKB CAM?**
A Sorry.
MR. McFERRIN-CLANCY: Same objection.
MR. HALL: Same objection.
A There was no research done at IKB CAM from our side to evaluate the dynamics of the commercial paper market, yes.
**Q And I take it from your testimony you have done no formal analysis about whether the downturn in the commercial paper markets supporting structured finance should have been foreseen. Is that also true?**
MR. STERN: Objection to form.
MR. HALL: Object to the form.
MR. McFERRIN-CLANCY: Objection. You may answer.
A I have no comment on what should have happened, what should have been foreseen. As I was saying on Wednesday, I made the statement that this was something that could not have been foreseen. It is like, again, looking at it from an economic perspective,

332

it is like analyzing the Stock Market, the Dow, and one should certainly -- we can argue that with the economy moderating and going into recession, we can argue whether the Stock Market is going to fall 10 or 15 percent, on what the earnings potential of companies, all these things we can discuss. But surely nobody will argue that if the US economy is going to go into recession the US Stock Exchange is going to cease to exist. That would even have been more plausible than the commercial paper market -- because after all here we are investing in company's future cashflow, not just on very liquid short-term assets. So I restate what I said on Wednesday, that this is something that, to my knowledge, nobody could have foreseen. We are not talking about downturn, we are talking about it ceased to exist.
**Q Are you through, Doctor?**
A Yes.
**Q I move to strike as non-responsive.**
**My question to you, Doctor, was you have done no formal analysis that addresses the downturn ceasing to exist of the commercial paper market supporting structured finance. Is that correct?**
A That is correct.
MR. ROUHANDEH: Object to the form, lack of

333

foundation.
MR. HALL: Object to the form.
MR. AIETA: Same objection.
MR. McFERRIN-CLANCY: Objection.
MR. CAPUTO: In retrospect, do you think you should have been more mindful of the likelihood of the collapse of the commercial paper market in doing your research?
A No.
**Q Why not?**
A Because the event that is portrayed by such a development is just something that doesn't fall within the sphere of my possibility of my knowledge of what could happen. Now, I could state to you my example on the New York Stock Exchange, that we can discuss and evaluate whether markets are going to weaken, whether they are going to perform well, but it would be to argue that like on an equity analyst, that the New York Stock Exchange is going to cease to exist, close of business, that is something that I don't think I would have spent much time on analyzing at IKB.
**Q Did the commercial paper market that was supporting the structured finance cease to exist?**
A Well, if you look at the liquidity in the market, there was significant reduction in the volume of commercial paper being issued, as far as the data -- at

334

least as far as the data that I have seen, yes.
**Q My question was did it cease to exist at some point?**
**MR. McFERRIN-CLANCY: Asked and answered. You may answer again.**
A If you define a market as a place where there is adequate opportunity to buy and sell, then my answer would be yes.
**Q I am marking as Exhibit 106 plaintiff's notice of deposition to defendants IKB and IKB CAM.**
**(Exhibit P106 marked for identification)**
**Have you seen this exhibit before, Doctor?**
A No, I don't think so.
**Q Are you aware you have been designated by IKB to speak on behalf of the company in addressing certain subject matters that are at issue in this case?**
A Yes.
**Q If you look at page 6 of this deposition notice, there is a number of subject matter areas. Do you have an understanding about which of these matters you have been designated to testify about?**
A I know that I am designated to testify on certain issues, yes.
**Q Can you identify any of the issues on page 6 that you are designated to testify about?**

335

Veritext National Deposition & Litigation Services
866 299-5127

EXHIBIT 4

**From:** Rajiyah, Anushka (FID) [Anushka.Rajiyah@morganstanley.com]
**Sent:** Wednesday, September 06, 2006 11:55 AM
**To:** Guadagnuolo, Lapo
**Subject:** FW: IKB Presentation for RA call

**Attachments:** RE: IKB Presentation for RA call

Hi Lapo,
I have been trying to call you to discuss tomorrows call with IKB. IKB are keen to discuss the portfolio parameters and for you to provide feedback on the termsheet.

Please call me when free. I have re-attched the email i sent you previously outlining the call agenda.

Thanks

**Anushka Rajiyah**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-3061
Mobile: [redacted]
Fax: +44 20 7677-3454
Anushka.Rajiyah@morganstanley.com

---

**From:** Rajiyah, Anushka (FID)
**Sent:** 01 September 2006 10:34
**To:** Rajiyah, Anushka (FID); 'Guadagnuolo, Lapo'; 'Inglis, Perry'
**Cc:** Drennan, Gregg (FID); 'Söhlke, Thomas, Dr.'; 'Rohde, Christian'
**Subject:** RE: IKB Presentation for RA call

Dear All,

Please find attached IKBs updated presentation for next weeks conference call. We have made some minor changes.

During the call we envisage the following to be discussed as:

1. IKB to provide a brief update on organization
2. Overview of the establishment of a new separate asset management subsidiary which will serve as SIV asset manager and more detailed overveiw of the key personnel to be involved in the SIV management
3. Update on SIV establishment process i.e. progress with QSR, simulation model etc.
4. Rating agencies to provide feedback on the Termsheet. Specifically regarding target portfolio and target portfolio parameters. Finalization of portfolio parameters is crucial in order for IKB to shortly begin the asset ramp-up process

We should arrange a call prior to the conference calls to discuss further. Please let me know your availability.

Further in there termsheet we would like to alter the following portfolio parameters:
Page 41
Global RMBS: 75% max eligible limit (changed from 55%)
70% max operational limited (changed from 45%)

I have attached the revised version incorporating this change

Thanks

**Anushka Rajiyah**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW

Draft: August 12 2006

# SIV Königsallee PLC Termsheet

**Termsheet Overview**

**Index**

I. General Transaction Terms
II. Market Valuations
III. Capital Tests
IV. Investment Portfolio
V. Market Sensitivity Tests
VI. Liquidity Features
VII. Operating States
VIII. Investment Defeasance Plan
IX. Senior Funding
X. Hedging Overview
XI. Synthetic Investments
XII. Reporting

**Appendices**

a) Senior Debt Obligation Termsheet
b) Terms and Conditions of the Capital Notes
c) Base Capital Requirements for Cash Investments
d) CDS Counterparty Idealised Default Table
e) Investment Recovery Rate Tables
f) Base Capital Requirement Sector Mapping Table
g) Capital Note Maturity Test
h) Liquidity Eligible Investment Haircuts
i) Ratings Mapping Tables
j) Issues To Be Finalised Post Closing



# Presentation to Rating Agencies

## SIV „Rhinebridge“

September 2006

IKB
Deutsche Industriebank

CONFIDENTIAL

S&P-IKB 0013031

# Topics

2

1. **Bank highlights and Securitisation Division**

2. Establishment of Credit Asset Management GmbH

3. SIV Rhinebridge Update

Appendix A – IT Overview

*IKB. Committed to Enterprise.*

IKB Deutsche Industriebank

CONFIDENTIAL

S&P-IKB 0013032



# Topics

23

1. Bank highlights and Securitisation Division
2. Establishment of Credit Asset Management GmbH
3. **SIV Rhinebridge**

Appendix A – IT Overview

*IKB. Committed to Enterprise.*

IKB Deutsche Industriebank

CONFIDENTIAL

S&P-IKB 0013053

# The planned SIV, „Rhinebridge", will be managed by CAM

- CAM will be responsible for the Investment Advisory for the SIV „Rhinebridge"
- SIV-set up is carried out with experienced partners
  - Morgan Stanley as a structuring and placement a
  - QSR (subsidiary of the Bank of New York) as administrator
- Investments consist of high grade, variable or fixed-interest securities such as ABS, CDOs, CMBS or RMBS, which are traded on the OTC-market
- Based on Morgan Stanley SIV structure
  - Senior Capital Notes to be launched at closing
  - Co-Issuance Structure to be utilised

CONFIDENTIAL

# Update of SIV process (1/2)

- **Successful incorporation of IKB CAM GmbH**

- **Portfolio ramp-up**
  - Asset ramp-up to commence in October once lead portfolio manager is appointed
  - Rating agency feedback on investment criteria crucial prior to commencing asset ramp-up
  - Assets to be held on IKB balance sheet and transferred to SIV Rhinebridge at closing

- **Building of simulation model**
  - Prototype model developed by IKB based on Morgan Stanley model framework
  - Finalising model and installing on IKB system

- **Ongoing integration of SAMS (CAM IT infrastructure) with QSR systems**
  - SIV „Rhinebridge" will be set up using „EnSIS", QSR's SIV administration platform
  - Creation of test portfolio to simulate „live"
  - Interface files have been specified to load all relevant data from EnSIS to SAMS, the IKB CAM standard reporting and surveillance application
  - Process interface testing to commence in October

IKB
Deutsche Industriebank

# Update of SIV process (2/2)

- **Operating Manual and QSRs Systems**
  - Termsheet draft provided to rating agencies
  - Ongoing work with QSR to identify and process required system changes
  - IKB section to be completed now that CAM set up and integration is complete
- **Appointment of lawyers finalised**
  - Mayer Brown have been appointed as lead drafting counsel
  - SIV documentation process commencing
- **Key Planned Milestone Dates**
  - Capital Notes Marketing: November
  - Pricing: February
  - Closing: March



SIV „Rhinebridge“ transaction structure
27
Charitable Trust
IKB CAM - Manager (100% subsidiary of IKB)
Information exchange
Administrator (QSR)
Administration Fee
100% Equity
profit distribution
Management Fee
Asset Selection & Portfolio Surveillance
Operational Management
SIV "Rhinebridge" (limited liability company based in Dublin)
Board of Directors (1 of 3 directors by IKB)
Collateral: includes ABS, RMBS, other fixed income securities
Principal & Interest
Collateral Purchase
Conversion of Asset Cash-Flows
Hedging Fee
Liquidity Facilities
Liquidity Fee
Various Services
Placement Services
Arranger Fee
Principal & Interest
Senior Notes consisting of CP and MTN [AAA/Aaa or A-1+/P-1]
Senior Capital Notes [AAA/Aaa]
Mezzanine Capital Notes [A/A3]
Junior Capital Notes [NR]
About 90% of outstanding securities
About 10% of outstanding securities
Hedge Counterparty
Liquidity Provider
Trustee and Collateral Agent, Issuing & Paying Agent (QSR)
Arranger/Placement Agent (Morgan Stanley)
IKB. Committed to Enterprise.
IKB
Deutsche Industriebank

CONFIDENTIAL S&P-IKB 0013057

# Waterfall overview

28

Administrative Expenses

↓

Senior Obligations due and payable

↓

- Fees, costs and expenses of Liquidity Providers
- Deposits in respect of Breakable Deposits

↓

- Senior Management Fee
- Fees costs and expenses of Administrator
- Fees, costs, expenses of the Issuer not covered by Administrative expenses

↓

Interest and Principal on Senior Capital Notes

↓

Interest and Principal on Mezzanine Capital Notes

↓

Junior Management Fee

↓

Interest and Principal on Junior Capital Notes

↓

Junior Capital Notes Subordinated Payments (at Closing not expected to be any)

↓

Payments due under Post Reserve Distributable Profit Payment Order

IKB. Committed to Enterprise.

IKB Deutsche Industriebank

CONFIDENTIAL

S&P-IKB 0013058

# Portfolio composition

- A potential portfolio could have the following characteristics (current working case):
  - WAL: 4.45 years, WARF: 26.1 (Aa2/Aa3)

**Portfolio Composition**

| Category | AAA | AA | A | Total |
|---|---|---|---|---|
| Cashflow CDO | 7.50% | 2.50% | 2.50% | 12.50% |
| Synthetic CDO | 10.00% | | | 10.00% |
| CMBS | 6.50% | 3.75% | 3.75% | 14.00% |
| RMBS - Prime | 2.50% | | | 2.50% |
| RMBS Sub-Prime | 2.50% | 1.25% | 1.25% | 5.00% |
| RMBS - Alt-A | 5.00% | | | 5.00% |
| HEL | 25.00% | 15.00% | 10.00% | 50.00% |
| Student Loans | 1.00% | | | 1.00% |
| Total | 60.00% | 22.50% | 17.50% | 100.00% |

**Rating Breakdown**
% of the Total Portfolio

A
17,5%
Aa
22,5%
Aaa
60,0%

**Collateral Breakdown**
% of the Total Portfolio

Credit Cards 1%
CDO 13%
Synthetic CDO 10%
CMBS 14%
RMBS - Prime 3%
RMBS - Subprime 5%
RMBS - Alt-A 5%
HEL 49%

*IKB. Committed to Enterprise.*

IKB Deutsche Industriebank

# Investment criteria – sector concentration

| Sector Category | Max Eligible Limit | Max Operational Limit |
|---|---|---|
| **Global CDOs** | 40.00% | 35.00% |
| *CLOs* | 40.00% | 35.00% |
| *Structured Finance CDOs* | 25.00% | 20.00% |
| *HY CBOs* | 20.00% | 17.50% |
| *Emerging Market CDOs* | 5.00% | 4.00% |
| *Single Tranche Synthetic CDOs* | 15.00% | 12.50% |
| *Synthetic CDOs (excluding Single Tranche)* | 15.00% | 12.50% |
| *Trust Preferred CDOs* | 5.00% | 4.00% |
| *Balance Sheet CDOs* | 25.00% | 22.50% |
| *SME CDOs* | 25.00% | 22.50% |
| *CRE CDOs* | 5.00% | 4.00% |
| *Other* | 8.00% | 6.00% |
| **CMBS** | 50.00% | 40.00% |
| *Single Property* | 20.00% | 17.50% |
| *Conduit* | 35.00% | 30.00% |
| *Large Loan* | 40.00% | 35.00% |
| *Credit Tenant Lease* | 10.00% | 8.00% |
| *Other* | 8.00% | 6.00% |
| **Consumer ABS** | 60.00% | 50.00% |
| *Non-Sallie Mae Student Loans* | 40.00% | 35.00% |
| *Sallie Mae Student Loans* | 40.00% | 35.00% |
| *Student Loans combined* | 40.00% | 35.00% |
| *Credit Cards* | 30.00% | 25.00% |
| *Charged off Cards (i.e. non performing)* | 5.00% | 4.00% |
| *Auto Loans* | 30.00% | 25.00% |
| *Auto Sub-Prime* | 5.00% | 4.00% |
| *Consumer Loans* | 30.00% | 25.00% |
| *Other* | 5.00% | 4.00% |
| **Global RMBS** | 75.00% | 70.00% |
| *Prime RMBS* | 50.00% | 40.00% |
| *Home Equity Loans* | 70.00% | 65.00% |
| *HELOC* | 20.00% | 17.50% |
| *Non-Prime RMBS* | 40.00% | 35.00% |
| *Manufactured Housing* | 5.00% | 4.00% |
| *Other* | 8.00% | 6.00% |
| **Corporate ABS** | 50.00% | 40.00% |
| *Trade Receivables* | 10.00% | 8.00% |
| *Lease Backed* | 10.00% | 8.00% |
| *Aircraft Loans/Leases* | 10.00% | 8.00% |
| *Whole Business* | 10.00% | 8.00% |
| *Other* | 8.00% | 6.00% |
| **Other** | 5.00% | 4.00% |
| **Monoline wrapped Global RMBS** | 30.00% | 25.00% |

*IKB. Committed to Enterprise.*

IKB
Deutsche Industriebank

# Investment criteria – country concentration

| Country | Max Eligible Limit | Max Operational Limit |
|---|---|---|
| **USA** | 100.00% | 100.00% |
| **European** | 100.00% | 100.00% |
| *UK* | 60.00% | 60.00% |
| *France* | 50.00% | 50.00% |
| *Germany* | 50.00% | 50.00% |
| *Italy* | 50.00% | 50.00% |
| *Netherlands* | 50.00% | 50.00% |
| *Spain* | 50.00% | 50.00% |
| *Austria* | 25.00% | 25.00% |
| *Belgium* | 25.00% | 25.00% |
| *Denmark* | 25.00% | 25.00% |
| *Finland* | 25.00% | 25.00% |
| *Ireland* | 25.00% | 25.00% |
| *Luxembourg* | 25.00% | 25.00% |
| *Norway* | 25.00% | 25.00% |
| *Portugal* | 25.00% | 25.00% |
| *Sweden* | 25.00% | 25.00% |
| *Switzerland* | 25.00% | 25.00% |
| *Greece* | 10.00% | 10.00% |
| *Non-Defined Pan-European (only listed Countries)* | 25.00% | 25.00% |
| *Euro Cash* | 25.00% | 25.00% |
| **Rest of World** | 25.00% | 25.00% |
| *Australia* | 25.00% | 25.00% |
| *Canada* | 25.00% | 25.00% |
| *Japan* | 25.00% | 25.00% |
| *New Zealand* | 10.00% | 10.00% |
| *Singapore* | 10.00% | 10.00% |
| *Hong Kong* | 10.00% | 10.00% |
| *Korea* | 10.00% | 10.00% |
| *Non-Defined Rest of World (only listed Countries)* | 25.00% | 25.00% |

# Investment criteria – single obligor

| Single Obligor at Point of Purchase | Maximum Exposure (Normal Obligors) | Maximum Exposure (Exceptional Obligors) |
|---|---|---|
| *Overall* | 4.00% | 8.00% |
| *AAA* | 4.00% | 8.00% |
| *AA* | 2.00% | 4.00% |
| *A* | 0.50% | 1.00% |

| Single Obligor Concentration | Normal Obligors | | Exceptional Obligors | |
|---|---|---|---|---|
| | Max Eligible Limit | Max Operational Limit | Max Eligible Limit | Max Operational Limit |
| *Overall* | 4.00% | 4.00% | 8.00% | 8.00% |
| *AAA* | 4.00% | 4.00% | 8.00% | 8.00% |
| *AA* | 4.00% | 4.00% | 8.00% | 8.00% |
| *A* | 4.00% | 2.00% | 8.00% | 4.00% |
| *BBB* | 2.00% | 2.00% | 4.00% | 1.00% |
| *BB* | 0.50% | 0.00% | 1.00% | 0.00% |

# Investment criteria – other constraints

| Currency | Eligible Limit | Operational Limit |
|---|---|---|
| USD (Minimum) | 75.00% | 75.00% |
| EUR (Maximum) | 25.00% | 25.00% |
| GBP (Maximum) | 25.00% | 25.00% |
| Other (Maximum) | 25.00% | 15.00% |

| Rating | Min Eligible Limit | Min Operational Limit |
|---|---|---|
| AAA | 40.00% | 50.00% |
| AA to AAA | 60.00% | 75.00% |
| A to AAA | 80.00% | 90.00% |
| BBB to AAA | 85.00% | 95.00% |
| BB to AAA | 90.00% | 100.00% |

| Other Tests | Maximum |
|---|---|
| % of Investments with | |
| - Expected Final Maturity greater then 15 years | 5.00% |
| - Legal Final Maturity greater then 35 years | 5.00% |
| - WAL greater then 12 years | 5.00% |
| % of Investments not publicly or shadow rated | |
| - by Moody's | 20.00% |
| - by S&P | 20.00% |
| % of synthetic Investments | 25.00% |
| % of non AAA rated CDO-Investments | 15.00% |
| % Fixed Rate Securities | 40.00% |

| Servicer | Max Eligible Limit | Max Operational Limit |
|---|---|---|
| Servicer Exposure | 25.00% | 20.00% |

CONFIDENTIAL