EXHIBIT 10

HIGHLY CONFIDENTIAL

1

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
   ---------------------------------
 3  KING COUNTY, WASHINGTON           )
 4  Individually and on Behalf of All ) Civil Action No.
    Similarly Situated,               ) 1:09-cv-08387-SAS
 5              Plaintiff,            ) Others
 6  vs.                               ) CLASS ACTION
 7  IKB DEUTSCHE INDUSTRIEBANK AG,    )
    et al.,                           )
 8              Defendants.           )
   ---------------------------------
 9  IOWA STUDENT LOAN LIQUIDITY       ) Civil Action No:
10                                    ) 1:09-cv-08822-SAS
11  CORPORATION, Individually and on  )
    Behalf of All Others Similarly    )
12  Situated,                         )
                Plaintiff,            ) CLASS ACTION
13  vs.                               )
14  IKB DEUTSCHE INDUSTRIEBANK, AG,   )
    et al.,                           )
15              Defendants.           )
   ---------------------------------
16
17              HIGHLY CONFIDENTIAL
18
19     VIDEOTAPED DEPOSITION OF LAPO GUADAGNUOLO
20   taken at taken at 70 Fleet Street, City of London,
21   UK, Thursday, November 17, 2011, commencing at
22   10:04 a.m., before AILSA WILLIAMS, Accredited
23   LiveNote Reporter.
24
25  PAGES 1 - 195
```

**HIGHLY CONFIDENTIAL**

### Page 186

1  on it, i.e. and I remember suggesting we should move  17:35:35
2  more primary analysis in this surveillance to make sure  17:35:40
3  we are adequately staffed in a way to cover that  17:35:44
4  expectation of more work, and that is why I call it --  17:35:49
5  it is the biggest threat if we don't do it, and  17:35:53
6  effectively we actually did that, we moved people into  17:35:57
7  surveillance.  17:35:59
8      Q  Why at the time you wrote this did you  17:36:00
9  believe that the surveillance for CDOs was completely  17:36:01
10 inadequate?  17:36:04
11     A  I explained to you what I meant with that  17:36:08
12 paragraph. So I didn't -- it was not there to mean that  17:36:10
13 at that time the surveillance that we were doing was not  17:36:14
14 proper. If that had been the case, I would have raised  17:36:18
15 it surely not just in that meeting, it would have been a  17:36:22
16 problem that we would have wanted to tackle well before,  17:36:24
17 and surely in a different way.  17:36:28
18     Q  Point 3, you say:  17:36:32
19     "The presence of regulators, all the red tape",  17:36:33
20 and I believe you mean "bureaucracy", and "the need to check  17:36:36
21 in with different people (especially in NY)", I take it that  17:36:40
22 means New York. Is that correct?  17:36:43
23     A  That is right, yes.  17:36:46
24     Q  "... for almost all decisions is a big  17:36:46
25 threat." What did you mean by that?

### Page 187

1      A  Well, again, it is to be considered in the  17:36:54
2  spirit of what I was presenting, which is again I was  17:36:58
3  making clear to the senior people, sometimes probably  17:37:02
4  they need to hear that we were expecting also probably  17:37:07
5  more by bureaucracy, we mean more regulatory activity,  17:37:11
6  more things to be done for external parties, not just  17:37:21
7  the external by the regulators but also internal  17:37:25
8  parties, that would have meant needing to -- having to  17:37:28
9  go through different processes, red tape. So I am  17:37:32
10 trying to say we might face situations where a lot of  17:37:35
11 our time would be spent in these things, so we have to  17:37:38
12 be aware first that that could happen and, secondly,  17:37:42
13 that we are ready for that challenge.  17:37:44
14     MR. CAPUTO: I have no further questions.  17:37:52
15     MR. RINGEL: Why don't we go off the record.  17:37:55
16     THE VIDEOGRAPHER: Going off the record. The  17:37:56
17 time is 5:37.  17:37:57
18     (A short break)  17:37:59
19     THE VIDEOGRAPHER: Back on the record. The  17:42:19
20 time is 5:41.  17:42:20
21     MR. CAPUTO: Before you start, Dean, I want to  17:42:24
22 go on the record to say the elapsed time so far is five  17:42:25
23 hours, 31 minutes for today.  17:42:28
24     MR. RINGEL: That sounds in the right ballpark  17:42:30
25 as to calculations. We will look at it too, but thank

### Page 188

1  you. I am not suggesting that the time I am about to  17:42:35
2  take counts against that.  17:42:37
3      Good afternoon, Mr. Guadagnuolo. As you know,  17:42:40
4  my name is Dean Ringel and I am the attorney for  17:42:42
5  McGraw-Hill. I would like to ask you a few questions.  17:42:46
6      Sir, what were the S&P ratings on the  17:42:49
7  commercial paper at Rhinebridge at the time that S&P  17:42:51
8  issued its ratings in June 2007.  17:42:55
9      A  The ratings were A1 plus.  17:42:58
10     Q  What about the MTN programs?  17:42:59
11     A  The senior note MTNs, AAA.  17:43:03
12     Q  And mezzanine capital notes?  17:43:07
13     A  Single A.  17:43:09
14     Q  How did those ratings compare with your  17:43:10
15 own understanding of the appropriate ratings?  17:43:11
16     A  They were my honest independent opinion of  17:43:14
17 the creditworthiness of those issuances.  17:43:17
18     Q  Who rated the Rhinebridge SIV notes that  17:43:20
19 we have been talking about?  17:43:22
20     A  A committee process, where I was one of  17:43:24
21 the analysts.  17:43:26
22     Q  Was there a vote with respect to those  17:43:28
23 ratings?  17:43:31
24     A  Yes.  17:43:31
25     Q  What was the vote?

### Page 189

1      A  The vote was unanimous for the ratings.  17:43:33
2      Q  Did there ever come a time that the actual  17:43:37
3  ratings on the Rhinebridge obligations diverged from  17:43:40
4  your honest opinion of the applicable ratings what they  17:43:44
5  should be?  17:43:47
6      A  No.  17:43:48
7      Q  Did anyone who sat on the committee that  17:43:48
8  rated the Rhinebridge notes ever express in any way a  17:43:51
9  view that the rating did not represent their honest  17:43:54
10 opinion?  17:43:57
11     A  No.  17:43:57
12     Q  Did anyone at committee ever express a  17:43:58
13 view to you a rating came to diverge from their honest  17:44:02
14 opinion?  17:44:06
15     A  No.  17:44:06
16     MR. RINGEL: Thank you. That is all the  17:44:07
17 questions I have. I think we are done.  17:44:09
18     I would note briefly for the record that I  17:44:13
19 informed Mr. Caputo at lunchtime that unfortunately the  17:44:16
20 designated 30(B)(6) witness for the remainder of the S&P  17:44:19
21 30(B)(6) deposition is ill and will not be able to  17:44:23
22 attend his deposition tomorrow. We will talk off the  17:44:27
23 record about how to deal with that.  17:44:30
24     We just want to reserve the right to review  17:44:36
25 and sign the deposition.

## PRELIMINARY DISCUSSION
## RATING CAPITAL NOTES HIGHER THAN SINGLE-A

Date: 13-Feb-07
Attendees: LG, PI, KVA, CP, SMc, NK

**BACKGROUND**
Morgan Stanley is teaming up with IKB Deutsche Industriebank, the manager, to set up RhineBridge PLC, a new SIV. This SIV will be very close in terms of assets and strategy to Cheyne SIV, the other Morgan Stanley arranged SIV, closed in Aug. 2005. Like Cheyne SIV, the senior notes will be rated with a capital charge matrix, whereas the model for capital notes is based on a simulation model.

The main difference is that while Cheyne has a three tier capital structure (Senior notes (AAA/A-1+); Mezz capital notes (A), and Juniot capital notes (NR)), RhineBridge wants to have senior capital notes rated AAA junior to the senior notes and senior to the mezzanine capital notes.

The AAA rating will speak to ultimate interest and principal. They are aware that we might need to call them "Deferrable" as we would do in other SF areas.

A very rough estimate of the capital structure is as follows

  AAA/A-1+ MTNs/CPs = 91%
  AAA cap notes = 3.5%
  A cap notes = 4.5%
  NR Income notes = 1%
  Leverage to Senior Notes = 10.11
  Leverage to AAA cap notes = 17.18

As a comparison, Cheyne SIV (at almost 9.6bn of assets) is

  AAA/A-1+ MTNs/CPs = 93%
  A cap notes = 6%
  NR Income notes = 1%
  Leverage to Senior Notes = 13.28

We have seen the model and commented upon that. Stephen can give more colour but this committee is to focus on the feasibility.

**STATUS QUO IN SIVs AND SOME CONSIDERATIONS**
- Up to now, we have a qualitative cap for capital note rating in SIV at A-flat.

- From a pure quantitative/modeling point of view, we all know that capital notes (expecially the ones with a first loss piece underneath) can easily be rated above A-flat. Looking at the tranching above, you can clearly see that almost half of the RhineBridge AAA cap notes could be rated AAA (as Cheyne, which is not among the most levered SIVs, has 93% of Senior notes). However, RhineBridge has 91% of AAA/A-1+ senior notes. In other words, these are like Junior senior notes, hence with lower stability.

**Highly Confidential - Attorneys Eyes Only**                                                    **S&P-IKB 0021271**

- If I am not mistaken, 3 years ago we could have rated Sigma notes at AA level from the model, but we decided not to. Those were not first loss piece as there was a trapping mechanism. RhineBridge will have "true" subordination from the mezzanine and the income notes.

- It is also true that we (and the most experienced managers) want to see capital note ratings very stable. Since we insist on this for A rated capital notes, we should be even more worried about that for a AAA rating and require a "rating volatility" buffer, which up to now has been on a voluntary basis, among other things

We have seen the model and commented upon that. Stephen can give more colour but we

### PRELIMINARY THOUGHTS
- One reason why we cap the rating of capital notes at A is the presence of other 'soft' defeasance events and assumptions of the management behaviour (like the fact that the pool will stay the same for the life of the vehicle) for loss in no defeasance. Now, this is not even an experienced SIV manager.

- My starting point is that to give a AAA rating to capital notes, these notes should pass the same tests for the senior notes (also the obligor limits compared to NAV, to cover from idionsicratic risk). If they could pass AAA tests, then we should not even worry about operational/management risk/soft issues, as we would assume defeasance occurs today, as we do for senior notes. If not, we have to discuss the operational risk issue as above.

- we have to think about the market reaction and whether we want to be doing this with a new manager.

- are we against subordinated paper being rated AAA from a rating policy point of view?


### PREVIOUS COMMENTS FROM EMAILS
Q: They can model defeasance and remain at the end of defeasance with the capital notes' notional and their acrrued interest?
A: Let's assume they can.

Q: In defeasance, they do not pay coupon and rating will address deferred and ultimate coupon and principal?
A: Yes, we go with the assumption that ANY capital notes cannot receive anything in defeasance, hence if they have a long MTN, they will have to wait for it to be paid. At the end of the day, let's not forget the capital structure compared to Cheyne above.

Highly Confidential - Attorneys Eyes Only

# Rhinebridge SIV
## STRUCTURE AND CREDIT COMMITTEE

**Date:** March 22, 2007
**Analysts:** Lapo Guadagnuolo, Stephen Mccabe (quantitative analysts)
**Attendees:** Perry Inglis, Katrien Van Acoleyen, Cristina Polizu, Nik Khakee, Tom Kitto, Jonathan Lam, Jake Chao.

**NOTE**: Due to technical problems, we could not blackline this ramp to Cheyne SIV, of which this vehicle is a copy cat both in terms of structure and modelling, since the arranger is the same, Morgan Stanley. However, we used the same format of Cheyne's ramp and we will highlight the few points that we would like committee for focus on. As a summary, the only points that are different from Cheyne SIV are:

- The presence of senior capital notes that we refused to rated AAA, whereas they will be AAA both from Fitch and Moody's (see Appendix I for committee where it was agreed <u>not to rate</u> them).
- HEL portfolio limit and
- appointment of the Enforcement Manager.

### Index

I. General Transaction Terms
II. Market Valuations
III. Capital Tests
IV. Investment Portfolio
V. Market Sensitivity Tests
VI. Liquidity Features
VII. Operating States

1

Highly Confidential - Attorneys Eyes Only                                                    S&P-IKB 0011842

## I. General Transaction Terms

| | |
|---|---|
| Overview | Rhinebridge PLC is a structured investment vehicle ("SIV") in respect of which IKB Credit Asset Management GmbH situated in London and a wholly owned subsidiary of IKB Deutsche Industriebank AG ("IKB") will act as investment manager (the "Investment Manager"). |
| | Rhinebridge PLC will invest in a portfolio of highly-rated cash ABS securities |
| | Rhinebridge PLC (the "Issuer"), will issue Euro C.P., Euro MTNs and Euro Capital Notes (collectively referred to as "Euro Notes"). Rhinebridge PLC is a bankruptcy remote public limited company incorporated in Ireland. |
| | Rhinebridge LLC (the "Co-Issuer"), a wholly owned subsidiary of the Issuer, will together with the Issuer co-issue U.S. C.P., U.S. MTNs and U.S Capital Notes (collectively, the "U.S. Notes"). Rhinebridge LLC is a bankruptcy remote Delaware limited liability company. |
| | The Euro Notes and U.S. Notes (collectively the "Notes") will have substantially the same terms and conditions subject to jurisdictional requirements. |
| Programme Size | Initially, up to a maximum of $20 billion aggregate principal amount of Commercial Paper and Medium Term Notes may be outstanding at any one time.<br>Initially, up to a maximum of $3 billion aggregate principal amount of Capital Notes may be outstanding at any one time. |
| Capital Notes | At Closing, four tranches of Capital Notes will be issued, Senior Capital Notes, Mezzanine Capital Notes, Junior Capital Notes and Combination Capital Notes. |
| | The Capital Notes will initially be floating rate and issued in U.S. Dollars only. Non-U.S. Dollar and/or fixed rate issuance of Capital Notes would only be made <u>subject to Rating Agency Approval</u>. |
| | Combination Capital Notes shall contain Senior Capital Note, Mezzanine Capital Note and Junior Capital Note components in defined proportions |
| Rating Agencies | Standard & Poor's Ratings Services ("S&P"), Moody's Investors Service Limited. ("Moody's"), Fitch Ratings Limited ("Fitch") |
| Ratings | Rhinebridge PLC as a vehicle will have the following counterparty credit rating: |

| S&P | [AAA] |
|---|---|
| Moody's | [Aaa] |
| Fitch | [AAA] |

The Senior Debt Obligations will have the following credit ratings:

| S&P | [A-1+/AAA] |
|---|---|
| Moody's | [P-1/Aaa] |
| Fitch | [F1+] |

2

The Senior Capital Notes would be expected to have the following ratings:

| S&P | [NR] |
|---|---|
| Moody's | [Aaa] |
| Fitch | [AAA] |

The Mezzanine Capital Notes will have the following ratings:

| S&P | [A] |
|---|---|
| Moody's | [A3] |
| Fitch | [A] |

**The Junior Capital Notes will not be rated.**

The Combination Capital Notes will have the following rating:

| S&P | [BBB] |
|---|---|
| Moody's | [Baa2] |
| Fitch | [BBB] |

Expectation in terms of capital structure is

AAA/A-1+ MTNs/CPs = 91%
NR senior cap notes = 3.5%
A mezzanine cap notes = 4.5%
NR Income notes = 1%
Leverage to MTN/CPs = 10.11

IKB will invest 50% in both the senior and mezzanine capital notes and 40% in the income notes.

Security Agreement   The Issuer will grant a security interest in the Investments and its other interests (including certain bank accounts and its rights under the programme documents) (collectively, the "Collateral") to the Security Trustee for the benefit of the Secured Parties.

The Capital Notes will be secured on a subordinated basis on all of the Collateral

The Security Trustee will enforce its rights in the Collateral following the occurrence of an Enforcement Event. The Issuer may not issue any further Debt Obligations after the security interest is enforced. In addition, the Security Trustee shall with the help of the manager thereafter manage the Issuer's business under guidelines intended to provide for the payment of outstanding Debt Obligations in accordance with the Priority of Payments in Enforcement. The Security Trustee will be authorised (or, under certain circumstances, required) by the Security Trust Deed to liquidate the Investments to provide for, among other things, the payment of the Senior Obligations.

3

Highly Confidential - Attorneys Eyes Only

S&P-IKB 0011844

| | |
|---|---|
| Secured Parties | *Inter alios*, Debt Obligation holders, the Hedge Counterparties, the CDS Counterparties, the Liquidity Providers, any Repo Counterparties, the Investment Manager, the Administrator, the issuing and paying agents and the placement agents for the Debt Obligations. |
| Limited Recourse and Non Petition | The Issuer's obligations will be payable solely from the Collateral and no recourse shall be had against any other investments or any other person in respect of such liabilities. Non petition language will be signed up by all parties. |
| Security Trustee | The Bank of New York |
| Investment Manager | IKB Credit Asset Management GmbH, London Branch which is situated in London and a wholly owned subsidiary of IKB. |
| Substitute Investment Manager | Initially, QSR Management Limited ("QSR"). |
| Investment Management Fee | Fees due to the Investment Manager under an investment management agreement to be entered into between, *inter alios*, the Investment Manager and the Issuer. |
| | The Investment Management shall receive a Senior Management Fee of 5 bps and a Junior Management Fee of 4 bps calculated with reference to the total notional of assets under management (excluding Cash Equivalents). The Senior Management Fee is payable as part of the Subordinated Administrative Expenses. The Junior Management Fee ranks junior to the Senior Capital Notes and Mezzanine Capital Notes, but senior to the Junior Capital Notes. |
| | In addition, the Investment Manager receives an Incentive Fee equal to the Post Reserve Distributable Profit not distributed to the Capital Noteholders as Variable Margin. |
| Arranger | Morgan Stanley & Co. International Limited |
| Administrator | QSR |
| Auditors | Most probably, KPMG |
| Administrative Expenses | The following Administrative Expenses will be paid in the following order of priority and senior to any payments to the Senior Obligations:<br>a) any fees, costs and expenses (including reasonable legal fees and expenses) of the Security Trustee, any Receiver or Insolvency Administrator;<br>b) any fees, costs and expenses (including reasonable legal fees and expenses) of the Custodian;<br>c) any fees, costs and expenses (including reasonable legal fees and expenses) of the Securities Agents;<br>d) any fees and expenses of the Issuers for the purposes of maintaining their corporate or limited liability company existence or authority to engage in the transactions contemplated in the Transaction Documents;<br>e) any indemnification obligations of the Issuer to the Security Trustee, any Receiver or Insolvency Administrator;<br>f) any indemnification obligations of the Issuer to the Custodian, the Securities Agents, the Manager, the Administrator, the USCP Placement Agents, the ECP Dealers and the Term Note Dealers up to the relevant Indemnity Cap. |

Highly Confidential - Attorneys Eyes Only                    S&P-IKB 0011845

| | |
|---|---|
| Senior Obligations | The following obligations of the Issuer shall be Senior Obligations:<br>a) Senior Debt Obligations;<br>b) Payments under Liquidity Advances; and<br>c) Payments under Hedge Contracts. |
| Operating Expenses | The following Operating Expenses will be paid *pari passu* and junior to any Administrative Expenses, any payments to the Senior Obligations and any obligations to purchase Investments previously committed to be purchased:<br>a) Administrator Fee;<br>b) Senior Investment Management Fee;<br>c) Issuer expenses not covered by Administrative Expenses; |
| Priority of Payments before Enforcement | Prior to an Enforcement Date, the Issuer shall pay its Obligations on the date when they become due and payable and subject to the applicable Restricted Investment Limitations or Restricted Funding Limitations.:<br><br>**first**, to pay all Administrative Expenses due on such date,;<br><br>**second**, to pay, *pro rata*, all amounts due on such date in respect of any Senior Obligations;<br><br>**third**, to acquire Investments previously committed to be purchased;<br><br>**fourth**, to pay, *pro rata*, all Operating Expenses due on such date;<br><br>**fifth**, to pay all Interest Amounts and principal in respect of Capital Notes due on such date, in accordance with the Interest Payment Priority and the Redemption Priority specified in the Terms and Conditions of the Capital Notes;<br><br>**sixth**, to pay, *pro rata* and *pari passu*, the Mezzanine Capital Notes Subordinated Payments due on such date;<br><br>**seventh**, to pay, *pro rata* and *pari passu*, the Junior Capital Notes Subordinated Payments due on such date;<br><br>**eighth**, to pay all of the Variable Margin, if any, in respect of the Capital Notes due on such date in accordance with the Interest Payment Priority specified in the Terms and Condition of the Capital Notes;<br><br>**ninth**, to pay the Incentive Management Fee to the Manager. |
| Priority of Payments following Enforcement | Following an Enforcement Date, any amounts received by the Security Trustee or a Receiver shall, be applied in the following order of priority |

5

Highly Confidential - Attorneys Eyes Only                                                                     S&P-IKB 0011846

**first**, in satisfaction of or provision for all Administrative Expenses accrued and/or payable, in the order specified in the definition of Administrative Expenses;

**second** in satisfaction of or provision for all Senior Obligations as and when the same become payable and, if more than one such Senior Obligation is payable at the relevant time, *pari passu* and in proportion to the amounts payable in respect thereof;

**third**, in satisfaction of or provision for all Operating Expenses accrued and/or payable;

**fourth**, in satisfaction of or provision for all Interest Amounts and all outstanding Redemption Amounts payable to the Senior Capital Noteholders in respect of Senior Capital Notes outstanding *pari passu* and in proportion to the amounts payable;

**fifth**, in satisfaction of or provision for all Interest Amounts and all outstanding Redemption Amounts payable to the Mezzanine Capital Noteholders in respect of Mezzanine Capital Notes outstanding *pari passu* and in proportion to the amounts payable;

**sixth**, in satisfaction of or provision for all Mezzanine Capital Notes Subordinated Payments *pari passu* and in proportion to the amounts payable;

**seventh**, in satisfaction of or provision for all Interest Amounts and all outstanding Redemption Amounts payable to the Junior Capital Noteholders in respect of Junior Capital Notes outstanding *pari passu* and in proportion to the amounts payable;

**eighth,** in satisfaction of or provision for any Junior Capital Notes Subordinated Payments *pari passu* and in proportion to the amounts payable;

**ninth,** in satisfaction of an amount equal to the greater of (A) the remaining surplus (if any) less the Equity Amount and (B) zero, which shall be declared as Distributable Profits and paid first to the Capital Notes as Variable Margin in accordance with the Interest Payment Priority specified in the Terms and Conditions of the Capital Notes and then to the Manager as Incentive Management Fee; and

**tenth,** in payment of any remaining amount following application of the amounts set out in the above paragraphs (which amount shall not exceed the Equity Amount) to the Issuer and the Co-Issuer.

6

Highly Confidential - Attorneys Eyes Only

S&P-IKB 0011847

## II. Market Valuations

| | |
|---|---|
| Valuation | The Market Value of each (a) Investment and (b) Hedge Counterparty Exposure, shall be checked daily. |
| General Valuation Rules | The following general rules are applicable to all valuations of Investments: |

a) The Investment Manager shall use best endeavours to ascertain the Market Value of each Investment sourced using an Approved Form of Valuation on a weekly basis;

b) If the Investment Manager cannot ascertain the Market Value of an Investment using an Approved Form of Valuation on a given day, the discount margin relating to the Investment shall remain unchanged, and the Market Value shall be updated to reflect accrued interest and the natural movement to par of the clean price (e.g. for a constant discount margin and amortisation profile the clean price will tend towards par on the final payment date).

c) Should the Investment Manager fail to source an Approved Market Valuation from dealers for more than 4 successive weeks, the Investment shall be valued at the lower of (i) the lower of the S&P or Moody's or Fitch relevant recovery rate (ii) [90%] of the last Market Value sourced from a dealer.

d) All Market Values shall be updated daily by either (i) comparing the Market Value from the previous day (ii) cross checking any price movement with any corresponding movement in spread, (iii) using the discount margin or (iv) checking against known market movements and conditions.

e) In addition to sourcing Market Values for Investments, the Investment Manager will also endeavour to source discount margins from external sources independent of the Issuer and Investment Manager at the same time as an Approved Market Valuation is obtained. Such discount margins shall be used to check the Approved Market Value and assumed amortisation profile for price validation purposes.

f) The discount margin is either calculated from the Approved Market Valuation using an accepted fixed income pricing calculation methodologies or sourced as in (e) above.

| | |
|---|---|
| Approved Form of Valuation | The market valuation of the Investments will be obtained using one of the two Approved Forms of Valuation of Investments listed below: |

a) Directly sourced from dealers following the Dealer Pricing Guidelines for Investments; or

b) Using electronic External Pricing Sources

| | |
|---|---|
| Dealer Pricing Guidelines for Investments | When sourcing Market Value information from dealers, the following rules shall apply: |

a) It shall be a condition precedent that a dealer from whom an Investment is purchased must provide a weekly bid price to be used in the calculation of the Investment's Market Value..

b) Valuations may be sourced from additional dealers where deemed necessary or appropriate by the Investment Manager.

Highly Confidential - Attorneys Eyes Only                                    S&P-IKB 0011848

|  |  |
|---|---|
|  | c) Where the Investment Manager deems a valuation too high or too low pursuant to the General Valuation Rules, the dealer is requested to reaffirm the valuation and to explain the basis of the quotation. |
|  | d) If the Investment Manager remains dissatisfied with the accuracy of the valuation and if the valuation has been obtained from a single dealer, then one or more valuations will be sought from other dealers |
| External Pricing Sources | Only electronic External Pricing Sources then currently used by market participants will be used as pricing sources, which will initially include (but may be expanded, subject to Rating Agency Confirmation, from time to time): |
|  | JPMorgan Index; IDC; Bloomberg Generic; Bloomberg; Euroclear; Reuters; Markit; Broker; |
| Approved Forms of Valuations of Hedge Counterparty Exposures | All Hedge Counterparty Exposures will be Marked to Market daily using one of the three Approved Forms of Valuation of Hedge Counterparty Exposures listed below: |
|  | a) Market Values directly sourced from dealers; |
|  | b) Exchange-traded Hedge Contracts will be valued at the official closing price; or |
|  | c) Modelled valuations. This is where the [Administrator, on behalf of the Issuer], derives a Market Value for a Hedge Counterparty Exposure using an in-house or third party derivative valuation system based on accepted fixed income pricing calculation methodologies.. |

Highly Confidential - Attorneys Eyes Only                                    S&P-IKB 0011849

### III. Capital Tests

| | |
|---|---|
| Rationale | On each Business Day, in order to ensure capital adequacy, the Issuer will consider the Market Value of all Investments and Hedges, and will assign a capital charge. |
| Capital Test Overview | Each Capital Test must be tested on each Business Day, apart from the Simulation Model Rating Test for the Capital Notes, which shall be calculated weekly. |
| | Failure to comply with the Minor Capital Tests will lead to Restricted Investments. Failure to comply with the Major Capital Tests will result in Restricted Funding (with the exception of the Major Capital Loss Limit Test, failure of which will result in Enforcement). In both cases there is a 5 Business Day cure period to permit curing of the test. |
| Capital Tests | The Capital Tests shall comprise the Major Capital Tests and the Minor Capital Tests |

The Major Capital Tests comprise:

a) Major Capital Adequacy Test

b) Major Capital Loss Limit Test

The Minor Capital Tests comprise:

   a) Minor Capital Adequacy Test

   b) Minor Capital Loss Limit Test

   c) Capital Note Simulation Model Rating Test

| | |
|---|---|
| Major Capital Adequacy Test | The capital requirement is determined by the haircuts applied to the Investments and net positive Hedge Counterparty Exposures. |
| | In comparison to the Minor Capital Adequacy Test, the minimum required capital is set lower, using the Investment Capital Requirement and Hedge Capital Requirement, without multiplying either by a factor. |
| | The Major Capital Adequacy Test shall be defined as: |
| | $I(Major) + H(Major) - P - Q - L - CD \geq 0$; where: |
| | $I(Major)$ = sum of Market Value of Cash Investments * (1- relevant Investment Capital Requirement)) |
| | $H(Major)$ = sum of Market Value of net positive Hedge Counterparty Exposures * (1- relevant Hedge Capital Requirement)) + Market Value of net negative Hedge Counterparty Exposures (negative number) |
| | P = sum of additional capital charges incurred due to breaches of Portfolio Parameter Tests |
| | Q = additional capital charge incurred due to a breach of the Maximum Net Positive Hedge |

9

| | |
|---|---|
| | Counterparty Exposure Test. |
| | L = Effective Notional Value of Senior Debt Obligations and all additional obligations which rank senior or pari passu to the Senior Debt Obligations. |
| | CD = is the maximum amount of breakage fee payable at any time for the withdrawal of Breakable Deposits |
| | For the avoidance of doubt, for Ineligible Investments, the amended market value as calculated in I(Minor) shall be considered to be zero, i.e. the Investment is fully capitalised. |
| Major Capital Loss Limit Test | The Major Capital Loss Limit Test measures whether the NAV of the Capital Notes is less than the given level. |
| | The Major Capital Loss Limit Test shall be satisfied if: |
| | NAV >= 0.5 CN |
| | CN is the principal amount outstanding of the Capital Notes. |
| Minor Capital Adequacy Test | The capital requirement is determined by the haircuts applied to the Investments and net positive Hedge Counterparty Exposures. |
| | In comparison to the Major Capital Adequacy Test, the minimum required capital is set higher, multiplying both the Investment Capital Requirement and Hedge Capital Requirement by a factor. |
| | The Minor Capital Adequacy Test shall be defined as: |
| | I(Minor) + H(Minor) − P − Q − L − CD ≥ 0; here: |
| | I(Minor) = sum of Market Value of Cash Investments * (1- (relevant Investment Capital Requirement*(100/70)) |
| | H(Minor) = sum of Market Value of net positive Hedge Counterparty Exposures * (1- (relevant Hedge Capital Requirement*(100/70) + Market Value of net negative Hedge Counterparty Exposures (negative number) |
| | P, Q, L and CD are as defined in Major Capital Adequacy Test above |
| | For the avoidance of doubt, for Ineligible Investments, the market value shall be considered to be zero, i.e. the Investment is fully capitalised. |
| Minor Capital Loss Test | The Minor Capital Loss Limit Test measures whether the NAV of the Capital Notes is less than the given level. |
| | The Minor Capital Loss Limit Test shall be defined as: |
| | NAV > 0.7 CN |
| | CN is the principal amount outstanding of the Capital Notes. |
| Capital Note Simulation Model Rating Test | The Capital Note Simulation Model Rating Test shall be breached if the output from the Capital Note Simulation Model implies Capital Note ratings falling below the following levels: |
| | a) Senior Capital Notes: Rating falls below [Aa2] (Moody's), or [AA] (Fitch) |
| | b) Mezzanine Capital Notes: Rating falls below BBB+ (S&P), Baa1 (Moody's), or |

Highly Confidential - Attorneys Eyes Only                              S&P-IKB 0011851

|  |  |
|---|---|
|  | BBB+ (Fitch) |
|  | c) Combination Capital Notes: Rating falls below BB+ (S&P) or below, or Ba1 (Moody's) or below, or BB+ (Fitch) |
|  | The Capital Note Simulation Model Rating Test will be performed on a weekly basis and each time new Capital Notes are issued by the vehicle or existing Capital Notes are redeemed. |
| Leverage Limit | 22, calculated as notional of Senior Debt Obligations over NAV. |
| Hedge Counterparty Capital Requirements | The Base Capital Requirement for net positive Hedge Counterparty exposures is dependent on the Applicable Hedge Counterparty Rating of the Hedge Counterparty and the tenor of the Hedge Agreement. The Capital Investment Class for net positive Hedge Counterparty Exposures shall be RMBS. |
| Eligible Hedge Counterparty Rating | A Hedge Counterparty has an Eligible Hedge Counterparty Rating if the Applicable Hedge Counterparty Rating is equal to or higher than A-1, P-1 and F1 by S&P, Moody's and Fitch respectively. |

Highly Confidential - Attorneys Eyes Only              S&P-IKB 0011852