TAB 1



EXHIBIT
P280
147.11

# Rhinebridge SIV
## STRUCTURE AND CREDIT COMMITTEE

**Date:** March 22, 2007
**Analysts:** Lapo Guadagnuolo, Stephen Mccabe (quantitative analysts)
**Attendees:** Perry Inglis, Katrien Van Acoleyen, Cristina Polizu, Nik Khakee, Tom Kitto, Jonathan Lam, Jake Chao.

**NOTE:** Due to technical problems, we could not blackline this ramp to Cheyne SIV, of which this vehicle is a copy cat both in terms of structure and modelling, since the arranger is the same, Morgan Stanley. However, we used the same format of Cheyne's ramp and we will highlight the few points that we would like committee for focus on. As a summary, the only points that are different from Cheyne SIV are:

- The presence of senior capital notes that we refused to rated AAA, whereas they will be AAA both from Fitch and Moody's (see Appendix I for committee where it was agreed <u>not to rate</u> them).
- HEL portfolio limit and
- appointment of the Enforcement Manager.

**Index**

I. General Transaction Terms
II. Market Valuations
III. Capital Tests
IV. Investment Portfolio
V. Market Sensitivity Tests
VI. Liquidity Features
VII. Operating States

1

## I. General Transaction Terms

**Overview**

Rhinebridge PLC is a structured investment vehicle ("SIV") in respect of which IKB Credit Asset Management GmbH situated in London and a wholly owned subsidiary of IKB Deutsche Industriebank AG ("IKB") will act as investment manager (the "Investment Manager").

Rhinebridge PLC will invest in a portfolio of highly-rated cash ABS securities

Rhinebridge PLC (the "Issuer"), will issue Euro C.P., Euro MTNs and Euro Capital Notes (collectively referred to as "Euro Notes"). Rhinebridge PLC is a bankruptcy remote public limited company incorporated in Ireland.

Rhinebridge LLC (the "Co-Issuer"), a wholly owned subsidiary of the Issuer, will together with the Issuer co-issue U.S. C.P., U.S. MTNs and U.S Capital Notes (collectively, the "U.S. Notes"). Rhinebridge LLC is a bankruptcy remote Delaware limited liability company.

The Euro Notes and U.S. Notes (collectively the "Notes") will have substantially the same terms and conditions subject to jurisdictional requirements.

**Programme Size**

Initially, up to a maximum of $20 billion aggregate principal amount of Commercial Paper and Medium Term Notes may be outstanding at any one time.
Initially, up to a maximum of $3 billion aggregate principal amount of Capital Notes may be outstanding at any one time.

**Capital Notes**

At Closing, four tranches of Capital Notes will be issued, Senior Capital Notes, Mezzanine Capital Notes, Junior Capital Notes and Combination Capital Notes.

The Capital Notes will initially be floating rate and issued in U.S. Dollars only. Non-U.S. Dollar and/or fixed rate issuance of Capital Notes would only be made subject to Rating Agency Approval.

Combination Capital Notes shall contain Senior Capital Note, Mezzanine Capital Note and Junior Capital Note components in defined proportions

**Rating Agencies**

Standard & Poor's Ratings Services ("S&P") , Moody's Investors Service Limited. ("Moody's"), Fitch Ratings Limited ("Fitch")

**Ratings**

Rhinebridge PLC as a vehicle will have the following counterparty credit rating:

| S&P | [AAA] |
|---|---|
| Moody's | [Aaa] |
| Fitch | [AAA] |

The Senior Debt Obligations will have the following credit ratings:

| S&P | [A-1+/AAA] |
|---|---|
| Moody's | [P-1/Aaa] |
| Fitch | [F1+] |

2

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0011843**

The Senior Capital Notes would be expected to have the following ratings:

| S&P | [NR] |
|-----|------|
| Moody's | [Aaa] |
| Fitch | [AAA] |

The Mezzanine Capital Notes will have the following ratings:

| S&P | [A] |
|-----|------|
| Moody's | [A3] |
| Fitch | [A] |

**The Junior Capital Notes will not be rated.**

The Combination Capital Notes will have the following rating:

| S&P | [BBB] |
|-----|-------|
| Moody's | [Baa2] |
| Fitch | [BBB] |

Expectation in terms of capital structure is

AAA/A-1+ MTNs/CPs = 91%
NR senior cap notes = 3.5%
A mezzanine cap notes = 4.5%
NR Income notes = 1%
Leverage to MTN/CPs = 10.11

IKB will invest 50% in both the senior and mezzanine capital notes and 40% in the income notes.

| Security Agreement | The Issuer will grant a security interest in the Investments and its other interests (including certain bank accounts and its rights under the programme documents) (collectively, the "Collateral") to the Security Trustee for the benefit of the Secured Parties. |

The Capital Notes will be secured on a subordinated basis on all of the Collateral

The Security Trustee will enforce its rights in the Collateral following the occurrence of an Enforcement Event. The Issuer may not issue any further Debt Obligations after the security interest is enforced. In addition, the Security Trustee shall with the help of the manager thereafter manage the Issuer's business under guidelines intended to provide for the payment of outstanding Debt Obligations in accordance with the Priority of Payments in Enforcement. The Security Trustee will be authorised (or, under certain circumstances, required) by the Security Trust Deed to liquidate the Investments to provide for, among other things, the payment of the Senior Obligations.

3

**Highly Confidential - Attorneys Eyes Only**

**S&P-IKB 0011844**

| | |
|---|---|
| Secured Parties | *Inter alios*, Debt Obligation holders, the Hedge Counterparties, the CDS Counterparties, the Liquidity Providers, any Repo Counterparties, the Investment Manager, the Administrator, the issuing and paying agents and the placement agents for the Debt Obligations. |
| Limited Recourse and Non Petition | The Issuer's obligations will be payable solely from the Collateral and no recourse shall be had against any other investments or any other person in respect of such liabilities. Non petition language will be signed up by all parties. |
| Security Trustee | The Bank of New York |
| Investment Manager | IKB Credit Asset Management GmbH, London Branch which is situated in London and a wholly owned subsidiary of IKB. |
| Substitute Investment Manager | Initially, QSR Management Limited ("QSR"). |
| Investment Management Fee | Fees due to the Investment Manager under an investment management agreement to be entered into between, *inter alios*, the Investment Manager and the Issuer. |
| | The Investment Management shall receive a Senior Management Fee of 5 bps and a Junior Management Fee of 4 bps calculated with reference to the total notional of assets under management (excluding Cash Equivalents). The Senior Management Fee is payable as part of the Subordinated Administrative Expenses. The Junior Management Fee ranks junior to the Senior Capital Notes and Mezzanine Capital Notes, but senior to the Junior Capital Notes. |
| | In addition, the Investment Manager receives an Incentive Fee equal to the Post Reserve Distributable Profit not distributed to the Capital Noteholders as Variable Margin. |
| Arranger | Morgan Stanley & Co. International Limited |
| Administrator | QSR |
| Auditors | Most probably, KPMG |
| Administrative Expenses | The following Administrative Expenses will be paid in the following order of priority and senior to any payments to the Senior Obligations:<br>a) any fees, costs and expenses (including reasonable legal fees and expenses) of the Security Trustee, any Receiver or Insolvency Administrator;<br>b) any fees, costs and expenses (including reasonable legal fees and expenses) of the Custodian;<br>c) any fees, costs and expenses (including reasonable legal fees and expenses) of the Securities Agents;<br>d) any fees and expenses of the Issuers for the purposes of maintaining their corporate or limited liability company existence or authority to engage in the transactions contemplated in the Transaction Documents;<br>e) any indemnification obligations of the Issuer to the Security Trustee, any Receiver or Insolvency Administrator;<br>f) any indemnification obligations of the Issuer to the Custodian, the Securities Agents, the Manager, the Administrator, the USCP Placement Agents, the ECP Dealers and the Term Note Dealers up to the relevant Indemnity Cap. |

4

**Highly Confidential - Attorneys Eyes Only**

**S&P-IKB 0011845**

| | |
|---|---|
| Senior Obligations | The following obligations of the Issuer shall be Senior Obligations: |

a)  Senior Debt Obligations;

b)  Payments under Liquidity Advances; and

c)  Payments under Hedge Contracts.

| | |
|---|---|
| Operating Expenses | The following Operating Expenses will be paid *pari passu* and junior to any Administrative Expenses, any payments to the Senior Obligations and any obligations to purchase Investments previously committed to be purchased: |

a)  Administrator Fee;

b)  Senior Investment Management Fee;

c)  Issuer expenses not covered by Administrative Expenses;

| | |
|---|---|
| Priority of Payments before Enforcement | Prior to an Enforcement Date, the Issuer shall pay its Obligations on the date when they become due and payable and subject to the applicable Restricted Investment Limitations or Restricted Funding Limitations.: |

> **first**, to pay all Administrative Expenses due on such date,;

> **second**, to pay, *pro rata*, all amounts due on such date in respect of any Senior Obligations;

> **third**, to acquire Investments previously committed to be purchased;

> **fourth**, to pay, *pro rata*, all Operating Expenses due on such date;

> **fifth**, to pay all Interest Amounts and principal in respect of Capital Notes due on such date, in accordance with the Interest Payment Priority and the Redemption Priority specified in the Terms and Conditions of the Capital Notes;

> **sixth**, to pay, *pro rata* and *pari passu*, the Mezzanine Capital Notes Subordinated Payments due on such date;

> **seventh**, to pay, *pro rata* and *pari passu*, the Junior Capital Notes Subordinated Payments due on such date;

> **eighth**, to pay all of the Variable Margin, if any, in respect of the Capital Notes due on such date in accordance with the Interest Payment Priority specified in the Terms and Condition of the Capital Notes;

> **ninth**, to pay the Incentive Management Fee to the Manager.

| | |
|---|---|
| Priority of Payments following Enforcement | Following an Enforcement Date, any amounts received by the Security Trustee or a Receiver shall, be applied in the following order of priority |

**Highly Confidential - Attorneys Eyes Only**

**S&P-IKB 0011846**

**first**, in satisfaction of or provision for all Administrative Expenses accrued and/or payable, in the order specified in the definition of Administrative Expenses;

**second** in satisfaction of or provision for all Senior Obligations as and when the same become payable and, if more than one such Senior Obligation is payable at the relevant time, *pari passu* and in proportion to the amounts payable in respect thereof;

**third**, in satisfaction of or provision for all Operating Expenses accrued and/or payable;

**fourth**, in satisfaction of or provision for all Interest Amounts and all outstanding Redemption Amounts payable to the Senior Capital Noteholders in respect of Senior Capital Notes outstanding *pari passu* and in proportion to the amounts payable;

**fifth**, in satisfaction of or provision for all Interest Amounts and all outstanding Redemption Amounts payable to the Mezzanine Capital Noteholders in respect of Mezzanine Capital Notes outstanding *pari passu* and in proportion to the amounts payable;

**sixth**, in satisfaction of or provision for all Mezzanine Capital Notes Subordinated Payments *pari passu* and in proportion to the amounts payable;

**seventh**, in satisfaction of or provision for all Interest Amounts and all outstanding Redemption Amounts payable to the Junior Capital Noteholders in respect of Junior Capital Notes outstanding *pari passu* and in proportion to the amounts payable;

**eighth**, in satisfaction of or provision for any Junior Capital Notes Subordinated Payments *pari passu* and in proportion to the amounts payable;

**ninth**, in satisfaction of an amount equal to the greater of (A) the remaining surplus (if any) less the Equity Amount and (B) zero, which shall be declared as Distributable Profits and paid first to the Capital Notes as Variable Margin in accordance with the Interest Payment Priority specified in the Terms and Conditions of the Capital Notes and then to the Manager as Incentive Management Fee; and

**tenth**, in payment of any remaining amount following application of the amounts set out in the above paragraphs (which amount shall not exceed the Equity Amount) to the Issuer and the Co-Issuer.

6

S&P-IKB 0011847

## II.  Market Valuations

Valuation

The Market Value of each (a) Investment  and (b) Hedge Counterparty Exposure ,shall be checked daily.

General Valuation Rules

The following general rules are applicable to all valuations of Investments:

a)  The Investment Manager shall use best endeavours to ascertain the Market Value of each Investment sourced using an Approved Form of Valuation on a weekly basis;

b)  If the Investment Manager cannot ascertain the Market Value of an Investment using an Approved Form of Valuation on a given day, the discount margin relating to the Investment shall remain unchanged, and the Market Value shall be updated to reflect accrued interest and the natural movement to par of the clean price (e.g. for a constant discount margin and amortisation profile the clean price will tend towards par on the final payment date).

c)  Should the Investment Manager fail to source an Approved Market Valuation from dealers for more than 4 successive weeks, the Investment shall be valued at the lower of (i) the lower of the S&P or Moody's or Fitch relevant recovery rate (ii) [90%] of the last Market Value sourced from a dealer.

d)  All Market Values shall be updated daily by either (i) comparing the Market Value from the previous day (ii) cross checking any price movement with any corresponding movement in spread, (iii) using the discount margin or (iv) checking against known market movements and conditions.

e)  In addition to sourcing Market Values for Investments, the Investment Manager will also endeavour to source discount margins from external sources independent of the Issuer and Investment Manager at the same time as an Approved Market Valuation is obtained. Such discount margins shall be used to check the Approved Market Value and assumed amortisation profile for price validation purposes.

f)  The discount margin is either calculated from the Approved Market Valuation using an accepted fixed income pricing calculation methodologies or sourced as in (e) above.

Approved Form of Valuation

The market valuation of the Investments will be obtained using one of the two Approved Forms of Valuation of Investments listed below:

a)  Directly sourced from dealers following the Dealer Pricing Guidelines for Investments; or

b)  Using electronic External Pricing Sources

Dealer Pricing Guidelines for Investments

When sourcing Market Value information from dealers, the following rules shall apply:

a)  It shall be a condition precedent that a dealer from whom an Investment is purchased must provide a weekly bid price to be used in the calculation of the Investment's Market Value..

b)  Valuations may be sourced from additional dealers where deemed necessary or appropriate by the Investment Manager.

7

Highly Confidential - Attorneys Eyes Only

S&P-IKB 0011848

c) Where the Investment Manager deems a valuation too high or too low pursuant to the General Valuation Rules, the dealer is requested to reaffirm the valuation and to explain the basis of the quotation.

d) If the Investment Manager remains dissatisfied with the accuracy of the valuation and if the valuation has been obtained from a single dealer, then one or more valuations will be sought from other dealers

**External Pricing Sources**

Only electronic External Pricing Sources then currently used by market participants will be used as pricing sources, which will initially include (but may be expanded, subject to Rating Agency Confirmation, from time to time):

JPMorgan Index;
IDC;
Bloomberg Generic;
Bloomberg;
Euroclear;
Reuters;
Markit;
Broker;

**Approved Forms of Valuations of Hedge Counterparty Exposures**

All Hedge Counterparty Exposures will be Marked to Market daily using one of the three Approved Forms of Valuation of Hedge Counterparty Exposures listed below:

a) Market Values directly sourced from dealers;

b) Exchange-traded Hedge Contracts will be valued at the official closing price; or

c) Modelled valuations. This is where the [Administrator, on behalf of the Issuer], derives a Market Value for a Hedge Counterparty Exposure using an in-house or third party derivative valuation system based on accepted fixed income pricing calculation methodologies..

8

**Highly Confidential - Attorneys Eyes Only**

## III. Capital Tests

| | |
|---|---|
| Rationale | On each Business Day, in order to ensure capital adequacy, the Issuer will consider the Market Value of all Investments and Hedges, and will assign a capital charge. |
| Capital Test Overview | Each Capital Test must be tested on each Business Day, apart from the Simulation Model Rating Test for the Capital Notes, which shall be calculated weekly. |
| | Failure to comply with the Minor Capital Tests will lead to Restricted Investments. Failure to comply with the Major Capital Tests will result in Restricted Funding (with the exception of the Major Capital Loss Limit Test, failure of which will result in Enforcement). In both cases there is a 5 Business Day cure period to permit curing of the test. |
| Capital Tests | The Capital Tests shall comprise the Major Capital Tests and the Minor Capital Tests |

The Major Capital Tests comprise:

a)   Major Capital Adequacy Test

b)   Major Capital Loss Limit Test

The Minor Capital Tests comprise:

a)   Minor Capital Adequacy Test

b)   Minor Capital Loss Limit Test

c)   Capital Note Simulation Model Rating Test

| | |
|---|---|
| Major Capital Adequacy Test | The capital requirement is determined by the haircuts applied to the Investments and net positive Hedge Counterparty Exposures. |

In comparison to the Minor Capital Adequacy Test, the minimum required capital is set lower, using the Investment Capital Requirement and Hedge Capital Requirement, without multiplying either by a factor.

The Major Capital Adequacy Test shall be defined as:

$I(Major) + H(Major) - P - Q - L - CD \geq 0$; where:

$I(Major)$ = sum of Market Value of Cash Investments * (1- relevant Investment Capital Requirement))

$H(Major)$ = sum of Market Value of net positive Hedge Counterparty Exposures * (1- relevant Hedge Capital Requirement)) + Market Value of net negative Hedge Counterparty Exposures (negative number)

$P$ = sum of additional capital charges incurred due to breaches of Portfolio Parameter Tests

$Q$ = additional capital charge incurred due to a breach of the Maximum Net Positive Hedge

9

**Highly Confidential - Attorneys Eyes Only**

**S&P-IKB 0011850**

Counterparty Exposure Test.

L = Effective Notional Value of Senior Debt Obligations and all additional obligations which rank senior or pari passu to the Senior Debt Obligations.

CD = is the maximum amount of breakage fee payable at any time for the withdrawal of Breakable Deposits

For the avoidance of doubt, for Ineligible Investments, the amended market value as calculated in I(Minor) shall be considered to be zero, i.e. the Investment is fully capitalised.

| | |
|---|---|
| Major Capital Loss Limit Test | The Major Capital Loss Limit Test measures whether the NAV of the Capital Notes is less than the given level. |

The Major Capital Loss Limit Test shall be satisfied if:

$$NAV >= 0.5 \ CN$$

CN is the principal amount outstanding of the Capital Notes.

| | |
|---|---|
| Minor Capital Adequacy Test | The capital requirement is determined by the haircuts applied to the Investments and net positive Hedge Counterparty Exposures. |

In comparison to the Major Capital Adequacy Test, the minimum required capital is set higher, multiplying both the Investment Capital Requirement and Hedge Capital Requirement by a factor.

The Minor Capital Adequacy Test shall be defined as:

$$I(Minor) + H(Minor) - P - Q - L - CD \geq 0; \ here:$$

I(Minor) = sum of Market Value of Cash Investments * (1- (relevant Investment Capital Requirement*(100/70))

H(Minor) = sum of Market Value of net positive Hedge Counterparty Exposures * (1- (relevant Hedge Capital Requirement*(100/70) + Market Value of net negative Hedge Counterparty Exposures (negative number)

P, Q, L and CD are as defined in Major Capital Adequacy Test above

For the avoidance of doubt, for Ineligible Investments, the market value shall be considered to be zero, i.e. the Investment is fully capitalised.

| | |
|---|---|
| Minor Capital Loss Test | The Minor Capital Loss Limit Test measures whether the NAV of the Capital Notes is less than the given level. |

The Minor Capital Loss Limit Test shall be defined as:

$$NAV > 0.7 \ CN$$

CN is the principal amount outstanding of the Capital Notes.

| | |
|---|---|
| Capital Note Simulation Model Rating Test | The Capital Note Simulation Model Rating Test shall be breached if the output from the Capital Note Simulation Model implies Capital Note ratings falling below the following levels: |

a)   Senior Capital Notes: Rating falls below [Aa2] (Moody's), or [AA] (Fitch)

b)   Mezzanine Capital Notes: Rating falls below BBB+ (S&P), Baa1 (Moody's), or

10

BBB+ (Fitch)

c)   Combination Capital Notes: Rating falls below BB+ (S&P) or below, or Ba1 (Moody's) or below, or BB+ (Fitch)

The Capital Note Simulation Model Rating Test will be performed on a weekly basis and each time new Capital Notes are issued by the vehicle or existing Capital Notes are redeemed.

| | |
|---|---|
| Leverage Limit | 22, calculated as notional of Senior Debt Obligations over NAV. |
| Hedge Counterparty Capital Requirements | The Base Capital Requirement for net positive Hedge Counterparty exposures is dependent on the Applicable Hedge Counterparty Rating of the Hedge Counterparty and the tenor of the Hedge Agreement. The Capital Investment Class for net positive Hedge Counterparty Exposures shall be RMBS. |
| Eligible Hedge Counterparty Rating | A Hedge Counterparty has an Eligible Hedge Counterparty Rating if the Applicable Hedge Counterparty Rating is equal to or higher than A-1, P-1 and F1 by S&P, Moody's and Fitch respectively. |

11

## IV. Investment Portfolio

Investment Class

At closing, it is only Structured Finance or cash

Investment Purchase Criteria

The Issuer is permitted to invest in Investments which, at the time of purchase, satisfy each of the following Investment Purchase Criteria:

a) Each Investment must have a Deemed Rating of at least:

   i)   A- by S&P

   ii)  A-1 by S&P and has an original term to maturity of [180] days or less

b) Each Investment must be one of the Eligible Investment Types;

c) No investment may be made in SIV securities, interest only bonds or convertible bonds;

d) Each Investment must be capable, in normal market conditions, of being marked to market on a regular basis using an Approved Form of Valuation;

e) Each Investment must be denominated in an Eligible Currency;

f) Each Investment must bear or accrete interest at a fixed rate or at a floating rate under an interest-rate index;

g) Each Investment must be issued by an Obligor domiciled in an Eligible Jurisdiction;

h) The Issuer is not restricted from purchasing such Investment as a result of being in Restricted Investments, Restricted Funding or Enforcement or such an Investment would not give rise to a Restricted Investments Event, a Restricted Funding Event or an Enforcement Event;

i) The Issuer must be capable of hedging each Investment in compliance with the Market Sensitivity Tests, or in compliance with the HEL Hedging Criteria;

j) Future cash flows are not dependent upon any event, other than the ability of the Obligor to make such payments.

k) No Investment may be made if the addition of such Investment to the Investment Portfolio would result in the breach of an Eligible Limit of a Portfolio Parameter Test, or, to the extent that such Eligible Limit was not satisfied prior to such investment, such breach shall not be made worse following such investment;

l) The Maximum Non-AAA Rated CDO Investment at Point of Purchase Test must be satisfied having giving effect to the Investment purchase, or to the extent that the Maximum Non-AAA Rated CDO Investment at Point of Purchase Test was not satisfied immediately prior to such investment, such Maximum Non-AAA Rated CDO Investment at Point of Purchase Test shall not be made worse following such investment;

m) The Maximum Legal Final Maturity of Investments at Point of Purchase Test must be satisfied having giving effect to the Investment purchase, or to the extent that the Maximum Legal Final Maturity of Investments at Point of Purchase Test was not satisfied immediately prior to such investment, such Maximum Legal Final Maturity of Investments at Point of Purchase Test shall not be made worse following such investment;

n) The Maximum Expected Final Maturity of Investments at Point of Purchase Test must be

12

satisfied having giving effect to the Investment purchase, or to the extent that the Maximum Expected Final Maturity of Investments at Point of Purchase Test was not satisfied immediately prior to such investment, such Maximum Expected Final Maturity of Investments at Point of Purchase Test shall not be made worse following such investment;

o) The Maximum Investment Weighted Average Life at Point of Purchase Test must be satisfied having giving effect to the Investment purchase, or to the extent that the Maximum Investment Weighted Average Life at Point of Purchase Test was not satisfied immediately prior to such investment, such Maximum Investment Weighted Average Life at Point of Purchase Test shall not be made worse following such investment;

p) The Maximum Investment Portfolio Weighted Average Life Test must be satisfied having giving effect to the Investment purchase, or to the extent that the Maximum Investment Portfolio Weighted Average Life Test was not satisfied immediately prior to such investment, such Maximum Investment Portfolio Weighted Average Life Test shall not be made worse following such investment;

q) The Maximum Non-Public Rated Test must be satisfied having giving effect to the Investment purchase, or to the extent that the Maximum Non-Public Rated Test was not satisfied immediately prior to such investment, such Maximum Non-Public Rated Test shall not be made worse following such investment;

r) The Maximum Single Obligor at Point of Purchase Test - % of Total Principal Portfolio Value must be satisfied having giving effect to the Investment purchase, or to the extent that the Maximum Single Obligor at Point of Purchase Test - % of Total Principal Portfolio Value was not satisfied immediately prior to such investment, such Maximum Single Obligor at Point of Purchase Test - % of Total Principal Portfolio Value shall not be made worse following such investment;

s) The Maximum Single Obligor at Point of Purchase Test - % of Adjusted Net Asset Value must be satisfied having giving effect to the Investment purchase, or to the extent that the Maximum Single Obligor at Point of Purchase Test - % of Adjusted Net Asset Value was not satisfied immediately prior to such investment, such Maximum Single Obligor at Point of Purchase Test - % of Adjusted Net Asset Value shall not be made worse following such Investment;

t) The Maximum Synthetic Investments at Point of Purchase Test must be satisfied having giving effect to the Investment purchase, or to the extent that the Maximum Synthetic Investments Test at Point of Purchase Test was not satisfied immediately prior to such investment, such Maximum Synthetic Investments Test at Point of Purchase Test shall not be made worse following such investment;

**Eligible Investment Types**

At closing, the Issuer may purchase the following types of Cash Investments:

a) Structured Finance Securities (including Insurer Guaranteed Structured Finance Securities);

b) Cash Equivalents

**Cash Equivalents**

Shall comprise the following:

a) Any overnight investment in AAA/AAAm, AAA/F1 and Aaa/MR1+ rated money market

13

funds, subject to Rating Agency Approval;

b) Cash in any Eligible Currency, deposited in a bank with a rating of AAA and/or A-1+ by S&P;

c) Breakable Deposits;

d) Puttable Investments;

e) Money Market Funds;

f) Any investment in commercial paper, bank certificates of deposit, cash deposits that mature in less than 30 calendar days from an Issuer rated A-1+/ P-1/F1; or

g) Any other investment which, with Rating Agency Approval, may be treated as a Cash Equivalent

| | Maximum |
|---|---|
| Maximum % of Investments with an Legal Final Maturity greater than 35 years (or greater than 45 years if the Investment is an RMBS or CDO of ABS Investment, unless the Investment's Key Country of Jurisdiction is Holland, where maximum Legal Final Maturity may be greater than 100 years) | 5.0% |

| | Maximum |
|---|---|
| Maximum % of Investments with an Expected Final Maturity greater than 15 years but less than 20 years | 5.0% |

| | Maximum |
|---|---|
| Maximum % of Investments with WAL greater than [12] years | 5.0% |

| | Maximum |
|---|---|
| WAL of portfolio (in years) | 7.0 |

Maximum Non-Public Rated Test    Defines the maximum percentage of Total Principal Portfolio Value which is not publicly

14

**Highly Confidential - Attorneys Eyes Only**

**S&P-IKB 0011855**

rated by S&P.

S&P will permit a maximum of 10% of the Total Principal Portfolio Value to be notched or credit estimated. Notching is the same as per CDO of ABS.

| Deemed Rating Category | Maximum Exposure Obligors |
|---|---|
| Overall | [4.0%] |
| AAA/Aaa/AAA | [4.0%] |
| AA /Aa/AA | [2.0%] |
| A / A | [0.5%] |

| Single Obligor Groups | Maximum Exposure Obligors |
|---|---|
| Largest Single Obligor Group Exposure | [100%] |
| Sum of two largest Single Obligor Group Exposures excluding AAA/Aaa/AAA Investments | [100%] |
| Sum of three largest Single Obligor Group Exposures excluding AAA/Aaa/AAA & AA/Aa/AA Investments | [100%] |
| Sum of five largest Single Obligor Group Exposures excluding AAA/Aaa/AAA, AA/Aa/AA & A/A/A Investments | [100%] |

| | |
|---|---|
| Ineligible Investments | Investments which, on each Business Day, fail to comply with the Investment Holding Criteria after a 5 Business Day cure period and which have a public rating of below BB-/Ba3/BB- for S&P/Moody's/Fitch respectively. |
| | Ineligible Investments are fully capitalised for the purpose of calculating the Major and Minor Capital Adequacy Tests. |
| Operational Limits | The Operational Limits within the Portfolio Parameter Tests serve as a set of "soft" limits. Failure to comply with these tests shall act as an early warning to the Investment Manager and shall result in an increased Non-Operational Capital Charge. |
| Eligible Limits | The Eligible Limits within the Portfolio Parameter Tests serve as a set of "hard" limits. Failure to comply with these tests shall incentivise the Investment Manager to realign the Investment Portfolio through the application of an increased Eligible Capital Charge. |
| Non-Operational Capital Charge | The Non-Operational charge results in a higher Investment Capital Requirement by multiplying the Base Capital Requirement by a factor of 1.1. |

| Deemed Rating category | Minimum Eligible Limit | Minimum Operational Limit |
|---|---|---|
| | | |

15

Highly Confidential - Attorneys Eyes Only

S&P-IKB 0011856

| | | |
|---|---|---|
| AAA/Aaa/AAA | [40%] | [50%] |
| AA/Aa/AA to AAA/Aaa/AAA | [60%] | [75%] |
| A to AAA/Aaa/AAA | [80%] | [90%] |
| BBB/Baa/BBB to AAA/Aaa/AAA | [85%] | [95%] |
| BB/Ba/BB to AAA/Aaa/AAA | [90%] | [100%] |

| Sector Category | Max Eligible Limit | Max Operational Limit |
|---|---|---|
| Global CDOs | [40%] | [35%] |
|    *CLOs* | [40%] | [35%] |
|    *Structured Finance CDOs* | [30%] | [25%] |
|    *HY CBOs* | [20%] | [17.5%] |
|    *Single Tranche CDO* | [7.5%] | [5%] |
|    *Investment Grade Corporate Single Tranche CDO* | [5%] | [4%] |
|    *Trust Preferred CDOs* | [5%] | [4%] |
|    *Balance Sheet CDOs* | [25%] | [22.5%] |
|    *SME CDOs* | [25%] | [22.5%] |
|    *CRE CDOs* | [5%] | [4%] |
|    *Other* | [8%] | [6%] |
| CMBS | [50%] | [40%] |
|    *Single Property* | [20%] | [17.5%] |
|    *Conduit* | [30%] | [25%] |
|    *Large Loan* | [40%] | [35%] |
|    *Credit Tenant Lease* | [10%] | [8%] |
|    *Other* | [8%] | [6%] |
| Consumer ABS | [60%] | [50%] |
|    *Non-Sallie Mae Student Loans\** | [40%] | [35%] |
|    *Sallie Mae Student Loans\** | [40%] | [35%] |
|    *Credit Cards* | [30%] | [25%] |
|    *Charged off Cards (i.e. non performing)* | [5%] | [4%] |
|    *Auto Loans* | [30%] | [25%] |
|    *Auto Sub-Prime* | [5%] | [4%] |
|    *Consumer Loans* | [30%] | [25%] |
|    *Other* | [5%] | [4%] |

\* Non-Sallie Mae Student Loans and Sallie Mae Student Loans combined are subject to an operational limit of 35% and an eligible limit of 40%

| | | |
|---|---|---|
| Global RMBS | [75%] | [70%] |
|    *Prime RMBS* | [50%] | [40%] |
|    *Home Equity Loans* | [70%] | [65%] |
|    *HELOC* | [20%] | [17.5%] |
|    *Non-Prime Non-US RMBS* | [40%] | [35%] |
|    *Manufactured Housing* | [5%] | [4%] |
|    *Other* | [8%] | [6%] |

**Highly Confidential - Attorneys Eyes Only**          **S&P-IKB 0011857**

| | | |
|---|---|---|
| Corporate ABS | [50%] | [40%] |
| *Trade Receivables* | [10%] | [8%] |
| *Lease Backed* | [10%] | [8%] |
| *Aircraft Loans/Leases* | [0%] | [0%] |
| *Whole Business* | [10%] | [8%] |
| *Other* | [8%] | [6%] |
| Other | [5%] | [4%] |

**Target Portfolio Composition**

| Category (€MM) | AAA | AA | A | Total |
|---|---|---|---|---|
| CDO | 17.50% | 2.50% | 2.50% | 22.50% |
| CMBS | 6.50% | 5.00% | 2.50% | 14.00% |
| HEL | 25.00% | 15.00% | 10.00% | 50.00% |
| RMBS | 9.50% | 2.00% | 1.00% | 12.50% |
| Credit Cards | 1.00% | - | - | 1.00% |
| Total | 59.50% | 24.50% | 16.00% | 100.00% |

**Target Portfolio Size**         2,500,000,000 USD

As of now, they have $1.783bn assets with the following HEL breakdown

**Rhinebridge plc HEL portfolio breakdown**

| PRIME | (FICO >= 680) | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| AAA | - | - | - | 17.66% | 4.20% |
| AA | - | - | 1.31% | - | - |
| A | - | - | 0.13% | - | - |
| Totals | - | - | 1.43% | 17.66% | 4.20% |

| MIDPRIME | (FICO >= 635<680)) | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| AAA | - | - | - | 3.76% | - |
| AA | - | - | 2.01% | 0.65% | - |
| A | - | - | 0.36% | - | - |
| Totals | - | - | 2.37% | 4.41% | - |

| SUBPRIME | (FICO < 635) | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| AAA | - | - | - | 4.74% | - |
| AA | 0.12% | 0.28% | 10.39% | 3.05% | - |
| A | - | 2.33% | 4.54% | 0.36% | - |
| Totals | 0.12% | 2.61% | 14.93% | 8.16% | - |

* 2007 PRIME vintage includes USD 45m of wrapped

17

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0011858**

assets
* 2006 PRIME vintage includes USD 90m of wrapped
assets

Myself, Gordon Wright and Stephen Mccabe visited them on 19th March 2007 and discussed their views of the HEL market. First of all, we need to bear in mind that

- that this vehicle has specific HEL curves which is more severe than the one size fits all that we have in some matrix SIV
- we accept AAA HELs as LEAs..although they will run them using the old more conservative haircuts
- that we do have market value deals that are mono sectors, and
- that almost 60% of the US ABS market if not more is HEL anyway, so a SIV investing in ABS assets is bound to certain extent to buy HEL.
- If losses were to increase, we would have higher prepayments in the top part of the capital structure that would decrease duration, hence market value movements.

We went through their investment approach (specifically for HEL) and these are the main points:
- they very much start from research and economist view on housing market, inflation, consumer spending which they have both within Rhinebridge and IKB itself.
- select originators very carefully and none of the originators in trouble today are in their portfolios
- do their own stresses on HEL assets in terms of prepayment rates and delinquencies. These stresses are multiplied in case of signs of bad managers as well.
- they cannot buy the BBB tranches of any investment
- very cautios about vintage. Of the 'troubled' subprime 2006, they only have 0.36% of the portfolio at A. Nothing in the BBB area.
- Some single-As that have some vintage are now more like AAs or AAAs due to the high prepayments.
- Pool is very granular: 128 assets for average position of $7.9m

| Key Country of Investment Category | Max Eligible Limit | Max Operational Limit |
|---|---|---|
| *U.S.A* | *[100%]* | *[100%]* |
| *European* | *[100%]* | *[100%]* |
| -Non-Defined Pan-European* | [25%] | [25%] |
| -Euro Cash | [25%] | [25%] |
| -France | [50%] | [50%] |
| -Germany | [50%] | [50%] |
| -Italy | [50%] | [50%] |
| -Spain | [50%] | [50%] |
| -UK | [50%] | [50%] |
| -Austria | [25%] | [25%] |
| -Belgium | [25%] | [25%] |
| -Denmark | [25%] | [25%] |
| -Finland | [25%] | [25%] |
| -Greece | [10%] | [10%] |
| -Ireland | [25%] | [25%] |
| -Luxembourg | [25%] | [25%] |
| -Netherlands | [25%] | [25%] |
| -Norway | [25%] | [25%] |
| -Portugal | [25%] | [25%] |

**Highly Confidential - Attorneys Eyes Only**

**S&P-IKB 0011859**

| | | |
|---|---|---|
| -Sweden | [25%] | [25%] |
| -Switzerland | [25%] | [25%] |
| | | |
| *Rest of World* | *[25%]* | *[25%]* |
| -Non-Defined Rest of the World | [25%] | [25%] |
| -Australia | [25%] | [25%] |
| -Canada | [25%] | [25%] |
| -Japan | [25%] | [25%] |
| -New Zealand | [10%] | [10%] |
| -Singapore | [10%] | [10%] |
| -Hong Kong | [10%] | [10%] |
| -Korea | [10%] | [10%] |
| *Including only countries which are listed under European | | |

| Category | Eligible Limit | Operational Limit |
|---|---|---|
| USD (Minimum) | [75%] | [75%] |
| EUR (Maximum) | [25%] | [25%] |
| GBP (Maximum) | [25%] | [25%] |
| Other (Maximum) | [25%] | [15%] |

Eligible Currency — Shall mean one of the following currencies: U.S. Dollars, Australian Dollars, Canadian Dollars, Danish Krone, Euros, Hong Kong Dollars, Japanese Yen, New Zealand Dollars, Norwegian Krone, Pounds Sterling, Singapore Dollars, Swedish Krone, Swiss Francs or any such other currency, subject to Rating Agency Confirmation, from time to time.

| Hedge Counterparty Deemed Rating | Maximum Exposure | |
|---|---|---|
| | Max Eligible Limit | Max Operational Limit |
| AAA/Aaa/AAA | [4.0%] | [4.0%] |
| AA/Aa/AA | [4.0%] | [4.0%] |
| A/A/A | [4.0%] | [2.0%] |
| BBB/Baa/BBB | [2.0%] | [0.5%] |
| BB/Ba/BB | [0.5%] | [0.0%] |

19

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0011860**

### V. Market Sensitivity Tests

Market Sensitivity Tests

The Market Sensitivity Tests shall include:

a)  Interest Rate Exposure Compliance Tests:

    i)   Parallel Yield Curve Test

    ii)  Stressed Parallel Yield Curve Test

    iii) Point Yield Curve Test

    iv) Stressed Point Yield Curve Test

b)  Currency Exposure Compliance Tests:

    i)   Spot Foreign Exchange Test

    ii)  Stressed Spot Foreign Exchange Test

### ALL AS PER CRITERIA

Violation of Market Sensitivity
Tests

In the event of non-compliance with an Interest Rate Exposure Compliance Test and/or a Currency Exposure Compliance Test, the Investment Manager shall use all reasonable efforts and take such steps as will result in compliance within five Business Days, and during that period be in Restricted Investments. If the [Investment Manager/Administrator] is unable to remedy the situation within five Business Days, Restricted Funding will be initiated.

Restricted Funding may be reversed if the breach of the Market Sensitivity Test is rectified, however the vehicle shall only be permitted to return to Normal Operations from Restricted Funding (which was caused by a breach of a Market Sensitivity Test) once every 10 years.

Highly Confidential - Attorneys Eyes Only

S&P-IKB 0011861

## VI.  Liquidity Features

Available Liquidity

In each Liquidity Test, the Available Liquidity is the sum of the forms of liquidity which are listed as being acceptable for consideration (e.g. given credit) in that test.

Liquidity Tests

The Liquidity Tests shall comprise the following tests:

a)  1-Day Liquidity Test (i.e. NCO1)

b)  5-Day Liquidity Test (i.e. NCO5)

c)  10-Day Liquidity Test (i.e. NCO10)

d)  15-Day Liquidity Test (i.e. NCO15)

1-Day Liquidity Test

1-Day Available Liquidity shall be the sum of:

a)  Cash in hand

b)  Committed Liquidity Value

c)  Full notional of Breakable Deposits, excluding breakage costs

d)  Full notional of Money Market Funds

e)  Full notional of Puttable Investments

f)  Liquidity Eligible Committed Repo

5-Day Liquidity Test

5-Day Available Liquidity shall be the sum of:

a)  Cash in hand

b)  Committed Liquidity Value

c)  Full notional of Breakable Deposits, excluding breakage costs

d)  Full notional of Money Market Funds

e)  Full notional of Puttable Investments

f)  Liquidity Eligible Committed Repo

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0011862**

| 10-Day Liquidity Test | 10-Day shall be the sum of: |
|---|---|

a)  Cash in hand

b)  Committed Liquidity Value

c)  Full notional of Breakable Deposits, excluding breakage costs

d)  Full notional of Money Market Funds

e)  Full notional of Puttable Investments

f)  Liquidity Eligible Committed Repo

g)  Haircut Market Value of all Liquidity Eligible Investments

**15-Day Liquidity Test**  15-Day Available Liquidity shall be the sum of:

a)  Cash in hand

b)  Committed Liquidity Value

c)  Full notional of Breakable Deposits, excluding breakage costs

d)  Full notional of Money Market Funds

e)  Full notional of Puttable Investments

f)  Liquidity Eligible Committed Repo

g)  Haircut Market Value of all Liquidity Eligible Investments

**Liquidity Providers**  No one Liquidity Provider may comprise more than 50% of total Available Liquidity (excluding the Haircut Market Value of LEIs).

**Rating of Committed Liquidity Providers**  Level 1 Committed Liquidity Providers (which provide the Level 1 Committed Liquidity Value) must have a minimum short-term rating of A-1+/P-1/F1.

Level 2 Committed Liquidity Providers (which provide the Level 2 Committed Liquidity Value) must have a minimum short-term rating of A-1/P-1/F1.

Uncovered Level 2 Committed Liquidity Providers (which provide the Covered Level 2 Committed Liquidity Value) must also have a long-term rating of at least A+.

If a Liquidity Provider is downgraded below A-1+/P-1/F1, but retains an A-1/P-1/F1 rating the Level 1 Liquidity Facility becomes a Level 2 Liquidity Facility after 30 calendar days.

If a Liquidity Provider is downgraded below A-1/P-1/F1, the facility becomes ineligible for purposes of meeting the liquidity requirement after 30 calendar days.

For the avoidance of doubt, subject to the restrictions explained below, the presence of Level 2 Liquidity Providers will not affect the A-1+/P-1/F1 rating of the Senior Debt Obligations.

22

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0011863**

**VII.  Operating States**

Operating States

The various Operating States are:

a)  Normal Operations;

b)  Restricted Investments;

c)  Restricted Funding; and

d)  Enforcement.

Normal Operations

The Issuer shall be in Normal Operations prior to a:

a)  Restricted Investments Event;

b)  Restricted Funding Event; or

c)  Enforcement Event.

However, the Issuer may re-enter Normal Operations after a Restricted Investments Event or re-enter Restricted Investments or Normal Operations after a Restricted Funding Event, if the conditions that caused the Restricted Investments Event or the Restricted Funding Events are remedied subject to further conditions described below (subject to certain Rating Agency conditions).

Restricted Investments Limitations

During Restricted Investments, the Issuer shall not be permitted to:

a)  Purchase new Investments unless (i) such purchase is an Investment Switch, or (ii) the Issuer had committed to purchase such Investment(s) whilst in Normal Operations and prior to the occurrence of the relevant Restricted Investments Event, or (iii) upon obtaining Rating Agency Confirmation

b)  Enter into new Investment Derivatives unless (i) such purchase is an Investment Switch or (ii) the Issuer had committed to enter into such Investment Derivatives whilst in Normal Operations and prior to the occurrence of the relevant Restricted Investments Event.

c)  Redeem any of the Capital Notes except:

(i) if the non-redemption of a particular Capital Note would otherwise cause a Enforcement Event;

(ii) if, after such redemption, the only cause of the Issuer being in Restricted Investments would be a failure to redeem an outstanding Capital Note by its Expected Maturity Date and/or a failure of the Capital Note Maturity Test;

(iii) if the Issuer would return to Normal Operations after such redemption;

(iv) all outstanding Senior Ranking Obligations have been paid and/or provisioned for in full subject to certain conditions in the Terms and Conditions of the Capital Notes (see Appendix B for further details);

d)  Redeem any capital notes under redemption at the option of the noteholder, redemption at the option of the Issuer or purchase any capital notes;

23

**Highly Confidential - Attorneys Eyes Only**                                    **S&P-IKB 0011864**

   e) Pay the Variable Margin on any Capital Notes;

   f) Pay any Mezzanine Capital Notes Subordinated Payments until all outstanding Senior Ranking Obligations have been paid and/or provisioned for in full (subject to certain conditions as outlined in the Terms and Conditions of the Capital Notes);

   g) Pay any Junior Capital Notes Subordinated Payments until all outstanding Senior Ranking Obligations have been paid and/or provisioned for in full;

   h) Pay any Incentive Fee amounts to the Investment Manager.

**Restricted Investments Events**   Failure to comply with any of the following events shall constitute a Restricted Investments Event and will cause the Issuer to enter Restricted Investments:

   a) A Minor Capital Test remaining unremedied after 5 business days;

   b) The Minimum Weighted Average Life of Senior Funding Test remaining unremedied after 5 business day;

   c) Failure of the Market Sensitivity Tests or Liquidity Tests during the 5-day cure period for such tests; or

   d) Failure to redeem Capital Notes by the Expected Maturity Dates after 5 business days.

**Restricted Funding**   In the event of the occurrence of any of the Restricted Funding Events, Restricted Funding shall be initiated. In such case, the Investment Manager may liquidate, as necessary, the Investment Portfolio in order to sequentially pay down the Secured Obligations as. In addition, while in Restricted Funding, the manager may draw down all undrawn liquidity (to the extent deemed appropriate), extend liquidity notes (CP with extendable maturity date), sell defaulted Investments and terminate Hedge Agreements or Investment Derivative Contracts

**Highly Confidential - Attorneys Eyes Only**      **S&P-IKB 0011865**

| | |
|---|---|
| Restricted Funding Limitations | During Restricted Funding, the Issuer shall be subject to the same restrictions as during Restricted Investments. In addition, the Issuer shall not be permitted to: |

a) Issue new Senior Debt Obligations or enter into new Repo Funding Transactions and Securities Lending Agreements except to fund purchases which Issuer had committed to purchase whilst in Normal Operations or Restricted Investments and prior to the occurrence of the relevant Restricted Funding Event.

b) Purchase new Investments and Investment Derivatives (except Risk-Free Investments or any other Investments subject to Rating Agency Confirmation for the purposes of improving investment returns on available cash until outstanding Capital Senior Obligations can be redeemed), provided that this restriction on purchase of new Investments and Investment Derivatives shall not apply in the event that the Issuer had committed to purchase such Investment(s) and Investment Derivatives whilst in Normal Operations or Restricted Investments and prior to the occurrence of the relevant Restricted Funding Event.

c) Pay interest on the Capital Notes until all outstanding Senior Ranking Obligations have been paid and/or provisioned for in full;

d) Redeem any Capital Notes until all outstanding Senior Ranking Obligations have been paid and/or provisioned for in full;

e) Pay any Mezzanine Capital Notes Subordinated Payments until all outstanding Senior Ranking Obligations have been paid and/or provisioned for in full.

**Restricted Funding Event**

Failure to comply with of any of the following events shall constitute a Restricted Funding Event and will cause the Issuer to enter Restricted Funding:

a) A Major Capital Test remaining unremedied after 5 business days (except the Major Capital Loss Limit Test, failure of which shall immediately constitute a Restricted Funding Event and if unremedied for 5 business days will constitute an Enforcement Event);

b) A Market Sensitivity Test remaining unremedied after 5 business days; or

c) A Liquidity Test remaining unremedied after 5 business days.

**Return to Normal Operations from Restricted Funding**

Once the conditions that caused the Restricted Funding Event are remedied, and all other Restricted Funding Events that may have occurred since the initial Restricted Funding Event are also remedied, the Issuer shall return to Restricted Investments or Normal Operations (as appropriate).

If the conditions that caused the Restricted Funding Event were caused by breach of a Market Sensitivity Test and/or a Liquidity Test, the Issuer shall only be permitted to return to Normal Operations once within any [10] year period. In the event of a second breach of a Market Sensitivity Test and/or Liquidity Test within [10] years of the first breach, the Issuer remain in Restricted Funding or Enforcement.

25

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0011866**

**Enforcement Limitations**

The Enforcement Limitations shall be the same as the Restricted Funding Limitations. Upon an Enforcement Event, the security constituted by the Security Trust Deed shall become immediately enforceable, notwithstanding that none of the secured obligations of the Issuer are then due and payable. Post Enforcement, the Security Trustee or the Defeasance Manager (acting as an agent of and following the instructions of the Security Trustee) shall manage the security assets and the business of the Issuer with the objective of arranging a timely payment of the Issuer's obligations in accordance with the Payment Priority in Enforcement and in compliance with the Enforcement limitations (provided that such compliance, in the opinion of the Security Trustee, does not adversely affect the interest of the Secured Creditors).

**DEFEASANCE MANAGER DISCUSSION**

As of today, the defeasance manager is IKG, i.e. the investment manager. Although it is common knowledge that upon enforcement, the 'keys' are handed to the security trustee, who can afterwards decide to reappoint the investment manager, their argument to keep their proposal is as follows (as they put it):

"We believe that the Enforcement Manager's role following the Enforcement Date represents a material advantage over existing structures. The period immediately following the Enforcement date can be the most critical for the structure as inertia or inaction on the part of the Security Trustee can potentially lead to increased losses to the portfolio.

It is for this reason that we believe that the Enforcement Manager being mandated to immediately implement the Enforcement Procedures is a substantial advantage. Any objection that the Manager should not act as Enforcement Manager (as its actions may be deemed to be the cause of the vehicle entering into enforcement) are strongly mitigated by the fact that (i) Manager is subject to termination in the event of a material breach of its duties under the Management Agreement and (ii) the Manager's actions as Enforcement Manager are not to exercise discretionary investment authority (as in the pre-enforcement phase) but rather it is constrained to follow the Enforcement Procedures, which are designated to minimise losses to the Portfolio and are detailed.

The key additional stipulations are (i) the Enforcement Manager is acting on behalf of and is agent of the Security Trustee (rather than the Issuer, as in other SIVs) and (ii) the Security Trustee has the power to terminate the Enforcement Manager without cause at any time. These two factors afford the Security Trustee greater control following enforcement."

What they say makes sense and they might have a point on the inactivity of the trustee as well as on the fact that the manager acts as agent and on behalf of trustee and it must follow precise enforcement guidelines at the end of the day....so its discretionality is practically non existing. But, it is different that other SIVs.

I am not particularly fussed about this because at the end of the day enforcement procedures will be followed and if the Security Trustee thinks that the manager is doing a bad job it can always get rid of it.

26

**Highly Confidential - Attorneys Eyes Only**          **S&P-IKB 0011867**

| | |
|---|---|
| Enforcement Event | Failure to comply with of any of the following events shall constitute a Enforcement Event and will cause the Issuer to enter Enforcement: |

    a)   The occurrence of Mandatory Acceleration Event

    b)   The Major Capital Loss Limit Test remaining unremedied after 5 business days

    c)   A Senior Note Event of Default

    d)   The cancellation of a Commitment under any Liquidity Facility or any Committed Repo Facility following the occurrence of a Liquidity Event of Default

    e)   A Hedge Contract Event of Default

| | |
|---|---|
| Senior Note Event of Default | Failure to pay interest or principal on the Senior Debt Obligations after 5 business days cure period |
| Liquidity Event of Default | Means: |

a) with respect to any Liquidity Facility Agreement, has the meaning ascribed thereto in the relevant Liquidity Facility Agreement; or

b) with respect to any Committed Repo Agreement, has the meaning ascribed thereto in the relevant Committed Repo Agreement.

| | |
|---|---|
| Hedge Contract Event of Default | The termination of any Hedge Agreement or Investment Derivative Contract as a consequence of a Hedge Contract Event of Default as defined in the relevant Hedge Contract. |
| Inability to Return to Normal Operations | Once the Issuer has entered Enforcement, it cannot return to Normal Operations. |
| Management during Enforcement | The Security Trustee will enforce its rights to the Collateral following the occurrence of an Enforcement Event.  The Security Trustee shall thereafter manage the Issuer's business. It may retain the Investment Manager or appoint additional or replacement financial advisors to act as Defeasance Manger. |
| Ramp-Up Period | Shall last from the Closing Date during Normal Operations until the earlier of the following: |

    a)   The date six months following the Closing Date; or

    b)   The occurrence of an Enforcement Event, Restricted Funding Event or Restricted Investments Event.

Highly Confidential - Attorneys Eyes Only

S&P-IKB 0011868

## S&P Base Capital Requirements for Cash Investments

**CDOs**

| Deemed Rating | Years | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| AAA | 3.49 | 3.98 | 4.63 | 5.23 | 5.89 | 6.65 | 7.32 | 8.07 | 8.82 | 9.57 |
| AA+ | 3.58 | 4.16 | 4.91 | 5.61 | 6.36 | 7.21 | 7.97 | 8.80 | 9.62 | 10.44 |
| AA | 3.67 | 4.34 | 5.19 | 5.98 | 6.83 | 7.77 | 8.62 | 9.53 | 10.42 | 11.30 |
| AA- | 3.87 | 4.80 | 5.92 | 7.00 | 8.11 | 9.32 | 10.44 | 11.59 | 12.71 | 13.78 |
| A+ | 4.07 | 5.26 | 6.66 | 8.02 | 9.38 | 10.87 | 12.26 | 13.64 | 14.99 | 16.26 |
| A | 4.27 | 5.73 | 7.39 | 9.04 | 10.66 | 12.42 | 14.08 | 15.70 | 17.27 | 18.74 |
| A- | 4.62 | 6.35 | 8.29 | 10.17 | 11.96 | 13.88 | 15.63 | 17.31 | 18.89 | 20.35 |
| BBB+ | 4.97 | 6.98 | 9.19 | 11.30 | 13.27 | 15.33 | 17.18 | 18.92 | 20.51 | 21.95 |
| BBB | 5.33 | 7.61 | 10.08 | 12.42 | 14.57 | 16.78 | 18.73 | 20.52 | 22.13 | 23.55 |
| BBB- | 10.66 | 13.34 | 16.14 | 18.71 | 20.97 | 23.22 | 25.11 | 26.81 | 28.27 | 29.49 |
| BB+ | 15.99 | 19.06 | 22.20 | 24.99 | 27.37 | 29.65 | 31.49 | 33.09 | 34.40 | 35.44 |
| BB | 21.32 | 24.79 | 28.26 | 31.28 | 36.08 | 36.08 | 37.88 | 39.38 | 40.53 | 41.38 |
| BB- | 26.66 | 30.51 | 34.32 | 37.56 | 40.16 | 42.52 | 44.26 | 45.66 | 46.67 | 47.33 |
| < BB- | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

**CMBS**

| Deemed Rating | Years | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| AAA | 3.18 | 3.66 | 4.19 | 4.77 | 5.42 | 5.96 | 6.72 | 7.46 | 8.20 | 8.96 |
| AA+ | 3.29 | 3.92 | 4.60 | 5.34 | 6.14 | 6.84 | 7.77 | 8.66 | 9.56 | 10.46 |
| AA | 3.41 | 4.17 | 5.01 | 5.91 | 6.86 | 7.72 | 8.82 | 9.86 | 10.91 | 11.95 |
| AA- | 3.55 | 4.46 | 5.46 | 6.52 | 7.61 | 8.62 | 9.86 | 11.04 | 12.21 | 13.37 |
| A+ | 3.69 | 4.75 | 5.90 | 7.12 | 8.35 | 9.52 | 10.91 | 12.22 | 13.52 | 14.79 |
| A | 3.84 | 5.04 | 6.35 | 7.72 | 9.10 | 10.42 | 11.96 | 13.40 | 14.83 | 16.22 |
| A- | 4.10 | 5.43 | 6.85 | 8.33 | 9.80 | 11.20 | 12.80 | 14.29 | 15.74 | 17.13 |
| BBB+ | 4.36 | 5.81 | 7.35 | 8.94 | 10.49 | 11.98 | 13.64 | 15.17 | 16.65 | 18.05 |
| BBB | 4.63 | 6.19 | 7.84 | 9.55 | 11.19 | 12.76 | 14.48 | 16.06 | 17.56 | 18.96 |
| BBB- | 10.74 | 11.92 | 14.51 | 16.42 | 18.21 | 19.89 | 21.67 | 23.27 | 24.74 | 26.09 |
| BB+ | 16.86 | 17.66 | 21.18 | 23.30 | 25.23 | 27.02 | 28.86 | 30.48 | 31.93 | 33.22 |
| BB | 22.98 | 23.40 | 27.85 | 30.17 | 32.26 | 34.16 | 36.05 | 37.69 | 39.12 | 40.34 |
| BB- | 29.10 | 29.14 | 34.51 | 37.05 | 39.28 | 41.29 | 43.24 | 44.90 | 46.31 | 47.47 |
| < BB- | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

**Credit Cards**

| Deemed Rating | Years | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| AAA | 1.50 | 1.73 | 1.99 | 2.26 | 2.48 | 2.78 | 2.99 | 3.31 | 3.64 | 3.98 |
| AA+ | 1.57 | 1.84 | 2.15 | 2.47 | 2.78 | 3.18 | 3.50 | 3.89 | 4.28 | 4.69 |
| AA | 1.63 | 1.95 | 2.31 | 2.68 | 3.08 | 3.57 | 4.01 | 4.46 | 4.92 | 5.39 |
| AA- | 1.71 | 2.05 | 2.44 | 2.83 | 3.27 | 3.79 | 4.26 | 4.74 | 5.23 | 5.72 |

Highly Confidential - Attorneys Eyes Only

S&P-IKB 0011869

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| A+ | 1.79 | 2.15 | 2.57 | 2.99 | 3.46 | 4.01 | 4.51 | 5.02 | 5.53 | 6.05 |
| A | 1.87 | 2.26 | 2.70 | 3.15 | 3.64 | 4.23 | 4.76 | 5.29 | 5.84 | 6.39 |
| A- | 2.12 | 2.61 | 3.16 | 3.74 | 4.38 | 5.03 | 5.61 | 6.23 | 6.86 | 7.49 |
| BBB+ | 2.37 | 2.96 | 3.62 | 4.34 | 5.11 | 5.83 | 6.46 | 7.18 | 7.89 | 8.60 |
| BBB | 2.63 | 3.31 | 4.08 | 4.93 | 5.85 | 6.63 | 7.31 | 8.12 | 8.92 | 9.71 |
| BBB- | 8.37 | 9.17 | 10.06 | 11.03 | 12.08 | 12.95 | 13.70 | 14.59 | 15.45 | 16.30 |
| BB+ | 14.12 | 15.03 | 16.03 | 17.14 | 18.31 | 19.27 | 20.10 | 21.06 | 21.99 | 22.89 |
| BB | 19.87 | 20.89 | 22.01 | 23.24 | 24.55 | 25.59 | 26.49 | 27.53 | 28.52 | 29.48 |
| BB- | 25.62 | 26.75 | 27.98 | 29.35 | 30.78 | 31.92 | 32.89 | 34.00 | 35.06 | 36.07 |
| < BB- | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

**Auto Loans**

| Deemed Rating | Years | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| AAA | 1.60 | 2.01 | 2.46 | 2.95 | 3.42 | 3.96 | 4.42 | 4.97 | 5.53 | 6.10 |
| AA+ | 1.67 | 2.14 | 2.66 | 3.22 | 3.75 | 4.36 | 4.89 | 5.50 | 6.12 | 6.76 |
| AA | 1.74 | 2.27 | 2.86 | 3.48 | 4.08 | 4.76 | 5.36 | 6.03 | 6.72 | 7.41 |
| AA- | 1.86 | 2.48 | 3.18 | 3.91 | 4.64 | 5.40 | 6.12 | 6.91 | 7.71 | 8.51 |
| A+ | 1.97 | 2.70 | 3.49 | 4.34 | 5.14 | 6.05 | 6.89 | 7.79 | 8.69 | 9.60 |
| A | 2.09 | 2.91 | 3.81 | 4.77 | 5.68 | 6.70 | 7.65 | 8.66 | 9.68 | 10.69 |
| A- | 2.34 | 3.27 | 4.28 | 5.35 | 6.35 | 7.47 | 8.51 | 9.59 | 10.67 | 11.73 |
| BBB+ | 2.60 | 3.64 | 4.76 | 5.93 | 7.03 | 8.24 | 9.37 | 10.52 | 11.66 | 12.77 |
| BBB | 2.86 | 4.01 | 5.24 | 6.52 | 7.71 | 9.02 | 10.22 | 11.45 | 12.65 | 13.80 |
| BBB- | 8.66 | 10.02 | 11.45 | 12.91 | 14.24 | 15.67 | 16.98 | 18.28 | 19.52 | 20.70 |
| BB+ | 14.46 | 16.03 | 17.67 | 19.30 | 20.77 | 22.33 | 23.73 | 25.11 | 26.39 | 27.59 |
| BB | 20.26 | 22.05 | 23.88 | 25.69 | 27.30 | 28.99 | 30.49 | 31.93 | 33.27 | 34.48 |
| BB- | 26.07 | 28.06 | 30.09 | 32.08 | 33.83 | 35.64 | 37.24 | 38.76 | 40.14 | 41.38 |
| < BB- | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

**RMBS**

| Deemed Rating | Years | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| AAA | 1.74 | 2.03 | 2.26 | 2.62 | 2.97 | 3.26 | 3.68 | 4.09 | 4.50 | 4.92 |
| AA+ | 1.80 | 2.14 | 2.41 | 2.82 | 3.21 | 3.56 | 4.02 | 4.47 | 4.93 | 5.40 |
| AA | 1.86 | 2.24 | 2.57 | 3.02 | 3.46 | 3.85 | 4.37 | 4.86 | 5.37 | 5.87 |
| AA- | 1.97 | 2.42 | 2.82 | 3.36 | 3.88 | 4.36 | 4.97 | 5.55 | 6.14 | 6.73 |
| A+ | 2.07 | 2.59 | 3.07 | 3.70 | 4.29 | 4.87 | 5.57 | 6.24 | 6.91 | 7.59 |
| A | 2.18 | 2.77 | 3.32 | 4.03 | 4.71 | 5.38 | 6.17 | 6.93 | 7.69 | 8.45 |
| A- | 2.41 | 3.08 | 3.72 | 4.50 | 5.24 | 5.96 | 6.81 | 7.60 | 8.39 | 9.17 |
| BBB+ | 2.65 | 3.40 | 4.11 | 4.96 | 5.77 | 6.55 | 7.44 | 8.28 | 9.10 | 9.90 |
| BBB | 2.89 | 3.71 | 4.50 | 5.43 | 6.29 | 7.14 | 8.08 | 8.95 | 9.81 | 10.62 |
| BBB- | 9.59 | 10.55 | 11.46 | 12.49 | 13.42 | 14.32 | 15.26 | 16.12 | 16.97 | 17.76 |
| BB+ | 16.29 | 17.38 | 18.43 | 19.55 | 20.56 | 21.51 | 22.45 | 23.29 | 24.13 | 24.90 |
| BB | 22.99 | 24.22 | 25.39 | 26.62 | 27.69 | 28.70 | 29.63 | 30.46 | 31.29 | 32.04 |
| BB- | 29.69 | 31.06 | 32.35 | 33.68 | 34.82 | 35.89 | 36.82 | 37.62 | 38.46 | 39.18 |
| < BB- | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

**Student Loans**

Highly Confidential - Attorneys Eyes Only

S&P-IKB 0011870

| Deemed Rating | Years | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| AAA | 1.53 | 1.81 | 2.09 | 2.37 | 2.65 | 2.91 | 3.07 | 3.38 | 3.71 | 4.04 |
| AA+ | 2.00 | 2.42 | 2.83 | 3.30 | 3.76 | 4.21 | 4.61 | 5.08 | 5.60 | 6.13 |
| AA | 2.46 | 3.04 | 3.57 | 4.24 | 4.88 | 5.50 | 6.15 | 6.77 | 7.50 | 8.23 |
| AA- | 2.58 | 3.26 | 3.90 | 4.69 | 5.45 | 6.19 | 6.97 | 7.70 | 8.55 | 9.39 |
| A+ | 2.70 | 3.48 | 4.24 | 5.15 | 6.01 | 6.89 | 7.78 | 8.64 | 9.60 | 10.55 |
| A | 2.82 | 3.71 | 4.57 | 5.60 | 6.58 | 7.58 | 8.60 | 9.57 | 10.64 | 11.71 |
| A- | 3.08 | 4.08 | 5.07 | 6.21 | 7.28 | 8.37 | 9.47 | 10.50 | 11.62 | 12.71 |
| BBB+ | 3.34 | 4.46 | 5.56 | 6.81 | 7.98 | 9.15 | 10.33 | 11.43 | 12.59 | 13.72 |
| BBB | 3.60 | 4.84 | 6.05 | 7.41 | 8.67 | 9.94 | 11.20 | 12.35 | 13.57 | 14.73 |
| BBB- | 9.51 | 10.96 | 12.39 | 13.92 | 15.31 | 16.68 | 18.01 | 19.21 | 20.44 | 21.58 |
| BB+ | 15.42 | 17.09 | 18.72 | 20.42 | 21.94 | 23.42 | 24.82 | 26.07 | 27.31 | 28.44 |
| BB | 21.33 | 23.22 | 25.05 | 26.93 | 28.57 | 30.16 | 31.63 | 32.93 | 34.18 | 35.30 |
| BB- | 27.24 | 29.35 | 31.39 | 33.44 | 35.20 | 36.90 | 38.45 | 39.78 | 41.06 | 42.15 |
| <BB- | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

| HELs Deemed Rating | Years | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| AAA | 2.32 | 2.77 | 3.16 | 3.70 | 4.22 | 4.71 | 5.23 | 5.72 | 6.32 | 6.92 |
| AA+ | 2.39 | 2.91 | 3.36 | 3.97 | 4.55 | 5.10 | 5.67 | 6.22 | 6.86 | 7.51 |
| AA | 2.47 | 3.05 | 3.56 | 4.24 | 4.88 | 5.49 | 6.12 | 6.71 | 7.41 | 8.09 |
| AA- | 2.59 | 3.29 | 3.91 | 4.71 | 5.47 | 6.21 | 6.96 | 7.67 | 8.46 | 9.24 |
| A+ | 2.72 | 3.52 | 4.26 | 5.18 | 6.06 | 6.93 | 7.80 | 8.62 | 9.52 | 10.39 |
| A | 2.84 | 3.76 | 4.60 | 5.66 | 6.65 | 7.64 | 8.64 | 9.57 | 10.57 | 11.54 |
| A- | 3.10 | 4.12 | 5.07 | 6.20 | 7.25 | 8.28 | 9.28 | 10.20 | 11.16 | 12.07 |
| BBB+ | 3.36 | 4.48 | 5.53 | 6.74 | 7.84 | 8.91 | 9.92 | 10.82 | 11.75 | 12.60 |
| BBB | 3.63 | 4.85 | 5.99 | 7.29 | 8.44 | 9.54 | 10.56 | 11.45 | 12.34 | 13.13 |
| BBB- | 9.52 | 10.90 | 12.20 | 13.55 | 14.72 | 15.78 | 16.72 | 17.51 | 18.28 | 18.92 |
| BB+ | 15.42 | 16.96 | 18.40 | 19.82 | 20.99 | 22.02 | 22.88 | 23.58 | 24.22 | 24.72 |
| BB | 21.32 | 23.02 | 24.60 | 26.09 | 27.27 | 28.27 | 29.04 | 29.64 | 30.16 | 30.51 |
| BB- | 27.22 | 29.07 | 30.80 | 32.36 | 33.55 | 34.51 | 35.20 | 35.71 | 36.10 | 36.31 |
| <BB- | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

# APPENDIX I

## PRELIMINARY DISCUSSION
## RATING CAPITAL NOTES HIGHER THAN SINGLE-A

Date: 13-Feb-07
Attendees: LG, PI, KVA, CP, SMc, NK

### BACKGROUND

Morgan Stanley is teaming up with IKB Deutsche Industriebank, the manager, to set up RhineBridge PLC, a new SIV. This SIV will be very close in terms of assets and strategy to Cheyne SIV, the other Morgan Stanley arranged SIV, closed in Aug. 2005. Like

Highly Confidential - Attorneys Eyes Only

S&P-IKB 0011871

Cheyne SIV, the senior notes will be rated with a capital charge matrix, whereas the model for capital notes is based on a simulation model.

The main difference is that while Cheyne has a three tier capital structure (Senior notes (AAA/A-1+); Mezz capital notes (A), and Juniot capital notes (NR)), RhineBridge wants to have senior capital notes rated AAA junior to the senior notes and senior to the mezzanine capital notes.

The AAA rating will speak to ultimate interest and principal. They are aware that we might need to call them "Deferrable" as we would do in other SF areas.

A very rough estimate of the capital structure is as follows

    AAA/A-1+ MTNs/CPs = 91%
    AAA cap notes = 3.5%
    A cap notes = 4.5%
    NR Income notes = 1%
    Leverage to Senior Notes = 10.11
    Leverage to AAA cap notes = 17.18

As a comparison, Cheyne SIV (at almost 9.6bn of assets) is

    AAA/A-1+ MTNs/CPs = 93%
    A cap notes = 6%
    NR Income notes = 1%
    Leverage to Senior Notes = 13.28

We have seen the model and commented upon that. Stephen can give more colour but this committee is to focus on the feasibility.


STATUS QUO IN SIVs AND SOME CONSIDERATIONS
- Up to now, we have a qualitative cap for capital note rating in SIV at A-flat.

- From a pure quantitative/modeling point of view, we all know that capital notes (expeically the ones with a first loss piece underneath) can easily be rated above A-flat. Looking at the tranching above, you can clearly see that almost half of the RhineBridge AAA cap notes could be rated AAA (as Cheyne, which is not among the most levered SIVs, has 93% of Senior notes). However, RhineBridge has 91% of AAA/A-1+ senior notes. In other words, these are like Junior senior notes, hence with lower stability.

- If I am not mistaken, 3 years ago we could have rated Sigma notes at AA level from the model, but we decided not to. Those were not first loss piece as there was a trapping mechanism. RhineBridge will have "true" subordination from the mezzanine and the income notes.

- It is also true that we (and the most experienced managers) want to see capital note ratings very stable. Since we insist on this for A rated capital notes, we should be even more worried about that for a AAA rating and require a "rating volatility" buffer, which up to now has been on a voluntary basis, among other things

Highly Confidential - Attorneys Eyes Only                    S&P-IKB 0011872

We have seen the model and commented upon that. Stephen can give more colour but we

**PRELIMINARY THOUGHTS**
- One reason why we cap the rating of capital notes at A is the presence of other 'soft' defeasance events and assumptions of the management behaviour (like the fact that the pool will stay the same for the life of the vehicle) for loss in no defeasance. Now, this is not even an experienced SIV manager.

- My starting point is that to give a AAA rating to capital notes, these notes should pass the same tests for the senior notes (also the obligor limits compared to NAV, to cover from idionsicratic risk). If they could pass AAA tests, then we should not even worry about operational/management risk/soft issues, as we would assume defeasance occurs today, as we do for senior notes. If not, we have to discuss the operational risk issue as above.

- we have to think about the market reaction and whether we want to be doing this with a new manager.

- are we against subordinated paper being rated AAA from a rating policy point of view?


**PREVIOUS COMMENTS FROM EMAILS**
Q: They can model defeasance and remain at the end of defeasance with the capital notes' notional and their accrued interest?
A: Let's assume they can.

Q: In defeasance , they do not pay coupon and rating will address deferred and ultimate coupon and principal?
A: Yes, we go with the assumption that ANY capital notes cannot receive anything in defeasance, hence if they have a long MTN, they will have to wait for it to be paid. At the end of the day, let's not forget the capital structure compared to Cheyne above.

From Nik
The note is very helpful.  I just cancelled a Paribas lunch so I will be able to make at least part of it.  I am forwarding to the core NY team.  NY SIV criteria team are Halprin (AM); Kitto; Cho; Wolf (leads) with Neilson and Lam (back ups).

I thank you for the subjective criteria references because that's what I would have asked - can you clip the Cheyne Operating Manual and forward that.

(1) I specifically am interested in this call in your point - concentration guidelines married to the AAA limitations.

(2) Cheyne was a while ago for me so please forgive me or team if there are questions.

(3) Clarification: I believe we have not precluded AAA as subordinated rating available - CDPCs for example.

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0011873**

But we have precluded in liquidation structures.  Irrespective of "defeasance" methodology, we have said that AAA and AA require the AAA methodology (Cristina says it far better than I could).

(4) your comments on us also needing to chat about what makes sense is appreciated and I actually think your manager comments are important. Whilst the vote on Sigma was passionate, my reason in fact was Gordian are a manager that violated guidelines and then ignored the guidelines (back a few years). My position on the prior vote was in fact strongly influenced by the fact that while I could rationalize not joining ratings agency competitors in using ratings as a commentary on discussions, I could not rationalize awarding a AAA or AA subordinated note rating to management that had in fact violated guidelines and then blamed it on our so-called poor corporate ratings acumen.  That's not AAA or AA (to me).  I say this only to highlight that while the model was part of the discussion, the "ban" oh higher than "A" for me was in part tied to that management issue.  I cannot say how a new manager will treat the guidelines.  We hope for and expect the best but can be surprised by ongoing observation.

I look forward to today's discussion

**COMMITTEE FEEDBACK:**
For whatever rating above single-A, we must assume defeasance on day one. Hence if a note (although subordinated) can pass ALL AAA tests and the vehicle goes into defeasance/restricted funding if capital tests does not cover all AAAs (whatever their subordination), we can give AAA.

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0011874**

TAB 2

| From: | Kimball, Andrew |
|---|---|
| Sent: | Saturday, February 23, 2008 10:37 PM |
| To: | McDaniel, Raymond; Clarkson, Brian |
| Subject: | Internal Discussion Document |

Ray & Brian,

This brief very rough memo intends to put more or less everything that came to me top of mind out on the table for discussion as to what we mean by triple-A. These (and more that others may contribute) are questions we need to ask ourselves and answer, as we set about creating a conceptual framework for the meaning of triple-A. Some of the points here would be amended or eliminated. Many more might be re-cast as being unacceptable for a triple-A when present in the extreme but acceptable in moderation.

If the entire approach appears distractive or not productive, please indicate and point me in a different direction.

Thanks.



Triple-A.doc



PLAINTIFF'S EXHIBIT

689 ID

Cal 1-1-11

Confidential

MDYS ADCB 936592

# The Desired Meaning of Triple-A
23 February 2008

### A.  When Triple-A's Don't Behave

Entire sectors of structured finance ratings have been severely downgraded from triple-A over the past nine months, including US non-prime RMBS, SFG CDOs; CPDOs, and SIVs.  Despite strong prior performance for some of these sectors, the magnitude of these downgrades calls into question our ability to assess risk to the triple-A level of certainty in these transactions.

We are incrementally adjusting our models, methodologies, and assumptions to accommodate the current stressed environment.  But are parameter adjustments enough?

In addition, we are questioning the adequacy of a triple-A definition too narrowly focused on expected loss to the near exclusion of considerations of rating stability.

### B.  The Intended Meaning of Ratings

Moody's long-term debt ratings rank predicted future creditworthiness ordinally, across industry sectors and geographies.   They are relative rankings of credit risk.  In addition, over time they have become associated with approximate levels of expected loss. At one time a global Aaa rating was thought of as having a one in ten thousand probability of default and a Aa rating as having a one in one thousand probability of default, and so on. To what historical meaning that probability attached was never clear. Such rough quantifications of default probability were largely displaced by the publication in 1989 of Moody's first analysis of actual historical default rates, between 1970 and 1988, calculated by rating category and for specified time horizons. This research has since been extended back to 1920 and updated annually and is widely used by market participants to associate rating levels with expected future credit loss based on historical distributions. The study reported that in fact credits rated Aaa historically have defaulted about one time in ten thousand over a four-year time horizon.

Although historical default and loss experience can be used as one approximation of what Moody's ratings meant during the time period studied, expected loss rates are not a complete description of what Moody's means by its ratings and are not the intended targets except in the very roughest sense certainly of the analysts or rating committees for fundamental credits.  Rather it is their primary intention to rank credits with consistency within and across industries, typically by implicit comparison to past ratings and reference to standard statistical ratios. Over time, the loss distribution associated with a consistently-applied rating level becomes evident empirically.

In contrast to company ratings, Moody's ratings of structured securitizations often use an expected credit loss number as the explicit and determinative meaning. This practice reflects the greater susceptibility of pools of underlying assets in such transactions to statistical analysis and quantification or, conversely, the greater difficulty in estimating credit risk by more subjective and experience-based measures. The structured finance mapping to expected loss is based on an idealized version of historical default experience for Moody's rated debt.

Moody's intends its ratings, both structured and fundamental, to accurately reflect relative credit risk. It also intends its ratings—both structured and fundamental—to indicate levels of expected loss that are roughly consistent across sectors and geographies and that have some stability over time. However, default experience for different sectors will rarely be identical for each time horizon or historical period, as market and macroeconomic factors play out differently across sectors and regions.

Notwithstanding the often substantial variation in default and loss rates from year to year, market participants, regulators, and the rating agencies themselves continue to find ratings useful approximations of expected credit loss, usually by mapping each rating category against its historical performance, with allowances for short-term variability. This quantification is widely used in sizing capital reserves against potential credit losses at financial institutions, evaluating overcollateralization levels for asset securitizations, establishing regulatory— or sponsor-driven investment hurdles, and so on.

*Ratings Distribution.* The distribution of credits across the twenty-one rating categories comprising Moody's scale changes over time due to shifting market appetite and changes in the economy or an industry. Thus the explosion of structured finance transactions in the last twenty years has greatly swollen the proportion of Aaa and Aa ratings.  Market appetite in the United States for speculative grade new issue credits has also changed the distribution on the low end of the scale.

Confidential

MDYS ADCB 936593

### c.   The Historical Record

Until now, loss rates in SF (particularly for Aaa's) were low & comparable to corporates (except Baa loss rates were higher).

Secular trends toward larger SF portfolios & tighter SF spreads suggest investor demand for SF securities was rising.  Flight-to-quality actually ran from corporate to structured in 2002

Over 60,000 Aaa SF securities were issued since 1993 (compared to about 100 corporate Aaa issuers), yet only 45 Aaa tranches, from 30 deals, involving just 7 originators were ever impaired.

- □ LGD rates were generally small & large impairments were fraud
- □ Impaired Aaa's involved subprime RMBS, franchise loans, MH ABS, healthcare receivables, retail store credit cards, equipment lease ABS
- □ Originators were weakly capitalized specialty finance companies

### D.   Desired Attributes of Triple-A Ratings

#### EXPECTED LOSS

1)   A triple-A should survive a reasonably stressful environment with rating intact.  It should survive the equivalent of the US Great Depression, undoubtedly with downgrades but with no loss to Aaa holders.

2)   Statistically, an investor holding a portfolio of 50,000 triple-A companies for four years should experience 1 default.

3)   Event risk is limited to the extreme and unforeseeable (e.g. the decision by Texaco to file for bankruptcy protection in order to avoid a bizarre jury decision).

> **EXPECTED LOSS NOTES**
>
> o *General Electric*. Market share, diversification of business lines, management strength & depth make a default implausible.
> o Muni.
> o US prime mortgage-backed security
> o Credit Suisse
> o No telecommunications or IT companies (e.g. Amazon) – regardless of balance sheet or cash flow strengths -- given the rapid pace of product and market transformation.

#### TRANSITION RISK

There is an expectation of stability to a triple-A rating.  Some uses of ratings assume a very low rating transition risk for highly-rated risks.

4)   There may be susceptibility to modest change in credit level, perhaps a drop to double-A over a one to three year time frame.

5)   There is no credit cliff, no single event or relatively small change in the performance of an underlying asset that would cause a large shift in the expected loss on the security.

> **TRANSITION RISK NOTES**
>
> o On average, 8% of corporate triple-A's drop to double-A over the course of a year
> o Corporates in cyclical industries (e.g. commodities) or sectors in heavy transition (telecommunications) typically would not qualify
> o No single-event catastrophe bonds. No tobacco settlement receivables securitizations. No single-product  company. No hotel chains or airlines, susceptible to a global safety scare or fuel price crisis.
> o No Resecuritizations, such as CDO squared, most ABS CDOs, and re-securitizations for funding purposes where the collateral is not the senior most tranches.  Eliminates most second lien products.  Re-REMIC?
> o No leveraged portfolio of risks with potentially high default correlations in a stress environment with a significant number of potentially risky and correlated structured assets.
> o No credits susceptible to market price or liquidity. Hence, no SIVs. No CPDOs.

THE MEANING OF TRIPLE-A    2/23/2008 - 2

Confidential

MDYS ADCB 936594

## INFORMATION RISK

6)  The data or information needed to analyze the credit risk must be adequate to eliminate substantially all data-related uncertainty about future performance across a range of scenarios.

7)  Typically data supporting a triple-A structured tranche would be at least ten years, representative in make-up relative to the transactions being rated, and cover an extreme market downturn..

8)  Transactions depending on price levels or movements must be supported by data adequate to demonstrate survival through a period of extreme illiquidity.

INFORMATION QUALITY NOTES

o  For prime US mortgages, there is a xx year history of historical performance, including recessions in 19yy and 19zz, as well as a general understanding of the impact in the 1930s on mortgages of that era.  That is adequate to support a US prime mortgage-backed security at triple-A.  However, subprime mortgages, etc etc

o  For structured financings, an underlying asset class should ordinarily have at least ten years of performance data and cover one or more bad scenarios. Examples of asset classes that qualify are: corporate debt, which has default history back to the 1920s; b; c.  Examples of asset classes that do not qualify include: x, y, z.

o  At least for now, we do not know enough about pricing to support a triple-A dependent on assumptions about magnitude and sharpness of price changes.  Even with that knowledge, we will need to be closer to the trading environment, to avoid wholly depending on third-party marks.  So no triple-A SIVs, market value CDOs, commodity price index CPDOs, etc.

o  No Aaa on mortgage without indenture assurance of loan by loan information.

## COMPLEXITY

9)  The methodology and/or model supporting a triple-A must be readily understandable and credible to professional investors. Structural simplicity enables identification of key assumptions and dependencies, enabling mitigating provisions as needed.

10)  Triple-A structures should not be highly dependent on untestable assumptions about correlation or fat tails or liquidity conditions.

11)  Complexity may take the form of combining different risks, such as in CPDOs or CDO triggers, which combined credit and market risk

COMPLEXITY NOTES

o  No triple-A SIVs, CPDOs, CDO squared

o  No triple-A structures which arbitrage a mismatch between long-term assets and short-term liabilities without a full liquidity backstop

o  No multi-layer securitizations such as SF CDOs and CDO squared

12)  Triple-A structures should avoid multi-layer securititizations, which hamper transparence and magnify errors in the rating of the underlying assets.

## GOVERNANCE

13)  Information asymmetries and conflicting incentives are out.

14)  A triple-A is unlikely in the absence of strong governance. Board. Management. No reliance on single strong man. A business approach subject to possible legal or regulatory challenge would ordinarily not be eligible.

15)  Typically, no transaction driven primarily by market arbitrage would qualify for a triple-A.  Without a straght-forward economic rationale for the business, there is too much occasion for mis-alignment of incentives.

GOVERNANCE NOTES

o  No triple-A where asset originators do not also hold a residual interest (hedged exposures don't count) or meaningful reps and warranties

o  No synthetic CDOs.  Only CDOs funding on-balance sheet assets.

Confidential

MDYS ADCB 936595

E. Process

New asset classes eligible for Aaa will be approved by cross-discipline policy committee

THE MEANING OF TRIPLE-A    2/23/2008 - 4

Confidential

MDYS ADCB 936596

TAB 3



EXHIBIT
339
3.9.11
PENGAD 800-631-6989

| From: | Boudkeev, Timour <Timour.Boudkeev@moodys.com> |
|---|---|
| Sent: | Tuesday, March 4, 2008 9:07 AM (GMT) |
| To: | Tabe, Henry <Henry.Tabe@moodys.com> |
| Subject: | RE: Committee Memo |

Thanks. Timour is my first name, which is why it bounced.

Can you get back to me on the K2 as well, please (see separate e-mail I sent you yesterday).

-----Original Message-----
From: Tabe, Henry
Sent: 03 March 2008 20:26
To: Boudkeev, Timour
Subject: FW: Committee Memo

This was returned to me.

-----Original Message-----
From: Tabe, Henry
Sent: Monday, March 03, 2008 8:11 PM
To: Cantor, Richard
Cc: Leegerstee, Reynold; boudkeev.timour@moodys.com; michael.west@moodys.com
Subject: RE: Committee Memo

Thanks.

The spreadsheet shows that prices (NAVs) were still relatively high in mid-Nov. By the 30th when sweeping actions were taken, there were further falls to affect all but 4 vehicles. The speed of the drops was unprecedented.

This comes back to the point about reliability of our underlying ratings (and applies to SIV-lites as well, which had almost all Aaa assets). As mentioned in the call, I don't think we can escape from the fact that the undoing of SIVs and SIV-lites is primarily explained by the overly aggressive ratings of underlying assets, from the market's perspective. Granted that senior debt issuance had evaporated, it was ultimately the dramatic drops in value of highly rated assets that caused trigger breaches and loss crystallisations. The extent of the damage caused to a vehicle then depended on secondary factors such as the dispersion of liabilities (WAL) and concentration in the most problematic asset classes.

Another point I did not address sufficiently in the call, also linked to the above is why we got comfortable rating SIV-lites. To the fact that committed liquidity was higher than normal (~25% compared to ~10%, though in hindsight, with a subjective out to funding) and leverage was lower, we should add that ratings were higher (Aaa on average compared to traditional SIVs at Aa, first rated in 1988). Again, nothing would have saved the sector once the market had decided that those Aaa/Aa assets were worthless.

-----Original Message-----
From: Cantor, Richard
Sent: Monday, March 03, 2008 5:49 PM
To: Tabe, Henry
Subject: FW: Committee Memo

MDYS ADCB 774814

-----Original Message-----

**From:** Rast, Martin

**Sent:** Tuesday, November 20, 2007 12:50 PM

**To:** Kimball, Andrew; Mazataud, Paul; Yoshizawa, Yuri; Cantor, Richard; Fu, Yvonne; Rosa, David; Kerlogue, Paul; Remeza, Algis; Tabe, Henry; Ng, Julie; Ameer, Rana; Jung, Angela; Papadacci, Cyril

**Subject:**      Committee Memo

Dear all,

attached please find the committee documents.

Model
<< File: SIV Ratings Calculator v104.xls >>

Supporting Memo on details of the new modelling proposal

Best,
Martin

Martin Rast
+44 20 7772 8676

Confidential                                                                   MDYS ADCB 774815

TAB 4

**From:** Gärtner, Frank [Frank.Gaertner@ikb.de]
**Sent:** Tuesday, April 17, 2007 11:45 AM
**To:** Drennan, Gregg (FID); Valev, Iskren (FID)
**Cc:** Ryan, Neil; harvey
**Subject:** RE: Rhinebridge: various issues
Vertrauliche E-Mail von der / Confidential e-mail from IKB Deutsche Industriebank AG

If its just a matter for the raters to agree on the dox I am not concerned about the timetable.


**Beste Grusse,**


**Frank.**
**Frank Gärtner**


Solicitor, Rechtsanwalt
IKB Deutsche Industriebank AG
Bereich RV (Recht und Verträge)
RV2/Kapitalmarktrecht und Finanzprodukte
Wilhelm-Bötzkes-Straße 1
40474 Düsseldorf
Tel.: +49 (0) 211 8221 4748
mobile: +49 (0) 151151 06839
Fax.: +49 (0) 211 8221 2748
mailto: Frank.Gaertner@ikb.de
website: www.ikb.de

_____

Rechtsform Aktiengesellschaft
Sitz Düsseldorf
Handelsregister Amtsgericht Düsseldorf B Nr. 1130
Vorsitzender des Aufsichtsrats: Ulrich Hartmann
Vorstand: Frank Braunsfeld, Volker Doberanzke, Markus Guthoff, Claus Momburg, Stefan Ortseifen


Diese E-Mail begründet keine Verpflichtung der IKB, es sei denn dies wäre durch schriftliche Vereinbarung mit dem Empfänger vereinbart.
This emails contents do not constitute a commitment by  IKB, except where provided for in a written agreement between the bank and the recipient of this
message.

_____

**From:** Drennan, Gregg (FID) [mailto:Gregg.Drennan@morganstanley.com]
**Sent:** Tuesday, April 17, 2007 5:42 PM
**To:** Gärtner, Frank; Valev, Iskren (FID)
**Cc:** Ryan, Neil; harvey
**Subject:** RE: Rhinebridge: various issues

We need the docs separate from Fanny - althouhg her mail highlights that the agencies are now primarily waiting for the
docs to continue theri work (SnP and FItch are basically done apart from the docs).

Moodys confirmed about a month ago that they would not release pre-sales without finalising doc review - see mail from
David Rosa on the 14th March.

**Gregg Drennan - Executive Director**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-6967
Mobile: +44 77951-27591
Fax: +44 20 7677-4328
Gregg.Drennan@morganstanley.com

_____

**From:** Gärtner, Frank [mailto:Frank.Gaertner@ikb.de]



EXHIBIT
Plaintiffs'
350
11/18/11   PENGAD 800-631-6989

MS_001372330

**Sent:** 17 April 2007 16:38
**To:** Drennan, Gregg (FID); Valev, Iskren (FID)
**Cc:** Ryan, Neil; harvey
**Subject:** RE: Rhinebridge: various issues

Vertrauliche E-Mail von der / Confidential e-mail from IKB Deutsche Industriebank AG

We are in contact with Fanny. This is the first time that I hear that Moodys ned the dox settled for the pre-sale. Did you know this?

Beste Grüsse,

**Frank.**
**Frank Gärtner**

Solicitor, Rechtsanwalt
IKB Deutsche Industriebank AG
Bereich RV (Recht und Verträge)
RV2/Kapitalmarktrecht und Finanzprodukte
Wilhelm-Bötzkes-Straße 1
40474 Düsseldorf
Tel.: +49 (0) 211 8221 4748
mobile: +49 (0) 151151 06839
Fax.: +49  (0) 211 8221 2748
mailto: Frank.Gaertner@ikb.de
website: www.ikb.de

_____

Rechtsform Aktiengesellschaft
Sitz Düsseldorf
Handelsregister Amtsgericht Düsseldorf B Nr. 1130
Vorsitzender des Aufsichtsrats: Ulrich Hartmann
Vorstand: Frank Braunsfeld, Volker Doberanzke, Markus Guthoff, Claus Momburg, Stefan Ortseifen
Diese E-Mail begründet keine Verpflichtung des IKB, es sei denn dies wäre durch schriftliche Vereinbarung mit dem Empfänger vereinbart.
This emails contents do not constitute a commitment by  IKB, except where provided for in a written agreement between the bank and the recipient of this message.

_____

**From:** Drennan, Gregg (FID) [mailto:Gregg.Drennan@morganstanley.com]
**Sent:** Tuesday, April 17, 2007 4:59 PM
**To:** Gärtner, Frank; Valev, Iskren (FID)
**Cc:** Ryan, Neil; harvey
**Subject:** RE: Rhinebridge: various issues

It was understood that all of us had worked flat out to get the red out but we were expecting the docs last week? I`m trying to avoid the docs once again being a cause of crisis.

**Gregg Drennan - Executive Director**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-6967
Mobile: +44 77951-27591
Fax: +44 20 7677-4328
Gregg.Drennan@morganstanley.com

_____

**From:** Gärtner, Frank [mailto:Frank.Gaertner@ikb.de]
**Sent:** 17 April 2007 15:56
**To:** Drennan, Gregg (FID); Valev, Iskren (FID)
**Cc:** Ryan, Neil; harvey
**Subject:** RE: Rhinebridge: various issues

MS_001372331

Vertrauliche E-Mail von der / Confidential e-mail from IKB Deutsche Industriebank AG

The red was circulated only three weeks ago, then you told us that Iskren etc were all on hols over Easter; also people on the swap side left MS before Easter. What are you trying to say?

**Beste Grüsse,**

**Frank.**
**Frank Gärtner**

Solicitor, Rechtsanwalt
IKB Deutsche Industriebank AG
Bereich RV (Recht und Verträge)
RV2/Kapitalmarktrecht und Finanzprodukte
Wilhelm-Bötzkes-Straße 1
40474 Düsseldorf
Tel.: +49 (0) 211 8221 4748
mobile: +49 (0) 151151 06839
Fax.: +49 (0) 211 8221 2748
mailto: Frank.Gaertner@ikb.de
website: www.ikb.de

Rechtsform Aktiengesellschaft
Sitz Düsseldorf
Handelsregister Amtsgericht Düsseldorf B Nr. 1130
Vorsitzender des Aufsichtsrats: Ulrich Hartmann
Vorstand: Frank Braunsfeld, Volker Doberanzke, Markus Guthoff, Claus Momburg, Stefan Ortseifen
Diese E-Mail begründet keine Verpflichtung der IKB, es sei denn dies wäre durch schriftliche Vereinbarung mit dem Empfänger vereinbart.
This emails contents do not constitute a commitment by IKB, except where provided for in a written agreement between the bank and the recipient of this message.

---

**From:** Drennan, Gregg (FID) [mailto:Gregg.Drennan@morganstanley.com]
**Sent:** Tuesday, April 17, 2007 4:46 PM
**To:** Gärtner, Frank; Valev, Iskren (FID)
**Cc:** Ryan, Neil; harvey
**Subject:** RE: Rhinebridge: various issues

Frank, Neil

When will we see the new suite of docs? Given the call earlier we will need to make judgements very soon as to achievable pricing and closing dates from a docs perspective. We have unfortunately just lost 3 weeks from not having any docs to review - and we need some time to review and consider them to see where we stand.

Thanks

**Gregg Drennan - Executive Director**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-6967
Mobile: +44 77951-27591
Fax: +44 20 7677-4328
Gregg.Drennan@morganstanley.com

---

**From:** Gärtner, Frank [mailto:Frank.Gaertner@ikb.de]
**Sent:** 16 April 2007 08:58
**To:** Valev, Iskren (FID); Drennan, Gregg (FID)
**Cc:** Ryan, Neil

MS_001372332

**Subject:** Rhinebridge: various issues

Vertrauliche E-Mail von der / Confidential e-mail from IKB Deutsche Industriebank AG

Iskren/Gregg,

1. Re indemnities: I spoke to Yurij last week and we agreed the final wording. I am sending it to Mayers for incorporation.

2. Re USToBO: IKB opposses giving the opinion on the following grounds -

- The structure of Rhinebridge is basically modeled on Cheyne (as required by MS) and no such opinion was given in Cheyne. Like in Cheyne the Rhinebridge Manager may enter into a wide range of Investment Derivatives (see the Red: not just the Associated Derivatives, which are solely to provide hedges) and, like in Cheyne, may also enter into securities lending transactions. This creates a possibility, although fairly unlikely, that Rhinebridge could be treated as a "dealer" in stocks or securities for U.S. federal income tax purposes, which could subject any transactions entered into by the Issuer through the Manager, their employees, agents or IKB affiliates (because affiliates due to their affiliate status may be considered agents of the Manager for this purpose) to U.S. corporate income tax (and possibly an additional "branch profits tax") if they act in whole or in part within the U.S. in conducting such transactions. This situation appears to make it technically impossiblet to give an opinion. It is on MSs advice concerning the structure that Rhinebridge has the discretion to Investment Derivatives and we see no reason why IKB CAM should be penalised for following MSs advice. To sort out and spend time, energy and money on sorting out this issue amounts to a penalty.
- You mentioned that the main reason for the USBoTO is the co-issuance structure which Rhinebridge applies. You say this wasnt yet possible in Cheyne. Co-issuance structures were made possible only after Cheyne as a result of a change in Irish law. Cheyne was two years ago. I understand from my telecon with Gregg and Jonathan Edge the other day that Sidleys have been fairly commonly asked to provide a USBoTO in SIV-projects. Acc to the market data available to me there are about 23 or 24 SIVs out there. I have identified 5 SIVs since Cheyne. One of them is Carrera. No USBoTO was given in Carrera. This leaves a maximum of 4 SIVs in respect of which Sidleys may have been involved/approached to give a USBoTO for co-issuance reasons. I cant remember exactly what Jonathans words were during my telecon with him and Gregg, but the impression which his words conveyed was such that I could reasonably assume that an USBoTO was given in respect of many more SIVs than just 4. Hence I think its unlikely that they were given as a result of the co-issuance structure. Please let me know what MSs reasons are for obtaining a USBoTO.
- Also: the info on which I still work today is that no notes will be co-issued in the foreseeable future. As far as I am aware MS have not yet found an investor in the US for the first round of notes - at least not one who requires notes to be co-issued. Hence, if you convince IKB that MSs primary reason for the USBoTO is the co-issuance structure then we should wait until the first co-issuance of notes - which will also give us time to find out whether the technical obstacles mentioned above have gone away.

3. Another opinion: why? As this is a US driven request and you mention internal legal advisers I presume Yurij has asked for this. I will touch base with him.

4. This week.

5. I will get in touch with Rhinebridgge LLC.

**Beste Grüsse,**

**Frank.**
**Frank Gärtner**

Solicitor, Rechtsanwalt
IKB Deutsche Industriebank AG
Bereich RV (Recht und Verträge)
RV2/Kapitalmarktrecht und Finanzprodukte
Wilhelm-Bötzkes-Straße 1
40474 Düsseldorf
Tel.: +49 (0) 211 8221 4748
mobile: +49 (0) 151151 06839
Fax.: +49 (0) 211 8221 2748

mailto: Frank.Gaertner@ikb.de
website: www.ikb.de

Rechtsform Aktiengesellschaft
Sitz Düsseldorf
Handelsregister Amtsgericht Düsseldorf B Nr. 1130
Vorsitzender des Aufsichtsrats: Ulrich Hartmann
Vorstand: Frank Braunsfeld, Volker Doberanzke, Markus Guthoff, Claus Momburg, Stefan Ortseifen
Diese E-Mail begründet keine Verpflichtung der IKB, es sei denn dies wäre durch schriftliche Vereinbarung mit dem Empfänger vereinbart.
This emails contents do not constitute a commitment by IKB, except where provided for in a written agreement between the bank and the recipient of this
message.

**From:** Valev, Iskren (FID) [mailto:Iskren.Valev@morganstanley.com]
**Sent:** Friday, April 13, 2007 6:01 PM
**To:** Gärtner@ms.com; Gärtner, Frank
**Cc:** Drennan, Gregg (FID)
**Subject:** various issues

Frank,

I would like to get an update on the various outstanding issues, opinion and indemnity discussions that have taken
place in the last 2 weeks.

1. Indemnities: Have you had the chance to review the revised indemnity language that was sent by Yurij? The mark-up
sent by Yurij reflects what all 3 dealers agreed on this week. If you have signed off, can you forward to Mayer Brown for
inclusion into the next draft of the management agreement.

2. How did your call with Mayer Brown on the US Trade or Business opinion go? Please let us know if you would like
Sidley tax lawyers to follow up with Mayer's tax lawyers, as far as I know such conversation never happened because
John Organ from Mayer Brown never returned Sidley's calls.

3. I have been asked by our internal and external counsel for a Blue Sky Opinion/Analysis for the paper sold in US. This
is an analysis showing that the private placement of US CP and co-issued MTN and capital notes sold in US to US
persons does not violate any US State Security Laws and is pretty typical for private placement deals in US. Can you
follow up with Mayers on that.

4. We are expecting the next draft of the transaction documents, have you heard back from Mayers?

5. I sent you and Alan Geraghty an e-mail yesterday about the documents that our NY short term desk requires to set
up trading accounts with Rhinebridge. It turned out that they need the Patriot Act docs (W9, Article of Incorporation, List
of Board of Directors)  for the US entity Rhinebridge LLC. I wasn't sure if Alan is the right person to ask for these
docs, did you forward the request to the person who set up the US entity?


Thank you and have a good weekend,


**Iskren Valev - Vice President**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7800
Mobile: +44 77859-70693
Iskren.Valev@morganstanley.com

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation.  Morgan Stanley may deal
as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers.  This is not research and is not from

MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com /servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com /servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com /servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com /servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

TAB 5

**From:** Guadagnuolo, Lapo
**Sent:** Wednesday, August 30, 2006 1:21 PM
**To:** Van Acoleyen, Katrien
**Subject:** FW: IKB termsheet blackline

Katrien,

this is another SIV that has come through. It is the same MS team now helping out IKB to set up a SIV as they did for Cheyne. MS came to use something like 2-3 months ago for informal/initial chat about it.

Now they have just sent the op man and termsheet blacklined against Cheyne SIV. Myself and Perry will have a call with MS and IKB next week.

Lapo

---

**From:** Rajiyah, Anushka (FID) [mailto:Anushka.Rajiyah@morganstanley.com]
**Sent:** 30 August 2006 09:55
**To:** Guadagnuolo, Lapo
**Cc:** Drennan, Gregg (FID); Moubarak, Rany (FID)
**Subject:** IKB termsheet blackline

Hi Lapo,

PLease find attached the blackline to Cheyne

Thanks

**Anushka Rajiyah**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-3061
Mobile: +44 77299-77005
Fax: +44 20 7677-3454
Anushka.Rajiyah@morganstanley.com

---

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

**Highly Confidential - Attorneys Eyes Only**

TAB 6

From: Guadagnuolo, Lapo
Sent: Wednesday, December 06, 2006 7:01 PM
To: Mccabe, Stephen
Subject: Re: Cheyne-IKB SIV

Oh, yes!
-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Mccabe, Stephen <Stephen_Mccabe@standardandpoors.com>
To: Guadagnuolo, Lapo <Lapo_Guadagnuolo@standardandpoors.com>
Sent: Wed Dec 06 23:55:42 2006
Subject: RE: Cheyne-IKB SIV

The fat guy!!!!!!

-----Original Message-----
From: Guadagnuolo, Lapo
Sent: Thursday, 7 December 2006 10:55 AM
To: Mccabe, Stephen
Subject: Re: Cheyne-IKB SIV

Well, you know with these guys.....as soon as possible, preferably yesterday!!

Thinking of having to listen to that Gregg guy again.....makes me very happy!!

Who's Remi?
-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Mccabe, Stephen <Stephen_Mccabe@standardandpoors.com>
To: Guadagnuolo, Lapo <Lapo_Guadagnuolo@standardandpoors.com>
Sent: Wed Dec 06 23:46:51 2006
Subject: RE: Cheyne-IKB SIV

Makes perfect sense as usual - what is the timing?
Obviously have the initial meetings with Greg and Remi and I will fill Anthony in on the approach we took.

Stephen

| From: | Guadagnuolo, Lapo |
|---|---|
| Sent: | Thursday, 7 December 2006 12:13 AM |
| To: | Mccabe, Stephen |
| Subject: | FW: Cheyne-IKB SIV |

Hi Stephen,

Does the below make sense to you? Morgan stanley (the guys of Cheyne SIV) wants to do another SIV where the manager is now IKB. I gave them preliminary comments on the termsheet which is blacklined against Cheyne and they are asking who from modelling side we have.

I thought you should be involved again but use this vehicle to introduce Anthony to the beauty of SIV world.

Morgan Stanley is telling me that they want to the same as Cheyne SIV but they are already talking about some tweaks to the simulation for the capital notes that they did...as they'd like to get senior capital notes rated higher than A...I made clear to them that it is not just about modelling...but you know these guys...

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0082508**

Let me know what you think.

Cheers
Lapo

_____

From:       Inglis, Perry
Sent:       06 December 2006 12:56
To:         Guadagnuolo, Lapo
Subject:    RE: Cheyne-IKB SIV

OK - check with Stephen re workload but I think your suggestion makes sense

-----Original Message-----
From:       Guadagnuolo, Lapo
Sent:       06 December 2006 12:51
To:         Inglis, Perry
Subject:    RE: Cheyne-IKB SIV

Sorry sorry I meant the MS-IKB, my mistake.

For the Cheyne one we had a preliminary call yesterday and honestly it looks a very complicated to I think she suggested Seb.

_____

From:       Inglis, Perry
Sent:       06 December 2006 12:45
To:         Guadagnuolo, Lapo
Subject:    RE: Cheyne-IKB SIV

can you please check with Cristina - I think she has already allocated - and yes I recall that she was suggesting getting Anthony involved. In fact I thought you responded to her to clarify that it is closer to a SIV than a CDPC etc? no?

-----Original Message-----
From:       Guadagnuolo, Lapo
Sent:       06 December 2006 12:42
To:         Inglis, Perry
Subject:    Cheyne-IKB SIV

Hi Perry,

Who has been allocated to the new Cheyne-IKB SIV from the modelling side? Stephen worked on Cheyne and this IKB 'should' be very very similar. I thought this one would be a good one for Anthony to start on with obviously Stephen in the shadow.

What do you think?

Lapo

TAB 7

**Private and Confidential – Not to be Distributed Externally**

## Committee Memorandum
## IKB/MS/Rhinebridge – Capital Note notching calibration

| | |
|---|---|
| **Presenter:** | Angela Jung |
| **Committee Chair Person:** | Henry Tabe |
| **Committee Members:** | Henry Tabe, David Rosa, Fanny Lau, (Martin Rast) and Mark Abbott |
| | |
| **Committee Date:** | 14 February 2007 |
| **Transaction Committee:** | SIV |
| | |
| **SIV Name:** | **Rhinebridge** |
| **Arranger:** | **Morgan Stanley** |
| **Manager:** | **IKB** |

<u>**Specific Comments**</u> :

Purpose of the committee:

: Calibration of Rhinebridge's capital model to our Moody's standards

<u>**Monitoring Comments**</u> :

None.

## Committee Result

## Feed Back Required by the Committee

- Stress spread vol 2 times
- Around proposed target of WAL 5, leverage 10.6 portfolio quality Aa2, the committee is comfortable with 1 notch downgrade
- The committee requires IKB to notify moody's in case of any change occurs from the target proposed in this memo

1

MDYS RHNB 012021

Private and Confidential – Not to be Distributed Externally

## 1. Background

Rhinebridge is a SIV proposed to be set up and managed by IKB, and arranged by Morgan Stanley. IKB proposes to run the vehicle with target portfolio rating of Aa2, leverage 11.1 and Wal of 4.65 years.

IKB's capital model is identical to that of Cheyne's. Morgan Stanley proposes to update its rating transition matrix for IKB. However, this is not expected to change the end results of the simulation significantly.

The purpose of today's committee is to review the proposed capital model and calibrate this to our Moody's standards.

## 2. Model description

(The model description here closely follows the committee memo prepared by David Rosa in Dec 2006, with regard to Cheyne Funding Capital Model)

Morgan Stanley has developed a Monte Carlo simulator to rate the Senior Capital Notes (SCNs), Mezzanine Capital notes (MCNs) and Combination Capital Notes (Combo notes) following Moody's Capital Note Model paper.

However, the defeasance trigger is defined using Matrix Capital Adequacy instead of 50% NAV Loss.

In specific, the defeasance occurs in month n if

Portfolio Value (Mn) – Senior Notes – Amortised Costs (Mn) + Loss Reserve (Mn) <Portfolio Capital Requirement (Mn)

Capital requirements are function of the asset's industry, rating and WAL and equal to the multiplication of a generic haircuts by the liability maturity factor and by the capital requirements factor.

Generic Haircuts:

| Generic Haircuts | | |
|---|---|---|
|  | 42 months | 60 months |
| Aaa | 3.255 | 3.920 |
| Aa | 4.883 | 5.880 |
| A | 6.510 | 7.840 |
| Baa | 10.579 | 12.740 |
| Ba | 16.275 | 19.600 |

Liability maturity factor:

| WAL Senior Liabilities | Liability Maturity Factor |
|---|---|
| 6 months | 0.99 |

Capital Requirements factor for each asset category:

2

MDYS RHNB 012022

**Private and Confidential – Not to be Distributed Externally**

| | | | Capital Requirements Factor | | | | |
|---|---|---|---|---|---|---|---|
| | CDO | CMBS | Credit Cards | Auto Loans | RMBS | Student Loans | HEL |
| Aaa | 1.60 | 1.0 | 0.75 | 0.85 | 0.75 | 0.75 | 0.90 |
| Aa | 1.60 | 1.0 | 0.75 | 0.85 | 0.75 | 0.75 | 0.90 |
| A | 1.60 | 1.0 | 0.75 | 1.00 | 0.75 | 0.75 | 1.00 |
| Baa | 2.50 | 1.0 | 1.00 | 1.25 | 1.00 | 1.00 | 1.25 |
| Ba | 2.50 | 1.0 | 1.30 | 1.50 | 1.00 | 1.00 | 1.50 |

As pointed out in David's previous memo, the main drawbacks of the current proposal are that
- Only broad category ratings states have been modelled (i.e. Aaa, Aa, A, Baa rather than Aaa, Aa1, Aa2, Aa3 and so forth) for Spread and Transition;
- No wind down upon defeasance is modelled – i.e. loss upon defeasance is assumed to be equal to trigger level. (MS is currently working on a version of the model that will model the liquidation process taking into account the senior liability maturity profile and a specified order of sale, but this is currently **not available**.)

The MS model hasn't changed in great deals since Cheyne. The Market Value of portfolio is simulated monthly during 10 year simulation period (i.e. 120 periods).

- The Market value of the portfolio is simulated monthly using Moody's ratings transition tables. In detail,
  1) Adjust Moody's standard 5 year tables to remove the effect of withdrawn ratings treating everything below B as defaulted
  2) Given the 5 years historical tables, compute yearly tables by using a compounding method.
  3) Then replace the default figures by the 1 year Moody's idealised default rates making sure when compounding this 1 year table to 5 and 10 years, the default rates are higher than the 5 and 10 years Moody's idealised numbers, respectively.
  => Therefore, the default figures are more conservative than the Moody's idealised numbers.
*The fact that the simulated defaults by construction are higher than our idealised default rates is a conservative method that offsets the non-modelling of intermediate rating states.*

- Credit spread process is captured using a simplified Mean Reversion process

- Spread volatility used in model – MS model a single spread process for a given rating and industry category *irrespective of maturity*, implying that they only have simple spread volatility for a given rating and industry category. Even if the proposed capital matrix has different inputs for different maturities, they only use the 5-year maturity point to feed into the simulation model.
*Given that the expected WAL is in the 3-5 year region, the 5 year assumption seems conservative enough.*

- Conservative correlation assumptions for credit spreads (60% pair wise) and transitions (20% pair wise) are made due to lack of data availability.


**Recommendation:**

Accept the model

3

MDYS RHNB 012023

**Private and Confidential – Not to be Distributed Externally**

### *3. Calibration of MS's model to GAIA*

The proposed representative portfolio by Rhinebridge is as following:

Number of assets: 152
WAL of assets: 5 years
Leverage: 10.64
WAL of liabilities: 0.5 years (6 months)
Target portfolio Quality: Aa2 (WARF 20)

Concentrations:

| | |
|---|---|
| cdo | 22% |
| cmbs | 14% |
| credit_cards | 1% |
| hel | 50% |
| rmbs | 13% |
| Grand Total | 100% |

Simulation Inputs:

| | |
|---|---|
| Normal/Restricted Investments | Normal |
| Liquidation Process | All at Once |
| Number of Simulation Paths | 10,000 |
| Length of Simulations (years) | 10 |
| Periodicity (months/year) | 12 |
| Random Seed | 16 |
| Spread Correlation | 60% |
| Transition Correlation | 20% |
| Portfolio Size | 2,500,000,000 |
| Portfolio Spread | 34.0 bps |
| Running Reserve | - |

Capital Structure:

| | Size | % of Structure | Spread |
|---|---|---|---|
| Senior Notes | 2,265,000,000 | 90.60% | .30 bps |
| SCN | 100,000,000 | 4.00% | 50 bps |
| MCN | 110,000,000 | 4.40% | 100 bps |
| JCN | 25,000,000 | 1.00% | bps |

We have asked MS to run a number of simulations so that we could capture the sensitivity of their model to the changes of

- Leverage (8 times, 10.64 times, 11.1 times);
- WAL of asset (4 years, 5 years, 5.25 years);
- Portfolio Quality (Aa1 – WARF 10, Aa2 – WARF 20, Aa3 – WARF 40)

In addition, we asked to stress the spread volatility of MS model to 1.5 times, 2 times and 2.5 times. As discussed in the previous committee, the 2 times stress seems most appropriate.

4

MDYS RHNB 012024

**Private and Confidential – Not to be Distributed Externally**

Presented below are the comparisons of GAIA and MS's model runs for the stated combination of WAL/Leverage and Portfolio quality for spread vol stress 2 times and 2.5 times. The 1.5 times stress results are attached on the back of this committee memo.

5

MDYS RHNB 012025

**Private and Confidential – Not to be Distributed Externally**

Presented below are the summary of notching differences between GAIA and IKB's model where the stress vol = 2 times.

| | WAL 4 | | | WAL 5 | | | WAL 5.25 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Aa1 | Aa2 | Aa3 | Aa1 | Aa2 | Aa3 | Aa1 | Aa2 | Aa3 |
| Leverage 8 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | -1 |
| Leverage 10.6 | 1 | 1 | 0 | -2 | -1 | 0 | -1 | 0 | 1 |
| Leverage 12.5 | 0 | 0 | 0 | 0 | 1 | 3 | 1 | 1 | 3 |

**Recommendation:**

Start with 10.64 Leverage, WAL of 5 years, Portfolio Aa2. We notch down MS's rating by 1 given that this then produces the identical rating as GAIA's.

Now, there could be 2 possible broad departures from the target –

- The vehicle improves either by
  1) Improving the portfolio quality
  2) Lowering the Leverage
  3) Shortening the WAL

**Recommendation:**

⇨ The MS model gives more generous ratings benefit to any of the listed improvement above, compare to GAIA
⇨ However, in this case, Moody's doesn't need to comply with it (i.e. unchanged capital note rating). In any sense if we feel compelled to upgrade their capital note ratings, only do so by moderate sense according to the GAIA result in each case.

- Now, there can be another scenario where the vehicle is running in aggressive manner by
  1) Lowered portfolio quality
  2) Higher Leverage
  3) Longer WAL

**Recommendation:**

⇨ MS penalises the capital note rating more severely than GAIA, implying that at any rate, IKB will recognise the risks of running the vehicle in aggressive manner before GAIA detects it.
⇨ Therefore, we could be comfortable without having to notch their results at any rate given the fact that MS model produces more conservative capital ratings.

6

MDYS RHNB 012026

**Private and Confidential – Not to be Distributed Externally**

**Appendix:**

Comparison of results: GAIA vs MS capital Model with spread volatility stressed at 1.5 times

**WAR = Aa1    Aa1**

| Leverage | Wal | SCN | *GAIA* Combo | PD | SCN | MCN | Vol Stress = 1.5 Combo | PD |
|---|---|---|---|---|---|---|---|---|
| 8 | 4 | Aaa+ | Aa1+ | 0.00% | Aaa | Aa1+ | A1 | 0 |
| 10.6 | 4 | Aaa+ | Aa3 | 0.36% | Aaa | Aa1+ | A1- | 0.0001 |
| 12.5 | 4 | Aaa+ | A2- | 1.60% | Aaa | Aa2+ | A1- | 0.0019 |
| 8 | 5 | Aaa | Aa3- | 0.48% | Aaa | Aa1 | A2+ | 0.00% |
| 10.6 | 5 | Aa1 | Baa1 | 3.04% | Aaa | Aa2+ | A2 | 0.07% |
| 12.5 | 5 | Aa2- | Baa3 | 6.84% | Aaa | A2 | A3 | 1.08% |
| 8 | 5.25 | Aaa+ | A1+ | 0.60% | Aaa | Aa1 | A2+ | 0 |
| 10.6 | 5.25 | Aa1 | Baa1- | 3.76% | Aaa | Aa2 | A2 | 0.13% |
| 12.5 | 5.25 | Aa1 | Baa3 | 7.16% | Aaa | Baa1 | Baa1 | 0.0248 |

**WAR = Aa2    Aa2**

| Leverage | Wal | SCN | *GAIA* Combo | PD | SCN | MCN | Vol Stress = 1.5 Combo | PD |
|---|---|---|---|---|---|---|---|---|
| 8 | 4 | | *Aa3+* | | Aaa | Aa1 | A1- | 0.00% |
| 10.6 | 4 | Aaa+ | A1 | 0.72% | Aaa | Aa1 | A2+ | 0.08% |
| 12.5 | 4 | Aaa+ | A3- | 0.026 | Aaa | Aa3 | A2 | 0.65% |
| 8 | 5 | Aaa | A2+ | 1.16% | Aaa | Aa1 | A2 | 0.00% |
| 10.6 | 5 | Aa2 | Baa2 | 4.92% | Aaa | Baa2- | A3+ | 0.25% |
| 12.5 | 5 | Aa3 | Ba1+ | 9.96% | Aaa | Baa2- | Baa2- | 5.07% |
| 8 | 5.25 | | *A2* | | Aaa | Aa1 | A2 | 0.00% |
| 10.6 | 5.25 | Aa1 | Baa2 | 5.24% | Aaa | A1- | A3 | 0.77% |
| 12.5 | 5.25 | | *Ba2-* | | Aaa | Ba1 | Baa3- | 10.17% |

**WAR = Aa3**

| Leverage | Wal | SCN | *GAIA* Combo | PD | SCN | MCN | Vol Stress = 1.5 Combo | PD |
|---|---|---|---|---|---|---|---|---|
| 8 | 4 | | *Aa3* | | Aaa | Aa1 | A1- | 0.00% |
| 10.6 | 4 | Aaa | A2 | 1.40% | Aaa | Aa2+ | A2+ | 0.17% |
| 12.5 | 4 | | *Baa2-* | | Aaa | A2 | A3 | 2.46% |
| 8 | 5 | Aa1 | A2 | 1.56% | Aaa | Aa1 | A2 | 0.00% |
| 10.6 | 5 | Aa2- | Baa3+ | 6.68% | Aaa | A2 | A3 | 1.31% |
| 12.5 | 5 | Aa3 | Ba1- | 13.36% | Aaa | Ba1- | Ba1 | 17.93% |
| 8 | 5.25 | | *A3+* | | Aaa | A1- | A2 | 0.01% |
| 10.6 | 5.25 | Aa1 | Baa3 | 7.56% | Aaa | Baa1 | Baa1- | 3.06% |
| 12.5 | 5.25 | Aa2 | Ba2+ | 14.16% | Aaa | Ba3 | Ba2- | 29.25% |

TAB 8

## PRELIMINARY DISCUSSION
## RATING CAPITAL NOTES HIGHER THAN SINGLE-A



Date: 13-Feb-07
Attendees: LG, PI, KVA, CP, SMc, NK

**BACKGROUND**

Morgan Stanley is teaming up with IKB Deutsche Industriebank, the manager, to set up RhineBridge PLC, a new SIV. This SIV will be very close in terms of assets and strategy to Cheyne SIV, the other Morgan Stanley arranged SIV, closed in Aug. 2005. Like Cheyne SIV, the senior notes will be rated with a capital charge matrix, whereas the model for capital notes is based on a simulation model.

The main difference is that while Cheyne has a three tier capital structure (Senior notes (AAA/A-1+); Mezz capital notes (A), and Juniot capital notes (NR)), RhineBridge wants to have senior capital notes rated AAA junior to the senior notes and senior to the mezzanine capital notes.

The AAA rating will speak to ultimate interest and principal. They are aware that we might need to call them "Deferrable" as we would do in other SF areas.

A very rough estimate of the capital structure is as follows

        AAA/A-1+ MTNs/CPs = 91%
        AAA cap notes = 3.5%
        A cap notes = 4.5%
        NR Income notes = 1%
        Leverage to Senior Notes = 10.11
        Leverage to AAA cap notes = 17.18

As a comparison, Cheyne SIV (at almost 9.6bn of assets) is

        AAA/A-1+ MTNs/CPs = 93%
        A cap notes = 6%
        NR Income notes = 1%
        Leverage to Senior Notes = 13.28

We have seen the model and commented upon that. Stephen can give more colour but this committee is to focus on the feasibility.

**STATUS QUO IN SIVs AND SOME CONSIDERATIONS**

- Up to now, we have a qualitative cap for capital note rating in SIV at A-flat.

- From a pure quantitative/modeling point of view, we all know that capital notes (expecially the ones with a first loss piece underneath) can easily be rated above A-flat. Looking at the tranching above, you can clearly see that almost half of the RhineBridge AAA cap notes could be rated AAA (as Cheyne, which is not among the most levered SIVs, has 93% of Senior notes). However, RhineBridge has 91% of AAA/A-1+ senior notes. In other words, these are like Junior senior notes, hence with lower stability.

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0019955**

- If I am not mistaken, 3 years ago we could have rated Sigma notes at AA level from the model, but we decided not to. Those were not first loss piece as there was a trapping mechanism. RhineBridge will have "true" subordination from the mezzanine and the income notes.

- It is also true that we (and the most experienced managers) want to see capital note ratings very stable. Since we insist on this for A rated capital notes, we should be even more worried about that for a AAA rating and require a "rating volatility" buffer, which up to now has been on a voluntary basis, among other things

We have seen the model and commented upon that. Stephen can give more colour but we

PRELIMINARY THOUGHTS
- One reason why we cap the rating of capital notes at A is the presence of other 'soft' defeasance events and assumptions of the management behaviour (like the fact that the pool will stay the same for the life of the vehicle) for loss in no defeasance. Now, this is not even an experienced SIV manager.

- My starting point is that to give a AAA rating to capital notes, these notes should pass the same tests for the senior notes (also the obligor limits compared to NAV, to cover from idionsicratic risk). If they could pass AAA tests, then we should not even worry about operational/management risk/soft issues, as we would assume defeasance occurs today, as we do for senior notes. If not, we have to discuss the operational risk issue as above.

- we have to think about the market reaction and whether we want to be doing this with a new manager.

- are we against subordinated paper being rated AAA from a rating policy point of view?


PREVIOUS COMMENTS FROM EMAILS
Q: They can model defeasance and remain at the end of defeasance with the capital notes' notional and their acrrued interest?
A: Let's assume they can.

Q: In defeasance , they do not pay coupon and rating will address deferred and ultimate coupon and principal?
A: Yes, we go with the assumption that ANY capital notes cannot receive anything in defeasance, hence if they have a long MTN, they will have to wait for it to be paid. At the end of the day, let's not forget the capital structure compared to Cheyne above.

**Highly Confidential - Attorneys Eyes Only**                    **S&P-IKB 0019956**

TAB 9

HIGHLY CONFIDENTIAL

```
 1            UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF NEW YORK
   --------------------------------
 3  KING COUNTY, WASHINGTON        )
 4  Individually and on Behalf of All) Civil Action No.
    Similarly Situated,            ) 1:09-cv-08387-SAS
 5                Plaintiff,        ) Others
 6  vs.                            ) CLASS ACTION
 7  IKB DEUTSCHE INDUSTRIEBANK AG,  )
    et al.,                        )
 8                Defendants.       )
   --------------------------------
 9  IOWA STUDENT LOAN LIQUIDITY     ) Civil Action No:
10                                 ) 1:09-cv-08822-SAS
11  CORPORATION, Individually and on )
    Behalf of All Others Similarly  )
12  Situated,                      )
                  Plaintiff,        ) CLASS ACTION
13  vs.                            )
14  IKB DEUTSCHE INDUSTRIEBANK, AG, )
    et al.,                        )
15                Defendants.       )
   --------------------------------
16
17                HIGHLY CONFIDENTIAL
18
19      VIDEOTAPED DEPOSITION OF LAPO GUADAGNUOLO
20    taken at taken at 70 Fleet Street, City of London,
21    UK, Thursday, November 17, 2011, commencing at
22    10:04 a.m., before AILSA WILLIAMS, Accredited
23    LiveNote Reporter.
24
25    PAGES 1 - 195
```

HIGHLY CONFIDENTIAL

Page 42

1  refer to senior notes we will both understand that you   11:00:48
2  are talking about the commercial paper and the MTNs.  Is   11:00:51
3  that correct?   11:00:55
4       A   That is fair, yes.   11:00:55
5       Q   What rating did the senior notes receive   11:01:02
6  from Standard & Poor's in the Rhinebridge SIV?   11:01:05
7       MR. RINGEL:  Objection to form, compound.  You   11:01:09
8  may answer.   11:01:11
9       A   The rating that we gave to the senior   11:01:15
10  notes, by senior notes meaning the senior MTNs, was AAA,   11:01:19
11  whereas the rating to the CP was A1 plus.   11:01:25
12       Q   And, as Standard & Poor's defines those   11:01:37
13  ratings, the A1 plus rating indicates a high expectation   11:01:41
14  of full recovery.  Is that correct?   11:01:47
15       MS KAMISON:  Objection.   11:01:51
16       MR. RINGEL:  Object to the form.   11:01:52
17       A   The A1 plus definition would be defined   11:01:55
18  as -- again, I don't have the specific definition but it   11:02:00
19  would refer to high level of creditworthiness.   11:02:04
20       Q   What do you mean by "high level of   11:02:29
21  creditworthiness"?   11:02:31
22       A   Clearly ratings, if you take a step back,   11:02:37
23  are relative measures, so an A1 plus level of   11:02:41
24  creditworthiness would be relatively higher than an A1   11:02:45
25  with a short-term rating space, and by

Page 43

1  "creditworthiness" we generally refer to the ability and   11:02:51
2  willingness of the issuer to make repayments of its   11:02:58
3  obligation in a timely and full manner.   11:03:03
4       Q   What is the meaning that Standard & Poor's   11:03:45
5  ascribes to the AAA rating that the MTNs were given?   11:03:50
6       A   For AAA it is the same, meaning that I   11:04:00
7  told you about the A1 plus, but it is the rating that is   11:04:03
8  used for the long-term rating spectrum.   11:04:07
9       Q   On the A1 plus rating, the plus is --   11:04:21
10  strike that.  What is the plus?  What does that connote?   11:04:24
11       MR. RINGEL:  I am assuming you are asking the   11:04:34
12  last question:  "What does that connote?"   11:04:36
13       A   Yes.   11:04:38
14       A   I guess the plus is -- I think the name of   11:04:39
15  it, the actual technical name of it is the modifier,   11:04:42
16  which we usually use in rating scales to denote a rating   11:04:47
17  that is higher than the one that does not have the plus.   11:04:53
18       Q   So A1 and A1 plus -- strike that.  How   11:05:00
19  does Standard & Poor's concede the difference in this   11:05:14
20  case then between an A1 and an A1 plus rating for   11:05:16
21  commercial paper?   11:05:21
22       MR. RINGEL:  Objection to form.  You may   11:05:25
23  answer.   11:05:26
24       A   I guess for in this case short-term   11:05:31
25  obligations that we consider to have a higher

Page 44

1  creditworthiness of an A1 issuance, if it is a higher   11:05:41
2  creditworthiness, we would tend to use the A1 plus to   11:05:49
3  denote that higher creditworthiness.   11:05:53
4       Q   And for short-term commercial paper the A1   11:06:03
5  plus is the highest rating that Standard & Poor's   11:06:06
6  provides, is that correct?   11:06:12
7       A   It is the highest rating in the short-term   11:06:14
8  rating scale, yes.   11:06:16
9       Q   In doing the rating process for the   11:06:49
10  Rhinebridge SIV, Standard & Poor's analyzed certain   11:06:52
11  risks against its criteria in order to establish the   11:06:56
12  rating.  Is that correct?   11:07:02
13       A   What I would say, in rating the   11:07:09
14  Rhinebridge SIV, we would have looked at the risks or   11:07:11
15  factor of risks that we would consider in our criteria.   11:07:20
16       Q   When you say "factor of risks," as you did   11:07:30
17  in your answer, what do you mean by that?   11:07:32
18       A   What I meant by that is that there are, as   11:07:36
19  we say in our criteria, areas of risk that we look at,   11:07:39
20  and they would be defined as generically credit risk,   11:07:45
21  market risk, liquidity risk.  These are the main ones   11:07:51
22  that I can think of.   11:07:58
23       MR. CAPUTO:  Let's go off the record.   11:07:59
24       THE VIDEOGRAPHER:  Going off the record.  The   11:08:45
25  time is 11:07.

Page 45

1       (A short break).   11:08:52
2       THE VIDEOGRAPHER:  Back on the record.  The   11:21:09
3  time is 11:20.   11:21:10
4       MR. CAPUTO:  I neglected to ask you, regarding   11:21:15
5  your review in preparation for this deposition, whether   11:21:17
6  you reviewed the operations manual for the Rhinebridge   11:21:21
7  SIV.   11:21:25
8       A   No, I didn't.   11:21:28
9       Q   Did you review the termsheet for the   11:21:30
10  Rhinebridge SIV?   11:21:33
11       A   No.   11:21:37
12       Q   Did you review the operations manual for   11:21:38
13  the Cheyne SIV in preparation for this deposition?   11:21:41
14       A   No.   11:21:47
15       Q   Did you review the termsheet for the   11:21:48
16  Cheyne SIV for this deposition?   11:21:51
17       A   No.   11:21:52
18       (Exhibit P275 marked for identification).   11:22:18
19       Q   I am marking as Exhibit 275 to this   11:22:19
20  deposition a document with the Bates number S&P-IKB   11:22:24
21  0029582 through 605, and I am marking as Exhibit 276 a   11:22:30
22  document with the Bates number S&P-ADCB  0062675 through   11:22:52
23  693.   11:23:09
24       (Exhibit P276 marked for identification)   11:23:10
25       What are Exhibits 275 and 276?

12 (Pages 42 to 45)

HIGHLY CONFIDENTIAL

Page 46

1    MR. RINGEL:  Objection to form, compound.  You    11:23:47
2    may answer.                              11:23:48
3        A    The 275, as the title says, is the    11:23:51
4    "Criteria for SIVs".  The 276 says:  "Redevelopments of    11:23:55
5    that criteria.                           11:24:03
6        Q    So Exhibit 276 is a supplement to Exhibit    11:24:08
7    275.  Is that correct?                    11:24:13
8        MR. RINGEL:  Objection to form.  You may    11:24:14
9    answer.                                  11:24:16
10       A    Yes, I mean, supplement is -- I would call    11:24:19
11   it more an extension.  It touches on things that were    11:24:23
12   not discussed in the first criteria and I think it    11:24:26
13   clarifies others.                         11:24:34
14       Q    In the rating process for the Rhinebridge    11:24:37
15   SIV, these two documents were considered together as the    11:24:40
16   criteria for your rating evaluation.  Is that right?    11:24:46
17       MR. RINGEL:  Objection to form.  You may    11:24:50
18   answer.                                  11:24:51
19       A    In rating Rhinebridge SIVs we would have    11:24:53
20   used the general SIV criteria and those would have been    11:24:56
21   the two main documents.                  11:24:58
22       Q    And these same criteria were used to rate    11:25:03
23   the Cheyne SIV, is that right?           11:25:08
24       MR. RINGEL:  Objection to form.  You may    11:25:10
25   answer.

Page 47

1        A    Again, that would have been two of the    11:25:11
2    main documents that we looked at for Cheyne as well.    11:25:15
3        Q    I am trying to understand whether we have    11:25:22
4    the universe of criteria for the SIV rating of    11:25:24
5    Rhinebridge in Exhibits 275 and 276.  In that regard, do    11:25:31
6    we?                                       11:25:37
7        MR. RINGEL:  Objection to form.  You may    11:25:39
8    answer.                                  11:25:40
9        A    These would be, yes, the main that I would    11:25:42
10   refer to as criteria for SIVs.  I believe there was    11:25:45
11   another paper generally for SIV criteria, in particular    11:25:47
12   for the capital notes.                    11:25:51
13       Q    What is the other paper you are referring    11:25:53
14   to.                                       11:25:54
15       A    I don't recall the name.  I think it is    11:25:57
16   called "Rating of capital notes of SIVs", something like    11:25:59
17   that.                                     11:26:03
18       Q    When was that published?         11:26:05
19       A    I believe that could have been 2005, if I    11:26:11
20   am not mistaken.                          11:26:13
21       Q    In the prerelease publication of the    11:26:19
22   ratings for the Rhinebridge SIV, Exhibits 275 and 276    11:26:30
23   alone are mentioned.  Was that an oversight?  Should    11:26:36
24   there have been something else mentioned as criteria?    11:26:41
25       MR. RINGEL:  Objection to form.

Page 48

1        A    I believe we have used part of the concept    11:26:50
2    in rating the capital which is in the rating capital    11:26:55
3    notes criteria paper.  I can't remember -- if you are    11:26:59
4    telling me that it was not in the related articles, that    11:27:06
5    I cannot tell you.                        11:27:10
6        Q    In a number of references in    11:27:24
7    Standard & Poor's documents regarding the rating of the    11:27:31
8    Rhinebridge SIV it is referred to as a "Cheyne copycat".    11:27:38
9    Do you have an understanding what that means?    11:27:44
10       MR. RINGEL:  Objection to form, foundation.    11:27:46
11       A    I remember that is a term that I would    11:27:50
12   have used just simply to say that in a number of aspects    11:27:54
13   that yes, it is fair to say that the Rhinebridge was    11:27:59
14   similar to Cheyne.                        11:28:00
15       Q    When you say -- strike that.  I am marking    11:28:48
16   as Exhibit 277 a one page document, Bates S&P-IKB    11:29:45
17   0013239.                                 11:29:50
18       (Exhibit P277 marked for identification)    11:29:52
19       This is an e-mail chain from you, and the last    11:30:22
20   e-mail, Mr. Guadagnuolo, is to Katrien Van Acoleyen.    11:30:26
21       A    That is right.                  11:30:35
22       Q    And who is she?                 11:30:37
23       A    She is a colleague at S&P.        11:30:39
24       Q    What is her position?           11:30:41
25       MR. RINGEL:  You are asking as of 2007 or now?

Page 49

1        Q    I am asking as of the date of this e-mail.    11:30:47
2        A    Okay.  I believe her position, I think she    11:30:50
3    was a director at that time.              11:30:54
4        Q    Did she work with you on the rating of the    11:30:59
5    Rhinebridge SIV?                          11:31:02
6        A    Going back to what I was testifying    11:31:05
7    before, I wouldn't necessarily say that she was directly    11:31:07
8    involved in the rating of the Rhinebridge.  She was part    11:31:10
9    of what I would have called the SIV team in general, the    11:31:13
10   SIV team.                                 11:31:17
11       Q    In the second paragraph you state:  "Now    11:31:18
12   they have sent the op man and termsheet blacklined    11:31:23
13   against Cheyne SIV."  Does "op man" mean operations    11:31:29
14   manual?                                   11:31:35
15       A    That is correct.                 11:31:37
16       Q    And when you say "blacklined", what do you    11:31:38
17   mean by that?                             11:31:41
18       A    I guess blacklined, it is the jargon to    11:31:44
19   say that they presented something for the Rhinebridge    11:31:47
20   highlighting what were the differences with the Cheyne    11:31:53
21   SIV structure.                            11:31:56
22       Q    So if I understand your answer, they took    11:31:59
23   the operations manual and termsheet from Cheyne and then    11:32:02
24   made some changes to it and forwarded that to you as the    11:32:06
25   initial draft for the Rhinebridge SIV.  Is that correct?

13 (Pages 46 to 49)

HIGHLY CONFIDENTIAL

Page 58

1   manager operates the vehicle that in case were to be   11:48:20
2   breached, they would trigger some operation, some type   11:48:26
3   of operation, like limited operation or limited   11:48:32
4   investments or restricted funding, which are not in and   11:48:39
5   of itself let's say a concern or an issue for the senior   11:48:39
6   notes but they could be for the capital notes, and so   11:48:42
7   some of those tests, some of these operations can be   11:48:48
8   triggered or breached not necessarily quantifiable   11:48:52
9   things but more, as I said, operational elements or   11:48:57
10  manager behaviour in some cases, and we would not feel   11:49:02
11  comfortable to make assumptions on those factors for   11:49:06
12  ratings as high as AAA and AA.  We would not be   11:49:10
13  comfortable to make our own assumptions on how those   11:49:14
14  tests and operations should behave for not higher than in   11:49:16
15  single A creditworthiness level.   11:49:22
16       Q   On the second page of this exhibit you   11:49:25
17  say: "One reason why we capped the rating of capital   11:49:27
18  notes at A is the presence of other soft defeasance   11:49:30
19  events."  What do you mean by "soft defeasance events"?   11:49:34
20       A   Sorry, tell me where you are reading?   11:49:38
21       Q   Under "Preliminary thoughts", on the   11:49:43
22  second page.   11:49:45
23       A   Yes.  So this for example would be an   11:50:01
24  example what I am talking about, which is exactly that   11:50:04
25  when you look at capital notes sometimes we have to make

Page 59

1   assumptions of whether the pool is going to change   11:50:13
2   dramatically over the life of the vehicle or not, and   11:50:17
3   since for capital notes themselves we wouldn't   11:50:24
4   necessarily make assumptions that the pool can   11:50:26
5   dramatically change from one day to the other, and this   11:50:29
6   is a qualitative, you can call it a qualitative position   11:50:34
7   that we take, that statement, we wouldn't be happy to   11:50:37
8   make it for AAA and AA levels, so that is exactly an   11:50:40
9   example of management behaviour linked to defeasance,   11:50:44
10  which is an operational mode which I was discussing   11:50:47
11  before.   11:50:52
12       Q   In this case you make note that the   11:50:58
13  manager here is not -- and the managers is IKB CAM, is   11:51:01
14  that correct?   11:51:06
15       A   Sorry, yes, "the managers", I would have   11:51:07
16  referred to IKB, yes.   11:51:10
17       Q   And you indicate IKB CAM is not an   11:51:11
18  experienced manager, is that correct?   11:51:14
19       MS KAMISON:  Objection.   11:51:18
20       MR. RINGEL:  Object to the form.   11:51:19
21       A   I am saying that it is not an experienced   11:51:20
22  SIV manager, which is a fair statement because that was   11:51:22
23  the first SIV that they were intending to manage.   11:51:25
24       Q   And how did the fact that this was the   11:51:32
25  first SIV that IKB CAM was going to manage affect your

Page 60

1   view regarding the ratings of the Rhinebridge SIV?   11:51:44
2       A   It is something that we did take into   11:51:56
3   consideration and, for example, this is a clear example   11:51:58
4   that the reason why we would have not been comfortable,   11:52:01
5   among other things, of not rating the capital notes   11:52:08
6   higher than single A in the general scheme of things,   11:52:15
7   one thing would have been the fact that the manager was   11:52:15
8   not an experienced manager in managing an SIV vehicle.   11:52:18
9       Q   I would like you to go back to Exhibit   11:52:50
10  275.  You previously mentioned there are areas of risk   11:52:52
11  that Standard & Poor's assesses in the rating process of   11:53:11
12  SIVs, and in particular the Rhinebridge SIV, and I   11:53:15
13  believe one of the areas of risk you mentioned is credit   11:53:20
14  risk.  Is that correct?   11:53:22
15       MR. RINGEL:  Objection to form.  You may   11:53:23
16  answer.   11:53:25
17       A   I think, as I was saying, there are   11:53:28
18  factors that we looked at, and the credit in that case I   11:53:29
19  guess I suppose the credit risk, the credit risk of the   11:53:34
20  portfolio would have been considered as one of the   11:53:38
21  factors.   11:53:40
22       Q   Look at page ending in Bates number 583 of   11:53:44
23  Exhibit 275.  At the left-hand column, towards the   11:53:51
24  bottom, there is a heading "Credit risk".  That is the   11:53:58
25  same credit risk you are talking about, is that correct?

Page 61

1       A   Can I just read that part?   11:54:05
2       Q   Sure.   11:54:10
3       A   Yes, this talks a bit, it is a larger   11:54:34
4   concept but it does touch upon the credit risk of the   11:54:36
5   assets that I was mentioning.   11:54:39
6       Q   In looking at the credit risk, I am sorry,   11:54:56
7   in the Rhinebridge SIV, what did Standard & Poor's   11:55:03
8   specifically address?   11:55:07
9       MR. RINGEL:  I am sorry, may I have that read   11:55:11
10  back, please.   11:55:13
11       MR. CAPUTO:  Isn't it on your screen?   11:55:16
12       MR. RINGEL:  Yes.  I want to make sure I know   11:55:17
13  what the question is.  You started in one direction and   11:55:19
14  went in another.  Why don't you just restate it so that   11:55:21
15  he has the question you want to ask in front of him.  He   11:55:24
16  does not have a screen.   11:55:26
17       Q   If you ever don't understand what I have   11:55:31
18  said, please ask me and I will be glad to repeat it.   11:55:34
19       A   Okay.   11:55:38
20       Q   My question was, in looking at the credit   11:55:39
21  risk, in regard to the Rhinebridge SIV, what did   11:55:41
22  Standard & Poor's specifically address?   11:55:46
23       A   As I said, it would have been my   11:55:52
24  testimony -- I said the credit risk was basically   11:55:53
25  speaking of the portfolio, so not the credit risk of the

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

Page 62

```
1    vehicle, so the credit risk of the portfolio, the main    11:56:02
2    factors we would have looked at was the creditworthiness    11:56:08
3    of the assets that the vehicle was intending to invest    11:56:11
4    in.                                          11:56:14
5         Q   How was that determined?           11:56:19
6         MR. RINGEL:  Objection to form.  You may    11:56:23
7    answer.                                      11:56:23
8         A   The element that we would have look at in    11:56:30
9    order for us to look at the creditworthiness of the    11:56:33
10   assets would have been mainly the rating of those assets    11:56:35
11   as provided by the rating analysts who were rating those    11:56:39
12   assets.                                      11:56:42
13        Q   Are you talking about the ratings that    11:56:53
14   these assets already had when they were acquired by the    11:56:55
15   Rhinebridge SIV?  Is that correct?           11:56:58
16        MR. RINGEL:  Objection to form.          11:57:00
17        A   I am referring to the ratings that the    11:57:03
18   assets had when they would have entered into the    11:57:05
19   portfolio, yes.                              11:57:08
20        Q   Just so we are clear, when you are talking    11:57:09
21   about assets, you are talking about the various products    11:57:13
22   that were acquired to be collateral in the structure of    11:57:16
23   the SIV.  Is that right?                     11:57:21
24        MR. RINGEL:  Objection to form.          11:57:24
25        A   Yes, I would call the assets basically the
```

Page 63

```
1    investments probably is the best word to say, that the    11:57:28
2    vehicle would have made on the portfolio that was    11:57:33
3    supposed to back the notes.                  11:57:34
4         Q   And the ratings you were referring to,    11:57:44
5    those would be ratings by Standard & Poor's?    11:57:45
6         A   That is correct.                    11:57:50
7         Q   And they would also be ratings by the    11:57:51
8    other credit rating agencies, is that accurate?    11:57:54
9         A   In some instances, yes.             11:58:00
10        Q   And a certain percentage of the portfolio    11:58:02
11   could be made up of assets that were not rated by    11:58:05
12   Standard & Poor's, is that correct?          11:58:08
13        A   I have a vague recollection that I think    11:58:13
14   there was I think a small bucket limit of assets that    11:58:15
15   were not necessarily rated by S&P.           11:58:20
16        Q   For the assets that were not rated by    11:58:27
17   Standard & Poor's, does Standard & Poor's just accept    11:58:32
18   the rating or does it do some further evaluation on    11:58:35
19   those assets?                                11:58:38
20        MR. RINGEL:  Object to the form.  Foundation.    11:58:40
21        A   I believe what again I have -- my    11:58:45
22   understanding is that for the assets that didn't    11:58:47
23   necessarily carry a public rating of S&P, there was a    11:58:51
24   small bucket where the manager could use to invest in    11:58:58
25   assets not rated publicly by S&P.  Again I am not 100
```

Page 64

```
1    percent clear on that, but they would need to be    11:59:09
2    publicly rated by other agencies, and I believe we would    11:59:15
3    take what we would call a notch down from those ratings,    11:59:22
4    which I don't recall at this time what that would mean,    11:59:24
5    but we wouldn't have taken the rating as it was by the    11:59:31
6    other agencies.                              11:59:35
7         Q   When you say "notch down" in your answer,    11:59:41
8    what do you mean by that?                    11:59:43
9         A   Notch down is a general term to say that    11:59:46
10   if there was another agency that publicly was rating the    11:59:48
11   asset, and one agency was rating that AAA, another one    11:59:52
12   AA, for example, we have tended to go to the lowest of    11:59:57
13   the two, and out of that probably assume one or two    12:00:00
14   notches down.  I don't particularly recollect the number    12:00:06
15   of notches but that is what I mean by that.    12:00:09
16        Q   I just want to be clear, when you talk    12:00:12
17   about notches, what do you mean specifically by that?    12:00:14
18        A   Notches, what I was saying before, that on    12:00:16
19   a rating category there are divided into modified plus,    12:00:18
20   no plus, minus and minus, so when you notch down I    12:00:22
21   means going one rating level lower.  So one notch down    12:00:26
22   for AA would be AA minus, two notches down would be A    12:00:30
23   plus, in this case.                          12:00:33
24        Q   For those assets that that were acquired    12:00:45
25   by the Rhinebridge SIV that had been previously rated by
```

Page 65

```
1    Standard & Poor's, was there some re-evaluation or    12:00:56
2    rerating of those assets --                  12:01:03
3         MR. RINGEL:  Objection to form.          12:01:05
4         Q   -- when the rating process for the SIV was    12:01:07
5    undertaken?                                  12:01:10
6         MR. RINGEL:  Objection to form, lack of    12:01:11
7    foundation.  You may answer.                 12:01:13
8         A   I am not aware of a rerating of those    12:01:16
9    assets.                                      12:01:18
10        Q   For instance, if there was a 2005 CDO that    12:01:20
11   IKB CAM purchased for the Rhinebridge SIV, and it had    12:01:26
12   been rated previously by Standard & Poor's --    12:01:30
13        A   They had or they had not?           12:01:35
14        Q   Had.                                12:01:37
15        A   Okay.                               12:01:38
16        Q   And then when your group was looking at    12:01:39
17   rating the SIV, they wouldn't do anything further by    12:01:41
18   rerating that particular CDO?               12:01:46
19        MR. ROCHE:  Object to the form.          12:01:50
20        MR. RINGEL:  Objection to form, lack of    12:01:51
21   foundation.                                  12:01:52
22        A   So, as I said, if an asset was carrying a    12:01:54
23   public rating from S&P, we wouldn't have done further    12:01:58
24   work on the rating.                          12:02:02
25        Q   Was there any circumstance at all that
```

17 (Pages 62 to 65)

HIGHLY CONFIDENTIAL

Page 66

1  would warrant putting a previously rated asset that was      12:02:10
2  acquired for the Rhinebridge SIV into a new rating      12:02:18
3  process as part of the work done on the Rhinebridge SIV?      12:02:22
4         MR. RINGEL: Objection to form.      12:02:28
5         A  You are asking if an asset was rated by      12:02:31
6  S&P, and if there was any reason why we would have done      12:02:36
7  a reanalysis of that rating, no, no I can't think of any      12:02:40
8  case.      12:02:45
9         Q  Going back to Exhibit 275, under the      12:02:53
10  credit risk, it says that: "Standard & Poor's will      12:02:55
11  expect the SIV manager to adopt an approach that assumes      12:03:02
12  a level of default in rating migration during the wind      12:03:06
13  down period, commensurate with Standard & Poor's default      12:03:10
14  and migration studies, as well as an approach accounting      12:03:14
15  for asset correlation".      12:03:18
16         What were the particular default tables that were      12:03:23
17  used for the analysis for the rating of the Rhinebridge SIV? 12:03:25
18         MR. RINGEL: Objection to form. You left out      12:03:35
19  a few words in the quotation.      12:03:37
20         A  So in rating the Rhinebridge SIV one of      12:03:41
21  the factors, as I said, would have been looking at the      12:03:45
22  credit risk of the portfolio, and one element of the      12:03:47
23  credit risk is the defaults or rating migration of the      12:03:52
24  assets. For that part we would have used or considered      12:03:55
25  the use of migration tables coming from the corporate

Page 67

1  data that we had in-house.      12:04:10
2         Q  What is the source of the corporate data      12:04:23
3  that you used to determine rating migration?      12:04:26
4         A  I think the main source I think is a      12:04:33
5  database, which is an internal database called I think      12:04:38
6  Credit Pro, I think is the name.      12:04:44
7         Q  And what is the source of the information      12:04:49
8  that is in the Credit Pro database?      12:04:51
9         A  I am not an expert on that so I might tell      12:04:55
10  you not exactly all the data that goes in there. I know      12:04:59
11  for sure that what is in there is the rating information      12:05:01
12  on the ratings produced by S&P, I believe in the last 30      12:05:05
13  or 35 years, yes, so by that information, meaning the      12:05:10
14  ratings they were given, the transition and whether      12:05:16
15  those ratings defaulted or not and the timeframe that      12:05:19
16  that happened.      12:05:21
17         Q  In determining the ratings migration for      12:05:25
18  the Rhinebridge SIV, your analysis was not limited      12:05:27
19  simply to like kind of assets such as CDOs or RMBS, is      12:05:32
20  that right?      12:05:39
21         MS KAMISON: Object to the form.      12:05:40
22         MR. ROCHE: Object to the form.      12:05:41
23         MR. RINGEL: Objection to form.      12:05:41
24         A  You are saying for the ratings of the      12:05:42
25  assets in the SIV?

Page 68

1         Q  Yes.      12:05:46
2         A  So I guess can you say your question      12:05:50
3  again, sorry.      12:05:53
4         Q  For rating the Rhinebridge SIV, the rating      12:05:57
5  migration information you were using was not limited to      12:06:02
6  the same type of assets that were in the Rhinebridge      12:06:08
7  SIV. Is that correct?      12:06:11
8         MR. RINGEL: Objection to form.      12:06:13
9         A  Okay, the main rating migration style of      12:06:16
10  database that we used for SIV, not just for Rhinebridge,      12:06:22
11  was that database that I mentioned, which was mainly      12:06:27
12  populated with corporate transition data because by      12:06:30
13  definition the corporate, the universe is bigger. Now,      12:06:38
14  I don't know exactly, as I said, how that database was      12:06:42
15  actually populated.      12:06:45
16         Q  At the time of the rating of the      12:06:55
17  Rhinebridge SIV, 2006/2007, was there any analysis done      12:06:57
18  at Standard & Poor's to determine whether the rating      12:07:04
19  migrations data that was pulled from Credit Pro related      12:07:08
20  or how it related to assets such as those in the      12:07:17
21  Rhinebridge SIV?      12:07:23
22         MS KAMISON: Object to the form.      12:07:25
23         MR. RINGEL: Objection to form.      12:07:26
24         Q  Let me ask it differently. As you      12:07:29
25  mentioned, most of the data in the Credit Pro database

Page 69

1  was corporate data. Is that correct?      12:07:35
2         A  That is my understanding, yes.      12:07:37
3         Q  And most of the assets -- almost all the      12:07:38
4  assets in the Rhinebridge SIV were RMBS, CDOs,      12:07:44
5  residential mortgage related kind of assets. Is that      12:07:52
6  also correct?      12:07:57
7         MR. ROCHE: Object to the form.      12:07:58
8         MR. RINGEL: Object to the form.      12:07:59
9         Q  What happened to one was good for all?      12:08:00
10         A  The portfolio in Rhinebridge was invested,      12:08:04
11  you are right, in RMBS, CDO and CMBS that I recall.      12:08:09
12         Q  And at that time did Standard & Poor's do      12:08:15
13  any study that looked at the adequacy of using ratings      12:08:17
14  migration from corporate data to measure ratings      12:08:21
15  migration in the kind of assets that were in the      12:08:25
16  Rhinebridge SIV?      12:08:28
17         MR. RINGEL: Objection to form.      12:08:29
18         A  I can't really say if it was specific      12:08:33
19  data, but clearly both Credit Pro database would have      12:08:35
20  had rating migration of noncorporate assets, because      12:08:40
21  that was the database for rating transition and      12:08:43
22  defaults. We had surely studies that I think at least      12:08:48
23  were published on a yearly basis of rating transition      12:08:52
24  and defaults of all the ratings that we were producing,      12:08:55
25  and to answer your question, yes, the discussions of

18 (Pages 66 to 69)

HIGHLY CONFIDENTIAL

Page 74

1    said it the way that I would say it.                    12:25:38
2          Q   In doing the rating of the Rhinebridge        12:25:41
3    SIV, either you or someone working with you applied what   12:25:43
4    are called default tables.  Is that right?             12:25:53
5          MR. RINGEL:  Objection to form.  You may         12:25:57
6    answer.                                                12:25:59
7          A   I wouldn't necessarily say we used default   12:26:00
8    tables.  What we used for the credit part of the       12:26:03
9    analysis was a transition table that, you know, the goal  12:26:07
10   of the transition table would have been to simulate    12:26:16
11   movement of ratings that ultimately could bring to     12:26:20
12   default, but I don't think I would call it a default   12:26:24
13   table per se.                                          12:26:28
14         Q   Looking again at document Exhibit 275,       12:26:32
15   page 583, it indicates that Standard & Poor's publishes  12:26:37
16   default and migration studies in the context of credit  12:26:46
17   risk.  Were default studies used in doing the rating   12:26:51
18   analysis on the Rhinebridge SIV?                       12:26:58
19         MR. RINGEL:  Objection to form, in light of      12:27:00
20   the prior answer.  You may answer.                     12:27:02
21         A   I guess what this part of the criteria       12:27:06
22   says is that, as we said, we looked at level of default  12:27:07
23   and rating migration commensurate with default and     12:27:13
24   migration studies.  By that I mean that in order to come  12:27:16
25   up with our rating transition matrix we would have

Page 75

1    looked at the defaults and the migration studies       12:27:24
2    themselves, and come up with what we felt was the proper  12:27:27
3    transition matrix to use for our analysis.             12:27:32
4          Q   When you said "levels of default" in your    12:27:38
5    answer, what were you referring to specifically?       12:27:40
6          A   What I referred to is that, as I was         12:27:46
7    saying before, the rating transition matrix is a       12:27:48
8    starting point, which then leads to -- by definition,   12:27:51
9    the more transition you have, you might ultimately have  12:27:55
10   an asset that defaults, so that is what I tend to      12:27:58
11   differentiate, is that you have first the right rating  12:28:03
12   migration and then that brings to default, and you     12:28:07
13   wanted to make sure that the rating transition that we  12:28:10
14   apply does indeed produce level of default that we feel  12:28:12
15   comfortable with, and us getting comfortable with one of  12:28:16
16   the ways is clearly we look whether they are            12:28:20
17   commensurate to the actual default studies that we have  12:28:22
18   out there.                                             12:28:25
19         Q   When you say "default studies" in your       12:28:36
20   answer, what are you referring to?                     12:28:38
21         A   I am referring to, for example, those        12:28:41
22   publications that we have on an annual basis, which are  12:28:44
23   just factual publication that list and indicate the    12:28:48
24   number of defaults that we had on a year by year basis,  12:28:52
25   different cohorts.

Page 76

1          Q   What default studies were used in rating     12:28:58
2    the Rhinebridge SIV?                                   12:29:00
3          MR. RINGEL:  Objection to form, assumes facts    12:29:02
4    not in evidence.                                       12:29:04
5          A   What we used for the Rhinebridge SIV was a   12:29:07
6    transition matrix which we dust discussed before which  12:29:11
7    is a stressed transition matrix, so which was the same  12:29:14
8    matrix that we were using for all the SIVs, so we didn't  12:29:19
9    do any specific study, default studies as you said for  12:29:22
10   the Rhinebridge SIV.                                   12:29:28
11         Q   Was the transition matrix that was used in   12:29:42
12   rating the Rhinebridge SIV the same transition matrix   12:29:47
13   that was used in rating the Cheyne SIV?                12:29:52
14         A   Yes, it was the same component, yes.         12:29:56
15         Q   Between the rating of the Cheyne case --     12:30:01
16   sorry, between the rating of the Cheyne SIV and the     12:30:05
17   rating of the Rhinebridge SIV, were there any market    12:30:09
18   changes that would suggest that the transition should be  12:30:12
19   rated or should be viewed differently than it was viewed  12:30:18
20   through your transition data?                          12:30:22
21         MR. ROCHE:  Object to the form.                  12:30:26
22         MR. RINGEL:  Object to the form.                 12:30:27
23         A   Sorry, can you repeat the question,          12:30:29
24   please?                                                12:30:31
25         Q   Sure.  Between the time when the Cheyne

Page 77

1    SIV was rated and the rating of the Rhinebridge SIV,    12:30:34
2    were there any market changes that suggested that the   12:30:38
3    transition data you were using should somehow be        12:30:42
4    modified or changed?                                   12:30:46
5          MR. ROCHE:  Same objection.                      12:30:48
6          MR. RINGEL:  Object to the form.                 12:30:49
7          A   No I am not aware of, no.                     12:30:52
8          Q   Was market changes that could affect         12:30:55
9    transition indications something that Standard & Poor's  12:30:56
10   tracked?                                               12:30:59
11         MR. ROCHE:  Object to the form.                  12:31:06
12         A   As I said, we were publishing rating         12:31:07
13   transitions and default studies, so that is clearly    12:31:10
14   something that we were tracking.  We didn't feel -- I am  12:31:15
15   not aware of reasons why there was any specific rating   12:31:19
16   transition or rating migration that made us think that  12:31:30
17   the stressed table that we were using was not the       12:31:34
18   appropriate one.                                       12:31:40
19         Q   For the levels of default that you were      12:31:48
20   referring to, those were the same default levels that   12:31:51
21   were applied to rate the Cheyne SIV as the Rhinebridge  12:31:55
22   SIV.  Is that correct?                                 12:31:58
23         MR. RINGEL:  Objection to form.  I think that    12:31:59
24   misstates the prior testimony.  You may answer.        12:32:01
25         A   As I was trying to explain before, we

Veritext National Deposition & Litigation Services
866 299-5127

HIGHLY CONFIDENTIAL

Page 78

1  don't have specific level of default, so everything      12:32:07
2  stems from the rating migration, okay, and yes, that    12:32:10
3  rating migration table was the same in Cheyne and       12:32:14
4  Rhinebridge and the other SIVs.                         12:32:18
5      Q  And between the rating of the Cheyne SIV          12:32:33
6  and the rating of the Rhinebridge SIV, were there any   12:32:36
7  market changes that suggested that your rating process  12:32:40
8  was not sensitive enough to the potential level of      12:32:44
9  defaults for ABS securities?                            12:32:48
10     MR. RINGEL:  Object to the form.                     12:32:51
11     MR. ROCHE:  Object to the form.                      12:32:53
12     A  Not that I am aware of.                            12:32:56
13     Q  Again, that is something that                      12:32:59
14 Standard & Poor's would track, is that correct?          12:33:02
15     MR. ROCHE:  Object to the form.                       12:33:06
16     MR. RINGEL:  Object to the form.                      12:33:07
17     A  As I said, the only thing that I am aware          12:33:07
18 of that we would have tracked is the level or the number 12:33:10
19 of the rating migration and number of defaults that we   12:33:14
20 had, which was the basis of the annual study that we     12:33:16
21 would publish.                                           12:33:20
22     Q  The annual study that you published, to           12:33:27
23 the extent that there were changes in that, that would   12:33:30
24 reflect Standard & Poor's recognition of changes in the  12:33:34
25 market that affected your previous determinations such

Page 79

1  as the transition migration.  Is that correct?          12:33:43
2      MR. RINGEL:  Objection to form.                      12:33:47
3      A  I guess it is a hypothetical question.            12:33:49
4  Yes, if we had been in a situation that we would have    12:33:52
5  witnessed a level of migration or level of default that  12:33:55
6  we considered particularly high, that could have         12:34:00
7  potentially made us think or consider whether the tools  12:34:04
8  that we were using or the tables that we were using were 12:34:08
9  correct or not correct, if we were comfortable with them 12:34:11
10 or not.                                                  12:34:16
11     Q  When you say the level of migration, as           12:34:18
12 you just did in your answer, and whether it was          12:34:22
13 particularly high, that may result in a reconsideration, 12:34:24
14 what did you mean by "particularly high"?                12:34:29
15     A  I don't have a definition of what it              12:34:36
16 means, so I am just saying, you know, hypothetically     12:34:38
17 speaking, if we had seen, if we had witnessed certain    12:34:42
18 rating migration of default behaviours, that would have  12:34:46
19 been of concern to us, then, as we usually do, we would  12:34:50
20 have taken that into consideration.                      12:34:55
21     Q  I understand that.  I am just trying to           12:34:58
22 determine what level has to change in order for it to be 12:35:00
23 a concern for Standard & Poor's.  With that              12:35:05
24 understanding, I will ask my question again.  What level 12:35:08
25 of change would be necessary for Standard & Poor's to

Page 80

1  recognize the need for a change, for instance, in the   12:35:16
2  rating migrations it was making?                        12:35:19
3      MR. RINGEL:  Objection to form, incomplete          12:35:22
4  hypothetical.                                           12:35:23
5      A  It is not something that is defined              12:35:25
6  anywhere, so I cannot answer that question.             12:35:29
7      Q  Who makes the determination that there is        12:35:32
8  sufficient change that Standard & Poor's needs to       12:35:34
9  change, for instance, its migration table?              12:35:40
10     MR. RINGEL:  Object to the form, foundation.         12:35:43
11     A  I cannot answer the question.  There is no        12:35:47
12 specific person or body that does that.  It is I guess   12:35:50
13 part of a body of analysts that we are that if there are 12:35:53
14 things in development of the markets that could be a     12:35:57
15 concern to us, we would take that into consideration.    12:36:00
16     Q  When Standard & Poor's publishes its             12:36:06
17 annual statement related to rating migration, for        12:36:09
18 instance, I take it that there is some process by which  12:36:13
19 changes to that are reviewed internally at               12:36:18
20 Standard & Poor's.  Is that right?                       12:36:22
21     MR. RINGEL:  Objection to form.                      12:36:23
22     A  As I said, I am just aware of the fact           12:36:28
23 that we publish a study.  To me, my understanding, I am  12:36:31
24 not an expert on that, I am not the person who produced  12:36:34
25 that, I am not part of the team who produced that, but

Page 81

1  my understanding is it is more like a factual           12:36:38
2  publication, i.e. no more than that.  This is the number 12:36:41
3  of defaults and migration that we had in the past year. 12:36:44
4  I am not aware of anything else that goes into it more   12:36:47
5  than the factual statement.                             12:36:51
6      Q  So I take it from your answer that even          12:36:57
7  though Standard & Poor's does sometimes make changes     12:36:59
8  that it publishes, you are not aware of what is involved 12:37:03
9  in the process of approving those changes.  Is that      12:37:08
10 correct?                                                 12:37:10
11     MR. RINGEL:  Objection to form.  I think that        12:37:11
12 misstates the testimony.  You may answer.                12:37:12
13     A  What I am saying is that, as I said, since        12:37:15
14 the beginning there is a study that we make.  Again, I    12:37:18
15 am not producing the study, I am not part of producing   12:37:22
16 the study.  My understanding, but again I am probably    12:37:24
17 not the best person to talk about that, is it is a       12:37:27
18 factual statement of things that have happened.  So when 12:37:29
19 you say "change", it is just publication from one year   12:37:31
20 to the other.  What I was saying, generally speaking,    12:37:36
21 outside that, it is not necessarily linked to that, if   12:37:40
22 we as S&P were to see or witness things in the market    12:37:45
23 that makes them uncomfortable or concerned in some of    12:37:50
24 our assumptions that we use in our ratings might not be  12:37:53
25 appropriate anymore, it is plausible that we will take

21 (Pages 78 to 81)

## Page 82

1 those into consideration.                    12:37:59
2     Q  What kind of change would have to occur    12:38:11
3 for rating migrations for Standard & Poor's to be    12:38:12
4 uncomfortable with whatever its rating migration table    12:38:16
5 is at that time?                              12:38:20
6        MR. RINGEL:  Objection to form.        12:38:22
7        MR. ROCHE:  Object to the form.         12:38:23
8     A  I think I have replied to that already.  I    12:38:26
9 said there is not as far as I know a specific number or    12:38:28
10 threshold or magnitude of movements that would, you    12:38:31
11 know, cut the definition whether to look at it or not,    12:38:35
12 so I cannot answer that question.             12:38:39
13     Q  So, it is not necessarily a quantitative    12:38:42
14 question in order to determine whether a change is    12:38:47
15 needed.  Is that right?                       12:38:51
16        MR. RINGEL:  Objection to form you may answer.    12:38:53
17     A  As I am trying to say, all the decision or    12:38:56
18 the discussions that we have, yes, there is never one    12:38:59
19 factor, either qualitative or quantitative, that is just    12:39:02
20 the only thing.  There are many things that we take into    12:39:05
21 consideration overall.                        12:39:08
22     Q  The criteria that we have been looking at    12:39:12
23 on 275 also indicates that asset correlations are looked    12:39:15
24 at relative to assessing credit risk.  Is that correct?    12:39:21
25     A  Yes, asset correlation, it would be a

## Page 83

1 factor that is used in our analysis, we look at rating    12:39:29
2 migration and defaults.                       12:39:35
3     Q  And what is specifically meant by "asset    12:39:39
4 correlations", and particularly as it relates to the    12:39:41
5 Rhinebridge SIV?                              12:39:43
6     A  Assets correlation, again I am not a    12:39:48
7 quant, so my understanding of asset correlation is a    12:39:51
8 factor in our analysis that defines what is the    12:39:56
9 likelihood that two ratings of two assets might move    12:40:06
10 together over time and ultimately but not necessarily    12:40:11
11 default over time.  So that is the best definition I can    12:40:15
12 give you for asset correlation.               12:40:21
13     Q  And those correlations relate to movement    12:40:24
14 within a particular group of assets, is that right?    12:40:26
15        MR. RINGEL:  Objection to form.  You may    12:40:31
16 answer.                                       12:40:32
17     A  It depends, but we have asset correlation    12:40:35
18 sometimes only for within one sector or across sectors,    12:40:39
19 yes.                                          12:40:44
20     Q  So the asset correlations that were    12:40:44
21 involved in the rating of the Rhinebridge SIV involved    12:40:47
22 both correlations within an assets class as well as    12:40:52
23 between asset classes.  Is that correct?      12:40:57
24     A  My understanding, my recollection is that    12:41:02
25 for the Rhinebridge SIVs we had an assumption of asset

## Page 84

1 correlation which was the same across all the assets.    12:41:10
2     Q  And what was the assumption of the asset    12:41:15
3 correlation for the Rhinebridge SIV?          12:41:21
4     A  I don't have 100 percent recollection.  I    12:41:27
5 believe it was between 0.1 or 0.2, I don't recall.    12:41:29
6     Q  And that was the same asset correlation    12:41:37
7 assumption that was used to rate the Cheyne SIV.  Is    12:41:41
8 that right?                                   12:41:44
9     A  That is my understanding, yes.          12:41:45
10     Q  Between the time of the rating of the    12:41:50
11 Cheyne SIV and the rating of the Rhinebridge SIV, in    12:41:51
12 2007, were there any market changes that suggested that    12:41:57
13 the correlation assumption used to rate the Rhinebridge    12:42:03
14 SIV was not appropriate, not accurate?        12:42:09
15        MR. ROCHE:  Object to the form.          12:42:17
16        MR. RINGEL:  Object to the form.         12:42:18
17     A  Not that I know of.                    12:42:18
18     Q  The criteria go on to mention measures of    12:42:42
19 market risk involved in the SIV rating process.  What    12:42:46
20 was measured relative to market risk in the Rhinebridge    12:42:51
21 SIV?                                          12:42:55
22     A  What we would define as market risk    12:43:00
23 generally speaking for SIVs and for the Rhinebridge SIV    12:43:04
24 was risk associated to price movements, price movements    12:43:06
25 of the underlying assets, but also interest rates or FX

## Page 85

1 movements, in case the assets were denominated in a    12:43:22
2 different currency than the currency of the liabilities.    12:43:29
3     Q  Relative to Rhinebridge, how were the    12:43:38
4 price movements in underlying assets analyzed?    12:43:40
5        MR. RINGEL:  Objection to form.         12:43:43
6     A  Sorry, can you repeat the question?     12:43:48
7     Q  Sure.  Relative to Rhinebridge, how were    12:43:50
8 the price movements in the underlying assets analyzed?    12:43:53
9        MR. RINGEL:  Same objection, vague and    12:43:57
10 ambiguous.  You may answer.                   12:43:58
11     A  The way I would say is that we did an    12:44:01
12 analysis of price changes in price movements that made    12:44:04
13 into, you know, the capital matrices that we were using,    12:44:13
14 so the capital matrices that we were using for the    12:44:16
15 senior note ratings, embedded into that capital matrix    12:44:20
16 there would have been an analysis of market devaluation    12:44:24
17 of the assets.                                12:44:31
18     Q  So, if I understand your answer, the    12:44:35
19 formula that was used to determine -- that was used in    12:44:38
20 the capital matrix embraced the potential movements of    12:44:47
21 the underlying assets?                        12:44:51
22        MR. RINGEL:  Objection to form.         12:44:53
23     A  Would embrace, I guess, the level of    12:44:57
24 market depreciation, that assets in that particular    12:45:00
25 sector, you know, sorry, that we were comfortable to

HIGHLY CONFIDENTIAL

Page 86

1    take into consideration for those assets in our analysis    12:45:11
2    on the senior notes.    12:45:14
3        Q   Is the capital matrices a table or is it a    12:45:26
4    formula?    12:45:29
5        A   It is a table.  It is a matrix, basically.    12:45:32
6        Q   And what is the capital matrix that was    12:45:38
7    used to rate the Rhinebridge SIV or in the rating of the    12:45:40
8    Rhinebridge SIV?    12:45:46
9        MR. RINGEL:  Objection to form.  You may    12:45:47
10   answer.    12:45:47
11       A   You are asking what it was or --    12:45:49
12       Q   Yes.  How would you identify it?    12:45:51
13       A   Okay.  It is basically a double entry    12:45:54
14   matrix, which has ratings on one as one factor and tenor    12:45:59
15   on the other factor, and it is populated by percentages    12:46:05
16   which are called capital charges, and then you would    12:46:10
17   have different matrices for different asset classes.    12:46:10
18       Q   And the capital matrix that was used to    12:46:22
19   rate the Rhinebridge SIV was the same capital matrix    12:46:24
20   that was used to rate at Cheyne SIV?    12:46:27
21       MR. RINGEL:  Objection to form.    12:46:29
22       A   The capital matrix, first of all, would be    12:46:32
23   one input that we used for our analysis and -- I don't    12:46:34
24   know number by number but my recollection is yes, that    12:46:37
25   they were the same.

Page 87

1        Q   Was there any market change between the    12:46:46
2    rating of the Cheyne SIV and the rating of the    12:46:47
3    Rhinebridge SIV that suggested that the capital matrix    12:46:51
4    that was used was not appropriate and should be changed?    12:46:58
5        MR. ROCHE:  Object to the form.    12:47:02
6        MR. RINGEL:  Objection to form.    12:47:03
7        A   No.    12:47:04
8        Q   Are the capital charges sometimes referred    12:47:10
9    to as haircuts?    12:47:12
10       A   I would not usually use that term.  I    12:47:17
11   might have but usually I try to call them capital    12:47:23
12   matrices, sorry, capital charges.    12:47:27
13       Q   What was done in rating the Rhinebridge    12:47:34
14   SIV to assess the interest rate risk that you identified    12:47:37
15   as one of the market risk considerations?    12:47:41
16       A   For the interest and market value risk,    12:47:51
17   usually the way that the structure tries to look at the    12:47:53
18   interest rate in FX risk is through so-called market    12:48:04
19   sensitivity tests.  Market sensitivity tests are    12:48:08
20   supposed to be tests whereby the vehicle itself would    12:48:12
21   tend to run what is called in jargon a market neutrality    12:48:18
22   level, i.e. that the assets tend to be fully hedged to    12:48:24
23   make sure that there is no market risk or interest rate    12:48:28
24   risk.  The hedge sometimes might be not 100 percent    12:48:31
25   hedged, and in that case there is a specific test that

Page 88

1    makes sure that if it is not 100 percent hedged, which    12:48:40
2    does not hopefully occur, the change of interest rates    12:48:48
3    and FX movement should not create more than 30 BIPs    12:48:53
4    change in market value of the assets, so that is more a    12:48:57
5    test that is used in order to, let's say, make sure that    12:49:01
6    the SIV is not exposed to interest rates or FX    12:49:05
7    movements.    12:49:09
8        Q   Were the sensitivity tests used for    12:49:14
9    tracking the interest rate changes the same as the --    12:49:17
10   were the sensitivity tests used for tracking interest    12:49:25
11   rate changes in Rhinebridge the same as those used in    12:49:28
12   the Cheyne ratings?    12:49:31
13       MR. RINGEL:  Objection to form.    12:49:33
14       A   I believe the tests themselves were the    12:49:36
15   same, I think so.    12:49:38
16       Q   And was the sensitivity thresholds set the    12:49:41
17   same between those tests?    12:49:44
18       MR. RINGEL:  Objection, form, foundation.    12:49:49
19       A   I seem to recall that they would be the    12:49:51
20   same, yes.    12:49:53
21       Q   Between the time of the rating of the    12:50:00
22   Cheyne SIV and the Rhinebridge SIV, were there any    12:50:02
23   market changes that suggested that there needed to be    12:50:04
24   adjustment to the thresholds for the sensitivity tests    12:50:09
25   used to measure interest rate changes?

Page 89

1        MR. ROCHE:  Object to the form.    12:50:16
2        MR. RINGEL:  Object to the form.    12:50:16
3        A   No.    12:50:17
4        Q   I take it that ultimately    12:50:22
5    Standard & Poor's was comfortable with the hedges that    12:50:28
6    Rhinebridge offered relative to the interest rates, is    12:50:35
7    that correct?    12:50:40
8        MR. RINGEL:  Objection to form, foundation.    12:50:41
9        A   I think we ultimately were comfortable    12:50:44
10   that the overall mechanism of dealing with interest    12:50:47
11   rates and FX movements was something that we were    12:50:50
12   comfortable with.    12:50:53
13       Q   Looking at 275 again, under "Market Risk"    12:51:09
14   the last paragraph or the last sentence:    12:51:14
15       "Standard & Poor's expects to see market value    12:51:18
16   decline calculations appropriate for all the assets that an    12:51:20
17   investment manager may consider for its SIV."    12:51:25
18       Were there market value decline calculations    12:51:28
19   presented to Standard & Poor's regarding the Rhinebridge    12:51:32
20   SIV?    12:51:35
21       A   I believe this is a general statement to    12:51:43
22   say that we would expect that the market value declines    12:51:46
23   that are modeled or assumed in the vehicle and that    12:51:50
24   sometimes can be captured by capital charges sometimes    12:51:55
25   can be captured by simulation model, yes, they were

23 (Pages 86 to 89)

HIGHLY CONFIDENTIAL

Page 94

```
1    there is an addition of all the amount of capital that    14:02:20
2    is needed for each asset that makes the capital for the    14:02:23
3    entire portfolio.                                          14:02:27
4        (Exhibit P280 marked for identification)              14:02:27
5        Q   I am going to mark as Exhibit 280 a               14:02:47
6    document with the Bates number S&P-IKB 0011842 through    14:02:50
7    874. My question as you look at this is what is this       14:03:01
8    document?                                                  14:03:43
9        A   This would be what we call the ramp that          14:03:51
10   was presented to the committee for Rhinebridge SIV.        14:03:54
11       Q   What are you referring to when you say             14:04:00
12   "the ramp"?                                                14:04:01
13       A   Ramp is a term that we use which defines           14:04:04
14   the paper or the memo that is produced in the committee    14:04:07
15   and the discussions that the rating is based upon.         14:04:14
16       Q   This document is dated March 22, 2007, is         14:04:19
17   that right?                                                14:04:19
18       A   That is right.                                     14:04:23
19       Q   Did you prepare this document?                     14:04:24
20       A   I believe yes, I prepared, yes, all of it,        14:04:35
21   yes.                                                       14:04:41
22       MR. RINGEL:  Once again, I note that there was       14:04:43
23   an e-mail that was part of the document as originally      14:04:45
24   produced, and I would ask if you are able to provide       14:04:47
25   that.
```

Page 95

```
1        MR. CAPUTO:  I can only tell you that the           14:04:52
2    document was copied as it was produced to me.  If there   14:04:55
3    is something else on it, it is not on this version.       14:04:57
4        MR. RINGEL:  I will object.  With that in           14:05:00
5    mind, you may continue your examination.                  14:05:02
6        Q   The top third of the page there is a note,       14:05:10
7    it says:                                                   14:05:12
8        "Due to technical problems we cannot blackline        14:05:17
9    this ramp to Cheyne SIV, of which this vehicle is a copycat, 14:05:20
10   both in terms of structure and modeling."                  14:05:25
11       Again, what was the reference to the blacklining       14:05:28
12   in this regard?                                            14:05:30
13       A   I guess, in this regard, again I was             14:05:34
14   presenting this vehicle, and as I said before there were   14:05:37
15   a number of similarities with the Cheyne vehicle, so my    14:05:40
16   intention at the beginning was to produce a document       14:05:45
17   that could have easily shown the difference with the       14:05:48
18   Cheyne vehicle, which usually I would have done for a      14:05:52
19   blackline.  By blackline I mean cross out the stuff that   14:05:56
20   did not apply and add the things that did apply.  For      14:06:00
21   whatever reason I remember I could not do it.  Probably    14:06:02
22   I am not the best person to use Word, and so I ended up    14:06:05
23   producing this paper, but still trying to highlight the    14:06:10
24   parts that were different.                                 14:06:14
25       Q   And you note those parts -- you say:
```

Page 96

```
1        "As a summary, the only points that are different 14:06:18
2    from Cheyne SIV are" and then you list three points:  "The 14:06:20
3    presence of senior capital notes that we have refused rated 14:06:24
4    AAA, whereas they will be AAA both from Fitch and Moody's." 14:06:30
5    Then the second point was:  "HEL portfolio limit and       14:06:37
6    appointment of the Enforcement Manager."                   14:06:45
7        So those are the differences between the Cheyne      14:06:49
8    SIV and the Rhinebridge SIV, is that correct?              14:06:52
9        MR. RINGEL:  Objection to form.                     14:06:54
10       A   As I recall, back then this would be the          14:06:56
11   three main ones that I would have wanted the committee      14:06:58
12   to get attention to in the first page.                     14:07:02
13       Q   I would like you to look at the page that        14:07:16
14   ends in Bates number 869, at the end of the document.      14:07:20
15   What do those charts on 869 and the following pages --     14:07:34
16   what are they?                                             14:07:40
17       MR. RINGEL:  Objection to form.  Compound.          14:07:43
18       A   Those represent the capital matrices             14:07:49
19   applied to the assets of the portfolio.                    14:07:53
20       Q   And these are the capital matrices we have       14:08:01
21   been talking about relative to determining the capital     14:08:03
22   levels.  Is that correct?                                  14:08:08
23       A   Yes, the ones that would be one input to         14:08:09
24   define the capital, yes.                                    14:08:12
25       Q   And these capital matrices on the pages we
```

Page 97

```
1    have just referenced, those are the same as the capital    14:08:16
2    matrices in the Cheyne SIV, is that correct?               14:08:19
3        MR. RINGEL:  Objection to form.  You may            14:08:22
4    answer.                                                    14:08:24
5        A   It is my recollection they would have been       14:08:26
6    the same, yes.                                             14:08:27
7        Q   Was there anything between the rating of         14:08:32
8    the -- strike that.                                        14:08:33
9        Was there any market events between the rating of 14:08:35
10   the Cheyne SIV and the rating of the Rhinebridge SIV that   14:08:37
11   suggested that the use of these capital matrices was no     14:08:40
12   longer warranted?                                          14:08:43
13       MR. ROCHE:  Object to the form.                     14:08:45
14       MR. RINGEL:  Object to the form.                    14:08:46
15       A   Not that I am aware of, no.                       14:08:49
16       Q   Was there any information that                    14:08:50
17   Standard & Poor's had that suggested that since the        14:08:51
18   rating of the Cheyne SIV these capital matrices would no   14:08:57
19   longer result in appropriate ratings?                      14:09:01
20       MR. ROCHE:  Object to the form.                     14:09:04
21       MR. RINGEL:  Object to the form.                    14:09:04
22       A   No.                                               14:09:05
23       Q   I would like you to look at the page            14:09:26
24   ending in 859.  In the middle of the page there is a       14:09:28
25   paragraph that begins:  "We went through their
```

25 (Pages 94 to 97)

HIGHLY CONFIDENTIAL

Page 150

```
1   Finance Ratings, Monthly Review Meeting, March 19,      16:19:30
2   2007."  You see that?                       16:19:34
3        A   Yes.                              16:19:36
4        Q   And you have never seen this document     16:19:36
5   before?                                  16:19:38
6        A   No.                              16:19:40
7        Q   This particular document talks about      16:19:44
8   "Overview and impact of the residential sub-prime     16:19:46
9   market".  Is that correct?                   16:19:50
10       A   That is what the title says.        16:19:53
11       Q   If you look at the -- essentially every    16:20:03
12  page, it says that:  "This document contains proprietary   16:20:08
13  and confidential information and is for        16:20:11
14  Standard & Poor's employees."  Do you see that?      16:20:13
15       A   Yes.                             16:20:16
16       Q   But you don't recall ever seeing this     16:20:17
17  document, is that right?                    16:20:19
18       A   That is right.                    16:20:20
19       Q   Would it be the practice in the structured   16:20:25
20  finance rating group at Standard & Poor's in this    16:20:28
21  timeframe, 2007, to keep track of matters that affected   16:20:31
22  structured finance ratings within Standard & Poor's?    16:20:39
23       MR. RINGEL:  Objection to form.        16:20:42
24       A   To answer your question, I don't have an   16:20:48
25  understanding that there would be a formal meeting or
```

Page 151

```
1   anything like that.  I suppose each asset class would    16:20:54
2   have looked at their own asset class, you know, in     16:20:59
3   whatever form they thought was the best way of doing it.   16:21:05
4        Q   Are you surprised, as one of the leading    16:21:08
5   analysts on structured finance ratings, that you     16:21:11
6   apparently did not receive an overview on impact of     16:21:16
7   residential sub-prime market that was specifically     16:21:21
8   directed at structured finance ratings?        16:21:24
9        MR. RINGEL:  Objection to form.        16:21:26
10       A   To correct, I was lead analyst for the    16:21:31
11  Rhinebridge SIVs and I was part of the CDO and SIV team,   16:21:33
12  which is one subset of structured finance rating.  I    16:21:37
13  have not seen this document.  This seems to be      16:21:41
14  referencing, at least by the title, the residential    16:21:43
15  sub-prime market, which I would have expected probably    16:21:48
16  had been produced for the RMBS group.          16:21:51
17       Q   However, you in your group were making    16:22:12
18  decisions all the time in rating SIVs regarding     16:22:15
19  residential sub-prime issues.  Correct?        16:22:20
20       MR. RINGEL:  Objection to form, foundation.   16:22:26
21       A   As I explained, one of the factors that we   16:22:30
22  would use for our rating analysis of the SIVs would have   16:22:32
23  been the creditworthiness of the assets in the     16:22:36
24  portfolio, and that would have been expressed by the    16:22:39
25  rating of those assets which we were getting from our
```

Page 152

```
1   colleagues in the RMBS group.                16:22:46
2        Q   I see.  So once you received the rating,    16:22:51
3   that is where it stood.  You didn't have anymore --    16:22:53
4   strike that.  There was still a surveillance function   16:23:00
5   that stayed with your group after you would rate a SIV,   16:23:03
6   is that right?                           16:23:06
7        A   The surveillance of the SIVs would have    16:23:09
8   been part of the done by the SIV group, yes.       16:23:11
9        Q   Looking at the page ending in 467, which    16:23:17
10  is the presentation overview, it says:  "The sub-prime   16:23:22
11  residential mortgage market is attracting considerable   16:23:30
12  attention amid mounting delinquencies and defaults.  In   16:23:34
13  particular, sub-prime originated in 2006 that has been    16:23:38
14  out there for a year is experiencing more financial    16:23:42
15  difficulties than loans from previous vintage years."    16:23:44
16       In doing your work with the rating of the     16:23:50
17  Rhinebridge SIV, were you aware of this information?    16:23:54
18       MR. RINGEL:  Objection to form.  You may      16:23:58
19  answer.                                 16:23:59
20       A   As I said, I don't recall receiving or     16:24:00
21  discussing this particular paper, but it is fair to say   16:24:06
22  that that particular point, i.e. that there were some   16:24:08
23  considerations that even S&P was doing on a particular   16:24:13
24  sector linked to the residential mortgages, in     16:24:17
25  particular the 2006 vintage and the lower rated tranches
```

Page 153

```
1   of those vehicles, yes, I was aware, generically aware   16:24:25
2   of that.  I know there were being publications of     16:24:29
3   articles talking about that issue, so I was aware from   16:24:33
4   that point of view, yes.                    16:24:38
5        Q   Was there anything about the information    16:24:42
6   that was available to Standard & Poor's regarding the    16:24:44
7   sub-prime market that suggested that Standard & Poor's    16:24:47
8   approach to rating matters containing sub-prime assets    16:24:51
9   was not properly considering the actual risks those    16:24:59
10  assets were facing?                       16:25:02
11       MR. RINGEL:  Objection to form.        16:25:04
12       A   No, as I said, I am aware of publications   16:25:07
13  where issues surrounding some vintages and some ratings   16:25:11
14  were discussed, even by S&P.                 16:25:16
15       Q   But there is nothing from your perspective    16:25:21
16  that suggests that there should be some concern about    16:25:24
17  the approach that S&P had towards rating assets that    16:25:27
18  contained sub-prime residential mortgages?       16:25:32
19       MR. RINGEL:  Objection to form.        16:25:36
20       A   That is correct.                 16:25:37
21       Q   The third bullet point says:         16:25:45
22       "Numerous sub-prime lenders, such as New Century   16:25:47
23  are facing financial difficulties, but larger more     16:25:51
24  diversified firms, such as HSBC Holdings, have also been   16:25:55
25  negatively impacted."
```

39 (Pages 150 to 153)

HIGHLY CONFIDENTIAL

Page 154

1    Was the origination by various sub-prime lenders    16:26:04
2    something that was considered in doing the ratings of the    16:26:11
3    Rhinebridge SIV?    16:26:16
4        MR. RINGEL: Objection to form, the predicate    16:26:18
5    to the question.    16:26:19
6        A    No, the answer to the question is no.    16:26:22
7        Q    Was there any concern within    16:26:26
8    Standard & Poor's at the time of the Rhinebridge SIV    16:26:28
9    rating that the failures by various originators of    16:26:31
10   sub-prime loans was having an effect on the actual risk    16:26:37
11   those loans were facing that were not being captured by    16:26:44
12   the rating process?    16:26:48
13       MR. RINGEL: Objection to form.    16:26:50
14       A    No, I am not aware of those things having    16:26:54
15   an impact on our thinking on the process.    16:26:57
16       Q    Standard & Poor's monitors the work its    16:27:05
17   competitor rating agencies does, is that right?    16:27:13
18       MR. RINGEL: Objection to form, vague and    16:27:16
19   ambiguous.    16:27:21
20       A    I am not aware if that is something that    16:27:21
21   is formally done.  It surely is something that I don't    16:27:24
22   do.    16:27:27
23       Q    I understand that, but Standard & Poor's    16:27:27
24   has a competitor intelligence group that monitors what    16:27:29
25   its competitor rating agencies do.  Isn't that correct?

Page 155

1        A    I am not aware of any such team within    16:27:38
2    S&P.    16:27:43
3        (Exhibit P291 marked for identification)    16:27:43
4        Q    You are aware that the other rating    16:27:56
5    agencies were looking at matters involving sub-prime    16:28:00
6    residential mortgages in the 2007 timeframe?    16:28:03
7        MR. RINGEL: Objection to form, vague and    16:28:06
8    ambiguous.    16:28:07
9        A    No, I didn't have a specific understanding    16:28:08
10   or recollection of that.    16:28:12
11       Q    I am going to mark as Exhibit 291 a    16:28:13
12   document with Bates number IKB003786060 through 067.    16:28:15
13   This is a comment by Moody's Investors Services dated    16:28:39
14   March 23, 2007.    16:28:42
15       MR. RINGEL: Would you give us a moment.  We    16:28:45
16   have not got the document yet.    16:28:46
17       Q    I am sorry.    16:28:49
18       A    Sorry, the question again?    16:29:14
19       Q    This is a comment by Moody's Investor    16:29:18
20   Services dated March 23, 2007, is that right?    16:29:20
21       A    That is what it says here, yes.    16:29:23
22       Q    And this comment is entitled: "The impact    16:29:25
23   of sub-prime residential mortgage backed securities on    16:29:30
24   Moody's-rated structured finance CDOs: A preliminary    16:29:34
25   review".  Do you have some knowledge of how the other

Page 156

1    rating agencies were rating structured finance assets    16:29:43
2    such as CDOs --    16:29:48
3        MR. ROCHE:  Object to the form.    16:29:51
4        Q    -- at the time of the rating of the    16:29:51
5    Rhinebridge SIV in 2007?    16:29:53
6        MR. ROCHE:  Object to the form.    16:29:55
7        MR. RINGEL:  Object to the form, vague and    16:29:56
8    ambiguous.    16:29:57
9        A    I have to say that I have a very, very    16:29:58
10   generic understanding.    16:30:02
11       Q    Looking at the bottom line of the    16:30:13
12   introduction summary, it says:    16:30:17
13       "Based on our testing, we found that the effects    16:30:19
14   were generally mild to moderate in cases where sub-prime    16:30:22
15   RMBS exposure was low or even approached the observed    16:30:27
16   average of 45 percent.  But in cases where the concentration    16:30:31
17   levels were higher, the potential downgrade impact on SF",    16:30:37
18   which I believe means structured finance "CDO notes was    16:30:41
19   severe, in some cases ten or more notches".    16:30:46
20       Was there information available to    16:30:50
21   Standard & Poor's at this time that confirmed the    16:30:53
22   conclusions in this Moody's report?    16:30:56
23       MR. RINGEL: Objection to form.    16:30:59
24       A    No, I am not aware of specific studies on    16:31:03
25   that.

Page 157

1        Q    Did these results from this investigation    16:31:07
2    by Moody's suggest to Standard & Poor's that their    16:31:09
3    approach to rating structured finance assets, such as    16:31:13
4    CDOs, was not properly considering the actual risk those    16:31:17
5    structured finance assets were facing?    16:31:20
6        MR. RINGEL: Objection to form, foundation,    16:31:24
7    vague and ambiguous.    16:31:26
8        A    I don't see that there is a reference to    16:31:30
9    S&P here.    16:31:33
10       Q    There is no reference to S&P there.    16:31:33
11       A    I thought you said that this was showing    16:31:36
12   that S&P or something --    16:31:38
13       Q    I said do these results from this    16:31:40
14   investigation by Moody's suggest to Standard & Poor's    16:31:42
15   that their approach to rating structured finance assets,    16:31:46
16   such as CDOs, was not properly considering the actual    16:31:49
17   risk those structured finance assets were facing?    16:31:53
18       MR. ROCHE: Object to the form.    16:31:58
19       MR. RINGEL: Same objections.    16:31:58
20       A    No.    16:31:59
21       Q    I am going to mark as Exhibit 292 a    16:32:42
22   document with Bates number S&P-IKB 1966909 through 950.    16:32:44
23       (Exhibit P292 marked for identification)    16:32:57
24       This should be a fairly easy read,    16:33:29
25   Mr. Guadagnuolo.

HIGHLY CONFIDENTIAL

Page 158

1    A  I can see.                        16:33:33
2    Q  There is a lot we were not supposed to   16:33:36
3  know about this Chairman's report here.  I address your   16:33:37
4  attention to the third page of the document that ends in   16:33:42
5  913, but first, this is the June 2007 report from the   16:33:46
6  Board of Directors of the McGraw-Hill companies.  Is   16:33:58
7  that correct?                          16:34:03
8    A  That is what it seems to say on the front   16:34:04
9  page.                                16:34:06
10   Q  You have seen the Board of Directors   16:34:07
11  reports from McGraw-Hill, the parent of   16:34:09
12  Standard & Poor's, is that correct?   16:34:12
13   A  No.                            16:34:14
14   Q  You don't have any reason to believe this   16:34:18
15  is not a copy of the Board of Directors report for   16:34:19
16  June 2007, do you?                   16:34:23
17   A  There is not much in there but I guess the   16:34:26
18  title suggests that it is.              16:34:27
19   Q  At that Board of Directors meeting, in the   16:34:33
20  minutes, it was noted on page 3:  "Unfortunately, growth   16:34:35
21  is not expected to remain that strong in the second half   16:34:39
22  due to continued problems in the housing market."  Was   16:34:43
23  that information that was generally available within   16:34:48
24  Standard & Poor's?                   16:34:51
25     MR. RINGEL:  Objection to form.

Page 159

1     MR. ROCHE:  Object to the form.   16:34:58
2    A  No, at least it was not available to me.   16:35:00
3    Q  It goes on to say:  "Existing home sales   16:35:02
4  continue to fall.  The meltdown in the sub-prime   16:35:04
5  mortgage market will increase both foreclosures and the   16:35:07
6  overhang of homes for sale, while the resulting stricter   16:35:10
7  lending standards are placing a new drag on demand.  The   16:35:15
8  bottom line is that housing is expected to get worse   16:35:19
9  this year before it turns around in 2008."   16:35:22
10      Was that information that was generally understood   16:35:26
11  regarding the sub-prime market within Standard & Poor's at   16:35:29
12  this time, June 2007?                16:35:33
13     MR. RINGEL:  Objection to form.   16:35:36
14   A  As I said before, there were papers   16:35:39
15  produced by S&P ratings talking about the housing   16:35:44
16  market.  In that case there were discussions about   16:35:48
17  whether a certain condition or situation would have or   16:35:52
18  could have possibly impacted some vintages of some   16:35:59
19  ratings, especially below the capital structure, but I   16:36:02
20  have not seen comments in this particular form, and also   16:36:06
21  I suppose this talks about again McGraw-Hill, I suppose   16:36:10
22  probably it was talking the McGraw-Hill in general and   16:36:16
23  not just only ratings, just a part of it.   16:36:20
24   Q  I understand that, but is the fact that   16:36:23
25  those comments were something that were of such

Page 160

1  significance that they became a matter of the minutes of   16:36:28
2  the Board of Directors of the parent company for   16:36:31
3  Standard & Poor's something that suggests that the real   16:36:35
4  risk that ABS was facing at this time was something that   16:36:41
5  should be more directly assessed through the rating   16:36:48
6  process?                            16:36:54
7     MR. RINGEL:  Objection to form.  Also   16:36:56
8  objection to the characterization of the document.   16:36:57
9     MR. ROCHE:  Object to the form.   16:36:59
10   A  It doesn't specifically talk about   16:37:01
11  structured finance.  I guess it is talking about the   16:37:02
12  housing market, which clearly is a big market and can   16:37:05
13  have an impact on pretty much everything.   16:37:08
14   Q  In July 2010, Standard & Poor's put 612 US   16:37:21
15  sub-prime RMBS classes on negative credit watch.  Is   16:37:25
16  that correct?                        16:37:30
17     MR. RINGEL:  Objection to form.  You might   16:37:31
18  want to look at the date you used, the date of your   16:37:32
19  question.                            16:37:38
20   Q  July 10, 2007, sorry.              16:37:43
21     MR. RINGEL:  Do you want to reframe the   16:37:49
22  question so he has it all at once?      16:37:49
23   Q  In July 2007 Standard & Poor's put 612 US   16:37:56
24  sub-prime RMBS classes on negative credit watch.  Is   16:38:03
25  that correct?

Page 161

1    A  That is my understanding, yes.   16:38:08
2    Q  Did that -- strike that.  Was there a   16:38:14
3  discussion within the structured finance rating group   16:38:19
4  about the significance of so many sub-prime RMBS classes   16:38:22
5  being put on negative credit watch at the same time?   16:38:28
6     MR. RINGEL:  Objection to form.   16:38:33
7    A  I seem to have a recollection that there   16:38:37
8  were discussions around the fact that a rating action   16:38:39
9  like that one was about to happen.  Clearly, like all   16:38:45
10  ratings actions that we take, we were looking at it,   16:38:52
11  looking at that, and what that would have meant as an   16:38:56
12  impact to in particular the SIVs that we were looking   16:38:59
13  at.  I also remember that once those downgrades   16:39:01
14  occurred, and I think it was a mixture of downgrades and   16:39:07
15  watch placement, we looked at our vehicles or the SIVs,   16:39:11
16  it clearly was also Rhinebridge, to make sure whether   16:39:16
17  those assets were in the portfolio, and I think it   16:39:20
18  turned out that none of them were in the portfolio that   16:39:23
19  Rhinebridge had at that time, or even afterwards.   16:39:26
20   Q  Independent of the presence or absence of   16:39:32
21  these assets in the Rhinebridge portfolio, does the   16:39:33
22  massive downgrading of so many RMBS classes suggest that   16:39:37
23  the ratings at Standard & Poor's were not capturing the   16:39:43
24  actual risk that these classes were facing?   16:39:47
25     MR. RINGEL:  Objection to form.

41 (Pages 158 to 161)

HIGHLY CONFIDENTIAL

Page 166

1 paragraph in the middle:                              16:46:52
2       "However, given the new underwriting standards,   16:46:56
3 historical data was no guide, since almost half of the  16:46:58
4 sub-prime loans made for house purchases in 2006 were  16:47:03
5 low or no doc loans.  This is from Bear Stearns."  Was that  16:47:09
6 Standard & Poor's understanding at that time?           16:47:16
7       MR. RINGEL:  Objection to form.  I think this    16:47:20
8 may be beyond the scope.  I will permit him to answer   16:47:22
9 but I think he is answering in his personal capacity.   16:47:24
10      A   No, I don't know.                             16:47:33
11      Q   She goes on to say:                           16:47:38
12      "This implies a gigantic amount of fraud was being  16:47:40
13 perpetrated, which does defy common sense.  This also  16:47:43
14 implies not only that the default rates would be much higher  16:47:44
15 than historical data but correlation of mortgage defaults  16:47:50
16 would be higher too, as the entire market was underwriting  16:47:55
17 with weaker credit standards."                          16:47:59
18      Again, was that something that at this time       16:48:03
19 Standard & Poor's understood to be the case?            16:48:06
20      MR. RINGEL:  Same objection as to beyond the      16:48:09
21 scope.  Again, he has testified in his personal         16:48:12
22 capacity.  I will permit him to answer.                 16:48:15
23      MR. CAPUTO:  I take exception, but I am not       16:48:18
24 going to fight on the record.  I am not going to waste  16:48:19
25 time.

Page 167

1       A   Personally, no, I didn't know any of this    16:48:22
2 that Belinda is referring to.                            16:48:24
3       Q   So in doing your work in rating structured   16:48:27
4 finance vehicles, in 2007, you were unaware that the    16:48:30
5 likelihood that default rates would be much higher than  16:48:38
6 historical data and the correlation of mortgage defaults  16:48:41
7 would be higher too because the market was underwriting  16:48:45
8 with weaker credit standards?                            16:48:48
9       MR. ROCHE:  Object to the form.                   16:48:51
10      MR. RINGEL:  Objection to form, given the         16:48:52
11 date.                                                    16:48:54
12      A   First of all, I think, just to correct,       16:48:56
13 rating structured investment vehicles I guess what you  16:48:58
14 meant, and no, I didn't have an understanding about     16:49:00
15 that.                                                    16:49:05
16      Q   She concludes by saying:  "The lack of        16:49:16
17 underwriting standard, the speed at which the RMBS      16:49:18
18 issuance increased and such should have tipped us that a  16:49:20
19 higher level of defaults and correlation would follow."  16:49:26
20      Was there an understanding at Standard & Poor's at  16:49:29
21 that time that that in fact was the case?               16:49:31
22      MR. RINGEL:  Objection to form.  Same             16:49:35
23 objection as before also as to scope.                   16:49:37
24      A   I cannot speak for S&P but I would say I      16:49:40
25 personally was not aware.

Page 168

1       Q   So was there any discussion within           16:49:44
2 structured finance about the likelihood of higher       16:49:46
3 defaults in the RMBS area?                               16:49:50
4       MR. RINGEL:  Your question is directed to        16:49:55
5 structured finance.  Do you mean the entire structured  16:49:57
6 finance group or SIVs?                                   16:49:59
7       MR. CAPUTO:  No, I don't know the answer to      16:50:07
8 that.  It depends on what he tells me.                   16:50:09
9       MR. RINGEL:  All right.  I am going to object    16:50:11
10 because that is an awfully broad question.              16:50:12
11      MR. CAPUTO:  He is in the structured finance      16:50:15
12 group.                                                   16:50:16
13      MR. RINGEL:  So are many other people.  The      16:50:17
14 scope of your 30(B)(6) request is a lot narrower than    16:50:21
15 that.  You have changed terms and I think that is        16:50:23
16 trouble, so I am going to object to form and as beyond   16:50:25
17 the scope.  You may answer.                              16:50:29
18      A   As I testified before, I said I was aware    16:50:32
19 of papers and articles, public articles that were       16:50:36
20 produced in 2007 about the housing market in general,   16:50:40
21 produced by the RMBS group, and in those ones there were  16:50:44
22 discussions about specific vintages and ratings in the  16:50:48
23 capital structure, so we did take note of those.  The   16:50:53
24 reality is that in the SIV sector, particularly in      16:50:58
25 Rhinebridge, those assets were not part of the

Page 169

1 investment in the portfolio, even on the investment     16:51:04
2 guidelines of the manager.                               16:51:07
3       Q   RMBS was not part of the investment          16:51:16
4 portfolio in Rhinebridge?                                16:51:18
5       A   That is not what I said.                      16:51:21
6       Q   Well, let me ask it.  Was RMBS a part of     16:51:28
7 the investment portfolio in Rhinebridge?                 16:51:31
8       A   Yes.                                          16:51:33
9       Q   In light of the information that you are     16:51:37
10 talking about, and this general understanding, was there  16:51:39
11 something more formal that came from higher in the      16:51:42
12 Standard & Poor's hierarchy that suggested to people    16:51:45
13 such as you, who were rating various in this case       16:51:49
14 structured investment vehicles, that there should be    16:51:56
15 some greater concern paid to the changing market forces  16:51:59
16 regarding RMBS?                                          16:52:05
17      MR. ROCHE:  Object to the form.                   16:52:09
18      MR. RINGEL:  Objection to form.                   16:52:10
19      A   No, there was not any formal announcement.    16:52:12
20 What I said is that clearly we produced research, and we  16:52:16
21 were looking at that research from our colleagues, and   16:52:19
22 we were taking note of that, as I said, in our          16:52:22
23 surveillance, continuous surveillance analysis of the    16:52:25
24 vehicles.                                                16:52:29
25      MR. CAPUTO:  Let's go off the record.

43 (Pages 166 to 169)

TAB 10

**From:** Drennan, Gregg (FID) [Gregg.Drennan@morganstanley.com]
**Sent:** Friday, March 02, 2007 11:55 AM
**To:** Drennan, Gregg (FID); Guadagnuolo, Lapo; Katugampola, Navindu (FID); Inglis, Perry; Wallis, Stephen; Neil.Ryan@ikb-cam.de; Valev, Iskren (FID); Chen, Gracie (FID); Frank.Gaertner@ikb.de; Mccabe, Stephen
**Subject:** RE: Update on the AAA rating for Senior Capital Notes

Lapo

Per the below, we still have concerns on your SCN feedback. However, in the interests of time we would like to ensure that we continue to work full speed on all the other issues outstanding (termsheet (which you will receive today), legal docs, due dilligence, etc), understanding that S&P will not be rating the SCNs above A unless the point below is resolved.

In particular, in light of our various discussion on the SCNs, and in order to finalise our collective analyses as quick as possible, we would propose reverting to our previous methodology (used on Cheyne) for rating the MCNs and the CCNs (combo capital notes - I know you guys ultimately didnt rate the CCNs but we had finalised the numbers and methdology). This means that we will be using:
- the simulation model to prove that probability of defeasance (as measured by the probability of a market value drop of a given size) is consistent with a A rating
- the separate excess spread analysis used for both the MCNs and the CCNs

We will refresh both of these analyses with IKB specific numbers and send you results for a) our long term target portfolio (WAL = 3.25yrs), and b) the expected day 1 portfolio (WAL = 4.7 yrs) for your sign off.

We will use the same assumptions (in terms of spread vol, etc) as on Cheyne. However please let us know as soon as possible if there would be any additional sensitivity runs you would require to consider prior to sign off.

I hope that by using this approach we can reach an answer on the MCNs and the CCNs by the end of next week?

Yours,

**Gregg Drennan - Executive Director**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-6967
Mobile: +44 77951-27591
Fax: +44 20 7677-4328
Gregg.Drennan@morganstanley.com

---

**From:** Drennan, Gregg (FID)
**Sent:** 01 March 2007 16:15
**To:** 'Guadagnuolo, Lapo'; Katugampola, Navindu (FID); Inglis, Perry; Wallis, Stephen; Neil.Ryan@ikb-cam.de; Valev, Iskren (FID); Chen, Gracie (FID); Frank.Gaertner@ikb.de; Mccabe, Stephen
**Subject:** RE: Update on the AAA rating for Senior Capital Notes

Lapo,

We are ok for the same rating stresses to be applied (e.g. same market value drop), however we expect the structural features to differ in relation to the senior notes (SNs) and the senior capital notes (SCNs) - ie loss of AAA rating for the SNs will lead to defeasance but loss of AAA rating for SCNs will not result in defeasance but in restricted investments. I believe your committee is mistakenly tieing together two distinct concepts.

The key question is, considering the SIV structure and note features, should loss of either rating result in defeasance:
a) If the SIV loses its A-1+/AAA SN rating it will likely be prohibitively expensive to continue business and it may not even be possible to refinance the SNs, which have an expected WAL of 6 months, hence resulting in liquidation of assets and recognition of market value losses. As such the defeasance trigger simply formally forces a funding stop on raising SNs which likely would have happened anyway.
b) In contrast loss of the SCN rating, whilst having negative reputational effects, will not cause liquidation of the portfolio. Even if the SCNs, with an expected WAL of 5yrs, are shortly coming due and cannot be refinanced, the structure is protected by the 3 year legal tail on the SCNs, and the fact that failure to repay SCNs at expected maturity is a restricted

S&P-IKB 0061760

investments event. Amortisation of the assets will therefore be used to ensure repayment of SCNs and other liabilities (e.g. the structure isnt exposed to losses caused by forced liquidation) - note that the capital note maturity test specifcially tests the ability of asset amortisations to cover liability amortisations.

Please explain why, in the 2nd case, where the downgrade of the SCNs would not otherwise result in liquidation and realised market value losses, you wish there to be a liquidation and realised losses forced on capital noteholders?

Also, we believe that as long as different structural triggers and the risks invovled are clearly explained to investors, this is the key consideration.

I would also stress that your feedback seems illogical given:
- it implies both the SCNS and the MCNs would have the same A rating
- the fact that the recent SIV-Lites have significantly lower subordination below AAA and AA than we are proposing for broadly similar portfolios

Yours,

**Gregg Drennan - Executive Director**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-6967
Mobile: +44 77951-27591
Fax: +44 20 7677-4328
Gregg.Drennan@morganstanley.com

--------------------------------------------------------------------------------

**From:** Guadagnuolo, Lapo [mailto:Lapo_Guadagnuolo@standardandpoors.com]
**Sent:** 26 February 2007 12:03
**To:** Katugampola, Navindu (FID); Inglis, Perry; Wallis, Stephen; Neil.Ryan@ikb-cam.de; Drennan, Gregg (FID); Valev, Iskren (FID); Chen, Gracie (FID); Frank.Gaertner@ikb.de; Mccabe, Stephen
**Subject:** Update on the AAA rating for Senior Capital Notes

Dear All,

as promised, we checked again internally on the feasibility of assigning a AAA rating to the Senior Capital Notes for this vehicle and the outcome is that we are comfortable to allow that provided that assumptions/stresses and rating methodology as a whole used to rate these notes do not differ form the ones used to rate the AAA/A-1+ senior notes.

In other words, among other things, restricted funding must start when the market value of the assets, multiplied by the AAA capital matrices, is enough to cover the par value of all AAA rated liabilities (regardless if they are senior notes or senior capital).

Please let us know how you would like to proceed.

Best regards
Lapo

--------------------------------------------------------------------------------
The information contained in this message is intended only for the recipient, and may be a confidential attorney-client communication or may otherwise be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, please be aware that any dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by replying to the message and deleting it from your computer. The McGraw-Hill Companies, Inc. reserves the right, subject to applicable local law, to monitor and review the content of any electronic message or information sent to or from McGraw-Hill employee e-mail addresses without informing the sender or recipient of the message.
--------------------------------------------------------------------------------
This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS

    S&P-IKB 0061761

Research but it may refer to a research analyst/research report.  Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm.  We do not represent this is accurate or complete and we may not update this.  Past performance is not indicative of future returns.  For additional information, research reports and important disclosures, contact me or see **https://secure.ms.com/servlet/cls**.  You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions.  We cannot guarantee that any such requests received via e-mail will be processed in a timely manner.  This communication is solely for the addressee(s) and may contain confidential information.  We do not waive confidentiality by mistransmission.  Contact me if you do not wish to receive these communications.  In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

CONFIDENTIAL

S&P-IKB 0061762

TAB 11

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------
KING COUNTY, WASHINGTON        )
Individually and on Behalf of   )
All Others Similarly Situated,  )
      Plaintiff,              )
vs.                             ) Civil Action No.
IKB DEUTSCHE INDUSTRIEBANK AG,  ) 1:09-cv-08387-SAS
et al.,                         ) CLASS ACTION
      Defendants.             )
---------------------------------)
IOWA STUDENT LOAN LIQUIDITY     )
CORPORATION, Individually and on )
Behalf of All Others Similarly   )
Situated,                       )
      Plaintiff,             ) Civil Action No:
vs.                             ) 1:09-cv-08822-SAS
IKB DEUTSCHE INDUSTRIEBANK AG,  ) CLASS ACTION
et al.,                         )
      Defendants.             )
---------------------------------
      HIGHLY CONFIDENTIAL

  VIDEOTAPED DEPOSITION OF DAVID ROSA
   TUESDAY, NOVEMBER 29, 2011
PAGES 1 - 172

Page 2

1   APPEARANCES OF COUNSEL:
2
3   FOR THE PLAINTIFF:
4
5     ROBBINS GELLER RUDMAN & DOWD LLP
6     BY: DARRYL J. ALVARADO, ESQ.
7       JOHN RICE, ESQ.
8     655 West Broadway
9     Suite 1900
10    San Diego, CA 92101
11    Tel: 619 231 1058
12    Email: jcaputo@rgrdlaw.com
13
14
15  FOR THE IKB DEFENDANT AND THE WITNESS:
16
17    LOWENSTEIN SANDLER PC
18    BY: ZACHARY ROSENBAUM, ESQ.
19    1251 Avenue of the Americas
20    New York, NY 10020
21    Tel:  212 204 8690
22    Email: tredburn@lowenstein.com
23    Email: hbishop@lowenstein.com
24
25

Page 3

1   APPEARANCES OF COUNSEL (CONTINUED):
2
3   FOR THE DEFENDANTS FITCH:
4
5     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
6     BY: TIM HOLLAND, ESQ.
7     1285 Avenue of the Americas
8     New York, NY 10019-6064
9     Tel: 212 373 3656
10    Email: tholland@paulweiss.com
11
12  FOR THE DEFENDANTS MOODY'S:
13
14    SATTERLEE STEPHENS BURKE & BURKE LLP
15    BY: JIM COSTER, ESQ.
16      JAMES DOTY, ESQ.
17    230 Park Avenue, New York, NY 10169
18    Tel: 212 818 9200.
19    Email: jcoster@ssbb.com
20    Email: jdoty@ssbb.com
21
22
23
24
25

Page 4

1   APPEARANCES OF COUNSEL (CONTINUED):
2
3   FOR THE DEFENDANTS MCGRAW-HILL:
4
5     CAHILL GORDON & REINDEL LLP
6     BY: MEGAN CREMINS, ESQ.
7       GUILLAUME BUELL, ESQ.
8     80 Pine Street
9     New York, NY 10005
10    Tel: 212 701 3000
11    Email: gbuell@cahill.com
12    Email: mcremins@cahill.com.
13
14  FOR THE DEFENDANTS MORGAN STANLEY:
15
16    DAVIS POLK & WARDWELL
17    BY: CHRISTOPHER ROCHE, ESQ.
18    450 Lexington Avenue
19    New York, NY 10017
20    Tel:  212.450. 4513
21    Email: chris.roche@davispolk.com
22
23  ALSO PRESENT:
24
25    WENDY VINER, Videographer

1 (Pages 1 to 4)

Page 13

```
 1       Q  Where was that meeting?
 2       A  Moody's.
 3       Q  For how long did you meet yesterday?
 4       A  Around five hours.
 5       Q  Who was present at that meeting yesterday?
 6       A  Joe and James, and Angela popped in for
 7  five minutes.
 8       Q  Was anyone on the phone during the meeting
 9  yesterday?
10       A  Yes, we called the lady from the fee
11  department so that I could testify today about that
12  area, if questioned.
13       Q  The fee department at Moody's?
14       A  Yes.
15       Q  Do you recall the name of that woman?
16       A  It will come to me.  Not immediately.
17       MR. COSTER:  What is her name?
18       MR. DOTY:  Deborah Gonzalez.
19       A  Deborah Gonzalez.
20       Q  During the first meeting, did you review
21  any documents?
22       A  Yes.
23       Q  About how many documents did you review?
24       A  I didn't count them.  I wouldn't know.
25  Several documents.
```

Page 14

```
 1       Q  Can you give me an approximation of the
 2  number of documents you reviewed at the first meeting?
 3       A  No.
 4       Q  More than 50?
 5       A  No, less than 50.
 6       Q  More than 20?
 7       A  I think around that number.
 8       Q  What types of documents did you review
 9  during the first meeting?
10       A  E-mails and committee memos.
11       Q  How much time did you spend reviewing
12  documents?
13       A  In that meeting?
14       Q  Correct.
15       A  I wouldn't know.  I think one is presented
16  a document and I read it and prepared for this
17  deposition, but I wouldn't be able to give you an exact
18  time.
19       Q  Did any of the documents that you reviewed
20  during the first meeting refresh your recollection?
21       A  No, not particularly.  I had an idea of
22  the rating process for Rhinebridge and it sort of helped
23  me to be able to prepare to testify today.
24       Q  Who selected the documents that you
25  reviewed during the first meeting?
```

Page 15

```
 1       MR. COSTER:  Object to form.  To the extent
 2  your attorney showed you documents it is privileged
 3  what documents were shown to you, but I will let you
 4  answer subject to the objection.
 5       A  The documents or the committee memos that
 6  we ourselves prepared to rate Rhinebridge, they were
 7  selected by the counsel, but then upon reading them we
 8  may have selected or asked to see other committee memos,
 9  so that is the way the process worked.
10       Q  Did you review any documents that were not
11  provided to you by your attorneys?
12       MR. COSTER:  Object to form, just ignored the
13  earlier answer.  You can answer.
14       A  No.
15       Q  Did you review any deposition transcripts
16  or deposition videos in preparation for today's
17  deposition other than the deposition of last April 2011
18  deposition that you said that you looked at?
19       MR. COSTER:  Object to form.
20       A  No, not depositions, no.  Not other
21  people's depositions, no.
22       Q  How about during the second meeting, did
23  you review documents during the second meeting?
24       A  Yes, it was the same as the first, memos
25  and e-mails.
```

Page 16

```
 1       Q  Did any of the documents you reviewed
 2  during the second meeting refresh your recollection?
 3       A  Of the process, yes, it confirmed my
 4  recollection of the process.
 5       Q  And what recollection was that?
 6       MR. COSTER:  Object to form.
 7       A  Just the way we rate SIVs in general and
 8  that Rhinebridge followed the same approach, so it
 9  reinforced my prior view.
10       Q  How about in the third meeting at the
11  hotel with Mr. Doty and Ms Jung and Ms Lau, did you
12  review documents during that meeting?
13       A  Yes, we did.
14       Q  Do you know approximately how many
15  documents you looked at during that meeting?
16       A  There were not many.  It was after work
17  and we didn't spend a lot of time, so perhaps around
18  ten.
19       Q  What types of documents were they?
20       A  E-mails and committee memos, around the
21  rating process of Rhinebridge.
22       Q  Did any of the documents reviewed at the
23  third meeting at the hotel refresh your recollection?
24       A  The answer I gave to the previous meeting
25  still applies.  It confirmed my understanding of how we
```

4 (Pages 13 to 16)

```
1   had rated Rhinebridge and it allowed me to observe the
2   facts looking at the memos that we -- what we had done
3   was exactly as we had rated other SIVs before.
4        Q   Did the documents refresh any other
5   recollection?
6        MR. COSTER:  Object to form, mischaracterizes
7   the earlier testimony.
8        A   No, nothing in particular, no.
9        Q   How about in yesterday's meeting, did you
10  review documents yesterday?
11       A   Yes.
12       Q   Approximately how many documents did you
13  review yesterday?
14       A   Less than 10.  Around 10 or less than 10.
15       Q   Did any of the documents you reviewed
16  yesterday refresh your recollection?
17       A   No.  They confirmed my prior view of the
18  way we rated Rhinebridge to be able to testify today.
19       Q   Who selected the documents that you looked
20  at yesterday?
21       MR. COSTER:  Object to form.  To the extent
22  your lawyer sourced the document it is privileged, if
23  not then it is not privileged, then you can answer
24  subject to that objection.
25       A   Counsel selected documents.  There was one
```

```
1   actually asked for.
2        Q   What was that?  There was one that you
3   actually asked for, is that what you said?
4        A   Yes.
5        Q   Which document was that?
6        A   Can I?
7        MR. COSTER:  Sure.
8        A   The time schedule.  So I could not
9   remember exactly when we -- to get the dates right when
10  we rated and we assigned and when we received the
11  application form, when we assigned the first rating.  I
12  could not remember that, when did the committees take
13  place, when did we take rating action and so forth.  I
14  couldn't remember the month and so I asked for a
15  timeline.
16       Q   What is the time schedule?  Is that a
17  document that was created by Moody's?
18       MR. COSTER:  Object to form.  If you know.
19       A   Sorry?
20       MR. COSTER:  If it was prepared by counsel
21  don't testify to it.  If it was prepared by Moody's you
22  can testify to it.  If you don't know you can say you
23  don't know.
24       A   I asked counsel for it so that I could --
25  just the dates and which months and which things.
```

```
1        MR. COSTER:  His question is do you know who
2   prepared it.
3        A   No, I don't know.  It is publicly
4   available information.  I was lazy.  I could have got it
5   myself but I asked for help.
6        Q   Did any other documents refresh your
7   recollection that you reviewed yesterday?
8        MR. COSTER:  Object to form, mischaracterizes
9   the earlier testimony.
10       A   No.
11       Q   Did you communicate with anyone other than
12  your attorneys, Ms Lau or Ms Jung, in preparation for
13  today's deposition?
14       A   Paul Kerlogue.
15       Q   Paul Kerlogue.  When did you speak to
16  Mr. Kerlogue?
17       A   Yesterday.
18       Q   Why did you speak to Mr. Kerlogue?
19       A   Again, to prepare for this deposition, get
20  his views.  He was the analyst after Fanny left.  He had
21  reviewed the legal documents and so I wanted to also
22  have a discussion with him.
23       Q   What legal documents are you referring to
24  in your prior answer?
25       A   The transaction documents.  Collateral
```

```
1   management agreement, trustee agreement, swap
2   documentation, the issuer's memorandum of association,
3   the whole legal structure for Rhinebridge.
4        Q   Is Mr. Kerlogue a current Moody's
5   employee?
6        A   Yes.
7        Q   What is his position at Moody's?
8        A   His position is Vice President Senior
9   Credit Officer, I believe.
10       Q   Did you meet with him at Moody's offices
11  in London?
12       A   Yes.
13       Q   Was anyone else present during your
14  meeting with Mr. Kerlogue?
15       A   James.
16       Q   Did you make any efforts to speak with
17  anyone else in preparation for your deposition today?
18       MR. COSTER:  Object to form.  Other than any
19  people he has already identified?
20       Q   Yes.  Any other people?  You said you
21  talked to your lawyers, Angela Jung, Fanny Lau and Paul
22  Kerlogue.  Is that right?
23       MR. COSTER:  And Deborah Gonzalez.
24       Q   And Deborah Gonzalez.
25       A   Yes.  No, these are the people which had
```

1  am not 100 percent sure, but that is the way it works,
2  so it becomes more and more granular, what is the rating
3  of asset, what is the asset class, what is the WAL, what
4  is the liability, and then all of that together provides
5  the final haircut, which again is a stress on top of the
6  market value of the assets, which is the key or one of
7  the key components we are always looking at.
8      MR. ALVARADO:  Why don't we go ahead and take
9  a break.
10      THE VIDEOGRAPHER:  Going off the record.  The
11  time is 12:47.
12          (Break for Lunch.)
13      THE VIDEOGRAPHER:  We are back on record.  The
14  time is 1:43.
15      MR. ALVARADO:  Do you understand you are still
16  under oath, Mr. Rosa?
17      A  Yes.
18      Q  We talked about haircut matrices earlier.
19  Do you remember that testimony that you gave about
20  haircut matrices?
21      MR. COSTER:  Object to form.
22      A  I remember you asked about it.
23      Q  And a haircut is a discount applied to the
24  market value of the SIV's assets, right?
25      MR. COSTER:  Object to form.  No foundation.

1  You can answer.
2      A  Yes it is a stress which could be viewed
3  as a discount, a discount factor, I guess.
4      Q  And what are haircuts used for?
5      MR. ROCHE:  Object to form.
6      MR. COSTER:  Object to form.  Outside the
7  scope.  If you want to ask about the Rhinebridge SIV
8  you can.
9      MR. ALVARADO:  I will withdraw.  What were the
10  haircuts that were applied to the Rhinebridge SIV, what
11  were the purpose of those haircuts?
12      MR. ROCHE:  Object to form.
13      MR. BUELL:  Object to form.
14      MR. COSTER:  Same objection.  You can answer.
15      A  As I have tried to explain, in rating the
16  senior notes, the CP and the MTN, we start with the
17  market value of the assets.  We then look at the
18  operating states of the vehicle and, in particular, the
19  triggers that lead to restricted funding, because that
20  is the first protection mechanism of the SIV.  Then the
21  second layer of analysis is the qualitative analysis,
22  the quality of the investment manager, the strength of
23  the sponsorship from in this case IKB.  Then, thirdly,
24  for the senior notes, we also look at a particular
25  analysis which has to do with the capital adequacy.  In

1  relation to the capital adequacy, the haircuts play a
2  role, in the sense that they are an additional stress to
3  the market value of the assets, and if that stress goes
4  below a certain level, the way the operating states of
5  the vehicle work is that could also lead to a change in
6  operating state, but beyond that they allow us to
7  monitor the vehicle and see up-front not only what is
8  the market value today but also what is the scenario in
9  the future, and a stressed scenario in the future,
10  and if there is enough cushion on the capital side to
11  absorb such a particular event.  So that is the role
12  they play in SIVs and in Rhinebridge.
13      Q  Do the haircuts contribute to the sizing
14  of the cushion?
15      MR. COSTER:  Object to form.
16      A  One of the factors that influence the size
17  of the capital notes are the haircuts.  The second
18  factor is the actual rating of the capital notes
19  themselves, because the larger the capital notes the
20  higher their rating, because the lower will be the
21  likelihood of a defeasance, so it is one of the many
22  factors that determine the overall size of the cushion.
23      Q  How are haircuts calculated?
24      MR. COSTER:  Object to form.  Talking about
25  the haircuts in Rhinebridge, right?

1      Q  Just generally, how are haircuts
2  calculated?
3      MR. COSTER:  Don't answer the question.
4  Beyond the scope.
5      MR. ALVARADO:  You are instructing him not to
6  answer on the beyond the scope basis?
7      MR. COSTER:  Yes.  That question was also
8  asked of other witnesses.  If you tie it to
9  Rhinebridge, it is fine.  If you want a witness on SIVs
10  in general, you should have said so.  We told you we
11  would testify here as to the rating of the Rhinebridge
12  SIV.  If you want to find out about that, you can ask
13  him about the Rhinebridge SIV.
14      Q  How were the haircuts that were used in
15  the Rhinebridge SIV calculated?
16      MR. BUELL:  Object to form.
17      A  In the case of the Rhinebridge SIV, we
18  followed an equivalent process as we have been
19  discussing for the capital notes, in relation to rating
20  the capital notes.  So first of all there was a proposal
21  put forward by the manager, and in this case together
22  with the arranger.  My recollection or my understanding
23  is that the proposal is very similar, if not identical,
24  to the proposal that was put forward for the Cheyne SIV.
25  So in that regard part of the work that was done for

26 (Pages 101 to 104)

1   Cheyne on our side was, you know, to restate, we had the
2   benefit of extensive amount of work that we did for
3   Cheyne, and there was a particular committee where those
4   haircuts were discussed, because Rhinebridge made a
5   proposal for having a senior capital note with a rating
6   of AAA, and therefore, to be able to provide feedback to
7   that proposal, we had to once again review the haircuts
8   in the context of Rhinebridge.  So we discussed again to
9   what extent there would be a need to change anything
10  that was discussed at the time of Cheyne.  We then
11  provided feedback in relation to rating the senior
12  capital notes, which was different from Cheyne, so then
13  there is the Cheyne structure.
14      So, in summary, to rate the senior notes, we look
15  at market value, the operating states, we look at the
16  haircuts in connection to Rhinebridge, the work that was
17  done, extensive work that was done for rating Cheyne was
18  used here as well, when providing feedback.  There was a
19  specific difference in relation to Cheyne and there was a
20  committee that discussed that difference.
21      Q   The haircuts that were used to rate the
22  Rhinebridge senior notes were identical to the haircuts
23  used to rate the Cheyne SIV senior notes, were they not?
24      MR. COSTER:  Object to form, foundation.
25      A   I don't have a specific recollection.  My

1   understanding is in the memo you showed me, the
2   committee memo you showed me.  Well, here actually, this
3   one, 377, that what we see here is the same as in
4   Cheyne.  I mean, the one -- the last matrix capital
5   requirement factor, I recall from the depositions on
6   Cheyne that the CDO bucket had a stress which was above
7   the others.  I can see it here.  So that one seems very
8   similar, if not identical.  The others I can't respond
9   with the same level of confidence, but my general
10  understanding is that if not similar, very similar.
11      Q   They were identical, weren't they?
12      MR. COSTER:  Object to form.  Asked and
13  answered.  He just answered the question.  You can
14  answer it again.
15      A   To my best recollection, if not identical,
16  very similar.
17      Q   So despite the fact that there had been
18  two years of additional data following the close of
19  Cheyne, Moody's didn't update the haircuts.  Right?
20      MR. COSTER:  Object to form.
21      MR. BUELL:  Object to form.
22      MR. COSTER:  Completely ignores the earlier
23  testimony.
24      A   So the analysis that we did to rate
25  Rhinebridge, we took into consideration the work we had

1   done in Cheyne, took into consideration the work that we
2   were doing across the sector, because other managers
3   were putting forward similar proposals, and we took into
4   consideration market events since rating Cheyne, which
5   at that point were very, very positive.  There had been
6   no rating transitions on the asset classes Rhinebridge
7   was intended to invest in, and from a market value
8   perspective there had been no indication whatsoever on
9   that point that our assumptions needed to be revised.
10  An important thing to understand this fully is that the
11  Cheyne haircuts had already been constructed, and
12  assuming very, very distressed scenarios, and we had
13  reviewed that over a period of two years, and the
14  following years simply reinforced our previous
15  assumptions.  Nothing materially -- nothing significant
16  happened.  Therefore, our understanding at the point of
17  rating Rhinebridge is that our stresses should be
18  maintained.
19      Q   I will mark Exhibit 378.
20      (Exhibit P378 marked for identification)
21      Exhibit 378 is an e-mail string bearing Bates
22  number MDYS RHNB 050532 through 050533.  The e-mail string
23  begins at the bottom of page ending 532.  It is an e-mail --
24  it is the same e-mail that we looked at earlier in Exhibit
25  375, where Morgan Stanley sent along a simulation model to

1   yourself and Angela and Fanny.  Do you see that?
2       A   Yes.
3       Q   Have you compared that with Exhibit 375?
4       A   Yes.
5       Q   Fanny responded to that e-mail, do you see
6   that, on February 7 and she says:
7       "Hi, Navindu.  In your memo, there is the
8   following paragraph under the section mean spread used in
9   the model:  For the calibration runs, we will use the mean
10  historical spreads that were originally computed in order to
11  produce our capital matrices proposal to Moody's.  They are
12  based on historical spread data analysis and interpolations
13  as described in our memo 'Haircut matrices proposal' sent to
14  you on 2 July 2004.
15      "Could you please send us a copy of the haircut
16  proposal when you are free."
17      Do you see that?
18      A   Yes.
19      Q   So Fanny is requesting that Morgan Stanley
20  send along the haircut proposal that Morgan Stanley is
21  putting forward.  Correct?
22      MR. COSTER:  Object to form, vague and
23  ambiguous.
24      A   Yes, my interpretation of 378 is that it
25  follows 375.  Fanny received the simulation model, there

Page 165

1        Q   And it says: "Key test breach.
2    Rhinebridge has breached its NCO5 test on 7 September,
3    Friday last week, and is currently in Restricted
4    Investment."  Do you see that?
5        A   Yes.
6        Q   We touched on it earlier today, but can
7    you describe for me what the NCO5 test is?
8        MR. COSTER:  Object to form, asked and
9    answered.
10       A   Yes.
11       MR. COSTER:  You can answer it again.
12       A   Okay.  I will make reference to -- it is
13   easier to respond that way -- to our presale.  So
14   referencing Exhibit 381, 42003, the liquidity tests are
15   comprised of four different analyses.  The first one is
16   the one day test, the five day, the 10 and the 15.  In
17   relation to the one and the five day test, we compare
18   the net cumulative outflows, so these are the outgoings,
19   CP and MTNs which are maturing over the next year, and
20   we compare those with the available liquidity, such as
21   committed repos, breakable deposits, asset puts, money
22   market funds and committed liquidity facilities provided
23   by P one rated financial institutions with same day
24   availability, no cancellations and limited default
25   clauses.  So, in essence, we are comparing outflows with

Page 166

1    available liquidity and cash in deposit.  So all of that
2    then, either the liquidity -- all these forms of
3    liquidity is greater or lower than the one day and the
4    five day test.  If it is lower, there is a breach.  So
5    there is no -- from these tests there is no -- we give
6    zero value to LEAs.  So this is actually a good example
7    of how the tests are so broad, in some cases we give
8    value LEAs with haircuts, other cases we don't, so that
9    we capture the full type of risks that an SIV may face,
10   and in this particular situation there seems to have
11   been a breach of the Exhibit 384, there seems to be a
12   breach in the NCO5.
13       Q   Okay.  So the five just represents how
14   much outflow is expected within the next five days.  Is
15   that right?
16       MR. COSTER:  Object to form.  He just
17   testified as to what the 5 was.
18       A   No, it is the cumulative five, so it is a
19   rolling window of five days, so it is the next five
20   days, then it is the second day to the sixth, the third
21   day to the seventh, so it is a rolling window of five
22   days up to one year.
23       Q   Okay, and then there is the box there that
24   represents the portfolio.  Do you see that?
25       A   Yes.

Page 167

1        Q   It says: "Portfolio size, USD
2    2.26 billion" and WAL, weighted average life, 3.35
3    years.  Do you see that?
4        MR. BUELL:  Objection, mischaracterizes the
5    document.
6        A   Yes, I see that, yes, weighted average
7    3.35, yes.
8        Q   And the third entry there is "home equity
9    loans".  Do you see that?
10       A   Yes.
11       Q   If you look over to the right, to the
12   furthest right, the total percentage of home equity
13   loans in a Rhinebridge SIV as of September 7, 2007 was
14   49.8 percent.  Right?
15       MR. COSTER:  Object to form, no foundation,
16   assumes facts not in evidence.
17       A   Yes, that is what it says here.
18       Q   And then there is the other asset types
19   are also listed there, right, "cash equivalents", do you
20   see that?
21       A   I do.
22       Q   And that is 3.3 percent?
23       A   Yes.
24       Q   And then there is a note after the table
25   there that says "Large RMBS exposure, almost 95 per cent

Page 168

1    of the portfolio comprised of assets with
2    direct/indirect RMBS exposure.  Nearly 50 percent of the
3    portfolio is comprised of HELs."  Does that comport with
4    your recollection of the Rhinebridge SIV's RMBS
5    exposure?
6        MR. COSTER:  Object to form, no foundation.
7        A   I think so, yes.  There is nothing here
8    that is surprising.
9        MR. ALVARADO:  I might be done.  Can I take
10   five minutes?
11       MR. COSTER:  Sure.
12       THE VIDEOGRAPHER:  Going off the record.  The
13   time is 4:31.
14
15       (A short break)
16       THE VIDEOGRAPHER:  We are back on the record.
17   The time is 4:46.
18       MR. ALVARADO:  I have no further questions at
19   this time.  Thank you for your time.
20       MR. COSTER:  Anybody else.
21       MR. BUELL:  No questions.
22       MR. ROCHE:  No questions.
23       MR. COSTER:  We want to mark it "Highly
24   Confidential".  Mr. Rosa would like to review and sign
25   the transcript.

42 (Pages 165 to 168)

TAB 12

| From: | Katugampola, Navindu (FID) <Navindu.Katugampola@morganstanley.com> |
| Sent: | Wednesday, February 7, 2007 2:28 PM (GMT) |
| To: | Lau, Fanny <Fanny.Lau@moodys.com> |
| Cc: | harvey <harvey@morganstanley.com>; Jung, Angela <Angela.Jung@moodys.com>; Rosa, David <David.Rosa@moodys.com> |
| Subject: | RE: Simulation Model memo - 6 February 2007 sent to Moodys.doc |

Fanny,

In the calibration runs we have been sending you we have actually been using current market spreads, not mean historical spreads. This gives a more accurate representation of the portfolio's current market value in the simulation, and thus should make it easier to tie out numbers closer to pricing (when, as the model memo describes, we would be using then current market spreads). The memo you refer to was part of our original proposal to you to determine the Capital Requirement Matrices, which should stay the same.

Thanks,

Navindu

**Navindu Katugampola**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-4266
Mobile: +44 78018-18252
Fax: +44 20 7056-2041
Navindu.Katugampola@morganstanley.com

From: Lau, Fanny [mailto:Fanny.Lau@moodys.com]
Sent: 07 February 2007 10:01
To: Katugampola, Navindu (FID)
Cc: harvey; Jung, Angela; Rosa, David
Subject: RE: Simulation Model memo - 6 February 2007 sent to Moodys.doc

Hi Navindu,

In your memo, there is the following paragraph under the section mean spread used in the model:

For the calibration runs, we will use the mean historical spreads that were originally computed in order to produce our capital matrices proposal to Moody's. They are based on historical spread data analysis and interpolations as described in our memo "Haircut matrices proposal" sent to you on 2-Jul-2004.

Could you please sent us a copy of this haircut proposal when you are free?

Many thanks,
Fanny

-----Original Message-----
From: Katugampola, Navindu (FID) [mailto:Navindu.Katugampola@morganstanley.com]
Sent: 06 February 2007 17:22
To: Lau, Fanny; Jung, Angela; Rosa, David
Cc: harvey
Subject: Simulation Model memo - 6 February 2007 sent to Moodys.doc



EXHIBIT
P378
11.29.11

Fanny & team,

Please find attached the Rhinebridge simulation model memo, as requested. I am working on producing a summary of this, and will send this through as well.

Thanks and regards,

Navindu

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

**The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you. Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.**

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

MDYS RHNB 050533