TAB 13



## Structured Credit
## Europe/US
## New Issue Report

# Rhinebridge Plc

**Analysts**

Patrick Clerkin
+44 20 7417 4279
patrick.clerkin
@derivativefitch.com

Alan Dunetz
+1 212 908 0733
alan.dunetz
@derivativefitch.com

Glenn Moore
+44 20 7862 4167
glenn.moore
@derivativefitch.com

**Performance Analytics**

Emmy Bronsema
+44 20 7417 3559
emmy.bronsema
@fitchratings.com

Katerina Vladimirova
+44 20 7862 4164
katerina.vladimirova
@derivativefitch.com

## Final Ratings

| Class | Programme Size (USDbn) | Priority | Rating |
|---|---|---|---|
| US CP | 20[a] | Senior | F1+ |
| US MTN | 20[a] | Senior | AAA |
| Euro CP | 20[a] | Senior | F1+ |
| Euro MTN | 20[a] | Senior | AAA |
| Senior Capital Notes | 3[b] | Subordinate | AAA |
| Mezzanine Capital Notes | 3[b] | Subordinate | A |
| Junior Capital Notes | 3[b] | Subordinate | NR |
| Combo Note | 3[b] | Subordinate | BBB |

a Subject to a USD20bn limit
b Subject to a USD3bn limit
Source: Rhinebridge documentation

## Key Parties

| | |
|---|---|
| **Manager** | IKB CAM, London branch |
| **Sponsor** | IKB Deutsche Industriebank AG |
| **Administrator** | QSR Management Limited |
| **Liquidity Providers** | 'F1+' or 'F1' rated institutions |
| **Security Trustee and Principal Paying Agent** | The Bank of New York, London branch |

Source: Rhinebridge documentation

## Key Features

o   Innovative three tier capital structure (including 'AAA' senior capital notes) designed to reduce probability of enforcement.

o   Rhinebridge has launched with approximately 83% 'AAA', 13% 'AA' and 4% 'A' of which 17% of the portfolio was invested in seasoned bonds.IKB AG is a significant sponsor of Rhinebridge Plc, with a strong co-investment commitment in the capital notes.

o   Although a new structured investment vehicle (SIV) manager, the team has a very strong track record in managing the asset classes targeted for the portfolio, which launched with a high home equity loan (HEL) exposure.

o   Launch size USD2.4bn.

o   Interest rate risk on HELs requires more management than other ABS products.

o   Comprehensive analytical tools and resources in place to manage the risks in the portfolio and investment decisions are based on a range of macroeconomic, transaction-specific criteria and portfolio analysis.

o   IKB AG has successfully advised an ABCP conduit for five years.

Highly Confidential

FITCH-RHINE 00047584

DerivativeFitch

## Summary

Rhinebridge Plc, an SIV incorporated in Ireland, and Rhinebridge LLC., its wholly owned subsidiary incorporated in Delaware (together Rhinebridge, or the issuer), are to be sponsored by IKB AG and managed by the London branch of IKB Credit Asset Management Gmbh (IKB CAM). IKB CAM was established in September 2006 as the credit asset management arm of IKB AG. IKB CAM is a wholly owned subsidiary of IKB AG and also benefits from Patronaterklarung as well as a profit and loss sharing agreement. IKB CAM advises on Rhineland, a USD16bn asset-backed commercial paper (ABCP) programme, and over USD7bn for IKB AG's balance sheet.

Fitch's ratings are based on the financial strength of the structure, the standards imposed by the operating guidelines, the strength of the management team and the infrastructure in place to support the programme. The ratings of the senior notes address the payment of interest and principal, and part of the rating analysis focuses on the certainty of senior note repayment should Rhinebridge enter a restricted funding or enforcement state. In the restricted funding state, the vehicle is no longer allowed to issue senior notes and may be forced to liquidate assets to pay maturing senior notes. The rating on the capital notes, which addresses the ultimate payment of interest and principal (on or before legal final maturity), reflects the probability of the structure entering a restricted funding state (please see *States of Operation* section below). The capital rating analysis therefore factors the structure's ability to avoid both enforcement and substantial realised losses arising from credit impairment in the investment portfolio.

## Structure

The issuer will acquire assets purchased subject to the operating limits that are highlighted in the structural section of this presale. The investments are managed according to a set of portfolio guidelines and the weighted-average rating at launch was 'AA'. Rhinebridge will initially finance these assets using US commercial paper (CP). However, over time it will access the Euro and US medium-term notes (MTN) and Euro and US CP markets (collectively, the senior notes), together with the capital note programmes.

The capital notes use a three tier structure: senior, mezzanine and junior capital notes and a combination note. Fitch has assigned final ratings to the senior notes and the senior and mezzanine capital notes to be issued by Rhinebridge as indicated in the ratings table on page 1. The junior capital notes are unrated.

The combination capital notes will contain senior capital note, mezzanine capital note and junior capital note components in a defined proportion. These combination notes are rated 'BBB' at closing.

## Management

Fitch's analysis of Rhinebridge's notes recognises the fundamental importance of the manager. The Rhinebridge team is responsible for actively managing a broad range of business areas, including portfolio management, credit analysis, cash flow and funding, liquidity management, interest rate and FX management. Recognition of the breadth of the management role, and the ability of the management team to fundamentally influence the risk profile of the business, is what distinguishes the analysis of Rhinebridge from that of other structured finance transactions.

Highly Confidential

FITCH-RHINE 00047585

DerivativeFitch

## Management Biographies

**Winfried Reinke**, *CEO, IKB Credit Asset Management GmbH*

Mr. Reinke established IKB CAM in September 2006. He has 29 years' experience in the banking and capital markets. From 1996, he was head of treasury and financial markets at IKB Deutsche Industriebank AG, sharing responsibility with Michael Braun for the group funding, liquidity management, asset and liability management, product development, proprietary trading and fixed income management. He developed IKB AG's securitisation programmes (Provide, Bacchus and Equinotes), was responsible for the growth of the bank's investment business in structured credit product and established Rhineland Funding, the ABCP conduit. Mr. Reinke was managing director of IKB AG's Luxembourg subsidiary as well as head of its Luxembourg branch from 1991 to 1996, having previously spent seven years in a senior position in the export finance department of IKB AG in Düsseldorf. Prior to joining IKB AG in 1984, Mr. Reinke worked in the export finance division of DG Bank, Frankfurt and as a credit analyst with Citibank, Frankfurt. Mr. Reinke studied economics at the University of Saarbrücken, where he obtained his degree in 1978.

**Dr. Frank Lehrbass**, *CIO, IKB Credit Asset Management GmbH*

Dr. Frank Lehrbass joined IKB Credit Asset Management GmbH in January 2007. He previously worked with DG Hypothekenbank AG, Hamburg where he headed the portfolio management and structured credit group. Prior to that appointment, he was head of credit risk modelling, where his responsibilities included the bank-wide implementation of Credit Risk+ and the RAROC approach. He was also responsible as managing director for the foundation of the NPL servicer IMMOFORI and for the full risk transfer of exposures via the Bauhaus and Provide transactions. Dr. Lehrbass had previously headed the analytics and systems group within the credit management division of WestLB. He started his professional career at WestLB as trader in the index derivatives group. Dr. Lehrbass was educated at the University of Bonn, Johns-Hopkins University, Baltimore, and Mannheim, where he was awarded an M.A. degree in economics. He also holds a PhD in economics from the University of Dortmund. Dr. Lehrbass is the author of several publications in the fields of credit risk measurement (among others, "*Credit Risk+ in the Banking Industry*"), Structured product pricing, non-performing loans and real estate investment banking and has been a speaker at various European ABS and credit portfolio management conferences.

**Michael Braun**, *Managing Director, Head of Treasury and Financial Markets, IKB AG and Member of Advisory Board, IKB Credit Asset Management GmbH*

Michael Braun has been head of the treasury and financial markets division of IKB Deutsche Industriebank AG, Düsseldorf since April 1991, sharing responsibility with Mr. Reinke for group funding, liquidity management, asset and liability management, product development, proprietary trading and fixed income management. He, along with Winfried Reinke, was one of the founders and promoters of IKB AG's securitisation programmes. His current responsibilities comprise investments in structured credit portfolios (ABS and CDOs) as well as the bank's balance-sheet securitisation transactions (corporate loans, leveraged loans, CMBS, sub debt and infrastructure finance). He is also a member of the advisory board of IKB Credit Asset Management GmbH. In this respect, he has taken up prime functions specifically with respect to the company's advisory position for Rhineland Funding. From 1986 to 1991, he was managing director of IKB AG's Luxembourg subsidiary as well as head of its Luxembourg branch, where his prime responsibilities were the corporate lending business, treasury and capital markets activities. Mr. Braun started his professional career at IKB AG in 1979, working as a legal counsel with responsibilities in the areas of international finance, workout and real estate leasing. Mr. Braun holds a full legal degree from Albertus Magnus University, Cologne, and the Ministry of Justice of North-Rhine Westfalia.

Highly Confidential

FITCH-RHINE 00047586

**DerivativeFitch**

**Neil Ryan**, *Director, Head of IKB Credit Asset Management, London branch*

Neil has over 17 years' experience in credit markets and is responsible for managing the portfolio, setting strategic and tactical goals and managing the branch operations from London. He originally joined Manufacturers Hanover in 1989 and completed the New York-based management training programme, returned to London with Abbey National Treasury Services (1992 to 1994) and Lehman Brothers (1994 to 1996). Mr. Ryan then worked at BNP Paribas and BW Bank Ireland plc (now LBBW) before becoming managing director at Naspa Dublin in 2001. There he was responsible for managing the Irish regulated bank that ran a full trading book portfolio across ABS (RMBS, CMBS, CDO, NPL and whole business ABS), bank FRNs and corporates as well as a loan and asset swap book. He returned to London and established IKB CAM, London branch in 2006. Mr. Ryan graduated in law (LL.B., Trinity College Dublin 1988 and LL.M., London School of Economics 1989) before completing an MBA at London Business School (1996). As well as being a part-time lecturer at UCD, he was a founder member of the Irish Securitisation Forum in 2005.

**Uta Kubis**, *Director, Senior Portfolio Manager*

Uta Kubis is responsible for the CDO investments in the portfolio. She is also the head of the cash CDO investment team at IKB CAM and had previously been an investment officer at IKB CAM in Düsseldorf before joining the London branch in March 2007. From 2001 to 2004, she was a CDO analyst as well as an analyst for trade receivables transactions in the risk management department of IKB AG. Before joining IKB AG, she had worked at Commerzbank AG, Frankfurt as a credit analyst within the domestic corporate lending business, focusing on large and mittelstand lending as well as workout loans. She was also heavily involved in the development of a rating system for Basel II. Ms. Kubis studied at the Bankakademie in Dortmund, where she obtained her degree as a bank officer in 2005.

**Dr. Klaus Dieter Bauknecht**, *Director, Head of Credit Research*

Klaus Bauknecht joined IKB AG in early 2004 to head up the research effort. Prior to joining IKB AG, he was a director in the National Treasury of South Africa, responsible for econometric model building for tax policy simulations. He was also responsible for further developing the macro-econometric model and for providing economic forecasts for the National Treasury's three-year budget process and inflation outlook. Mr. Bauknecht also worked for ING Barings in Johannesburg/London where he was responsible for economic, fixed income and top-down equity research. While working as a financial analyst, he ranked among the top four analysts for economic and innovative research in the annual financial mail survey of institutional equity and fixed income investors. Mr. Bauknecht holds a Master in Commerce cum laude and PhD in Economics/Econometrics from the University of Stellenbosch, South Africa and has been a guest lecturer at several South African universities.

Highly Confidential

FITCH-RHINE 00047587

DerivativeFitch

## Fitch Analysis

### Monte Carlo Modelling

The main risks to the Rhinebridge portfolio arise from any sudden defaults, sharp spread widening and liquidity stresses that could make it difficult to roll over the short-term liabilities. As part of the analytic process, Fitch uses the agency's SIV model to analyse Rhinebridge's exposure to credit risk and market risk. Its analysis focuses on the potential change in the portfolio's value and capital requirements caused by defaults, rating transitions and general market spread widening.

The change in asset value is determined using both a stressed, scenario-based approach and a simulation approach. The first determines the maximum fall in asset value resulting from an immediate spread widening and the portfolios sensitivity to different asset classes. The second simulates the distribution of asset values at the end of an exposure period, resulting from a combination of spread widening and rating transition.

The Fitch SIV model is a multi-time-step Monte Carlo simulation model based on the VECTOR engine. It calculates the effect of rating transitions and movements in credit spreads on the market value of the portfolio in each period.

At the end of each time step, the portfolio cash flows are calculated. Asset mark-to-market gains and losses are calculated for each time step and combined with the cumulative default losses to calculate the net asset value (NAV) of the capital, which is the market value of assets less senior liabilities plus reserves.

If, at any time during the simulation, the NAV of capital falls below a specified amount (e.g. 50% of total capital notes for Rhinebridge), the SIV is assumed to enter enforcement. During the enforcement process, the model will stop capital and performance payments and sell assets to meet the senior liabilities as they fall due.

The SIV model is used to calculate the subordination levels for each note at its target rating. The ratings are driven by:

1. credit default risk;
2. market risk; and
3. size of total capital – if 50% of the total capital value has been eroded, through a combination of credit default events and market value losses, then this causes an enforcement event.

The model is used to analyse the entire capital structure. Three different scenarios are typically examined:

1. going concern – assume that the vehicle continues as normal unless a breach of a test occurs;
2. day one orderly unwind – assume that a restricted funding or enforcement event occurs immediately; and
3. accelerated unwind – assume that the vehicle is insolvent today.

The different analytical approaches are used to create a rating band for Rhinebridge's capital note. Once the rating band has been established, the qualitative assessment of the manager will help dictate the final rating.

Rhinebridge Plc:                                                                          5

Derivative**Fitch**

## Analytical Summary

The results of Fitch's analysis produced some interesting conclusions (see *Appendix* for an illustration):

1.  As total capital is increased, the 50% trigger point increases, and hence, the trigger point is less likely to be breached. Although the higher trigger point will be breached less frequently, the severity of loss upon breach will be greater.

### Impact of a Change in Capital Size

| Total Capital | Probability of Loss | Severity of Loss |
|---|---|---|
| Increase | Lower | Higher |
| Decrease | Higher | Lower |

Source: Fitch

2.  If enforcement occurs, the capital notes will suffer a loss.

3.  Changing the capital note tranching does not affect the level of credit defaults within the portfolio.

Therefore, the subordination levels for the senior capital notes and the mezzanine capital notes are driven by the size of total capital, the credit risk of the portfolio and the market risk of the portfolio.

### 'AAA' Senior Notes versus 'AAA' Senior Capital Notes

The Fitch 'AAA' rating addresses the probability that the rated tranche incurs a single dollar of loss; hence both the senior notes and the senior capital notes are able to withstand the Fitch 'AAA' stress. The difference between the two is explained below.

### Expected Recovery

The difference between the two types of notes is the recovery value given that an enforcement event has occurred or, to put it more formally, the expected recovery conditional upon an enforcement event occurring.

### 'AAA' Senior versus Capital Note Expected Recovery

| Tranche | Rating | Expected Recovery |
|---|---|---|
| Senior Notes | AAA | 100% |
| Senior Capital Notes | AAA | 70–80% |

Source: Fitch

Therefore, although both senior notes and senior capital notes have a 'AAA' probability of loss, given that an enforcement event has occurred the expected recovery on the senior capital notes will be less than the senior notes.

## Structural Tests

Rhinebridge must comply with a series of tests, including interest rate sensitivity tests, currency sensitivity tests, liquidity tests, portfolio parameter tests and capital tests.

If these tests are breached and not remedied within a specified period (see *States of Operation* section) then Rhinebridge will enter the relevant restricted state. Interest rate and currency risks are hedged to ensure that the vehicle does not run any market risk (other than credit risk). In the event of non-compliance of the interest rate or currency sensitivity test or the liquidity tests, the manager will have five days to remedy the situation, otherwise the vehicle will enter a restricted funding state.

Highly Confidential

FITCH-RHINE 00047589

DerivativeFitch

## Market Sensitivity Tests

### 1. Interest Rate Sensitivity

On each business day, the manager determines the portfolio's sensitivity to changes in interest rates as follows:

1.  **Parallel yield curve shift**: the change in NAV across all instruments caused by a 1bp and a 100bp parallel shift in the yield curve.

### Parallel Yield Curve Test

| Test | Change | Tolerance |
|---|---|---|
| **Parallel yield curve shift(s)** | 1bp parallel yield curve shift (up or down) | 0.2bp change in NAV |
| | 100bp parallel yield curve shift (up or down) | 20bp change in NAV |

Source: Transaction Documentation

2.  **Point-by-point yield curve shift**: measured for each tenor along the relevant yield curve; this is the change in NAV across all instruments caused by a 1bp and 100bp shift in the yield curve at 11 different tenors along the curve.

### Point-by-Point Yield Curve Test

| Test | Change | Tolerance |
|---|---|---|
| **Point-by-point yield curve shift(s)** | 1bp shift (up or down) of the yield curve at independent points | 0.2bp change in NAV |
| | 100bp shift (up or down) of the yield curve at independent points | 20bp change in NAV |

Source: Transaction Documentation

3.  **Hedging compliance test**: the issuer will use an interest rate hedging strategy to offset the available funds cap (AFC) risk of the HEL and Home Equity Line of Credit (HELOC) assets, typically by purchasing interest rate caps or other derivatives. The hedging compliance test measures the value of the HEL and HELOC assets and hedge portfolio given a parallel shift in the forward curve by increasing each point on the curve by 100bp.

### Point-by-Point Yield Curve Test

| Test | Change | Tolerance |
|---|---|---|
| **Available funds cap test** | 100bp upward parallel yield curve shift | Zero or positive change for HEL bonds, HELOC bonds and the hedge portfolio |

### 2. FX Sensitivity Limit

On each business day, the manager will calculate the sensitivity of the issuer's assets and liabilities to changes in foreign exchange rates.

### FX Sensitivity Test

| | | |
|---|---|---|
| **Spot foreign exchange** | 1% change in relative value | 2bp change in NAV |
| | 10% change in relative value | 20bp change in NAV |

Source: Transaction Documentation

Highly Confidential

FITCH-RHINE 00047590

DerivativeFitch

## Liquidity Tests

### Liquidity NCO Limit

The net cumulative outflow (NCO) limit monitors the maximum NCO over the given period over the next year, relative to the amount of available liquidity resources over the same period.

The issuer maintains committed liquidity and liquid assets in an amount equal to the maximum net cumulative cash outflow during any consecutive period of one, five, 10 and 15 days over the next year.

### NCO One- and Five-Day Test

The manager performs the daily test to ensure that the issuer has sufficient committed liquidity in an aggregate amount equal to, or greater than, the one- and five-day NCO test.

### NCO 10- and 15-Day Test

The manager performs the daily test to ensure that the issuer has sufficient committed liquidity and that liquid assets have a discounted market value greater than or equal to the 10- and 15-day NCO test.

### Committed Liquidity

The balance of the committed liquidity includes:

1.    committed liquidity facilities;

2.    demand deposits, including cash;

3.    breakable deposits less breakage fees; and

4.    committed repurchase agreements, puttable asset agreements and any other facility that may be agreed with Fitch.

The target balance of these liquidity facilities should represent 5% to 10% of the asset portfolio, allowing the vehicle to remain liquid even during a disruption in the funding market.

### Liquid Assets

Part of the issuer's liquidity requirements may be supplied by holdings of liquid assets. These are highly rated, highly liquid securities that can be liquidated at short notice to meet Rhinebridge's obligations. Liquidity eligible assets can include:

1.    'AAA' USD-denominated floating-rate ABS, backed by:

    a.    credit card loans with an average life not in excess of seven years;

    b.    auto loans with an average life not in excess of three years; or

    c.    government guaranteed student loans with an average life not in excess of two years.

2.    'AAA' USD-denominated HELs that:

    a.    have an average life of five years or less.

3.    UK or Australian RMBS that:

    a.    have an average life of five years or less.

The amount of eligible liquidity provided by each liquid asset for the purpose of the NCO test is determined by discounting the market value of these assets by a factor agreed with Fitch.

Highly Confidential

FITCH-RHINE 00047591

DerivativeFitch

## Restricted Funding Capital and Restricted Investments Capital Tests

Each business day, the manager will test the restricted funding and restricted investments capital tests.

## Minor Capital Tests

Failure of a minor capital test will result in Rhinebridge entering a restricted investment state.

1. **Minor Capital Adequacy Test**
   Market value of assets * (1 − restricted investments test capital charge) ≥ senior liabilities.

2. **Minor Capital Loss Test**
   NAV > 70% * capital notional.

3. **Capital Note Simulation Model Rating Test (Calculated Weekly)**
   The issuer will breach the capital note simulation model rating test if the implied rating of the mezzanine capital notes falls below either 'BBB+' and the implied rating of the senior capital notes falls below 'AA'.

4. **Capital Note Maturity Test (Calculated Weekly)**
   This tests that the amortisation profile of the asset portfolio is adequate to repay maturing capital notes at their legal final maturity.

5. **Adjusted Net Asset Value Leverage Test**
   NAV of the capital notes / senior obligations > 4.55%.

   If a five business day breach of a restricted investments test occurs, the vehicle will enter a state of restricted investments until such time as compliance is achieved.

## Major Capital Tests

Failure of a major capital test will result in Rhinebridge entering a restricted funding state.

1. **Major Capital Adequacy Test**
   Market value of assets * (1 − restricted funding test capital charge) ≥ senior liabilities.

2. **Major Capital Loss Limit Test**
   Market value of asset - senior liabilities ≥ 50% * (outstanding capital notes).

3. **Maximum Leverage Tests**
   — Total portfolio value / capital notional <= 25
   — Total portfolio value / junior capital notional <= 133
   — Total portfolio value / (junior + mezzanine capital notional) <= 33.3

4. **Relative Leverage Tests**
   — (junior + mezzanine notional) / senior notional >= 5.5/4.5
   — junior / (mezzannie notional + senior notional) >= 1/9

The restricted funding and restricted investments capital charges are agreed with Fitch and are based on predefined matrices. These use the rating and tenor of the asset to size the minimum capital requirement, e.g. long-dated low-rated assets will have a higher capital charge than short-dated highly rated assets.

If a five business day breach of a restricted funding test occurs, the vehicle will enter a state of restricted funding until such time as compliance is achieved.

Rhinebridge Plc:                                                                                    9

FITCH-RHINE 00047592

Derivative**Fitch**

## Leverage

Rhinebridge operates both restricted funding and restricted investments capital leverage tests. The maximum implied leverage of the vehicle under normal operations is 25x, with the minimum NAV at 70%.

Rhinebridge is currently targeting an operating leverage of between 9 and 12x.

## Portfolio Criteria

Rhinebridge must comply with the following operating limits:

## Obligor Concentration Limits

The portfolio is required to reflect the following single obligor concentration limits defined in terms of asset ratings:

### Rating of Obligor Group

| Rating | Max (%) |
|---|---|
| AAA | 4 |
| AA | 4 |
| A | 2 |
| BBB | 0.5 |
| BB | 0 |

Source: Transaction documents

## Average Life of Portfolio

The target weighted-average life of the investment portfolio is approximately 3.5 years compared with the weighted-average life of the senior notes at approximately six months. The maximum weighted-average life at point of purchase of the portfolio is seven years.

### Maximum Investment Weighted-Average Life

| | Max (%) |
|---|---|
| Up to and including 12 years | 100 |
| Less than 20 years | 5 |
| Greater than 20 years | 0 |

Source: Transaction documents

## Currency Risk Limit

The percentage of credit exposure to investments and hedging agreements in each currency must comply with the following limits:

### Currency Limits (%)
**Sovereign state or supranational/foreign currency rating**
**Max or min percentage of portfolio**

| | |
|---|---|
| US (MIN) | 75 |
| EUR (MAX) | 25 |
| GBP( MAX) | 25 |
| Other (MAX) | 15 |

Source: Transaction documents

## Country Risk Limit

The percentage of credit exposure to investments and hedging agreements in each jurisdiction may not exceed the levels defined in the table below.

### Country Limits (%)

Highly Confidential

FITCH-RHINE 00047593

DerivativeFitch

| | |
|---|---:|
| US | 100 |
| UK | 50 |
| France | 50 |
| Germany | 50 |
| Italy | 50 |
| Spain | 25 |
| Other | |

Source: Transaction documents

## Rating Limits

Rhinebridge may only enter into new investments (and other obligations) when these meet the minimum rating requirements detailed below. These are determined using the available Fitch ratings. For non-Fitch rated assets, the lower of S&P and Moody's current rating will be used as the deemed rating. (Note that notching is not applied to non-Fitch rated assets.)

### Portfolio Rating Limits

| Rating category | Minimum requirements (%) |
|---|---:|
| AAA | 40 |
| AAA to AA | 60 |
| AAA to A | 80 |
| AAA to BBB | 85 |
| AAA to BB | 90 |

Rating requirements expressed as a percentage of the total portfolio notional amount
Source: Transaction documents

## Rating Concentration Limit

Rhinebridge must operate within portfolio limits. If a maximum operational concentration limit is breached then an additional capital charge of 10% is applied to the amount in excess of the limit. A breach of the maximum eligible limit would require Rhinebridge to hold a 100% capital charge against the amount in excess of the limit.

### Maximum Portfolio Concentration

| Sector Category | Max Eligible Limit | Max Operational Limit |
|---|---|---|
| Global CDOs | 40% | 35% |
| CLOs | 40% | 35% |
| Structured Finance CDOs | 30% | 25% |
| HY CSOs | 20% | 17.5% |
| Single Tranche CDO | 7.5% | 4% |
| Investment-Grade Corporate | 5% | 4% |
| Trust Preferred CDOs | 5% | 4% |
| Balance Sheet CDOs | 25% | 22.5% |
| SME CDOs | 25% | 22.5% |
| CRE CDOs | 5% | 4% |
| Other | 8% | 6% |
| CMBS | 50% | 40% |
| Single Property | 20% | 17.5% |
| Conduit | 30% | 25% |
| Large Loan | 40% | 35% |
| Credit Tenant Lease | 10% | 8% |
| Other | 8% | 6% |
| Consumer ABS | 60% | 50% |
| Non-Sallie Mae Student Loans* | 40% | 35% |
| Sallie Mae Student Loans* | 40% | 35% |
| Credit Cards | 30% | 25% |
| Charged-off Cards (i.e. non-performing) | 5% | 4% |
| Auto Loans | 30% | 25% |
| Auto Sub-Prime | 5% | 4% |
| Consumer Loans | 30% | 25% |
| Other | 5% | 4% |
| Global RMBS | 75% | 70% |

Rhinebridge Plc:                                                                                           11

Highly Confidential                                                         FITCH-RHINE 00047594

| | | |
|---|---|---|
| Prime RMBS | 50% | 40% |
| Home Equity Loans | 70% | 65% |
| HELOC | 20% | 17.5% |
| Non-Prime Non-US RMBS | 40% | 35% |
| Manufactured Housing | 5% | 4% |
| Other | 8% | 6% |
| Corporate ABS | 50% | 40% |
| Trade Receivables | 10% | 8% |
| Lease Backed | 10% | 8% |
| Aircraft Loans/Leases | 0% | 0% |
| Whole Business | 10% | 8% |
| Other | 8% | 6% |
| Other | 5% | 4% |
| Monoline Wrapped Global RMBS | 30% | 25% |

Source: Transaction documents, Fitch
* Non-Sallie Mae Student Loans and Sallie Mae Student Loans combined are subject to an operational limit of 35% and an eligible limit of 40%

## States of Operation

Rhinebridge will operate in four possible states: normal, restricted investments, restricted funding and enforcement. These states are designed to mitigate the risks to senior and mezzanine creditors arising from any actual portfolio losses or potential losses caused by any decline in the market value of the underlying portfolio.

### Normal Operating State

In this state, Rhinebridge is able to run the business under the credit, liquidity, market risk and capital guidelines. Rhinebridge may grow the portfolio, increase funding, pay interest and distribute profits to investors.

### Restricted Investments State

This state has been designed to allow the issuer to re-enter normal operations without being required to sell off assets. In this state, the following restrictions apply:

1. the issuer will not be permitted to invest in new assets, except those of equal or lower capital requirement;
2. the issuer will only enter into new hedging agreements in limited circumstances;
3. no capital notes may be redeemed unless all senior-ranking obligations have been paid in full unless such capital note redemption would be for the benefit of the vehicle;
4. no variable margin will be paid to any capital note;
5. no junior management fees will be paid to the manager; and
6. no interest will be paid to junior capital notes unless all senior-ranking obligations have been paid in full.

### Restricted Investments Event

The events that can force Rhinebridge into a restricted investments state are:

1. breach of any of the minor capital tests or the weighted-average life of senior funding test if such breach remains unremedied immediately following the expiry of a cure period of five business days commencing on the date of such breach;
2. failure by the issuer to redeem any capital note on or by its expected maturity date if such failure remains unremedied immediately following the expiry of a cure period of five business days commencing on the date of such failure;
3. breach of any of the market sensitivity tests; or
4. breach of any of the liquidity tests.

### Restricted Investments Remedial Condition

The cure is immediate once the test is passed.

Highly Confidential

FITCH-RHINE 00047595

**Derivative Fitch**

### Restricted Funding

This state has been designed to allow the portfolio to unwind as the liabilities in the portfolio mature, if necessary by selling assets, and restrict payments to the subordinated notes. Under restricted funding, restrictions apply (in addition to the restricted investment restrictions):

1. no senior notes may be issued;
2. the issuer will not be permitted to invest in new assets;
3. no interest amount may be paid to the holders of the senior capital notes, mezzanine capital notes or junior capital notes until all senior ranking obligations have been paid in full;
4. no variable margin may be paid to capital notes until all the outstanding senior ranking obligations to payment of the variable margin have been paid; and
5. no capital notes may be redeemed until all the outstanding senior ranking obligations have been paid.

### Restricted Funding Event

The events that can force Rhinebridge into a restricted funding state are:

1. five-day breach *of any of* the major capital tests (other than the major capital loss test);
2. breach of the major capital loss test;
3. five day breach *of any of* the market sensitivity tests; and
4. five day breach *of any of* the liquidity tests.

The cure is immediate once the test is passed.

### Enforcement

Unlike the restricted states, the enforcement state is permanent. The senior creditor may request that the trustee enforces security over the assets and unwind the portfolio as the liabilities in the portfolio mature, if necessary by selling assets, and restrict payments to the subordinated notes. In enforcement, in addition to the restricted funding conditions, the enforcement manager will draw or exercise, as applicable, all its committed liquidity and will liquidate assets as necessary to pay the senior notes as they come due

Highly Confidential

FITCH-RHINE 00047596

DerivativeFitch

### Enforcement Event

The events that can force Rhinebridge into an enforcement state are:

1. the occurrence of a default in payment of any principal or interest on any senior notes;
2. a default in payment of principle or interest on the senior capital note or the mezzanine capital note on the legal maturity date;
3. a default under the liquidity agreement;
4. a derivative specified default;
5. a repo specified default;
6. the issuer becomes insolvent; and
7. five-day breach of the major capital loss test.

The restricted investment and restricted funding are not permanent states and the SIV may return to a normal state of operations following corrective action by the manager. The senior capital and mezzanine capital note ratings address the probability that the SIV will enter a restricted funding state.

### Reporting

The issuer provides monthly investor reports as well as its audited annual and semi-annual consolidated financial statements to investors.

In addition, reports on the interest rate sensitivity, FX sensitivity, NCO, diversification and capital tests and associated limits are sent to Fitch weekly. The reports will also indicate if any breach of the tests has occurred and whether, as a result, Rhinebridge has entered a restricted state.

The manager will also provide quarterly commentaries combining market and research perspectives on the investment strategy.

## Performance Analytics

Fitch receives weekly reports from Rhinebridge, focusing on limit compliance, portfolio composition and market tests. This data is analysed against transaction-specific internal surveillance guidelines created by Fitch, which include market value and leverage calculations.

The senior note rating addresses the likelihood that Rhinebridge will be able to make payments to the senior noteholders irrespective of whether a restricted funding state occurs. The capital note rating addresses the probability that restricted funding will occur. For the purposes of the capital note rating and analysis, Fitch calculated the probability that restricted funding would lead to a loss of at least USD1 on the notes.

It should be noted that the rating of the notes is linked not only to the credit quality of the assets held and the manager's ability to manage the vehicle, but also linked to the impact on the portfolio's value of market factors that may be beyond the manager's control. The mark-to-market of the portfolio is very important for the ongoing surveillance of the notes and particularly the capital notes. For example, sharp increases in spreads, whether caused by asset-specific issues or general market conditions, will erode the market value of the capital in this programme and increase the probability that restricted funding will occur. This may lead to downward rating pressure on the capital note.

The rating on the senior notes is a function of the vehicle's ability to meet its obligations on these notes in full in a range of circumstances, including a rapid liquidation of the portfolio in the event that the vehicle has difficulty rolling over maturing short-dated funding. The rating on the senior notes would not necessarily be at risk if a restricted funding event became more likely. However, it would be at risk if the market value of the portfolio was severely impaired, if there was any significant rating migration in the portfolio or if it became evident that assets would have to be liquidated substantially below par.

Rhinebridge Plc:                                                                                          14

Highly Confidential

FITCH-RHINE 00047597

DerivativeFitch

Further information on this service is available at www.fitchratings.com

Please call the Fitch analysts listed on the first page of this report for any queries regarding the initial analysis or the ongoing performance.

Highly Confidential

FITCH-RHINE 00047598

DerivativeFitch

## Appendix: Simple Illustration of How the Relative Size of Capital Affects the Probability and the Severity of Loss

Below are two example of how varying the total amount of capital affects the probability of loss and the loss severity for a hypothetical portfolio. Note these are examples and are not intended to reflect the Rhinebridge portfolio analysis.

### Example 1



In the first example, 92% of the portfolio is funded using CP and MTNs and the remaining 8% is funded with capital notes.

The distribution represents the NAV or the recovery value of total capital after the vehicle enters enforcement. Enforcement occurs once the combination of mark-to-market losses and credit losses reach 50% of total capital, 4% of portfolio value in this example.

### Example 2



Highly Confidential

FITCH-RHINE 00047599

DerivativeFitch

In the second example, 93% of the portfolio is funded using CP and MTNs and the remaining 7% is funded with capital notes.

The distribution represents the NAV or the recovery value of total capital after the vehicle enters enforcement. Enforcement occurs once the combination of mark-to-market losses and credit losses reach 50% of total capital, 3.5% of portfolio value in this example.

The keys points to highlight are as follows:

1.  Reducing the total capital increases the probability of loss – represented by the area under the NAV distribution line in the charts.

2.  Reducing the total capital reduces the severity of loss of total capital– represented by the position of the NAV distribution line in the charts.

3.  Changing the liability structure has no effect on the level of credit defaults.

Highly Confidential                                                          FITCH-RHINE 00047600

Derivative **Fitch**

Copyright © 2010 by Fitch, Inc., Fitch Ratings Ltd. and its subsidiaries. One State Street Plaza, NY, NY 10004.
Telephone: 1-800-753-4824, (212) 908-0500. Fax: (212) 480-4435. Reproduction or retransmission in whole or in part is prohibited except by
permission. All rights reserved. All of the information contained herein is based on information obtained from issuers, other obligors, underwriters, and
other sources which Fitch believes to be reliable. Fitch does not audit or verify the truth or accuracy of any such information. As a result, the information
in this report is provided "as is" without any representation or warranty of any kind. A Fitch rating is an opinion as to the creditworthiness of a security.
The rating does not address the risk of loss due to risks other than credit risk, unless such risk is specifically mentioned. Fitch is not engaged in the offer
or sale of any security. A report providing a Fitch rating is neither a prospectus nor a substitute for the information assembled, verified and presented to
investors by the issuer and its agents in connection with the sale of the securities. Ratings may be changed, suspended, or withdrawn at anytime for any
reason in the sole discretion of Fitch. Fitch does not provide investment advice of any sort. Ratings are not a recommendation to buy, sell, or hold any
security. Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-exempt nature or
taxability of payments made in respect to any security. Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating
securities. Such fees generally vary from US$1,000 to US$750,000 (or the applicable currency equivalent) per issue. In certain cases, Fitch will rate all
or a number of issues issued by a particular issuer, or insured or guaranteed by a particular insurer or guarantor, for a single annual fee. Such fees are
expected to vary from US$10,000 to US$1,500,000 (or the applicable currency equivalent). The assignment, publication, or dissemination of a rating by
Fitch shall not constitute a consent by Fitch to use its name as an expert in connection with any registration statement filed under the United States
securities laws, the Financial Services and Markets Act of 2000 of Great Britain, or the securities laws of any particular jurisdiction. Due to the relative
efficiency of electronic publishing and distribution, Fitch research may be available to electronic subscribers up to three days earlier than to print
subscribers.

Rhinebridge Plc:                                                                                                         18

TAB 14

Page 1

1                UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF NEW YORK

    --------------------------------

3   KING COUNTY, WASHINGTON,          )

4   Individually and On Behalf of     )

5   All Others Similarly Situated,    )

6                  Plaintiff,         )

7      vs.                            ) Civil Action No.

8   IKB DEUTSCHE INDUSTRIEBANK AG,    ) 1:09-cv-08387-SAS

9   et al.,                          ) CLASS ACTION

10                 Defendants,        )

    --------------------------------)

11  IOWA STUDENT LOAN LIQUIDITY       )

12  CORPORATION, Individually and     )

13  On Behalf of All Others           )

14  Similarly Situated,               )

15                  Plaintiff,        )

16     vs.                            ) Civil Action No.

17  IKB DEUTSCHE INDUSTRIEBANK AG,    ) 1:09-cv-08822-SAS

18  et al.,                          ) CLASS ACTION

19                 Defendants.        )

    --------------------------------

20              HIGHLY CONFIDENTIAL

21

22       VIDEOTAPED DEPOSITION OF GLENN MOORE

23          WEDNESDAY, NOVEMBER 30, 2011

24

25  PAGES 1 - 233

Page 50

1  "Experienced Rating Analysts", and the first bullet
2  there says:
3      "The Fitch SIV rating team have experience"
4  -- it's bolded and underlined -- "working in SIV
5  market."  Do you see that?
6      A.   I see that.
7      Q.   Who, other than yourself and Paddy
8  Clerkin, worked in the SIV team at this time?
9      A.   So, internally, the SIV team was
10  Paddy and I.  We would work on all SIV transactions
11  but, at Fitch, there were a number of people over
12  the years that had worked on the various vehicles.
13      Q.   Who were those people?
14      A.   From committee papers I had seen
15  and from discussions, I know that Roger Merritt had
16  been involved, Kim Slawek, Richard Gamble,
17  Ken Gill, and there's somebody else I want to say.
18  I mean, but these were long-standing Fitch
19  employees.
20      Q.   And -- but at the time of this
21  presentation in November 2006, those individuals
22  did not work in the Fitch team, right?
23      MR. EHRLICH:  Objection to form, misstates
24  the testimony.
25      A.   You shouldn't think of the SIV

Page 51

1  team, ie, me and Paddy, as being a silo.  I mean,
2  Fitch works on a committee basis, so all of these
3  people would be aware of, you know, what's going
4  on, so they -- they -- they would have involvement.
5      MR. ALVARADO:  Down to the second bullet
6  there, it says, "Experience includes SIV
7  structuring" -- bolded and underlined -- "capital
8  model development, rating agency negotiation, SIV
9  growth planning, credit analysis, marketing and
10  investment risk & committee membership."
11      Do you see that?
12      A.   I do.
13      Q.   And the SIV structuring experience,
14  is that referring to the other six or seven SIVs
15  that Fitch had rated prior to the Rhinebridge SIV?
16      MR. EHRLICH:  Objection to form, misstates
17  the document.
18      A.   No, the experience of the people
19  who worked at Fitch previously had structuring
20  experience of SIVs.  I didn't draft this, so I
21  don't know exactly who they're talking about who
22  had that experience.
23      MR. ALVARADO:  And -- okay.  Skipping over a
24  little bit, it says "rating agency negotiation".
25  Do you see that?

Page 52

1      A.   I do, yes.
2      Q.   What does that mean?
3      A.   That would be mean from the other
4  side, so somebody is working at a firm trying to
5  get something rated, working with the agencies.
6      Q.   You said "a firm".  What, another
7  rating agency, or -- is that what you refer to when
8  you said "a firm"?
9      A.   Sorry, did I say "a firm"?
10      Q.   You said work -- "somebody working
11  at a firm trying to" --
12      A.   No, "a firm", not "affirm".  A
13  company.
14      Q.   A company.
15      A.   Sorry.
16      Q.   Right.  Is that -- are you
17  referring to other rating agencies in that
18  sentence, or ---
19      A.   No, no, no, other SIVs -- I mean,
20  it could be anything, any bank, or anyone who has
21  ever had calls to work with a rating agency, but,
22  again, I didn't write this, so -- yeah, I don't --
23  it's quite generic.
24      Q.   And then it continues, and then at
25  the end it says "marketing and investment & risk

Page 53

1  committee membership".  Do you see that?
2      A.   I do, yeah.
3      Q.   Did -- who had experience marketing
4  SIVs at Fitch?
5      MR. EHRLICH:  Objection to form.
6      A.   I don't know that it's even
7  specifically talking about SIVs at this point.
8  Again -- I mean it just says "marketing".  That
9  could be marketing anything.
10      MR. ALVARADO:  If you turn to page 8 under,
11  "Benefits of selecting Fitch in the rating
12  process", the second bullet says:
13      "Rating agencies traditionally have been poor
14  in specifying the minimum content requirements for
15  the Operating Manual or minimum requirements for
16  capital sufficiency.  This leads to delays and
17  wastes manager's resources.  Fitch assist the
18  manager by providing clear guidance on the minimum
19  content on the Operating Manual and [the] minimum
20  capital requirements we expect to see."
21      Do you see that?
22      A.   I do.
23      Q.   Did you assist Rhinebridge in the
24  content of the operating manual that governed
25  Rhinebridge?

14 (Pages 50 to 53)

HIGHLY CONFIDENTIAL

Page 74

1    A.   Well, within the Rhinebridge
2  context, it was a trigger that said when the
3  capital value is eroded by 50 per cent then the
4  vehicle must unwind, or go into enforcement.
5    MR. BUELL:  Objection to form.  Prior
6  question.
7    THE COURT REPORTER:  I'm sorry, objection to
8  form?
9    MR. BUELL:  Prior question.
10   MR. ALVARADO:  When the -- so the cap -- you
11 said the capital value.  Is that the same as the
12 market value?  In your prior answer, you said,
13 within the Rhinebridge context it was a trigger
14 that said when the capital value is eroded by
15 approximately 50 per cent.  Is that the same as
16 market value?
17   MR. EHRLICH:  Objection to form.
18   A.   No, no, I'll clarify.  So, I'll
19 probably use a few terms here.  You have a
20 portfolio value, where I'm talking about the
21 average price of all of the assets.  When I'm
22 talking about capital value, it will be the price
23 of the most junior note on the liability side.  So
24 when I say 50 per cent on a capital note, I mean
25 50 per cent of that particular note has eroded.

Page 75

1    MR. ALVARADO:  Then Mr. Clerkin continued in
2  his e-mail to you, he said -- if you skip down a
3  bit, he says -- he says, "I have not heard of HELs
4  as LEAs."  Do you see that?
5    A.   Yes.
6    Q.   Fitch ultimately permitted the
7  Rhinebridge SIV to treat certain HELs at LEAs; is
8  that correct?
9    MR. EHRLICH:  Objection to the form and to
10 "permitted".
11   A.   Yeah.  I mean, I'll say again,
12 Fitch never permitted nor -- yeah -- it doesn't
13 permit anything.  It rates to what it sees.
14   MR. ALVARADO:  The Rhinebridge SIV treated
15 certain HELs as LEAs; is that right?
16   MR. EHRLICH:  Objection to the form and
17 foundation.
18   A.   Yeah, within this documentation, it
19 wanted to have LEAs or home equity loans acting as
20 liquid eligible assets.
21   MR. ALVARADO:  And those HELs that were able
22 to be considered LEAs had a haircut on them; is
23 that right?
24   MR. EHRLICH:  Objection to form and
25 foundation.

Page 76

1    A.   Yeah, generally, depending on the
2  credit risk, maturity, of any asset.  If it was
3  eligible, then it would have a haircut applied to
4  it.
5    MR. ALVARADO:  And, what were the haircuts on
6  the HEL -- or the LE -- the HELs that were allowed
7  to be LEAs in the Rhinebridge SIV?
8    MR. EHRLICH:  Objection to form and
9  foundation.  You can answer if you know.
10   A.   No, I don't recall.
11   MR. ALVARADO:  Had you ever heard of HELs as
12 LEAs in prior SIVs?
13   MR. EHRLICH:  Objection to the form.
14   A.   No, I hadn't, but we also didn't
15 have 100 per cent market coverage.
16   MR. ALVARADO:  And he concludes his e-mail to
17 you, and he says:
18   "It all sounds as if IKB are pushing the
19 boundaries of what the market understands a SIV to
20 be."
21   Do you see that?
22   A.   I do.
23   Q.   Did you believe that IKB was
24 pushing the boundaries what the market understands
25 a SIV to be?

Page 77

1    MR. EHRLICH:  Objection to form.  Calls for
2  speculation.
3    MR. ALVARADO:  I'm asking if you believe,
4  sir.
5    A.   I don't know which boundaries Paddy
6  is referring to.
7    Q.   I'm not asking what Paddy's
8  referring to, I'm asking you if you believe that
9  IKB was pushing the boundaries of what the market
10 understands a SIV to be.
11   MR. EHRLICH:  An objection to form.  Vague as
12 to boundaries.
13   A.   Yeah, if you can define some
14 boundaries.
15   MR. ALVARADO:  Did you believe that IKB was
16 pushing what was -- what was normal -- in the
17 normal SIV market?
18   MR. EHRLICH:  Objection to form.
19   MR. ALVARADO:  Pushing beyond what was in the
20 normal SIV market?
21   MR. EHRLICH:  Totally vague.  You can answer
22 if you understand.
23   MS. KAMISON:  And objection as to IKB.
24   A.   Sorry, what was the question?
25   MR. ALVARADO:  I said, did you believe that

20 (Pages 74 to 77)

HIGHLY CONFIDENTIAL

Page 90

1  the testimony.
2       A.    It was formulated in that sense,
3  yes.  However, just to point out, that wasn't the
4  end of the analysis.
5       MR. ALVARADO:  What -- what continued after
6  that, after the acceptance of the other rating
7  agencies' ratings?
8       MR. EHRLICH:  Objection to form, vague.
9       A.    So, I mean --
10      MR. EHRLICH:  Is this SIV analysis?  What
11 analysis are you talking about?
12      MR. ALVARADO:  Do you have my question in
13 mind?
14      A.    No, sorry.  Can you repeat the
15 question?
16      Q.    You said that that wasn't the end
17 of the analysis.  My question is, what continued
18 after that, after you took a look at the other
19 rating agencies' ratings and then accepted those
20 ratings, what else was done?
21      A.    So, that's -- yeah, so specifically
22 on Rhinebridge, if we felt there were
23 concentrations to any areas or any sectors or asset
24 classes where Fitch didn't have full coverage and
25 we were applying this policy, then we would go to

Page 91

1  the experts within that area and ask them to look
2  through the assets and just give us a feel for the
3  quality of the rating.
4       Q.    Was notching ever performed after
5  -- based on this later analysis that was done --
6       MR. EHRLICH:  Objection.
7       MR. ALVARADO:  -- after this discussion with
8  the other groups at Fitch?
9       MR. EHRLICH:  Objection to form.  Vague as to
10 context.
11      A.    Are we talking about Rhinebridge or
12 just generally at Fitch?
13      MR. ALVARADO:  I'm just asking you a general
14 question.
15      A.    Committee have -- within -- I mean,
16 the whole rating process is a committee process.
17 Quite often we would stress our own ratings or to
18 look at different scenario -- different scenario
19 and outcomes, so if we thought there was a
20 particular concentration, we may stress everything
21 within that sector.
22      Q.    And how about with respect to the
23 Rhinebridge SIV?  Did -- were assets notched later
24 down the road, after further discussion with other
25 groups at Fitch?

Page 92

1       MR. EHRLICH:  Objection to the form.
2       A.    I don't recall ever notching the
3  rating.  But, as part of our analysis, we would
4  take the historical migration of certain asset
5  classes, or, in fact, the entire portfolio, and
6  start scaling it up, so increasing the amount of --
7  if you like, adding multipliers to the default, and
8  we would do similar things with market value as
9  well.
10      MR. ALVARADO:  Was that done for the
11 Rhinebridge SIV?
12      A.    Yes, there were multiple stresses
13 performed.
14      Q.    Is that other stresses performed in
15 the context of the internal SIV model or the CDO
16 VECTOR of the model?
17      MR. EHRLICH:  Objection to form.
18      A.    Both, and -- and more.  I mean, all
19 analysis.  Any -- any analytic analysis you can do,
20 you can stress.
21      THE VIDEOGRAPHER:  Mr. Moore, please.
22      A.    Sorry.
23      MR. ALVARADO:  You can put that document
24 aside.  I'm marking exhibit 389 for identification.
25      (Exhibit 389 marked for identification)

Page 93

1       MR. ALVARADO:  For the record, exhibit 389 is
2  an e-mail string bearing Bates number FITCH-RHINE
3  00053420 through 00053423.  Please take a moment to
4  familiarise yourself with the document, and let me
5  know when you're ready.
6       MR. SILVER:  I think you may have misstated
7  the dates.
8       MS. KEENE:  Sorry, these are not the numbers
9  I have got.
10      MR. ALVARADO:  Oh, did I --
11      MS. KEENE:  Bates numbers.
12      MR. EHRLICH:  Yep.  We have 53265 through 67.
13      A.    Yep.
14      MR. EHRLICH:  Which is what the witness has.
15      MR. ALVARADO:  Bear with me.
16      (Short pause)
17      MR. ALVARADO:  So, sorry about that.  Is this
18 what the witness has?
19      MR. EHRLICH:  Yes, it is 53265 through 67.
20      A.    Mmm-hmm.
21      (Short pause)
22      MR. ALVARADO:  The e-mail string begins on
23 the page ending 266, and it's an e-mail from
24 Jeffrey Cromartie to the European Structured Credit
25 e-mail distribution group with a CC to Kevin

24 (Pages 90 to 93)

HIGHLY CONFIDENTIAL

Page 94

1  Kendra.  Do you see that?
2       A.    I do.
3       Q.    And who's Jeffrey Cromartie?
4       A.    I think at that time he was heading
5  up the European surveillance team, structured
6  credit surveillance team.
7       Q.    And then the European Structured
8  Credit, that was the umbrella group under which it
9  worked; is that right?
10      A.    That's correct.
11      Q.    And -- so you were a member of this
12  e-mail distribution group?
13      A.    I'd imagine so.  I mean, I don't
14  know if I was or wasn't, but I'd imagine so.
15      Q.    And who is Kevin Kendra?
16      A.    He was an analyst, fairly senior
17  analyst, I think senior director in the U.S..  I
18  don't recall what sector he was covering at that
19  point in time.
20      Q.    And the subject is:
21      "New Transactions with U.S. Subprime Exposure
22  -- approved by Stefan -- so read it."
23  Right?
24      A.    Correct.
25      Q.    And it says:

Page 95

1  "Team,
2       If you have" -- "if you have a transaction
3  with U.S. RMBS subprime exposure, please cross
4  reference your portfolio against two lists of
5  potential problem assets located here:"
6       And then there's a link provided, right?
7       A.    Mmm-hmm.
8       Q.    And what -- what is this link?
9  Where would you be able to find this link to the
10  (H:) drive?
11      A.    On the internal network of Fitch.
12      Q.    And did you -- did you -- did you
13  cross-reference the Rhinebridge SIVs assets to this
14  checklist that Jeffrey Cromartie sent out?
15      A.    I don't specifically remember
16  whether I did or didn't do this check.
17      Q.    And then is this sometimes referred
18  to as the screener?
19      MR. EHRLICH:  Objection to the form,
20  foundation.
21      A.    Ah, no, I don't know.  Where does
22  it say "screening"?
23      MR. ALVARADO:  It doesn't say that.  Do you
24  know what "screener" is?
25      A.    Not within the context of the U.S.

Page 96

1  transactions, no.
2       Q.    What is your understanding of it
3  within the context of non-U.S. transactions?
4       A.    Um --
5       MR. EHRLICH:  Objection to form, vague.  You
6  can answer.
7       A.    I mean, after, I think, 2008 or
8  nine, we had a screener process for new
9  transactions, but clearly that's not what they're
10  -- I don't think they're referring to here.
11      MR. ALVARADO:  You can put that aside.  I'm
12  marking exhibit 390.
13      (Exhibit 390 marked for identification)
14      MR. ALVARADO:  Exhibit 390 is an e-mail
15  string bearing Bates number FITCH-RHINE 00053420
16  through 00053423.
17          (Short pause)
18      A.    Okay.
19      Q.    The e-mail string begins on the
20  page ending 422, and it's an e-mail from
21  Jeffrey Cromartie again to you, Stefan Bund -- and
22  Stefan Bund, right, and the subject is
23  "Rhinebridge"?
24      MR. EHRLICH:  I think you misread the
25  document, but it's clear, on the face of it.

Page 97

1       MR. ALVARADO:  Are you on page 4?
2       A.    Sorry, I was reading something
3  else.  Sorry, can you --
4       MR. ALVARADO:  On the page ending 422.
5       A.    Yep.
6       Q.    The bottom there, Jeffrey Cromartie
7  writes:
8       "Hi Glenn,
9       Thank[s] you for your slides on SIV exposure.
10  Stefan presented them to Kim and our new chief
11  credit officer, and things went well."
12      Do you see that?
13      A.    I see that.
14      Q.    And what slides did you prepare for
15  Mr. Cromartie?
16      A.    I'm afraid I don't recall the exact
17  slides.
18      Q.    Well, they concerned SIV exposure,
19  right?
20      A.    That's what he's written, yes.
21      Q.    And who was the new chief credit
22  officer referenced here, do you know?
23      A.    I believe that's Roger Merritt, and
24  he appears later in the e-mail chain.
25      Q.    And Kim, is that Kim Skinner?

Veritext National Deposition & Litigation Services
866 299-5127

Page 98

1    A.    No, it's Karen Skinner, but this is
2    Kim Slawek.
3    Q.    And -- well here -- you mention
4    Roger.  He writes an e-mail that begins on the page
5    ending 420.  Do you see that?  And he writes:
6    "Thanks for this analysis.
7    With 1.50% c/e" -- does that stand for
8    "credit enhancement"?
9    A.    Yes, it does.
10   Q.    -- "below the A rated notes, could
11   the rating of those notes effectively be
12   'weak-linked' to any credit migration in the
13   portfolio?"
14   Do you see that?
15   A.    I do.
16   Q.    And what does "weak-linked to any
17   migration in the portfolio" mean?
18   MR. EHRLICH:  Objection to form.  Calls for
19   speculation.
20   A.    What he's asking is is there any
21   sizeable asset -- low-rated asset that, if
22   defaulted, could cause a default in the A notes.
23   So, can I just ask, what was the -- when did we
24   issue the rating on Rhinebridge?  It was after this
25   day, wasn't it?

Page 99

1    MR. ALVARADO:  Yes.
2    A.    Okay.  So that -- so when we're
3    talking about credit enhancement of the A notes,
4    this is like an expectation of where things will
5    eventually come out.
6    Q.    Okay.  And then he continues:
7    "Not an [immediate] issue, but I raise this
8    because our RMBS group does expect some significant
9    credit migration over the next year in many of the
10   subprime transactions."
11   Do you see that?
12   A.    I do.
13   Q.    And did you have discussions with
14   people at Fitch regarding the expectation of the
15   RMBS group to -- that there was going to be a
16   significant credit migration over the next year?
17   MR. EHRLICH:  Objection to the form, vague as
18   to timeframe.
19   MR. ALVARADO:  In connection with rating the
20   Rhinebridge SIV.
21   A.    I had discussions with the U.S.
22   RMBS group around the credit quality of the
23   portfolio, and their expectation at that time was
24   that no -- no investment grade note would be
25   downgraded, so Roger's referring here to far more

Page 100

1    junior notes in U.S. subprime securitizations.
2    Q.    And then if you -- if you turn to
3    your e-mail that's on the page ending 420.
4    A.    Mmm-hmm.
5    Q.    Toward the bottom where it says -
6    you write, "Additionally" -- well let me just ask
7    you this, first.  What does "credit migration"
8    mean?
9    A.    Um, rating downgrades, essentially,
10   so migrating down the rating scale.
11   Q.    And you write:
12   "Additionally, we had somebody from the RMBS
13   team look over [the] portfolio to spot any
14   potential downgrades but they commented that the
15   asset selection and choice of originators was good
16   and they did not expect any of the asset" --
17   "assets to migrate in the near future."
18   Do you see that?
19   A.    Yep.
20   Q.    And who -- who did you speak with
21   at -- in the RMBS team in connection with the
22   Rhinebridge SIV rating?
23   MR. EHRLICH:  Objection to form and
24   foundation.  You can answer.
25   A.    I recall telephone conversations

Page 101

1    and e-mail exchanges with several people.  I -- I
2    can't give you specifics, though, but -- but senior
3    people within the RMBS team.
4    MR. ALVARADO:  And those -- those people are
5    in the U.S.?
6    A.    Yes.
7    Q.    And what did they do to determine
8    that the asset selection and choice of originators
9    was good?
10   MR. EHRLICH:  Objection to the form.  You can
11   answer.
12   A.    I don't -- if you're asking me
13   specifically what did they do, I don't know, would
14   have to ask them.
15   MR. ALVARADO:  In what form did they tell you
16   that the selection and choice of originators was
17   good?  The asset selection and choice of
18   originators was good?
19   MR. EHRLICH:  Objection to form and
20   foundation.  You can answer.
21   A.    I mean, what they would be telling
22   me is that they've chosen AAA assets from good
23   originating banks with strong criteria, and they --
24   they didn't expect any of these to be downgraded in
25   the near term.

26 (Pages 98 to 101)

Page 102

1    MR. ALVARADO:  Anything else?
2    A.   No, not that I recall.
3        (Short pause)
4    MR. ALVARADO:  You can put that document
5    aside.
6        (Short pause)
7    MR. ALVARADO:  This is sort of a big one.  Do
8    you think we have time?  Are you doing okay?
9    A.   No, no, I'm happy.
10   MR. EHRLICH:  It's only been about 50
11   minutes, I think.
12   MR. ALVARADO:  I'm marking exhibit 391.
13   (Exhibit 391 marked for identification)
14   MR. ALVARADO:  This is a large document, and,
15   please, take as much time as you need to
16   familiarise yourself with it, but I will be just
17   directing you to particular parts.
18   A.   Yeah.  I mean, these are committee
19   papers that I was involved in, so rather than spend
20   a couple of hours reading it, you might want to be
21   a bit more specific.
22   MS. KEENE:  This is 391?
23   MS. KAMISON:  391.
24   MR. EHRLICH:  Yes, that's correct.
25   MR. ALVARADO:  Sure, so what is this

Page 103

1    document, sir?
2    A.   It looks like an amalgamation of a
3    number of documents, some of them appear to be
4    Rhinebridge performance reports, some of them
5    appear to be listing out the portfolio, committee
6    papers.  Yeah, I'm flicking through it now.
7    Q.   And you -- you said -- it's an
8    e-mail that attaches the various documents that you
9    just described, and you sent this e-mail on July
10   30th, 2007, right?
11   A.   It looks as though I did, yes.
12   Q.   And you sent this e-mail in the
13   ordinary course of your business at Fitch?
14   A.   I did, yes.
15   Q.   And it's titled "Committee paper +
16   last weeks Rhinebridge report (with portfolio)",
17   right?
18   A.   Mmm-hmm.
19   Q.   You write:
20   "Kim
21   Here is the final committee paper and last
22   weeks Rhinebridge report, I will send on this weeks
23   as soon as it arrives."
24   Was this -- when you say "final committee
25   paper", is that -- does that refer to the paper

Page 104

1    that was completed -- the committee paper that was
2    completed right prior to the launch of the
3    Rhinebridge SIV?
4    A.   Yes.
5    MR. EHRLICH:  Objection to the form.
6    A.   Yes.
7    MR. ALVARADO:  And the first attachment here
8    is ending on 850-0001.  Do you see that?
9    A.   I do, yeah.
10   Q.   It's the "Rhinebridge plc Fitch's
11   Weekly Report", right?
12   A.   Correct.
13   Q.   And from whom did you receive this
14   report on a weekly basis?
15   MR. EHRLICH:  Objection to form and
16   foundation.
17   A.   I believe it came directly from
18   IKB CAM but produced by QSR.
19   MR. ALVARADO:  And what does this -- what
20   does the weekly report reflect?
21   A.   It will -- it will go through
22   assets, liabilities, pricing, liquidity tests,
23   making sure that they're compliant with their own
24   documentation.
25   Q.   And if you turn to the page ending

Page 105

1    09 -- "-0009".
2    A.   Yep.
3    Q.   This begins the list of the
4    portfolio that underlies the Rhinebridge SIV,
5    right?
6    A.   Correct.
7    Q.   And column E there has a Fitch
8    rating, and then it's all filled in.  Do you see
9    that?
10   A.   Yes.
11   Q.   Do you know if this -- if this was
12   filled in, even if Fitch had rated an asset, would
13   -- would the equivalent Fitch rating be inserted
14   here?
15   A.   The honest answer is I don't know
16   how these ratings were put together, given that
17   Fitch has a rating assigned to every asset, and we
18   know that Fitch didn't rate every asset.  There was
19   some method of assigning.  I can't say what method
20   that was.
21   Q.   And then if you turn to the page
22   ending 851, if you would, please.  This is -- the
23   title is "Committee/Authorisation Papers", right?
24   A.   Yes.
25   Q.   The transaction is the Rhinebridge

27 (Pages 102 to 105)

HIGHLY CONFIDENTIAL

Page 114

1 of language on my part. I just meant I ordered
2 them from top to bottom, so the volatility starts
3 all good from the lowest to the highest, and I
4 chose the highest for the higher volatility curve.
5 I mean, it's probably not arbitrary, there is
6 actually a logic there.
7         MR. ALVARADO: And then if you skip down.
8     A.   Mmm-hmm.
9     Q.   It says:
10    "Why not choose one of the other sectors if
11 the Hi vol curve is using a sort time period of
12 data?"
13    Do you see that?
14    A.   So let me just read.
15        (Short pause)
16    A.   Okay, yeah.
17    Q.   The title there is -- it refers to
18 a short time period of data. Is that the period
19 you were discussing a minute ago, the 1990 through
20 -- I can't remember what the end range was?
21    A.   I think it went up to present day,
22 but the -- these time series weren't all starting
23 in 1990, and I believe that the high volatility
24 home equity Credit Suisse data was fairly short in
25 tenor, and generally when you're calibrating, you

Page 115

1 want to use the longest set of data you can because
2 then you get a better estimation of a long-term
3 mean, or long-term average, sorry.
4     Q.   And you -- you said, "Purely
5 because the parameters looked reasonable", right,
6 that's why a shorter time period of data was used?
7         MR. EHRLICH: Objection to form.
8     A.   Sorry, say that again. Where are
9 we?
10        MR. ALVARADO: Page ending 855 --
11    A.   No, sorry, where?
12        MR. EHRLICH: Beginning of that paragraph.
13    A.   Okay. So, "If the long term mean
14 is set to high then this actually helps the
15 vehicles ..." So, although the -- although I've
16 called these two curves high and low volatility,
17 another input into them is the long-term mean, and
18 so you don't want to calibrate your model to have
19 too high a long-term mean, because otherwise you
20 start -- when you start simulating, you start
21 generating loads of money and you have loads of
22 excess cash.
23    So, although we used this as a calibration,
24 you're trying to balance having something that has
25 a reasonable long-term mean, not too high, you

Page 116

1 don't want to give too much benefit, but at the
2 same time you want to have something that has
3 enough volatility to give you the stresses that you
4 want to see.
5         MR. ALVARADO: And that's what you're
6 referring to when you wrote, "Purely because the
7 parameters looked reasonable"?
8     A.   That would be an assumption. That
9 appears to be what I'm writing.
10        (Short pause)
11    Q.   If you could turn to the page
12 ending 894.
13        MR. EHRLICH: Nine-four, you said?
14        MR. ALVARADO: Yeah.
15        MR. EHRLICH: Okay.
16    A.   Okay.
17        MR. ALVARADO: Toward the bottom, there's a
18 heading that says "Base Capital Requirements" and
19 then it says:
20    "The following tables are used to calculate
21 the Base Capital requirements."
22    Do you see that?
23    A.   Yep.
24    Q.   And then there's a series of tables
25 that follow, and they continue on through the page

Page 117

1 ending 897. Do you see that?
2     A.   Mmm-hmm.
3     Q.   And where are these tables?
4     A.   So within the documentation for
5 Rhinebridge, produced, obviously, by Rhinebridge,
6 and they were saying this is the minimum amount of
7 capital that they wanted their SIV to hold against
8 each of these different products by a maturity and
9 by rating.
10    Q.   And so did Rhinebridge supply you
11 with these tables?
12        MR. EHRLICH: Objection to the form.
13    A.   These would have been cut and paste
14 out of Rhinebridge documentation.
15        MR. ALVARADO: And did -- did you do anything
16 to verify that these tables had required sufficient
17 capital?
18        MR. EHRLICH: Objection. Vague, ambiguous
19 and confusing. You can answer.
20    A.   I know what you're getting at, and,
21 yes, we did. So, Rhinebridge had a number of
22 different tables by different asset classes, and we
23 looked at some industry standards and compared and
24 contrasted the two.
25        MR. ALVARADO: Other than comparing and

30 (Pages 114 to 117)

HIGHLY CONFIDENTIAL

Page 198

1    Q.    You said, "When they sold a bond, I
2  would look at the price that they sold it at".
3    A.    Yeah.  Okay, so when Rhinebridge
4  sold a bond, I would look at the price, but I was
5  also doing this for all the other SIVs as well, so
6  it was as Rhinebridge sold the bond, I would check
7  it to their books and records, make sure there
8  wasn't a difference in price, or significant
9  difference in price, and for the bonds that were on
10  their books -- Rhinebridge's as books and records,
11  I would crosscheck those to other vehicles where we
12  were also obtaining prices from them and check.
13    Q.    And when did you do that analysis?
14    A.    I don't recall the date, but it was
15  as they started liquidating.  So, from this e-mail
16  it looks as though they sold one bond on that date,
17  so it would have been after this date.
18    Q.    You can put that to the side.  I'm
19  marking exhibit 402 for identification.
20    (Exhibit 402 marked for identification)
21    MR. ALVARADO:  Exhibit 402 --
22    A.    Oh, sorry.
23    Q.    -- is an e-mail bearing Bates
24  number FITCH-RHINE 00055240.
25    (Short pause)

Page 199

1    A.    Okay.
2    Q.    And this is an e-mail from
3  Stefan Bund to you and several other Fitch
4  employees; is that right?
5    A.    Correct.
6    Q.    With a CC to Thomas von Luepke.  Do
7  you see that?
8    A.    Yes.
9    Q.    And the subject is "Rhinebridge
10  committee", right?
11    A.    Correct.
12    Q.    And he writes:
13    "These are the findings from IKB meeting I
14  attended today together with FI team."
15    Does "FI" there stand for Fitch?
16    A.    Financial institution.
17    Q.    And what is that?
18    A.    The bank ratings team.
19    Q.    So IKB was represented by Braeuning
20  the CEO; Glueder, the CFO; and Braun, the
21  treasurer, right?  And then he continues and says,
22  "There will be no further support for RB."  Do you
23  see that?
24    A.    Mmm-hmm.
25    Q.    And RB there stands for

Page 200

1  Rhinebridge, right?
2    A.    Yeah.  I mean, that would be my
3  assumption, yeah.
4    Q.    And did you have an understanding
5  as to why IKB was giving no further support for
6  Rhinebridge?
7    MR. EHRLICH:  Objection to form.  Calls for
8  speculation.
9    MS. KAMISON:  Objection.  Lacks foundation.
10    A.    I -- I didn't attend the meeting
11  and Stefan wrote the e-mail, so it was kind of
12  third hand.
13    MR. ALVARADO:  But you received this e-mail
14  from Mr Bund, stating that there would be no
15  further support for Rhinebridge.
16    THE COURT REPORTER:  Sorry, can you just
17  repeat that, and I didn't get the last answer.
18    A.    I -- I didn't attend this meeting
19  and Stefan wrote the e-mail, so it was kind of
20  third hand.
21    MR. ALVARADO:  Well, Stefan -- you learned
22  from Stefan that there will be no further support
23  for Rhinebridge, right?
24    MR. EHRLICH:  Objection to form.
25    A.    I mean, and that is eventually what

Page 201

1  happened, yes.
2    Q.    He's -- he's explained that they
3  wanted to cap their losses and expect further MV
4  declines, right?
5    A.    Mmm-hmm.
6    MR. EHRLICH:  Objection to the form.
7    MR. ALVARADO:  And did you have any
8  conversations with anyone at Fitch concerning IKB's
9  ceasing support for Rhinebridge?
10    MR. EHRLICH:  Objection to form.  Vague and
11  ambiguous.
12    MS. KAMISON:  Objection.  Lacks foundation.
13    A.    Sorry, what was the question again?
14  Did I have?
15    MR. ALVARADO:  Did you have any conversations
16  with anyone at Fitch concerning IKB's ceasing
17  support for Rhinebridge?
18    MS. KAMISON:  Same objection.
19    A.    I mean, of course.  Do I recall any
20  specifics?  No.
21    MR. ALVARADO:  Did you have an understanding
22  as to why -- what had changed from the earlier
23  exhibit that we saw where Rhinebridge was giving
24  support to -- or where IKB was giving support to
25  Rhinebridge?

51 (Pages 198 to 201)

HIGHLY CONFIDENTIAL

Page 202

1    MR. EHRLICH:  Objection to form.  Asked and
2  answered.  Calls for speculation.
3       A.    Yeah, you'd need to speak to IKB's
4  management.
5    MR. ALVARADO:  And you didn't -- you don't
6  have any knowledge of why that was the case?
7    MR. EHRLICH:  Objection to form.  Asked and
8  answered.
9       A.    They were under no legal obligation
10  to buy CP from their vehicle.
11    THE VIDEOGRAPHER:  Five minutes left on the
12  tape.
13    MR. ALVARADO:  You said earlier that they
14  would have bought CP to help protect the vehicle
15  that they put together, right?
16    MS. KAMISON:  Objection.
17    MR. EHRLICH:  Objection to form, misstates
18  the testimony.
19       A.    Is that what I said?  Because I
20  thought I said it was commonplace for sponsoring
21  banks to buy the CP off the SIVs that they set up
22  or sponsored when there was a shortage of CP
23  investors in the market.
24    MR. ALVARADO:  And why is that the case?
25    MR. EHRLICH:  Objection to form.  Calls for

Page 203

1  speculation.
2       A.    I can speculate.  I mean -- but I
3  don't know what their motivation was.
4    MR. ALVARADO:  And then it continues.  It
5  says "Braeuning" there, and there is a colon, and
6  there is a quote, and it says:
7       "we were afraid of fire sale for quite some
8  time."
9       Do you see that?
10       A.    I do.
11       Q.    Did you have discussions with
12  people concerning a fire sale of assets in the
13  Rhinebridge SIV?
14    MR. EHRLICH:  Objection to the form.  Vague
15  and ambiguous.  Lacks foundation.
16       A.    I think, as I have mentioned a few
17  times now, one of the parts -- one part of the
18  analysis is to -- the scenario where the vehicle
19  has to unwind, it has to sell its assets, and
20  generally that's considered a fire sale.
21    MR. ALVARADO:  And did you -- did you have
22  conversations about a fire sale of the Rhinebridge
23  SIV's underlying collateral?
24       A.    Yes, I would have done.  I would
25  have had conversations around any vehicle that is

Page 204

1  subject to a trigger and forced to sell assets.
2  That would be part of the committee process.  Do I
3  remember, like, talking in this instance about this
4  case?  I'm afraid not.
5    MR. ALVARADO:  Do you recall when those
6  conversations took place?
7       A.    Sorry, which --
8    MR. EHRLICH:  Objection to the form.
9       A.    Which ones.
10    MR. ALVARADO:  The conversations concerning
11  fire sales of assets.
12       A.    It would be over the fire years
13  that I was at Fitch.  That's part of the analysis
14  that you'd perform.
15       Q.    How about specifically related to a
16  fire sale of assets of the Rhinebridge SIV's
17  assets?
18    MR. EHRLICH:  Objection to form.  Lacks
19  foundation.
20       A.    No, but -- again, this is -- I've
21  already answered this.  I don't recall discussing
22  Rhinebridge in particular at this time.
23    MR. ALVARADO:  Why don't we take a break.
24    THE VIDEOGRAPHER:  We are going off the
25  record at three o'clock.

Page 205

1       (Short pause)
2    THE VIDEOGRAPHER:  We are back on the record
3  as of 3.16.  You may continue.
4    MR. ALVARADO:  Mr. Moore, you understand
5  you're still under oath?
6       A.    I do, yes.
7       Q.    I'm going to mark exhibit 403.
8    (Exhibit 403 marked for identification)
9    MR. ALVARADO:  Exhibit 403 is an e-mail
10  bearing Bates number IKB000284915.
11       (Short pause)
12       A.    Okay, yeah.
13       Q.    Exhibit 403 begins with an e-mail
14  from Amrit Bains, at IKB CAM, right?
15       A.    Mmm-hmm.
16       Q.    And it's sent to you and
17  Paddy Clerkin, with a CC to various IKB CAM
18  employees, right?
19       A.    Mmm-hmm.
20       Q.    And you received this e-mail from
21  Mr. Bains in the ordinary course of your business
22  on June 19th, 2007, correct?
23       A.    Correct.
24       Q.    And the subject is "NCO's", right?
25       A.    Correct.

52 (Pages 202 to 205)