TAB 29

| From: | Drennan, Gregg (FID) [Gregg.Drennan@morganstanley.com] |
|---|---|
| Sent: | Monday, March 26, 2007 12:07:52 PM |
| To: | Lau, Fanny; Jung, Angela; Rosa, David |
| CC: | harvey; Gärtner@ms.com; Gärtner, Frank; Ryan, Neil |
| Subject: | FW: Rhinebridge - sample rating promises |

Fanny,

In relation to your proposed rating language below I feel very strongly that i would like to keep to the language in the current draft of the OM which is based on that from the OM, new issue report and the rating letter (which were all consistent) from Cheyne. The changes to the language vs Cheyne are caused only by: adding the SCN references (SCN and MCN rating language is identical) and deleting the reference to the US capital notes (the pass through structure meant that these were described separately for Cheyne which is not required here). None of the other changes between the IKB and Cheyne SIV affect elements of the rating language so I see no need to change them - and I know that the Cheyne language was carefully drafted and explicitly considered by committee to match both the terminology and structure of MS arranged SIVs and the rating approach used by Moodys to analyse them.

Looking at the language below, whilst the form of the description differs from our proposed language I don't really see any changes of substance in your proposed language and hence it seems much easier to keep to the existing language. If you think that the existing language is deficient then please could i ask you to mark required changes on the existing language. Also note that the language below would need several modifications to link it to the terminology in this deal etc.

Note that after checking the Cheyne language i did note two points:
- for the description of the SCN/MCN rating, one final sentence was missing from the OM description (it was in the Cheyne rating letter but not the OM) so i will add it to the end of the relevant paragraph (note this brings it closer to your description below): "Moody's ratings on the Senior Capital Notes and the Mezzanine Capital Notes address payments as promised in the event of Restricted Funding and the probability of Restricted Funding itself."
- can you confirm whether for the CP and MTN, does the rating relate to the programme or just to the notes?

Also note that we dont disclose the combo rating language in the OM - these just go in the pricing supplement for the combo notes.

Please let me know asap if this will be a problem

Can you also let me know when you are available for a call on the numbers - following your conversations with Neil on Friday I need to ensure I am clear where you are on the numbers and expected rating before we go red today.

Yours,

Gregg Drennan - Executive Director
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-6967
Mobile: +44 77951-27591
Fax: +44 20 7677-4328
Gregg.Drennan@morganstanley.com

---

From: Valev, Iskren (FID)
Sent: 26 March 2007 10:49
To: Drennan, Gregg (FID)
Subject: FW: Rhinebridge - sample rating promises
Importance: High


Moody's rating language. Let's discuss

Iskren Valev - Vice President
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7800
Mobile: +44 77859-70693

**IKB000143917**

Iskren.Valev@morganstanley.com

_____

From: Lau, Fanny [mailto:Fanny.Lau@moodys.com]
Sent: 26 March 2007 10:45
To: Valev, Iskren (FID); Gärtner, Frank
Cc: Rosa, David; Jung, Angela
Subject: Rhinebridge - sample rating promises


Iskren/Frank,

I set out below a few samples of our rating promise.

Thanks,
Fanny


Samples of rating promise

1.     Aaa Senior MTN Programme

Moody's Aaa rating assigned to each of the senior medium term note programmes addresses the timely payment of interest and principal at par on the final maturity date.  Moody's ratings assigned to such programmes address the likelihood that investors will receive payments as promised in the event of defeasance or enforcement and do not address the probability that such events will occur.

2.     P-1 Senior CP Programme

Moody's P-1 rating assigned to each of the senior commercial paper programmes addresses the timely payment of interest (if applicable) and principal at par on the final maturity date.  Moody's ratings assigned to such programmes address the likelihood that investors will receive payments as promised in the event of defeasance or enforcement and do not address the probability that such events will occur.

3.     Aaa/A Capital Notes

Moody's Aaa rating assigned to the [Senior Capital Notes] addresses the payment of interest and principal at par on the final maturity date.  The rating does not address the risk that interest payments on the [Senior Capital Notes] may be deferred prior to such final maturity date, whether by way of [restrictive operations] or otherwise and does not apply to any early redemptions at the option of the [Senior Capital Noteholder].  Moody's rating assigned to the [Senior Capital Notes] addresses the likelihood that investors will receive payments as promised in the event

CONFIDENTIAL                                                    IKB000143918

TAB 30

| From: | Day, Stephen <SDay@mayerbrownrowe.com> |
|---|---|
| Sent: | Monday, March 26, 2007 10:21 AM (GMT) |
| To: | Drennan, Gregg (FID) <Gregg.Drennan@morganstanley.com>; Valev, Iskren (FID) <Iskren.Valev@morganstanley.com>; Hitselberger, Carol A. <CHitselberger@mayerbrownrowe.com>; Gelfand, Rebecca <RGelfand@mayerbrownrowe.com>; Reich, Lindsay <LReich@mayerbrownrowe.com>; Gärtner@mail20.mayerbrownrowe.com; Gärtner, Frank <Frank.Gaertner@ikb.de>; Ryan, Neil <Neil.Ryan@ikb-cam.de> |
| Cc: | JEdge@Sidley.com |
| Subject: | RE: Rhinebridge - CN IM comments |

Fanny's objections do not sound like real world issues to me. The board of directors are empowered and responsible to ensure they have all the information they require to make any determination. It should be well within the abilities of the BoD of the Issuer to make a determination as to whether or not any Noteholder will be materially prejudiced by any course of action. In other programs, in cases where the Security Trustee is required to make a determination they usually request the right to rely on a certification by the Issuer. In point of fact I think this is how our Clause 3.2 (Amendments) of the TTA - which is supposed to govern these instances - is currently drafted. The approach suggested seems unduly restrictive for the Issuer especially in the context of a perpetual programme.

-----Original Message-----
**From:** Drennan, Gregg (FID) [mailto:Gregg.Drennan@morganstanley.com]
**Sent:** 26 March 2007 11:10
**To:** Valev, Iskren (FID); Hitselberger, Carol A.; Day, Stephen; Gelfand, Rebecca; Reich, Lindsay; Gärtner, Frank; Ryan, Neil
**Cc:** JEdge@Sidley.com
**Subject:** RE: Rhinebridge - CN IM comments

Sounds like on the voting point we should go with 2 as discussed as an option last night? Frank?

We are trying to kill the rating language change she is proposing

**Gregg Drennan - Executive Director**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-6967
Mobile: +44 77951-27591
Fax: +44 20 7677-4328
Gregg.Drennan@morganstanley.com

---

**From:** Valev, Iskren (FID)
**Sent:** 26 March 2007 11:00
**To:** Hitselberger, Carol A.; Day, Stephen; Gelfand, Rebecca; Reich, Lindsay; Gärtner, Frank; Ryan, Neil
**Cc:** Drennan, Gregg (FID); 'JEdge@Sidley.com'
**Subject:** FW: Rhinebridge - CN IM comments

Dear all,

here are Moody's comments that came out this morning. I spoke with her and convinced her that we can ignore some of her comments:

p1 - Ignore
p8 - Ignore
p22 - Ignore for now, but Fanny will require the technical default to be included in the underlined documents, otherwise the current langiage does not work, as I explained yesterday
p23 -

1) Fanny wants to agg a statement that if there is a conflict of the interest of the SCN, MCN and JCN, SCN will have priority over MCN and MCN will have priority over JCN. Mayer Brown, is there any legal reason of not putting that?

**CONFIDENTIAL**                                   **IKB000850390**

2) Technical default - can ignore
3) Indemnitied of the Sec Trustee - Fanny wants to add the clarification that the Sec Trustee is indemnified under the STD, i guess that is a true statement

p27 - ignore
p29 - just a note to include that in the other docs

on the Voting point: Fanny agrees that the board of directors is a very responsible body and can be liable for not acting on behalf of the Noteholders, but she is concerned that the board may not have enough information to be able to make the determination what is in the interest of the noteholders (for example, they may decide that a change of business is in the best interest of the noteholders). Fanny sounds like she is not willing to negotiate on this, this is in line with Moody's new approach of avoiding Rating Confirmations when then can be held liable for providing rating confirmation without noteholder's consent and which we discussed with Moody's many times over the last 2 weeks. Therefore, the 2 options are: 1) to include a provision that the Issuer will ask the Sec Trustee for an advice if the modification is adverseley affecting the noteholders before making such determination or 2) to say that these are modifications of "minor technical nature". Frank, let us know if you want to raise the issue further with Fanny.

Fanny just send Moody's rating langauage which we are currently reviewing.

**Iskren Valev - Vice President**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7800
Mobile: +44 77859-70693
Iskren.Valev@morganstanley.com

---

**From:** Lau, Fanny [mailto:Fanny.Lau@moodys.com]
**Sent:** 26 March 2007 09:34
**To:** Valev, Iskren (FID); Gärtner, Frank
**Subject:** Rhinebridge - CN IM comments

<<Rhinebridge IM CN (24 Mar 2007).doc>> <<Ts and Cs of Capital Note - Moody's comments 26 Mar 2007.pdf>>

Iskren/Frank,

I hope you had a good weekend.  Please find attached our comments on the CN IM.

Iskren, I will give you a call a little later.

Thanks,

Kind regards,
Fanny

---

**The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you. Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.**

---

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

The information in this e-mail is confidential and may be legally privileged.
If you are not the intended recipient, you must not read, use or
disseminate that information. If you have received this e-mail in error,
please notify us and destroy it immediately.
It is your responsibility to protect your system from viruses and any other
harmful code or device. We try to eliminate them from e-mails and
attachments; but we accept no liability for any which remain. We may
monitor or access any or all e-mails sent to us.
This is a legal, not a financial, communication. It is not intended to be,
nor should it be construed as, a direct or indirect invitation or inducement
to any person to engage in investment activity.
Mayer, Brown, Rowe & Maw LLP is an English limited liability partnership
(registered in England and Wales with number OC303359) which is regulated by the Law Society.
We operate in combination with our associated Illinois, USA, limited
liability partnership. A list of names of our members and their professional
qualifications is open to inspection at our registered office, 11 Pilgrim
Street, London EC4V 6RW.

CONFIDENTIAL

IKB000850392

TAB 31

| | |
|---|---|
| **From:** | Day, Stephen <SDay@mayerbrownrowe.com> |
| **Sent:** | Monday, March 26, 2007 12:42 PM (GMT) |
| **To:** | Valev, Iskren (FID) <Iskren.Valev@morganstanley.com>; Hitselberger, Carol A. <CHitselberger@mayerbrownrowe.com>; Gelfand, Rebecca <RGelfand@mayerbrownrowe.com>; Reich, Lindsay <LReich@mayerbrownrowe.com>; Gärtner, Frank <Frank.Gaertner@ikb.de>; Ryan, Neil <Neil.Ryan@ikb-cam.de> |
| **Cc:** | Drennan, Gregg (FID) <Gregg.Drennan@morganstanley.com>; JEdge@Sidley.com; Gelfand, Rebecca <RGelfand@mayerbrownrowe.com>; Reich, Lindsay <LReich@mayerbrownrowe.com>; Handa, Neal <NHanda@mayerbrownrowe.com> |
| **Subject:** | RE: Rhinebridge - CN IM comments |

Thanks for these Iskren.

Are we to assume that all other comments (to the extent they are requesting specific changes) are acceptable or unacceptable to MS and IKB or are they being addressed with Moodys directly and you are providing us with only the agreed changes ?

Please see my responses below regarding the guidance you provided.

In addition, please note my questions below (page numbers corresponding to the mark-up of the redline I received - Moody's comments in [red text]

p5 - Legal Maturity Date - are we now changing this to five years rather than three ?
p.10 - sample rating language - I assume this is the language Gregg advised you are resisting ? If not, please provide agreed wording if there is a change
p.11 - "Assume the modes of operation are in effect" - any idea what is intended here ?
p.12 - No change on the basis of guidance below and discussions on Sunday
p.89 - "why the deletion" - we will assume no change here unless you tell us otherwise
p.93, 94, 95 - please advise
p.104 - should the language be amended to provide for "credit estimates" but only in the case of Moody's ?
p.108 - change "implied" to "then current" or only with respect to Moody's ?
p.178 - please advise

Thanks

Stephen

-----Original Message-----
**From:** Valev, Iskren (FID) [mailto:Iskren.Valev@morganstanley.com]
**Sent:** 26 March 2007 11:00
**To:** Hitselberger, Carol A.; Day, Stephen; Gelfand, Rebecca; Reich, Lindsay; Gärtner@ms.com; Frank; Ryan, Neil
**Cc:** Drennan, Gregg (FID); JEdge@Sidley.com
**Subject:** FW: Rhinebridge - CN IM comments

Dear all,

here are Moody's comments that came out this morning. I spoke with her and convinced her that we can ignore some of her comments:

p1 - Ignore  [I don't see a comment]
p8 - Ignore  [I don't see a comment]
p22 - Ignore for now, but Fanny will require the technical default to be included in the underlined documents, otherwise the current langiage does not work, as I explained yesterday  [ok - no change]
p23 -  [?]

1) Fanny wants to agg a statement that if there is a conflict of the interest of the SCN, MCN and JCN, SCN will have

**IKB000850437**

priority over MCN and MCN will have priority over JCN. Mayer Brown, is there any legal reason of not putting that?  [No, if this is what IKB wants we can include language to this effect in the Condition and in the Security Trust Deed]
2) Technical default - can ignore  [ok - no change]
3) Indemnitied of the Sec Trustee - Fanny wants to add the clarification that the Sec Trustee is indemnified under the STD, i guess that is a true statement  [Fanny's change is not necessary the language above already qualifies the circumstances where the Security Trustee is entitled not to act "if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it" - this language tracks the provisions of the Security Trust Deed and changing it will probably necessitate getting further sign off from Lovells and BONY]

p27 - ignore  [I don't see a comment]
p29 - just a note to include that in the other docs  [I don't see a comment]

on the Voting point: Fanny agrees that the board of directors is a very responsible body and can be liable for not acting on behalf of the Noteholders, but she is concerned that the board may not have enough information to be able to make the determination what is in the interest of the noteholders (for example, they may decide that a change of business is in the best interest of the noteholders). Fanny sounds like she is not willing to negotiate on this, this is in line with Moody's new approach of avoiding Rating Confirmations when then can be held liable for providing rating confirmation without noteholder's consent and which we discussed with Moody's many times over the last 2 weeks. Therefore, the 2 options are: 1) to include a provision that the Issuer will ask the Sec Trustee for an advice if the modification is adverseley affecting the noteholders before making such determination or 2) to say that these are modifications of "minor technical nature". Frank, let us know if you want to raise the issue further with Fanny.  [Please see my earlier response - I understand this is being separately discussed]

Fanny just send Moody's rating langauage which we are currently reviewing.

**Iskren Valev - Vice President**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7800
Mobile: +44 77859-70693
Iskren.Valev@morganstanley.com

---

**From:** Lau, Fanny [mailto:Fanny.Lau@moodys.com]
**Sent:** 26 March 2007 09:34
**To:** Valev, Iskren (FID); Gärtner, Frank
**Subject:** Rhinebridge - CN IM comments

<<Rhinebridge IM CN (24 Mar 2007).doc>> <<Ts and Cs of Capital Note - Moody's comments 26 Mar 2007.pdf>>

Iskren/Frank,

I hope you had a good weekend.  Please find attached our comments on the CN IM.

Iskren, I will give you a call a little later.

Thanks,

Kind regards,
Fanny

---

**The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution**

**or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you. Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.**

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

The information in this e-mail is confidential and may be legally privileged.
If you are not the intended recipient, you must not read, use or
disseminate that information. If you have received this e-mail in error,
please notify us and destroy it immediately.
It is your responsibility to protect your system from viruses and any other
harmful code or device. We try to eliminate them from e-mails and
attachments; but we accept no liability for any which remain. We may
monitor or access any or all e-mails sent to us.
This is a legal, not a financial, communication. It is not intended to be,
nor should it be construed as, a direct or indirect invitation or inducement
to any person to engage in investment activity.
Mayer, Brown, Rowe & Maw LLP is an English limited liability partnership
(registered in England and Wales with number OC303359) which is regulated by the Law Society.
We operate in combination with our associated Illinois, USA, limited
liability partnership. A list of names of our members and their professional
qualifications is open to inspection at our registered office, 11 Pilgrim
Street, London EC4V 6RW.

**IKB000850439**

TAB 32

| From: | Lau, Fanny <Fanny.Lau@moodys.com> |
|---|---|
| Sent: | Monday, March 26, 2007 12:47 PM (GMT) |
| To: | Drennan, Gregg (FID) <Gregg.Drennan@morganstanley.com>; Jung, Angela <Angela.Jung@moodys.com>; Rosa, David <David.Rosa@moodys.com> |
| Cc: | harvey <harvey@morganstanley.com>; Gärtner, Frank <Frank.Gaertner@ikb.de>; Ryan, Neil <Neil.Ryan@ikb-cam.de>; Valev, Iskren (FID) <Iskren.Valev@morganstanley.com> |
| Subject: | RE: Rhinebridge - sample rating promises |

Greg,

The sample wording has been provided to give the issuer an indication of what the rating letters will say.  Based on the information provided, the Issuer may disclose as it wishes upon advice of their advisors.

It was our understanding that the issuer is seeking programme ratings for their senior debts and note ratings for the capital notes (this will have to be the case as there is only one programme).

A call for later afternoon will be best as I have a scheduled call at 2 -3 and also need to have a further talk with committee.

Kind regards,
Fanny

> -----Original Message-----
> **From:** Drennan, Gregg (FID) [mailto:Gregg.Drennan@morganstanley.com]
> **Sent:** 26 March 2007 12:08
> **To:** Lau, Fanny; Jung, Angela; Rosa, David
> **Cc:** harvey; Gärtner@ms.com; Frank; Ryan, Neil
> **Subject:** FW: Rhinebridge - sample rating promises
> **Importance:** High
>
> Fanny,
>
> In relation to your proposed rating language below I feel very strongly that i would like to keep to the language in the current draft of the OM which is based on that from the OM, new issue report and the rating letter (which were all consistent) from Cheyne. The changes to the language vs Cheyne are caused only by: adding the SCN references (SCN and MCN rating language is identical) and deleting the reference to the US capital notes (the pass through structure meant that these were described separately for Cheyne which is not required here). None of the other changes between the IKB and Cheyne SIV affect elements of the rating language so I see no need to change them - and I know that the Cheyne language was carefully drafted and explicitly considered by committee to match both the terminology and structure of MS arranged SIVs and the rating approach used by Moodys to analyse them.
>
> Looking at the language below, whilst the form of the description differs from our proposed language I don't really see any changes of substance in your proposed language and hence it seems much easier to keep to the existing language. If you think that the existing language is deficient then please could i ask you to mark required changes on the existing language. Also note that the language below would need several modifications to link it to the terminology in this deal etc.
>
> Note that after checking the Cheyne language i did note two points:
> - for the description of the SCN/MCN rating, one final sentence was missing from the OM description (it was in the Cheyne rating letter but not the OM) so i will add it to the end of the relevant paragraph (note this brings it closer to your description below): "Moody's ratings on the Senior Capital Notes and the Mezzanine Capital Notes address payments as promised in the event of Restricted Funding and the probability of Restricted Funding itself."
> - can you confirm whether for the CP and MTN, does the rating relate to the programme or just to the notes?
>
> Also note that we dont disclose the combo rating language in the OM - these just go in the pricing supplement for the combo notes.
>
> Please let me know asap if this will be a problem

CONFIDENTIAL

IKB000916050

Can you also let me know when you are available for a call on the numbers - following your conversations with Neil on Friday I need to ensure I am clear where you are on the numbers and expected rating before we go red today.

Yours,

**Gregg Drennan - Executive Director**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-6967
Mobile: +44 77951-27591
Fax: +44 20 7677-4328
Gregg.Drennan@morganstanley.com

---

**From:** Valev, Iskren (FID)
**Sent:** 26 March 2007 10:49
**To:** Drennan, Gregg (FID)
**Subject:** FW: Rhinebridge - sample rating promises
**Importance:** High

Moody's rating language. Let's discuss

**Iskren Valev - Vice President**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7800
Mobile: +44 77859-70693
Iskren.Valev@morganstanley...com

---

**From:** Lau, Fanny [mailto:Fanny.Lau@moodys.com]
**Sent:** 26 March 2007 10:45
**To:** Valev, Iskren (FID); Gärtner, Frank
**Cc:** Rosa, David; Jung, Angela
**Subject:** Rhinebridge - sample rating promises

Iskren/Frank,

I set out below a few samples of our rating promise.

Thanks,
Fanny

**Samples of rating promise**

1.    **Aaa Senior MTN Programme**

Moody's **Aaa** rating assigned to each of the senior medium term note programmes addresses the timely payment of interest and principal at par on the final maturity date. Moody's ratings assigned to such programmes address the likelihood that investors will receive payments as promised in the event of defeasance or enforcement and do not address the probability that such events will occur.

2.    **P-1 Senior CP Programme**

IKB000916051

Moody's **P-1** rating assigned to each of the senior commercial paper programmes addresses the timely payment of interest (if applicable) and principal at par on the final maturity date. Moody's ratings assigned to such programmes address the likelihood that investors will receive payments as promised in the event of defeasance or enforcement and do not address the probability that such events will occur.

**3.     Aaa/A Capital Notes**

Moody's **Aaa** rating assigned to the [Senior Capital Notes] addresses the payment of interest and principal at par on the final maturity date. The rating does not address the risk that interest payments on the [Senior Capital Notes] may be deferred prior to such final maturity date, whether by way of [restrictive operations] or otherwise and does not apply to any early redemptions at the option of the [Senior Capital Noteholder]. Moody's rating assigned to the [Senior Capital Notes] addresses the likelihood that investors will receive payments as promised in the event of a defeasance or an enforcement and addresses the likelihood that investors will receive payments as promised in the event of defeasance or enforcement and the probability that such events will occur.

**4.     Standard/Combination Capital Notes**

Moody's rating assigned to the [Standard Capital Notes] addresses the expected loss posed to investors in relation to ultimate payment of LIBOR plus [25] basis points and ultimate payment of principal on the final maturity date set at 10 years on a rolling basis. The rating does not address the risk that interest payments on the [Standard Capital Notes] may be deferred prior to this date, whether by way of [restrictive operations] or otherwise and does not apply to any early redemptions at the option of the [Standard Capital Noteholder]. Moody's rating assigned to the [Standard Capital Notes] addresses the likelihood that investors will receive payments as promised in the event of defeasance or enforcement and the probability that such events will occur.

**The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you. Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.**

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

**The information contained in this e-mail message, and any attachment thereto, is confidential and may not be disclosed without our express permission. If you are not the intended recipient or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution**

or copying of this message, or any attachment thereto, in whole or in part, is strictly prohibited. If you have received this message in error, please immediately notify us by telephone, fax or e-mail and delete the message and all of its attachments. Thank you. Every effort is made to keep our network free from viruses. You should, however, review this e-mail message, as well as any attachment thereto, for viruses. We take no responsibility and have no liability for any computer virus which may be transferred via this e-mail message.

CONFIDENTIAL

IKB000916053

TAB 33

| From: | Katugampola, Navindu (FID) <Navindu.Katugampola@morganstanley.com> |
|---|---|
| Sent: | Thursday, March 15, 2007 1:04 PM (GMT) |
| To: | harvey <harvey@morganstanley.com> |
| Cc: | Ryan, Neil <Neil.Ryan@ikb-cam.de>; Rohde, Christian <Christian.Rohde@ikb-cam.de>; Gärtner@ms.com; Gärtner, Frank <Frank.Gaertner@ikb.de> |
| Subject: | FW: update |
| Attach: | Rhinebridge Questions 15032007.xls |

Fitch termsheet update

**Navindu Katugampola**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-4268
Mobile: +44 78018-18252
Fax: +44 20 7056-2041
Navindu.Katugampola@morganstanley.com

**From:** Glenn.Moore@derivativefitch.com [mailto:Glenn.Moore@derivativefitch.com]
**Sent:** 15 March 2007 12:59
**To:** Katugampola, Navindu (FID)
**Subject:** RE: update

Hi

Here are the questions relating to the Termsheet and also all questions that you required further clarification.

Thanks

Glenn Moore
Associate Director
**DerivativeFitch**
Tel: +44 (0)20 7862 4167
Fax: +44 (0)20 7417 4224
glenn.moore@derivativefitch.com

ISR - Best Rating Agency - Europe (*2005, 2004, 2003, 2001, 2000, 1999*)
SFI - Best Rating Agency for Securitisation (*2005, 2004, 2003, 2001, 2000, 1999*)

"Katugampola, Navindu \(FID\)"
<Navindu.Katugampola@morganstanley.com>

15/03/07 10:41

To <Glenn.Moore@derivativefitch.com>
cc
Subject RE: update



Great, thanks Glenn!

**Navindu Katugampola**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-4268
Mobile: +44 78018-18252
Fax: +44 20 7056-2041
Navindu.Katugampola@morganstanley.com

**From:** Glenn.Moore@derivativefitch.com [mailto:Glenn.Moore@derivativefitch.com]
**Sent:** 15 March 2007 10:10
**To:** Katugampola, Navindu (FID)
**Subject:** update

Morning

I have all of the comments on the termsheet, before I send them out I am going to meet with Paddy and give him an update and go through some of my comments with him.

Will send the results shortly.

Thanks

Glenn Moore
Associate Director
**DerivativeFitch**
Tel:   +44 (0)20 7862 4167
Fax:   +44 (0)20 7417 4224
glenn.moore@derivativefitch.com

ISR - Best Rating Agency - Europe (*2005, 2004, 2003, 2001, 2000, 1999*)
SFI - Best Rating Agency for Securitisation (*2005, 2004, 2003, 2001, 2000, 1999*)

Confidentiality Notice: The information in this e-mail and any attachment(s) is confidential and for the use of the addressee(s) only. If you have received this e-mail in error, please delete this e-mail. Unauthorized use, reliance, disclosure or copying of the contents of this e-mail, or any similar action, is prohibited.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

**HIGHLY CONFIDENTIAL RATING AGENCY**                    **IKB000394177**

Confidentiality Notice: The information in this e-mail and any attachment(s) is confidential and for the use of the addressee(s) only. If you have received this e-mail in error, please delete this e-mail. Unauthorized use, reliance, disclosure or copying of the contents of this e-mail, or any similar action, is prohibited.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

**HIGHLY CONFIDENTIAL RATING AGENCY**

**IKB000394178**

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | DATE: | 3/15/2007 | | | | | |
| 2 | | | | | | | |
| 3 | TRANSACTION: | Rhinebridge | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | STATUS | QUESTION NUMBER | DATE OF QUESTION | EST DATE | SUBJECT | DESCRIPTION | Page |
| 11 | OPEN | 10 | 12-Feb-07 | 15-Mar-07 | net Draft 12 Dec 2006 Sector Concentration Test | | 40 |
| 12 | OPEN | 14 | 12-Feb-07 | 15-Mar-07 | net Draft 12 Dec 2006 AFC risk in other ABS | | 49 |
| 13 | OPEN | 15 | 12-Feb-07 | 15-Mar-07 | net Draft 12 Dec 2006 Puttable Investments | | 51 |
| 14 | OPEN | 23 | 16-Feb-07 | 20-Feb-07 | lbly this should be in I Monthly reporting | | 19 |
| 15 | OPEN | 24 | 16-Feb-07 | 16-Feb-07 | anagement Agreeme General | | |
| 16 | OPEN | 24 | 16-Feb-07 | 16-Feb-07 | anagement Agreeme General | | |
| 17 | OPEN | 25 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Ratings | | 76 |
| | OPEN | 26 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Minor Capital Tests | | 90 |
| 18 | | | | | | | |
| 19 | OPEN | 27 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Custody Arrangements | | 107 |
| 20 | OPEN | 28 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Approved Bank | | 147 |
| 21 | OPEN | 29 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Committed Liquidity | | 149 |
| 22 | OPEN | 30 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Deemed Rating | | 151 |
| 23 | OPEN | 31 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Cash Equivalent | | 151 |
| 24 | OPEN | 32 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Permitted Hedge Counterparty | | 160 |
| 25 | OPEN | 33 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Risk-Free Investments | | 163 |
| 26 | OPEN | 34 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Top Rated | | 166 |

Highly Confidential

Rhinebridge Questions 150307

IKB0003941794-0001

| | H | I | J | K | L |
|---|---|---|---|---|---|
| | | QUESTION / COMMENT | | RESPONSE | | COMMENT |
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | "Other" represents 26% of the portfolio | ? | | |
| 11 | | | | | ie in each subsector there is an "other" class. Please remove all of them and have 1 total other class |
| 12 | | Could you confirm that "other ABS" covers any product that includes some interest rate optionality. | Specifically AFC optionality | | Just to clarify - other ABS will include CDOs, HEL, Credit Cards...etc? |
| 13 | | Is this same day basis? | ? | | Are assets puttable on the same day basis? How quick can you get your cash? |
| 14 | | Could we can included a portfolio report in the Vector format in order to perform surveilance on the portfolio. | | | |
| 15 | | Include Fitch in all appropriate places. | | | |
| 16 | | Fitch does not "agree" with anything in the documentation. | | | |
| 17 | | F1 or F1+? | | | |
| 18 | | Please clarify: The Issuer shall breach the "Capital Note Rating Test" if either (i) the public rating of the Mezzanine Capital Notes falls below [Baa1] from Moody's [or [BBB+] from Fitch or (ii) if the public rating of the Mezzanine Capital Notes falls below [A1] from Moody's or [A] from Fitch. | | | |
| 19 | | This should read A+ by Fitch;long-term senior unsecured debt obligations are rated below [A1] by Moody's .. [F1] by Fitch | | | |
| 20 | | Should be F1+ | | | |
| 21 | | Should be F1+ | | | |
| 22 | | What is the Deemed Rating methodology if Fitch does not rate an asset? | | | |
| 23 | | Please explain what this means: AAA (or Fitch (if available) | | | |
| 24 | | I think that you mean A- rather than F2; are rated at least F1 and F2 respectively by Fitch | | | |
| 25 | | Does this imply that Rhinebridge may invest in risk free assets that are not rated by Fitch? | | | |
| 26 | | Did you mean F1+ | | | |

Rhinebridge Questions 150307

IKB000394179-0002

IKB0003417b-0003

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 27 | OPEN | 35 | 27-Feb-07 | 27-Feb-07 | rospectus - Capital N Definition | | i |
| 28 | OPEN | 36 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Priority of Payments before enforcement | 9 |
| | | 37 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Junior Capital Maximum Leverage Test | 19 |
| 29 | | | | | | | |
| 30 | OPEN | 38 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Capital Note Rating Test | 21 |
| 31 | OPEN | 41 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Cash Equivalents | 30 |
| 32 | OPEN | 42 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Max Non-Public Rated Test | 34 |
| | OPEN | 44 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Servicer limits | 48 |
| 33 | | | | | | | |
| 34 | OPEN | 45 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Market Sensitivity | 50 |
| 35 | OPEN | 46 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Rating of Committed Liqudity Providers | 59 |
| 36 | OPEN | 47 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Rating of Committed Liqudity Providers | 59 |
| 37 | OPEN | 48 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Rating of Committed Liqudity Providers | 59 |
| 38 | OPEN | 49 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Committed Liquidity Value | 59 |
| 39 | OPEN | 50 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Breakable Deposits | 60 |
| 40 | OPEN | 51 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Breakable Deposits | 61 |
| 41 | OPEN | 52 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Money Market Funds | 61 |
| 42 | OPEN | 53 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Putable Investments | 62 |
| 43 | OPEN | 54 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Committed Repo | 62 |
| 44 | OPEN | 55 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Committed Repo Counterparty | 67 |
| 45 | OPEN | 58 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Violation of Liquidity Test | 69 |
| 46 | OPEN | 59 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Restricted Investment Limitations | 73 |
| 47 | OPEN | 60 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Minimum Portfolio Value | 74 |
| 48 | OPEN | 61 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Risk free | 79 |
| | OPEN | 62 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Default order of sale | |
| 49 | | | | | | | |
| 50 | OPEN | 63 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Repo transactions | 81 |
| 51 | OPEN | 64 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Eligible Hedge counterparty | 83 |
| | OPEN | 65 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Appendix C | 88 |
| 52 | | | | | | | |
| 53 | OPEN | 66 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Appendix E | 91 |
| 54 | OPEN | 67 | 15-Mar-07 | 15-Mar-07 | | isheet Draft 5 Mar vs Capital Note Maturity Test | 92 |

Highly Confidential

Rhinebridge Questions 150307

| | H | I | J | K | L |
|---|---|---|---|---|---|
| 27 | Definition of Fitch: "Fitch means Fitch, Inc., Fitch Ratings, Ltd. and their subsidiaries including Derivative Fitch, Inc., and Derivative Fitch Ltd. and any successor or successors thereto." | | | | |
| 28 | Third point, please explain "investments previously committed to be purchased" | | | | |
| 29 | Committee would be more comfortable if there was also a minor Junior capital max leverage test. | | | | |
| 30 | Please change the definition to a Fitch BBB+ test | | | | |
| 31 | MMF AAA/V1+ | | | | |
| 32 | Duplicated | | | | |
| 33 | Fitch Servicer Rating S1 - S5. Eligible Limmit S1 =15%, S2 = 10% and S3-S5 = 7.5% | | | | |
| 34 | Will Rhingebridge use a macro hedging policy rather than the traditional micro hedging | | | | |
| 35 | Level 1 F1+ | | | | |
| 36 | If a Liquidity provider is downgraded below F1+ | | | | |
| 37 | For the avoidance of doubt, .....F1+ rating of the Senior Debt Obligations | | | | |
| 38 | A-1 Rated Liquidity Providers Cap - please remove A-1 reference | | | | |
| 39 | F1+ | | | | |
| 40 | Third para from the bottm "F1+ for Fitch" | | | | |
| 41 | AAA/V1+ | | | | |
| 42 | F1+ | | | | |
| 43 | F1+ | | | | |
| 44 | F1+ | | | | |
| 45 | non compliance => restricted investment during the 5 days | | | | |
| 46 | g) ERROR - reword | | | | |
| 47 | Do not require a minimum value | | | | |
| 48 | d) F1+ | | | | |
| 49 | 1. please check that the sentisence make sence. 2. Raiting agencys do not approve anything. | | | | |
| 50 | F1+ | | | | |
| 51 | F1+ | | | | |
| 52 | Please include the 0 year capital required on each of the tables for clarity of how you intend to interpolate between them. | | | | |
| 53 | Senior AAA recovery 80%, non Senior AAA 60%, other are fine | | | | |
| 54 | Remove Moodys and replace with Rating Agencies | | | | |

Rhinebridge Questions 150307

IKB0003941179-0004

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 55 | OPEN | 68 | 15-Mar-07 | 15-Mar-07 | tsheet Draft 5 Mar vs Capital Note Maturity Test | | 93 |
| | | | | | | | 2.d |
| 56 | OPEN | 69 | 15-Mar-07 | 15-Mar-07 | tsheet Draft 5 Mar vs Capital Note Maturity Test | | 97 |
| | OPEN | 57 | 15-Mar-07 | 15-Mar-07 | tsheet Draft 5 Mar vs Appendix H | | 100 |
| 57 | | | | | | | |
| 58 | | | | | | | |
| 59 | | | | | | | |

Highly Confidential

Rhinebridge Questions 150307

IKB0003941794005

| | H | I | J | K | L |
|---|---|---|---|---|---|
| 55 | "with a par put option, and not the put option date"? please explain | | | | |
| 56 | How are the the long term leverage ratios derived? | | | | |
| 57 | LEA - HEL as they represent such a high proportion of the portfolio and will have embedded options and there is no limit to the amount the this asset class can contribute towards LEAs I think that the committee would like to see the haircut in the region of 10%. | | | | |
| 58 | | | | | |
| 59 | | | | | |

Rhinebridge Questions 150307

Highly Confidential

IKB0003g4179-0006

TAB 34

"Chen, Gracie \(FID\)" <Gracie.Chen@morganstanley.com>

04/02/2007 07:19 AM

To   <Glenn.Moore@derivativefitch.com>

cc   "harvey"
<harvey@morganstanley.com>,
"Ryan, Neil" <Neil.Ryan@jkb-cam.de>

bcc

Subject   Haircuts on AAA HELs as LEAs

History:

☐ This message has been forwarded.

Glenn,

Following our brief conversation last week on the 10% haircuts Fitch proposed to apply on HELs as LEAs, please find attached some slides we put together with recent market data for your consideration for a less stringent haircut on HELs as LEAs.

HEL is by far the largest ABS sector in terms of primary issuance volumes and the most actively traded assets class at Morgan Stanley. Its secondary trading volumes have remained robust even in the recent difficult market condition and the trade tickets has remained at decent sizes. We hope these data can resolve Fitch's concern of the liquidity of HELs as LEAs and provide sufficient information for your committee's consideration for more favorable haircut numbers.

Please give us a call if you would like to discuss.

Thanks and Regards,

**Gracie Chen**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7545
Mobile: +44 79172-42893
Fax: +44 20 7677-3454
Gracie.Chen@morganstanley.com



EXHIBIT
393

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not

Confidential

represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email


- Presentation to Fitch 2 April 2007 HEL.ppt

Confidential

FITCH-RHINE 00052969

# Presentation to Fitch

## Home Equity Loans Approval as LEA

2 April 2007

Morgan Stanley

Confidential

Confidential

**Presentation to Fitch**

## Executive Summary

- **Morgan Stanley would like Fitch to reconsider the haircut applied on the AAA HEL purchased by SIVs as Liquid Eligible Assets**

- **Morgan Stanley believes that AAA HEL are one of the most liquid ABS asset classes. To support this argument, we provided Fitch with the following data:**
  - HEL primary issuance volumes
  - HEL secondary trading volumes
  - HEL spread volatility
  - HEL trading volumes and ticket sizes compared to other ABS asset classes

Morgan Stanley

FITCH-RHINE 00052971

1



Confidential

Presentation to Fitch

## Spread Data vs. Trading Volume

- Secondary trading volumes have remained robust despite recent market uncertainty



5 yr AAA HEL Spread (RA) vs. AAA HEL Trading Volume (LA)

Source   Morgan Stanley

Notes
1. As of 28 March 2007

Morgan Stanley

3

Confidential

Confidential

## Presentation to Fitch

# Morgan Stanley AAA Rated ABS Trading Volumes

- In 2006, AAA HEL were the most actively traded asset class at Morgan Stanley

  — AAA HEL trading volumes exceeded the "classic" LEA trading volumes

- Morgan Stanley's total trading volume of AAA rated HELs in 2006 is $44.7 billion compared to $22.0 billion total trading volume of AAA rated Credit Cards and $10.2 billion of AAA rated Student Loans



AAA Rated ABS Assets Monthly Trading Volume Comparison (AAA HEL, AAA Credit Card, AAA Student Loans) [1]



Morgan Stanley's ABS Trading by Sector and Rating [1]



Morgan Stanley

1. Source: Morgan Stanley

4

Presentation to Fitch

# AAA Rated HEL Trade Numbers

- Morgan Stanley has executed 1,445 AAA rated HEL trades in 2006

  – Of these trades, 530 were over $20mm

- In contrast, over the same period, Morgan Stanley executed 876 AAA Credit Card Trades (300 were over $20mm) and 309 AAA Student Loan trades (174 were over $20mm)





Morgan Stanley AAA Rated HEL Trade Tickets [1]

■ Tickets between $0-10MM  ■ Tickets between $10-20MM  ■ Tickets of $20MM+

1. Source: Morgan Stanley

Morgan Stanley

Confidential

FITCH-RHINE 00052975

Presentation to Fitch



# AAA Rated Credit Card Trade Numbers

Morgan Stanley AAA Rated Credit Card Trading Trade Tickets [1]

1. Source: Morgan Stanley

Morgan Stanley

Confidential

Presentation to Fitch

# AAA Rated Student Loans Trade Numbers

Morgan Stanley AAA Rated Student Loan Trade Tickets [1]



Legend: ▤ Tickets between $0-10MM   ▥ Tickets between $ 10-20MM   ▦ Tickets of $20MM+

1. Source: Morgan Stanley

Morgan Stanley

7

Confidential

FITCH-RHINE 00052977

TAB 35



Girish Mistry/LON/INTL/BNY

08/10/2007 01:46 PM

To   Sonia Chaliha/LON/INTL/BNY@BNY, Ian
     Gass/LON/INTL/BNY@BNY, Michael C.
     Adams/LON/INTL/BNY@BNY
cc   John B. Kennelly/LON/INTL/BNY@BNY

bcc

Subject   Fw: LEI haircut for HEL in the OpMan

Sonia,

We currently have the following haircuts against HEL LEIs in Rhinebridge

0-1 years  3%
1-2 years  4%
2-5 years  5%

For Moody's, S&P and Fitch

The changes that needed are as follows

**Moodys (Rhinebridge and Cheyne (Moodys confirmation received below) - therefore we are
implementing a change for Cheyne only as this is already in place for Rhinebridge**

0-1 years  3%
1-2 years  4%
2-5 years  5%

**S&P (Rhinebridge and Cheyne) – still awaiting confirmation from S&P for Cheyne – Change being
made for both Cheyne and Rhinebridge**

0-1 year   = 3%
1-2 years = 4%
2-3 years = 5%

**Fitch (Rhinebridge only as Cheyne is not rated by Fitch) - Change being made for Rhinebridge
only**

0-1 years  10%
1-2 years  10%
2-5 years  10%

Sonia,

Don't know if you need to update the Op manual with these changes

Thanks

Girish

---

**Girish Mistry** · The Bank of New York Mellon
QSR Management Ltd · Tel +44.207.964.6644 · Fax +44.207.964.6622 · gmistry@bankofny.com



HIGHLY CONFIDENTIAL

**QSR Management Limited** (a company incorporated with limited liability in England and Wales, **Registered Number** 4341962) with its **Registered Office** at
One Canada Square, London E14 5AA. Telephone + 44 20 7964 5200, Fax + 44 20 7964 6622.
Authorised and regulated by the Financial Services Authority.
----- Forwarded by Girish Mistry/LON/INTL/BNY on 10/08/2007 13:31 -----



"Chen, Gracie \(FID\)"
<Gracie.Chen@morga
nstanley.com>

09/08/2007 16:21

To: <Gmistry@bankofny.com>
cc: "Katugampola, Navindu \(FID\)"
<Navindu.Katugampola@morganstanley.com>
Subject: LEI haircut for HEL in the OpMan

Hi Girish,

Could you please add the haircut below for HELs in the OpMan for IKB and Cheyne. Please do not hesitate to give us a call if there is any problem.

| Industry Sector | Deemed Ratings | Remaining Weighted Average Life (Year) | Floating-Rate Haircuts (%) |
|---|---|---|---|
| HELs | AAA/Aaa/AAA | 0-1 | 3 |
| | AAA/Aaa/AAA | 1-2 | 4 |
| | AAA/Aaa/AAA | 2-5 | 5 |

Many Thanks and Best Regards,

**Gracie Chen**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7545
Mobile: +44 79172-42893
Fax: +44 20 7677-3454
Gracie.Chen@morganstanley.com

**From:** Jung, Angela [mailto:Angela.Jung@moodys.com]
**Sent:** 09 August 2007 16:11
**To:** Chen, Gracie (FID)
**Cc:** Kerlogue, Paul; Rosa, David; Katugampola, Navindu (FID)
**Subject:** RE: Written confirmation for HELs as LEAs

Gracie,

We just discovered that the haircut factors for both Cheyne and Rhinebridge are missing. We shall affirm this if you put them in their OpMans and send us the documents accordingly.

Regards,
Angela

HIGHLY CONFIDENTIAL

BNYM10346545



This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation.  Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers.  This is not research and is not from MS Research but it may refer to a research analyst/research report.  Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm.  We do not represent this is accurate or complete and we may not update this.  Past performance is not indicative of future returns.  For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls.  You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions.  We cannot guarantee that any such requests received via e-mail will be processed in a timely manner.  This communication is solely for the addressee(s) and may contain confidential information.  We do not waive confidentiality by mistransmission.  Contact me if you do not wish to receive these communications.  In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

HIGHLY CONFIDENTIAL

BNYM10346546

TAB 36

**From:** Chen, Gracie (FID) [Gracie.Chen@morganstanley.com]
**Sent:** Wednesday, January 31, 2007 8:11 AM
**To:** Wallis, Stephen
**Cc:** Katugampola, Navindu (FID); Drennan, Gregg (FID); Valev, Iskren (FID)
**Subject:** RE: HEL and LEA's

Dear Stephen,

Thank you for confirming that S&P is happy with the data for 0-3 yr AAA-rated HELs as LEAs. Could you please give us written confirmations of your approval for 0-3yr AAA HELs as LEAs for IKB as well as for Cheyne? Please let us know if there is any problem. Many thanks.

Regards,

**Gracie Chen**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7545
Mobile: +44 77085-16325
Gracie.Chen@morganstanley.com

---

**From:** Wallis, Stephen [mailto:stephen_wallis@standardandpoors.com]
**Sent:** 19 January 2007 17:16
**To:** Drennan, Gregg (FID); Chen, Gracie (FID)
**Cc:** Valev, Iskren (FID); Katugampola, Navindu (FID); Guadanuolo, Lapo; Van landschoot, Astrid; harvey
**Subject:** RE: HEL and LEA's

Gregg,

Thank you for the email and sorry for my delay in responding.  As has been discussed, we are happy with the data which has been provided for 0-3yr HEL's and are confident that we can provide haircuts for that tenor.  However the data becomes worrying beyond 3yrs where we are still awaiting an explanation as to the lack of issuance and trading volumes for 3-5yr and 5yr+ HEL's.  This point has been the main issue since the email I sent on 20th December.  We accept that HEL's are a very significant part of the whole ABS market, but it seems that this may be weighted heavily towards the 0-3yr HEL's?

Please let me know how you would like to proceed.

Thanks and kind regards,

Stephen

-----Original Message-----
**From:** Drennan, Gregg (FID) [mailto:Gregg.Drennan@morganstanley.com]
**Sent:** 16 January 2007 19:50
**To:** Wallis, Stephen; Chen, Gracie (FID)
**Cc:** Valev, Iskren (FID); Katugampola, Navindu (FID); Guadanuolo, Lapo; Van landschoot, Astrid; harvey
**Subject:** RE: HEL and LEA's

Stephen
At this point we are happy to put the >5yr WAL proposal to the side - we still believe they are appropriate for treatment as LEAs. However, can we ask you to now committee the <5yr WAL HEL proposal. We are frankly running out of data (much of the data you understandably would ideally like to see is not available) and i think the data that we have presented to date, including clarifiying that LEAs are the most signnificant part of the entire global ABS market is very convincing as to their appropriateness as LEAs.
We look forward to hearing from you.
Thanks

CONFIDENTIAL                                    S&P-IKB 0030071

**Gregg Drennan - Executive Director**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-6967
Mobile: +44 77951-27591
Fax: +44 20 7677-4328
Gregg.Drennan@morganstanley.com

......................................................................................................................

**From:** Wallis, Stephen [mailto:stephen_wallis@standardandpoors.com]
**Sent:** 16 January 2007 16:01
**To:** Chen, Gracie (FID)
**Cc:** Drennan, Gregg (FID); Valev, Iskren (FID); Katugampola, Navindu (FID); Guadagnuolo, Lapo; Van landschoot, Astrid
**Subject:** RE: HEL and LEA's

Gracie,

Thank you for sending this data although we're still very keen to seek further clarification supporting the 7yr HEL request.  As mentioned previously, we want to know why the trading volumes for HEL's over 0-3yrs are so low (follow up presentation slide 5) compared to the student loans/credit cards for example?

Thanks and kind regards,

Stephen

> -----Original Message-----
> **From:** Chen, Gracie (FID) [mailto:Gracie.Chen@morganstanley.com]
> **Sent:** 16 January 2007 08:49
> **To:** Chen, Gracie (FID); Wallis, Stephen
> **Cc:** Drennan, Gregg (FID); Valev, Iskren (FID); Katugampola, Navindu (FID); Guadagnuolo, Lapo; Van landschoot, Astrid
> **Subject:** RE: HEL and LEA's
>
> Good Morning Stephen,
>
> Could you please let us know when you would be able to give us some comments on this?
>
> **Gracie Chen**
> Morgan Stanley | Fixed Income
> 20 Cabot Square | Canary Wharf | Floor 02
> London, E14 4QW
> Phone: +44 20 7677-7545
> Mobile: +44 77085-16325
> Gracie.Chen@morganstanley.com

......................................................................................................................

**From:** Chen, Gracie (FID)
**Sent:** 10 January 2007 15:48
**To:** 'Wallis, Stephen'
**Cc:** Drennan, Gregg (FID); Valev, Iskren (FID); Katugampola, Navindu (FID); Guadagnuolo, Lapo; Van landschoot, Astrid
**Subject:** RE: HEL and LEA's

Dear Stephen,

Following our phone call yesterday, please find in the attachment the spread movement data of AAA rated

                                                                     S&P-IKB 0030072

HELs with different maturities to further support our request for you to approve AAA rated HELs up to 7 yrs as LEAs. This is unfortunately the only relevant HEL spread data we keep track of. Please let us know your thoughts on this. Many thanks.

**Gracie Chen**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7545
Mobile: +44 77085-16325
Gracie.Chen@morganstanley.com

--------------------------------------------------------------------------------------------

**From:** Wallis, Stephen [mailto:stephen_wallis@standardandpoors.com]
**Sent:** 20 December 2006 12:12
**To:** Katugampola, Navindu (FID)
**Cc:** Drennan, Gregg (FID); Guadagnuolo, Lapo; Chen, Gracie (FID); Van landschoot, Astrid
**Subject:** RE: HEL and LEA's

Navindu,

We have had a look at the documents you sent over and have the following questions:

1. It seems as though the trading volumes for 0-3yrs are very high, however when you look beyond this maturity there is a significant drop.  Would you maybe be able to break down the graph on the 'follow up slide 2' to show the issuance split between 0-3yrs, 3-5yrs and 5yrs+ maturities?

2. Could you also break down the graph in slide 8 to show the amount of 7yr HEL's which were traded during this period?

3. There is nothing about bid-ask spread in the slides. I know that we have this issue surrounding historical data but could you provide the market information today?  As this point was raised at the start of the discussions on HEL's, I thought there might have been some collation of data from your side over the last few months?

I think our main concern at the moment is that your request is for us to approve 7yr HEL's as LEA's, but the data is still quite generic, and not specific to this particular type of asset.

Please let me know whether this additional data will be obtainable.

Thanks and regards,

Stephen

        -----Original Message-----
        **From:** Katugampola, Navindu (FID) [mailto:Navindu.Katugampola@morganstanley.com]
        **Sent:** 20 December 2006 00:00
        **To:** Katugampola, Navindu (FID); Wallis, Stephen
        **Cc:** Drennan, Gregg (FID); Guadagnuolo, Lapo; Chen, Gracie (FID); Van landschoot, Astrid
        **Subject:** RE: HEL and LEA's

        Stephen,

        Could you please let me know your thoughts on this?

        Thanks and regards,

        Navindu

S&P-IKB 0030073

**Navindu Katugampola**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-4268
Mobile: +44 78018-18252
Fax: +44 20 7056-2041
Navindu.Katugampola@morganstanley.com

**From:** Katugampola, Navindu (FID)
**Sent:** 14 December 2006 00:09
**To:** 'Wallis, Stephen'
**Cc:** Drennan, Gregg (FID); Guadagnuolo, Lapo; Chen, Gracie (FID); Van landschoot, Astrid
**Subject:** RE: HEL and LEA's

Stephen & team,

Please find attached some follow-up material on the use of HELs at LEAs as discussed on the call last week. We noted the questions you had asked, and obtained as much data as we could to address these. I also attach, for your information, the previous material we sent to you in September. If you have any questions on the attached, please do get in touch with either myself or Gracie. Otherwise, I hope you now feel you have sufficient data to make an informed decision on this.

We look forward to hearing from you.

Thanks and regards,

Navindu

**Navindu Katugampola**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-4268
Mobile: +44 78018-18252
Fax: +44 20 7056-2041
Navindu.Katugampola@morganstanley.com

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

The information contained in this message is intended only for the recipient, and may be a confidential attorney-client communication or may otherwise be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, please be aware that any dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by replying to the message and deleting it from your computer.

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan

Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see **https://secure.ms.com/servlet/cls**. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

---

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see **https://secure.ms.com/servlet/cls**. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

---

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see **https://secure.ms.com/servlet/cls**. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

**S&P-IKB 0030075**

TAB 37

| Patrick Clerkin/SF/LON/F-I | To | Glenn Moore/SF/LON/F-I@F-I |
|---|---|---|
| 11/20/2006 09:40 AM | cc | |
| | bcc | |
| | Subject | Re: Follow-up |

Glenn

60 per cent in one asset category does seem aggressive

Would like to know how if there is any cap risk assoc with HELs. There may not be but worth checking with a HEL analyst in NY

What credit quality are they targeting?

The NY H E L analyst will be able to provide indication on pricing
But I have not heard of HELs as LEAs

It all sounds as if IKB are pushing the boundaries of what the market understands a SIV to be.

----- Original Message -----
From: Glenn Moore
Sent: 20/11/2006 14:09
To: Patrick Clerkin
Subject: Fw: Follow-up

Paddy

IKB's SIV is going to be 60% HEL.

This does not appear to be a SIV to me and would probably be more akin to a market value CDO. Would you feel comfortable rating this as a SIV and wouldn't we always apply a haircut to the LEA assets?

Thanks

Glenn

----- Forwarded by Glenn Moore/SF/LON/F-I on 20/11/06 14:01 -----

| "Pinkus, Michael" | | |
|---|---|---|
| <michael.pinkus@ikb-cam.de> | To | <Glenn.Moore@derivativefitch.com> |
| | cc | <Patrick.Clerkin@derivativefitch.com> |
| 20/11/06 13:55 | Subject | RE: Follow-up |

**EXHIBIT**

387

FITCH-RHINE 00052662

Glenn,

that's 60% of the total portfolio.

Regards,

Michael

From: Glenn.Moore@derivativefitch.com [mailto:Glenn.Moore@derivativefitch.com]
Sent: Monday, November 20, 2006 2:38 PM
To: Pinkus, Michael
Cc: Patrick.Clerkin@derivativefitch.com
Subject: RE: Follow-up

Michael

Just to clarify, is the 60% HEL

A. 60% of the total portfolio
OR
B. 60% of the total LEA

I will organise a committee to discuss your proposal and will have a definitive answer by the middle of the week.

Thanks

Glenn Moore
Associate Director
**DerivativeFitch**
Tel: +44 (0)20 7862 4167
Fax: +44 (0)20 7417 4224
glenn.moore@derivativefitch.com

ISR - Best Rating Agency - Europe (*2005, 2004, 2003, 2001, 2000, 1999* )
SFI - Best Rating Agency for Securitisation (*2005, 2004, 2003, 2001, 2000, 1999* )

"Pinkus, Michael" <michael.pinkus@lkb-cam.de>

20/11/06 13:27

T     <Glenn.Moore@derivativefitch.com>
o

c     <Patrick.Clerkin@derivativefitch.com

Highly Confidential

```
c       >
S       RE: Follow-up
u
b
je
ct
```

Glenn,

We are looking to implement 60-70% max HEL bonds without a haircut and as liquidity eligible assets. This is probably not good news for bringing you all on board the SIV. Please let me know if your guidlines will be able to stretch as far as we are looking for.

Regards,

Michael

From: Glenn.Moore@derivativefitch.com [mailto:Glenn.Moore@derivativefitch.com]
Sent: Monday, November 20, 2006 12:36 PM
To: Pinkus, Michael
Cc: Patrick.Clerkin@derivativefitch.com
Subject: Follow-up

Michael

Thank you for your time on Friday and I hope that it was useful.

In the meeting you raised the question on whether HEL could be used as eligible assets for the NCO test. Some vehicles do allow for HEL to be used but are generally constrained to AAA floating HEL and have a 5% haircut. They are also subject to a maximum of approximately 10% of the total portfolio. Note that this information represents existing SIV guidelines, however, our committee will be happy to consider new and innovative approaches.

Does this answer your question? What is your precise proposal?

I am also going to send out an email later today to arrange a follow-up meeting regarding your capital model. I am going to include Bernd Claussen and Winfried Reinke are there any other members of your team that I should include when arranging a time?

Regards

Glenn Moore

Highly Confidential

Associate Director
**DerivativeFitch**
Tel: +44 (0)20 7862 4167
Fax: +44 (0)20 7417 4224
glenn.moore@derivativefitch.com

ISR - Best Rating Agency - Europe (*2005, 2004, 2003, 2001, 2000, 1999* )
SFI - Best Rating Agency for Securitisation (*2005, 2004, 2003, 2001, 2000, 1999* )

Confidentiality Notice: The information in this e-mail and any attachment(s) is confidential and for the use of the addressee(s) only. If you have received this e-mail in error, please delete this e-mail. Unauthorized use, reliance, disclosure or copying of the contents of this e-mail, or any similar action, is prohibited.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

Confidentiality Notice: The information in this e-mail and any attachment(s) is confidential and for the use of the addressee(s) only. If you have received this e-mail in error, please delete this e-mail. Unauthorized use, reliance, disclosure or copying of the contents of this e-mail, or any similar action, is prohibited.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

FITCH-RHINE 00052665

TAB 38

**From:**      Rosa, David <David.Rosa@moodys.com>
**Sent:**      Wednesday, August 8, 2007 6:24 PM (GMT)
**To:**        Kerlogue, Paul <Paul.Kerlogue@moodys.com>; Jung, Angela <Angela.Jung@moodys.com>
**Subject:**   RE: Written Confirmation for HEL as LEA

i agree that we can't change the rules now.We will have to communicate this later and give them time to readap
It should be ok for us becasue i msure they are not loading up on these at the moment...

> -----Original Message-----
> **From:** Kerlogue, Paul
> **Sent:** Wednesday, August 08, 2007 6:26 PM
> **To:** Jung, Angela; Rosa, David
> **Subject:** RE: Written Confirmation for HEL as LEA
>
> Yes a bit stuck - can we affirm on a temporary basis?
>
>> -----Original Message-----
>> **From:** Jung, Angela
>> **Sent:** 08 August 2007 18:15
>> **To:** Rosa, David; Kerlogue, Paul
>> **Subject:** RE: Written Confirmation for HEL as LEA
>>
>> We're in a difficult position in that if we change our approach on this rather than allowing them to classify HEL as LEA, this may cause breach of liquidity tests. (especially NCO 10).If we affirm this now, it is clear that our massage to the market is that Moody's still view HELs as liquid assets while the reality is the opposite.
>>
>> Angela
>>
>>> -----Original Message-----
>>> **From:** Rosa, David
>>> **Sent:** 08 August 2007 18:09
>>> **To:** Kerlogue, Paul; Jung, Angela
>>> **Subject:** RE: Written Confirmation for HEL as LEA
>>>
>>> We have accepted it for both deals although with benefit of insight it was a mistake.
>>> d
>>>
>>>> -----Original Message-----
>>>> **From:** Kerlogue, Paul
>>>> **Sent:** Wednesday, August 08, 2007 4:56 PM
>>>> **To:** Jung, Angela; Rosa, David
>>>> **Subject:** RE: Written Confirmation for HEL as LEA
>>>>
>>>> I am a bit uncomfortable affirming this when managers tell us the market is illiquid at the moment.
>>>>
>>>> P
>>>>
>>>>> -----Original Message-----
>>>>> **From:** Jung, Angela
>>>>> **Sent:** 08 August 2007 16:46
>>>>> **To:** Kerlogue, Paul; Rosa, David
>>>>> **Subject:** RE: Written Confirmation for HEL as LEA
>>>>>
>>>>> Paul and David
>>>>>
>>>>> Do we maybe need to change our view on this?
>>>>>
>>>>> Angela
>>>>>
>>>>>> -----Original Message-----
>>>>>> **From:** Chen, Gracie (FID) [mailto:Gracie.Chen@morganstanley.com]
>>>>>> **Sent:** 08 August 2007 12:52
>>>>>> **To:** Kerlogue, Paul; Jung, Angela

**Cc:** Katugampola, Navindu (FID)
**Subject:** Written Confirmation for HEL as LEA

Dear Paul/Angela,

Hope all is well with you. Could you please send us a written confirmation of Moody's approval for 0-5 year AAA HELs as LEAs for IKB and for Cheyne. We would be very grateful if you could get back to us on this at your early convenience.

Many thanks and Best Regards,

**Gracie Chen**
Morgan Stanley | Fixed Income
20 Cabot Square | Canary Wharf | Floor 02
London, E14 4QW
Phone: +44 20 7677-7545
Mobile: +44 79172-42893
Fax: +44 20 7677-3454
Gracie.Chen@morganstanley.com

......................................................................................................................................................................

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

TAB 39

**Permanent Subcommittee on Investigations**
Document originally produced in unformatted text; reformatted
(including exclusion of metadata) for readability by the Subcommittee.
Original document retained in Subcommittee files.

**DATE:** Wed, 2 May 2007
**TIME:** 10:51:57
**AUTHOR:** Froeba, Mark
**RECEIPIENT:** Buchwald, Zach (FID); May, William;
**CC:** Hart, Briana (FID)
**SUBJECT:** RE: Upcoming CLOs / grandfathering list


Zach,

Even for deals that are grandfathered (ie, analyzed under Moody's current methodology), we will begin asking them to REPORT (i) PDRs and (ii) PEs of LGD for each credit and for the pool.  In addition, we will ask that every CDO include the "D" and "LD" ratings as a basis for default in the "Defaulted Security" definition.

Please call me if you want to discuss these points.  Thanks.

Mark

    -----Original Message-----
    **From:** Buchwald, Zach (FID) [mailto:Zach.Buchwald@morganstanley.com]
    **Sent:** Wednesday, May 02, 2007 9:00 AM
    **To:** May, William
    **Cc:** Froeba, Mark; Hart, Briana (FID)
    **Subject:** Upcoming CLOs / grandfathering list


    Bill:

    Thanks again for your help (and Mark's) in getting Morgan Stanley up-to-speed with your new methodology.  As we discussed last Friday, please find below a list of transactions with which Morgan Stanley is significantly engaged already (assets in warehouses, some liabilities placed).  We appreciate your willingness to grandfather these transactions w/r/t Moody's old methodology.  Please know that we are working hard to get these deals priced as quickly as possible, but bear in mind that market movements or slower-than-expected ramp-ups can sometimes slow down any individual deal.


    Ellington - Sound Beach CLO
    NYLIM - Flatiron 2007-1 CLO
    Allstate - AIMCO CLO 2007-A
    MJX - Venture IX CLO
    Deerfield - Deer Park CLO
    Blackstone - Essex Park CDO 2007
    MS Prop - South Shore CLO
    Halcyon - Halcyon Loan Investors Hybrid CLO
    Fore Advisors - Fore CLO I
    BlueMountain - BlueMountain CLO V
    BSIS - BSIS V
    [Gilles Marchand] - Sound View CLO
    Highland - [Pharma CLO 1]
    Apidos - Apidos CLO VII
    RiverSource - [summer CLO]
    Symphony - [summer CLO]
    Avenue Capital - Avenue CLO VII
    Mountain Capital - Moutain CLO VII

**Permanent Subcommittee on Investigations**
**EXHIBIT #76**

**PSI-MOODYS-000056**

Zach Buchwald
Executive Director
Morgan Stanley & Co.
1585 Broadway
New York, NY 10036
Telephone: 212-761-1975
Facsimile: 212-507-8275

This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see <https://secure.ms.com/servlet/cls>. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).

**PSI-MOODYS-000057**

**From:** immanager@standardandpoors.com
**Sent:** Thursday, April 05, 2007 3:56 PM
**To:** Shah, Rahul Dilip (Structured Finance - New York); Mooney, Shannon
**Subject:** IMlogic IMManager conversation export: Thursday, April 05, 2007 3:55:44 PM EDT: haha

IM Network: MSN IM

IM Users:

participant=rahul_d_shah@standardandpoors.com "Shah, Rahul Dilip (Structured Finance - New York)"
"rdsshah@hotmail.com"
participant=shannon_mooney@standardandpoors.com "Mooney, Shannon" "shannon.mooney@comcast.net"

IM Dialog:

Thursday, April 05, 2007 3:55:44 PM EDT Mooney, Shannon started conversation.
Thursday, April 05, 2007 3:55:44 PM EDT Shah, Rahul Dilip (Structured Finance - New York) has entered the conversation.
Thursday, April 05, 2007 3:55:44 PM EDT Mooney, Shannon: haha
Thursday, April 05, 2007 3:55:44 PM EDT Mooney, Shannon: IM Administrator: This IM session is being recorded and may be reviewed for compliance by McGraw-Hill through its several divisions...
Thursday, April 05, 2007 3:55:44 PM EDT Mooney, Shannon: IM Administrator: This IM session is being recorded and may be reviewed for compliance by McGraw-Hill through its several divisions...
Thursday, April 05, 2007 3:55:44 PM EDT Shah, Rahul Dilip (Structured Finance - New York): IM Administrator: This IM session is being recorded and may be reviewed for compliance by McGraw-Hill through its several divisions...
Thursday, April 05, 2007 3:55:44 PM EDT Shah, Rahul Dilip (Structured Finance - New York): IM Administrator: This IM session is being recorded and may be reviewed for compliance by McGraw-Hill through its several divisions...
Thursday, April 05, 2007 3:56:35 PM EDT Mooney, Shannon: i didn't really notice...but now that i think about it i kindof tune her out whes she talks
Thursday, April 05, 2007 3:57:39 PM EDT Shah, Rahul Dilip (Structured Finance - New York): well she just is too political...and she doesn't have anything of substance to say...but keeps thinking that she does.
Thursday, April 05, 2007 3:57:53 PM EDT Shah, Rahul Dilip (Structured Finance - New York): (I'm done venting now) :)
Thursday, April 05, 2007 3:58:15 PM EDT Mooney, Shannon: k go take a nap
Thursday, April 05, 2007 3:58:19 PM EDT Mooney, Shannon: see you later
Thursday, April 05, 2007 3:58:24 PM EDT Shah, Rahul Dilip (Structured Finance - New York): ok
Thursday, April 05, 2007 3:58:42 PM EDT Shah, Rahul Dilip (Structured Finance - New York): btw - that deal is ridiculous
Thursday, April 05, 2007 3:59:05 PM EDT Mooney, Shannon: i know right...model def does not capture half of the rish
Thursday, April 05, 2007 3:59:08 PM EDT Mooney, Shannon: risk
Thursday, April 05, 2007 3:59:09 PM EDT Shah, Rahul Dilip (Structured Finance - New York): we should not be rating it
Thursday, April 05, 2007 3:59:17 PM EDT Mooney, Shannon: we rate every deal
Thursday, April 05, 2007 3:59:30 PM EDT Mooney, Shannon: it could be structured by cows and we would rate it
Thursday, April 05, 2007 3:59:54 PM EDT Shah, Rahul Dilip (Structured Finance - New York): but there's a lot of risk associated with it - I personally don't feel comfy signing off as a committee member.

Permanent Subcommittee on Investigations
**EXHIBIT #30a**

PSI-SP-000015

**From:** Ghetti, Belinda
**Sent:** Saturday, December 16, 2006 9:33 AM
**To:** Billick, Nicole; Meyer, Chris
**Subject:** RE: Synthetic CDO^2 of ABS (both Cash and Synthetic)

Yes, drill down approach seems to be reasonable, the more I think about it. I guess we can run some numbers and see if it makes sense. Left a message for Lapo see what he says.

Chris: for your BoA deal, they seem to be passing pik stresses but only with fix cap. Variable cap fails everything up to the A-2. They may think about putting a pct limitation for pikable CDO. In any case, I think I can offer them the fix cap solution. I will then send them the language of the implied write down Jammy.

Both of you, have a good weekend.

-----Original Message-----
From:  Billick, Nicole
Sent:  Saturday, December 16, 2006 01:01 AM Eastern Standard Time
To:    Meyer, Chris; Ghetti, Belinda
Subject:     RE: Synthetic CDO^2 of ABS (both Cash and Synthetic)

glad my cdo^2 problems are amusing mr. meyers :)

I'm back to the mindset now that we should be able to drill down & pop in the ~100 abacus portfolio assets into the overall portfolio papa portfolio of ~99 names. I think drill down should work as long as you mark each abacus asset as 'cdo1' and put in the BBB attachment & detachment point. running abacus originally w/AAA vs BBB recoveries was to determine that magic attachment point, so now that that is done, I think it is ok if each of the baby abacus assets receive the liability/tiered recovery rate wrt the respective liability of the new overall CDO at hand bc at the end of the day that is what we are looking at....(did that make sense?) so I agree w/Chris that the backed out/implied recovery of the BBB baby abacus tranche would probably be zero here in the AAA liability scenario of this new portfolio/deal I'm rating....which also means in the B environment the sucker should look a bit better....

this also makes me think that the baby abacus assets should be run w/the same Pd tables as the new overlying CDO, i.e., so if abacus was run w/stressed/harsher Pds but my overall new CDO is run at normal 3.2, I think the baby abacus assets should also be run at the normal 3.2 level (same rationale as above).

i almost hate to ask bc i've been ignoring the this whole coming of the new year....but are we seriously doing away w/2.4.3 even for CMBS portfolios?  (even if CMBS group still uses it???)

to Chris's point - if the baby abacus assets are composed of synthetic CDOs - then is a bigger nightmare that i do not want to think about right now....but technically you could keep going & going. This all makes me wonder if this is truly worth it - my portfolio also references Cobalt III (almost pure synthetic, but cash modeled - hybrid) as well - to me this BBB asset is sooo lucky to get a 30% recovery in a AAA scenario!!!  do not see why it deserves a higher recovery over abacus....

ok, i'm going to sleep now (I know, finally), but the above just hit me - we'll see what I think after some solid shut eye.

-----Original Message-----
From: Meyer, Chris
Sent: Friday, December 15, 2006 8:31 PM
To: Ghetti, Belinda; Billick, Nicole
Subject: RE: Synthetic CDO^2 of ABS (both Cash and Synthetic)

So, in thinking about Nicole's CDO of CDO problem (hee, hee), it seems reasonable (to me anyways) to tier recoveries on single tranche CLNs (or single tranche swaps). Doesn't it make sense that a BBB synthetic would likely have a zero recovery in a AAA scenario - depending on tranche thickness?

When the required subordination for the BBB tranche was determined, we modeled the recoveries of the assets given a BBB scenario (indicating the severity of loss in a BBB economic environment given the position of the asset in the capital strucutre).  If we ran the recovery model with the AAA recoveries, it stands to reason that the tranche would fail...since there

Permanent Subcommittee on Investigations
**EXHIBIT #27**

PSI-SP-000045

CRDT_RTG_EXH_0000123

would be lower recoveries and presumably a higher degree of defaults.  Essentially, I'm wondering whether my initial feeling that a drill down approach on synthetics would not work is false.  BUT are there any knock-on effects if the synthetic itself had synthetics in its portfolio?  Rating agencies continue to create and even bigger monster -- the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters. :o)

-----Original Message-----
From:  Ghetti, Belinda
Sent:  Friday, December 15, 2006 07:08 PM Eastern Standard Time
To:   Meyer, Chris; Billick, Nicole
Subject:     RE: Synthetic CDO^2 of ABS (both Cash and Synthetic)

When you have time, can you send over the disclosure language for variable notes.

-----Original Message-----
From: Meyer, Chris
Sent: Friday, December 15, 2006 6:33 PM
To: Billick, Nicole; Ghetti, Belinda
Subject: RE: Synthetic CDO^2 of ABS (both Cash and Synthetic)


Ghetti...can you send her the link and instructions.  Otherwise, I'll send when I log on from DC later tonight.


-----Original Message-----
From:  Billick, Nicole
Sent:  Friday, December 15, 2006 06:08 PM Eastern Standard Time
To:   Meyer, Chris; Ghetti, Belinda
Subject:     RE: Synthetic CDO^2 of ABS (both Cash and Synthetic)

Thanks Chris.

One Q: to use the recovery calc (I've never done before...& need to run Farooq's abacus pool now...) - where do you get the beta version of Evaluator from? thx! Nicole


Nicole J. Billick
Associate Director
Structured Finance Ratings
Standard & Poor's
55 Water Street, 41st Floor
New York, NY 10041-0003
phone: 212-438-3020
fax: 212-438-6021
nicole_billick@standardandpoors.com

-----Original Message-----
From: Meyer, Chris
Sent: Friday, December 15, 2006 5:27 PM
To:   Ghetti, Belinda; Billick, Nicole
Subject:     Synthetic CDO^2 of ABS (both Cash and Synthetic)

<< File: Synthetic CDO^2 of ABS.doc >>
R. Christopher Meyer
Associate Director
Global CDO Group
Structured Finance Ratings
Standard & Poor's
55 Water Street, 41st Floor
New York, NY 10041

**PSI-SP-000046**

CRDT_RTG_EXH_0000124

**From:** Gutierrez, Michael
**Sent:** Tuesday, August 08, 2006 9:36 AM
**To:** Koch, Richard
**Subject:** RE: Loss severity vs gross/net proceeds

They've become so beholden to their top issuers for revenue they have all developed a kind of Stockholm syndrome which they mistakenly tag as Customer Value creation - this Homecomings thing is going to be messy and I need this controversy now like a hole in the head but we have to be evenhanded with all companies- I'll give you a ring today on this

> -----Original Message-----
> **From:** Koch, Richard
> **Sent:** Monday, August 07, 2006 9:21 PM
> **To:** Gutierrez, Michael
> **Subject:** RE: Loss severity vs gross/net proceeds
>
> I'm not surprised; there has been rampant appraisal and underwriting fraud in the industry for quite some time as pressure has mounted to feed the origination machine. With respect to your last sentence, our RMBS friends never questioned the news about the Homecomings (RFC) investigations of its lending practices during the call today, it was all uncomfortably cozy for my taste.
>
> **Richard W. Koch**
> **Director, Structured Finance Ratings**
> **Standard & Poor's**
> **55 Water Street (42nd Fl)**
> **New York, NY 10041-0003**
> ☎ **(212) 438-2513**
> 📠 **(212) 438-2662**
> 📧 **Richard_Koch@sandp.com**
>
> > -----Original Message-----
> > **From:** Gutierrez, Michael
> > **Sent:** Monday, August 07, 2006 4:55 PM
> > **To:** Koch, Richard
> > **Subject:** Loss severity vs gross/net proceeds
> >
> > Rich:
> >
> > I may have mentioned this already but in putting together slides for the AFN conference I noticed a disturbing pattern - for each of three companies with high gross and net proceeds recovery the loss severity was mind-boggling - between 40 and 52 % (even for one with 92% net proceeds recovery) I think this may be a story that needs to be told and it isn't about broken servicing shops. That kind of disparity points to one thing - bloated appraisals at origination (or flat out appraisal fraud) I was shocked - even with regional price depreciation there is no way the gap should be so stark between current value and total recoverability on the outstanding balance.
> >
> > I'd like to have Gregg run a report comparing loss severity to net and gross

Permanent Subcommittee on Investigations
**EXHIBIT #14**

**PSI-SP-000091**

proceeds for all our sub prime servicers to see if this is indeed a trend or just an aberration on the peers chosen for a particular slide. If it does turn out to be a pattern we need to be careful how we use this - perhaps comparing the overall portfolio loss severity at the platform level vs. that of S&P rated transactions - there could be a good commentary out of this (or a bad reflection on how the deal side treats valuations on originations)

Michael Gutierrez
Director
Standard & Poor's
Structured Finance
Servicer Evaluations
55 Water Street, 41st Floor
New York, NY 10041-0003
Tel (212) 438-2476
Fax (212) 438-2664

PSI-SP-000092

CRDT_RTG_EXH_0000089

**From:** Highland, Edward
**Sent:** Tuesday, September 05, 2006 8:21 PM
**To:** Gutierrez, Michael; Richard Koch
**Cc:** Mackey, Robert
**Subject:** RE: Nightmare Mortgages

Had the same feeling. This is deja vu 1980's without the goodwill asset.

Edward B. Highland, Jr.
Director
Standard and Poor's
55 Water Street
42nd Floor
New York, NY  10041-0003

Tel 212-438-1287
Fax 212-438-2662

Edward_Highland@sandp.com
www.stardardandpoors.com

-----Original Message-----
From: Gutierrez, Michael
Sent: Tuesday, September 05, 2006 6:53 PM
To: Highland, Edward; Richard Koch
Cc: Mackey, Robert
Subject: RE: Nightmare Mortgages

Good grief -I had no idea about how GAAP allows the lenders to book the income - I'm surprised the OCC and FDIC doesn't come downharder on these guys-  this is like another banking crisis potentially looming!!

-----Original Message-----
From: Highland, Edward
Sent: Tuesday, September 05, 2006 12:28 PM
To: Richard Koch; Gutierrez, Michael
Cc: Mackey, Robert
Subject: RE: Nightmare Mortgages

I smell class-action!

Edward B. Highland, Jr
Director
Structured Finance Ratings
Standard & Poor's
55 Water Street, 42nd Floor
New York, NY  10041-0003
Tel  212-438-1287
Fax  212-438-2662

Permanent Subcommittee on Investigations
**EXHIBIT #46b**

PSI-SP-000110

**From:** Richard Koch [rwkoch@operamail.com]
**Sent:** Saturday, September 02, 2006 4:30 PM
**To:** Mackey, Robert; Gutierrez, Michael
**Cc:** michael_Gutierrez@sandp.com
**Subject:** RE: Nightmare Mortgages

Saw a long t.v. advertisement this morning from Freedom Financial on reverse mortgages . . . their pitch man is James Garner. Must of cost some bucks . . . it was well-produced.


> ----- Original Message -----
> From: "Mackey, Robert" <robert_mackey@standardandpoors.com>
> To: "Richard Koch" <rwkoch@operamail.com>, Michael_Gutierrez@standardandpoors.com
> Subject: RE: Nightmare Mortgages
> Date: Sat, 2 Sep 2006 10:01:04 -0400
>
>
> This is frightening.  It wreaks of greed, unregulated brokers, and
> "not so prudent" lenders.  However, some borrowers are at fault as
> well.  When I first heard of this product, just two years ago, I
> thought it might work for a small niche of the housing market.
> That's where it should have remained:
>
> Option ARMs were created in 1981 and for years were marketed to
> well-heeled home buyers who wanted the option of making low
> payments most months and then paying off a big chunk all at once.
> For them, option ARMs offered flexibility.
>
> Hope our friends with large portfolios of these mortgages are
> preparing for the inevitable.
>
>
>
> -----Original Message-----
> From: Richard Koch [mailto:rwkoch@operamail.com]
> Sent: Friday, September 01, 2006 10:17 PM
> To: Michael_Gutierrez@sandp.com
> Cc: Robert_Mackey@sandp.com
> Subject: Nightmare Mortgages
>
>
> Interesting Business Week article on Option ARMs, quoting anecdotes
> involving some of our favorite servicers (It's no wonder
> Homecomings is under FTC scrutiny; could WAMU be next?).  Also
> includes a brief quote from Tom Marano.
>
>
> Nightmare Mortgages
> They promise the American Dream: A home of your own -- with
> ultra-low rates and payments anyone can afford. Now, the trap has
> sprung
>
>
> For cash-strapped homeowners, it was a pitch they couldn't refuse:
> Refinance your mortgage at a bargain rate and cut your payments in
> half. New home buyers, stretching to afford something in a
> super-heated market, didn't even need to produce documentation,
> much less a downpayment.
>
> Those who took the bait are in for a nasty surprise. While many

**Permanent Subcommittee on Investigations**
**EXHIBIT #46a**

PSI-SP-000116

> Americans have started to worry about falling home prices,
> borrowers who jumped into so-called option ARM loans have another,
> more urgent problem: payments that are about to skyrocket.
>
> Slide Show >>
> The option adjustable rate mortgage (ARM) might be the riskiest and
> most complicated home loan product ever created. With its
> temptingly low minimum payments, the option ARM brought a whole new
> group of buyers into the housing market, extending the boom longer
> than it could have otherwise lasted, especially in the hottest
> markets. Suddenly, almost anyone could afford a home -- or so they
> thought. The option ARM's low payments are only temporary. And the
> less a borrower chooses to pay now, the more is tacked onto the
> balance.
>
> The bill is coming due. Many of the option ARMs taken out in 2004
> and 2005 are resetting at much higher payment schedules -- often to
> the astonishment of people who thought the low installments were
> fixed for at least five years. And because home prices have leveled
> off, borrowers can't count on rising equity to bail them out.
> What's more, steep penalties prevent them from refinancing. The
> most diligent home buyers asked enough questions to know that
> option ARMs can be fraught with risk. But others, caught up in real
> estate mania, ignored or failed to appreciate the risk.
>
> There was plenty more going on behind the scenes they didn't know
> about, either: that their broker was paid more to sell option ARMs
> than other mortgages; that their lender is allowed to claim the
> full monthly payment as revenue on its books even when borrowers
> choose to pay much less; that the loan's interest rates and
> up-front fees might not have been set by their bank but rather by a
> hedge fund; and that they'll soon confronted with the choice of
> coughing up higher payments or coughing up their home. The option
> ARM is "like the neutron bomb," says George McCarthy, a housing
> economist at New York's Ford Foundation. "It's going to kill all
> the people but leave the houses standing."
>
> Because banks don't have to report how many option ARMs they
> underwrite, few choose to do so. But the best available estimates
> show that option ARMs have soared in popularity. They accounted for
> as little as 0.5% of all mortgages written in 2003, but that shot
> up to at least 12.3% through the first five months of this year,
> according to FirstAmerican LoanPerformance, an industry tracker.
> And while they made up at least 40% of mortgages in Salinas,
> Calif., and 26% in Naples, Fla., they're not just found in
> overheated coastal markets: Through Mar. 31 of this year, at least
> 51% of mortgages in West Virginia and 26% in Wyoming were option
> ARMs. Stock and bond analysts estimate that as many as 1.3 million
> borrowers took out as much as $389 billion in option ARMs in 2004
> and 2005. And it's not letting up. Despite the housing slump,
> option ARMs totaling $77.2 billion were written in the second
> quarter of this year, according to investment bank Keefe, Bruyette
> & Woods Inc.
>
> The First Wave
> After prolonging the boom, these exotic mortgages could worsen the
> bust. They also betray such a lack of due diligence on the part of
> lenders and borrowers that it raises questions of what other
> problems may be lurking. And most of the pain will be borne by
> ordinary people, not the lenders, brokers, or financiers who
> created the problem.

**PSI-SP-000117**

CRDT_RTG_EXH_0000180

>
> Gordon Burger is among the first wave of option ARM casualties. The
> 42-year-old police officer from a suburb of Sacramento, Calif., is
> stuck in a new mortgage that's making him poorer by the month.
> Burger, a solid earner with clean credit, has bought and sold
> several houses in the past. In February he got a flyer from a
> broker advertising an interest rate of 2.2%. It was an unbeatable
> opportunity, he thought. If he refinanced the mortgage on his
> $500,000 home into an option ARM, he could save $14,000 in interest
> payments over three years. Burger quickly pulled the trigger,
> switching out of his 5.1% fixed-rate loan. "The payment schedule
> looked like what we talked about, so I just started signing away,"
> says Burger. He didn't read the fine print.
>
> After two months Burger noticed that the minimum payment of $1,697
> was actually adding $1,000 to his balance every month. "I'm not
> making any ground on this house; it's a loss every month," he says.
> He says he was told by his lender, Minneapolis-based Homecoming
> Financial, a unit of Residential Capital, the nation's
> fifth-largest mortgage shop, that he'd have to pay more than
> $10,000 in prepayment penalties to refinance out of the loan. If
> he's unhappy, he should take it up with his broker, the bank said.
> "They know they're selling crap, and they're doing it in a way
> that's very deceiving," he says. "Unfortunately, I got sucked into
> it." In a written statement, Residential said it couldn't comment
> on Burger's loan but that "each mortgage is designed to meet the
> specific financial needs of a consumer."
>
> The loans certainly meet the needs of banks. Option ARMs offer
> several payment choices each month. Among Burger's alternatives
> were one for $2,524, about what a standard fixed-rate mortgage
> would be on the new amount, and the $1,697 he pays. Why would his
> bank make the minimum so low? Thanks to a perfectly legal
> accounting practice, no matter how little Burger pays each month,
> the bank gets to record the full amount.
>
> Option ARMs were created in 1981 and for years were marketed to
> well-heeled home buyers who wanted the option of making low
> payments most months and then paying off a big chunk all at once.
> For them, option ARMs offered flexibility.
>
> So how did these unusual loans get into the hands of so many
> ordinary folks? The sequence of events was orderly and even
> rational, at least within a flawed system. In the early years of
> the housing boom, falling interest rates made safe fixed-rate loans
> attractive to borrowers. As home prices soared, banks pushed
> adjustable-rate loans with lower initial payments. When those got
> too pricey, banks hawked loans that required only interest payments
> for the first few years. And then they flogged option ARMs -- not
> as financial-planning tools for the wealthy but as affordability
> tools for the masses. Banks tapped an army of unregulated mortgage
> brokers to do what needed to be done to keep the money flowing,
> even if it meant putting dangerous loans in the hands of people who
> couldn't handle or didn't understand the risk. And Wall Street
> greased the skids by taking on much of the new risk banks were
> creating.
>
> Now the signs of excess are crystal clear. Up to 80% of all option
> ARM borrowers make only the minimum payment each month, according
> to Fitch Ratings. The rest of the money gets added to the balance
> of the mortgage, a situation known as negative amortization. And

PSI-SP-000118

CRDT_RTG_EXH_0000181

> once balances grow to a certain amount, the loans automatically
> reset at far higher payments. Most of these borrowers aren't paying
> down their loans; they're underpaying them up.
>
> Yet the banking system has insulated itself reasonably well from
> the thousands of personal catastrophes to come. For one thing,
> banks can sell some of their option ARMs off to Wall Street, where
> they're packaged with other, better loans and re-sold in chunks to
> investors. Some $182 billion of the option ARMs written in 2004 and
> 2005 and an additional $83 billion this year have been sold,
> repackaged, rated by debt-rating agencies, and marketed to
> investors as mortgage-backed securities, says Bear, Stearns & Co.
> (BSC )Banks also sell an unknown amount of them directly to hedge
> funds and other big investors with appetites for risk.
>
> The rest of the option ARMs remain on lenders' books, where for now
> they're generating huge phantom profits for some lenders. That's
> because, according to generally accepted accounting principles, or
> GAAP, banks can count as revenue the highest amount of an option
> ARM payment -- the so-called fully amortized amount -- even when
> borrowers make only the minimum payment. In other words, banks can
> claim future revenue now, inflating earnings per share.
>
> For many industries, so-called accrual accounting, which lets
> companies book sales when they contract for them rather than when
> they receive the cash, makes sense. The revenues will eventually
> come. But accrual accounting doesn't apply well to option ARMs,
> since it's more difficult to know if unpaid interest will ever
> cross a banker's desk. "This is basically an IOU that may never get
> paid," says Robert Lacoursiere, an analyst at Banc of America
> Securities. James Grant of Grant's Interest Rate Observer recently
> wrote that negative-amortization accounting is "frankly a
> fraudulent gambit. But what it lacks in morality, it compensates
> for in ingenuity." The Financial Accounting Standards Board, which
> is responsible for keeping GAAP up to date, stands by its standard
> but told BusinessWeek in a written statement that it is "concerned
> that the disclosures associated with these types of loans [are] not
> providing enough transparency relative to their associated risks."
>
> Camouflaged Losses
> Risks or not, the accounting treatment is boosting reported profits
> sharply. At Santa Monica (Calif.)-based FirstFed Financial Corp.
> (FED ), "deferred interest" -- what an outsider might call phantom
> income -- made up 67% of second-quarter pretax profits. FirstFed
> did not respond to requests for comment. At Oakland (Calif.)-based
> Golden West Financial Corp. (GDW ), which has been selling option
> ARMs for two decades, deferred interest made up about 59.6% of the
> bank's earnings in the first half of 2006. "It's not the loan
> that's the problem," says Herbert M. Sandler, CEO of World Savings
> Bank, parent of Golden West. "The problem is with the quality of
> the underwriting."
>
> In the middle of one of the hottest U.S. markets, Coral Gables
> (Fla.)-based BankUnited Financial Corp. (BKUNA ) posted a $14.8
> million loss for the quarter ended June, 2005. Yet it reported
> record profits of $23.8 million for the quarter ended in June of
> this year -- $20.9 million of which was earned in deferred
> interest. Some 92% of its new loans were option ARMs. Humberto L.
> Lopez, chief financial officer, insists the bank underwrites
> carefully. "The option ARMs have gotten a bit of a raised eyebrow
> because we generate and book noncash earnings. But...it's our

PSI-SP-000119

CRDT_RTG_EXH_0000182

> money, and we do feel comfortable we'll get it back."
>
> Even the loans that blow up can be hidden with fancy bookkeeping.
> David Hendler of New York-based CreditSights, a bond research shop,
> predicts that banks in coming quarters will increasingly move weak
> loans into so-called held-for-sale accounts. There the loans will
> sit, sequestered from the rest of the portfolio, until they're sold
> to collection agencies or to investors. In the latter case, a
> transaction on an ailing loan registers on the books as a trading
> loss, gets mixed up with other trading activities and -- presto! --
> it vanishes from shareholders' sight. "There are a lot of ways to
> camouflage the actual experience," says Hendler.
>
> There's no way to camouflage what Harold, a former computer
> technician who asked BusinessWeek not to publish his last name, is
> about to face. He's disabled and has one source of income: the
> $1,600 per month he receives in Social Security disability
> payments. In September, 2005, Harold refinanced out of a fixed-rate
> mortgage and into an option ARM for his $150,000 home in Chicago.
> The minimum monthly payment for the first year is $899, which he
> can afford. The interest-only payment is $1,329, which he can't.
> The fully amortized payment is $1,454, which his lender, Washington
> Mutual (WM), gets to count on its books. WaMu, no fly-by-night
> operation, said it couldn't comment on Harold's case, citing
> confidentiality issues. A spokesman says the bank "accounts for its
> option ARM product in accordance with generally accepted accounting
> principles." WaMu has about $12 billion in loans negatively
> amortizing right now, up from $2.5 billion in 2005, estimates
> CreditSights' Hendler. In a written statement, WaMu said "borrowers
> who request an adjustable loan with payment options should
> understand those options and potential adjustments throughout the
> life of the loan. We make detailed disclosures to customers that
> are designed to develop a more informed consumer of mortgage
> products and ensure that our customers are comfortable with the
> loan products they select."
>
> Hard Sell
> To get the deals done, banks have turned increasingly to
> unregulated mortgage brokers, who now account for 80% of all
> mortgage originations, double what it was 10 years ago, according
> to the National Association of Mortgage Brokers. In 2004 banks
> began offering fatter sales commissions on option ARMs to encourage
> brokers to push them, says Gail McKenzie, assistant U.S. attorney
> in Atlanta, who is investigating mortgage brokers for improper
> practices.
>
> The problem, of course, is that many brokers care more about
> commissions than customers. They use aggressive sales tactics,
> harping on the minimum payment on an option ARM and neglecting to
> mention the future implications. Some even imply verbally that
> temporary teaser rates of 1% to 2% are permanent, even though the
> fine print says otherwise. It's easy to confuse borrowers with
> option ARM numbers. A recent Federal Reserve study showed that one
> in four homeowners is mystified by basic adjustable-rate loans. Add
> multiple payment options into the mix, and the mortgage game can be
> utterly baffling.
>
> Billy and Carolyn Shaw are among the growing ranks of borrowers who
> have taken out loans they say they didn't understand. The retired
> couple from the Salinas (Calif.) area needed to tap about $50,000
> in equity from their $385,000 home to cover mounting expenses.

CRDT_RTG_EXH_0000183

> Billy, 66, a retired mechanic, has diabetes. Carolyn, 61, has been
> caring for her grandchildren, 10-year-old twins, since her
> daughter's death in 2000. The Shaws have a fixed income of $3,000 a
> month that will fall by about $1,000 in November after Billy's
> disability benefits run out. Their new loan's minimum payment of
> about $1,413 is manageable so far, but the fully amortized amount
> of about $3,329 is out of the question. In a little over a year,
> they've added some $8,500 to their loan balance and now face a big
> reset if they continue to pay only the minimum. "We didn't totally
> understand what was taking place," says Carolyn. "You have to pay
> attention. We didn't, and we're really stuck here." The Shaws'
> lender, Golden West, says it routinely calls customers to ask them
> if they are happy and understand their mortgage loan.
>
> Then there's the illegal stuff. Mortgage fraud is one of the
> fastest-growing white-collar crimes in the nation, costing $1
> billion in 2005, double the year before. A slower housing market
> could foster more wrongdoing. "With a tighter market, you are going
> to find there is more incentive to manipulate," says Tim Irvin of
> Irvin Investigations & Research Services in Spring, Texas. "Brokers
> are having a harder time getting business, so they're getting
> creative."
>
> Concerns like these haven't curbed Wall Street's hunger for option
> ARMS. "At a price, you can originate or sell anything," says Thomas
> F. Marano, global head of mortgage and asset-backed securities at
> Bear Stearns. Hedge funds have been particularly active, buying
> risky loans directly from banks and cutting out the bundlers in the
> middle. Kathleen C. Engel, an associate professor of law at
> Cleveland-Marshall College of Law at Cleveland State University,
> says Wall Street and hedge fund money has helped to finance
> widespread lending abuses, particularly among the most vulnerable
> borrowers.
>
> Pros Go Unscathed
> Why are hedge funds willing to buy risky loans directly? Because
> they can demand terms that help insulate them from losses. And
> banks, knowing what the hedge funds want in advance, simply take it
> out of the hides of borrowers, many of whom qualify for lower rates
> based on their credit histories. "Even if the loan goes bad, [the
> hedge funds are] still making money hand over fist," says Engel.
>
> Eventually, some of it will go sour. But the Wall Street pros who
> buy option ARMs are in the business of managing risk, and no one
> expects widespread losses. They've taken on billons in iffy option
> ARMs, but the loans are no shakier than the billions in emerging
> market debt or derivatives they buy and sell all the time. Blowups
> are factored into the investing decision.
>
> Banks that hold lots of option ARMs on their books will surely be
> hit by loan defaults in coming years. "It's certainly reasonable to
> expect to see some excesses wrung out," says Brad A. Morrice,
> president and CEO of New Century Financial Corp. But even here the
> damage will likely be limited. Banks use insurance and other
> financial instruments to protect their portfolios, and they hold
> real assets -- homes -- as collateral. Christopher L. Cagan,
> director of research and analytics at First American Real Estate
> Solutions, a researcher and unit of title insurer First American,
> forecasts total defaults of $300 billion across all types of loans,
> not just option ARMs, over the next five years -- less than 1% of
> total homeowner equity. (In comparison, JPMorgan Chase & Co. alone

PSI-SP-000121

CRDT_RTG_EXH_0000184

> has a mortgage portfolio of $182.8 billion.) Cagan estimates that
> banks will end up losing only $100 billion of it all told.
>
> Most of the pain will be born by ordinary people. And it's already
> happening. More than a fifth of option ARM loans in 2004 and 2005
> are upside down -- meaning borrowers' homes are worth less than
> their debt. If home prices fall 10%, that number would double. "The
> number of houses for sale is tripling in some markets, so people
> are not going to get out of their debt," says the Ford Foundation's
> McCarthy. "A lot are going to walk."
>
> Jennifer and Eric Hinz of Somerset, Wis., are feeling the squeeze.
> They refinanced out of a 5.25% fixed-rate, 30-year loan in June,
> 2005, and into an option ARM with a 1% teaser rate from Indymac
> Bank. The $1,483 payment for their original mortgage dropped to as
> low as $747 with the new option ARM. They say they had no idea when
> they signed up, however, that the low payment adds $600 in deferred
> interest to their balance every month. Worse, they thought the 1%
> would last three years, but they're already paying 7.68%. "What
> reasonable human being would ever knowingly give up a 5.25%
> fixed-rate for what we're getting now?" says Eric, 36, who works in
> commercial construction. Refinancing is out because they can't
> afford the $15,000 or so in fees. "I'm paying more, and the
> interest is just going up and up and up," says Jennifer, 34, a
> stay-at-home mom. "I feel like we got totally screwed." They say
> their mortgage broker has stopped returning their phone calls.
> Indymac declined to comment on the loan's specifics.
>
> Stories like these can be found across the socioeconomic spectrum,
> says Allen J. Fishbein, director of Housing & Credit Policy for the
> Consumer Federation of America. In a May focus group, the CFA found
> that option ARM customers at all income levels said the loans were
> the only way they could afford their homes. While many recognized
> that their mortgages could increase, "they professed complete
> surprise that they could increase as much as they could," says
> Fishbein. That lack of diligence will cost them over time.
>
> Not that all option ARM holders go in blindly. While the loans are
> marketed aggressively, plenty of holders know exactly what they're
> getting into. Jon and Meghan Bachman of Portland, Ore., consider
> them wealth-building tools. "We want to own a bunch of houses,"
> says Meghan. "We're hoping for early retirement."
>
> So far they have stayed out of the fire. The couple, who are in
> their 30s, bought their first home, a 100-year-old farm house in
> Portland, Ore., in October, 2005, with a no-money-down loan for
> $200,000 from GreenPoint Mortgage, a unit of NorthFork
> Bancorporation Inc. By May, the value of the house had soared to
> $275,000. Rather than sit tight as their grandparents might have,
> the Bachmans, with an annual household income of $70,000, took out
> a home equity loan to put a $30,000 downpayment on an investment
> property in an up-and-coming neighborhood nearby. They pay a
> minimum of just $825 on their new $191,000 mortgage, and rent the
> house out for $100 more than that. Sooner or later, the payment
> will rise. Then they'll have to raise the rent to stay in the
> black. If the still-strong Portland housing market tanks, they
> could find themselves in deep trouble. It's a risk they say they're
> willing to take.
>
> Public policy has yet to catch up with the new complexities of the
> lending industry. Comptroller of the Currency John C. Dugan, the

PSI-SP-000122

CRDT_RTG_EXH_0000185

> banking industry's main regulator, wants banks to clean up their
> act. A source inside the federal Office of the Comptroller says
> Dugan intends to raise lending standards, as he did last year on
> credit cards, where super-low minimum payments made it improbable
> that cardholders would ever pay down debts. New guidelines are
> expected this fall.
>
> Fair-housing pundits suggest that mortgage lenders follow the lead
> of the securities industry and require that mortgage borrowers be
> not only eligible for a product but also suitable -- meaning the
> loan won't impose hardship. Says Consumer Federation of America's
> Fishbein: Buyers have to have a "reasonable prospect of being able
> to handle the payments, not at the initial rate, but [assuming] the
> worst-case scenario."
>
> So far, banks have shown little desire to raise their standards. In
> February, Golden West announced it would raise its minimum option
> ARM payment to 2.6% of the loan. In March, Golden West's Sandler
> wrote a nine-page letter to the Office of Thrift Supervision
> decrying the lax lending standards he was seeing. "Foolish lenders
> who eventually stumble under the weight of their missteps will
> bring down innocent borrowers with them and leave the rest of us to
> clean up the mess," he wrote. But on May 7, Golden West announced
> it was selling out to Charlotte (N.C.)-based Wachovia Corp. (WB ).
> By June it had dropped its option ARM rate back down to 1.50%.
> Sandler says the rates were changed according to the bank's
> interest rate outlook.
>
> Analyst Frederick Cannon of Keefe Bruyette & Woods says most banks
> don't apologize for their option ARM businesses. "Almost without
> exception everyone says [the option ARM] is a great loan, it's
> plenty regulated, and don't bug us," he says. In an April letter to
> regulators, Cindy Manzettie, chief credit officer for Fifth Third
> Bank in Cincinnati, said it's not the "lender's responsibility to
> help the consumer determine the appropriate payment option each
> month.... Paternalistic regulations that underestimate the
> intelligence of the American public do not work."
>
> ------------------------------------------------------
>
> The information contained in this message is intended only for the
> recipient, and may be a confidential attorney-client communication
> or may otherwise be privileged and confidential and protected from
> disclosure. If the reader of this message is not the intended
> recipient, or an employee or agent responsible for delivering this
> message to the intended recipient, please be aware that any
> dissemination or copying of this communication is strictly
> prohibited. If you have received this communication in error,
> please immediately notify us by replying to the message and
> deleting it from your computer. The McGraw-Hill Companies, Inc.
> reserves the right, subject to applicable local law, to monitor and
> review the content of any electronic message or information sent to
> or from McGraw-Hill employee e-mail addresses without informing the
> sender or recipient of the message.
> ------------------------------------------------------
>
>

PSI-SP-000123

CRDT_RTG_EXH_0000186

**From:** Gutierrez, Michael
**Sent:** Friday, October 20, 2006 9:41 AM
**To:** Koch, Richard; Mackey, Robert; Frie, Steven; Highland, Edward

Pretty grim news as we suspected - note also the "mailing in the keys and walking away"
epidemic has begun - I think things are going to get mighty ugly next year!

# More Home Loans Go Sour --- Though New Data Show Rising Delinquencies, Lenders Continue to Loosen Mortgage Standards

By Ruth Simon
1,155 words
19 October 2006
The Wall Street Journal
D1
English
(Copyright (c) 2006, Dow Jones & Company, Inc.)

MORTGAGE lenders are making it easier to get loans even as the housing market cools -- and as the number of borrowers struggling to make their payments continues to rise, new studies show.

In the latest sign that a cooling housing market and weaker credit standards are beginning to take their toll on borrowers and lenders, the number of past-due mortgages continued to rise in the three months ended Sept. 30, according to data from Equifax Inc. and Moody's Economy.com Inc.

The increase is particularly notable because bad loans normally climb when the economy weakens and job losses rise, leaving more borrowers unable to make their monthly payments. By contrast, the latest increase appears to be more closely tied to looser lending standards, borrowers tapping their equity and slowing home-price growth.

"We're seeing rises in delinquencies and loan losses that are unrelated to what's going on in the job market," says Mark Zandi, chief economist of Moody's Economy.com. "It's very unusual."

Some 2.33% of mortgages were delinquent at the end of the third quarter, the highest level since 2003, according to Equifax and Moody's Economy.com. Among the areas that saw the biggest jump in the delinquency rate since the end of last year were Stockton and Merced, Calif., and Las Vegas-Paradise, Nev. Delinquency rates were highest in McAllen-Edinburg-Mission, Texas; Brownsville-Harlingen, Texas; and Detroit-Livonia-Dearborn, Mich.

A separate report released yesterday by the federal Office of the Comptroller of the Currency found that lenders continued to ease credit standards over the past year.

To be sure, mortgage delinquencies have been at low levels in recent years, and the recent uptick only brings them closer to historical averages. The seasonally adjusted mortgage-delinquency rate reached its most-recent peak of 2.53% in the first quarter of 2002, according to Equifax and Moody's Economy.com.

The latest news comes amid increasing concerns that lenders have been loosening their standards in an

Permanent Subcommittee on Investigations
**EXHIBIT #47**

PSI-SP-000131

effort to boost loan volume as refinancings and home purchases wane. In a speech to the American Bankers Association this week, Comptroller of the Currency John Dugan noted that bank regulators have seen a "significant easing" of mortgage lending standards this year, even though banks normally tighten standards when the housing market cools. "We don't want to see the lending decisions bankers make today result in excessive foreclosures -- and reduced affordable housing credit -- tomorrow," he said.

The Comptroller's report found that competitive pressures are driving many banks to further loosen their credit standards. More than one-third of the lenders relaxed their standards for home-equity loans in the 12 months ended this March, according to bank examiners, while less than 5% tightened their standards.

Over the same period, 26% eased their mortgage-lending standards, most often by increasing the use of nontraditional mortgage products. These include loans that allow borrowers to pay interest and no principal in the early years or make a minimum payment that can lead to a rising loan balance. Yesterday, regulators released a booklet designed to help consumers understand these exotic mortgage products.

"We have reason to believe that the amount of easing we saw back in March is continuing," says Kathryn Dick, deputy comptroller for credit and market risk at the OCC. Federal bank regulators have been stepping up their scrutiny of residential mortgage lending by large banks, she says, with a particular focus on banks that lend heavily in cooling housing markets.

There are signs that some lenders are beginning to pull back. Last week, New Century Financial Corp. said it would begin tightening lending guidelines for adjustable-rate mortgages sold to "at-risk" borrowers. The company also said it would offer the option of refinancing into a low-fee 30-year or 40-year fixed-rate mortgage to certain borrowers with adjustable-rate or interest-only loans held by the company.

Agencies that counsel homeowners with mortgage problems say that many borrowers are running into problems because of the terms of their loans, not their personal circumstances. "It's mostly people with adjustables" who are having trouble paying their loans, says Pam Canada, executive director of the NeighborWorks HomeOwnership Center in Sacramento, Calif.

David M. Crosby, a Las Vegas bankruptcy attorney, says he has seen a "surge" in borrowers with mortgage problems. "Most of it is [tied to] the end of the housing boom, but I do see a good percentage of clients who got caught by a change in their mortgage rates." In addition, some clients "bought a number of speculative homes," he says. "The market turned on them, and now they are in a real financial mess."

Some homeowners are calling it quits. "A surprising number of people are walking away from their homes rather than trying to save them," says Mr. Crosby, either because the rate on their loan has jumped or because they owe more than the home is worth.

While the number of bad loans remains manageable, higher loan losses could force lenders to cut back on credit, making it more difficult for some borrowers to get a loan. A spike in foreclosures could also help push home prices downward in some markets if lenders were forced to sell significant numbers of homes at a loss.

Absent a recession and job losses, the rise in delinquencies is unlikely to have an impact on the national economy, says Doug Duncan, chief economist of the Mortgage Bankers Association. But an increase in

**PSI-SP-000132**

CRDT_RTG_EXH_0000189

bad loans could hurt some local housing markets, "especially if you see home price declines," he says.

An analysis by Moody's Economy.com found that a weak economy -- as measured by payroll growth -- was the driving factor in less than one-quarter of the metro areas with large increases in delinquencies. Instead, the rise in bad loans was more closely correlated with "mortgage equity withdrawal," a measure of how much cash homeowners have pulled out by refinancing, taking out home-equity loans or selling their homes and pocketing some of the profits, the study found.

Other factors included slowing home-price growth and a high proportion of loans given to borrowers with scuffed credit. The study was based on an analysis of credit records and included late payments on mortgages and home-equity loans and lines of credit.

---

Michael Gutierrez
Director
Standard & Poor's
Structured Finance
Servicer Evaluations
55 Water Street, 41st Floor
New York, NY 10041-0003
Tel (212) 438-2476
Fax (212) 438-2664

PSI-SP-000133

CRDT_RTG_EXH_0000190

**From:** Giudici, Andrew
**Sent:** Monday, March 05, 2007 9:31 AM
**To:** Quinn, William
**Cc:** Mason, Scott; Warner, Ernestine
**Subject:** RE: Subprime Vintage Comparison

Bill, We need to make a change to the paragraph below.

**2006 Deals May Be Worst Performing In Recent History**
The number of T~~t~~otal and serious delinquencies for the 2006 vintage ~~are~~ is consistently higher than the more recent vintages. However, ~~the serious delinquencies (90-plus-days, foreclosure, and REO)2006 deals nearly equal to the 6.0% delinquencies reported for the 2000 vintage after just 12 months of performance~~ the loans in the transactions issued in 2006 have nearly the same level of serious delinquencies after just 12 months of performance as those in the 2000 vintage, which had 6% in serious delinquencies after one year of performance. (Bill, The statement above is no longer true. I think we should take it out and combine the first sentence with the paragraph below.)

Chart 1 contains delinquency information for ~~each~~ the 2000-2006 vintage~~s~~ ~~in~~ at six- and 12-month intervals. After 12 months of seasoning, the 2006 vintage had approximately 13% in total delinquencies, with 6.65% categorized as seriously delinquent. Comparatively, after one year of performance, ~~D~~delinquencies for the 2006 vintage ~~have increased by~~were approximately 13%, 14%, 59%, 94%, 95%, and 41% higher ~~when compared with~~ than those~~e~~ for the 2000-2005 vintages, respectively. In addition, serious delinquencies in the 2006 transactions have increased ~~by~~ approximately 11%, 22%, 73%, 105%, 113%, and 43% faster than those ~~when compared with~~in the 2000-2005 vintages, respectively (see chart 2).

Please let me know if you have any questions.

Thanks,

Andrew

-----Original Message-----
**From:**  Mason, Scott
**Sent:**  Monday, March 05, 2007 7:56 AM
**To:**  Giudici, Andrew
**Subject:**  FW: Subprime Vintage Comparison

FYI

-----Original Message-----
**From:**  Quinn, William
**Sent:**  Friday, March 02, 2007 6:51 PM
**To:**  Mason, Scott
**Cc:**  Bessenoff, Arlene; Warner, Ernestine
**Subject:**  RE: Subprime Vintage Comparison

Scott -

Permanent Subcommittee on Investigations
**EXHIBIT #50**

PSI-SP-000163

CRDT_RTG_EXH_0000199

I'm sending you my edits for the 2000 vs. 2006 subprime article.
I've attached 2 versions {1 is tracked, and the other is clean, which is easier to read}

The reason for this: This is a huge topic and your research will get a ton of market exposure/coverage. Given the topic and market relevance, we, as editors, have been asked to raise the bar a little in terms of how material flows and reads. I don't believe I did anything that changed any meaning, but I did try to enhance with some clearer language and added transitions. I also tried to provide more information in your sub-heads and headlines.

We can certainly discuss, and I certainly am only trying to help. Feel free to reject anything I've done that damages/changes meaning or you don't feel is appropriate. {I've cc'd Ernestine Warner because she is working on a separate article on subprime.}

Hope this helps.

Best,

Bill Quinn
SF Editorial
Ext. 37504

<< File: Subprime vintage comparison--BQ1.doc >>  << File: Subprime vintage comparison--BQ1clean.doc >>

**From:** Bessenoff, Arlene
**Sent:** Friday, March 02, 2007 10:42 AM
**To:** Quinn, William; Mason, Scott
**Cc:** Schneider, Michael
**Subject:** FW: Subprime Vintage Comparison
**Importance:** High

I am out of the office, but did check in to see e-mails.  With this message, I am asking Bill Quinn to assign this article, if it has not already been assigned. Scott,  I am concerned that, to my knowledge, we had no advance notice of a piece this size (and priority), especially since we were all in contact with you about the LEVELS article during the week. Going forward, we need advance notice.

Once we assign, we will let you know a reasonable time for editing and publishing, keeping in mind that you would like to get this out soon.

Thank you!

PSI-SP-000164

**Arlene**

---

**From:** Mason, Scott
**Sent:** Friday, March 02, 2007 7:24 AM
**To:** Bessenoff, Arlene; Schneider, Michael
**Subject:** Subprime Vintage Comparison

Hi Arlene and Michael:

Here is another article we would like to have published ASAP.  It is a comparison of the 2006 vintage of subprime loans with prior vintages.  Please let me know what we can do to help.  Thanks.

<< File: 2000 and 2006 Subprime Vintage Comparison 3-2-07 v1.doc >>

M. Scott Mason
Director
Structured Finance Ratings, RMBS
Standard & Poor's
55 Water Street, 40th Floor
New York, NY 10041-0003

212-438-2539 ph
212-438-2661 fx
scott_mason@sandp.com

PSI-SP-000165

**From:** Bell, Ian
**Sent:** Tuesday, March 21, 2006 6:30 AM
**To:** Gillis, Tom
**Cc:** Inglis, Perry; Jordan, Pat
**Subject:** Moody's

Tom

FYI. Just sat on a panel with Frderic Drevon, my opposite number at Moody's who fielded a question on what happens to old transactions when there is a change to rating methodologie.  The official Moody's line is that there is no "grandfathering" and that old transactions are reviewed using the new criteria.  However, "the truth is that we do not have the resources to review thousands of transactions, so we focus on those that we feel are more at risk.".  Interestingly, Olivier Dufour from Fitch said they "grandfathered" as it would otherwise be "unfair".

Regards

Ian
------------------------
Sent from my BlackBerry Wireless Handheld

Permanent Subcommittee on Investigations
**EXHIBIT #71**

PSI-SP-000235

CRDT_RTG_EXH_0000288

**From:** Warner, Ernestine
**Sent:** Saturday, February 03, 2007 12:02 PM
**To:** D'Erchia, Peter
**Subject:** RE: Headcount for RMBS Surveillance?/

That right. They will be a great help but they will not start until August, right? Let's talk about anything that we might be able to do in the interim. I talked to Tommy yesterday and he thinks that the ratings are not going to hold through 2007. He asked me to begin discussing taking rating actions earlier on the poor performing deals. I have been thinking about this for much of the night. We do not have the resources to support what we are doing now. A new process, without the right support, would be overwhelming.

E

-----Original Message-----
From: D'Erchia, Peter
Sent: Saturday, February 03, 2007 11:56 AM
To: Warner, Ernestine
Subject: FW: Headcount for RMBS Surveillance?/


Peter D'Erchia.
Managing Director
Standard and Poor's          Structured Finance Surveillance.     55 Water Street, 42nd. Floor.   10040  212 - 438 -
2438

-----Original Message-----
From:  D'Erchia, Peter
Sent:  Saturday, February 03, 2007 11:55 AM Eastern Standard Time
To:    D'Erchia, Peter
Subject:    RE: Headcount for RMBS Surveillance?/

Also you should be getting 4 or 5 new Associates from the 2007 Associate class for 12 and continuing ti get them going forward. That might help

Peter D'Erchia.
Managing Director
Standard and Poor's          Structured Finance Surveillance.     55 Water Street, 42nd. Floor.   10040  212 - 438 -
2438

-----Original Message-----
From:  D'Erchia, Peter
Sent:  Saturday, February 03, 2007 11:50 AM Eastern Standard Time
To:    Warner, Ernestine
Subject:    RE: Headcount for RMBS Surveillance?/

Write a one paragraph need for the title upgrade and send it to Nancy Farrelly. I think it will be approved. Thanks. Peter

Peter D'Erchia.
Managing Director
Standard and Poor's          Structured Finance Surveillance.     55 Water Street, 42nd. Floor.   10040  212 - 438 -
2438

**Permanent Subcommittee on Investigations**
**EXHIBIT #86**

PSI-SP-000280

-----Original Message-----
From:  Warner, Ernestine
Sent:  Saturday, February 03, 2007 11:45 AM Eastern Standard Time
To:    D'Erchia, Peter
Subject:    RE: Headcount for RMBS Surveillance?/

Peter, what can we do now?  My group is under serious pressure to respond to the burgeoning poor performance of sub-prime deals.  After losing Taoheed, we are really falling behind.

We need to talk about getting more resources in general.  I am seeing evidence that I really need to add to staff to keep up with what is going on with sub prime and mortgage performance in general, NOW.  We talked about adding three people several months ago.  We need to reopen that discussion.

In addition to Taoheeds replacement and Darwin starting next week, I still need two RAs and an Associate.  And that's just a start.

Are you in VCD training next week?  Maybe we can talk at the end of one of the sessions?

Ernestine

-----Original Message-----
From: Allegretta, Angela
Sent: Friday, February 02, 2007 4:42 PM
To: D'Erchia, Peter
Cc: Warner, Ernestine
Subject: Headcount for RMBS Surveillance?/

Peter & Ernestine,

I just returned from a meeting with the Finance Team and no approval is in place for upgrade or replacement for Associate-

Headcount Open-


*    RA - Taoheed Agbabiaka

Pls let me know -

Angela C. Allegretta
Senior Staffing Consultant
Human Resources Talent Acquisition
Standard & Poor's
55 Water Street, 37th Floor
New York, NY 10041
(212) 438-2470 (Tel)
(212) 438-6753 (Fax)
angela_allegretta@standardandpoors.com


**PSI-SP-000281**

CRDT_RTG_EXH_0000327

For Career Opportunities, please visit our website at:
http://www2.standardandpoors.com/portal/site/sp/en/us/page.topic/careers/4,7,7,0,0,0,0,0,0,0,0,0,0,0,0,0,0,0.html


-----Original Message-----
From: D'Erchia, Peter
Sent: Friday, February 02, 2007 3:43 PM
To: Allegretta, Angela
Subject: RE: Interview


Thank you. Sorry for this.


Peter D'Erchia.
Managing Director
Standard and Poor's                    Structured Finance Surveillance.    55 Water Street, 42nd. Floor.   10040  212 - 438 - 2438


   -----Original Message-----
From:  Allegretta, Angela
Sent:  Friday, February 02, 2007 03:33 PM Eastern Standard Time
To:    D'Erchia, Peter; Warner, Ernestine
Subject:    RE: Interview


Peter,


I will see if he is available on Tuesday, 2/6 vs. Wednesday 2/7


Angela
Angela C. Allegretta
Senior Staffing Consultant
Human Resources Talent Acquisition
Standard & Poor's
55 Water Street, 37th Floor
New York, NY 10041
(212) 438-2470 (Tel)
(212) 438-6753 (Fax)
angela_allegretta@standardandpoors.com

For Career Opportunities, please visit our website at:
http://www2.standardandpoors.com/portal/site/sp/en/us/page.topic/careers/4,7,7,0,0,0,0,0,0,0,0,0,0,0,0,0,0,0.html



-----Original Message-----
From: D'Erchia, Peter
Sent: Friday, February 02, 2007 2:59 PM
To: Allegretta, Angela; Warner, Ernestine
Subject: Interview


**PSI-SP-000282**

Angela.  I am sorry for the late notice but I will be unable to conduct an interview with Phillip Wong on Monday at 8:30 a m.  Eric Thompson's.  Mom passed away unexpectedly and I will be attending the funeral.  Eric manages the CMBS surveillance group.  I think Phil said he could come in the morning of Tuesday or Wednesday I would be willing to do either of those days at 8:30. Sorry again for late notice but it was unavoidable.   Peter

Peter D'Erchia.
Managing Director
Standard and Poor's          Structured Finance Surveillance.     55 Water Street, 42nd. Floor.   10040  212 - 438 -
2438

PSI-SP-000283

CRDT_RTG_EXH_0000329

**From:** Barnes, Susan
**Sent:** Friday, July 22, 2005 1:50 PM
**To:** Byrnes, Bernard
**Subject:** FW: Washington Mutual

-----Original Message-----
**From:** Michael Blomquist [mailto:michael@resourcerealty.com]
**Sent:** Monday, June 27, 2005 4:12 PM
**To:** Barnes, Susan
**Subject:** Washington Mutual

Hello Susan,

I saw you today on CNBC and the reason for my email is that I am extremely afraid of the seeds of destruction the financial markets have planted. I have contacted the OTS, FDIC and others and my concerns are not addressed. I have been a mortgage broker for the past 13 years and I have never seen such a lack of attention to loan risk. I am confident our present housing bubble is not from supply and demand of housing, but from money supply. In my professional opinion the biggest perpetrator is Washington Mutual.

1) No income documentation loans.
2) Option ARMS (negative amortization). on over-leveraged collateral.
2b) Interest income on negative amortization is not taxed, but booked as revenue. Increase in loan balance shows as an increase on balance sheet and loan losses are not increased. Looks great for financials, but terrible for bank depositors.
2c) Option ARMS are funded and held from depositors. (huge risk to FDIC)
3) Option ARMS make up 90% of Bay Area loans in CA.
4) WAMUs recent bid for Providian is the purchase of another highly leveraged/securitized bank.
5) 100% financing loans.

I have seen instances where WAMU approved buyers for purchase loans; where the fully indexed interest only payments represented 100% of borrower's gross monthly income. We need to put a stop to this madness!!!

Best wishes,

Michael Blomquist
408-■■■■■

■■■ = Redacted by the Permanent Subcommittee on Investigations

**Permanent Subcommittee on Investigations**
**EXHIBIT #45**

PSI-SP-000395

TAB 40

**Structured Finance Credit Committee**
**May 31, 2007**
**Meeting Notes**

**Attendees: N. Weill, D. Scholz, N. Agarwal, R. Bunja, J. Cheng, J. Fons, M. Kanef, N. Kirnon, J. Hu, G. Levington, P. Mazataud, P. Neckles, P. Obias, B. Pfister, N. Phipps, D. Rosa, K. Sawada, B. Shih, J. Snailer, L. Washburn**

1) Finalize Research Review Guidelines (Detlef Scholz)
- The proposed revision to the research review guidelines looks to streamline the review process. For certain industry and sector methodologies, the proposed revision would replace the current requirement of SCC co-chair notification with SCC Research Delegate notification.
- Research delegates – Gareth Levington, Rudy Bunja, and (for AFG) Nicolas Weill and David Rosa (and perhaps Jian Hu) – will be highlighted on the SCC intranet page.
- **Follow-up**: The SCC approved the proposed revision to the research review guidelines.

2) Eligible Investments (Joe Snailer, Ben Shih)
- The proposal looks to establish a simple rule set eligible investments for deals with a senior class rated Aaa.
- The proposal modeled the expected loss impact and basis point reduction of eligible investments by using a lognormal distribution for the underlying assets and a binomial distribution for the eligible investments.
- The proposal limits the size of the eligible investment to the amount of the deal's credit enhancement. The proposal also sets a minimum rating threshold for eligible investment at P-1 or, if there is no short-term rating, A2. Eligible investments would also have to have a maturity (or coupon payment) within six months.
  - Variations from these guidelines (e.g. What if maturity is longer than six months? What about A3-rated investments? What if the senior rating is not Aaa?) would have to be modeled by the issuer and reviewed by a rating committee before approval.
  - Eligible investments rated Aaa would not be limited by the size rule above.
- These model-indicated proposal results were then tested against the CDO model to confirm their accuracy. The CDO-model test confirmed that the proposal was appropriate.
- The proposal may be impacted by the upcoming study on short-term default probabilities. Following the finalization of that study, the proposal will be re-tested to see if any refinements are necessary.
- SCC members suggested that Jerome Cheng be consulted on how the proposal might affect unusual situations for credit card securitizations. SCC members also noted that the final, published Special Report on the rule set include some comments on how the rule set may be applied to Mutual Fund ratings.



- SCC members also suggested that prior to publishing the new guidelines, the proposal be circulated internally to determine the rating impact. Members noted that usually affected ratings are grandfathered, rather than downgraded. If, however, the rating impact is large enough for a particular deal, the situation may require further review. SCC members from Japan noted that the proposal may result in 3 to 5 downgrades.
- SCC members noted that if the rating impact of the proposal is not large, a Request for Comment on this topic might not be necessary.
- SCC members asked whether downgraded investments that no longer met the rule set would have to be replaced. (Currently there is a 30-day replacement rule for certain downgraded ratings on transactions such as swaps.)
  - o SCC members responded that since the eligible investments only have six-month maturities, Moody's would generally be comfortable without a replacement requirement for downgraded eligible investments.
- **Follow-up**: The SCC approved the proposed rule set for Eligible Investments. The next step is further internal review of the rating impact. Assuming little rating impact, the proposal will be published as a Special Report. The Special Report should include comments on how the rule set would be applied to Mutual Funds. The Special Report should also list a few bullet points on how Moody's would handle exceptions to the rule set (i.e. longer maturities, lower senior ratings, replacement for investments with longer maturities, etc.). Jerome Cheng should also be consulted on how the proposal would be applied to unusual situations for credit card securitization.

3) Non-published Ratings (Richard Michalek)
- Even though they may be considered IIRs (Investor Initiated Ratings), unpublished ratings and credit estimates on underlying assets for a CDO or monocline insurer may be permitted in cases where, for example, a CDO manager or monoline requires the rating so that they themselves may issue collateralized debt or, for monolines, unsecured debt that will ultimately receive a public rating from Moody's.
- Unpublished ratings and credit estimates are still prohibited if the tranche that is publicly rated by Moody's is simply a pass-through of the underlying asset.
- Corporate Finance (CFG) is currently discussing an expansion of its practices for credit estimates. The SCC should determine whether a similar expansion would be appropriate for SFG.
- Rating letters that accompany unpublished ratings and credit estimates should state that the rating cannot be distributed beyond the addressee, or potential investors in the CDO.
- SFG practices on communicating these unpublished ratings to Moody's FIG monoline team are inconsistent. Sometimes the unpublished rating is given to FIG; other times it is not.
- Unpublished ratings on underling assets may become published if the underlying issuer requests a published, uninsured rating. In such cases, the unpublished rating transitions to a published ratings and existing guidelines on rating committees and monitoring should apply.

MDYS ADCB 1030418

- SCC members proposed calling all unpublished ratings credit estimates. Others noted that such a name change may require Moody's to lower the pricing for unpublished ratings, because credit estimates as seen as less precise.
    - SCC members noted that, to the extent there is no impact on pricing, unpublished ratings should be referred to as credit estimates. The rationale for the name change is that Moody's Code of Professional Conduct requires that "ratings" be published and monitored. This section of the Code stems from recent regulatory requirements.
    - Unpublished "ratings" are, by definition, not published and, in addition, are frequently monitored. (Specifically, at a monoline's or CP conduit's request, unpublished ratings on underlying assets are usually monitored.)
    - SCC members agreed that unpublished ratings should technically not be called ratings. Rather, perhaps unpublished ratings should be called "something we call a rating, but is not," since unpublished credit material cannot be called a rating.
- Some SCC members suggested that the scale for unpublished ratings/credit estimates be changed from the traditional "Aaa to C" scale to a numeric scale so that users would be quickly aware of the difference between an unpublished and published rating.
    - Others noted that changing the symbol/scale may impact pricing, as consumers might feel that a numeric scale would not give them the same level of accuracy as an unpublished rating.
- SCC members also noted that any product of a formal rating committee might also be considered a rating, whether published or unpublished.
- Another related topic: There are approximately 20 unpublished, monitored ratings that are not part of a CDO or monoline portfolio, but rather they are simply private placements. If a rating on such a deal goes down, whom does Moody's contact? Usually, the investor would be notified of a rating change. With certain private placements, however, such notification may not be possible.
    - Suggested work-arounds included notifying the trustee, where possible, or creating ghost names – names that only the investor would know – on moodys.com.
    - Other SCC members noted that the Moody's business model is geared toward public, monitored ratings. Allowing for private, monitored ratings goes against the usual model and creates problems. Perhaps it would be a better idea to convince the issuers on these private, monitored ratings to publish their ratings.

- **Follow-up:** SCC members asked: "Are we ok with providing unpublished, monitored ratings to CP conduits or warehouse facilities for bonds, or for CDO purposes?" SCC members said yes, as long as the requester owns the entire security.

  SCC members then asked whether the SCC was comfortable with the trustee or ghost name notification system for unpublished, monitored ratings that are not used for CP conduit or warehouse purposes. Members said yes. Members noted

MDYS ADCB 1030419

that, in these cases, notification could be particularly problematic if third-party ownership changed hands.

SCC members noted that further review on the topic would follow the forthcoming CFG recommendations. In addition, members asked, "Unpublished ratings bring in business, but they go against the business model. Should we continue doing this?" Members responded that yes, unpublished ratings were ok, but should be discouraged and approved by senior staff, such as a GMD, to ensure their proper use.

SCC members agreed to put together a working group to study the issue of credit estimates further.

4) Structured Finance Counterparty Instrument Ratings (David Rosa)
- Basel II may require Special Purpose Vehicles (SPVs) to obtain counterparty ratings on specific instruments, rather than a rating on the counterparty as a whole.
- Contracts between counterparties may allow for varying seniority on separate transactions. This difference in seniority may allow Moody's to provide separate, expected loss ratings on each transaction.
- The proposal is to introduce a new type of rating: Structured Finance Counterparty Instrument Ratings.
- SCC members questioned whether counterparty instrument ratings would be useful, since it is nearly impossible to predict how the differences in transaction seniority would be treated in bankruptcy. On the other hand, other members noted that it may be possible to assume that SPVs do not go bankrupt.
- SCC members noted that the proposed definition should not include any qualifications for early termination or counterparty default. That is, early termination and counterparty default should not be carve-outs from the draft definition of Structured Finance Counterparty Instrument Ratings.
- **Follow-up:** The draft definition will be presented to the Rating Symbols & Practices committee for further review.

5) Tabled items: Volatility Ratings, Linkage, Short-term transition study, Rating definition special report, Calls based on index-linked spread changes
- Postponed for a later date

MDYS ADCB 1030420

TAB 41

**From:** Wong, Elwyn
**Sent:** Wednesday, November 23, 2005 10:34 AM
**To:** Ghetti, Belinda; Kambeseles, Peter
**Subject:** FW: Disclaimer - Help

Only gets better

-----Original Message-----
From: Bryan, Andrea
Sent: Wednesday, November 23, 2005 10:27 AM
To: Wong, Elwyn
Subject: Re: Disclaimer - Help


Yes. What happens when they hear that cash deals won't be using e3.
-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Wong, Elwyn <Elwyn_Wong@standardandpoors.com>
To: Bryan, Andrea <andrea_bryan@standardandpoors.com>
Sent: Wed Nov 23 10:21:32 2005
Subject: RE: Disclaimer - Help

Lord help our fucking scam ... this has to be the stupidest place I have worked at. Marc Steinberg is sending us a cash CDo of
ABS portfolio to check as we speak

Your conference call on E3?

-----Original Message-----
From: Bryan, Andrea
Sent: Wednesday, November 23, 2005 10:14 AM
To: Wong, Elwyn
Subject: Re: Disclaimer - Help


No and I'm sure that we will not provide them any signoff.
-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Wong, Elwyn <Elwyn_Wong@standardandpoors.com>
To: Bryan, Andrea <andrea_bryan@standardandpoors.com>
Sent: Wed Nov 23 10:09:28 2005
Subject: FW: Disclaimer - Help

I guess we have not heard boo from J Ro

-----Original Message-----



Permanent Subcommittee on Investigations
EXHIBIT #64

PSI-SP-000192

CRDT_RTG_EXH_0000271

From: Neer, Brian (FID) [mailto:Brian.Neer@morganstanley.com]
Sent: Wednesday, November 23, 2005 9:42 AM
To: elwyn_wong@sandp.com
Subject: Disclaimer - Help


Elwyn,


We are in a bit of a pickle here. My legal staff is not letting me send anything out to any investor on anything with an S&P rating right now. We are waiting for you to tell us you that you approve the disclaimer or are grandfathering our existing and pipeline deals. My business is on "pause" right now.


Help!


Thanks,


Brian


This is not an offer (or solicitation of an offer) to buy/sell the securities/instruments mentioned or an official confirmation. Morgan Stanley may deal as principal in or own or act as market maker for securities/instruments mentioned or may advise the issuers. This is not research and is not from MS Research but it may refer to a research analyst/research report. Unless indicated, these views are the author's and may differ from those of Morgan Stanley research or others in the Firm. We do not represent this is accurate or complete and we may not update this. Past performance is not indicative of future returns. For additional information, research reports and important disclosures, contact me or see https://secure.ms.com/servlet/cls. You should not use e-mail to request, authorize or effect the purchase or sale of any security or instrument, to send transfer instructions, or to effect any other transactions. We cannot guarantee that any such requests received via e-mail will be processed in a timely manner. This communication is solely for the addressee(s) and may contain confidential information. We do not waive confidentiality by mistransmission. Contact me if you do not wish to receive these communications. In the UK, this communication is directed in the UK to those persons who are market counterparties or intermediate customers (as defined in the UK Financial Services Authority's rules).


PSI-SP-000193

TAB 42

**EXHIBIT**
297
3. 4. 11.   AW

| | |
|---|---|
| From: | Anderberg, Stephen |
| Sent: | Wednesday, June 08, 2005 8:28 PM |
| To: | Bryan, Andrea |
| Cc: | Kobylinski, Jimmy; Drexler, Michael |
| Subject: | FW: E3: Surveillance approach for synthetics |

Attachments:   E3 Options.doc

Hi Andrea,

Can we talk about this Thursday?

If this is the way the org wants to go then we'll be on board, but to me London's proposed approach seems to me to combine the worst of both worlds: it manages to be both an operational nightmare *and* analytically muddled at the same time.   If we want to pursue a client-friendly strategy (I have no problem with this) then I think we should simply grandfather the existing deals.

Thanks!   Jimmy, can you add Andrea and Michael to your 1pm meeting?

Steve

-----Original Message-----
| | |
|---|---|
| From: | Collingridge, Simon |
| Sent: | Monday, June 06, 2005 9:49 AM |
| To: | Jordan, Pat; Gillis, Tom; Bryan, Andrea; Anderberg, Stephen |
| Cc: | Coyne, Patrick; D'Erchia, Peter; Inglis, Perry; Gilkes, Kai; Smith, Belinda |
| Subject: | E3: Surveillance approach for synthetics |

Dear All,

Attached is a summary of the options as we see them for the application of E3 to surveillance of existing **synthetic** transactions. While we assume a need for broad consistency, I understand that Steve is taking the lead in proposing the approach for *cash transactions.*

Party to the discussion here have been surveillance & new ratings in Europe and Stephen McCabe representing Melbourne.

In summary:
- We favour option 2
- We need urgently to do complete deal by deal comparison (current model/approach versus E3) to identify extent of potential ratings mismatch problems. This will be starting this week with initial priority given to $CDO^2$ as they are seen as most likely to experience wide discrepancy of result.
- Kai has put forward a proposal that a 'tolerance factor' is applied but we are not proposing that this be pursued.

As regards timing, I understand we are aiming for a formal market launch on 11 July. By that time, from a surveillance standpoint, we will need to have agreed on our approach, tested and be comfortable with the implications internally, tested and be comfortable with the response externally, have the operations in place to support the approach and be ready with a clear to communicate it externally.



PLAINTIFF'S
EXHIBIT NO. 157
FOR IDENTIFICATION
DATE: 10|21|11   RPTR:   TA

**CONFIDENTIAL**

**S&P-ADCB 0703695**

To that end, please could you let us have either your agreement to the proposed approach or comments, concerns alternatives etc **by the end of this week**. Please also advise if there is anyone else not copied here who should be or if there is any other information you need.

We will keep you updated as the exercise to compare detailed results of the current v E3 progresses.
Thanks

Simon

Simon Collingridge

E3 Options.doc (25 KB)

Head of Struct          red Finance Surveillance Europe

Phone: +44-20-7176-3841
Fax:      +44-20-7176-3667
simon_collingridge@standardandpoors.com

Standard & Poor's Structured Finance -- Vigilance. Transparency. Insight.
For further information please e-mail StructuredFinanceEurope@standardandpoors.com.

Standard and Poor's
20 Canada Square
Canary Wharf
London   E14 5LH

http://www.standardandpoors.com
http://www.ratingsdirect.com

CONFIDENTIAL

S&P-ADCB 0703696

**Policy for surveillance on introduction of Evaluator 'E3'**

With the introduction of E3, it is important that we have a clear and consistent approach to its application for the surveillance of existing deals ( i.e. those rated with prior versions of the model).
This requirement is particularly important for synthetic CDOs where surveillance, being fully based upon SROC, an output of the Evaluator, is so transparent externally.

For synthetic CDOs, there are two broad options – move all surveillance to E3 or grandfather all existing deals and continue to surveille on initial models:

**Option 1**

Move all aspects of surveillance of all deals, including publication of SROC, to E3

> Pros
>> Operationally easier to maintain
>> Consistency and transparency of ratings & publication
> Cons
>> Potentially less customer-friendly (if leads to downgrades)
>> Workload to set up existing deals on new platform
>> Accelerator changes required*
>> Accelerator stability*

**Option 2**

Consult Arrangers - Show them results (SROC etc) of E3 versus current model for all their deals.

> Arranger chooses to switch to E3 or stay with existing model either
>> a)  On all deals basis (preferred by us) or,
>> b)  Deal by deal

Bank which chooses to stay with old model has option at any time in future to switch to E3 but no going back

**Publishing**
> Option A – Publish on E3 (= All deals published consistently enabling cross deal comparison so potentially publishing some at SROC< 100 if surveilled on 'old' basis.)
> Option B – Publish on surveillance model = Published SROC reflects rating, but inconsistent and reduced cross deal comparison.)

> Pros
>> More  customer friendly (Less so if bank by bank as opposed to deal by deal.)

> Cons
>> Operationally more cumbersome
>> Accelerator changes required*
>> Set-up workload*

S&P-ADCB 0703697

Accelerator stability*

*Set-up work and Accelerator stability are potential issues under either option but may vary in scale. Accelerator changes (ability to identify upgrade levels and batch forward run) are required under both options.

### Recommendation

**Option 2.** Preferably on a bank by bank rather than deal basis (with aim being to 'convince' Arrangers of benefits of switching to E3). Publication Option A ( i.e. published SROC to be from E3.)

### Next steps

Surveillance to be given access to beta version of E3 accelerator. Priti's team to run the 'old' v E3 comparisons on an Arranger by Arranger basis, initially for internal comparison.

CONFIDENTIAL

TAB 43

From: Inglis, Perry
Sent: Wednesday, December 21, 2005 9:06 AM
To: Van Acoleyen, Katrien
Subject: RE: Grandfathering Policy

it is where we are unfortunately!  I don't think we can be clearer than that now

-----Original Message-----
From: Van Acoleyen, Katrien
Sent: 21 December 2005 13:45
To: Inglis, Perry
Subject: FW: Grandfathering Policy


FYI - i have many similar e-mails... there seems to be lots of confusion

-----Original Message-----
From: Laurence Knight [mailto:laurence.knight@db.com]
Sent: Wednesday, December 21, 2005 1:09 PM
To: Van Acoleyen, Katrien
Cc: Morhain, Cecile; Daniel Morley; Praveen Bhandari; Shrikant
Padmanabhan
Subject: RE: Grandfathering Policy


Katrien,

Please can you clarify a few points:

 - Does your proposed change in methodology for E2.4.3 mean that the
Ashmore transaction may be downgraded even if according to E2.4.3 this is
not warranted? Under what circumstances might such a downgrade occur (e.g.
due to a substitution in the portfolio /  a rating action on a credit in
the portfolio / automatically at the next S&P review)?

 - Does your proposed change in methodology for E2.4.3 mean that the
Ashmore transaction may not be upgraded even if according to E2.4.3 this
is warranted?

 - Does this mean that the Sydbank transaction will definitely not be
affected in any way (as it was not rated using E2.4.3)?

Kind Regards

Laurence Knight
Emerging Markets, Structured Products
+44 20 7545 8029



"Van Acoleyen, Katrien" <Katrien_VanAcoleyen@standardandpoors.com>
21/12/2005 12:34

To
Laurence Knight/DMGGM/DMG UK/DeuBa@DBEMEA
cc
Praveen Bhandari/DMGGM/DMG UK/DeuBa@DBEMEA, Shrikant Padmanabhan/DMGGM/DMG
UK/DeuBa@DBEMEA, Daniel Morley/DMGGM/DMG UK/DeuBa@DBEMEA, "Van Acoleyen,
Katrien" <Katrien_VanAcoleyen@standardandpoors.com>, "Morhain, Cecile"
<cecile_morhain@standardandpoors.com>
Subject
RE: Grandfathering Policy

**CONFIDENTIAL**                                                    **S&P-IKB 0775675**

Laurence,

Please find a clarification of our surveillance policy

1. All transactions that are rated on E2.4.3 will continue to be
surveilled on E2.4.3.

2. Any transaction failing on E2.4.3 will be analysed on E3 low as well.
This information will be used in committee and may result in a rating
action that is different from E2.4.3. alone (e.g. more notches).  The
transaction will continue to be surveilled on E2.4.3.

3. Any transaction on E2.4.3 that is a candidate for an upgrade will be
analysed on E3 Base as well.  This information will be used in committee
and may result in a rating action that is different from E2.4.3. alone
(e.g. fewer notches).  The transaction will continue to be surveilled on
E2.4.3.

4. If an arranger would like to move to the E3 model it will be surveilled
on E3.  No high/low applies.  This is a one-way move and they cannot go
back to E2.4.3.

5. All transactions rated on E3 will be surveilled on E3 Base and no
high/low analysis will apply.


Best regards

Katrien


-----Original Message-----
From: Laurence Knight [mailto:laurence.knight@db.com]
Sent: Wednesday, December 21, 2005 12:26 PM
To: Morhain, Cecile; Van Acoleyen, Katrien
Cc: Praveen Bhandari; Shrikant Padmanabhan; Daniel Morley
Subject: Grandfathering Policy


Cecile / Katrien,

We had an enquiry from a client regarding how the new S&P CDO Evaluator
3.0 will affect one of our existing synthetic EM CDOs - the client was
under the impression that it may be applied retrospectively to some
existing transactions.

Therefore, please can you reconfirm the grandfathering policy we agreed
for the Sydbank and Ashmore CDO transactions - i.e. that the CDO Evaluator

used at the time that each transaction was closed would continue to apply
throughout the life of the transaction. I believe the relevant S&P models
are:

Sydbank (Eirles II - XS0194412028, etc):          2.2
Ashmore (Atlas II - XS0221798027, etc):      2.4.3

Kind Regards

CONFIDENTIAL                                                          S&P-IKB 0775676

Laurence Knight
Emerging Markets, Structured Products
+44 20 7545 8029

---

This e-mail may contain confidential and/or privileged information. If you

are not the intended recipient (or have received this e-mail in error)
please notify the sender immediately and destroy this e-mail. Any
unauthorized copying, disclosure or distribution of the material in this
e-mail is strictly forbidden.

---

This e-mail may contain confidential and/or privileged information. If you
are not the intended recipient (or have received this e-mail in error)
please notify the sender immediately and destroy this e-mail. Any
unauthorized copying, disclosure or distribution of the material in this
e-mail is strictly forbidden.